# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ZACHARY TERRELL,<br>　　　　　Plaintiff, | *　NUMBER:<br>*<br>* |
| v. | *　SECTION:<br>* |
| TROOPER TROY PICHON, TROOPER<br>JEFFREY ROACH, LIEUTENANT<br>DERRELL WILLIAMS, and CAPTAIN<br>DARRIN NAQUIN, each in their<br>individual capacities.<br>　　　　　Defendants. | *　JUDGE:<br>*<br>*　MAGISTRATE<br>*<br>*<br>*<br>*<br>* |

# COMPLAINT

The Louisiana State Police ("LSP") has contracted with the City of New Orleans for the stated purpose of protecting the safety of residents and visitors in the French Quarter by enforcement of the law. For Plaintiff ZACHARY TERRELL, however, the law was violated in the course of its enforcement when Defendant Trooper TROY PICHON, believing he had witnessed a hand-to-hand transaction which was potentially illegal, assaulted TERRELL with a Taser, knocking him off of his bicycle, kicking TERRELL as he lay on the ground, and then dragging TERRELL across the asphalt in handcuffs, all while Defendant Trooper JEFFREY ROACH watched and did nothing to intervene. This was not PICHON's first use of excessive force in making an investigatory stop or arrest. Defendants Lieutenant DERRELL WILLIAMS, LSP Training Academy Director, and Captain DARRIN NAQUIN, PICHON's troop commander, have failed in their duty to train, discipline, and/or supervise PICHON's unconstitutional uses of excessive force.

In support of these claims, Plaintiff states as follows:

1

# I.     JURISDICTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 and § 1988, alleging violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

2.      Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. § 1367.

# II.    PARTIES

### A.     Plaintiff

3.      ZACHARY TERRELL is a person of the full age of majority and a citizen of the State of Louisiana and is currently domiciled in Bossier Parish, Louisiana.

### B.     Defendants

4.      Lieutenant DERRELL WILLIAMS is a person of the full age of majority and a resident of East Baton Rouge Parish, Louisiana. WILLIAMS is sued in his individual capacity.

5.      At all times described herein, WILLIAMS was a ranking officer with the LSP and Training Academy Director, and as such, was responsible for the supervision, administration, policies, practices, customs, operations, training, selection, and assignment of troopers and officers of the Louisiana State Police. As Training Academy Director, he was responsible for training LSP cadets as well as for providing continuing training for LSP troopers. WILLIAMS also served as Major and head of the Internal Affairs division

of LSP, and as such, was responsible for investigating the background of LSP applicants and investigating complaints of misconduct by employees of the LSP.

6.     At all pertinent times, WILLIAMS was and is a final policymaker with respect to the supervision, administration, policies, practices, customs, operations, training, selection, and assignment of troopers and officers of the Louisiana State Police. At all pertinent times, WILLIAMS was acting under color of state law and in the course and scope of his employment. WILLIAMS is liable both directly and, as to claims based on Louisiana state law, vicariously, for the actions complained of herein.

7.     Captain DARRIN NAQUIN is a person of the full age of majority and a resident of Orleans Parish, Louisiana. NAQUIN is sued in his individual capacity.

8.     At all times described herein, NAQUIN was the Commander for LSP New Orleans Criminal Enforcement Detail ("NOCED"), also known as Troop N, and as such, was responsible for the supervision, administration, policies, practices, customs, operations, training, selection, and assignment of troopers and officers relevant to NOCED or Troop N.

9.     At all pertinent times, NAQUIN was and is a final policymaker with respect to the supervision, administration, policies, practices, customs, operations, training, selection, and assignment of troopers and officers relevant to NOCED or Troop N. At all pertinent times, NAQUIN was acting under color of state law and in the course and scope of his employment. NAQUIN is liable both directly and, as to claims based on Louisiana state law, vicariously, for the actions complained of herein.

10.     Trooper TROY PICHON is a person of the full age of majority and a resident of Orleans Parish, Louisiana. PICHON is sued in his individual capacity.

11.     At all times described herein, PICHON was employed as a law enforcement officer of the LSP and was working in New Orleans as a member of NOCED or Troop N. At all pertinent times, he was acting under color of state law and in the course and scope of his employment. PICHON is directly liable for the actions complained of herein.

12.     Trooper JEFFREY ROACH is a person of the full age of majority and a resident of Orleans Parish, Louisiana. ROACH is sued in his individual capacity.

13.     At all times described herein, ROACH was employed as a law enforcement officer of the LSP and was working in New Orleans as a member of NOCED or Troop N. At all pertinent times, he was acting under color of state law and in the course and scope of his employment. ROACH is directly liable for the actions complained of herein.

## III.     FACTUAL ALLEGATIONS

### A.  The Events of June 17, 2017

14.     On the evening of Saturday, June 17, 2017, ZACHARY TERRELL had finished his shift at Tujague's restaurant. He had met up with a friend and the two were standing outside his friend's mother's house in the French Quarter, on St. Peter Street between Burgundy and Dauphine. TERRELL and his friend were making plans for the evening, which included TERRELL borrowing a bicycle from his friend briefly to stop by his brother's house in the nearby Sixth Ward and his friend going to buy drinks for the two to drink together at the house when TERRELL returned.

15.     With this plan in place, TERRELL put earphones in his ears and started to ride the bicycle up St. Peter towards Burgundy. TERRELL's earphones were shiny, royal blue earbuds.  The earphones were plugged into the earphone jack of TERRELL's phone, which he was holding in his right hand as he rode his bicycle.

16.     On the evening of June 17, 2017, PICHON and ROACH were on duty as Louisiana State Police troopers assigned to patrol the French Quarter. PICHON and ROACH were patrolling together in a marked LSP vehicle.

17.     As TERRELL and his friend were making their evening plans, PICHON and ROACH saw the two men speaking together on the sidewalk with their bicycles.

18.     PICHON and ROACH did not see two friends making plans. Rather, they reported seeing TERRELL, a Black man, and an "unknown white/male" appearing to be "really nervous."

19.     Observing the interaction between TERRELL and his friend, PICHON believed he was witnessing a hand-to-hand narcotics transaction.

20.     PICHON and ROACH circled the block in their vehicle and approached the two individuals. Because of the one-way streets in the French Quarter, this required PICHON and ROACH to loop around at least two blocks of French Quarter traffic at 11:00 p.m. on a Saturday evening before coming back to the place where TERRELL and his friend had been standing.

21.     Despite the amount of time it took for PICHON and ROACH to return to the site of the suspected drug transaction, TERRELL and his friend were still talking on the street at the exact same location. But PICHON and ROACH did not consider this fact in determining an approach strategy and appropriate level of force to use in an investigative stop of TERRELL and his friend.

22.     PICHON's report of TERRELL's arrest states that, as PICHON and ROACH approached in their vehicle the second time, TERRELL began to ride the bicycle

up the street. As PICHON and ROACH exited their vehicle to conduct a pedestrian stop, the unknown white male stood with his hands up.

23.     According to PICHON's report, PICHON gave an order to stop.

24.     TERRELL, on his bicycle with his earphones on in the French Quarter on a Saturday night, did not hear any order to stop.

25.     Neither PICHON nor ROACH questioned the unknown white male who, according to their suspicion, had engaged in a drug transaction with TERRELL.

26.     Neither PICHON nor ROACH identified the unknown white male.

27.     Neither PICHON nor ROACH made any effort to determine if the unknown white male was in possession of any illicit substance or possessed any evidence of the suspected drug transaction.

28.     Instead, PICHON gave chase to TERRELL.

29.     At the intersection of Burgundy and St. Peter Streets, PICHON Tased TERRELL in his lower back and incapacitated him.

30.     After TERRELL was incapacitated by PICHON's deployment of the Taser, TERRELL fell off the bicycle onto the asphalt.

31.     TERRELL did not have any weapon on his person.

32.     TERRELL did not reach for anything on his person and did not turn back towards or threaten PICHON in any fashion prior to PICHON's use of the Taser on him.

33.     TERRELL posed no danger to PICHON, to ROACH, to others in the area, or to himself.

34.     PICHON Tased TERRELL while the latter was on his bicycle in traffic on an open street. It was reasonably foreseeable that using the Taser on TERRELL while he

was riding the bicycle would result in serious injury to TERRELL. The Tasing by PICHON caused and/or contributed to TERRELL's fall from the bicycle and did, in fact, result in serious injury to TERRELL. Particularly considering these circumstances, PICHON's deployment of his Taser was a level of force grossly disproportionate to any risk TERRELL posed or may have posed.

35.    After he was taken off the bicycle, TERRELL was incapacitated and lying on the ground. Despite this lack of resistance, PICHON kicked TERRELL in the head and stomped TERRELL in the face. PICHON kneed TERRELL in the back while the latter was on the ground. After TERRELL was handcuffed, PICHON dragged TERRELL across the asphalt to the sidewalk of Burgundy Street.

36.    ROACH observed PICHON's actions, and also observed both that TERRELL was not resisting PICHON and that TERRELL posed no threat to PICHON. ROACH had a clear opportunity to intervene to stop one or more of the following: PICHON's use of the Taser; PICHON's kick to TERRELL's head; PICHON's stomping on TERRELL's face; PICHON's kneeing of TERRELL in the back; and PICHON's dragging of TERRELL across the asphalt to the sidewalk.

37.    ROACH failed to intervene to stop PICHON from engaging in any of these acts of excessive use of force against TERRELL.

38.    TERRELL received extensive injuries from PICHON's kicks and stomps in the head and face, including seven stitches around his right eyebrow, facial swelling and bruising, abrasions to his nose and upper lip, and a wound to the crown of his head. TERRELL also had wounds on both his wrists, as well as to his elbow and knee.

TERRELL's injuries were so significant that he required transport from the scene to University Medical Center (UMC) via ambulance.

39.     The spread and location of these wounds indicate that TERRELL could not and did not sustain these wounds only from falling from the bicycle, but some were a direct result of PICHON's kicks and stomps to TERRELL's head and face after he had been incapacitated.

40.     Four days after this incident, these areas on TERRELL's head and face displayed "honey crust" impetigo, an indication of painful infection which required treatment with antibiotics.

41.     After this experience, TERRELL experienced anxiety, sleeplessness, nightmares, intrusive negative thoughts, and an increased distrust of law enforcement and custody staff all related to the physical assault by Louisiana State Police troopers. TERRELL has received treatment for post-traumatic stress and anxiety.

42.     An LSP use of force report dated June 18, 2017 was completed as to PICHON's use of force on TERRELL. NAQUIN and WILLIAMS reviewed and signed the use of force report on July 5, 2017.

**B.      Trooper Pichon Had a Known History of Excessive Uses of Force.**

43.     PICHON's multiple uses of excessive force against TERRELL is consistent with PICHON's pattern and practice in the course of stops and arrests while patrolling. Since November 2015, PICHON has submitted at least five use of force reports, each of which raise questions regarding the appropriateness of the level of force.

44.     PICHON's use of force reports reflect a distinct pattern:

a. On November 21, 2015, PICHON deployed his Taser on a person's hand and abdomen after the person pulled away and took "a defensive stance" during handcuffing. According to his report, the individual attempted to strike PICHON's Taser from his hand; however PICHON reported that he was approximately five feet from the individual when he deployed the Taser. Critical sections of the report are vague or blank. The reason for contact is noted as "other" and the reason for use of force is noted only as "To Defend Self, To Effect an Arrest." Section Commander Donovan Archote and Training Academy Director DARRELL WILLIAMS signed off on this report of use of force.

b. On June 3, 2016, PICHON used "take down" techniques and an "arm lock" on a person to handcuff him on the 800 block of Iberville Street. The person "complained that his face was hurting and somehow was struck during the struggle." The individual was taken to Children's Hospital for treatment. Section Commander DARRIN NAQUIN and Training Academy Director DARRELL WILLIAMS both signed off on this report of use of force.

c. A few days later, on June 21, 2016, PICHON was conducting a pat down search on a "suspicious" individual, without indicating any basis for the suspicion. PICHON arrested the individual after he allegedly spit in PICHON's face. PICHON used joint and shoulder locks as well as a **neck** hold to escort the individual after cuffing. Section Commander

DARRIN NAQUIN and Training Academy Director DARRELL WILLIAMS both signed off on this report of use of force.

d. On July 28, 2016, PICHON Tased a person on the 1100 block of Canal Street after PICHON alleged the individual was given commands to stop and surrender and then "took a fighting stance as [PICHON] caught up to him." PICHON noted his distance from the subject was five feet. In the narrative explanation of the incident, PICHON did not mention the fighting stance, but wrote "Probes struck the subject in the right shoulder and right arm as he braced for the contact by the probes." The individual was transported to University Medical Center for treatment. Section Commander DARRIN NAQUIN and Training Academy Director DARRELL WILLIAMS both signed off on this report of use of force.

e. Only a little over a month before the events that form the basis of this Complaint, on May 6, 2017, PICHON wrote a use of force report after he used his Taser on a person on the 200 block of Bourbon Street around 8 p.m.. striking the individual in the back. PICHON explained the force by stating the person pulled away and fled on foot while he was "trying to conduct an investigation into narcotics investigation." PICHON also suggested that the Taser was used from 15 feet away after the person was "pulling at his front waistband and refused to show his hands." The report does not state that any weapon was recovered, suggesting there was no weapon. The individual was transported to University Medical

Center by EMS. Section Commander DARRIN NAQUIN and Training Academy Director DERRELL WILLIAMS both signed off on this report.

45.     PICHON's use of force reports repeat boiler plate language justifying his uses of force. This repeated, rote language should have raised concerns with NAQUIN and WILLIAMS and triggered investigations into each use of force.

46.     The sheer number of PICHON's use of force reports, particularly as compared to other Troopers similarly deployed, should also have triggered an investigation by NAQUIN and/or WILLIAMS. Additionally, the number of use of force reports documenting PICHON's use of a Taser, and resulting in injuries and hospital routes, should have triggered an investigation by NAQUIN and/or WILLIAMS.

47.     NAQUIN and WILLIAMS were both aware of the content and number of use of force reports by PICHON. As section commander, NAQUIN was responsible for reviewing use of force reports and ensuring that PICHON received retraining and discipline if necessary to prevent future uses of force. NAQUIN's repeated failure to retrain or discipline PICHON allowed PICHON to continue using excessive and unlawful force on individuals, including ZACHARY TERRELL.

48.     WILLIAMS signed off on each of the reports as the Training Academy Director. In that capacity, WILLIAMS was responsible for reviewing use of force reports to ensure that PICHON was only engaging in necessary levels of force consistent with LSP policies and training. On information and belief, WILLIAMS had authority to require PICHON to undergo further training on LSP's policies on the use of force during an arrest or stop.

49.     WILLIAMS also served as Major and head of Internal Affairs for the LSP. As such, he was responsible for investigating any complaints as to misconduct by LSP employees and prescribing discipline as necessary. In that capacity, WILLIAMS was responsible for investigating misconduct by PICHON and ROACH and ensuring that future violations of department policies, rules of ethics, and the law did not occur. WILLIAMS was transferred from his position over Internal Affairs pending an investigation into his conduct, and was subsequently demoted from the rank of Captain to Lieutenant.

50.     PICHON's reports raise multiple questions regarding his frequent Taser deployment and uses for force, but PICHON did not receive additional training even after WILLIAMS reviewed and signed off on PICHON's use of force reports. MAJOR WILLIAMS' repeated failure to retrain Trooper PICHON allowed Trooper PICHON to continue using excessive and unlawful force on individuals, including ZACHARY TERRELL.

## C. NOPD's Ability to Enforce the Law Through Constitutional Policing as Demonstrated by the NOPD Consent Decree Stands in Stark Contrast With These Defendants' Actions and Omissions.

51.     In September 2015, the LSP, the City of New Orleans, and the French Quarter Economic Development District entered into a Cooperative Endeavor Agreement (CEA) which became effective January 1, 2016.

52.     Through this CEA, LSP operates in concert with, and as an agent of, the City of New Orleans for the purpose of supplementing the force of the NOPD. This relationship continues today, through the LSP's creation of a New Orleans Criminal Enforcement Detain or "Troop N," headed by DARRIN NAQUIN.

53.     On information and belief, the patrol conducted by PICHON and ROACH in the French Quarter on June 17, 2017 was undertaken pursuant to, and either has been or will be compensated through, the September 2015 CEA.

54.     The New Orleans Police Department Consent Decree was agreed to by the City of New Orleans, the NOPD, and the Department of Justice, and adopted by the Court on January 11, 2013. *See United States of America v. City of New Orleans*, E.D. La., 12-cv-1924, ECF No. 2-1.

55.     The stated goal of the Consent Decree is to ensure "that police services are delivered to the people of New Orleans in a manner that *complies with the Constitution and laws of the United States*. The Parties have a shared recognition that the ability of a police department to protect the community it serves is only as strong as the relationship it has with that community. Public safety, constitutional policing, and the community's trust in its police force are thus interdependent. The full and sustained implementation of this Agreement is *intended to protect the constitutional rights of all members of the community*, improve the safety and security of the people of New Orleans, and increase public confidence in the New Orleans Police Department." E.D. La., 12-cv-1924, ECF No. 2-1 at 6 (emphasis added).

56.     Thus, the Consent Decree and NOPD policies seek to establish a baseline of conduct that allows vigorous law enforcement within constitutional guidelines. By contrast, Louisiana State Police troopers assigned to foot patrol in New Orleans pursuant to the 2015 CEA have not even been able to articulate, let alone follow, basic policing tenets such as the application of constitutional standards that form the basis for "reasonable suspicion" or "probable cause" in a pedestrian context.

57.    In providing guidance on constitutionally appropriate policing, the Consent Decree requires that "Officers shall use ECWs [tasers] **only when such force is necessary to protect the officer, the subject, or another party from physical harm**, and other less intrusive means would be ineffective. Officers shall be authorized to use ECWs to control a violent suspect when attempts to subdue the suspect by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the suspect within contact range. . . . **ECWs will not be used where such deployment may cause serious injury or death from situational hazards, including falling**, drowning, losing control of a moving vehicle, or igniting a potentially explosive or flammable material or substance, except where lethal force would be permitted." E.D. La. 12-cv-1924, ECF No. 2-1 at 25 (emphasis added).

58.    NOPD Policies and Procedures provide for use of Tasers when "a subject exhibits aggressive resistance and in situations in which the subject presents an imminent threat to the officer, himself / herself, or another person.  This includes situations in which a suspect is actively fleeing from arrest for a serious offense, but fleeing should not be the sole justification for using a CEW [taser] against a suspect.  Members should **consider the severity of the offense, the suspect's threat level to others, and the risk of serious injury to the subject before deciding to use a CEW on a fleeing suspect.**" NOPD Policies and Procedures, Use of Force, Chapter 1.3 at 9 (emphasis added).

59.    The guidance on constitutional policing provided by the Consent Decree and NOPD Policies and Procedures is not merely academic. On the evening of TERRELL's bearing and arrest, Defendants PICHON and ROACH completed a NOPD Gist Sheet and a NOPD Incident Report, assigning an NOPD item number to the incident. Both of these

forms call for a supervisor's signature. The incident report was signed and noted badge number N-8. The gist was signed by a supervisor with badge number 90950.

60.     But Troopers ROACH and PICHON deviated substantially from the standards articulated in both the Consent Decree and NOPD's Policies and Procedures. ROACH and PICHON's failure to even identify the "unknown white/male" standing with TERRELL raises significant questions regarding the troopers understanding of the severity of the suspected offense.

61.     Further, PICHON's account of the incident is at odds with other accounts and the fact that no weapon was ever found on TERRELL's person or in his vicinity. However, PICHON's deployment of the Taser against TERRELL while he was on his bike in traffic did pose a direct risk of serious injury to TERRELL, not to mention to others driving, walking, and biking in the Quarter.

62.     PICHON's and ROACH's actions deviated significantly from the guidelines for constitutional policing outlined in the Consent Decree and NOPD Policies. All Defendants knew or should have known these guidelines and the constitutional jurisprudence on which they are based. The failure of PICHON and ROACH to follow these guidelines, and the failure of WILLIAMS and NAQUIN to use these guidelines in their training and supervision of LSP troopers assigned to New Orleans, evinces their callous indifference to the civil rights of persons such as TERRELL.

### D.     Liability of Defendants

63.     All of the Defendants are liable to Plaintiff TERRELL for nominal, compensatory, and punitive damages.

64.     All of the Defendants are liable jointly, severally, and in solido for the injuries suffered by Plaintiff TERRELL as a result of the actions complained of herein.

65.     The Defendants' actions were intentional, callous, reckless, willful, wanton, and malicious, and constituted deliberate indifference to the rights of Plaintiff.

66.     The Defendants' acts and omissions were done in concert and in conspiracy to violate the legal and constitutional rights of Plaintiff TERRELL.

67.     The Defendants' actions were the proximate cause of the violation of Plaintiff's rights and the damages sustained by Plaintiff.

68.     As a result of the acts and omissions described herein, TERRELL unlawfully suffered physical pain and injury, psychological pain, emotional distress, and mental anguish.

## IV. CAUSES OF ACTION

## COUNT I

## Failure to Supervise and Train

## (NAQUIN and WILLIAMS)

69.     Defendants named in this Count, acting individually and together, under color of law, acted to violate TERRELL's rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

70.     Defendants NAQUIN and WILLIAMS, in their individual capacities, failed to supervise their subordinates, namely Troopers PICHON and ROACH, to ensure that these subordinates did not violate members of the public's rights protected under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

71.     TERRELL was directly harmed by this failure to supervise because it directly contributed to and/or resulted in the unlawful and excessive use of force against him. At all pertinent times, Defendants NAQUIN and WILLIAMS were aware of the need to supervise their subordinates in order to ensure that they did not violate the rights of members of the public.

72.     Defendants NAQUIN and WILLIAMS were specifically aware, as alleged above, that PICHON had, on multiple occasions, used excessive force against subjects who had been stopped or arrested.

73.     Defendants NAQUIN and WILLIAMS were specifically aware, as alleged above, that PICHON had, on multiple occasions, used boilerplate language to justify his uses of force, indicating that the factual basis for the use of force was fabricated.

74.     It was therefore reasonably foreseeable to Defendants NAQUIN and WILLIAMS that the failure to train, supervise, and/or discipline PICHON would result in additional incidents wherein a subject of a stop or arrest would be assaulted by PICHON in an excessive use of force.

75.     Defendants NAQUIN and WILLIAMS ignored the need to provide training, supervision, and/or discipline to PICHON and acted unreasonably and with deliberate indifference and disregard for TERRELL's constitutional rights as described above.

76.     At all pertinent times, Defendants NAQUIN and WILLIAMS, individually and collectively, were acting under color of state law and in the course and scope of their employment. Defendants NAQUIN and WILLIAMS acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of Plaintiff by failing to provide appropriate supervision and training to prevent the misconduct of troopers patrolling the French Quarter.

## COUNT II

## Excessive and Unreasonable Use of Force

## (PICHON and ROACH)

77.     Defendant PICHON's unlawful deployment of a Taser in a dangerous setting and his kicking, stomping, kneeing, and dragging of TERRELL when he was offering no resistance to any stop or arrest violated TERRELL's rights to due process of law, to equal protection of the law, to freedom from excessive force, and to freedom from cruel and unusual punishment. These rights are protected under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

78.     Defendant ROACH's failure to intervene to prevent Defendant PICHON from engaging in excessive use of force against TERRELL violated TERRELL's rights to due process of law, to equal protection of the law, to freedom from excessive force, and to freedom from cruel and unusual punishment. These rights are protected under the Fourth, Eighth, and Fourteenth Amendments to the United State Constitution.

79.      At all times Defendants PICHON and ROACH were acting under color of law and were aware that uses of force against members of the public without any justifiable basis were unlawful.

## COUNT III

## Negligent and/or Intentional Conduct Resulting in Injury

## (All Defendants)

80.     All Defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that caused injury and harm to TERRELL.

81.     Namely Defendant PICHON, assisted by ROACH, assaulted and battered TERRELL without cause or justification.

82.     Defendant ROACH had the duty and ability to intervene to prevent the tortious conduct of co-defendant PICHON towards TERRELL, as described herein, but failed to do so.

83.     Defendants PICHON and ROACH, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently towards TERRELL. They are therefore liable to Plaintiff, as described herein.

84.     Defendants NAQUIN and WILLIAMS are liable to TERRELL for the delictual acts of PICHON and ROACH under the Louisiana law of respondeat superior, in that NAQUIN and WILLIAMS acted as the supervisors of PICHON and ROACH.

85.     Defendants NAQUIN and WILLIAMS are liable to TERRELL for the delictual acts of PICHON and ROACH under the Louisiana law of negligent retention and for their failure to remove PICHON from duty, given PICHON's history of use of excessive force.

## V.     DAMAGES

86.     As a result of the actions of Defendants as described above, TERRELL suffered conscious and severe physical, mental, and emotional distress, pain, and suffering in the course of and following this incident.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that after due proceedings there be judgment rendered herein in Plaintiff's favor and against all Defendants individually and jointly, as follows:

1.     Compensatory, punitive, and nominal damages as prayed for herein;

2.     Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. 794(b), and all costs of these proceedings and legal interest;

3.     All other relief as appears just and proper to this Honorable Court.

Respectfully submitted,


s/ James W. Craig
James Craig, LSBN # 33687
Emily Washington, LSBN # 34143
Roderick & Solange MacArthur Justice Center
4400 S. Carrolton Ave.
New Orleans, LA 70119
Tel. 504-620-2259
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org

- AND -


_____
Elizabeth Cumming, LSBN #31685
1040 St. Ferdinand Street
New Orleans, LA 70117
Tel. 504-291-6990
Fax. 504-291-6995
elizabeth.cumming@ecumminglaw.com



*Attorneys for Plaintiff*