# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ZACHARY TERRELL, | * | NUMBER: 2:18-cv-05787 |
| Plaintiff, | * | |
| | * | |
| v. | * | SECTION: E |
| | * | |
| TROOPER TROY PICHON, | * | JUDGE: WENDY B. VITTER |
| LIEUTENANT DERRELL WILLIAMS, | * | |
| and CAPTAIN DARRIN NAQUIN, each | * | MAGISTRATE: MICHAEL B. NORTH |
| in their individual capacities. | * | |
| Defendants. | * | DIVISION: 5 |
| | * | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes Plaintiff Zachary Terrell who opposes Defendant's Motion for Summary Judgment.[1] In support of his opposition, Mr. Terrell states as follows: (1) Heck v. Humphrey[2] does not insulate police officers from all liability for every use of force, no matter how excessive, just because it occurred in the course of effecting an arrest; (2) Trooper Pichon's use of potentially lethal force, and Trooper Pichon's hitting and kicking of Mr. Terrell while he was on the ground and posed no objective risk, was excessive force in violation of  Mr. Terrell's constitutional rights; and (3) Lieutenant Williams and Captain Naquin's established pattern of failing to investigate, counsel, or discipline troopers for excessive uses of force in violation of Louisiana State Police (hereinafter "LSP") policy created a substantial likelihood that troopers, specifically including Trooper Pichon, would use excessive force in violation of individual's constitutional rights.

---

[1] ECF No. 29.
[2] 512 U.S. 477 (1994).

Plaintiff has dismissed all claims against Trooper Roach.[3] Accordingly, Plaintiff does not address Defendants' arguments as to Trooper Roach as they are now moot.

## I.     Disputed Factual Background

### Events of June 17, 2017

On the evening of Saturday, June 17, 2017, Plaintiff Zachary Terrell had finished his shift at Tujague's restaurant. He had met up with a friend and the two were standing outside his friend's mother's house in the French Quarter, on St. Peter Street between Burgundy and Dauphine.[4] Terrell and his friend were making plans for the evening, which included Terrell borrowing a bicycle from his friend briefly to stop by his brother's house in the nearby Sixth Ward as well as his friend going to buy drinks for the two to drink together at the house when Terrell returned.[5] With this plan in place, Terrell put earphones in his ears and started to ride the bicycle up St. Peter towards Burgundy.[6]

On the evening of June 17, 2017, Defendant Trooper Pichon and Trooper Roach were on duty as Louisiana State Police troopers assigned to patrol the French Quarter.[7] Pichon and Roach were patrolling together in a marked LSP vehicle.[8]

As Mr. Terrell and his friend were making their evening plans, Trooper Pichon and Trooper Roach saw the two men speaking together on the sidewalk.[9] Trooper Pichon did not see two friends making plans. Rather, he reported seeing Mr. Terrell, a Black man, and an "unknown white/male"

---

[3] ECF No. 34.
[4] Exhibit 1, Terrell Deposition, 12-15.
[5] Exhibit 1, Terrell Deposition, 16-17.
[6] Exhibit 1, Terrell Deposition, 31
[7] Exhibit 2, June 17, 2017 Troop N, Desk Log.
[8] Exhibit 3, Pichon Deposition at 169: 15-25; 171:1-12.
[9] Exhibit 4, LSP Case Report; Exhibit 5, LSP Arrest Report.

appearing to be "really nervous."[10] Observing the interaction between Mr. Terrell and his friend, Trooper Pichon believed he may have seen a hand-to-hand narcotics transaction.[11]

Trooper Pichon did not immediately attempt to make a stop based on his observation:

> I'm like, "Jeff, them dudes just did a hand to hand. Now they're trying to play it off like we didn't see it. Look, I tell you what, make the block. If they're still standing there, we'll stop and talk to them. If they're not, we'll just let them go about their business and be done with it."[12]

Troopers Pichon and Roach circled the block in their vehicle and approached the two individuals.[13] Because of the one-way streets in the French Quarter, this required the troopers to loop around at least two blocks of French Quarter traffic at 11:00 p.m. on a Saturday evening before coming back to the place where Mr. Terrell and his friend were still standing.[14]

Despite the amount of time it took for Trooper Pichon to return to the site of the suspected drug transaction, Mr. Terrell and his friend were still talking on the street at the exact same location.[15] But Trooper Pichon did not consider this fact in determining an approach strategy and appropriate level of force to use in an investigative stop of Mr. Terrell and his friend. According to Trooper Pichon's report and deposition testimony, as Trooper Pichon approached in their vehicle the second time, Mr. Terrell began to ride the bicycle up the street.[16] Mr. Terrell does not dispute that he was biking up the street.[17] As Trooper Roach approached the unknown white man, Trooper Pichon recalled:

---

[10] Exhibit 4, LSP Case Report; Exhibit 5, LSP Arrest Report; Exhibit 6, 6/17/17 UOF Report; Exhibit 3, Pichon Deposition, 171:20 – 172:13
[11] Exhibit 7, Roach Deposition 184:2-9.
[12] Exhibit 3, Pichon Deposition, 172:7-13.
[13] Exhibit 3, Pichon Deposition, 172:14-20.
[14] Exhibit 7, Deposition of Trooper Roach, 181 – 189; Deposition Exhibit of Map of French Quarter marked by Trooper Roach.
[15] Exhibit 3, Pichon Deposition, 172:14-20.
[16] Exhibit 3, Pichon Deposition 172:14-20.
[17] Exhibit 1, Terrell Deposition 31.

> Trooper Roach approached the white guy and, you know, introduced himself, say, hey, you know, police, whatever. I remember the guy throwing both hands up, like, almost touching the top of the roof. He just let out this real loud squeal, like he was real, real startled.[18]

Trooper Pichon told Mr. Terrell to stop.[19] Trooper Pichon then called Trooper Roach away from the unknown white male to follow Mr. Terrell who was still "slow rolling on his bike on the sidewalk."[20]

As Mr. Terrell and the troopers approached the intersection of Burgundy and St. Peter Streets, there was a vehicle approaching on Burgundy.[21] Mr. Terrell testified that he made a slight left turn down Burgundy to go around this vehicle.[22] Trooper Pichon testified that Mr. Terrell turned down Burgundy and was "going in the wrong direction against traffic on his bicycle."[23]

Trooper Pichon testified that Mr. Terrell stood up on the bike and started to bike faster.[24] Trooper Pichon includes in his report that he saw Mr. Terrell reach for his waistband.[25] Trooper Pichon testified that he noticed Mr. Terrell was biking away from him with only one hand on the handle bar.[26] From this singular fact, Trooper Pichon deduced that Mr. Terrell must have had a gun.[27] Undisputedly, Mr. Terrell did not have a gun.[28] Mr. Terrell is also clear that he did not ever reach for his waistband and he did not turn back towards or threaten anyone running behind him, including Trooper Pichon.[29] Trooper Pichon then tased Mr. Terrell in the lower back.[30]

---

[18] Exhibit 3, Pichon Deposition, 173:1-6.
[19] Exhibit 3, Pichon Deposition, 173:6-9; Exhibit 4, LSP Case Report; Exhibit 5, LSP Arrest Report; Exhibit 6, LSP UOF report.
[20] Exhibit 3, Pichon Deposition, 173:11-18.
[21] Exhibit 3, Pichon Deposition, 174:2 – 4; Exhibit 1, Terrell Deposition, 31:8-13.
[22] Exhibit 1, Terrell Deposition, 31:8-13.
[23] Exhibit 3, Pichon Deposition, 174:5-7; Exhibit 1, Terrell Deposition, 32:23-33:5.
[24] Exhibit 3, Pichon Deposition, 174:12-17.
[25] Exhibit 4, LSP Case Report; Exhibit 5, LSP Arrest Report; Exhibit 6, LSP UOF Report.
[26] Exhibit 3, Pichon Deposition, 174:23-175:3
[27] Exhibit 3, Pichon Deposition, 175:3-5.
[28] Exhibit 4, LSP Case Report; Exhibit 8, Terrell Declaration
[29] Exhibit 8, Terrell Declaration.
[30] Exhibit 6, LSP UOF Report; Exhibit 3, Pichon Deposition, 175:14-15.

Mr. Terrell locked up and fell off the bike. According to Trooper Pichon's testimony:

> The Taser hit him. He locked up. The bike drifted to the right, struck the curb, and he fell off the bike. At that point, I was running right on top of him. I said, "turn over, put your hands behind your back." He just kind of laid on his back, with his eyes -- like, what just happened to me.[31]

Mr. Terrell testified that he could not move his body after he was tased.[32]

While Mr. Terrell was on the ground, and during the time he was incapacitated by the Taser, Trooper Pichon punched and kicked Mr. Terrell.[33] Mr. Terrell had a significant laceration on his face and another cut to his scalp at the top of his head.[34] Trooper Pichon also kneed Mr. Terrell in the back while he was handcuffing Mr. Terrell, such that Mr. Terrell had bruising on his back.[35] In addition, Trooper Pichon dragged Mr. Terrell to the sidewalk after he had been handcuffed.[36] Mr. Terrell had two significant abrasions on both of his wrists.[37]

Trooper Pichon completed an LSP use of force report dated June 18, 2017 related to this incident.[38]

---

[31] Exhibit 3, Pichon Deposition 175:16-22.
[32] Exhibit 3, Terrell Deposition, 39: 25 – 40:7.
[33] Exhibit 3, Terrell Deposition, 38:5 – 39:24.
[34] Exhibit 9, Photographs of Mr. Terrell's Injuries; Exhibit 10, CCS Medical Records at bates numbers Terrell139, 143, 148, 233, 235; Exhibit 11, UMC Medical Records at 254, 293.
[35] Exhibit 1, Terrell Deposition, 40:8-12; Exhibit 9, Photographs of Mr. Terrell's Injuries.
[36] Exhibit 1, Terrell Deposition, 40:17-22.
[37] Exhibit 9, Photographs of Mr. Terrell's Injuries; Exhibit 10, CCS Medical Records at 139, 143; Exhibit 11, UMC Medical Records at 293.
[38] Exhibit 6, LSP UOF Report; Exhibit 3, Pichon Deposition, 263:22-25.

## Terrell's Injuries

Mr. Terrell received extensive injuries in the head and face, including seven stitches around his right eyebrow, facial swelling and bruising, abrasions to his nose and upper lip, and a wound to the crown of his head.[39] Mr. Terrell also had wounds on both his wrists, as well as to his elbow and knee.[40] Mr. Terrell's injuries were so significant that he required transport from the scene to University Medical Center (UMC) via ambulance.[41]

The spread and location of these wounds indicate that Mr. Terrell could not and did not sustain these wounds only from falling from the bicycle; rather, some were a direct result of Trooper Pichon's kicks and hits to Mr. Terrell's head and face after he had been incapacitated.[42] Four days after this incident, these areas on Mr. Terrell's head and face displayed "honey crust" impetigo, an indication of painful infection which required treatment with antibiotics.[43] Other injuries also resulted from Trooper Pichon dragging Mr. Terrell after he was handcuffed.

After this incident, Mr. Terrell experienced anxiety, sleeplessness, nightmares, intrusive negative thoughts, and an increased distrust of law enforcement and custody staff all related to the physical assault by Louisiana State Police troopers.[44]

Mr. Terrell has received treatment for post-traumatic stress and anxiety. While at the Orleans Justice Center (OJC), in July and August 2016, Mr. Terrell filed sick calls requesting to speak with mental health personnel because he was not sleeping well because of nightmares. When he was seen, he expressed to the provider his paranoia and anxiety "related to getting beaten up by

---

[39] Exhibit 9, Photographs of Mr. Terrell's Injuries; Exhibit 11, UMC Records at bates numbers Terrell000254, 293; Exhibit 10, CCS Records.
[40] Id.
[41] Exhibit 6, LSP UOF Report; Exhibit 11, UMC Records at bates numbers Terrell0000286-288.
[42] Exhibit 9, Photographs of Injuries to Mr. Terrell.
[43] Exhibit 10, CCS Records at 148
[44] Exhibit 12, Report of Dr. Edward Shwery (manually attached, filed under seal); Exhibit 10, CCS Records at bates numbers Terrell000132.

Louisiana State Troopers prior to arrest."[45] Mr. Terrell also described dreams in which the police are following him and reported waking up in cold sweats while feeling as if he is still in the nightmare.[46] On August 16, 2017, he was diagnosed with Post Traumatic Stress Disorder (PTSD) by providers at OJC.[47] Mr. Terrell received medication and counseling on coping strategies to help him manage his PTSD.[48] Mr. Terrell received treatment, including medication, for PTSD at other facilities in the course of his incarceration.[49]

At Elayn Hunt Correctional Center, in October 2017, on an urgent mental health referral, Terrell reported insomnia because of nightmares which required treatment. He received medication to treat these symptoms.

## II. Law and Argument

### A. Summary Judgment Standard

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[50] However, in evaluating the summary judgment record, all inferences drawn from the underlying facts must be viewed in a light most favorable to the nonmoving party.[51] A genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.[52]

---

[45] Exhibit 10, CCS Records at 130 – 132.
[46] Id.
[47] Id.
[48] Id.
[49] Exhibit 13, Elayne Hunt Medical Records; Exhibit 14, Bossier Parish Medical Records.
[50] Fed. R. Civ. P. 56(c).
[51] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).
[52] Anderson v. Liberty Lobby, Inc. 447 U.S. 242, 248 (1986).

A material fact is determined by substantive law and whether it could affect the outcome of the suit.[53]

### B. Mr. Terrell's Excessive Force Claims Against Trooper Pichon Do Not Challenge Mr. Terrell's Conviction.

Contrary to Defendants' argument, Mr. Terrell's § 1983 claim for excessive force is not barred simply because he pleaded guilty to one count of resisting an officer. Fifth Circuit and Supreme Court jurisprudence makes clear that criminal conviction does not preclude § 1983 claims against law enforcement officers so long as a favorable judgment on those claims would not "necessarily imply the invalidity of his conviction."[54]

Further, Fifth Circuit jurisprudence does not establish the de facto bar on any excessive force claim after resisting arrest that Defendants' seem to propose in their Motion for Summary Judgment.[55]

In Ballard v. Burton, plaintiff Ballard pleaded guilty to simple assault on Mississippi law enforcement officer Boling where Ballard had pointed a rifle and discharged shots at the officer. Another officer, defendant Burton, shot Ballard in the course of effecting Ballard's arrest. The record included a factual dispute regarding whether Ballard was observed shooting the riffle at Boling at the time that Burton shot Ballard. The District Court dismissed the excessive force claim at summary judgment citing Heck. The Fifth Circuit found the District Court erred in dismissing the case based on Heck.

In its opinion, the Fifth Circuit distilled the analysis:

> the dispositive question in determining whether Heck applies to preclude Ballard's § 1983 claim is as follows: Would a finding that

---

[53] Id.

[54] See Heck v. Humphrey, 512 U.S. 477, 486–87 (1994); Bush v. Strain, 513 F. 3d 492 (5th Cir. 2008); Ballard v. Burton, 444 F.3d 391 (5th Cir. 2006).

[55] See, e.g., Bush, 513 F.3d at 498; Ballard, 444 F.3d at 401; Arnold v. Town of Slaughter, 100 F. App'x 321, 324–25 (5th Cir. 2004).

Burton's use of force was objectively unreasonable necessarily call into question the validity of Ballard's conviction for simple assault upon Boling? If it is possible for Ballard to have assaulted Boling *and* for Burton's shooting of Ballard to have been objectively unreasonable, then <u>Heck</u> does not bar Ballard's claim. On the other hand, if the only way that Burton's shooting of Ballard could be objectively reasonable is for Ballard to have assaulted Boling, then <u>Heck</u> bars Ballard's excessive force claim.[56]

In applying this test to the facts of the case before it, the Fifth Circuit found:

> Not a single element of Ballard's simple assault conviction would be undermined if Ballard were to prevail in his excessive force claim against Burton or Oktibbeha County. For this reason, . . . Ballard's Mississippi conviction for simple assault does not, as a matter of law, necessarily imply that Burton did not use excessive force as alleged in the instant complaint.[57]

This Court and other District Courts in Louisiana have consistently recognized the compatibility under <u>Heck</u> of claims for excessive force and convictions for resisting arrest.[58]

In seeking dismissal of Plaintiff's claims on the basis of <u>Heck</u>, Defendants fundamentally misapprehend Plaintiff's claims. As an initial matter, Plaintiff's claims include two distinct events, not a single incident as Defendants suggest. The first event is Trooper Pichon's tasing of Mr. Terrell, while Mr. Terrell was on a bicycle in traffic on the street.[59] The second event is Trooper Pichon's stomping, punching, and dragging Mr. Terrell while he lay incapacitated on the ground.[60]

---

[56] <u>Ballard v. Burton</u>, 444 F.3d 391, 398 (5th Cir. 2006).

[57] <u>Ballard v. Burton</u>, 444 F.3d 391, 399–400 (5th Cir. 2006).

[58] <u>See, e.g.</u>, <u>Idel v. LeBlanc</u>, No. 17-1553, 2019 WL 1903285 (E.D. La. Apr. 29, 2019) ("Plaintiff's claim would not be barred by <u>Heck</u> if he ceased resisting before the application of excessive force."); <u>Wallace v. City of Slidell</u>,No. 15-383, 2016 WL 1223065, at *3 (E.D. La. Mar. 29, 2016) ("<u>Heck</u> does not operate as a per se bar on excessive force claims, even where, as here, there has been a conviction for crimes such as interfering with, resisting, or battering a police officer."); <u>see also</u> <u>Kador v. City of New Roads</u>, No. 07–682, 2011 WL 1326641, at *11 (M.D. La. 2011) ("Law enforcement can use excessive or unreasonable force in effecting an arrest, even where a person is resisting. For instance, if a person is resisting arrest by not allowing the officer to place handcuffs on them, it would be an unreasonable use of force to shoot that person or use any type of force that was objectively unreasonable and not necessary to safely make the arrest.").

[59] ECF No. 7 at Paragraphs 29-34; Exhibit 1, Terrell Deposition, 37:9-15; 71:20 – 73:16

[60] ECF No. 7 at Paragraph 35; Exhibit 1, Terrell Deposition, 38: 6-10; 39:3-24; 40:8-17; 40:19-22.

Plaintiff has not pleaded a single constitutional or state law claim based on unlawful stop, unlawful search, unlawful arrest, or unlawful prosecution.[61]

Defendants' statement that Plaintiff's counsel seeks to contest the lawfulness of the arrest and detention is baseless. In the First Amended Complaint and in the deposition, Mr. Terrell acknowledges and does not seek to challenge his plea to the convictions.[62] Nor is there a claim for false arrest in this case. Plaintiff's only constitutional and state tort claims against Trooper Pichon are for excessive use of force, based on the two distinct events, which Plaintiff will address in turn.

1. Plaintiff's challenge to force used while moving away from Trooper Pichon is not barred by Heck.

There is no factual dispute that Plaintiff was bicycling away from Trooper Pichon at the time that Trooper Pichon was attempting to question Mr. Terrell.[63] Fifth Circuit jurisprudence is clear that even when some level of force might be appropriate to affect a stop because of some level resistance, only a commensurate level of force may be used without violating the constitutional rights of the suspect.[64] Thus, the simple fact of resisting an officer does not foreclose the excessive force analysis or require the establishment of a fact that is inherently inconsistent with the underlying criminal conviction.[65]

---

[61] See ECF No. 7.
[62] Exhibit 1, Terrell Deposition, 57:22 – 59:21.
[63] Exhibit 1, Terrell Deposition, 31:1-13; 32:16-19; 59:1-21.
[64] Newman v. Guedry, 703 F.3d 757, 763 (5th Cir. 2012) (noting the need to assess the relationship between the need for force and the force used); see also Gomez v. Chandler, 163 F.3d 921, 923 (5th Cir. 1999); Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009).
[65] DeLeon v. City of Corpus Christi, 488 F.3d 649, 657 (5th Cir. 2007) (noting possibility of a non-Heck barred claim if claim was that police used excessive force after resistance stopped or that unreasonable force was used to stop resistance); Kador v. City of New Roads, No. 07–682, 2011 WL 1326641, at *11 (M.D. La. 2011) ("Law enforcement can use excessive or unreasonable force in effecting an arrest, even where a person is resisting. For instance, if a person is resisting arrest by not allowing the officer to place handcuffs on them, it would be an unreasonable use of force to shoot that person or use any type of force that was objectively unreasonable and not necessary to safely make the arrest."), citing VanGilder v. Baker, 435 F.3d 689, 692 (7th Cir. 2006) (denying summary judgment because plaintiff did not deny physical act of resistance, but alleged the response to the resistance was not objectively reasonable.)

Despite Defendants' best efforts, the question of whether Mr. Terrell saw or heard Trooper Pichon's order to stop is immaterial to the analysis of whether Mr. Terrell's action of riding away would have given an objectively reasonable officer a basis for tasing Mr. Terrell. [66] As the individual defendant officer's state of mind is irrelevant to the excessive force inquiry,[67] it is equally nonsensical to place the plaintiff's state of mind at issue.[68]

Defendants' reliance on Arnold v. Town of Slaughter,[69] Walker v. Munsell,[70] and Daigre v. City of Waveland[71] is misplaced. In each of those cases, the plaintiffs' claims included material allegations that they had not engaged in activity relevant to the question of whether the force used was objectively reasonable in light of the facts and circumstances from the perspective of a reasonable officer on scene.[72] In Arnold, the plaintiff disputed that he had belligerently attempted to hit an officer, although this action formed the basis of his conviction for resisting an officer.[73] In Walker, the plaintiff denied running away from the trooper or taking any other physical action to resist the officers.[74] In Daigre, the plaintiff denied all physical resistance.[75] The theme of each of these cases is not that the plaintiffs continued to maintain their innocence; it was that they denied the physical actions that formed the basis for the resisting charge. Accordingly, in those cases, a

---

[66] Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Newman v. Guedry, 703 F.3d 757, 761–62 (5th Cir. 2012); Darden v. City of Fort Worth, Texas, 880 F.3d 722, 728–29 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).

[67] Id.

[68] Manis v. Lawson, 585 F.3d 839, 845 (5th Cir. 2009) (finding that intention of individual subjected to use of force is not relevant to the question of whether officer's use of force was objectively reasonable.)

[69] 100 F. App'x 321, 324–25 (5th Cir. 2004).

[70] 281 F. App'x 388 (5th Cir. 2008).

[71] 549 F. App'x 283 (5th Cir. 2013).

[72] Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Newman v. Guedry, 703 F.3d 757, 761–62 (5th Cir. 2012); Darden v. City of Fort Worth, Texas, 880 F.3d 722, 728–29 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).

[73] Arnold v. Town of Slaughter, 100 F. App'x 321, 324–25 (5th Cir. 2004).

[74] Walker v. Munsell, 281 Fed.Appx. 388, 389 (5th Cir. 2008).

[75] Daigre v. City of Waveland, 549 F. App'x 283 (5th Cir. 2013).

fact finder would have to re-examine facts underlying the criminal conviction, in contravention of Heck.

In the instant case, Mr. Terrell does not deny that he was biking down the street and engaged in the physical action that formed the basis for his plea to resisting an officer.[76] Thus, the objective circumstance, i.e., that Mr. Terrell was biking away, that both forms the basis of the resisting conviction and the use of force is not in dispute.[77]

The only fact dispute that actually impacts on the reasonableness of the force used in the circumstance is the question of whether Mr. Terrell reached for his waistband. However, this factual dispute does not have any bearing on any of the elements of the underlying criminal conviction for resisting arrest, i.e., whether Mr. Terrell was moving away from the officer.[78] Because the fact finder can easily make a finding that Trooper Pichon used excessive force on Mr. Terrell without disturbing a single element of the underlying criminal case, including the conviction for resisting an officer, there cannot be a finding that any material allegation is "necessarily inconsistent with the validity of the conviction."[79]

Accordingly, Plaintiff's claim that the tasing while he was on the bicycle constituted excessive force is not barred by Heck.

---

[76] Exhibit 1, Terrell Deposition at 31:1-13; 32:16-19; 59:1-21;

[77] Mr. Terrell pled guilty to possession of heroin and tramadol, which were found on his person after the stop. Exhibit 4, LSP Case Report; Exhibit 1, Terrell Deposition, 59:1-8. The Fifth Circuit has long recognized that any excessive force claim is entirely distinct and subject to a completely separate analysis from the underlying arrest. Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007) (holding that an excessive force claim is separate and distinct from any unlawful arrest claim, and thus must be analyzed without regard to whether the arrest itself was justified.); see also Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1332 (11th Cir. 2006) (noting "When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest."); Osborne v. Harris Cty., Tex., 97 F. Supp. 3d 911, 935 (S.D. Tex. 2015) (holding same). As noted above, Plaintiff does not bring any claim regarding the stop, detention, or arrest. Thus, all discussion of the events leading up to the tasing are relevant only to the question of the objective reasonableness of the force Trooper Pichon employed.

[78] Mr. Terrell pled guilty to resisting an officer, LA R.S. 14:108. Trooper Pichon's claim that Terrell "reached into his waistband" is not an element of this offense.

[79] Bush v. Strain, 513 F. 3d at 498.

2. Plaintiff's challenge to force used after he was on the ground is not barred by Heck.

There is no dispute that Mr. Terrell did not offer any resistance, passive or active, after he fell off the bicycle.[80] There is a factual dispute as to when and how Mr. Terrell sustained his injuries.[81] As discussed in more detail below, Fifth Circuit and this Court's jurisprudence are also clear that any force that continued after resistance stopped is categorically not barred by Heck.[82] Further, if there is a factual dispute regarding when a plaintiff was injured, during the process of resisting or after all resistance stopped, the claim was not Heck-barred and summary judgment should be denied.[83]

### C. Trooper Pichon's Excessive Use of Force on Mr. Terrell When He did Not Pose a Danger Is A Violation of Clearly Established Law.

a. Excessive Force Standard

The Fifth Circuit has outlined three elements plaintiffs must establish in Fourth Amendment excessive-force claims: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[84]

The Supreme Court and Fifth Circuit have recognized that the question of whether the force was clearly excessive or unreasonable is a fact intensive one.[85] The Court's task is then to

---

[80] Exhibit 1, Terrell Deposition 39:25 – 40:22; Exhibit 3, Pichon Deposition, 175:16-22; Exhibit 4, LSP Case Report; Exhibit 6, LSP Use of Force Report.

[81] Exhibit 1, Terrell Deposition 38:8 – 39:24; Exhibit 3, Pichon Deposition, 244:4-245:12.

[82] Idel v. LeBlanc, CIVIL ACTION NO. 17-1553, 2019 WL 1903285 (E.D. La. Apr. 29, 2019) ("Plaintiff's claim would not be barred by Heck if he ceased resisting before the application of excessive force."); Bush v. Strain, 513 F.3d 492, 497-498, 502 (5th Cir. 2008).

[83] Bush v. Strain, 513 F.3d 492, 497-498,502 (5th Cir. 2008).

[84] Newman v. Guedry, 703 F. 3d 757, 761-2 (5th Cir. 2012); Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005).

[85] Graham v. Connor, 490 U.S. 386 (1989); Newman v. Guedry, 703 F. 3d. at 762; Darden v. City of Fort Worth, Texas, 880 F.3d 722, 728–29 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018); Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009).

13

determine whether the officers' actions were objectively reasonable in light of the facts and circumstances from the perspective of a reasonable officer on scene.[86]

According to recent jurisprudence, the inquiry could and possibly should stop here, with no need to assess whether the officer is entitled to qualified immunity. Fifth Circuit Justice Willet recently noted, that qualified immunity is a "judge-made" doctrine which may lack any sound basis in law.[87] As Justice Thomas recently explained, modern qualified immunity doctrine does not "interpret[] the intent of Congress" and, to the contrary, constitutes "the sort of 'freewheeling policy choice[s]'" that courts "lack the power to make."[88]

Alternatively,[89] the qualified immunity analysis requires a two-step approach to (1) determine if Mr. Terrell has alleged a violation of his constitutional right; and (2) whether Mr. Terrell's constitutional right was clearly established at the time of the Defendants' misconduct.[90] While excessive force claims do require a certain degree of fact specific inquiry,[91] the term "clearly established" does not require case law with precisely the same facts or force modalities.[92] The Fifth Circuit explains, "The central concept is that of 'fair warning': The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated

---

[86] <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); <u>Newman v. Guedry</u>, 703 F.3d 757, 761–62 (5th Cir. 2012); <u>Darden v. City of Fort Worth, Texas</u>, 880 F.3d 722, 728–29 (5th Cir. 2018), <u>cert. denied sub nom. City of Fort Worth, Tex. v. Darden</u>, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).
[87] <u>Zadeh v. Robinson</u>, 902 F. 3d 483, 498 – 99 (5th Cir. 2018).
[88] <u>Ziglar v. Abbasi</u>, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring); see also generally William Baude, Is Qualified Immunity Unlawful?, 106 Calif. L. Rev. 45 (2018).
[89] Although, clearly established law certainly prohibited Trooper Pichon's uses of force at the time, Plaintiff preserves the right to challenge this Court's and the Fifth Circuit's current qualified immunity framework, which is "not justified by . . . any federal statute, the rules of civil procedure, or the common law," <u>Medina v. Cram</u>, 252 F.3d 1124, 1135 (10th Cir. 2001) (Seymour, J., dissenting).
[90] <u>Saucier v. Katz</u>, 553 U.S. 194, 200 (2001); <u>Pearson v. Callahan</u>, 555 U.S. 232 (2009); <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).
[91] <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); <u>Newman v. Guedry</u>, 703 F.3d 757, 761–62 (5th Cir. 2012)
[92] <u>Cooper v. Brown</u>, 844 F. 3d 517, 524 – 525 (2016).

constitutional rights."[93] The Fifth Circuit held that the right to be free from excessive force during an investigatory stop or arrest was clearly established in August 2007, nearly twelve years ago.[94] Even when there may be some level of resistance necessitating force, officers must consider the relationship between the need and the amount of force used.[95]

As will be discussed in more detail below, Mr. Terrell meets each of the Fifth Circuit's elements for excessive force. He sustained serious injuries, including a laceration to his face, abrasions to his face, a cut to the top of his head, abrasions to both of his wrists, an abrasion to his knee, an abrasion to his elbow, and bruising on his back.[96] While Defendants claim ignorance as to how Mr. Terrell sustained these injuries, Mr. Terrell testifies and his medical records support that he sustained these injuries in combination from being tased off the bike, dragged while handcuffed, and kicked and punched while he was on the ground.[97] Trooper Pichon's actions of tasing Mr. Terrell while he was on a bicycle in traffic, and dragging, kicking, and punching Mr. Terrell when he was on the ground incapacitated by the Taser were clearly objectively excessive.

       b.   <u>Mr. Terrell's actions in biking down the street did not necessitate the use of potentially lethal force.</u>

In the instant case, the parameters of "clearly established Federal law" governing excessive force is outlined in cases addressing not only the use of a Taser, but also the use of lethal force. Deadly or lethal force is not force that <u>necessarily</u> results in death, but force that is <u>known to be capable of causing</u> serious bodily injury or death.[98] The question of whether a use of force, or a

---

[93] <u>Newman v. Guedry</u>, 703 F. 3d 757, 763 (5th Cir. 2012) (<u>quoting</u> <u>Kinney v. Weaver</u>, 367 F. 3d 337, 350 (5th Cir. 2004)).
[94] <u>Newman v. Guedry</u>, 703 F. 3d 757, 763 (5th Cir. 2012).
[95] <u>Deville v. Marcantel</u>, 567 F.3d 156, 167 (5th Cir. 2009).
[96] Exhibit 9, Photographs of Zachary Terrell's Injuries.
[97] Exhibit 1, Terrell Deposition at 48:4-49:1;49:9-51:22; Exhibit 11, University Medical Center Records; Exhibit 10, CCS Records.
[98] <u>Gutierrez v. City of San Antonio</u>, 139 F.3d 441, 446 (5th Cir. 1998) (defining deadly force as "force that is intended or known by the actor to cause, or in the manner of its use or intended use, is capable of causing death or serious

force instrumentality, constitutes deadly force is a question of fact, and must be resolved by a jury.[99]

In grappling with the question of whether hog-tying could be considered lethal force, the Fifth Circuit considered reports by other law enforcement agencies outside of Louisiana studying and making recommendations to mitigate deaths related to positional asphyxia and restraint mechanisms.[100] Taser, or conducted electrical weapons (alternately referred to as "CEW" and "ECW"), have similarly been the subject of studies by law enforcement and state entities in the wake of taser related deaths:

> In the aftermath of a series of deaths occurring as a result of CEW deployment, the Maryland Attorney General launched a Task Force to examine the CEW and to develop a series of recommendations for law enforcement agencies to consider when developing policy, training, and investigative protocols related to the use of CEW.[101]

The report of the Task Force specifically contemplates the serious risks associated with tasing an individual on a bicycle:

> If an ECW is used against a suspect driving a vehicle (or riding a motorcycle or bike), the vehicle may go out of control with a great potential to harm the suspect or even innocent bystander . . . . Officers should be trained to not use an ECW against a subject who is fleeing unless there are exigent circumstances because of the

---

bodily injury" and finding this definition to be clearly established prior to November 1994); Exhibit 18, LSP Policy 238, Use of Force, Terrell018387.

[99] Flores v. City of Palacios, 381 F.3d 391, 399 (5th Cir. 2004) (finding "whether a particular use of force is 'deadly force' is a question of fact, not of law.); Gutierrez v. City of San Antonio, 139 F.3d 441, 446-7 (5th Cir. 1998) (citing Robinette in discussion regarding whether other police instruments beyond guns can also be characterized as deadly force; noting the question of whether an instrumentality is deadly force is a question of fact; finding hog tying can create a substantial risk of death or serious injury such that the court considered it deadly force.); Wagner v. Bay City, Tex., 227 F.3d 316, 323 (5th Cir. 2000) (engaging in close factual analysis on the question of whether hog-tying was deadly force).

[100] See e.g., Gutierrez v. City of San Antonio, 139 F.3d 441, 446-7 (5th Cir. 1998); Wagner v. Bay City, Tex., 227 F.3d 316, 323 (5th Cir. 2000) (engaging in close factual analysis on the question of whether hog-tying was deadly force).

[101] Exhibit 15, Report of Timothy Longo at 22.

<u>increased risk of serious injury or death</u> and the potential lack of effectiveness.[102]

LSP's own policy statements and witness testimony create a clear record of factual dispute, which must be resolved in Mr. Terrell's favor at this stage, regarding whether the use of Taser in the circumstances of this case poses a risk of serious bodily injury[103] or death, and as such meets the legal and policy definitions for deadly force.

When Taser prongs are used, Taser causes neuromuscular incapacitation (hereinafter "NMI").[104] LSP's 30(b)(6) representative on Taser, Sgt. Davis, testified about the effect of an NMI from Taser:

> Well, neuromuscular incapacitation is what would commonly be, you know, considered for people to lock up, fall over, things like that, loose control of, you know, the – the ability to move and -- and speak, just – just lose normal motor control.[105]

Because of this effect, an individual is likely to fall uncontrollably after being tased:

> You are not going to throw your arms out if you are standing and walking away from me and you get tased and I achieve an NMI either. You are fully going to lock up and not have use of your arms and legs. You will just topple over.[106]

LSP policy clearly contemplates circumstances in which the use of Taser would be lethal force.[107] In discussing the Use of Force policy, Lt. Williams, LSP's former Training Director, testified regarding his understanding of this provision:

---

[102] Exhibit 15, Report of Timothy Longo at 23, quoting Report of the Maryland Attorney General's Task Force of Electronic Control Weapons, at page 23, citing Police Executive Research Forum, "Critical Issues in Policing Series: Strategies for Resolving for Conflict and Minimizing Use of Force (emphasis added).
[103] Captain Naquin defined serious bodily injury as "something that could result in some kind of permanent disfigurement or death." Exhibit 16, Naquin Deposition, 199:7-9.
[104] Exhibit 17, Scott Davis Deposition, 92:1-6.
[105] Exhibit 17, Scott Davis Deposition, 81:21-82:1.
[106] Exhibit 17, Scott Davis, Deposition, 189:6-11.
[107] Exhibit 18, LSP Policy 238.9 x)(g) (filed under seal), Use of Force; Exhibit 19, Williams Deposition, 167:10-20; Exhibit 20, Bradley Deposition, 147:24 -148:2 (Lt. Bradley confirmed that lethal and deadly force have the same meaning in the LSP policy context.)

A. I guess if, by you tasing someone – most of the time you tase somebody, they're going to fall. So if you're in a place where they fall could really hurt them or kill them, then, no, you wouldn't want to tase them.

Q. What instances would that be?

MR. FAHRENHOLT: Object to the form of the question.

EXAMINATION BY MS. CUMMING:

Q. That you can think of?

A. On side of the road, if you tase them, they fell into the highway, something like that.

Q. So, like, in traffic?

A. Right.[108]

Captain Naquin testified that moving traffic and the speed at which the person is biking would be factors to consider as part of a totality of the circumstances to justify the force:

A. Well, if you got cars that are moving, you know, there again, that's the totality of the circumstances; is there moving traffic, and the possibility that this person might fall into traffic. That's something that would have to be considered.

Q. Okay. And if the bicycle was moving?

A. Again, you know, the totality of the circumstances; is he barely moving; is he going 25 miles an hour.[109]

Sgt. Davis testified that a bicycle could be considered a vehicle under this policy.[110]

At the time he was incapacitated by Trooper Pichon's Taser, Mr. Terrell was operating a bicycle on a street in traffic. He was engaged in an activity that could have resulted in a serious injury or death, namely an uncontrolled fall from a bike in traffic. Mr. Terrell testified that as he approached the intersection there was a car in the intersection.[111] The car was still there at the time he was tased:

I was turning right behind a car, and I guess that's when I was tasered, because I fell, like looking that way – like this way – because I was going behind a car when – like this – I was going around a car and I just went down. And I just remember looking

---

[108] Exhibit 19, Williams Deposition, 169:15- 170:7.
[109] Exhibit 16, Naquin Deposition, 197:19 – 198:3.
[110] Exhibit 17, Davis Deposition, 190:11-21.
[111] Exhibit 1, Terrell Deposition, 31: 8 – 13; 33:3-21 36:14-37:1; 72:4-11.

this way."[112] As Mr. Terrell fell, he testified "I'm looking because I'm well aware there was a car right there . . . you can say traffic coming to me. I'm facing traffic because I'm crossing . . . ."[113]

A reasonable officer would have understood tasing Mr. Terrell while he was in this position to be consistent with both the legal definition and LSP policy's definition of lethal force.[114] Captain Williams establishes that there is at the very least a factual dispute regarding factors that would be necessary to determine if the use of force should be considered a lethal use of force:

> Q. Okay. Is it potentially lethal?
> A. Again, we don't know the situation. If you're saying, hypothetical, it was going against the flow of traffic, yes; but if not, he was going with the flow of traffic, no.[115]

As noted above, Mr. Terrell's testimony was that traffic was coming towards him.[116] Trooper Pichon testified that Mr. Terrell turned down Burgundy and was "going in the wrong direction against traffic on his bicycle."[117] Thus, in Captain Williams' understanding, Trooper Pichon's use of Taser in this circumstance would be a lethal use of force.

LSP's own witnesses testified that lethal force would not be justified to effect a misdemeanor or felony arrest when the individual did not pose a risk of harm to the officer or to anyone else.[118] Fifth Circuit and Supreme Court jurisprudence and LSP policy statements are clear that lethal force is only objectively reasonable when an individual poses a threat of serious bodily injury or death to an officer or others. In Tennessee v. Garner, the Supreme Court was clear, "The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape.

---

[112] Exhibit 1, Terrell Deposition, 37:9-15.
[113] Exhibit 1, Terrell Deposition, 75:6-13.
[114] Exhibit 19, Williams Deposition, 169:15- 170:7.
[115] Exhibit 19, Williams Deposition, 262:8-12.
[116] Exhibit 1, Terrell Deposition, 32:23 – 33:5.
[117] Exhibit 3, Pichon Deposition, 174:5-7.
118 Exhibit 19, Williams Deposition, 172:15 – 173:15.

Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."[119]

The Fifth Circuit has held that simply evading arrest, even in a speeding motor vehicle, cannot form a basis for use of lethal force as a matter of law.[120] In Lytle v. Bexar Cty., Tex., the Fifth Circuit found that a reasonable jury could find that lethal force was not an objectively reasonable means of stopping an individual fleeing in a car at a high rate of speed in a residential area and involved in a traffic accident in the course of flight.[121] The facts of Mr. Terrell's case, can be subsumed by Lytle – Mr. Terrell was not in an innately dangerous motor vehicle but on a bicycle and he did not pose any threat of harm to the officer, any bystander, or himself.

As noted above, this stop occurred only after Trooper Pichon passed Mr. Terrell and his friend (Logan Carroll) and determined that whatever activity they were engaged in did not present such a risk that he felt the need to stop and pursue their apprehension immediately.[122] Further, Trooper Pichon did not regard Mr. Carroll as a safety risk, in fact calling Trooper Roach from questioning Mr. Carroll to pursue Mr. Terrell who was "rolling away."[123] Trooper Pichon does not offer any basis for why Mr. Terrell was more of a safety risk than Mr. Carroll beyond his perception of Mr. Terrell's resistance.

Trooper Pichon's account that Mr. Terrell was reaching for his waistband as Mr. Terrell was moving away from the trooper is disputed by Mr. Terrell.[124] This fact dispute must be resolved in favor of Mr. Terrell at this stage. As a result, Trooper Pichon does not offer a single articulable

---

119 Tennessee v. Garner, 471 U.S. 1, 11-12 (1985); Young v. City of Killeen, TX., 775 F. 2d 1349, 1352-53 (5th Cir. 1985); Manis v. Lawson, 585 F.3d 839, 846 (5th Cir. 2009).
120 Lytle v. Bexar Cty., Tex., 560 F.3d 404, 416 (5th Cir. 2009) (collecting cases).
121 Lytle v. Bexar Cty., Tex., 560 F.3d 404, 416–17 (5th Cir. 2009).
122 Exhibit 3, Pichon Deposition, 184:3-18
123 Exhibit 3, Pichon Deposition, 173:16-18; Exhibit 7, Roach Deposition, 188:2-6; 9-10.
124 Exhibit 8, Terrell Declaration.

objectively reasonable basis for treating Mr. Terrell as any sort of threat – much less a threat that warranted use of lethal force.

Additionally, plaintiff's expert, Timothy Longo, an experienced law enforcement professional and former Chief of Police of Charlottesville, Virginia, opined that Trooper Pichon's boilerplate justification for the force without additional objective factors to support treating Mr. Terrell as a physical threat was not sufficient to make the tasing reasonable.[125] According to Mr. Longo:

> In addition to having a valid basis to conduct a pedestrian stop, there are two additional factors that a reasonable officer must consider before deploying CEW: (1) The subject on whom the officer elects to use such force must have demonstrated by action, word, or deed that he or she will likely use physical force to resist arrest or detention, or; (2) The subject on whom the officer elects to use such force must have demonstrated by action, word, or deed that he or she may assault or attempt to assault the officer or another.
>
> Regardless of which version of events the fact-finder deems credible, at the point Mr. Terrell was driving away on his bicycle he had not committed any offense for which physical harm or the threat of physical harm was present. He was merely a person in flight who had not committed an offense which gave rise to any imminent threat of physical harm to the troopers who may have been in the area at that time.[126]

Trooper Pichon's choice was not exclusively between potentially lethal tasing and giving up questioning Mr. Terrell all together: "In my experience, one obvious and viable option that Trooper Pichon may have considered is to broadcast Mr. Terrell's physical description and direction of travel using the assigned NOPD radio frequency so that officers in the area could make an attempt to stop him by a less intrusive means."[127] Trooper Pichon did not take any steps

---

[125] Exhibit 15, Longo Report at 25-26.
[126] Exhibit 15, Longo Report at 27.
[127] Exhibit 15, Longo Report at 26-27.

available to him that would have led to the apprehension of Mr. Terrell without putting Mr. Terrell's life, and the lives of other motorists and pedestrians in the area, at risk.

Fifth Circuit and Supreme Court jurisprudence, generally accepted law enforcement practice, and LSP's own policies are sufficient to clearly establish to a reasonable officer that use of potentially fatal Taser would not be reasonable in such circumstances.[128]

### 3. Mr. Terrell's actions in "rolling away" down the street did not necessitate the use of Taser.

Even if the use of Taser should be determined to not be lethal force, the use of Taser was still excessive force as a matter of clearly established law. As noted above, the simple fact of a resisting subject does not foreclose any and all analysis of whether the level of force was commensurate with the resistance, law that was clearly established as of June 17, 2017.[129] Further, even in 1998, it was clearly established that the reasonableness of officers who performed an action that had been banned or that was known to be dangerous would be difficult to establish as a factual matter.[130] The clear dangers of incapacitating an individual in Mr. Terrell's circumstances were clearly contemplated by LSP policy and trainers as well as generally accepted police practice.[131]

---

[128] Tennessee v. Garner, 471 U.S. 1, 11-12 (1985); Young v. City of Killeen, TX., 775 F. 2d 1349, 1352-53 (5th Cir. 1985); Manis v. Lawson, 585 F.3d 839, 846 (5th Cir. 2009)

[129] Newman v. Guedry, 703 F.3d 757, 763 (5th Cir. 2012) (noting the need to assess the relationship between the need for force and the force used); see also Gomez v. Chandler, 163 F.3d 921, 923 (5th Cir. 1999); Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009); DeLeon v. City of Corpus Christi, 488 F.3d 649, 657 (5th Cir. 2007) (noting possibility of a non-Heck barred claim if claim was that police used excessive force after resistance stopped or that unreasonable force was used to stop resistance); Kador v. City of New Roads, No. 07–682, 2011 WL 1326641, at *11 (M.D. La. 2011) ("Law enforcement can use excessive or unreasonable force in effecting an arrest, even where a person is resisting. For instance, if a person is resisting arrest by not allowing the officer to place handcuffs on them, it would be an unreasonable use of force to shoot that person or use any type of force that was objectively unreasonable and not necessary to safely make the arrest."), citing VanGilder v. Baker, 435 F.3d 689, 692 (7th Cir. 2006) (denying summary judgment because plaintiff did not deny physical act of resistance, but alleged the response to the resistance was not objectively reasonable.).

[130] Guitierrez v. City of San Antonio, 139 F. 3d 441, 448 – 449 (5th Cir. 1998); Darden v. City of Fort Worth, Texas, 880 F.3d 722, 732 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).

[131] Exhibit 18, LSP Policy 238 (filed under seal); Exhibit 19, Williams Deposition, 167:10-20; 169:15-170:7; Exhibit 16, Naquin Deposition, 197:19-198:3; Exhibit 17, Davis Deposition, 31:8 – 13; 33:3-21; 36:14-37:!; 72:4-11; Exhibit 15, Report of Timothy Longo, 22-23

Defendants' reliance on <u>Steen v. City of Pensacola</u>, a district court case outside of the Fifth Circuit, for the proposition that there is no per se prohibition on tasing an individual on a bicycle misses the essentially fact intensive nature of the use of force analysis, and ignores the Fifth Circuit's jurisprudence looking at overarching questions of reasonableness, not precise force modalities.[132] Defendants' reliance on <u>Steen</u> is all the more problematic because that District Court ignored its own binding Eleventh Circuit precedent. That case involved the tasing of a seventeen-year-old child riding a bicycle by an officer in a moving vehicle, traveling the wrong way down the road. The child fell off the bike and the officer's vehicle accelerated over the child, killing him.[133] The <u>Steen</u> Court declined to find that the use of Taser was unreasonable because it was not deadly force and defined deadly force as that which would be "virtually certain"[134] to cause death. However, the Eleventh Circuit has long defined deadly force as creating a substantial risk of serious injury or death.[135] Defendants' reliance on this problematic, non-authoritative opinion severely undermines any suggestion that any court had somehow blessed the use of Taser on someone on a bicycle.

As described, the serious risks associated with tasing an individual on a moving vehicle are well known to the general law enforcement community and to LSP.[136] Thus, what Defendants' dismiss as a narrow distinguishing basis, the danger the tasing posed in the circumstance should

---

[132] <u>Cooper v. Brown</u>, 844 F. 3d 517, 524-525 (5th Cir. 2016);<u>Wagner v. Bay City, Tex.</u>, 227 F.3d 316, 323 (5th Cir. 2000) (<u>citing</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) for the holding that standard for clearly established was not that the specific policy action had been held unlawful, but only that it be apparent in light of pre-existing law that such an action would be unlawful.); <u>Gutierrez v. City of San Antonio</u> 139 F. 3d 441, 446 (5th Cir. 1998) (finding that definition of deadly force not on the basis of instrumentality, but the circumstances of use was clearly established in 1994).

[133] <u>Steen v. City of Pensacola</u>, 809 F.Supp.2d 1342 (N.D. Fla.2011).

[134]<u>Steen v. City of Pensacola</u>, 809 F.Supp.2d 1342, 1350 (N.D. Fla.2011).

[135] <u>Pruitt v. City of Montgomery</u>, ALA., 771 F. 2d 1475, 1479 n. 10 (11th Cir. 1985).

[136] Exhibit 18, LSP Policy 238 (filed under seal); Exhibit 19, Williams Deposition, 167:10-20; 169:15-170:7; Exhibit 16, Naquin Deposition, 197:19-198:3; Exhibit 17, Davis Deposition, 31:8 – 13; 33:3-21; 36:14-37:!; 72:4-11; Exhibit 15, Report of Timothy Longo, 22-23.

form the basis for the fact finder's entire inquiry into reasonableness. Neither <u>Zimmerman v. Cutler</u>[137] nor <u>Pena v. City of Rio Grande</u>[138] contemplate tasing in a circumstance that was dangerous to the fleeing individual or others in the area. <u>Darden v. City of Forth Worth, Texas</u>,[139] <u>Hanks v. Rogers</u>,[140] and <u>Newman v. Guedry</u>[141] simply do not address the question of whether a highly intrusive level of force would be reasonable to stop a fleeing suspect. Defendants' implication that clearly established law would permit the use of a highly dangerous level of force on an individual simply because he or she was fleeing is overstated.

4. <u>After Mr. Terrell was on the ground, dragging him in handcuffs, hitting, and kicking him was clearly excessive force.</u>

After the tasing, there is no dispute that Mr. Terrell offered no resistance to the troopers.[142] Mr. Terrell was incapacitated from the Taser.[143] Despite this lack of resistance, Trooper Pichon engaged in additional force, causing injury to Mr. Terrell. Mr. Terrell testified that the first thing he recalled after being tased was getting hit.[144] Mr. Terrell testified that he was hit with a fist, and then kicked in his face and head area by a Trooper he later learned was Trooper Pichon.[145] In addition, Mr. Terrell testified that Trooper Pichon kneed him in the back while putting handcuffs on Mr. Terrell and Mr. Terrell was on the ground.[146] Trooper Pichon dragged him by the handcuffs, across the asphalt, to the sidewalk.[147] Trooper Pichon disputes this account of events,[148] but at this

---

[137] 657 Fed. App'x. 340, 347 (5th Cir. 2016).
[138] 839 F. 3d. 613, 620 (5th Cir. 2018).
[139] 880 F. 3d 722 (5th Cir. 2018).
[140] 853 F. 3d 738 (5th Cir. 2017).
[141] 703 F. 3d 757 (5th Cir. 2012).
[142] Exhibit 1, Deposition of Terrell, 39: 21-40:7; Exhibit 3, Pichon Deposition, 175:16-22; Exhibit 4, LSP Case Report.
[143] Exhibit 1, Deposition of Terrell, 39:25 – 40:7.
[144] Exhibit 1, Deposition of Terrell, 38:7-8, 25 – 39:2.
[145] Exhibit 1, Deposition of Terrell, 38:23-39:16.
[146] Exhibit 1, Deposition of Terrell, 40:8-25.
[147] Exhibit 1, Deposition of Terrell, 40:8-25.
[148] Exhibit 3, Pichon Deposition, 234:22- 235:1.

stage, the photographs and Mr. Terrell's testimony establish a record-supported factual dispute which must be resolved in favor of Mr. Terrell.

These uses of force are clearly excessive under any rubric, and particularly when taken in light of Fifth Circuit case law. Even if there is initial resistance to a stop or arrest, force used to overcome any resistance must reasonable.[149] Once resistance stops, "it is unreasonable to use force."[150] The jurisprudence is particularly clear that uses of force, including body pressure on a person on the ground, is unreasonable force and a violation of clearly established law.[151] The Fifth Circuit has held in both Fourth and Fourteenth Amendment contexts that "there is a well-developed body of case law in the Fifth Circuit specifically holding that the use of physical force against a restrained, passively resisting or non-resisting subject violates the constitution."[152] In relying on a Fifth Circuit opinion, the Sixth Circuit held it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is face-down prone position after being subdued and/ or incapacitated constitutes excessive force."[153]

To cast into sharper relief the plain fact dispute between Mr. Terrell's testimony regarding the force that occurred after the tasing and Trooper Pichon's denial of the use of force, a closer review of Mr. Terrell's injuries is instructive. The jury will be able to review Mr. Terrell's injuries as evidence of the excessive force: "[i]n evaluating excessive force claims, courts may look to the seriousness of injury to determine 'whether the use of force could plausibly have been thought

---

[149] Cooper v. Brown, 844 F.3d 517, 524–25 (5th Cir.2016); Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008).
[150] Shumpert v. City of Tupelo, 905 F.3d 310 (5th Cir. 2018).
[151] Delacruz v. City of Port Arthur, 1:18-CV-11, 2019 WL 1211843, at *9 (E.D. Tex. Mar. 14, 2019); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004), cert. denied, 544 U.S. 975 (2005).
[152] Salcido as Next of Friend of K.L. v. Harris Cty., Tex., No. H-15-2155, 2018 WL 6618407 (5th Cir. Dec. 18, 2018) (citing Bush, 513 F.3d at 501; Williams, 180 F.3d at 704).
[153] Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004), cert. denied, 544 U.S. 975 (2005) (discussing Simpson v. Hines, 903 F.2d 400 (5th Cir. 1990)).

necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur."

The spread of Mr. Terrell's injuries are significant and placed in such locations that a single fall from a bicycle is a highly unlikely origin for all of the injuries. Mr. Terrell had a significant cut to the top of his scalp, different from any other abrasion lower on his head or body.[154] Mr. Terrell had a large contusion on his back, again distinct and apart from any abrasions he sustained on his face and legs.[155] Mr. Terrell had significant and large abrasions on both wrists.[156] Mr. Terrell has a large abrasion on both the front of his nose and a large laceration over his right eyebrow.[157]

In addition, Mr. Terrell has been diagnosed and received treatment for PTSD.[158] In seeking treatment, Mr. Terrell has specifically referenced the memories of being hit and kicked as troubling to him.[159] The pattern and nature of these injuries establish a clear question of fact for a jury to determine how these injuries were caused, and given their severity, whether or not the use of such force could plausibly have been necessary.

---

[154] Exhibit 10, CCS Records; Exhibit 9, Photographs; Exhibit 11, UMC Records
[155] Exhibit 10, CCS Records; Exhibit 9, Photographs; Exhibit 11, UMC Records
[156] Exhibit 10, CCS Records; Exhibit 9, Photographs; Exhibit 11, UMC Records
[157] Exhibit 10, CCS Records; Exhibit 9, Photographs; Exhibit 11, UMC Records
[158] Exhibit 10, CCS Records; Exhibit 13, Hunt Records; Exhibit 14, Bossier Records; Exhibit 12 Shwery Report.
[159] Exhibit 10, CCS Records; Exhibit 12, Shwery Report.

**D.  Lt. Williams and Captain Naquin's Failure to Supervise Troopers, including Trooper Pichon, Created a Substantial Likelihood that their Troopers would Violate Individual Constitutional Rights.**

1.  Objective Deliberate Indifference Standard for Individual Supervisors

Fifth Circuit jurisprudence establishes a three-factor analysis of individual supervisor liability even where the supervisor is not personally involved in the underlying constitutional violation at issue:[160] "(1) the supervisor failed to train or supervise; (2) a causal link exists between the failure and violation of plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference. Similarly, failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[161]

While this three-element test is relatively straightforward, the question of the requisite level of deliberate indifference to establish the liability of a supervisor deserves a closer examination. There are two types of deliberate indifference: objective and subjective.[162] Objective deliberate indifference exists where officials knew or should have known that a particular policy or practice would present a risk of violation of the plaintiff's rights.[163] Because it contemplates the possibility of both official and individual liability based on an official's knowledge **or** constructive knowledge (what the official knew or should have known), the objective deliberate indifference standard

---

[160] Doe v. Taylor Indep. School Dist., 15 F.3d 443, 453 (5th Cir. 1994); Porter v. Epps, 659 F. 3d 440, 447 (5th Cir. 2011); City of Canton v. Harris, 489 U.S. 378, 390 (1989).

[161] E.A.F.F. v. United States, 955 F.Supp.2d 707, 739 (W.D. Tex.2013), aff'd sub nom. E.A.F.F. v. Gonzalez, 600 Fed.Appx. 205 (5th Cir. 2015) (citing Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011)); Brumfield v. Hollins, 551 F.3d 322, 328 (5th Cir .2008); see also Davidson v. City of Stafford, Texas, 848 F.3d 384, 397–98 (5th Cir. 2017), as revised (Mar. 31, 2017).

[162] Farmer v. Brennan, 511 U.S. 825, 840-42 (1994) (explaining that test for municipal liability described in City of Canton is objective test; test for direct liability against individuals is subjective test).

[163] City of Canton v. Harris, 489 U.S. 378, 390 (1989).

differs from the subjective deliberate indifference standard, which requires proof that that the defendant actually knew of but disregarded a risk.[164]

The Fifth Circuit holds that individual supervisors can be individually liable if they exhibit objective deliberate indifference toward the need for training or supervision of subordinates:

> [The] legal elements of an individual's supervisory liability and a political subdivision's liability . . . are similar enough that the same standards of fault and causation should govern. A municipality, with its broad obligation to supervise all of its employees, is liable under § 1983 if it supervises its employees in a manner that manifests deliberate indifference to the constitutional rights of citizens. We see no principled reason why an individual to whom the municipality has delegated responsibility to directly supervise the employee should not be held liable under the same standard. Other circuits have reached substantially the same result."[165]

In Porter v. Epps, the Court set out an objective deliberate indifference standard for individual supervisor liability: "to establish that a state actor disregarded a known or obvious consequence of his actions, there must be actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights and nevertheless chooses to retain that program."[166]

Defendants' citation to McClendon v. City of Columbia[167] to suggest a subjective deliberate indifference standard is inapposite. While the initial case did include a failure to train theory against the City of Columbia, a prior Fifth Circuit panel affirmed the district court's grant of summary judgment in favor of the City on the training claim, which was re-affirmed by the en

---

[164] Lawson v. Dallas County, 286 F.3d 257, 264 (5th Cir. 2002) (finding "Unlike the deliberate indifference standard applied to individual employees, this standard is an objective one; it considers not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights. Therefore, constructive notice is adequate.")
[165] Doe v. Taylor Indep. School Dist., 15 F.3d 443, 453 (5th Cir. 1994).
[166] Porter v. Epps, 659 F. 3d 440, 447 (5th Cir. 2011).
[167] 305 F. 3d 314, 326 n.8 (5th Cir. 2002).

banc court in the case Defendants cite.[168] Because the failure to train theory was not even before the Court, the articulation of the deliberate indifference standard is only binding on the question whether a direct action violating a plaintiff's constitutional rights is subject to a subjective deliberate indifference standard. In the portion of the opinion Defendants cite, the Fifth Circuit was articulating the deliberate indifference standard for a cause of action arising out of a direct violation of a plaintiff's constitutional rights, i.e. specifically creating a danger or risk for a private act of violence. That part of the opinion is not directed at a claim based on failure to supervise or failure to train.[169]

Thus, while objective deliberate indifference is a higher standard than negligence, it can be met without a showing that individual supervisors personally drew the inference of likely harm. Under clearly established Fifth Circuit precedent, individual supervisors are liable if they have constructive notice of deficiencies in training and supervision that are "obvious and obviously likely to result in a constitutional violation."[170]

There are two recognized mechanisms for establishing such constructive notice to a supervisory individual. The first is setting out a pattern and practice of the same or similar violations where the risk of harm was obvious.[171] The second is that the risk of harm from a single incident was obvious.[172]

---

[168] McClendon v. City of Columbia, 305 F.3d 314, 321 (5th Cir.2002) (outlining procedural posture of the case and re-affirming prior panel's summary judgment in favor of the City of Columbia on failure to train claims).

[169] McClendon v. City of Columbia, 305 F.3d 314, 326 (5th Cir. 2002) (defining deliberate indifference specifically in the context of "applying both the "special relationship" exception to the DeShaney rule and the "state-created danger" exception to the DeShaney rule have generally required plaintiffs to demonstrate (or, at the motion-to-dismiss stage, to allege) that the defendant state official at a minimum acted with deliberate indifference toward the plaintiff.")

[170] Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F. 3d 375 (5th Cir. 2005).

[171] City of Canton v. Harris, 489 U.S. 378 (1989); Davidson v. City of Stafford, Texas, 848 F.3d 384, 397–98 (5th Cir.2017), as revised (Mar. 31, 2017)

[172] City of Canton v. Harris, at 390 ; Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 385–86 (5th Cir. 2005). Although, the question of what law was clearly established for supervisors tends to be subsumed by the deliberate indifference analysis, Plaintiff re-urges his preservation of the right to challenge this Court's and the Fifth Circuit's current qualified immunity framework which is "not justified by . . . any federal statute, the rules of

2. Williams' Failure to Provide Coherent Training on Use of Force and Foot Pursuits

As Training Academy Director, Captain Williams allowed a cacophony of conflicting policy and training directives to Troopers regarding the use of force, particularly on foot patrol and during on-foot pursuits. As an initial matter Lt. Williams testified that there was no training or policy on foot patrol or foot pursuit offered to any of the troopers operating in the French Quarter.[173] In fact, none of the LSP's witnesses could recall or were aware of any training or policy on either foot patrol or foot pursuit offered to troopers operating in the French Quarter pursuant to the Cooperative Endeavor Agreement with the City of New Orleans.[174]

Plaintiff's expert noted that such training "was especially important given the nature of the detail and its contrast to the work that is typically performed by a Trooper whose primary focus is highway safety, enforcement of motor vehicle laws, and accident investigation and reconstruction."[175]

Beyond simply having no training or policy clarity regarding foot patrols, LSP witnesses demonstrated a startling lack of clarity in use of force and Taser policy. LSP's written policy restricts the use of Tasers to situations where they are necessary to protect the trooper, the subject or bystanders, and even then, only when less intrusive means would be ineffective.[176] However Sgt. Scott Davis, LSP's Rule 30(b)(6) designee on Taser policy and training, testified that the LSP policy is poorly written and does not reflect the position of the department.[177] Yet other LSP

---

civil procedure, or the common law," Medina v. Cram, 252 F.3d 1124, 1135 (10th Cir. 2001) (Seymour, J., dissenting), as to all supervisor claims.
[173] Exhibit 19, Williams Deposition, 125-126; 219-221.
[174] Exhibit 7, Roach Deposition, 116 -118; Exhibit 16, Naquin Deposition, 114; Exhibit 22, Bellue Deposition 115; Exhibit 19, Williams Deposition, 125; Exhibit 3, Pichon Deposition, 39:1-10; Exhibit 15, Longo Report, 67.  X
[175] Exhibit 15, Longo Report, 66.
[176] Exhibit 18, LSP Policy 238. 9. vi, Use of Force Policy.
[177] Exhibit 17, Davis Deposition, 174 – 176.

witnesses testified to their understanding that Policy 238 as written is an accurate reflection of LSP's use of force policy.[178]

The testimony of other Louisiana State Troopers demonstrates the conflicting understandings of LSP policy on the use of the Taser. Lt. Len Marie testified that if a trooper, "believes there's a reasonable suspicion for a crime has occurred and he had used his authority to stop the subject and subject walks away, runs away, crawls away, he can use any number of means to detain him up to an including tasing him."[179]

Lt. Patrick Bradley testified:

> "I would say if somebody in a resisting arrest situation, of somebody – and somebody's not – not complying, they – they – I don't think they have to necessarily be actively fighting you; if it's – if it's just a situation where – you know, any – any situation where you're going to avoid really fighting somebody. If you going to fight somebody, put your hand on them and wrestle them to the ground, the – the – the Taser is a – is an option – to de-escalate that from getting you know – you weigh out what's – you know – what's a – what's a heavier thing to do, tase somebody that last for a couple of seconds or you're – you know – it's a knock down, drag out fight in the – in the middle of the street."[180]

Plaintiff's expert notes, "the sworn deposition testimony of the Lieutenants reveals a lack of substantive knowledge of LSP's use of force policy with respect to CEW deployment. In my opinion, this hampers their ability to properly train, supervise, and evaluate the use of force decision making of LSP's greatest and most valuable internal resource, the Trooper."[181]

---

[178] Exhibit 19, Williams Deposition 154:17-24.
[179] Exhibit 23, Deposition of Marie, 28.
[180] Exhibit 20, Bradley Deposition, 156-7
[181] Exhibit 15, Longo Report, 33.

Sgt. Bellue testified that taser could be deployed on anyone actively resisting, which included "pulling away, fighting, running" even when these forms of resistance did not pose any physical threat to the officer or anyone else.[182]

Finally, Captain Williams, the Training Academy Director during the relevant time period, testified that Taser could be used if an individual is not replying to commands: "do what you need him to do to make the arrest."[183]

Such an organization-wide failure to consistently and coherently articulate the standard for use of force including use of Taser is an obvious invitation to constitutional violations. City of Canton v. Harris specifically contemplates that an agency failure to have an articulable policy on deadly force is such a glaring policy deficiency that it was likely to lead to a violation of constitutional rights:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.[184]

In the instant case, Captain Williams and LSP armed troopers with Tasers. Yet, based on the variance in testimony from LSP witnesses and LSP policy itself, Captain Williams failed to provide any sort of training that would establish a coherent or consistent understanding of how and when a trooper may use a Taser. Because LSP's own policy contemplates scenarios in which Taser use could be considered deadly force, Captain Williams' failure in training in this regard is a

---

[182] Exhibit 22, Bellue Deposition 32.
[183] Exhibit 19, Williams Deposition166
[184] City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989).

perfect example of deliberate indifference as contemplated by the <u>Harris</u> Court. Where the injury caused to Plaintiff began with an unjustified tasing, this record establishing LSP's incoherent use of force policy, particularly with regard to Taser use, must be considered as a moving factor in Plaintiff's injury.

Given the naked conflict between what LSP witnesses testified to and LSP's policy on taser use, "it is no wonder that apparent policy violations went unnoticed and therefore were not addressed during the use of force and EIS review process."[185]

### 3. Williams' and Naquin's Failure to Meaningfully Review Use of Force Reports

Lt. Williams' and Captain Naquin's testimony and the collection of use of reports each defendant approved[186] establish that neither defendant meaningfully executed his duties as a supervisor. Plaintiff's expert specifically notes that "comprehensive reviews of use of force incidents help officers and their agencies detect patterns or behaviors that have important implications for the development of policies that may reduce use of force incidents, ensure strict accountability regarding use of force decision making, and promote effective and engaged supervision."[187]

LSP's own policies specifically contemplate the importance of use of force report reviews. LSP's UOF policy specifically requires that any officer involved in a use of force will fill out a use of force report which is then reviewed by supervisors.[188]

---

[185] Exhibit 15, Longo Report, 36.
[186] Exhibit 24, 2016 and Exhibit 25, 2017 UOF Reports
[187] Exhibit 15, Longo Report, 30.
[188] Exhibit 18, LSP Policy 238, Section 10. This document will be provided to the Court under seal in light of the current Protective Order.

a. <u>Williams Failure to Engage in the Use of Force Review Process</u>

LSP's Use of Force policy requires the Training Academy Director to review Use of Force Reports to determine whether LSP rules or policy have been violated and whether current policy and training is adequate and comprehensible.[189] As discussed in more detail below, Captain Williams failed to accomplish every single one of these policy objectives in reviewing use of force reports. As noted above, testimony from LSP's own witnesses demonstrate mass confusion regarding what LSP's actual policy is on when Taser use is permitted. As will be discussed below, Captain Williams' own testimony acknowledged that use of force reports he reviewed plainly demonstrated violations of policies.

Because reviews of use of force are a well-established critical component of ensuring constitutional deployments of force, Williams' failure to engage in any meaningful use of force review as detailed below must be considered as creating an obvious risk for and a moving force in Trooper Pichon's unconstitutional use of excessive force.[190] Plaintiff's expert notes the particular significance Williams' final review as director of the training academy have in preventing constitutional violations:

> As the director of the Training Academy, Lieutenant Williams was given the duty of having the final review of use of force incidents occurring in the field. If has been my experience that this responsibility serves a useful purpose in that it helps to identify improper tactics, departures from policy and training, and emerging trends that require remediation, discipline, or amendments to policy and training. When the Training Director fails to perform this function properly potentially harmful behavior goes undetected and is allowed to continue without correction.[191]

Lt. Williams himself acknowledged the importance of use of force reviews:

---

[189] Exhibit 18, LSP Policy 238, Section 10, Use of Force.
[190] Exhibit 15, Longo Report, 30; Exhibit 18, LSP Policy, 238, Use of Force.
[191] Exhibit 15, Longo Report at 46.

A. Yes. I mean, <u>we want to keep down injuries on civilians as well as police officers</u>. We never want to injure anybody. So that's why you look at the use of force reports and determine, you know, if the right amount of force was used.[192]

These use of force reviews are not an abstract question of disembodied civil rights; they are a matter of ensuring public safety.

Captain Williams was aware of what should have been included in use of force reports to make for an effective review:

I would guess, I mean, the probable cause for you making the stop or whatever the situation was, how it escalated, how it got to where it was, why you felt the need to use whatever level of force that you used.[193]

Captain Williams also knew what he should have been reviewing the use of force reports for:

Q.      What was your reason --- why would you, as training academy director, review uses of force or use of force report?
A.      To read the narrative, to see if the amount of force used was the correct amount of force to use, the report was done correctly, seeing if this was, like, a trend, like you start seeing the same thing over and over and over again; like, I notice Taser has been used more time than it's ever been used.  Its because nobody uses OC spray anymore.  Nobody used their baton anymore.  So you look at different trends; <u>or if you see thing that you say ok, this is not safe, you know, I'm seeing it too often, maybe we should conduct some trainings to straighten this out.</u>  Those are the things I'm looking for."[194]

Despite understanding the critical importance of reviewing use of force reports to public safety and what he should be looking for, Captain Williams' actual approach to review was shockingly lackadaisical. Williams testified that in reviewing use of force reports he never found a policy violation:

Q. So when you found that department rules and regulations had been violated, did you take any steps as a result of that?

---

[192] Exhibit 19, Williams Deposition at 138:22-139:1 (emphasis added).
[193] Exhibit 19, Williams Deposition, 191:18-22
[194] Exhibit 19, Williams Deposition, 194: 19 – 195:11 (emphasis added)

A. I don't remember finding one. You know, you would look for them, but I mean, if I found one, I would call that commander, say, "okay, what did you do about this."[195]

Even with this clear understanding of what he should be reviewing in looking at use of force reports, Captain Williams testified repeatedly in his deposition that he did not have sufficient information regarding the reason for a use of force based on specific use of force reports that he had approved.[196] Thus, in a use of force report dated August 9, 2016, the report indicates that Sgt. Bellue deployed his Taser to stop an individual who was running away from a New Orleans Police Department (hereinafter "NOPD") officer.[197] The report did not indicate that the individual posed any risk or danger to anyone.[198] The information contained in the report itself was not consistent with use of Taser policy as Lt. Williams understands it.[199] Captain Williams signed off on this use of force report anyway.[200]

Another report dated August 7, 2016 features at least two uses of Taser on an intoxicated individual who was on the ground.[201] The report does not provide information about how the individual came to be on the ground. The report documents that the Taser was used twice, but only accounts for one deployment of the taser.[202] Although this is the sort of discrepancy that should have caused Captain Williams to seek more information, Captain Williams signed off on the report.[203] Further, Captain Williams has no specific memory and there is no documentation that Captain Williams spoke with anyone about this discrepancy.[204]

---

[195] Exhibit 19, Williams Deposition 211:19-25
[196] Exhibit 19, Williams Deposition, 221-243 generally.
[197] Exhibit 24, 2016 UOF Reports, Bates Numbers Terrell4884-95; Exhibit 19, Williams Deposition at 223 – 224 generally.
[198] Exhibit 19, Williams Deposition 225:9-14.
[199] Exhibit 19, Williams Deposition 226:6-13.
[200] Exhibit 19, Williams Deposition 226:25 – 227:23.
[201] Exhibit 24, 2016 UOF Reports Bates number 4890-5.
[202] Exhibit 19, Williams Deposition 232:5-21.
[203] Exhibit 19, Williams Deposition 232:22-233:7.
[204] Exhibit 19, Williams Deposition 233:8-234:9.

A third report, dated July 19, 2016 involves the stop of a motorist for improper display of a license plate which devolved to the trooper smashing in the driver's side window with his flashlight and pulling on the motorist's seat belt until it unbuckled.[205] Although the stop was only for improper display of license plate, the trooper listed "to prevent a violent felony" as the basis for the stop. Captain Williams initially testified breaking a driver's window if someone declined to exit their vehicle was an appropriate use of force.[206] However, on reviewing the narrative, Captain Williams changed his testimony:

> Q. Let's flip over to the next page. It's got a post incident observation narrative. And it's got a little more detail here. It looks like this guy, that the trooper was stopping this guy for improper display of a license plate. And then it looks like the driver was not happy about this stop and tried to give him his attorney's card, and the trooper ordered the guy out of the vehicle. And the guy said that it was a violation of his rights. Do you know why that's in quotes there, 'violation of his rights'?
> A: No.
> Q. Okay. And then looks like the trooper then struck the driver's side window of the vehicle with the butt of his flashlight until the window broke. At that point, Trooper Fellon was able to reach into the vehicle, unlock the driver's side door, and pull the seatbelt the person was wearing until he unbuckled it. The person then exited the vehicle and was placed in handcuffs. It looks like the arrests are resisting an officer, improper display of a license plate and no driver's license. Is breaking the car window and pulling on this person's seatbelt until the seatbelt is unbuckled seem like a reasonable use of force for an improper display of a license plate and no driver's license?
> Mr. Fahrenholt: Object to the form of the question:
> The Witness: No.[207]

Although Captain Williams acknowledged that this frighteningly rapid escalation in use of force resulting in significant property damage was not a reasonable use of force, or consistent with

---

[205] Exhibit 24, 2016 UOF Reports Bates numbers Terrell4944-4949.
[206] Williams 234:10-235:3.
[207] Williams 235:7 – 236:12.

policy,[208] he does not have any specific memory and there is no documentation that he requested more information or that he spoke with anyone about this incident.[209]

Finally, another report dated July 17, 2016, involved the repeated tasing of a mentally ill man.[210] Captain Williams confirmed that people who are mentally impaired are included on the list of people who should not be tased unless lethal force would be appropriate.[211] Although the use of force report was to document an instance of force LSP's policy would consider lethal force, there were discrepancies in the report about what resistance necessitated the use of force and when this resistance occurred.[212] Although Captain Williams did not have sufficient information to determine if this use of lethal force was consistent with policy, he approved the report. He did not have any specific memory and there was no documentation that he spoke with anyone else about this report.[213] Thus, Williams himself could identify policy violations and deficiencies in use of force reports he had signed off on and reviewed.

Beyond these reviews, Plaintiff's expert noted serious deficiencies and glaring policy violations in use of force reports he reviewed:

> Many of the reports lack information from which a reviewer can come to any reasonable conclusion as to the propriety of a Trooper's actions, or they reveal violations of policy that should have promptly been remediated.
>
> Bates No. 004980-004985 pertains to a traffic stop where the driver was wanted on three (3) outstanding warrants. According to the report, the driver fled the scene on foot and was subsequently apprehended. When located, he again attempted to flee by pulling away from the Trooper. As a result, the Trooper deployed his TASER striking the subject in the middle of the chest. The subject is reported to have spun around where he was again struck by the

---

[208] Exhibit 19, Williams 236:20-22,

[209] Exhibit 19, Williams 236:23-237:19.

[210] Exhibit 24, 2016 UOFS, Bates numbers Terrell4950-4955; Exhibit 19, Williams 238

[211] Exhibit 19, Williams 238:10-14.

[212] Exhibit 19, Williams 238:16 – 241:16.

[213] Exhibit 19, Williams242:18 – 243:7.

TASER barbs in the back. A drive stun between the shoulder blades is what appears to have brought the subject into submission. This report was approved by Lieutenant Williams about a month after it was written. In my opinion the narrative is insufficient to describe the level of resistance and threat that the subject posed to the officer to warrant the use of an CEW. Mere flight and the act of pulling away appear to be the only acts of aggression that are explained within the body of the report. Both are insufficient, in my opinion, to comply with LSP established policy. Further, TASER warns against using the TASER in the area of the chest. From what I can discern, no additional follow-up was conducted to determine if there was sufficient information that could be learned that would describe the suspects behavior as presenting a risk of physical harm to the trooper or others, and to determine why the TASER was deployed to a sensitive area such as the chest.

Bates No. 005468-005473 pertains to a subject who was apparently being arrested for a crime that constituted a felony. However, the report fails to set out what that felony may have been or the facts and circumstances which led to the Trooper's encounter with the subject. According to the report, the subject pulled away and pushed a trashcan at the Trooper. The basis for TASER deployment has been characterized as "*defense of officer, defense of self, and to prevent a violent felony*". Again, the report is absent any explanation as to what the violent felony may have been that would have supported use a CEW not once, but three times. As in the prior case, one of the deployments was to the subject's chest. The report was approved by Lieutenant Williams who appears to have conducted no follow-up to resolve these deficiencies.

Bates No. 005510-005515 pertains to a subject who had crossed the barricade and was allegedly interfering with a parade route. The active resistance attributed to this subject was that he pulled away and resisted handcuffing. When a wrist-lock failed to be effective, the Trooper resorted to use of his TASER. Once again, the scant narrative supplied by the writer fails to set out facts that would necessitate use of the TASER to protect the officer, the subject, or others from physical harm. It appears from the narrative that the only less intrusive means considered by the Trooper was a wrist-lock. When that failed, the TASER became the apparent weapon of choice. Lieutenant Williams approved this report without any apparent attempts to gather additional facts to better determine the appropriateness of the Trooper's actions and the necessity of using a TASER to effect an arrest for a minor and non-violent offense.

Bates No. 006303-006308 pertains to a traffic stop. The underlying basis for the stop is not explained in the narrative portion of the report. The subject's resistance is described as flexing his arm and refusing to be handcuffed. The scant narrative fails to articulate any additional facts that would support a belief that use of a CEW was necessary to protect the officer, the subject, or others from physical harm. Absent such facts, it appears that the TASER in drive-stun mode was used solely to cause the subject to cooperate in being handcuffed for an offense that is not even enumerated in the report. Lieutenant Williams approved this report without any apparent attempt to gather additional facts to determine the appropriateness of the Trooper's actions and the necessity of using an CEW to effect an arrest for an undetermined offense.

Bates No. 004992-004996 pertains to a traffic stop involving a moped. After a brief pursuit, the operator of the motor dropped the bike and fled. According to the brief report, the subject was running between vehicles in traffic congestion when the TASER was deployed. In fact, the only level of resistance enumerated in the report is "*resistance by flight*". Absent additional information not contained within the report, use of an ECW under these circumstances would have violated LSP policy. The report was approved by Lieutenant Williams who appears to have made no effort to gather additional facts in order to determine the appropriateness of the Trooper's actions and the necessity of using an CEW to affect an arrest under these circumstances.[214]

While policy violations are not per se constitutional rights violations, when an officer violates policy by engaging in a dangerous tactic that is discouraged or banned by the agency, then the objective reasonableness of the action is necessarily called into question.[215] As catalogued above, the record abounds with both formal violation in troopers failing to provide sufficient information about the circumstances of the use of force and substantive policy violations with troopers simply violating the LSP's Use of Force policy and causing physical harm to individuals.

---

[214] Exhibit 15, Longo Report 47-49. Bates numbers referenced are included in Exhibit 24, 2016 UOF Report and Exhibit 25, 2017 UOF Reports.

[215] Gutierrez v. City of San Antonio, 139 F. 3d 441, 448 – 449 (5th Cir. 1998); Darden v. City of Fort Worth, Texas, 880 F.3d 722, 732 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).

Such violations can form the basis for placing a supervisor, such as Captain Williams, on notice of the need for additional training.[216] As outlined above, no such training ever occurred

        b.   <u>Naquin's Failure to Engage in the Use of Force Review Process</u>

Similarly, Captain Naquin was tasked with reviewing use of force reports after a sergeant or Lieutenant had conducted the initial review.[217] When reviewing use of force reports, Captain Naquin stated that he would look for the circumstances that led to the use of force and whether or not the force was appropriate or excessive.[218]

But in his deposition, Captain Naquin was asked about two use of force reports involving the tasing of an individual after they were handcuffed.[219] LSP policy defines tasing an individual in handcuffs as only permissible where lethal force would be permitted.[220] Despite the heightened danger associated with tasing a handcuffed individual, Captain Naquin did not have any concerns regarding the adequacy of the narratives the troopers offered to justify these uses of lethal force.[221] Throughout his deposition testimony, Captain Naquin had to resort to hypotheticals or fill in facts in order to justify the uses of force:

> Q. Does this narrative, does this account with someone cuffed on the ground being tased, is that consistent with your understanding of the use of force policy?
> A: Well, he continued to go into his pockets. And I think that probably was the issue there, that **they probably** hadn't had an opportunity to search him thoroughly yet. They were concerned he may have had a weapon."[222]

---

[216] <u>Webster v. City of Houston</u>, 735 F.2d 838, 842 (5th Cir.1984), on reh'g, 739 F.2d 993 (5th Cir. 1984) (holding that constructive knowledge of constitutional rights violations could be imputed to an official or body when policy violations are persistent and widespread.); <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 (noting that the need for training may be obvious when police often violate constitutional rights when exercising discretion.)

[217] Exhibit 16, Naquin 199:10-200:6.

[218] Exhibit 16, Naquin 200:7-12.

[219] Exhibit 16, Naquin 210; Exhibit, 24, LSP UOF 2016 bates numbers Terrell005892-5896; 5808 – 5813.

[220] Exhibit 18, Use of Force Policy 238.9.x.c.

[221] Exhibit 16, Naquin 2016 - 210

[222] Exhibit 16, Naquin 206:6-14.

However, Captain Naquin was also clear that a pat down search for weapons would automatically be conducted after someone was handcuffed.[223] Plaintiff's expert noted that "If circumstances were such that a continuing threat of physical injury continued after the subject was handcuffed, a thorough, complete and detailed accounting was necessary to explain the objectively reasonable basis to have violated this policy."[224]

The second incident included statements that a trooper struck a cuffed individual with his hands and then tased the cuffed individual.[225] Captain Naquin could not tell from the report what the nature of the trooper's hand strike was.[226] Captain Naquin interpreted from the report that the Taser was deployed because "they were trying to keep him from falling" but he acknowledges that the report is not specific.[227] Plaintiff's expert stated, "I am of the opinion that the narrative failed to set out a complete and thorough account such that it can be properly evaluated and assessed for compliance with LSP policy."[228]

In reviewing use of force reports that Captain Naquin approved, Plaintiff's expert found a pattern of "similar deficiencies with regard to the clarity of information contained within the reports:"[229]

> Bates No. 6315-6319 pertains to a traffic stop that was initiated because the driver was not wearing a seat belt. The driver exited the vehicle and fled on foot. A CEW was deployed some six (6) times during the course of the Trooper's encounter with the subject; three (3) times while the subject was in flight and three (3) times while the subject was prone. The first two attempts while the subject was running failed. Upon the third attempt, the subject fell to the ground. According to the brief narrative, the subject resisted handcuffing. The first CEW deployment on the ground was inadvertent (the Trooper's finger-slipped). The subject allegedly continued to resist

---

[223] Exhibit 16, Naquin 206:19 – 207:1.
[224] Exhibit 15, LONGO 41.
[225] Exhibit 24, LSP 2016 UOFs bates numbers 5805 – 5813.
[226] Exhibit 15, Naquin 210:18 – 211:1.
[227] Exhibit 16, Naquin 212:20 – 213:18
[228] Exhibit 15, LONGO 42.
[229] Exhibit 15, LONGO 43.

and the CEW was deployed twice more resulting in compliance. The subject was charged with a host of criminal offenses but it is wholly unclear from the narrative how these offenses arose from the initial encounter; it was a traffic stop for not wearing a seat belt. Further, the verbiage used to describe the level of aggression posed by the subject that apparently warranted multiple CEW activations was resistance to being handcuffed. In my opinion the narrative is devoid of facts that would support any reasonable belief that the CEW was necessary to protect the officer, the subject, or others from physical harm, or that any other less intrusive means was considered by the Troopers. Notwithstanding these deficiencies, Captain Naquin and Lieutenant Williams approved the report.[230]

Like Captain Williams, the record establishes that Captain Naquin was reviewing and approving use of force reports that demonstrated both formal and substantive policy violations by troopers engaged in uses of force. Like Captain Williams, these clear policy violations serve as constructive notice to Captain Naquin of the heightened risk of constitutional rights violations by his subordinates.[231] As such Captain Naquin was on notice of the need to provide additional training and supervision to troopers.[232]

c. Naquin and Williams' respective failures to engage in the use of force review process fatally undermined the use of force review process.

All of the policy violations Captain Williams and Captain Naquin left unchecked in their respective use of force review process establish that while Captain Williams was training director and Captain Naquin was commander of Troop N, there was effectively no use of force review process. Neither Captain Williams nor Captain Naquin engaged in any independent investigation into use of force reports.

---

[230] Exhibit 15, Longo Report 43 – 44.
[231] Gutierrez v. City of San Antonio, 139 F. 3d 441, 448 – 449 (5th Cir. 1998); Darden v. City of Fort Worth, Texas, 880 F.3d 722, 732 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).
[232] Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir.1984), on reh'g, 739 F.2d 993 (5th Cir.1984) (holding that constructive knowledge of constitutional rights violations could be imputed to an official or body when policy violations are persistent and widespread.); City of Canton v. Harris, 489 U.S. 378, 390 (noting that the need for training may be obvious when police often violate constitutional rights when exercising discretion.)

Lt. Williams testified that he did not engage in or seek out any independent investigation into a Trooper's use of force:

> Q. Okay. So you see the use-of-force report. Is there anything else that you are looking at to determine if the use of force was appropriate, if the report was written correctly, all of that stuff, other than the use-of-force report itself?
> A. Right.
> Q. There's nothing else that you're looking at, other than use-of-force report itself; is that correct?
> A. Right. I'm looking at the report. Like I said, I'm seeing what techniques were used, if it was done correctly, looking at trends, looking at possible training issues, if we're seeing a pattern of certain things that people are doing that we may have to address.
> Q. But I just want to make absolutely clear that the only thing you've got in front of you when you're doing all of that work is what is -- what has been put onto the use-of-force report that you were looking at and reviewing at that moment?
> A. Right.
> Q. So do you ever conduct any independent investigation into uses of force?
> A. No.[233]

Indeed, testimony from LSP witnesses all the way down the chain of command establishes that no consistent independent investigation into officer uses of force ever actually occurs. Captain Naquin testified that the first round of review of a use of force report is done by the Sergeant or Lieutenant directly supervising the individual trooper.[234] Naquin described his review of uses of force:

> Q. So when you are reviewing a use-of-force report, what are you reviewing for?
> A. Just the circumstances that led him to use the use of force, and did I think it was appropriate under the circumstances and not excessive.
> Q. Okay. And what are you looking at when you do that review?
> A. Well, again, you know, what was the reason for him to initiate any kind of a use of force; did he just walk up to somebody and throw them to the ground, or did he walk up to somebody who --

---

[233] Exhibit 19, Williams Deposition, 197:19 – 198:19;
[234] Exhibit 16, Naquin Deposition 199:10-200:1

and place them under arrest and the guy resisted; how did he resist; those sorts of things.

Q. Where does that narrative come from? Where are you getting that information?

A. It's the trooper, when he writes the use of force, puts a narrative in there of the

circumstances of the arrest and what led him to use the use of force.

Q. So you're looking at the trooper's account of the use of force?

A. Yes.

Q. Are there any other sources of information?

A. If there's a video, we can look at video. If there's another trooper who is there 10 and witnessed it, we can talk to the other trooper.

Q. Okay. Would you ever talk to any other non-law enforcement witnesses?

A. If they were there. I can't remember specific incident that I did. Certainly, if it was something that went to internal affairs, they would, or something like that. But, no, I don't remember ever talking to civilian.

Q. Do you ever remember having one of your subordinate supervisors, sergeant or lieutenant?

A. I don't remember.

Q. Okay. So the review is based on primarily the trooper's own account, if available video, and possibly also another trooper's account who was in the area?

A. Yes.[235]

Sgt. Cuccia testified:

Q. Okay. I'm wondering what steps you take when you review a Use of Force Report to verify whether or not the reporting officer has complied with state police policy?

A. Usually, I look at the Use of Force Report. First off, I look and make sure everything is completed on it. Then I got to go into the meat of it and see exactly what it is was done. And then usually, if I have the arrest

report, then I'm kind of going kind of hand and hand with the arrest report and seeing that the Use of Force Report kind of jibes with what's documented in the report. Being as I've already read the report and everything meets the elements and there's nothing in there that needs to be addressed, then if it's the same as documented on the Use of Force Report, then that's signed and submitted as well.

Q. Okay. So you review the Use of Force Report to make sure that all of the information that's needed to be included in the report is there, correct?

---

[235] Exhibit 16, Naquin Deposition 200:7-202:1

A. Yeah. Basically, that they're both the same.They mirror each other.

Q. You're comparing the Use of Force Report to the arrest report; is that correct?

A. Yes. Well, if I've read it already and I know the scenario in my head, then I read it and I go, yeah, this is with that, yeah, this is what happened, okay.

Q. Okay.

A. And submit it.

Q. Other than the arrest report, is there any other document or record that you review when you're reviewing a Use of Force Report?

A. Not that I know of, no.[236]

Sgt. Cuccia also testified that after he did his review of making sure all the boxes were checked, he would send the report up to a supervisor to review. He had never had a use of force report returned seeking additional information.[237] It is worth noting, the arrest report Sgt. Cuccia reviews with the use of force report is also authored by the trooper.[238]

Lt. Bradley similarly testified:

Q. Okay. And in the Use-of-Force Report context, is there -- is there any kind of outside investigation beyond something that that trooper wrote? Is there any kind of interview of other witnesses or, you know, hunting down video or anything like that that happens when you are reviewing the Use-of-Force Report?

A. No.

Q. Okay.

A. Not -- not -- not without some sort of a complaint from the public or something, you know. If just in an every day thing, I wouldn't just go seek out those things, but things like videos and all would be -- you know, those would

all be available through the report, the – the incident -- you know, the IRS report.

Q. Uh-huh (affirmatively).

A. You know, if -- if some – if something didn't sit right based on the EIS and things like that, you could go further. If it was a -- in the case of a traffic stop, but there was a video, I guess, you know -- and there's not going to be video on every situation, but – but no. Just --

---

[236] Exhibit 26, Cuccia Deposition 54:17 – 56:3
[237] Exhibit 26, Cuccia Deposition, 57
[238] Exhibit 3, Pichon 255:22-24; Exhibit 22, Bellue Deposition, 73:10-13 – 78:1.

just on its face, every use of force is not going to lead to some long, you know, investigation about it.[239]

The IRS report Lt. Bradley references is authored by the trooper.[240]

Sgt. Bellue testified that if video or Taser deployment data was available, the use of force report could be cross checked with those two things.[241] However, Sgt. Bellue was uncertain that witness statements or other corroborating information would be checked in reviewing a use of force report.[242] When describing the additional information consistently available and referenced in reviewing a use of force report, Sgt. Bellue described the gist in the desk log of the arrest, or the arrest report, which again is authored by the trooper themselves.[243]

Only Sgt. Bellue and Captain Naquin could recall an instance of a trooper being disciplined after a review of available body camera video revealed an inconsistency in the trooper's use of force report – which was the same incident involving Trooper John Neal.[244]

In a classic example of letting the fox investigate the raid on the henhouse he was guarding, LSP's practice at every stage of use of force investigation is to consistently rely almost exclusively on the word of the trooper who engaged in the force. Thus, Lt. Williams and Captain Naquin's reviews of uses of force is necessarily limited almost exclusively to the trooper's account of the use of force, because no other statements or corroborating evidence is provided in the use of force report each reviewed.

Plaintiff's expert makes clear that such a review process is fatally flawed:

It has been my experience as a law enforcement officer, supervisor, trainer, policy maker, and municipal Police Chief that use of force reviews require a timely and thorough gathering of evidence which

---

[239] Exhibit 20, Bradley Deposition, 225:13 – 226:13.
[240] Exhibit 3, Pichon 255:22-24; Exhibit 22, Bellue Deposition, 73:10-13 – 78:1.
[241] Exhibit 22, Bellue Deposition, 52:18-57:20.
[242] Exhibit 22, Bellue Deposition, 57:21-58:25.
[243] Exhibit 22, Bellue Deposition, 58:17-59:4.
[244] Exhibit 16, Naquin Deposition, 132; Exhibit 22, Bellue Deposition, 58.

will oftentimes include statements from independent witnesses. I believe that it is a best practice that such statements be properly preserved and included in the evaluation of the force incident. In my opinion, relying solely on the officer's reporting when other evidence may exist is improper and contrary to generally accepted law enforcement practices. Moreover, it increases the likelihood that important variables relating to what led to the citizen encounter are missed, and a rich and complete description of the factors considered by the Troopers when a use of force decision is made are generally diminished if not lost. I believe that the absence of such independent and objective information may well render a supervisor's analysis and conclusions without a true basis in fact, and thus delegitimize the use force review process."[245]

Such a breakdown in a process designed to detect policy and constitutional violations like excessive uses of force can be considered at the very least toleration of such constitutional rights violations.[246] As such, the breakdown in the use of force review process for Troop N presided over by Captain Williams and Captain Naquin may be considered tantamount to the sort of custom or policy that establishes supervisory liability.[247]

> d. Naquin and Williams' failure to engage in use of force oversight translated to a failure to review Trooper Pichon's uses of force specifically.

Beyond the general failure to review and investigate uses of force reports, both Williams and Naquin specifically failed to effectively engage in any meaningful review of Trooper Pichon's many uses of force, creating a nexus between Williams and Naquin's general failure to review use of force reports and Trooper Pichon's excessive force on Mr. Terrell.

---

[245] Exhibit 15, Longo Report, 38-30
[246] Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir.1984), on reh'g, 739 F.2d 993 (5th Cir.1984).
[247] Id.

In reviewing two use of force reports from June 3, 2016 and June 21, 2016 respectively,[248] Captain Williams testified that they did not include information about what led to the escalation in force happened or why the escalation to the point of physical were necessary.[249]

In reviewing the June 3, 2016 report, Captain Naquin testified that he was not exactly sure what the armlock technique was that Trooper Pichon described in the use of force report.[250] He could not recall speaking with Trooper Pichon's supervisor to learn what this technique was and he did not recall reviewing any other documents when he approved the report.[251] Both Captain Naquin and Lt. Williams signed off on this use of force report despite the missing information.[252]

In reviewing the June 21, 2016 report, Captain Naquin testified that he could not determine what the basis of Trooper Pichon's initial approach, his suspicion of or reason for patting down - down two men based on the narrative in the use of force report.[253] This interaction led to a charge of resisting an officer, but no other charge, further highlighting the question of what led to the initial encounter. Again, Both Captain Naquin and Captain Williams signed off on this use of force report despite the missing information.

In a report on July 28, 2016, Trooper Pichon tased an individual for active aggressive resistance. In reviewing the report in the deposition, Williams testified, "Well, he didn't put enough information right here. Okay. Yes, he's in the fighting stance, okay, but he didn't put in there that he's given verbal commands to drop his hand, to turn around, put his hands behind his back, saying that he's under arrest. No, that's not enough information."[254] Although this was not

---

[248] Exhibit 27, 6/3/2016 UOF Report; Exhibit 28, 6/21/2016 UOF Report
[249] Exhibit 19, Williams 243- 249.
[250] Exhibit 19, Williams 234:9 – 235:14.
[251] Exhibit 19, Williams 235:17 – 236:5.
[252] Exhibit 27, 6/3/2016 UOF Report; Exhibit 28, 6/21/2016 UOF Report
[253] Exhibit 16, Naquin 237:7-238:22.
[254] Exhibit 19, Williams 251:15-24; 253:6-9.

enough information for Captain Williams to assess what was happening that would have permitted the use of taser, both he and Captain Naquin signed off on this use of force report.

On May 6, 2017, just weeks before the incident, Trooper Pichon tased a fleeing individual.[255] Lt. Williams reviewed this tasing and justified it by stating that the individual was reaching for his waistband.[256] As in the instant case, Trooper Pichon did not offer any more articulable or objective basis for assuming that the individual had a weapon beyond the individual supposedly reaching for a waistband. The use of force report does not document that any weapon was ever recovered. In his report, plaintiff's expert specifically notes the problem with this approach to reporting: "It has been my experience that such language is often used by an officer to articulate a reasonable apprehension of fear that a subject may be armed. In my opinion, supervisors reviewing use of force reporting should safeguard against the use of "boilerplate" language that may be used in such reporting to make reasonable an officer's actions."[257]

Trooper Pichon's many uses of force, including a tasing just a few weeks before the instant case in which Trooper Pichon either failed to include critical information in his use of force report or the report on its face demonstrated a policy violation were affirmatively approved by both Captain Williams and Captain Naquin. Thus, Captain Naquin and Captain Williams' complete lack of meaningful oversight in the use of force review process, as detailed above, also directly included a complete lack of oversight over Trooper Pichon himself. Policy and constitutional violations were left completely unmitigated, both generally and specifically with respect to Trooper Pichon, creating an obvious risk that Trooper Pichon specifically would engage in excessive use of force.

---

[255] Exhibit 29 May 6 tasing UOF
[256] Exhibit 19, Williams Deposition 255:20-25.
[257] Exhibit 15, Longo 25.

By virtue of the instant lawsuit, the contours of the gravity of Trooper Pichon's use of force on Mr. Terrell have been more clearly delineated than in his previous uses of force, which went completely uninvestigated. However, even in the instance of a potentially lethal use of force, no supervisor took any steps to investigate the use of force against Mr. Terrell.

Sergeant Bellue responded to the scene, ostensibly responding to the deployment of the taser. Sergeant Bellue did not interview a single witness. Sergeant Bellue did not interview Mr. Terrell. In fact, he did not even know that Mr. Terrell had been injured. Even though he was equipped with a body camera, Sergeant Bellue never turned it on. Absolutely no investigation or interrogation into the use of force was done that evening.[258]

Sgt. Cuccia's review of Trooper Pichon's use of force report for this incident fit the mold of lacking investigation:

> Q. Okay. We talked before in discussing review of use of force reports about some assessment of whether or not the activity described within the report complies with state police policy and procedure. Are you doing a similar evaluation when you're looking at a case report?
> A. Yeah. I mean, I read it. I mean, you know, if there's any policy violations that jump off the sheet at me, then yeah, it's a question I would be going back there to him and asking him. But, you know, if it's something that wasn't addressed or maybe was addressed on the scene, you know, by another supervisor, then I'm just really just reading over it just for content and then having it submitted.[259]

True to LSP custom, Sgt. Cuccia did not review anything outside the case report itself.[260] Captains Naquin and Williams both signed off on the use of force report. Captain Williams signed off on Trooper Pichon's two taser deployments using the same language, that suspect was reaching for his waistband on the same day without a question.[261]

---

[258] Exhibit 22, Bellue Deposition,134 – 142; 142:20-22.
[259] Exhibit 26, Cuccia Deposition 97:13 – 98:3
[260] Id. at 98:23-25); Exhibit 6, LSP UOF Report.
[261] Exhibit 19, Williams Deposition, 265:6-266:10

Plaintiff is aware these reviews occurred after Trooper Pichon had already used excessive force on Mr. Terrell. However, Plaintiff points to this investigative process as further evidence that Trooper Pichon's uses of force received the same indifference and lack of oversight as has been catalogued in the discussion of the more general failure in the use of force review process.

      e. <u>Naquin's Failure to Engage in Early Intervention System Process Generally and With Respect to Trooper Pichon</u>

Beyond his failures to specifically engage in meaningful review of use of force reports, Captain Naquin failed to employ another critical component in monitoring Trooper performance by failing to use the Early Intervention System (EIS).

In general terms, LSP policy describes the role of the EIS as part of LSP's responsibility to identify, evaluate, and assist employees who may have problems related to job performance or stress.[262]

Plaintiff's expert identified the significance of EIS:

> In addition to the immediate review of reports pertaining to high-risk critical tasks such as use of force, arrests, and vehicle pursuits, another mechanism from which supervisors and commanders are able to discern emerging trends or practices is LSP's Early Intervention System (EIS). Early Intervention Systems (EIS) have been in existence for decades and have offered a mechanism by which law enforcement agencies can track, monitor, and detect emerging trends that if left uncorrected, could potentially result in adverse employment action and lead to foreseeable risk of harm to the other officer and others. Their utility has become widely known in the law enforcement community. … The ultimate goal of an EIS is to identify officers who pose a risk by their behavior and improper performance to the department, themselves, and the community that they are sworn to serve. … Law enforcement agencies have enjoyed great benefits from the implementation of an EIS. Beyond salvaging an officer's career, effective use of the system looks beyond an individual incident or event, and focuses on the emerging problem.
> [263]

[262] Exhibit 30, Policy 216 1.i., EIS
[263] Exhibit 15, Longo Report 52 – 53.

LSP's Lt. Bradley testified about the function of EIS similarly:

> it's a way of use to take an extra look and look at the details of those, was – was everything that we did warranted, everything that trooper did warranted. So it's just way for us to kind of self police ourselves to make sure that we are not – that we are staying within the scope of what we should be dong, how we should be conducting ourselves.[264]

The EIS policy specifically tasks Troop / Section Commanders like Naquin with keeping an EIS file to provide time-sensitive reviews of significant events involving officers.[265] The troop commander is also tasked with ensuring that all events are entered into the EIS.[266]

A troop commander is responsible for triggering an EIS report when a trooper has either three EIS criteria events in a 90 day period or six criteria events in a 12 month period.[267] Some of the criteria that would trigger an EIS include: use of force incidents, pursuits, sustained and not-sustained citizen complaints, weapons discharges, at-fault state vehicle crashes; personal counseling sessions, disciplinary actions.[268]

Entering events into the EIS file and triggering an EIS report is not discretionary.[269]

Despite the clarity of this policy, Captain Naquin failed to follow LSP policy on EIS. Captain Naquin on at least two occasions failed to timely submit EIS reports on troopers with multiple triggering events.[270] In reviewing Captain Naquin's October 2, 2017 EIS report,[271] Plaintiff's expert noted:

> Two things struck me with regard to his correspondence: (1) The blatant disregard for the required timing of its submission; and (2) The pre-emptive justification for behaviors that triggered review that relied heavily upon the nature of the involved Troopers assigned

---

[264] Exhibit 20, Bradley Deposition, 224:22-225:4.
[265] Exhibit 30, LSP Policy 216 1.ii, EIS (filed under seal)
[266] Id.
[267] Id.
[268] Exhibit 30, LSP Policy 216 1.v, EIS (filed under seal)
[269] Exhibit 20, BRADLEY Deposition 240:10-241:1; 297:9-14
[270] Exhibit 31, NAQUIN EIS REPORTS.
[271] Exhibit 31, Naquin EIS reports bates numbers 16086 – 16093.

duties and seemed to neglect underlying facts. Throughout my review of the EIS reports filed by Defendants Naquin, I began to recognize the common theme of associated the officer's duties, their assignments, the constituents to whom they are exposed, and the high-risk nature of their work to the justification of conduct which may have departed from LSP policy and generally accepted law enforcement practices. Certainly, an officer's duty assignment and work environment is a faire measure when setting triggers for EIS activation and assessing conduct. Yet, the existence of such factors without an objective basis cannot ignore violations of established policies and accepted practice.[272]

Captain Naquin delegated in large part his responsibility for the EIS to a subordinate.[273] Like the use of force reports discussed above, the EIS report featured narratives based exclusively on the trooper's own account of the event without any regular external investigation to either confirm or dispute the trooper's account.

In creating the EIS reports that Captain Naquin was to review, Lt. Bradley testified that he would review a synopsis of the of the event which was created when the use of force report was generated.[274] According to Lt. Bradley's understanding and testimony, these EIS synopses were created by the sergeants on reviewing the Use of Force Reports.[275] However, both Sgts. Cuccia and Bellue testified that these synopses were authored by the troopers who engaged in the use of force themselves.

Sgt. Bellue testified:

> Q. And the synopsis is something that you would draft as the sergeant?
> A. Well, it was what the trooper wrote. In some cases, we took time and waited for the -- we had the arrest report with it because some troopers are just -- that way they get it done and get it over with.
> Q. Okay. Was there anything that as the sergeant you, personally, drafted that became part of the EIS packet for an event?
> A. No. Normally, I just cut the gist out, put it in the packet.

---

[272] Exhibit 15, Longo Report, 55.
[273] Exhibit 16, Naquin Deposition, 221.
[274] Exhibit 20, Bradley Deposition, 219:16-221:17.
[275] Exhibit 20, Bradley Deposition, 303:7-12

> Q. Okay. And the gist would be something that the actual trooper involved in the incident had authored him or herself?
> A. Correct.[276]

Sgt. Cuccia testified similarly:

> Q. Do you know how those narratives are created for this EIS form?
> A. I'm guessing it's probably made from arrests or maybe just little gists on the arrests.
> Q. Are these narratives something that you have ever drafted as a sergeant in reviewing use of force reports?
> A. There is a section on the Use of Force Report that does have a little narrative portion on it and it may be the same little narrative.
> Q. In the Use of Force Report form, the narrative would be something written by the reporting officer; is that correct?
> A. Yes.
> Q. I guess what I'm trying to understand is whether as a sergeant where you're reviewing a Use of Force Report, do you have any role in drafting a synopsis of that event that would be used in an EIS report?
> A. No. No, not me, no, because I don't even do -- the EIS report is done by the lieutenant.
> Q. Okay.
> A. He – like I said, he may have taken this from that and gather the gist from it and put it on there.
> Q. But you didn't participate in the drafting of these event synopsis for this Trooper Pichon EIS form?
> A. No, not to my knowledge, no.[277]

Although the troopers were writing their own accounts of the use of force for the EIS synopses, Lt. Bradley did not review anything outside these synopses in creating the EIS reports:

> Q. Okay. As you were compiling this EIS report, would you have looked at anything outside of the sergeant's EIS report?
> A. I don't recall looking at anything else outside of this --
> Q. Okay.
> A. -- for EIS, no.
> Q. Okay. So you would have only looked at whatever the sergeant generated?
> A. Correct.
> Q. And do you have any awareness or knowledge of what a sergeant would have looked at in generating a -- the synopsis or EIS report that you would have looked at to generate this?

---

[276] Exhibit 22, Bellue Deposition,72:22 – 73:13
[277] Exhibit 26, Cuccia Deposition 68:2 – 69:6.

A. No. Other than at -- at the – in close proximity to the time it actually occurred, probably that -- the desk log that we mentioned and -- and the -- the report, the actual --

Q. Uh-huh (affirmatively).

A. -- the actual -- you know, or maybe just speaking actually with the trooper at that -- that time of occurrence.

Q. Okay.

A. So they are -- they are closer to the time it happened because of when they are generating it, so just the report and the paperwork generated from that arrest at the time.

Q. Okay. So paperwork generated by the trooper, an interview with the trooper, him or herself, correct?

A. Correct.

Q. Okay. Are you aware of any other investigation, any witness statements, video or anything like that being collected and – and examined as the sergeant is writing the synopsis?

A. Not specifically that I know of, no.[278]

To summarize the EIS process, Captain Naquin delegated the compiling of EIS reports to his subordinates, including Lt. Bradley, and relied entirely on his subordinates' report and recommendations. Lt. Bradley relied exclusively on summaries of EIS triggering events that he believed had been compiled by sergeants in making his recommendations. However, based on the testimony of two LSP sergeants, the EIS summaries or synopses were in fact authored by the troopers who had engaged in the use of force themselves, without any other investigation. Thus, the EIS reports for which Captain Naquin was responsible under LSP policy, were ultimately based on the singular event perspective of the trooper or troopers involved.

Captain Naquin also failed to use the EIS process as an opportunity to correct trooper behavior before it became more serious. He testified that he could not recall a single instance retraining a trooper after an EIS review.[279] Lt. Bradley similarly testified that he could not recall ever counseling a trooper because he had a concern about uses of force in an EIS review.[280] Indeed,

---

[278] Exhibit 20, Bradley Deposition 303:13-304:23.
[279] Exhibit 16, Naquin Deposition, 229:14-18
[280] Exhibit 20, Bradley Deposition, 309:3-309:21

Lt. Bradley appeared to regard his primary function in speaking with the trooper in the EIS process as reassuring the trooper that they had not in fact done anything wrong and that they were doing a good job.[281]

The significant deficiencies of the EIS can be seen at work in an EIS report triggered for Trooper Pichon in 2016.  In the case of Trooper Pichon's 2016 EIS report, in two of the three instances the language from the use of force reports match two of the three use of force synopses of the EIS report.[282] Lt. Bradley wrote that each of the four triggering incidents were justified and consistent with LSP policy.  In reviewing the EIS report, Plaintiff's expert identified critical information missing from the narrative of each of the four events that would assist in determining if the events were consistent with LSP policy or not:

> On July 18, 2016, at 2:30 a.m., Trooper Pichon initiated a traffic stop. When he got out of his car to approach the driver, the car sped off. Trooper Pichon gave pursuit. During the course, the driver discarded a handgun (later determined to have been stolen). The driver eventually stopped and surrendered without further incident. I have no idea from reading the narrative what the underlying basis for the stop may have been. Nor does it appear that any inquiry was conducted to determine that information.
>
> On June 21, 2016, at 2:51 p.m., Trooper Pichon decided to stop two (2) "*suspicious*" male subjects on foot. During the course of the stop, Trooper Pichon attempted to conduct a pat-down of one of the subjects when the subject turned towards the Trooper, began to yell obscenities, and spit in Trooper Pichon's face.110 At this point, Trooper Pichon chose to place the subject under arrest at which the subject began to pull away and resist handcuffing. He was eventually handcuffed, but continued to jerk and pull while being escorted to the car. The narrative fails to set out either the basis for the stop or the basis for the pat-down. Nor, does the supervisor's EIS report address either of these issues.

---

[281] Exhibit 20, Bradley Deposition, 307:13 – 308:20.
[282] Exhibit 32, PICHON 2016 EIS Report; Exhibit 28 and Exhibit 27, Pichon UOF Reports; Exhibit 20, Bradley Deposition, 321:13 – 323:1. Plaintiff does not have pursuit reports and thus cannot compare language of Event 2 and the underlying report.  The language to described Events 1 and 3 are both verbatim copies of the use of force report narratives.

On June 2, 2016, at 12:04 a.m., Trooper Pichon stopped two (2) *"suspicious"* males who appeared *"nervous",* and possibly in violation of the curfew ordinance. Both subjects fled and were pursued on foot. When apprehended, one of the subjects was in possession of a handgun. He resisted handcuffing, pulled away, and maintained an arm underneath his body. He was eventually handcuffed with the assistance of another Trooper. The second subject was apprehended by NOPD.

. . .

While there may be separate documentation that I have not reviewed that further scrutinizes the appropriateness of the investigative stops initiated by Trooper Pichon in June of 2016, Lieutenant Bradley fails to articulate the underlying basis to support those stops sans the Troopers speculation that one or both of the persons on the morning of June 2, 2016, were in violation of a curfew ordinance. This is especially important, in my opinion, given what the lieutenant characterizes as a *"proactive"* detail. Neither the proactive nature of the work, the environment in which the Trooper's has been assigned, nor the quality of citizens in which the Trooper must interact suspends the Constitutional principles and generally accepted law enforcement practices that guide his work.[283]

Despite these deficiencies, Lt Bradley wrote that each of these events was justified and noted:

Trooper Pichon is assigned to the NOCED proactive detail. The detail is in an urban/high crime environment. Also, the majority of calls and interactions with citizens involve extreme impairment. Trooper Pichon has been a proactive member of the detail and has worked at a very high and professional level during his tour of duty.[284]

Plaintiff's expert noted that this language "is mirrored through the EIS reports that I have reviewed. This type of "boilerplate" language undermines the integrity of the EIS review process, is indicative of a pattern of behavior aimed at masking improper conduct, and is contrary to generally accepted policing practices."[285]

---

[283] Exhibit 15, Longo Report, 56-58
[284] Exhibit 32, Pichon EIS REPORT
[285]Exhibit 15, Longo Report ,58.

Nevertheless, Captain Naquin adopts the same language and Lt. Bradley's statement that no further action need be taken.[286] As plaintiff's expert notes, Captain Naquin repeatedly adopts his subordinate's boilerplate justification and his recommendation for no further action.[287]

Plaintiff's expert's review of the EIS reports submitted by Captain Naquin "reveal a pattern of complacency in the manner in which he carried out his important responsibility of ensuring that the Early Intervention System functioned properly by identifying trends that if left unattended would pose a foreseeable risk of harm to the involved Troopers and the citizens whom they are sworn to serve."[288] Trooper Pichon's 2016 EIS report fits squarely into this pattern, establishing not just a generalized risk of harm, but one specifically related to Trooper Pichon. His dangerous uses of force should have triggered closer scrutiny and remediation, but the deficiencies in the EIS process permitted by Captain Naquin allowed his uses of force to continue unchecked.

> f.   Lack of Training, Use of Force Review, and EIS in Combination all Establish Defendant Williams' and Naquin's Deliberate Indifference to an Intolerable Risk of Constitutional Violation

As detailed above, the record satisfied the three elements necessary to establish a supervisory claim: (1) failure to train; (2) a causal link between the failure to train and the constitutional rights violation; (3) deliberate indifference to the risk of harm.

Failure to train: Captain Williams own testimony acknowledged the lack of training on foot patrol. The inconsistent testimony on what exactly constituted LSP's taser policy established a clear lack of training on a critical use of force instrumentality. The use of force review process, for which both Captain Williams and Captain Naquin were responsibility was so fatally flawed as to be non-existent. The EIS review process for which Captain Naquin was responsible was

---

[286] Exhibit 32, EIS Reports; Exhibit 15, Longo Report,58.
[287] Exhibit 32, EIS Reports; Exhibit 15, Longo Report, 58 - 63.
[288] Exhibit 15, Longo Report, 64.

similarly non-existent. Through this lack of oversight Captain Naquin and Captain Williams tolerated potential excessive uses of force.

Causal link: The confusion surrounding taser use in the use of force policy and the lack of oversight through the use of force process and EIS review process both allowed Trooper Pichon's policy violations and previous uses of force to go uncorrected.

Deliberate Indifference: The Fifth Circuit standard requires either a notice of a pattern of similar violations or establishing that the risk of harm was obvious.[289] The record in this case meets both the standard for establishing a pattern as to an individual defendant and the more generalized standard of obvious harm.

The record establishes that both Naquin and Williams failed to engage in a legitimate use of force review and EIS processes, both generally and specifically with regard to Trooper Pichon's prior uses for force. This pattern of unchecked policy violations, including those Trooper Pichon himself engaged in, created an environment in which excessive use of force is necessarily going to occur:

> Neither LSP policy nor generally accepted law enforcement practices authorize the use of an ECW on persons who are running from law enforcement and have not demonstrated by their words or actions an intent to physically harm the officer or others.
>
> Neither LSP policy nor generally accepted law enforcement practices authorize the use of an ECW on persons who are failing to obey the commands of a law enforcement officer and has not demonstrated by words or actions an intent to physically harm the officer or others.
>
> Yet, in many of the reports that I have reviewed that have been deemed proper by the Defendant supervisors these very actions have been condoned. Even when they have triggered additional scrutiny through the EIS process, they have been exonerated based on the *"proactive" nature* of the Defendant Trooper's assignment, the

---

[289] Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 383 (5th Cir.2005); Davidson v. City of Stafford, Texas, 848 F.3d 384, 397–98 (5th Cir.2017), as revised (Mar. 31, 2017)

> *"urban/high crime area"* where they are deployed, and the type of individuals who they may encounter during the course of their tour which have been characterized as having *"extreme impairment"*.
>
> In my opinion, Defendants Naquin and Williams willingness to accept conduct that falls below the standards of the LSP is a *"means to an ends"* mentality that undermines the integrity of the use of force and EIS review process, is a dis-service to the LPS, **creates a foreseeable risk of harm to citizens, and is contrary to generally accepted law enforcement practices.** [290]

LSP use of force reports for 2016[291] and 2017[292] reflect that after use of force encounters with troopers, particularly tasing, individuals either required medical care on site or were transported to the hospital. These records reflect a pattern of injury.[293]

Further, LSP use of force reports for 2016 and 2017 reflect significant taser use. For the area covered by the NOPD Eighth District, which is roughly contiguous with the French Quarter, LSP troopers deployed tasers 24 times in 2016[294] and 28 times in 2017.[295] These stand-alone numbers may not be impressive, but taken in a larger context they are startling.

Captain Williams testified that he would not expect LSP's use of force rate to be higher than a local law enforcement agency's use of force rate.[296] However, when compared to NOPD's number of 7 reported taser deployments for 2016 in the Eighth District,[297] LSP taser deployments are nearly four times higher, making up 77% of all taser deployments.

---

[290] Exhibit 15, Longo Report, 64- 65
[291] Exhibit 24, 2016 LSP Use of Force Reports in globo
[292] Exhibit 25, 2017 LSP Use of Force Reports in glob
[293] In the case of establishing a pattern of excessive force, the Fifth Circuit has noted the similarity requirement is met by proof that the prior acts involved injury to a third party. Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 383 (5th Cir. 2005); Davidson v. City of Stafford, Texas, 848 F.3d 384, 397–98 (5th Cir. 2017), as revised (Mar. 31, 2017). Plaintiff meets that burden here.
[294] Exhibit 24, 2016 LSP UOF Reports *in globo.*
[295] Exhibit 25, 2017 LSP UOF Reports *in globo.*
[296] Exhibit 19, Williams Deposition, 213:8-9.
[297] See https://data.nola.gov/Public-Safety-and-Preparedness/NOPD-Use-of-Force-Incidents/9mnw-mbde/data (last accessed 07/08/2019).



For 2017, NOPD taser deployment increased slightly to 10,[298] but the numbers are similar:



These numbers alone do not prove that all LSP taser deployments are unconstitutional excessive uses of force. However, when they are coupled with the complete lack of oversight in the use of force review process and the mass confusion about when a taser may be used, then a frighteningly obvious risk of excessive use of force by taser emerges.

---

[298] See https://data.nola.gov/Public-Safety-and-Preparedness/NOPD-Use-of-Force-Incidents/9mnw-mbde/data (last accessed 07/08/2019).

Captain Naquin and Captain Williams had constructive notice of this risk of harm both generally and as to Trooper Pichon in particular. Yet, they took no steps to ameliorate that risk through training or disciplining troopers.

### E. Significant Factual Disputes Preclude Dismissal of Plaintiff's State Law Claim

In assessing pendant state law claims for assault and battery as part of a federal civil rights excessive force claim, the Fifth Circuit has engaged in a similar analysis:

> Louisiana's excessive force tort mirrors its federal constitutional counterpart. "The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result. Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case," and factors to consider are: (1) the known character of the arrestee, (2) the risks and dangers faced by the officers, (3) the nature of the offense involved, (4) the chance of the arrestee's escape if the particular means are not employed, (5) the existence of alternative methods of arrest, (6) the physical size, strength, and weaponry of the officers compared to the arrestee, and (7) the exigencies of the moment. These considerations are sufficiently similar to the *Graham* factors that our decision on this claim mirrors our decision of plaintiffs' § 1983 excessive force claim, and we thus reverse the district court's grant of summary judgment to defendants on the state-law excessive force/battery claim.[299]

Accordingly, the fact disputes supported by the record as outlined to the foregoing brief foreclose grant of summary judgment on Plaintiff's pendant state law claims.

### III. Conclusion

For the foregoing reasons, Plaintiff respectfully requests the Court to deny Defendants' Motion for Summary Judgment.

---

[299] Deville v. Marcantel, 567 F.3d 156, 172–73 (5th Cir. 2009) (internal citations removed)

Respectfully Submitted,


*/s/ Elizabeth Cumming*
James Craig, LSBN # 33687
Elizabeth Cumming, LSBN #31685
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
Tel. 504-620-2259
jim.craig@macarthurjustice.org
elizabeth.cumming@macarthurjustice.org

*Attorneys for Plaintiff*


**Date: July 8, 2019**