# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ZACHARY TERRELL,　　　　　　　　　\*　NUMBER: 2:18-cv-05787
　　　　　　Plaintiff,　　　　　　　　\*
　　　　　　　　　　　　　　　　　　\*
　　　　　v.　　　　　　　　　　　　\*　SECTION: E
　　　　　　　　　　　　　　　　　　\*
TROOPER TROY PICHON,　　　　　　　\*　JUDGE: WENDY B. VITTER
LIEUTENANT DERRELL WILLIAMS,　　\*
and CAPTAIN DARRIN NAQUIN, each　\*　MAGISTRATE: MICHAEL B. NORTH
in their individual capacities.　　　　\*
　　　　　　Defendants.　　　　　　\*　DIVISION: 5
　　　　　　　　　　　　　　　　　　\*

## PLAINTIFF'S REVISED OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes Plaintiff Zachary Terrell who opposes Defendant's Motion for Summary Judgment.[1] In this opposition, Terrell argues: (1) Heck v. Humphrey[2] does not insulate police officers from all liability for every use of force simply because the arrestee was later convicted of "resisting an officer"; (2) Trooper Pichon's (a) use of Taser against Terrell and then (b) hitting, kicking, and dragging Terrell was excessive force in violation of Terrell's constitutional rights; and (3) Lieutenant Williams and Captain Naquin's established pattern of failing to investigate, counsel, or discipline troopers (including Pichon) for excessive uses of force created a substantial likelihood that troopers, including Pichon, would use excessive force in violation of an individual's constitutional rights.[3]

---

[1] ECF No. 29. Plaintiff files this amended opposition pursuant to this Court's Order, ECF No. 48.
[2] 512 U.S. 477 (1994).
[3] Plaintiff has dismissed all claims against Trooper Roach. ECF No. 34. Accordingly, Plaintiff does not address Defendants' arguments as to Trooper Roach as they are now moot.

## I.     Disputed Factual Background

On the evening of Saturday, June 17, 2017, Plaintiff Zachary Terrell had finished his shift at Tujague's Restaurant. After work, he met a friend; the two were standing outside his friend's mother's house in the French Quarter, on St. Peter Street between Burgundy and Dauphine.[4] Terrell and his friend made plans to socialize together later that evening. Terrell borrowed a bicycle from his friend to see his brother in the nearby Sixth Ward while his friend agreed to buy drinks and await Terrell's return.[5] After this discussion, Terrell started to ride the bicycle up St. Peter towards Burgundy.[6]

At that same time, Defendant Pichon and Trooper Roach were on duty as Louisiana State Police troopers assigned to the French Quarter.[7] They were patrolling together in Roach's marked LSP vehicle.[8] Pichon and Roach saw Terrell and his friend speaking together on the sidewalk.[9] Pichon's report records his interpretation of the friends' interaction as an exchange between Terrell (a Black man) and an "unknown white/male" appearing to be "really nervous."[10] Pichon believed he may have seen a hand-to-hand narcotics transaction.[11] But he did not consider the situation sufficiently important to make an immediate stop:

> I'm like, well, I really don't feel like dealing with this, I just ate, I don't want to run after nobody. I'm like, "Jeff, them dudes just did a hand to hand. Now they're trying to play it off like we didn't see it. Look, I tell you what, make the block. If they're still standing there, we'll stop and talk to them. If they're not, we'll just let them go about their business and be done with it."[12]

---

[4] Exhibit 1, Terrell Deposition, 12-15.
[5] Exhibit 1, Terrell Deposition, 16-17.
[6] Exhibit 1, Terrell Deposition, 31.
[7] Exhibit 2, June 17, 2017 Troop N, Desk Log.
[8] Exhibit 3, Pichon Deposition at 169: 15-25; 171:1-12.
[9] Exhibit 4, LSP Case Report; Exhibit 5, LSP Arrest Report.
[10] Exhibit 4, LSP Case Report; Exhibit 5, LSP Arrest Report; Exhibit 6, 6/17/17 UOF Report; Exhibit 3, Pichon Deposition, 171:20 – 172:13
[11] Exhibit 7, Roach Deposition 184:2-9.
[12] Exhibit 3, Pichon Deposition, 172:3-13.

Pichon and Roach circled the block.[13] The one-way streets in the French Quarter required them to loop around at least two blocks of Saturday night traffic before their return to the site of the suspected drug transaction.[14] When the troopers returned, Terrell and his friend were still standing in conversation in the exact same location.[15] Terrell began to ride the bicycle up the street.[16] As Trooper Roach approached the unknown white man, Pichon recalled: "I remember the guy throwing both hands up, like, almost touching the top of the roof. He just let out this real loud squeal, like he was real, real startled."[17]

Meanwhile, Pichon told Terrell to stop,[18] and called Roach away from the unknown white male back to his vehicle to follow Terrell who was still "slow rolling on his bike on the sidewalk."[19]

As Terrell and the troopers approached the intersection of Burgundy and St. Peter, a vehicle approached on Burgundy.[20] Terrell testified that he made a slight left turn down Burgundy to go around this vehicle; [21] Pichon testified that Terrell turned down Burgundy and was "going in the wrong direction against traffic on his bicycle."[22]

Pichon testified that Terrell stood up on the bike and started to pedal faster.[23] Pichon's official report states that he saw Terrell reach for his waistband.[24] In deposition, Pichon testified that he noticed Terrell was biking away from him with only one hand on the handle bar.[25] From

---

[13] Exhibit 3, Pichon Deposition, 172:14-20.
[14] Exhibit 7, Deposition of Trooper Roach, 181 – 189; Deposition Exhibit of Map of French Quarter marked by Trooper Roach.
[15] Exhibit 3, Pichon Deposition, 172:14-20.
[16] Exhibit 3, Pichon Deposition 172:14-20. Terrell does not dispute that he biked away from Pichon. Exhibit 1, Terrell Deposition 31.
[17] Exhibit 3, Pichon Deposition, 173:1-6.
[18] Exhibit 3, Pichon Deposition, 173:6-9; Exhibit 4, LSP Case Report; Exhibit 5, LSP Arrest Report; Exhibit 6, LSP UOF report.
[19] Exhibit 3, Pichon Deposition, 173:11-18.
[20] Exhibit 3, Pichon Deposition, 174:2 – 4; Exhibit 1, Terrell Deposition, 31:8-13.
[21] Exhibit 1, Terrell Deposition, 31:8-13.
[22] Exhibit 3, Pichon Deposition, 174:5-7; Exhibit 1, Terrell Deposition, 32:23-33:5.
[23] Exhibit 3, Pichon Deposition, 174:12-17.
[24] Exhibit 4, LSP Case Report; Exhibit 5, LSP Arrest Report; Exhibit 6, LSP UOF Report.
[25] Exhibit 3, Pichon Deposition, 174:23-175:3.

these scant factors Pichon deduced that Terrell must have had a gun.[26] It is undisputed that Terrell did not, in fact, have a gun.[27] Terrell testified he did not ever reach for his waistband and he did not turn back towards or threaten anyone running behind him, including Pichon.[28] Pichon then tased Terrell in the lower back.[29]

Terrell locked up and fell off the bike. Pichon testified:

> The Taser hit him. He locked up. The bike drifted to the right, struck the curb, and he fell off the bike. At that point, I was running right on top of him. I said, "turn over, put your hands behind your back." He just kind of laid on his back, with his eyes -- like, what just happened to me.[30]

Terrell testified that he could not move his body after he was tased.[31]

While Terrell was on the ground, and incapacitated by the Taser, Pichon punched and kicked him,[32] causing a significant laceration on Terrell's face and a cut to his scalp at the top of his head.[33] Pichon also kneed Terrell in the back during handcuffing, bruising Terrell on his back.[34] In addition, Pichon dragged Terrell to the sidewalk after he had been handcuffed.[35] Pichon completed an LSP use of force report dated June 18, 2017 related to this incident.[36]

Terrell received extensive injuries to the head and face, including a laceration requiring seven stitches around his right eyebrow, facial swelling and bruising, abrasions to his nose and

[26] Exhibit 3, Pichon Deposition, 175:3-5.
[27] Exhibit 4, LSP Case Report; Exhibit 8, Terrell Declaration.
[28] Exhibit 8, Terrell Declaration.
[29] Exhibit 6, LSP UOF Report; Exhibit 3, Pichon Deposition, 175:14-15.
[30] Exhibit 3, Pichon Deposition 175:16-22.
[31] Exhibit 3, Terrell Deposition, 39: 25 – 40:7.
[32] Exhibit 3, Terrell Deposition, 38:5 – 39:24.
[33] Exhibit 9, Photographs of Terrell's Injuries; Exhibit 10, CCS Medical Records at bates numbers Terrell139, 143, 148, 233, 235; Exhibit 11, UMC Medical Records at 254, 293.
[34] Exhibit 1, Terrell Deposition, 40:8-12; Exhibit 9, Photographs of Terrell's Injuries.
[35] Exhibit 1, Terrell Deposition, 40:17-22.
[36] Exhibit 6, LSP UOF Report; Exhibit 3, Pichon Deposition, 263:22-25.

upper lip, and a wound to the crown of his head.[37] Terrell also had wounds on both his wrists,[38] as well as to his elbow and knees.[39] Terrell required transport from the scene to University Medical Center (UMC) via ambulance.[40] The spread and location of these wounds indicate that Terrell did not sustain them only from falling from the bicycle; rather, some were a direct result of Pichon's kicks and hits to Terrell's head and face while he was incapacitated.[41] Terrell's other injuries also resulted from Pichon dragging Terrell after he was handcuffed.

After this incident, Terrell experienced anxiety, sleeplessness, nightmares, intrusive negative thoughts, and an increased distrust of law enforcement and corrections staff, all related to the physical assault by a uniformed LSP law enforcement officer.[42]

## II.     Summary Judgment Standard

Summary judgment is only proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[43] However, in evaluating the summary judgment record, all inferences drawn from the underlying facts must be viewed in a light most favorable to the nonmoving party.[44] A genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.[45] A material fact is one which could affect the outcome of the suit under the applicable substantive law.[46] In a recent Fifth Circuit

---

[37] Exhibit 9, Photographs of Terrell's Injuries; Exhibit 11, UMC Records at bates numbers Terrell000254, 293; Exhibit 10, CCS Records.
[38] Exhibit 9, Photographs of Terrell's Injuries; Exhibit 10, CCS Medical Records at 139, 143; Exhibit 11, UMC Medical Records at 293.
[39] Exhibit 9, Photographs of Terrell's Injuries; Exhibit 11, UMC Records at bates numbers Terrell000254, 293; Exhibit 10, CCS Records.
[40] Exhibit 6, LSP UOF Report; Exhibit 11, UMC Records at bates numbers Terrell0000286-288.
[41] Exhibit 9, Photographs of Injuries to Terrell.
[42] Exhibit 12, Report of Dr. Edward Shwery (manually attached, filed under seal); Exhibit 10, CCS Records at bates numbers Terrell000132.
[43] Fed. R. Civ. P. 56(a).
[44] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).
[45] Anderson v. Liberty Lobby, Inc. 447 U.S. 242, 248 (1986).
[46] Id.

en banc opinion, the Court of Appeals re-affirmed that if there is any factual dispute that impacts the qualified immunity analysis, summary judgment must be denied.[47]

## III. There are Genuine Disputes of Material Fact Regarding Terrell's Claim that Pichon Twice Used Excessive Force Against Him.

The Fifth Circuit has outlined three elements plaintiffs must establish in Fourth Amendment excessive-force claims: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[48] The question of whether the force was clearly excessive or unreasonable is a fact intensive one.[49] The Court's task on summary judgment is to determine whether there are genuinely disputed factual issues controlling the adjudication of the objective reasonableness of an officers' actions in light of the facts and circumstances from the perspective of a reasonable officer on scene.[50]

Under this standard, the facts set forth above clearly demonstrate genuine disputes of material fact which preclude summary judgment in Pichon's favor. Pichon does not contest this, but instead raises two affirmative defenses he contends are fatal to Terrell's claims: the bar of Heck v. Humphrey[51] and the doctrine of qualified immunity. For the reasons set forth below, neither defense entitles Pichon to summary judgment.

---

[47] Cole v. Carson, No. 14-10228, 15-10045, 2019 WL 3928715 at *1 (5th Cir. Aug. 20, 2019) (en banc) (where "competing factual narratives" do not permit pretrial resolution of qualified immunity, trial by jury is required).

[48] Newman v. Guedry, 703 F.3d 757, 761-2 (5th Cir. 2012); Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005).

[49] Graham v. Connor, 490 U.S. 386 (1989); Newman v. Guedry, 703 F. 3d. at 762; Darden v. City of Fort Worth, Texas, 880 F.3d 722, 728–29 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018); Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009).

[50] Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Newman v. Guedry, 703 F.3d 757, 761–62 (5th Cir. 2012); Darden v. City of Fort Worth, Texas, 880 F.3d 722, 728–29 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).

[51] 512 U.S. 477 (1994).

A. Terrell's Excessive Force Claims Against Pichon Do Not Challenge Terrell's Conviction.

Contrary to Defendants' argument, Terrell's § 1983 claim for excessive force is not barred simply because he pleaded guilty to one count of resisting an officer. An arrestee's criminal conviction does not preclude § 1983 claims against law enforcement officers so long as a favorable judgment on those claims would not "necessarily imply the invalidity of his conviction."[52] As this Court has expressly recognized, "[b]y proving an excessive force claim, a plaintiff will not invariably invalidate his conviction."[53] There is no _de facto_ bar on all excessive force claims where the plaintiff has been convicted of resisting an officer or resisting arrest.[54]

Fifth Circuit jurisprudence is clear: even when some level of force might be appropriate to affect a stop because of some level of resistance, only a commensurate level of force may be used without violating the constitutional rights of the suspect.[55] Thus, the simple fact of resisting an officer does not foreclose the excessive force analysis or require the establishment of a fact that is

---

[52] Heck, supra, 512 U.S. at 486–87; Bush v. Strain, 513 F. 3d 492 (5th Cir. 2008); Ballard v. Burton, 444 F.3d 391 (5th Cir. 2006).

[53] Champagne v. Martin, No. 18-1785, 2019 WL 3430457 at *3 (E.D. La. July 29, 2019), quoting Arnold v. Town of Slaughter, 100 Fed. App'x. 321, 323 (5th Cir. 2004).

[54] Id.; see also Bush, 513 F.3d at 498; Ballard v. Burton, 444 F.3d 391, 401 (5th Cir. 2006); Arnold v. Town of Slaughter, 100 F. App'x 321, 324–25 (5th Cir. 2004); See, e.g., Idel v. LeBlanc, No. 17-1553, 2019 WL 1903285 (E.D. La. Apr. 29, 2019) ("Plaintiff's claim would not be barred by Heck if he ceased resisting before the application of excessive force."); Wallace v. City of Slidell, No. 15-383, 2016 WL 1223065, at *3 (E.D. La. Mar. 29, 2016) ("Heck does not operate as a per se bar on excessive force claims, even where, as here, there has been a conviction for crimes such as interfering with, resisting, or battering a police officer."); see also Kador v. City of New Roads, No. 07–682, 2011 WL 1326641, at *11 (M.D. La. 2011) ("Law enforcement can use excessive or unreasonable force in effecting an arrest, even where a person is resisting. For instance, if a person is resisting arrest by not allowing the officer to place handcuffs on them, it would be an unreasonable use of force to shoot that person or use any type of force that was objectively unreasonable and not necessary to safely make the arrest.").

[55] Newman v. Guedry, 703 F.3d 757, 763 (5th Cir. 2012) (noting the need to assess the relationship between the need for force and the force used); see also Gomez v. Chandler, 163 F.3d 921, 923 (5th Cir. 1999); Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009).

inherently inconsistent with the underlying criminal conviction.[56] The cases cited by Defendants are not to the contrary.[57]

This Court's analysis in <u>Champagne</u> is instructive. Plaintiff in that case was charged with resisting an officer in violation of La. R.S. 14:108, the exact charge at issue in this case. Like Terrell, Ms. Champagne sued law enforcement officers for excessive force under §1983. As here, the officers asserted that Champagne's conviction for resisting an officer barred her excessive force claim. This Court held that so long as the plaintiff did not contradict her conviction by alleging that she did not resist the officers, her claim was not barred by <u>Heck</u>.[58]

As in <u>Champagne</u>, Terrell acknowledges and does not seek to challenge his plea to the convictions.[59] Nor is there a claim for false arrest in this case. Plaintiff has not pleaded a single constitutional or state law claim based on unlawful stop, unlawful search, unlawful arrest, or unlawful prosecution. Plaintiff's only constitutional and state tort claims against Pichon are for excessive use of force.

---

[56] <u>DeLeon v. City of Corpus Christi</u>, 488 F.3d 649, 657 (5th Cir. 2007) (noting possibility of a non-Heck barred claim if claim was that police used excessive force after resistance stopped or that unreasonable force was used to stop resistance); <u>Kador v. City of New Roads</u>, No. 07–682, 2011 WL 1326641, at *11 (M.D. La. 2011) ("Law enforcement can use excessive or unreasonable force in effecting an arrest, even where a person is resisting. For instance, if a person is resisting arrest by not allowing the officer to place handcuffs on them, it would be an unreasonable use of force to shoot that person or use any type of force that was objectively unreasonable and not necessary to safely make the arrest."), <u>citing</u> <u>VanGilder v. Baker</u>, 435 F.3d 689, 692 (7th Cir. 2006) (denying summary judgment because plaintiff did not deny physical act of resistance, but alleged the response to the resistance was not objectively reasonable.)

[57] Defendants' reliance on <u>Arnold v. Town of Slaughter</u>, 100 F. App'x 321, 324–25 (5th Cir. 2004), <u>Walker v. Munsell</u>, 281 F. App'x 388, 388-89 (5th Cir. 2008) and <u>Daigre v. City of Waveland</u>, 549 F. App'x 283 (5th Cir. 2013) is misplaced. In each of those cases, the plaintiffs' claims included denials of the basic facts underlying their conviction as a material element of their case that the force used by the officer was objectively unreasonable. In <u>Arnold</u>, the plaintiff disputed that he had belligerently attempted to hit an officer, although this action formed the basis of his conviction for resisting an officer. In <u>Walker</u>, the plaintiff denied running away from the trooper or taking any other physical action to resist the officers. In <u>Daigre</u>, the plaintiff denied all physical resistance. The theme of each of these cases is not that the plaintiffs continued to maintain their innocence; it was that they denied the physical actions that formed the basis for the resisting charge. Accordingly, in those cases, a fact finder would have to re-examine facts underlying the criminal conviction, in contravention of <u>Heck</u>.

[58] <u>Champagne</u>, 2019 WL 3430457 at *4.

[59] Exhibit 1, Terrell Deposition, 57:22 – 59:21.

The <u>Heck</u> standard as explicated by <u>Champagne</u> must be applied to the two distinct uses of force alleged by Terrell. The first is Pichon's tasing of Terrell while Terrell was on a bicycle in traffic on the street.[60] Terrell does not dispute that he was bicycling away from Pichon at the time that the trooper was attempting to question him.[61] Whether Terrell saw or heard Pichon's order to stop is irrelevant to Terrell's excessive force claim, because that claim is focused on the objective reasonableness of tasing a cyclist riding away from an officer giving that order, not what the cyclist knew or heard.[62] Thus, as in <u>Champagne</u>, because Terrell does not dispute the act of cycling away from Pichon,[63] his claim that the use of the Taser was excessive force is not <u>Heck</u>-barred.[64]

The jury can find that Pichon's deployment of the Taser against Terrell was excessive force without disturbing any element of the underlying criminal case -- including the conviction for resisting an officer. Thus, no material allegation in Terrell's excessive force claim is "necessarily inconsistent with the validity of the conviction."[65]

The second use of force is Pichon's stomping, punching, and dragging Terrell while he lay incapacitated on the ground.[66] There is no dispute that Terrell offered no resistance -- passive or

---

[60] ECF No. 7 at Paragraphs 29-34; Exhibit 1, Terrell Deposition, 37:9-15; 71:20 – 73:16

[61] Exhibit 1, Terrell Deposition, 31:1-13; 32:16-19; 59:1-21.

[62] <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); <u>Newman v. Guedry</u>, 703 F.3d 757, 761–62 (5th Cir. 2012); <u>Darden v. City of Fort Worth, Texas</u>, 880 F.3d 722, 728–29 (5th Cir. 2018), <u>cert. denied sub nom. City of Fort Worth, Tex. v. Darden</u>, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).

[63] The only fact dispute that actually impacts on the reasonableness of the force used in the circumstance is the question whether Terrell "reached into his waistband." However, this fact dispute is not an element of the offense of "resisting an officer" under R.S. 14:108.

[64] Terrell pled guilty to possession of heroin and tramadol, which were found on his person after the stop. Exhibit 4, LSP Case Report; Exhibit 1, Terrell Deposition, 59:1-8. The Fifth Circuit has long recognized that any excessive force claim is entirely distinct and subject to a completely separate analysis from the underlying arrest. <u>Freeman v. Gore</u>, 483 F.3d 404, 417 (5th Cir. 2007) (holding that an excessive force claim is separate and distinct from any unlawful arrest claim, and thus must be analyzed without regard to whether the arrest itself was justified.); <u>see also</u> <u>Bashir v. Rockdale County, Ga.</u>, 445 F.3d 1323, 1332 (11th Cir. 2006) ("When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest."); <u>Osborne v. Harris Cty., Tex.</u>, 97 F. Supp. 3d 911, 935 (S.D. Tex. 2015) (holding same). As noted above, Plaintiff does not bring any claim regarding the stop, detention, or arrest. Thus, all discussion of the events leading up to the tasing are relevant only to the question of the objective reasonableness of the force Pichon employed.

[65] <u>Bush v. Strain</u>, 513 F. 3d at 498.

[66] ECF No. 7 at Paragraph 35; Exhibit 1, Terrell Deposition, 38: 6-10; 39:3-24; 40:8-17; 40:19-22.

active -- after he was tased off the bicycle.[67] There is a factual dispute as to when and how Terrell

sustained his injuries.[68] But any force that continued after resistance stopped is categorically not

barred by Heck.[69] Further, if there is a factual dispute regarding when a plaintiff was injured, i.e.,

whether during the process of resisting or after all resistance stopped, the claim is not Heck-barred

and summary judgment should be denied.[70]

B. Pichon's Excessive Use of Force on Terrell When He Did Not Pose a Danger Is A Violation of Clearly Established Law.

1. *Qualified Immunity in Excessive Force Cases*

The next defense raised by Pichon is qualified immunity.[71] Qualified immunity analysis

requires a two-step approach to (1) determine if Terrell has alleged a violation of his constitutional

right; and (2) whether that   constitutional right was clearly established at the time of the

Defendants' misconduct.[72] While excessive force claims do require a certain degree of fact specific

inquiry,[73] the term "clearly established" does not require prior case law with precisely the same

---

[67] Exhibit 1, Terrell Deposition 39:25 – 40:22; Exhibit 3, Pichon Deposition, 175:16-22; Exhibit 4, LSP Case Report; Exhibit 6, LSP Use of Force Report.

[68] Exhibit 1, Terrell Deposition 38:8 – 39:24; Exhibit 3, Pichon Deposition, 244:4-245:12.

[69] Idel v. LeBlanc, NO. 17-1553, 2019 WL 1903285 (E.D. La. Apr. 29, 2019) ("Plaintiff's claim would not be barred by Heck if he ceased resisting before the application of excessive force."); Bush v. Strain, 513 F.3d 492, 497-498, 502 (5th Cir. 2008).

[70] Bush v. Strain, 513 F.3d 492, 497-498,502 (5th Cir. 2008).

[71] Recent concurring opinions suggest that the doctrine of qualified immunity is contrary to the intent of the Framers of the Fourteenth Amendment or the Congress that enacted § 1983. As Judge Willett recently noted, qualified immunity is a "judge-made" doctrine which lacks any sound basis in law. Zadeh v. Robinson, 902 F. 3d 483, 498 – 99 (5th Cir. 2018) (Willett, J., concurring); see also Medina v. Cram, 252 F.3d 1124, 1135 (10th Cir. 2001) (Seymour, J., dissenting) ("the current qualified immunity framework, which is "not justified by . . . any federal statute, the rules of civil procedure, or the common law"). As Justice Thomas recently explained, modern qualified immunity doctrine does not "interpret[] the intent of Congress" and, to the contrary, constitutes "the sort of 'freewheeling policy choice[s]'" that courts "lack the power to make." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring); see also generally William Baude, Is Qualified Immunity Unlawful?, 106 Calif. L. Rev. 45 (2018). Recognizing that this Court is bound by Supreme Court and Fifth Circuit precedent, Terrell contends that the doctrine of qualified immunity should be abrogated as contrary to currently accepted principles of constitutional and statutory interpretation.

[72] Saucier v. Katz, 553 U.S. 194, 200 (2001); Pearson v. Callahan, 555 U.S. 232 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[73] Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Newman v. Guedry, 703 F.3d 757, 761–62 (5th Cir. 2012).

facts or force modalities.[74] The Fifth Circuit explains, "The central concept is that of 'fair warning': The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."[75] In <u>Newman</u>, the Fifth Circuit held that the right to be free from excessive force during an investigatory stop or arrest was clearly established in August 2007, nearly ten years before the facts of this case.[76] Even where there may be some level of resistance necessitating force, officers must consider the relationship between the need and the amount of force used.[77]

As will be discussed in more detail below, Terrell meets each of the Fifth Circuit's elements for excessive force.

### 2. Terrell's actions in biking down the street did not necessitate the use of potentially lethal force.

In the instant case, the parameters of "clearly established Federal law" governing excessive force is outlined in cases addressing both the use of a Taser and the use of lethal force because, in certain contexts, the two are equivalent. Deadly or lethal force is not force that <u>necessarily</u> results in death, but force that is <u>known to be capable of causing</u> serious bodily injury or death.[78] Whether a particular use of force (or a force instrumentality) constitutes deadly force is a question of fact for the jury.[79]

---

[74] <u>Cooper v. Brown</u>, 844 F. 3d 517, 524 – 525 (5th Cir. 2016).

[75] <u>Newman v. Guedry</u>, 703 F. 3d 757, 763 (5th Cir. 2012) (quoting <u>Kinney v. Weaver</u>, 367 F. 3d 337, 350 (5th Cir. 2004)).

[76] <u>Newman v. Guedry</u>, 703 F. 3d 757, 763 (5th Cir. 2012).

[77] <u>Deville v. Marcantel</u>, 567 F.3d 156, 167 (5th Cir. 2009).

[78] <u>Gutierrez v. City of San Antonio</u>, 139 F.3d 441, 446 (5th Cir. 1998) (defining deadly force as "force that is intended or known by the actor to cause, or in the manner of its use or intended use, is capable of causing death or serious bodily injury" and finding this definition to be clearly established prior to November 1994); Exhibit 18, LSP Policy 238, Use of Force, Terrell018387.

[79] <u>Flores v. City of Palacios</u>, 381 F.3d 391, 399 (5th Cir. 2004) (finding "whether a particular use of force is 'deadly force' is a question of fact, not of law.); <u>Gutierrez v. City of San Antonio</u>, 139 F.3d 441, 446-7 (5th Cir. 1998) (citing <u>Robinette</u> in discussion regarding whether other police instruments beyond guns can also be characterized as deadly force; noting the question of whether an instrumentality is deadly force is a question of fact; finding hog tying can

In adjudicating whether hog-tying could be considered lethal force, the Fifth Circuit considered reports by other law enforcement agencies outside of Louisiana studying and making recommendations to mitigate deaths related to positional asphyxia and restraint mechanisms.[80] Taser, or conducted electrical weapons (alternately referred to as "CEW" and "ECW"), have similarly been the subject of studies by law enforcement and state entities in the wake of Taser related deaths.[81] A report by the Maryland Attorney General's Task Force on ECWs specifically contemplates the serious risk of injury or death to a suspect or innocent bystander associated with tasing an individual on a bicycle.[82]

LSP's own policy statements and witness testimony create a clear factual dispute regarding whether the use of Taser in the circumstances of this case poses a risk of serious bodily injury[83] or death, and as such must be considered deadly force.[84] According to LSP's 30(b)(6) representative on Taser, Taser prongs cause neuromuscular incapacitation (hereinafter "NMI"), causing people to "lock up" or "fall over."[85] Accordingly, LSP's Use of Force policy contemplates circumstances in which the use of Taser would be lethal force, specifically when the tased subject could fall from a height or is in a moving vehicle, including a bicycle.[86]

---

create a substantial risk of death or serious injury such that the court considered it deadly force.); Wagner v. Bay City, Tex., 227 F.3d 316, 323 (5th Cir. 2000) (engaging in close factual analysis on the question of whether hog-tying was deadly force).

[80] See e.g., Gutierrez v. City of San Antonio, 139 F.3d 441, 446-7 (5th Cir. 1998); Wagner v. Bay City, Tex., 227 F.3d 316, 323 (5th Cir. 2000) (engaging in close factual analysis on the question of whether hog-tying was deadly force).

[81] Exhibit 15, Report of Timothy Longo at 22.

[82] Exhibit 15, Report of Timothy Longo at 23, quoting Report of the Maryland Attorney General's Task Force of Electronic Control Weapons, at page 23, citing Police Executive Research Forum, "Critical Issues in Policing Series: Strategies for Resolving for Conflict and Minimizing Use of Force" (emphasis added).

[83] Captain Naquin defined serious bodily injury as "something that could result in some kind of permanent disfigurement or death." Exhibit 16, Naquin Deposition, 199:7-9.

[84] Gutierrez v. City of San Antonio, 139 F.3d 441, 446 (5th Cir. 1998).

[85] Exhibit 17, Scott Davis Deposition, 92:1-6; 81:21-82:1; 189:6-11.

[86] Exhibit 18, LSP Policy 238.9 (x)(g) (filed under seal), Use of Force; Exhibit 19, Williams Deposition, 167:10-20; Exhibit 20, Bradley Deposition, 147:24 -148:2 (Lt. Bradley confirmed that lethal and deadly force have the same meaning in the LSP policy context.). A bicycle is considered a moving vehicle under LSP Policy. Exhibit 17, Davis Deposition, 190:17:21, 191:19-22, 200:23 – 201:6.,

In discussing the Use of Force policy, Defendant Williams, LSP's former Training Director, testified that when a subject is biking against the flow of traffic[87] and/or the tasing would cause a person to fall onto a roadway, tasing would be considered lethal force under LSP policy.[88] Similarly, Defendant Naquin testified that moving traffic and the speed at which the person is biking would be factors to consider to determine whether tasing would be considered as use of lethal force.[89]

At the time he was incapacitated by the Taser, Terrell was operating a bicycle on a street in traffic. He was engaged in an activity that could have resulted in a serious injury or death, namely an uncontrolled fall from a bike in traffic. Terrell testified that as he approached the intersection there was a car in the intersection.[90] The car was still there at the time he was tased.[91] In these circumstances, a reasonable officer would have understood that, under both the legal definition and LSP policy, tasing Terrell while he was in this position met the definition of lethal force.[92]

In the situation Pichon encountered on June 17, 2017, an objectively reasonable officer would have known that lethal force was not authorized. LSP witnesses testified that lethal force would not be justified to effect a misdemeanor or felony arrest when the individual did not pose a risk of harm to the officer or to anyone else.[93] Fifth Circuit and Supreme Court jurisprudence and LSP policy statements are clear that lethal force is only objectively reasonable when an individual poses a threat of serious bodily injury or death to an officer or others.

---

[87] Exhibit 19, Williams Deposition, 262:8-12; Exhibit 1, Terrell Deposition, 32:23 – 33:5 (Terrell testifies that traffic was coming towards him); Exhibit 3, Pichon Deposition, 174:5-7 (Pichon testifies that Terrell turned down Burgundy and was "going in the wrong direction against traffic on his bicycle").
[88] Exhibit 19, Williams Deposition, 169:15- 170:7.
[89] Exhibit 16, Naquin Deposition, 197:19 – 198:3.
[90] Exhibit 1, Terrell Deposition, 31: 8 – 13; 33:3-21 36:14-37:1; 72:4-11.
[91] Exhibit 1, Terrell Deposition, 37:9-15; 75:6-13.
[92] Exhibit 19, Williams Deposition, 169:15- 170:7.
93 Exhibit 19, Williams Deposition, 172:15 – 173:15.

In <u>Tennessee v. Garner</u>, the Supreme Court mandated, "The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."[94]

The Fifth Circuit has held that simply evading arrest, even in a speeding motor vehicle, cannot form a basis for use of lethal force as a matter of law.[95] In <u>Lytle v. Bexar Cty., Tex.</u>, the Fifth Circuit found that a reasonable jury could find that lethal force was not an objectively reasonable means of stopping an individual fleeing in a car at a high rate of speed in a residential area and involved in a traffic accident in the course of flight.[96] The facts of Terrell's case are even less appropriate for lethal force than those in <u>Lytle</u>: Terrell was not in an innately dangerous motor vehicle but on a bicycle and he did not pose any threat of harm to the officer, any bystander, or himself.

As noted above, Pichon had previously decided that whatever activity Terrell and the "unknown white male" were engaged in did not present such a risk that it required an immediate need to stop and pursue their apprehension.[97] Further, Pichon did not regard the white subject as a safety risk, in fact calling Trooper Roach away from questioning him to pursue Terrell who was "rolling away."[98] In both his report and in testimony, Pichon offered no basis for why Terrell posed a greater risk than "the unknown white man." The mere fact of biking away from Pichon did not make Terrell a threat necessitating the use of potentially lethal force.[99]

---

94 <u>Tennessee v. Garner</u>, 471 U.S. 1, 11-12 (1985); <u>Young v. City of Killeen, TX.</u>, 775 F. 2d 1349, 1352-53 (5th Cir. 1985); <u>Manis v. Lawson</u>, 585 F.3d 839, 846 (5th Cir. 2009).
95 <u>Lytle v. Bexar Cty., Tex.</u>, 560 F.3d 404, 416 (5th Cir. 2009) (collecting cases).
96 <u>Lytle v. Bexar Cty., Tex.</u>, 560 F.3d 404, 416–17 (5th Cir. 2009).
97 Exhibit 3, Pichon Deposition, 184:3-18 (decision to go around the block to see if the two were still there).
98 Exhibit 3, Pichon Deposition, 173:16-18; Exhibit 7, Roach Deposition, 188:2-6; 9-10.
99 <u>Lytle v. Bexar Cty., Tex.</u>, 560 F.3d 404, 416 (5th Cir. 2009) (collecting cases).

Importantly, Terrell disputes Pichon's account that he was reaching for his waistband while on his bike.[100] This fact dispute must be resolved in favor of Terrell at this stage. Stripped of this fact, Pichon has no other articulable objectively reasonable basis for treating Terrell as any sort of threat – much less a threat that warranted use of lethal force.

Additionally, plaintiff's expert, Timothy Longo, former Chief of Police of Charlottesville, Virginia, opined that Pichon's boilerplate justification of "reaching for his waistband," without additional objective factors demonstrating a physical threat, is insufficient to render the tasing reasonable.[101] According to Mr. Longo:

> Regardless of which version of events the fact-finder deems credible, at the point Mr. Terrell was driving away on his bicycle he had not committed any offense for which physical harm or the threat of physical harm was present. He was merely a person in flight who had not committed an offense which gave rise to any imminent threat of physical harm to the troopers who may have been in the area at that time.[102]

Pichon's choice was not exclusively between potentially lethal tasing and giving up questioning Terrell altogether: "In my experience, one obvious and viable option that Pichon may have considered is to broadcast Terrell's physical description and direction of travel using the assigned NOPD radio frequency so that officers in the area could make an attempt to stop him by a less intrusive means."[103] Pichon did not take any steps available to him that would have led to the apprehension of Terrell without putting Terrell's life, and the lives of other motorists and pedestrians in the area, at risk.

---

[100] Exhibit 8, Terrell Declaration.
[101] Exhibit 15, Longo Report at 25-27.
[102] Exhibit 15, Longo Report at 27.
[103] Exhibit 15, Longo Report at 26-27.

Fifth Circuit and Supreme Court jurisprudence, generally accepted law enforcement practice, and LSP's own policies are sufficient to clearly establish to a reasonable officer that potentially fatal use of a Taser would not be reasonable in such circumstances.[104]

### 3. Terrell's actions in "rolling away" down the street did not necessitate the use of Taser.

Even if the use of Taser were not considered the equivalent of lethal force, its use in the circumstances of this case is still excessive force as a matter of clearly established law. As noted above, the simple fact of a resisting subject does not foreclose the analysis of whether the level of force is commensurate with the resistance -- law that was clearly established before June 17, 2017.[105] Further, as early as 1998, the Fifth Circuit held that "it may be difficult to conclude that [ ] officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned."[106] Here, the dangers of incapacitating an individual in Terrell's circumstances were expressly contemplated by LSP policy and its trainers, as well as by generally accepted police practice.[107]

---

[104] Tennessee v. Garner, 471 U.S. 1, 11-12 (1985); Young v. City of Killeen, TX., 775 F. 2d 1349, 1352-53 (5th Cir. 1985); Manis v. Lawson, 585 F.3d 839, 846 (5th Cir. 2009)

[105] Newman v. Guedry, 703 F.3d 757, 763 (5th Cir. 2012) (noting the need to assess the relationship between the need for force and the force used); see also Gomez v. Chandler, 163 F.3d 921, 923 (5th Cir. 1999); Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009); DeLeon v. City of Corpus Christi, 488 F.3d 649, 657 (5th Cir. 2007) (noting possibility of a non-Heck barred claim if claim was that police used excessive force after resistance stopped or that unreasonable force was used to stop resistance); Kador v. City of New Roads, No. 07–682, 2011 WL 1326641, at *11 (M.D. La. 2011) ("Law enforcement can use excessive or unreasonable force in effecting an arrest, even where a person is resisting. For instance, if a person is resisting arrest by not allowing the officer to place handcuffs on them, it would be an unreasonable use of force to shoot that person or use any type of force that was objectively unreasonable and not necessary to safely make the arrest."), citing VanGilder v. Baker, 435 F.3d 689, 692 (7th Cir. 2006) (denying summary judgment because plaintiff did not deny physical act of resistance, but alleged the response to the resistance was not objectively reasonable.).

[106] Gutierrez v. City of San Antonio, 139 F. 3d 441, 449; see also Darden v. City of Fort Worth, Texas, 880 F.3d 722, 732 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).

[107] Exhibit 18, LSP Policy 238 (filed under seal); Exhibit 19, Williams Deposition, 167:10-20; 169:15-170:7; Exhibit 16, Naquin Deposition, 197:19-198:3; Exhibit 17, Davis Deposition, 31:8 – 13; 33:3-21; 36:14-37:1; 72:4-11; Exhibit 15, Report of Timothy Longo, 22-23.

Defendants' reliance on <u>Steen v. City of Pensacola</u>,[108] a district court case outside of the Fifth Circuit, for the proposition that there is no <u>per se</u> prohibition on tasing an individual on a bicycle ignores the Fifth Circuit's jurisprudence looking at overarching questions of reasonableness, not precise force modalities.[109] Defendants' reliance on <u>Steen</u> is all the more problematic because that District Court ignored its own binding Eleventh Circuit precedent.[110] Defendants' reliance on this problematic, non-authoritative opinion severely undermines any suggestion that any court had somehow blessed the use of Taser on someone on a bicycle.

The serious risks associated with tasing an individual on a moving vehicle are well known to the general law enforcement community and to LSP.[111] Neither <u>Zimmerman v. Cutler</u>[112] nor <u>Pena v. City of Rio Grande</u>[113] contemplate tasing in a circumstance that was dangerous to the fleeing individual or others in the area. <u>Darden v. City of Forth Worth, Texas</u>,[114] <u>Hanks v. Rogers</u>,[115] and <u>Newman v. Guedry</u>[116] simply do not address the question of whether a highly intrusive level of force would be reasonable to stop a fleeing suspect. Defendants' implication that

---

[108] <u>Steen v. City of Pensacola</u>, 809 F.Supp.2d 1342 (N.D. Fla.2011).

[109] <u>Cooper v. Brown</u>, 844 F. 3d 517, 524-525 (5th Cir. 2016);<u>Wagner v. Bay City, Tex.</u>, 227 F.3d 316, 323 (5th Cir. 2000) (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) for the holding that standard for clearly established was not that the specific policy action had been held unlawful, but only that it be apparent in light of pre-existing law that such an action would be unlawful); <u>Gutierrez v. City of San Antonio</u>, 139 F. 3d 441, 446 (5th Cir. 1998) (finding that definition of deadly force not on the basis of instrumentality, but the circumstances of use was clearly established in 1994).

[110] <u>Steen</u> involved the tasing of a seventeen-year-old child riding a bicycle by an officer in a moving vehicle, traveling the wrong way down the road. The child fell off the bike and the officer's vehicle accelerated over the child, killing him. The <u>Steen</u> Court declined to find that the use of Taser was unreasonable because it was not deadly force and defined deadly force as that which would be "virtually certain" to cause death. <u>Steen</u>, 809 F.Supp.2d at 1350. However, the Eleventh Circuit has long defined deadly force as creating a <u>substantial risk</u> – not "virtual certainty" – of serious injury or death. <u>Pruitt v. City of Montgomery, Ala.</u>, 771 F. 2d 1475, 1479 n. 10 (11th Cir. 1985).

[111] Exhibit 18, LSP Policy 238 (filed under seal); Exhibit 19, Williams Deposition, 167:10-20; 169:15-170:7; Exhibit 16, Naquin Deposition, 197:19-198:3; Exhibit 17, Davis Deposition, 31:8 – 13; 33:3-21; 36:14-37; 72:4-11; Exhibit 15, Report of Timothy Longo, 22-23.

[112] 657 Fed. App'x. 340, 347 (5th Cir. 2016).

[113] 839 F. 3d. 613, 620 (5th Cir. 2018).

[114] 880 F. 3d 722 (5th Cir. 2018).

[115] 853 F. 3d 738 (5th Cir. 2017).

[116] 703 F. 3d 757 (5th Cir. 2012).

clearly established law would permit the use of a highly dangerous level of force on an individual, simply because he or she was fleeing, is overstated.

    4.   *After Terrell was on the ground, dragging him in handcuffs, hitting, and kicking him was clearly excessive force.*

       There is no dispute that after the tasing, Terrell offered no resistance to the troopers.[117] Despite this lack of resistance, Pichon engaged in additional force, causing injury to Terrell. Terrell testified that the first thing he recalled after being tased was getting hit.[118] Terrell continued that he was hit with a fist, and then kicked in his face and head area by a Trooper he later learned was Pichon.[119] In addition, Terrell testified that Pichon kneed him in the back while putting handcuffs on Terrell and Terrell was on the ground.[120] Pichon dragged him by the handcuffs, across the asphalt, to the sidewalk.[121] Pichon disputes this account of events,[122] but at this stage, the photographs and Terrell's testimony establish a record-supported factual dispute which must be resolved in favor of Terrell.

       These uses of force are clearly excessive under any rubric, and particularly when taken in light of Fifth Circuit case law. Even if there is initial resistance to a stop or arrest, force used to overcome resistance must be reasonable.[123] Once resistance stops "it is unreasonable to use force."[124] The jurisprudence is particularly clear that uses of force, including body pressure on a person on the ground, is unreasonable force and a violation of clearly established law.[125] The Fifth Circuit has held in both Fourth and Fourteenth Amendment contexts that "there is a well-developed

---

[117] Exhibit 1, Deposition of Terrell, 39: 21-40:7; Exhibit 3, Pichon Deposition, 175:16-22; Exhibit 4, LSP Case Report.
[118] Exhibit 1, Deposition of Terrell, 38:7-8, 25 – 39:2.
[119] Exhibit 1, Deposition of Terrell, 38:23-39:16.
[120] Exhibit 1, Deposition of Terrell, 40:8-25.
[121] Exhibit 1, Deposition of Terrell, 40:8-25.
[122] Exhibit 3, Pichon Deposition, 234:22- 235:1.
[123] Cooper v. Brown, 844 F.3d 517, 524–25 (5th Cir.2016); Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008).
[124] Shumpert v. City of Tupelo, 905 F.3d 310 (5th Cir. 2018).
[125] Delacruz v. City of Port Arthur, 1:18-CV-11, 2019 WL 1211843, at *9 (E.D. Tex. Mar. 14, 2019); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004), cert. denied, 544 U.S. 975 (2005).

body of case law in the Fifth Circuit specifically holding that the use of physical force against a restrained, passively resisting or non-resisting subject violates the constitution."[126] In relying on a Fifth Circuit opinion, the Sixth Circuit held it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/ or incapacitated constitutes excessive force."[127]

Terrell's injuries cast this factual dispute around this use of force into sharper relief. The jury will be able to review Terrell's injuries as evidence of the excessive force: "[i]n evaluating excessive force claims, courts may look to the seriousness of injury to determine 'whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur."[128]

The spread of Terrell's injuries is significant in that a single fall from a bicycle is a highly unlikely origin for all of the injuries. In seeking treatment for PTSD, he specifically referenced the memories of being hit and kicked as troubling to him.[129] The pattern and nature of these injuries establish a clear question of fact for a jury to determine how these injuries were caused, and given their severity, whether or not the use of such force could plausibly have been necessary.

IV.     **Lt. Williams and Captain Naquin's Failure to Supervise Troopers, Including Pichon, Created a Substantial Likelihood That Their Troopers Would Violate Individual Constitutional Rights.**

   A. Objective Deliberate Indifference Standard for Individual Supervisors

Fifth Circuit jurisprudence establishes a three-factor analysis of individual supervisor liability even where the supervisor is not personally involved in the underlying constitutional

---

[126] Salcido as Next of Friend of K.L. v. Harris Cty., Tex., No. H-15-2155, 2018 WL 6618407 (5th Cir. Dec. 18, 2018) (citing Bush, 513 F.3d at 501; Williams, 180 F.3d at 704).
[127] Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004), cert. denied, 544 U.S. 975 (2005) (discussing Simpson v. Hines, 903 F.2d 400 (5th Cir. 1990)).
[128] Deville v. Marcantel, 567 F.3d 156, 168 (5th Cir.2009) (citing Brown v. Lippard, 472 F.3d 384, 386–87 (5th Cir.2006) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).
[129] Exhibit 10, CCS Records; Exhibit 12, Shwery Report; Exhibit 13, Hunt Records; Exhibit 14, Bossier Records.

violation at issue:[130] "(1) the supervisor failed to train or supervise; (2) a causal link exists between the failure and violation of plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference. Similarly, failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[131]

There are two types of deliberate indifference: objective and subjective.[132] Objective deliberate indifference exists where supervisors either had knowledge **or** constructive knowledge, i.e., that they knew or **should have known**, that a particular policy or practice would present a risk of violation of the plaintiff's rights.[133] The objective deliberate indifference standard differs from the subjective deliberate indifference standard, which requires proof that that the defendant actually knew of but disregarded a risk.[134]

The Fifth Circuit holds that individual supervisors are liable if they exhibit objective deliberate indifference toward the need for training or supervision of subordinates.[135] Objective deliberate indifference does not require a showing that individual supervisors personally drew the

---

[130] Doe v. Taylor Indep. School Dist., 15 F.3d 443, 453 (5th Cir. 1994); Porter v. Epps, 659 F. 3d 440, 447 (5th Cir. 2011); City of Canton v. Harris, 489 U.S. 378, 390 (1989).

[131] E.A.F.F. v. United States, 955 F.Supp.2d 707, 739 (W.D. Tex.2013), aff'd sub nom. E.A.F.F. v. Gonzalez, 600 Fed.Appx. 205 (5th Cir. 2015) (citing Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011)); Brumfield v. Hollins, 551 F.3d 322, 328 (5th Cir .2008); see also Davidson v. City of Stafford, Texas, 848 F.3d 384, 397–98 (5th Cir. 2017), as revised (Mar. 31, 2017).

[132] Farmer v. Brennan, 511 U.S. 825, 840-42 (1994) (explaining that test for municipal liability described in City of Canton is objective test; test for direct liability against individuals is subjective test).

[133] City of Canton v. Harris, 489 U.S. 378 390 (1989); Porter v. Epps, 659 F.3d 440, 447 (5th Cir. 2011) (defendant must have "actual or constructive notice that particular omission in their training program causes employees to violate citizens' constitutional rights and nevertheless chooses to retain the program."

[134] Lawson v. Dallas County, 286 F.3d 257, 264 (5th Cir. 2002) (finding "Unlike the deliberate indifference standard applied to individual employees, this standard is an objective one; it considers not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights. Therefore, constructive notice is adequate.")

[135] Doe v. Taylor Indep. School Dist., 15 F.3d 443, 453 (5th Cir. 1994); Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F. 3d 375 (5th Cir. 2005).

inference of likely harm.[136] Liability attaches as long as a supervisor has constructive notice of deficiencies in training and supervision that are "obvious and obviously likely to result in a constitutional violation."[137]

There are two recognized mechanisms for establishing such constructive notice to a supervisor. The first is setting out a pattern and practice of the same or similar violations where the risk of harm was obvious.[138] The second is that the risk of harm from a single incident was obvious.[139] Both exist in this case.

B. Williams' Failure to Provide Coherent Training on Use of Force and Foot Pursuits

As Training Academy Director, Lt. Williams allowed a cacophony of conflicting policy and training directives to Troopers regarding the use of force and foot patrol. Williams testified that there was no specific training or policy on foot patrol or foot pursuit offered to any of the troopers operating in the French Quarter.[140] In fact, none of the LSP witnesses could recall or were aware of any training or policy on either foot patrol or foot pursuit offered to troopers operating in

---

[136] Defendants' citation to McClendon v. City of Columbia, 305 F. 3d 314, 326 n.8 (5th Cir. 2002) to suggest a subjective deliberate indifference standard for supervisors is inapposite. While the initial case did include a failure to train theory against the City of Columbia, a prior Fifth Circuit panel affirmed the district court's grant of summary judgment in favor of the City on the training claim, which was re-affirmed by the en banc court in the case Defendants cite. McClendon, 305 F.3d at 321 (outlining procedural posture of the case and re-affirming prior panel's summary judgment in favor of the City of Columbia on failure to train claims). Because the failure to train theory was not even before the Court, the articulation of the deliberate indifference standard is only binding on the question whether a direct action violates a plaintiff's constitutional rights, i.e. specifically creating a danger or risk for a private act of violence. That part of the opinion is not directed at a claim based on failure to supervise or failure to train. Id. at 326.

[137] Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F. 3d 375 (5th Cir. 2005).

[138] City of Canton v. Harris, 489 U.S. 378 (1989); Davidson v. City of Stafford, Texas, 848 F.3d 384, 397–98 (5th Cir.2017), as revised (Mar. 31, 2017).

[139] City of Canton v. Harris, at 390; Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 385–86 (5th Cir. 2005). Although the content of clearly established law tends to be subsumed by the deliberate indifference analysis in considering supervisory liability, Plaintiff re-states in the context of his claims against Williams and Naquin that modern qualified immunity doctrine does not "interpret[] the intent of Congress" and, to the contrary, constitutes "the sort of 'freewheeling policy choice[s]'" that courts "lack the power to make." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring); see also Zadeh v. Robinson, 902 F. 3d 483, 498 – 99 (5th Cir. 2018) (Willett, J., concurring); Medina v. Cram, 252 F.3d 1124, 1135 (10th Cir. 2001) (Seymour, J., dissenting). Accordingly, Plaintiff asserts that the qualified immunity doctrine should be abrogated and thus not considered in the Court's analysis of the claims against Williams and Naquin.

[140] Exhibit 19, Williams Deposition, 125-126; 219-221.

the French Quarter, despite the language of the Cooperative Endeavor Agreement with the City of New Orleans acknowledging the need for same.[141] Plaintiff's expert noted that such training "was especially important given the nature of the detail and its contrast to the work that is typically performed by a Trooper whose primary focus is highway safety, enforcement of motor vehicle laws, and accident investigation and reconstruction."[142]

LSP witnesses also demonstrated a startling lack of consistency in their understanding of the agency's policy on use of force, including Taser. LSP's written policy on the subject restricts the use of Tasers to situations where they are necessary to protect the trooper, the subject, or bystanders, and even then, only when less intrusive means would be ineffective.[143] Williams testified that the written use of force policy was an accurate statement of LSP policy.[144]

However, there was wild inconsistency among LSP Troopers' testimony about the circumstances approved for use of Taser:

- Sgt. Scott Davis, LSP's designee on Taser policy and training, testified that the written use of force policy did not reflect the position of the department.[145]

- Lt. Len Marie, Sgt. Davis' supervisor, testified that if a trooper "believes there's a reasonable suspicion for a crime has occurred and he had used his authority to stop the subject and subject walks away, runs away, crawls away, he can use any number of means to detain him up to an including tasing him."[146]

---

[141] Exhibit 7, Roach Deposition, 116 -118; Exhibit 16, Naquin Deposition, 114; Exhibit 22, Bellue Deposition 115; Exhibit 19, Williams Deposition, 125; Exhibit 3, Pichon Deposition, 39:1-10; Exhibit 15, Longo Report, 67.
[142] Exhibit 15, Longo Report, 66.
[143] Exhibit 18, LSP Policy 238. 9. vi, Use of Force Policy.
[144] Exhibit 19, Williams Deposition 154:17-24.
[145] Exhibit 17, Davis Deposition, 174 – 176 (referring to the language of the written use of force policy as of June 17, 2017).
[146] Exhibit 23, Deposition of Marie, 28.

- Lt. Patrick Bradley testified that even where a subject is not "actively fighting" the trooper, but is not complying with the trooper's instructions, use of Taser is acceptable.[147]

- Defendant Williams testified that Taser could be used if an individual is not replying to commands: "do what you need him to do to make the arrest."[148]

- Sgt. Bellue testified that Taser could be deployed on anyone "actively resisting," but defined that term as "pulling away, fighting, running" even when these forms of resistance did not pose any physical threat to the officer or anyone else.[149]

Such an organization-wide failure to consistently and coherently articulate the standard for use of force (including use of Taser) is an obvious invitation to constitutional violations. The Supreme Court has long held that when instrumentalities of deadly force are provided to officers "the need to train officers in the constitutional limitations of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."[150] Because LSP's own policy contemplates scenarios in which Taser use could be considered deadly force, Williams' failure in training in this regard is a perfect example of deliberate indifference as contemplated by the Harris Court. Where the injury caused to Plaintiff began with an unjustified tasing, this record establishing LSP's incoherent use of force procedures, particularly regarding Taser use, must be considered as a moving factor in Plaintiff's injury.

---

[147] Exhibit 20, Bradley Deposition, 156-7. Plaintiff's expert notes, "the sworn deposition testimony of the Lieutenants reveals a lack of substantive knowledge of LSP's use of force policy with respect to CEW deployment. In my opinion, this hampers their ability to properly train, supervise, and evaluate the use of force decision making of LSP's greatest and most valuable internal resource, the Trooper." Exhibit 15, Longo Report, 33.
[148] Exhibit 19, Williams Deposition166
[149] Exhibit 22, Bellue Deposition 32.
[150] City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989).

C. <u>Williams' and Naquin's Failure to Meaningfully Review Use of Force Reports</u>

Given the naked conflict between LSP's written policy on Taser use and the LSP witnesses' understandings of this policy, "it is no wonder that apparent policy violations went unnoticed and therefore were not addressed during the use of force and EIS review process."[151] LSP policy underscores the importance of use of force report reviews. LSP's UOF policy specifically requires that any officer involved in a use of force will fill out a use of force report which is then reviewed by supervisors.[152] Plaintiff's expert notes the particular significance of Williams' final review as director of the training academy in preventing future constitutional violations:

> As the director of the Training Academy, Lieutenant Williams was given the duty of having the final review of use of force incidents occurring in the field. It has been my experience that this responsibility serves a useful purpose in that it helps to identify improper tactics, departures from policy and training, and emerging trends that require remediation, discipline, or amendments to policy and training. When the Training Director fails to perform this function properly potentially harmful behavior goes undetected and is allowed to continue without correction.[153]

Plaintiff's expert explained that "comprehensive reviews of use of force incidents help officers and their agencies detect patterns or behaviors that have important implications for the development of policies that may reduce use of force incidents, ensure strict accountability regarding use of force decision making, and promote effective and engaged supervision."[154] Williams himself acknowledged the reason to do use of force report reviews is "keep down injuries on civilians as well as police officers."[155] LSP use of force reports for 2016[156] and 2017[157] reflect

---

[151] Exhibit 15, Longo Report, 36.
[152] Exhibit 18, LSP Policy 238, Section 10. This document will be provided to the Court under seal in light of the current Protective Order.
[153] Exhibit 15, Longo Report at 46.
[154] Exhibit 15, Longo Report, 30.
[155] Exhibit 19, Williams Deposition at 138:22-139:1.
[156] Exhibit 24, 2016 LSP Use of Force Reports in globo.
[157] Exhibit 25, 2017 LSP Use of Force Reports in globo.

that after use of force encounters with troopers, particularly tasing, individuals either required medical care on site or were transported to the hospital. These records reflect a pattern of injury.[158]

Williams' and Naquin's testimony and the collection of use of reports each defendant approved[159] establish that neither defendant meaningfully executed his duties as a supervisor. Despite the risk of injury to individuals encountering their subordinates, neither Williams[160] nor Naquin[161] engaged in any independent investigation into use of force reports. Sgt. Cuccia, who reviewed UOF reports in New Orleans in the first instance before sending them to Naquin and ultimately to Williams, testified that he would review the arrest report, authored by the trooper, to make sure it "mirrored" the use of force report, [162]which is also authored by the trooper.[163] Lt. Bradley similarly testified that there was no outside investigation beyond the trooper's own account of the force.[164]

Thus, in a classic example of letting the fox investigate the raid on the henhouse he was guarding, Naquin and Williams' practice in reviewing UOF was to rely almost exclusively on reports authored by the trooper who engaged in the force. Plaintiff's expert makes clear that such a review process is fatally flawed.[165] Such a breakdown in a process designed to detect policy and constitutional violations like excessive uses of force tolerates – if not ratifies – the violation of civilians' constitutional rights.[166] As such, the breakdown in the use of force review process for

---

[158] In the case of establishing a pattern of excessive force, the Fifth Circuit has noted the similarity requirement is met by proof that the prior acts involved injury to a third party. Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 383 (5th Cir. 2005); Davidson v. City of Stafford, Texas, 848 F.3d 384, 397–98 (5th Cir. 2017), as revised (Mar. 31, 2017). Plaintiff meets that burden here.

[159] Exhibit 24, 2016 and Exhibit 25, 2017 UOF Reports.

[160] Exhibit 19, Williams Deposition, 197:19 – 198:19.

[161] Exhibit 16, Naquin Deposition, 200:7 - 202:1.

[162] Exhibit 26, Cuccia Deposition, 54:17 – 56:3.

[163] Exhibit 3, Pichon Deposition, 255:22-24; Exhibit 22, Bellue Deposition, 73:10-13 – 78:1.

[164] Exhibit 20, Bradley Deposition, 225:13 – 226:13.

[165] Exhibit 15, Longo Report, 30-31, 36-39.

[166] Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir.1984), on reh'g, 739 F.2d 993 (5th Cir. 1984).

Troop N presided over by Naquin and Williams is within the area of custom or policy that establishes supervisory liability.[167]

     *1. Williams failed to engage in the use of force review process.*

LSP's Use of Force policy requires the Training Academy Director to review Use of Force Reports to determine whether LSP rules or policy have been violated and whether current policy and training is adequate and comprehensible.[168] Defendant Williams failed to accomplish every single one of these policy objectives in reviewing use of force reports. Williams' failure to engage in any meaningful use of force review created an obvious risk for, and was a moving force in, Pichon's unconstitutional use of excessive force on Terrell.[169]

Williams was aware of what should have been included in use of force reports to make for an effective review.[170] He also knew the purpose of his review: "To read the narrative, to see if the amount of force used was the correct amount of force to use . . . you look at different trends; <u>or if you see thing[s] that you say ok, this is not safe, you know, I'm seeing it too often, maybe we should conduct some trainings to straighten this out.</u> Those are the things I'm looking for."[171]

But despite understanding the connection between his UOF reviews and troopers' actions, Williams' actual approach to review was shockingly lackadaisical. He has no memory of ever finding a violation of the use of force policy. [172] Further, on being tendered specific use of force reports during his deposition, Williams testified repeatedly that the reports lacked sufficient information for him to determine if the use of force described in the report was justified:[173]

---

[167] <u>Id</u>.
[168] Exhibit 18, LSP Policy 238, Section 10, Use of Force (under seal).
[169] Exhibit 15, Longo Report, 30; Exhibit 18, LSP Policy, 238, Use of Force (under seal).
[170] Exhibit 19, Williams Deposition, 191:18-22.
[171] Exhibit 19, Williams Deposition, 194: 19 – 195:11 (emphasis added).
[172] Exhibit 19, Williams Deposition 211:19-25.
[173] <u>See generally</u> Exhibit 19, Williams Deposition, 221-243.

- An August 9, 2016 UOF report indicates that Trooper Thomas Bellue deployed his Taser.[174] The information contained in the report itself was not consistent with use of force policy as Williams understands it; [175] but Williams nevertheless signed off on the UOF report anyway.[176]

- A UOF report dated August 7, 2016 documents that a Taser was used twice on an intoxicated individual on the ground.[177] But the report only accounts for one deployment of the Taser.[178] Williams signed off on the report anyway,[179] without any investigation.[180]

- A July 17, 2016 report describes the repeated tasing of a mentally ill man, comparable to a use of lethal force under LSP policy.[181] Despite discrepancies in the part of the report seeking to articulate the factual basis for the tasing under these circumstances, Williams approved the report. [182]

Beyond these examples, Plaintiff's expert noted serious deficiencies and glaring policy violations in use of force reports he reviewed. [183]

While policy violations are not per se constitutional rights violations, when an officer violates policy by engaging in a dangerous tactic that is discouraged or banned by the agency, then the objective reasonableness of the action is necessarily called into question.[184] As catalogued above, the record abounds with both formal violations of the troopers' duty to provide sufficient

---

[174] Exhibit 24, 2016 UOF Reports, Bates Numbers Terrell4884-95; Exhibit 19, Williams Deposition at 223 – 225.
[175] Exhibit 19, Williams Deposition 226:6-13.
[176] Exhibit 19, Williams Deposition 226:25 – 227:23.
[177] Exhibit 24, 2016 UOF Reports Bates number 4890-5; Exhibit 19, Williams Deposition 232:5-21.
[178] Exhibit 24, 2016 UOF Reports Bates number 4890-5; Exhibit 19, Williams Deposition 232:5-21.
[179] Exhibit 19, Williams Deposition 232:22-233:7.
[180] Exhibit 19, Williams Deposition 233:8-234:9.
[181] Exhibit 24, 2016 UOF Reports, Bates numbers Terrell4950-4955; Exhibit 19, Williams 238:10-14; Exhibit 18, Use of Force Policy, para. 9 x(i) (filed under seal).
[182] Exhibit 19, Williams 238:16 – 241:16, 242:18 – 243:7.
[183] Exhibit 15, Longo Report 47-49. The bates numbers Mr. Longo references in his report are included in Exhibit 24, 2016 Use of Force Reports and Exhibit 25, 2017 Use of Force Reports.
[184] Gutierrez v. City of San Antonio, 139 F. 3d 441, 448 – 449 (5th Cir. 1998); Darden v. City of Fort Worth, Texas, 880 F.3d 722, 732 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).

information about the circumstances of the use of force and substantive policy violations by troopers of LSP's Use of Force policy that caused physical harm to individuals. Such violations can form the basis for placing a supervisor, such as Williams, on notice of the need for additional training of LSP Troopers on Taser use.[185] But no such training ever occurred. Continued use of Taser without such training created an obvious risk of future incidents of excessive use of force involving the deployment of a Taser.

### 2. *Naquin failed to engage in the use of force review process.*

Similarly, Captain Naquin was tasked with reviewing use of force reports after a Sergeant or Lieutenant had conducted the initial review.[186] When reviewing use of force reports, Naquin stated that he would look for the circumstances that led to the use of force and whether or not the force was appropriate or excessive.[187]

In reviewing use of force reports that Naquin approved, Plaintiff's expert found a pattern of "deficiencies with regard to the clarity of information contained within the reports."[188] Plaintiff's expert found that the appropriateness of the level of force was either impossible to determine or clearly a violation of LSP policy on its face.[189]

LSP's use of force policy permits tasing a handcuffed individual only when lethal force would be permitted.[190] However, Naquin signed off on two use of force reports that documented tasing individuals who were handcuffed, without explanation.[191] The second incident included

---

[185] Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir.1984), on reh'g, 739 F.2d 993 (5th Cir. 1984) (holding that constructive knowledge of constitutional rights violations could be imputed to an official or body when policy violations are persistent and widespread.); City of Canton v. Harris, 489 U.S. 378, 390 (noting that the need for training may be obvious when police often violate constitutional rights when exercising discretion.)
[186] Exhibit 16, Naquin Deposition, 199:10-200:6.
[187] Exhibit 16, Naquin Deposition, 200:7-12.
[188] Exhibit 15, Longo Report, 43.
[189] Exhibit 15, Longo Report ,43.
[190] Exhibit 18, Use of Force Policy 238.9.x.c (under seal).
[191] Exhibit, 24, LSP UOF 2016 bates numbers Terrell005892-5896; 5808 – 5813.

statements that a trooper used his hands to strike and tased a handcuffed individual.[192] Naquin could not tell from the report what the nature of the trooper's hand strike was; [193] he acknowledged that the report was not specific.[194]

Thus, like Williams, Naquin reviewed and approved UOF reports that demonstrated both formal and substantive policy violations, and which gave Naquin constructive notice of the heightened risk of constitutional rights violations by his subordinates.[195] As such Naquin was on notice of the need to provide additional training and supervision to troopers.[196]

3. *Naquin and Williams' failures in use of force oversight resulted in a failure to review Pichon's uses of force specifically.*

Beyond the general failure to review and investigate uses of force reports, both Williams and Naquin specifically failed to effectively engage in any meaningful review of Pichon's many uses of force, creating a nexus between Williams and Naquin's general failure to review use of force reports and Pichon's excessive force on Terrell.

- In reviewing two use of force reports by Pichon from June 3, 2016 and June 21, 2016 respectively,[197] Williams testified that they lacked critical information about what led to the escalation in force.[198] He signed off on these reports despite the missing information.[199]

---

[192] Exhibit 24, LSP 2016 UOFs bates numbers 5805 – 5813.
[193] Exhibit 15, Naquin Deposition, 210:18 – 211:1.
[194] Exhibit 16, Naquin Deposition, 212:20 – 213:18.
[195] Gutierrez v. City of San Antonio, 139 F. 3d 441, 448 – 449 (5th Cir. 1998); Darden v. City of Fort Worth, Texas, 880 F.3d 722, 732 (5th Cir. 2018), cert. denied sub nom. City of Fort Worth, Tex. v. Darden, 139 S.Ct. 69; 202 L.Ed.2d 23 (2018).
[196] Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir.1984), on reh'g, 739 F.2d 993 (5th Cir.1984) (holding that constructive knowledge of constitutional rights violations could be imputed to an official or body when policy violations are persistent and widespread.); City of Canton v. Harris, 489 U.S. 378, 390 (noting that the need for training may be obvious when police often violate constitutional rights when exercising discretion.)
[197] Exhibit 27, 6/3/2016 UOF Report; Exhibit 28, 6/21/2016 UOF Report.
[198] Exhibit 19, Williams 243- 249.
[199] Exhibit 27, 6/3/2016 UOF Report; Exhibit 28, 6/21/2016 UOF Report.

- In reviewing the June 3, 2016 report, Naquin testified that he was not exactly sure what the armlock technique was that Pichon described in the use of force report.[200] He could not recall speaking with Pichon's supervisor to learn what this technique was or reviewing any other documents when he approved the report.[201] He signed off on this use of force report despite the missing information.[202]

- In reviewing the June 21, 2016 report, Naquin testified that he could not determine the basis of Pichon's initial approach, nor his suspicion of or reason for patting down two men.[203] This interaction led to a charge of resisting an officer, but no other charge, further highlighting the question of what led to the initial encounter. Again, he signed off on this use of force report despite the missing information.[204]

- In a July 28, 2016 report, Pichon tased an individual for active aggressive resistance. Williams testified regarding the report, "Well, he didn't put enough information right here. Okay. Yes, he's in the fighting stance, okay, but he didn't put in there that he's given verbal commands to drop his hand, to turn around, put his hands behind his back, saying that he's under arrest. No, that's not enough information."[205] Regardless, both he and Naquin signed off on this use of force report.

- On May 6, 2017, just weeks before the incident, Pichon tased a fleeing individual.[206] Lt. Williams reviewed this tasing and justified it without further investigation because it stated the individual was "reaching for his waistband."[207] As in the instant case, Pichon did not offer any

---

[200] Exhibit 19, Williams Deposition, 234:9 – 235:14.
[201] Exhibit 19, Williams Deposition, 235:17 – 236:5.
[202] Exhibit 27, 6/3/2016 UOF Report; Exhibit 28, 6/21/2016 UOF Report.
[203] Exhibit 16, Naquin Deposition, 237:7-238:22.
[204] Exhibit 28, 6/21/2016 UOF Report.
[205] Exhibit 19, Williams Deposition, 251:15-24; 253:6-9.
[206] Exhibit 29 May 6 tasing UOF.
[207] Exhibit 19, Williams Deposition, 255:20-25.

more articulable or objective basis for assuming that the individual had a weapon beyond the individual supposedly "reaching for a waistband." The use of force report does not document that any weapon was ever recovered.

Discussing the repetitive use of the language "reaching for his waistband," Plaintiff's expert notes, "such language is often used by an officer to articulate a reasonable apprehension of fear that a subject may be armed."[208] However, "supervisors reviewing use of force reporting should safeguard against the use of "boilerplate" language that may be used in such reporting to make reasonable an officer's actions."[209]

Pichon's many uses of force were approved by both Williams and Naquin without investigation. These supervisors' absence of meaningful oversight in the use of force review process also directly included a complete lack of oversight over Pichon himself. Policy and constitutional violations were left completely unaddressed, both generally and specifically with respect to Pichon, creating an obvious risk that Pichon specifically would engage in excessive use of force.

D. <u>Naquin's Failure to Engage in the Early Intervention System Process Generally and With Respect to Pichon</u>

Beyond his failures to specifically engage in meaningful review of use of force reports, Naquin failed to employ another critical component in monitoring Trooper performance by failing to apply the Early Intervention System (EIS). In general terms, LSP policy describes the role of the EIS as part of LSP's responsibility to identify, evaluate, and assist employees who may have problems related to job performance or stress.[210]

---

[208] Exhibit 15, Longo Report, 25.
[209] Exhibit 15, Longo Report, 25.
[210] Exhibit 30, Policy 216 1.i., EIS (under seal); see Exhibit 15, Longo Report, 52 – 53 (Plaintiff's expert opines that "Early Intervention Systems (EIS) have been in existence for decades and have offered a mechanism by which law

The EIS policy specifically requires commanders like Naquin to keep an EIS file to provide time-sensitive reviews of significant events involving officers.[211] The troop commander is also tasked with ensuring that all events are entered into the EIS.[212] An EIS report is required when a trooper has either three EIS criteria events in a 90 day period or six criteria events in a 12 month period.[213] Some of the criteria that would trigger an EIS include: use of force incidents, pursuits, sustained and not-sustained citizen complaints, weapons discharges, at-fault state vehicle crashes, personal counseling sessions, and disciplinary actions.[214] Naquin had no discretion in whether to enter events into the EIS file and submit an EIS report.[215]

But Naquin largely delegated his responsibility for the EIS to a subordinate.[216] Like the use of force reports discussed above, the EIS report featured narratives based exclusively on the trooper's own account of the event without any regular external investigation to either confirm or dispute the trooper's account.[217]

Naquin completely failed to use the EIS process as an opportunity to correct trooper behavior before it became more serious. He testified that he could not recall a single instance of retraining a trooper after an EIS review.[218] Naquin's subordinate, Lt. Bradley, similarly testified that he could not recall ever counseling a trooper because he had a concern about uses of force in

---

enforcement agencies can track, monitor, and detect emerging trends that if left uncorrected, could potentially result in adverse employment action and lead to foreseeable risk of harm to the officer and others.").
[211] Exhibit 30, LSP Policy 216 1.ii, EIS (under seal).
[212] Id.
[213] Id.
[214] Exhibit 30, LSP Policy 216 1.v, EIS (under seal).
[215] Exhibit 20, Bradley Deposition, 240:10-241:1; 297:9-14
[216] Exhibit 16, Naquin Deposition, 221.
[217] Lt. Bradley relied exclusively on summaries of EIS triggering events that he believed had been compiled by sergeants in making his recommendations. Exhibit 20, Bradley Deposition, 219:16-221:17, 303:7-12. However, based on the testimony of two LSP sergeants under Bradley, the EIS summaries or synopses were in fact authored by the troopers who had engaged in the use of force themselves, without any other investigation. Exhibit 22, Bellue Deposition, 72:22 – 73:13; Exhibit 26, Cuccia Deposition, 68:2 – 69:6. Thus, the EIS reports for which Naquin was responsible under LSP policy were ultimately based on the perspective of the trooper or troopers being reviewed.
[218] Exhibit 16, Naquin Deposition, 229:14-18.

an EIS review.[219] Lt. Bradley appeared to regard his primary function in speaking with the trooper in the EIS process as reassuring the trooper that they had not in fact done anything wrong and that they were doing a good job.[220]

Naquin had an opportunity to correct Pichon's tendencies towards excessive force through the EIS process before Pichon encountered Terrell on June 17, 2017. In the case of Pichon's 2016 EIS report, in two of the three instances the language from the use of force reports are a verbatim match to two of the three use of force synopses of the EIS report.[221] Lt. Bradley wrote that each of the four triggering incidents were justified and consistent with LSP policy, noting:

> Pichon is assigned to the NOCED proactive detail. The detail is in an urban/high crime environment. Also, the majority of calls and interactions with citizens involve extreme impairment. Pichon has been a proactive member of the detail and has worked at a very high and professional level during his tour of duty.[222]

In reviewing the EIS report, Plaintiff's expert noted that these grounds were utterly insufficient as justifications for the events which triggered EIS review. [223] Longo also points out that this language "is mirrored through the EIS reports that I have reviewed. This type of 'boilerplate' language undermines the integrity of the EIS review process, is indicative of a pattern of behavior aimed at masking improper conduct, and is contrary to generally accepted policing practices."[224]

---

[219] Exhibit 20, Bradley Deposition, 309:3 - 309:21
[220] Exhibit 20, Bradley Deposition, 307:13 – 308:20.
[221] Exhibit 32, Pichon 2016 EIS Report; Exhibit 27 and Exhibit 28, Pichon UOF Reports; Exhibit 20, Bradley Deposition, 321:13 – 323:1. Plaintiff does not have pursuit reports and thus cannot compare language of Event 2 and the underlying report. The language of described Events 1 and 3 are both verbatim copies of the use of force report narratives.
[222] Exhibit 32, Pichon EIS Report.
[223] Exhibit 15, Longo Report, 56-58. Longo opines: "Neither the proactive nature of the work, the environment in which the Trooper's has been assigned, nor the quality of citizens in which the Trooper must interact suspends the Constitutional principles and generally accepted law enforcement practices that guide his work."
[224]Exhibit 15, Longo Report, 58.

Nevertheless, Naquin adopted Bradley's language verbatim and concluded that no further action need be taken.[225] This is consistent with Naquin's practice of repeatedly adopting his subordinate's boilerplate justifications and his recommendations for no further action.[226]

Plaintiff's expert's review of the EIS reports submitted by Naquin "reveal a pattern of complacency in the manner in which he carried out his important responsibility of ensuring that the Early Intervention System functioned properly by identifying trends that if left unattended would pose a foreseeable risk of harm to the involved Troopers and the citizens whom they are sworn to serve."[227] Pichon's 2016 EIS report fits squarely into this pattern, establishing not just a generalized risk of harm, but one specifically related to Pichon. His dangerous uses of force should have triggered closer scrutiny and remediation, but the deficiencies in the EIS process permitted by Naquin allowed his uses of force to continue unchecked.

## V.    Significant Factual Disputes Preclude Dismissal of Plaintiff's State Law Claim

In assessing pendant state law claims for assault and battery as part of a federal civil rights excessive force claim, the Fifth Circuit holds that "Louisiana's excessive force tort mirrors its federal constitutional counterpart. The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result. Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case."[228] Accordingly, the fact disputes supported

---

[225] Exhibit 32, EIS Reports; Exhibit 15, Longo Report, 58.
[226] Exhibit 32, EIS Reports; Exhibit 15, Longo Report, 58 - 63.
[227] Exhibit 15, Longo Report, 64.
[228] Deville v. Marcantel, 567 F.3d 156, 172–73 (5th Cir. 2009) (internal citations removed). Factors considered in this analysis are: (1) the known character of the arrestee, (2) the risks and dangers faced by the officers, (3) the nature of the offense involved, (4) the chance of the arrestee's escape if the particular means are not employed, (5) the existence of alternative methods of arrest, (6) the physical size, strength, and weaponry of the officers compared to the arrestee, and (7) the exigencies of the moment.

by the record as outlined in the foregoing brief foreclose grant of summary judgment on Plaintiff's pendant state law claims.

**VI.    Conclusion**

For the foregoing reasons, Plaintiff respectfully requests the Court to deny Defendants' Motion for Summary Judgment.

Respectfully Submitted,

*/s/ Elizabeth Cumming*
James Craig, LSBN # 33687
Emily Washington, LSBN # 34143
Elizabeth Cumming, LSBN #31685
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
Tel. 504-620-2259
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org
elizabeth.cumming@macarthurjustice.org

*Attorneys for Plaintiff*