1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

ZACHARY TERRELL                )NO. 2:18-CV-5787
5                               )
              PLAINTIFF,        )SECTION F(5)
6                               )
VERSUS                          )JUDGE MARTIN L.C. FELDMAN
7                               )
TROOPER TROY PICHON, TROOPER    )MAGISTRATE JUDGE
8 JEFFREY ROACH, LIEUTENANT     )MICHAEL NORTH
DERRELL WILLIAMS, AND CAPTAIN   )
9 DARRIN NAQUIN, each in their  )
individual capacities          )
10                              )
              DEFENDANTS.       )
11 ------------------------------

12

13

14

15               DEPOSITION OF

16               ZACHARY TERRELL

17          NEW ORLEANS, LOUISIANA

18               MAY 1, 2019

19

20

21

ATKINSON-BAKER, INC.
22 (800) 288-3376
www.depo.com

23

REPORTED BY:    CYNTHIA M. HARE, CCR NO. 2010007

24

FILE NO:   AD03FFB

25

1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5   ZACHARY TERRELL                )NO. 2:18-CV-5787
                                   )
6              PLAINTIFF,          )SECTION F(5)
                                   )
7   VERSUS                         )JUDGE MARTIN L.C. FELDMAN
                                   )
8   TROOPER TROY PICHON, TROOPER   )MAGISTRATE JUDGE
    JEFFREY ROACH, LIEUTENANT      )MICHAEL NORTH
9   DERRELL WILLIAMS, AND CAPTAIN  )
    DARRIN NAQUIN, each in their   )
10  individual capacities          )
                                   )
11             DEFENDANTS.         )
    ------------------------------
12

13

14

15

16

17          Deposition of ZACHARY TERRELL, taken on behalf of

18  Defendants, at 4400 South Carrollton Avenue, New

19  Orleans, Louisiana 70119, commencing at 1:03 p.m.

20  Wednesday, May 1, 2019, before Cynthia M. Hare, CCR No.

21  2010007.

22

23

24

25

1  A P P E A R A N C E S:

2  FOR PLAINTIFF:

3  MACARTHUR JUSTICE CENTER
   BY: JAMES CRAIG, ESQUIRE
4       EMILY M. WASHINGTON, ESQUIRE
   4400 South Carrollton Avenue
5  New Orleans, Louisiana 70119

6  LAW OFFICE OF ELIZABETH CUMMING
   ELIZABETH CUMMING, ESQUIRE
7  316 South Dorgenois Street
   New Orleans, Louisiana 70119

8
   FOR DEFENDANTS:
9
   BURGLASS AND TANKERSLEY, L.L.C.
10 BY: GREGORY C. FAHRENHOLT
   5213 Airline Drive
11 Metairie, Louisiana 70001

12 LOUISIANA DEPARTMENT OF PUBLIC SAFETY
   BY: JENNIFER DEL MURRAY, ESQUIRE
13 Legal Affairs 7979 Independence Boulevard
   Baton Rouge, Louisiana 70806

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2    WITNESS:    ZACHARY TERRELL

 3    EXAMINATION                                    Page

 4          By Mr. Fahrenholt                        5,81

 5          BY Mr. Craig                             69

 6

 7    EXHIBITS:

 8          Exhibit 1 - Photograph                   81

 9

10    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

11          Line 18                                  23

12          Line 6                                   24

13          Line 24                                  60

14          Line 6                                   64

15

16    INFORMATION TO BE SUPPLIED:

17                        (None)

18

19

20

21

22

23

24

25
```

1               ZACHARY TERRELL,

2          having first been duly sworn, was

3          examined and testified as follows:

4                    EXAMINATION

5    BY MR. FAHRENHOLT:

6         Q.   Mr. Terrell, my name is Greg

7    Fahrenholt.  We were just introduced a few

8    minutes ago.  I've been appointed by the

9    State to represent the defendants in the

10   lawsuit that you filed in federal court.  I

11   assume you've never done a deposition before;

12   is that correct?

13        A.   No, sir.

14        Q.   I'm sure your attorneys have

15   explained it fully.  Basically, I am here to

16   ask you questions about yourself and about

17   what happened, as you describe in the

18   lawsuit, and what's happened since.

19   Basically, this is my only time to talk to

20   you, so I'm just trying to get an

21   understanding of what happened.  We have the

22   court reporter here.  She's sworn you in, so

23   you're under oath.  It's as if we're in a

24   court of law.  She's going to be taking down

25   all the words we say, so I would just ask you

1    if it's a yes or no question, make sure that

2    you say yes or no.  I know it might seem

3    casual because we're just sitting and talking

4    to each other, but I would just ask you not

5    to speak over my questions and I'll try to

6    the same, not to speak when you're speaking,

7    to make it easier for her to take it all

8    down; is that okay?

9        A.  Yes.

10       Q.  I'm going to ask some questions today

11   that probably aren't going to be good at some

12   point.  If anything is confusing to you; in

13   other words, just let me know if you don't

14   understand the question and I'll try to

15   rephrase it.  If you do answer a question,

16   I'm just going to assume that you did

17   understand it; is that fair?

18       A.  Gotcha.

19       Q.  What is your full name?

20       A.  Zachary Terrell.

21       Q.  Date of birth?

22       A.  11/29/88.

23       Q.  What are the last four digits of your

24   Social Security number?

25           MR. CRAIG:

6

```
 1              You can answer as to your last
 2          four digits.
 3          THE WITNESS:
 4              6237.
 5   MR. FAHRENHOLT:
 6       Q.  And where are you currently living?
 7       A.  Uptown.
 8       Q.  What's the address?
 9       A.  1921 Prytania, Apartment C.
10       Q.  How long have you been living there?
11       A.  Four months.
12       Q.  On the night of June 17, 2017, where
13   were you living at that time?
14       A.  I had no current resident, like -- I
15   was living like, auntie.
16       Q.  Okay.  So you were sometimes living
17   with your aunt?
18       A.  The majority -- you could say that.
19       Q.  And you would stay at other places at
20   other times?
21       A.  Occasionally.
22       Q.  On the morning of June 17, 2017, do
23   you recall where you would have woken up?
24       A.  No.
25       Q.  Tell me a little bit about your
```

1  background.  You have a high school diploma,

2  correct?

3      A.  Yes, sir.  No, I have a GED.

4      Q.  You have a GED, okay.  When did you

5  obtain a GED?

6      A.  2006.

7      Q.  Have you obtained any other type of

8  schooling or training since obtaining your

9  GED?

10     A.  Yes.

11     Q.  Tell me about that.

12     A.  I went to Louisiana Culinary

13  Institute in Baton Rouge.

14     Q.  When did you go to Louisiana Culinary

15  School?

16     Q.  In 2006.

17         MR. CRAIG:

18             Excuse me.  Can I just ask you to

19         speak up just a little bit?

20         THE WITNESS:

21             Yes, sir.

22         MR. CRAIG:

23             I don't know about anybody else,

24         but I think I'm the oldest person in

25         the room and I have a hard time

8

 1              hearing sometimes.

 2              THE WITNESS:

 3                   I talk low sometimes.

 4              MR. CRAIG:

 5                   That's fine.

 6  MR. FAHRENHOLT:

 7       Q.   You're currently employed, correct?

 8       A.   Yes, sir.

 9       Q.   And where are you working?

10       A.   Briquette's.

11       Q.   Briquette's, that's in the Warehouse

12  District?

13       A.   Yes, sir.

14       Q.   What are you doing at Briquette's?

15       A.   Cook.

16       Q.   How long have you been working there?

17       A.   Four months.

18       Q.   I understand in June 2017, on the

19  date of the incident we're here to talk

20  about, you were working at Tujaque's?

21       A.   Yes.

22       Q.   Were you working as a cook at

23  Tujaque's?

24       A.   Yes.

25       Q.   How long had you been working as a

1  cook at Tujaque's?

2       A.   Twenty-one days.

3       Q.   Where had you been working before

4  that?

5       A.   The Napoleon House.

6       Q.   Okay.

7       A.   No, I was working at Tomas.

8       Q.   And these are all jobs as a cook?

9       A.   Yes, sir.

10      Q.   Okay.  Do you remember the day of the

11 incident before you went to work, what

12 happened?  I know you said you don't recall

13 where you stayed the night before; is that

14 correct?

15      A.   Correct.

16      Q.   Do you remember anything about that

17 day?

18      A.   I went to work.

19      Q.   What time did your shift start that

20 day?

21      A.   It started at 10:00, but I get there

22 like 9:30.

23      Q.   This is in the morning?

24      A.   Uh-huh.

25           MR. CRAIG:

```
 1              Try to say yes or no instead of
 2         uh-huh.
 3         THE WITNESS:
 4              Yes, I'm sorry.
 5         MR. CRAIG:
 6              Thank you.
 7    MR. FAHRENHOLT:
 8         Q.  And how long was your shift that day?
 9         A.  All day.
10         Q.  Do you remember when your shift was
11    scheduled to end?
12         A.  Yes.
13         Q.  Okay, what was that?
14         A.  It was scheduled to end at 4:30.
15         Q.  Okay.
16         A.  But I stayed the rest of the day.
17         Q.  So you worked a double shift?
18         A.  (Nods head up and down)
19         Q.  What time did the night shift end?
20         A.  Like 10:30/11:00.
21         Q.  Did you immediately leave, or did you
22    stay at work for a bit after your shift
23    ended?
24         A.  The intention was to immediately
25    leave.
```

11

```
 1        Q.  Okay, the intention was to
 2   immediately leave.  Did you not immediately
 3   leave work?
 4        A.  In a way I did, in a way I didn't.
 5        Q.  Okay.
 6        A.  Does that make sense?
 7        Q.  I guess let's start with the way that
 8   you did, what did that mean?
 9        A.  I clocked out.
10        Q.  And what is the way that you didn't
11   mean?
12        A.  I stood there wait and use the phone.
13        Q.  Who were you calling on the phone?
14        A.  I didn't call no one, I got a call.
15        Q.  Who called you?
16        A.  Logan.
17        Q.  That's Logan Carroll?
18        A.  Yes.
19        Q.  How long have you known Logan
20   Carroll?
21        A.  Since I started working at Tomas.
22        Q.  That's Tomas Bistro?
23        A.  Yes, sir.
24        Q.  And when did you start working at
25   Tomas again?
```

12

```
 1        A.   2011.
 2        Q.   So you've known Logan Carroll since
 3   2011?
 4        A.   Yes.
 5        Q.   Did he work in the kitchen with you?
 6        A.   Yes.
 7        Q.   And what did you discuss on the phone
 8   with Logan Carroll while you were still at
 9   Tujaque's?
10        A.   My whereabouts.
11        Q.   The fact that you were still at work?
12        A.   Yes.
13        Q.   Did you make plans to meet with him?
14        A.   Yes.
15        Q.   And where did you make plans to meet
16   with him?
17        A.   At his house.
18        Q.   And where is his house located?
19        A.   His mother house on St. Peters and
20   Girod.  That's -- South -- St. Peters and
21   Burgundy.
22             THE WITNESS:
23                  Is it St. Peter or South Peter?
24             MR. CRAIG:
25                  Well, you just testify the best
```

13

1          you can, if you can, and we'll figure

2          it out as we go along.

3          THE WITNESS:

4               Yeah, I'm still getting used to

5          the S word, because I was on South

6          Peter.

7    MR. FAHRENHOLT:

8          Q.  It is confusing, South Peter and St.

9    Peter.  This is the street in the French

10   Quarter we're talking about?

11         A.  Yeah, so it's St. Peter.

12         Q.  So what time did you actually leave

13   Tujaque's?

14         A.  Approximately, like 11:00 something -

15   - approximately, 11:00.

16         Q.  Who was your supervisor at Tujaque's

17   at the time?

18         A.  Chef Gui Sockrider.

19         Q.  You think you left Tujaque's at

20   approximately eleven o'clock?

21         A.  Approximately, yes.

22         Q.  Then immediately after leaving, you

23   walked to your friend Logan Carroll's

24   mother's house?

25         A.  Yes, sir.

1      Q.   How long did the walk take?

2      A.   You want me to guess?

3      Q.   I don't want you to guess.  If you

4  don't know, it's fair to say that you don't

5  know.

6      A.   Yeah, I don't know.

7      Q.   Are you a brisk walker, a slow

8  walker?

9      A.   Moderate.

10      Q.   Logan Carroll wasn't working with you

11  at Tujaque's at the time?

12      A.   No, sir.

13      Q.   What happened next after you walked

14  to his mother's house?

15      A.   We went inside.

16      Q.   And how long were you inside?

17      A.   I don't know.

18      Q.   Do you know if it was more or less

19  than five minutes?

20      A.   More than five minutes, less than an

21  hour.

22      Q.   What did you do inside the house with

23  Logan Carroll?

24      A.   Talk.

25      Q.   And then what happened after you

1    talked to Mr. Carroll for however long?

2         A.   We made plans.

3         Q.   And this is all inside the house?

4         A.   Yes, sir.

5         Q.   What were the plans that you had

6    made?

7         A.   To come back and hang out.

8         Q.   Come back from where?

9         A.   I was going to see someone.

10        Q.   Who were you going to see?

11        A.   My brother.

12        Q.   What is your brother's name?

13        A.   Eric.

14        Q.   Eric, okay.  And where were you going

15   to see Eric?

16        A.   In the Treme.

17        Q.   In the Treme, okay.  At a specific

18   location in the Treme?  Do you recall what

19   streets that would have been on?

20        A.   Yeah, I recall, but --

21        Q.   Let me ask you this.  If in your

22   discovery responses it says that your brother

23   lived at the corner of Governor Nicholls and

24   Tonti.

25        A.   Yeah, it does, but you asked the

```
 1   question, I gave you Eric, you know what I
 2   mean?
 3        Q.  Yes.
 4            THE WITNESS:
 5                Do I have to give a specific
 6            street?
 7            MR. CRAIG:
 8                If you know.
 9            THE WITNESS:
10                Well, yes, I was going on
11            Governor Nicholls and Tonti to see my
12            brother.
13   MR. FAHRENHOLT:
14        Q.  So that's where you were intending to
15   go --
16        A.  Yes, sir.
17        Q.  -- once you left Logan Carroll's
18   mother's house?
19        A.  Yes, sir.
20        Q.  If I understand your testimony, you
21   went inside the home for some period of time
22   and talked to him, then you made plans to
23   come back after going to see your brother.
24   What happened next?
25        A.  We went outside.  We finished smoking
```

1  a cigarette.  He offered me his bike, and I

2  left.

3      Q.  How long were you outside?

4      A.  I don't know the specific time.  Not

5  long.

6      Q.  More or less than five minutes?

7      A.  A little more than five minutes.

8      Q.  More or less than ten minutes?

9      A.  Less than ten minutes, more than

10  five.

11      Q.  So between five and ten minutes?

12      A.  (Nods head up and down)

13      Q.  What was the purpose of going to

14  visit with your brother?

15      A.  Just to go see him.

16      Q.  How long did you plan on staying at

17  your brother's?

18      A.  Not long.

19      Q.  I believe it's in your Complaint -- I

20  know I read somewhere that your plan was that

21  Logan Carroll was going to buy drinks for the

22  two of you; is that correct?

23      A.  (Nods head up and down)  I mean, yes.

24      Q.  Do you know where he was going to go

25  buy drinks for you?

18

1          A.  No, sir.

2          Q.  Did you give him money to buy drinks

3     for you?

4          A.  No, sir.

5          Q.  He was going to buy the drinks

6     himself?

7          A.  Yes, sir.

8          Q.  And your medical records at

9     University Medical Center, I believe you told

10    the staff that during the day of the 17th at

11    some point you had taken some Tramadol pills,

12    you had smoked marijuana, and you drank some

13    alcohol.  Do you recall doing any of those

14    things?

15              MR. CRAIG:

16                  I'm going to object at this time,

17              and interpose an objection based on

18              the Fifth Amendment.  Mr. -- we have

19              given -- Mr. Terrell has given us,

20              and we have given to counsel for the

21              defendants, the specifics of the

22              charges, which Mr. Carroll was

23              arrested on that night and

24              previously, and the charges which he

25              pled to that night and in previous

1   years.  And our position is further
2   questioning on topics related to
3   potentially illegal conduct is
4   protected by the Fifth Amendment.
5   MR. FAHRENHOLT:
6       My response is that I -- what I'm
7   trying to find out is if he was on
8   any substances that would have
9   affected his memory on the night of
10  the incident.  He already doesn't
11  know where he was that morning.  So I
12  just -- I'm asking the questions to
13  try to get an idea about his memory.
14  His testimony here is based on his
15  memory that night.  I think it's
16  relevant.
17  MR. CRAIG:
18      We would not object to asking him
19  about the state of his memory, or the
20  state of his alertness, if you want
21  to inquire into those topics.  The
22  specific objection is with respect to
23  statements about having taken or
24  ingested specific substances that
25  would constitute a crime under

20

```
 1              Louisiana law.
 2   MR. FAHRENHOLT:
 3        Q.  Okay, I'm going to try to ask you
 4   like this.  I'll ask about the alcohol.  Do
 5   you recall if you drank alcohol at any time
 6   on the day of the June 17th?
 7              MR. CRAIG:
 8                   Yes, you can answer that.
 9              THE WITNESS:
10                   Yes.
11              MR. CRAIG:
12                   When I say "yes," I just meant
13              you can answer that.  I was not
14              coaching you what to say.  Will you
15              please repeat your testimony?
16              THE WITNESS:
17                   Yes.
18   MR. FAHRENHOLT:
19        Q.  What time of day would you have had
20   anything to drink?
21        A.  What time of day?
22        Q.  Yes.
23        A.  At night.
24        Q.  Was it during your shift at work?
25        A.  No.
```

21

1       Q.   Was it after your shift at work?

2       A.   Yes.

3       Q.   And your shift at work ended at

4  around 10:30; is that your testimony?

5       A.   Yes.

6       Q.   So after 10:30, you had some

7  alcoholic beverages?

8       A.   Yes.

9       Q.   How many drinks did you have?

10      A.   One.

11      Q.   What did you drink?

12      A.   A shot.

13      Q.   A shot of what?

14      A.   Liquor -- we could say bourbon, we

15  could say whiskey, whichever one -- they both

16  brown.

17      Q.   Okay.  Were you inebriated at all

18  from that shot of whiskey?

19      A.   No, sir.

20      Q.   Had you had any more whiskey to drink

21  before you left Logan Carroll's house?

22      A.   No, sir.

23      Q.   Did you have anything to drink at

24  Logan Carroll's house?

25      A.   That's where I had the drink at.

```
 1        Q.  Okay, understood.  Without discussing

 2   any specific substances, were you under the

 3   influence of anything that could have

 4   possibly affected your ability to recall what

 5   happened that night?

 6             MR. CRAIG:

 7                  Could you read back the question,

 8             and answer it very specifically,

 9             please.

10                  -- READ BACK --

11             MR. CRAIG:

12                  You can answer that.

13             THE WITNESS:

14                  At that time?

15   MR. FAHRENHOLT:

16        Q.  Yes.

17        A.  No.

18        Q.  Do you dispute the accuracy of

19   statements in your medical records that you

20   had taken Tramadol and smoked marijuana?

21             MR. CRAIG:

22                  Same objection as before.  We

23             will object to that and instruct him

24             not to answer.

25             MR. FAHRENHOLT:
```

```
 1              That's based on the Fifth
 2         Amendment?
 3         MR. CRAIG:
 4              Yes, sir.  Well, in a -- yes.
 5  MR. FAHRENHOLT:
 6      Q.  When you were arrested, you had 17
 7  individually wrapped bags of powder substance
 8  containing heroin in your possession; is that
 9  correct?
10         MR. CRAIG:
11              I'm going to object to that and
12              instruct the witness not to answer.
13              And I would appreciate it if we could
14              take a break so that we can kind of
15              maybe work out -- both, so that I can
16              confer with my colleagues, and
17              potentially work out with you what --
18              where we're coming from and just not
19              wanting to obstruct your deposition.
20         MR. FAHRENHOLT:
21              Sure.
22         MR. CRAIG:
23              But trying to protect the record.
24              I just want to -- do also want to say
25              that because of the short duration of
```

1          the statute of limitations time under

2          Section 1983, and the much longer

3          statute of limitations under the

4          criminal laws of Louisiana, it

5          presents certain problems that I

6          think -- I feel I need to protect my

7          client's rights on.

8              So it's certainly not our intent

9          to obstruct your examination, or to -

10         - and, obviously, as some point we're

11         going to talk about the arrest and

12         the plea.  But I feel the need to be

13         conservative, for lack of a better

14         word, in my approach to what I let

15         him testify to on these types of

16         subjects.

17             But let's take a short break, if

18         we can, so that I can confer with co-

19         counsel, and then possibly we might

20         want to have a colloquy off the

21         record just to see if we can kind of

22         figure out an agreed upon plan to let

23         you ask questions you need to ask

24         without endangering our client's

25         constitutional rights.

```
 1            MR. FAHRENHOLT:

 2                 Sure.

 3                 -- OFF THE RECORD --

 4   MR. FAHRENHOLT:

 5        Q.  Let me back up a bit.  Do you have

 6   contact information for Logan Carroll?

 7        A.  No, sir.

 8        Q.  Do you have a phone number for Logan

 9   Carroll?

10        A.  No, sir.

11        Q.  You don't have an address for Logan

12   Carroll?

13        A.  No, sir.

14        Q.  Since you were released from jail

15   earlier this year, have you spoken to Logan

16   Carroll?

17        A.  No, sir.

18        Q.  Since your arrest at all, have you

19   spoken to Logan Carroll?

20        A.  Yes, sir.

21        Q.  When is the last time you spoke to

22   Logan Carroll?

23        A.  Like a year ago.

24        Q.  In what context did you speak with

25   Logan?
```

```
 1        A.   Just a two-minute call.

 2        Q.   Have you spoken to him since you

 3   filed this lawsuit?

 4             MR. CRAIG:

 5                  Do you know off the top of your

 6             head when you filed the lawsuit?

 7             THE WITNESS:

 8                  Yes, sir.

 9   MR. FAHRENHOLT:

10        Q.   And I believe that was in June of

11   2018.  So you've spoken to him since June of

12   2018?

13        A.   Yes, sir.

14        Q.   Did you speak about the lawsuit

15   itself?

16        A.   No, sir.

17        Q.   Have you ever had a discussion with

18   Logan about whether he would be a witness in

19   your lawsuit?

20        A.   No, sir.

21        Q.   Do you know where he works now?

22        A.   No, sir, to be honest with you, I

23   don't know.

24        Q.   When you spoke to him within the last

25   year, did you call him or did he call you?
```

1        A.   I called him.

2        Q.   But you no longer have his number?

3        A.   No, sir.

4        Q.   Let's get back to the time that we

5   were talking about that night.   You were in

6   the home for some amount of time, then you

7   left and you were on the street, correct?

8        A.   Correct.

9        Q.   And rather than me trying to like

10  repeat what you testified as to what you were

11  doing, what were you doing outside of the

12  home that night?

13       A.   Talking, getting ready to leave.

14       Q.   Where were you standing in relation

15  to Logan?

16       A.   On the sidewalk across from him.

17       Q.   Were you within arm's length of each

18  other?

19       A.   Yes, sir.

20       Q.   Is there any point during that

21  discussion when you would have exchanged any

22  items between the two of you?

23       A.   Yes.

24       Q.   Tell me about that.

25       A.   We were smoking a cigarette.   I gave

1    him my lighter.  That was it.  No real --
2    simple, cordial.  I even put the lighter back
3    up, you know, that's how cordial we were, you
4    know, just standing there.
5          Q.  So at some point there was an
6    exchange of a lighter?
7          A.  Yeah, I think that was like as soon
8    as we walked out the gate.
9          Q.  Were there any other exchanges of
10   items?
11         A.  No, sir.
12         Q.  What kind of phone did you have at
13   the time?
14         A.  A Samsung Core, J something.
15         Q.  Were you using your phone at any
16   point during the time you were talking to
17   Logan Carroll outside?
18         A.  No, sir, I had it in my hand.
19         Q.  At any time when you were talking,
20   and before you left, did you look at the
21   phone?
22         A.  Yes, sir.
23         Q.  What were you looking at on the
24   phone, if you remember?
25         A.  Right before I left, I put my music

1   on.

2        Q.  Do you know if Logan Carroll is a

3   user of Tramadol?

4            MR. CRAIG:

5                He asked, do you know?  You can

6            answer.

7            THE WITNESS:

8                No, sir.

9   MR. FAHRENHOLT:

10       Q.  Is the answer that you don't know, or

11  that he does not?

12       A.  The answer is that I don't know.

13       Q.  Do you know if Logan Carroll is a

14  heroin user?

15       A.  Yes, sir.

16       Q.  You do know, or he is?

17       A.  I do know that he is a heroin user.

18       Q.  Okay, he is a heroin user?

19       A.  To my knowledge.

20       Q.  Did you see him use heroin that

21  evening?

22       A.  No, sir.

23       Q.  You spoke to him for some length of

24  time, and then you left, correct?

25       A.  (Nods head up and down)

1          Q.   Tell me about leaving, what did you

2     do to leave?

3          A.   I put my headphones on, --

4          Q.   Okay.

5          A.   -- told Logan bye, and I rode off.

6          Q.   And whose bicycle was that?

7          A.   Logan's.

8          Q.   What's the next thing that you

9     remember?

10          A.   Riding to the corner.

11          Q.   Okay.

12          A.   Making my mind up to go around this

13     car instead of waiting.

14          Q.   Okay.

15          A.   Then everything went haywire from

16     there.

17          Q.   While you and Logan were standing on

18     the sidewalk, did you ever see a State Police

19     vehicle drive past you?

20          A.   No, sir.

21          Q.   After you left on the bike, did you

22     see a State Police vehicle behind you?

23          A.   No, sir.

24          Q.   Did you ever see blue lights from a

25     police car behind you?

1     A.  No, sir.

2     Q.  Did you ever hear anyone behind you

3  telling you to stop?

4     A.  No, sir.

5     Q.  Did you ever hear anyone running

6  behind you?

7     A.  No, sir.

8     Q.  Where was it on the street -- strike

9  that.

10         What street were you on when you were

11  stopped?

12     A.  You say "when I was stopped," or when

13  --

14     Q.  Yes.  I'll strike that.

15     A.  No.

16     Q.  See, I told you I'd ask a bad

17  question.  You rode away on St. Peter Street,

18  correct?

19     A.  Yes, sir.

20     Q.  Did you ever turn onto Burgundy

21  Street?

22     A.  Yes, sir.

23     Q.  Which direction did you turn onto

24  Burgundy Street?

25     A.  Left.

32

1      Q.   That is against oncoming traffic?

2      A.   Yes, sir.

3      Q.   Why were you turning left on Burgundy

4  Street?

5      A.   To go around a car.

6      Q.   Which car is that?

7      A.   Just a pedestrian crossing -- going

8  across.

9      Q.   So there was a car in the

10  intersection of St. Peter and Burgundy, and

11  it's your testimony that you were attempting

12  to go around that?

13      A.   Yes.

14      Q.   And I know at some point you were

15  tased and you fall off your bike, correct?

16      A.   (Nods head up and down)

17      Q.   Where on the street are you at that

18  point?

19      A.   In the middle of the street.

20      Q.   That's the middle of Burgundy Street?

21      A.   Yes, sir.

22      Q.   How far down Burgundy Street from the

23  intersection are you when that happens?

24      A.   Like a car length from the corner.

25  That makes sense?

1          Q.  So where you fell was approximately

2    one car length from the intersection of St.

3    Peter and Burgundy Streets; is that correct?

4          A.  That would be about my guess.

5          Q.  You hadn't proceeded any further down

6    the block of Burgundy?

7          A.  No, sir.

8          Q.  Just so I understand, it is your

9    testimony that not once before you were tased

10   do you have any idea that there is a police

11   officer behind you attempting to stop you?

12         A.  No, sir.

13         Q.  And it is your testimony that as far

14   as you're aware, no one told you to stop?

15         A.  No, sir.

16         Q.  How loudly were you playing your

17   music?

18         A.  I had headphones in, all the way up.

19         Q.  All the way up?

20         A.  (Nods head up and down)

21         Q.  Could you -- strike that.

22              At some point as you were riding your

23   bike away from Logan Carroll before you're

24   tased, do you recall dropping anything on the

25   street?

```
 1        A.   No, sir.
 2        Q.   Do you know whether or not at some
 3   point during that ride you would have dropped
 4   a blister pack of Tramadol in the street?
 5        A.   No, sir.
 6        Q.   Is it your testimony that you did not
 7   drop a blister pack of Tramadol in the
 8   street?
 9             MR. CRAIG:
10                  You can answer that.
11             THE WITNESS:
12                  No, sir.
13   MR. FAHRENHOLT:
14        Q.   Is it your testimony that you did
15   not, or is -- did you, or did you not drop a
16   blister pack of Tramadol in the street while
17   you were biking away?
18        A.   To my knowledge, no, sir.
19        Q.   Did you have a silver blister pack of
20   Tramadol in your possession when you were
21   riding away?
22             MR. CRAIG:
23                  You can answer that.
24             THE WITNESS:
25                  Yes, sir.
```

```
 1   MR. FAHRENHOLT:

 2       Q.  But it's your testimony you didn't

 3   drop it on the street?

 4       A.  Not to my knowledge.

 5       Q.  To your knowledge, where was the

 6   Tramadol pack after you were tased?

 7       A.  I don't know.

 8       Q.  Do you know if it was in your pocket?

 9         MR. CRAIG:

10             You can answer that.

11         THE WITNESS:

12             I don't know.

13   MR. FAHRENHOLT:

14       Q.  It is your testimony that you were in

15   the middle of the street when you fell on the

16   bike?

17       A.  Yes, sir.

18       Q.  Was there anything around you that

19   you would have struck after you fell off the

20   bike, other than the pavement?

21       A.  Yes, sir, the pavement.

22       Q.  Did you hit a car after you fell?

23       A.  No, sir.

24       Q.  Did you hit any part of the sidewalk

25   or a curb after you fell?
```

1        A.   No, sir.

2        Q.   Can you describe to me how you fell

3   and what part of your body you landed on?

4        A.   Yes, sir.

5        Q.   Okay.

6        A.   I fell on the left side of my face.

7        Q.   Did you fall off the left side of the

8   bike?

9        A.   No, sir, I was turning right behind a

10  car, and I guess that's when I was tasered,

11  because I fell, like, looking that way --

12  like this way -- because I was going behind a

13  car when -- like this -- I was going around a

14  car and I just went down.  And I just

15  remember looking this way.

16       Q.   So your head was turned to the right?

17       A.   Yes, sir.

18       Q.   Did the bike fall to either side, or

19  did you go over the handle bars?

20       A.   I just fell.

21       Q.   You just fell, okay.  Other than your

22  face, what other parts of your body would

23  have hit the ground?

24       A.   My chest.

25       Q.   Okay.

```
1        A.   The front of my body.
2        Q.   Okay.  What happened next after you
3   fell?
4        A.   A whole bunch of stuff.
5        Q.   Let's start with the first thing.
6   What was the first thing you remember
7   happening after you fell?
8        A.   Getting hit.
9        Q.   Where were you hit?
10       A.   In the head and face area.
11       Q.   Which part of your face?
12       A.   The left side of my face.
13       Q.   Were you hit on the right side of
14  your face at all?
15       A.   No, sir, because it was on the
16  ground.
17       Q.   And how were you hit?
18       A.   Sir?
19       Q.   How were you hit?
20       A.   What you mean "how"?
21       Q.   Okay, let me ask this.  Who hit you?
22       A.   At that point, I was unclear.
23       Q.   When did it become clear who hit you?
24       A.   After I was handcuffed and sat up.
25       Q.   Is it your testimony that you were
```

38

1    hit by the police officer, correct?

2         A.   Yes, sir.

3         Q.   What part of the police officer's

4    body struck your face?

5         A.   Fist.

6         Q.   Fist?

7         A.   Feet.

8         Q.   Fist and feet?

9         A.   Yep.

10        Q.   So it's your testimony you were

11   punched?

12        A.   And kicked.

13        Q.   And kicked, okay.  What part of your

14   body was punched?

15        A.   My face and head area.

16        Q.   What part of your body was kicked?

17        A.   My face and head area.

18        Q.   Both punches and the kicks to the

19   left side of your face?

20        A.   Yes.

21        Q.   While you were being punched and

22   kicked, the right side of your face was on

23   the ground?

24        A.   Yes, sir.

25        Q.   Could you move your body at all at

1    this point?

2        A.   No, sir.

3        Q.   Do you have any idea how long it was

4    that you had lost the ability to move?

5        A.   No, sir.

6        Q.   How long were you on the ground?

7        A.   I can't recall.

8        Q.   Other than punches and kicks to your

9    face, did the police officer strike you in

10   any other parts of your body?

11       A.   He kneed me in my back when he was

12   handcuffing me.

13       Q.   Was that while you were on the

14   ground, or is it after you were taken off the

15   ground?

16       A.   While I was on the ground.

17       Q.   So you were handcuffed on the ground?

18       A.   (Nods head up and down)

19       Q.   How did you leave the ground?  Again,

20   bad question.  What happened next?

21       A.   I was dragged to the sidewalk and sat

22   up.

23       Q.   Do you remember which sidewalk you

24   were dragged to?

25       A.   On Burgundy, across the street.

Q.   The side closer to Armstrong Park --

A.   Yes.

Q.   -- or the side --

A.   Left side.  Going with the traffic.

Q.   Okay.  Other than you and the police officer, was anyone else around that you could see?

A.   I'm going to say this, not to my knowledge -- not that I can remember because everything was still fuzzy.

Q.   The car that you had biked around, did it leave the scene?

A.   I assume so.

Q.   Did anybody other than police officers talk to you while you were in handcuffs at the scene?

A.   Later, the ambulance.

Q.   But until the ambulance came, had anyone talked to you?

A.   No, sir.

Q.   I understand you say you were dragged and then you were sat up on the sidewalk, correct?

A.   (Nods head up and down)

Q.   Which trooper sat you up on the

41

1    sidewalk?

2         A.   I'm going to say this, --

3         Q.   Uh-huh.

4         A.   -- the black one.

5         Q.   Okay.  At that point you don't know

6    anyone's names, that fine.  Did you see

7    another trooper at that time?

8         A.   Not at the moment,  heard him

9         Q.   Okay, you heard another trooper.

10   What did he say?

11        A.   "Search him."

12        Q.   That was it?

13        A.   He said "search him," that's all he

14   said.

15        Q.   Did you see that other trooper?

16        A.   No, sir.

17        Q.   At some point while you were out

18   there, did you see the other trooper?

19        A.   Yes, sir.

20        Q.   How long was it before you saw him?

21        A.   I don't know.

22        Q.   Was it more than a few minutes?

23        A.   I don't know.

24        Q.   The black trooper that stopped you,

25   did he talk to you at any point while -- and

1   this is at the scene before EMS comes -- did
2   you have any conversations with the black
3   trooper?
4        A.  He asked me my name.
5        Q.  You told him your name?
6        A.  Yes, sir.
7        Q.  Was there any other conversation?
8        A.  No, sir.
9        Q.  He didn't say anything at all to you?
10       A.  Just asked me my name.
11       Q.  Did you say anything to him?
12       A.  Not to my knowledge.  I was still
13   incoherent, you know what I mean?  A whole
14   bunch just happened, so...
15       Q.  Okay.  After you saw the other
16   trooper, did you have any discussions with
17   him?
18       A.  No, sir.
19       Q.  Before you left in an ambulance, did
20   you see any other State Troopers or NOPD
21   officers at the scene?
22       A.  No, sir.
23       Q.  Do you have any way to estimate how
24   long it was between the time you were tased
25   and the time that EMS arrived at the scene?

```
 1        A.  No, sir.

 2        Q.  You left the scene in an ambulance?

 3        A.  Yes, sir.

 4        Q.  Did anyone ride along with you?

 5        A.  Not that I know of, in the ambulance.

 6   EMS was, I don't know, I was in and out of

 7   consciousness.  But I don't think no police

 8   was there.

 9        Q.  I'm sorry, did you say you were

10   unconscious?

11        A.  In and out of consciousness.

12        Q.  In and out of consciousness.  So you

13   lost consciousness during this event?

14        A.  Yes, sir.

15        Q.  When did you lose consciousness?

16        A.  Throughout the event.

17        Q.  At what point would you have stopped

18   losing consciousness?  I guess I'm trying to

19   understand, you say "through the event," so

20   what -- how long is the event?

21        A.  I don't know.

22        Q.  Did you tell any of the doctors or

23   the EMS that you had lost consciousness?

24        A.  No, sir, I never talked to not one of

25   them.
```

1      Q.   Did any of the EMT's ask you any

2   questions?

3      A.   Not that I can remember.

4      Q.   Did they load you onto a stretcher?

5      A.   Yes, sir.

6      Q.   They transported you into the back of

7   an ambulance?

8      A.   Yes, sir.

9      Q.   No one ever asked you anything?

10      A.   Not to my -- not that I remember.

11         MR. CRAIG:

12              Greg, let me know when you get to

13           a stopping point so he can do this

14           text to his boss.  Or whatever a

15           natural stopping point is.  Is now

16           okay?

17         MR. FAHRENHOLT:

18              This is fine.

19                   -- BREAK --

20   MR. FAHRENHOLT:

21      Q.   You were taken in the ambulance to

22   University Medical Center; do you remember

23   that?

24      A.   I was taken to the hospital.

25      Q.   Do you remember any discussions you

1  would have had with anyone on the staff at
2  University Medical Center?

3       A.  No, sir.

4       Q.  Do you not remember the specifics of
5  any discussions, or do you not remember
6  having any discussions with anyone at all?

7       A.  I don't remember any discussions with
8  any EMS workers or doctors.

9       Q.  What's the next thing you do remember
10  after that?

11      A.  I have one memory of the hospital.

12      Q.  Okay.

13      A.  She was spraying cold water on my
14  eye, and it was cold.

15      Q.  This would have been a nurse?

16      A.  Yeah, whoever was putting stitches in
17  my eye.  They was spraying water in it to
18  clean it out, and it was cold.

19      Q.  You remember having stitches put in
20  your eye at the hospital?

21      A.  Yeah, I got stitches.

22      Q.  Do you remember what other treatment
23  you had gotten at the emergency room?

24      A.  No, sir.

25      Q.  How did you leave the hospital?

46

1       A.   The police walked me out.

2       Q.   Was it the same police officers who

3   had arrested you?

4       A.   Yes, sir.

5       Q.   Did you have any conversations with

6   them at that time?

7       A.   No, sir.

8       Q.   Where did you go from there?

9       A.   Jail.

10      Q.   At any time before they left your

11  presence that night, did they say anything to

12  you, or did you say anything to them?

13          MR. CRAIG:

14              Object to the form.  All the

15          antecedents.  Do you mind cleaning it

16          up a little?

17  MR. FAHRENHOLT:

18      Q.   Sure.  So they bring you to the jail.

19  Did you have any discussions with either of

20  the police offers on the way to the jail?

21      A.   No, sir.

22      Q.   Did you have any discussions with

23  either of the police officers at the jail?

24      A.   No, sir.

25      Q.   Have you had any discussions with the

```
 1    police officers who arrested you since the

 2    night of your arrest?

 3         A.   No, sir.

 4         Q.   Can you describe all the injuries

 5    that you've sustained as a result of this

 6    incident?

 7         A.   Yes.

 8         Q.   Okay, can you tell me what injuries

 9    you sustained?

10         A.   I had lacerations to the top of my

11    head.

12         Q.   You pointed to the very top?

13         A.   Yeah, top of my head.  All right, I

14    had a laceration to my eye that required nine

15    stitches -- eight/nine stitches.  I had, all

16    this was messed up.

17         Q.   And you're pointing to the area --

18         A.   My upper lip, my nose, my wrist --

19    injuries to my wrist.

20         Q.   Which wrist?

21         A.   Both of my wrists.

22         Q.   Both wrists, okay.

23         A.   I had injuries to my knees.

24         Q.   Both knees?

25         A.   Yes, sir.  I had injuries to my
```

1    elbow.

2         Q.   Okay.

3         A.   Well, to my arm -- my elbow.  I had

4    mental issues (inaudible). Emotional issues.

5         Q.   And we'll discuss those in a little

6    more detail.  I'm trying to get an idea of

7    the physical injuries.

8         A.   That's it.

9         Q.   Do you know how you sustained the

10   injury to the top of your head?

11        A.   Yes, sir.

12        Q.   How, to your knowledge, did you

13   sustain that injury?

14        A.   To my knowledge, I was kicked in the

15   head.

16        Q.   Okay.  Okay, so when you testified

17   earlier that you were kicked and punched to

18   the left side of your face, you were also

19   kicked to the top of your head?

20             MR. CRAIG:

21                  Object to the form.  But you can

22             answer.

23             THE WITNESS:

24                  Yes, sir.

25        MR. FAHRENHOLT:

1     Q.  The eye laceration, that was on your

2  right eye -- or eyebrow area; is that --

3     A.  Yeah, right.

4     Q.  And that was the part of your head

5  that would have hit the ground after you fell

6  off the bike?

7          MR. CRAIG:

8              You can answer.

9          THE WITNESS:

10             No, sir.

11  MR. FAHRENHOLT:

12     Q.  Is that -- did you not fall?

13     A.  I fell on this side of my face -- the

14  left side of my face.

15     Q.  You fell on the left side of your

16  face.  Okay.  The left side of your face made

17  contact with the pavement?

18     A.  Yes, sir.

19     Q.  And you didn't have any injuries to

20  the left side of your face, just contact with

21  the pavement?

22     A.  Just a little swelling, that's it.

23     Q.  Okay, so most of the major injuries

24  were to the right side of your face?

25     A.  Yes, sir.

1       Q.   And it's your testimony that you did

2   not fall onto the right side of your face?

3       A.   Yes, sir.

4       Q.   How long was it after the night of

5   your arrest until the injury on the top of

6   your head had healed?

7       A.   I don't know.

8       Q.   Was it a few weeks, or was it months;

9   do you have any way to estimate it?

10       A.   I don't know, I wasn't counting to

11   see how long it healed.

12       Q.   Do you have any idea how long it was

13   before the laceration over your right eye

14   before that healed?

15       A.   No, sir.

16       Q.   What were the injuries you sustained

17   to your wrists?

18       A.   It was scrapes.

19       Q.   It was scrapes, okay.  And for the

20   record, you're showing me the top of each

21   wrist?

22       A.   Yeah, it was like on the side.

23       Q.   Other than scrapes to your wrists,

24   have you had any other lingering issues with

25   your wrists since the arrest?

1      A.   No, sir.

2      Q.   What about the injuries to your

3   knees, can you describe those?

4      A.   Just scrapes.

5      Q.   Just scrapes, okay.  Have you had any

6   lingering issues with your knees since the

7   arrest?

8      A.   No, sir.

9      Q.   All right, and your elbow, that was

10  also just a scrape?

11     A.   (Nods head up and down)

12     Q.   You haven't had any lingering issues?

13     A.   No, sir.

14     Q.   Had you ever treated with a

15  psychiatrist before your arrest?

16     A.   No, sir.

17     Q.   Had you ever been diagnosed with

18  depression by any doctor before your arrest?

19     A.   No, sir.

20     Q.   Had you ever taken any medications

21  for depression before your arrest?

22     A.   No, sir.

23     Q.   You said you've experienced mental

24  issues as a result of your arrest; is that

25  correct?

1              MR. CRAIG:

2                    Object to the form.  But you can

3              answer.

4              THE WITNESS:

5                    Yes, sir.

6    MR. FAHRENHOLT:

7         Q.  Have you ever received any diagnosis

8    from a doctor regarding your mental issues?

9              MR. CRAIG:

10                   Object to the form.  But you can

11             answer.

12             THE WITNESS:

13                   Yes, sir.

14   MR. FAHRENHOLT:

15        Q.  What, to your knowledge, is your

16   diagnosis?

17        A.  I was diagnosed with PTSD.

18        Q.  Am I correct that that diagnosis was

19   made while you were at Orleans Parish Prison?

20        A.  Yes, sir.

21        Q.  What sort of treatment have you

22   received for PTSD?  Have you been prescribed

23   medications for your PTSD?

24        A.  Yes, sir.

25        Q.  What medications are you prescribed?

1    If you know the names.  I know that they're

2    --

3         A.  I only know one name for one of them.

4    I don't remember the name for the other one.

5         Q.  Okay.

6         A.  One of them was Prazosin.

7         Q.  Okay.  You were prescribed that in

8    Orleans Parish?

9         A.  No, sir, in Hunts.

10        Q.  In Hunts, okay.  I know you were

11   arrested and eventually pled guilty and went

12   to prison.  What facilities did you go to?

13        A.  Orleans Parish, Hunts, Bossier, and

14   then Tullulah.

15        Q.  Tullulah?

16        A.  Yeah.

17        Q.  Was it in that order?

18        A.  Yes, sir.

19        Q.  The medication you described, that

20   was prescribed while you were in Hunts?

21        A.  Yes, sir.

22        Q.  To your understanding, what does that

23   medication treat?

24        A.  It's supposed to stop nightmares.

25        Q.  When did you begin having nightmares?

54

1        A.   I don't recall.

2        Q.   Do you still experience nightmares?

3        A.   Yes, sir.

4        Q.   How often do you experience

5   nightmares?

6        A.   Every time I sleep.

7        Q.   Are you still taking medication?

8        A.   No, sir.

9        Q.   Since your release earlier this year,

10  have you treated with any doctors, or

11  psychiatrists, or psychologists for any

12  mental or emotional issues?

13            MR. CRAIG:

14                 Object to the form.  But you can

15            answer.

16            THE WITNESS:

17                 I can say yes, but can we pause?

18            MR. CRAIG:

19                 Not while the question is

20            pending.  But you can answer his

21            question.

22            THE WITNESS:

23                 The answer is yes.

24  MR. FAHRENHOLT?

25        Q.   Who have you treated with?

```
 1        A.   I only saw one person one time.  Dr.
 2   Shwery, I saw him one time.
 3             MR. CRAIG:
 4                  You need to say the name again
 5             louder.
 6             THE WITNESS:
 7                  Dr. Shwery.
 8   MR. FAHRENHOLT:
 9        Q.   Is that Edward Shwery?  Is it Shwery
10   --
11        A.   I don't know his first name.
12        Q.   -- is it S-H-W-E-R-Y, do you know?
13        A.   Something like that, I guess so.
14   Shwery.
15        Q.   Is that someone that your attorneys
16   had advised that you go see?
17        A.   Yes.
18        Q.   And I suspect that's spelled
19   correctly.  Have you treated with any doctors
20   for any physical injuries that you would
21   relate to any of this incident since you've
22   been released from prison?
23             MR. CRAIG:
24                  Object to the form.  You can
25             answer.
```

56

1           THE WITNESS:

2               No, sir.

3    MR. FAHRENHOLT?

4        Q.  Other than nightmares, can you

5    describe any other emotional symptoms you've

6    had since this incident?

7        A.  Yes, sir.  Fear, anxiety, a bunch of

8    them every day.

9        Q.  So you're still experiencing these

10   symptoms?

11       A.  Every day.

12       Q.  Can you describe any other effects

13   this incident has had on your life?

14       A.  Yes.

15       Q.  Okay.

16       A.  When you say -- can you ask the

17   question one more time?

18       Q.  Other than the issues we've already

19   spoken about, are there any -- I know I think

20   you probably understand what I'm trying to

21   ask, but -- what other emotional, physical,

22   or other types of issues have you had since

23   this incident, that you would relate to this

24   incident?

25       A.  I'm trying to figure out how to put

1    it in words.  Because it's kind of -- I go

2    through it every day, like -- it's like a lot

3    of emotions, you know what I mean?  I go

4    fear, anger, you know what I'm saying?  Every

5    day, like -- because I'm always thinking that

6    they going to do me something, so I'm always

7    on guard.  I'm always -- I'm a recluse of

8    myself now, you know what I mean?  I don't go

9    anywhere no more.  I stay completely away

10   from the area, so it's like I don't know.  I

11   don't know how to describe it.  I don't know

12   how to put it in -- I want to put it in my

13   words, you know what I mean?  So that's about

14   the best I can describe it.

15        Q.  Have you had any interactions with

16   the State Troopers who arrested you since

17   that arrest?

18        A.  No, sir.

19        Q.  Have you had any interaction with

20   other State Troopers since your arrest?

21        A.  No, sir.

22        Q.  After your arrest you pled guilty to

23   three charges in Orleans Criminal District

24   Court; is that correct?

25        A.  Yes, sir.

58

1      Q.   Do you recall what you pled guilty

2   to?

3      A.   Yes, sir.

4      Q.   Yes?

5      A.   Yes, sir.

6      Q.   What was that?

7      A.   Possession of heroin, possession of

8   Tramadol, and resisting arrest.

9      Q.   Do you recall anything about the

10  court hearing where you pled guilty?

11     A.   Do you want to repeat the question?

12     Q.   Do you remember the court hearing?

13     A.   Yes, sir.

14     Q.   Did you plead guilty in open court?

15     A.   Yes, sir.

16     Q.   Were you asked by the court if you

17  had, in fact, committed those crimes?

18     A.   Yes, sir.

19     Q.   You pled guilty to resisting a police

20  officer, correct?

21     A.   Yes, sir.

22     Q.   What is your understanding of the

23  actions that you committed that were

24  resisting a police officer?

25          MR. CRAIG:

1                    Object to the form.  But you can

2          answer.

3            THE WITNESS:

4                    Rephrase the question.

5    MR. FAHRENHOLT:

6        Q.  What is your understanding of what

7    you did to resist the police officer that you

8    pled guilty to?

9            MR. CRAIG:

10                   Same objection.  You can answer.

11           THE WITNESS:

12                   I don't know what I did to

13           resist.  How can I know I'm resisting

14           if I'm not aware that they're behind

15           me, you know what I mean?  So I don't

16           know what my action -- you know, what

17           I did to constitute as resisting if

18           I'm not aware I'm being chased, you

19           know what I mean?

20   MR. FAHRENHOLT:

21       Q.  But you did, in fact, plead guilty to

22   resisting an officer?

23       A.  Yes, sir.

24       Q.  Did you give heroin to Logan Carroll

25   on the night of your arrest?

```
 1              MR. CRAIG:

 2                   Object to that question for the

 3              reasons previously stated.  We

 4              instruct the witness not to answer

 5              pursuant to the Fifth Amendment.

 6              MR. FAHRENHOLT:

 7                   But he pled guilty.

 8              MR. CRAIG:

 9                   Possession.

10              MR. FAHRENHOLT:

11                   Off the record.

12                   -- OFF THE RECORD --

13   MR. FAHRENHOLT:

14        Q.  Did you give Logan Carroll Tramadol

15   on the night of your arrest?

16              MR. CRAIG:

17                   I'm going to object to that,

18              also, actually, and instruct the

19              witness not to answer, pursuant to

20              the Fifth Amendment.  And move to

21              strike the witnesses answer after the

22              objection.

23              MR. FAHRENHOLT:

24                   Off the record again.

25                  -- OFF THE RECORD --
```

MR. FAHRENHOLT:

Q.  I don't mean to repeat questions from earlier, but I want to make these things clear.  So when you were standing out with Logan Carroll, you did not see the State Police vehicle drive past you at any point?

A.  No, sir.

Q.  When you were standing on the street with Logan Carroll, you did not see the State Police vehicle approach you before you rode away on the bike?

A.  No, sir.

Q.  And you did not see the State Police vehicle following you after you left on your bike?

A.  No, sir.

Q.  And at no point did a State Police vehicle pull on the side of you and someone in the vehicle told you to stop?

A.  No, sir.

Q.  You didn't see any lights at any time from the State Police vehicle before you were tased?

A.  No, sir.

Q.  You did not hear a police officer

1   command you to stop at any point before you

2   were tased?

3       A.  No, sir.

4       Q.  And the only people that have been

5   listed in your discovery responses, aside

6   from State Police employees who would have

7   knowledge of the facts of your lawsuit are

8   Logan Carroll and Gui Sockrider; is that

9   still correct?

10      A.  Yes, sir.

11      Q.  Are you aware of anyone else who

12  could be -- serve as a witness on your behalf

13  if this matter at the trial?

14          MR. CRAIG:

15              Object to the form.  But you can

16          answer.

17          THE WITNESS:

18              No, sir.

19  MR. FAHRENHOLT:

20      Q.  You're not aware of any eyewitnesses

21  to the events, other than yourself and the

22  two State Police troopers that you name in

23  this lawsuit; is that correct?

24      A.  Yes, sir.

25      Q.  I know what the response to these

```
 1   questions will be, but I am going to ask them
 2   just for the record.
 3           MR. CRAIG:
 4                Sure.
 5   MR. FAHRENHOLT:
 6       Q.  Did you have 17 individually wrapped
 7   bags of heroin in your possession at the time
 8   that you were tased?
 9           MR. CRAIG:
10                Object to that question, and
11                we're going to instruct the witness
12                not to answer pursuant to the Fifth
13                Amendment.
14           MR. FAHRENHOLT:
15                That objection is based on the
16                Fifth Amendment?  Okay.
17   MR. FAHRENHOLT:
18       Q.  Were you in possession of a plastic
19   bag with 15 Tramadol pills and a blister pack
20   of six Tramadol pills at the time that you
21   were arrested?
22           MR. CRAIG:
23                Hold on just a second.  May I
24                inquire, you're asking was he in
25                possession of Tramadol at the time he
```

64

```
 1            was stopped?
 2            MR. FAHRENHOLT:
 3                 Correct.
 4            MR. CRAIG:
 5                 We'll let -- you can answer that
 6            question.  Would you mind repeating
 7            it, Greg?
 8   MR. FAHRENHOLT:
 9       Q.  Were you in possession -- is it
10   correct that you were in possession of a
11   plastic bag containing 15 Tramadol pills and
12   a blister pack containing six Tramadol pills
13   at the time that you were tased and arrested?
14            MR. CRAIG:
15                 You can answer that.
16            THE WITNESS:
17                 Yes and no.
18   MR. FAHRENHOLT:
19       Q.  What is the yes, and what is the no?
20       A.  Yes, I had heroin; yes, I had
21   Tramadols; yes -- I mean, no, I didn't -- I
22   meant, I mis-spoke.  I don't know about that
23   blister pack yet, 'cause that was on the
24   ground.
25       Q.  Okay.  Did you have a prescription
```

Zachary Terrell
May 1, 2019

```
 1   for Tramadol at the time?

 2        A.  No, sir.

 3        Q.  Did you have any existing physical

 4   condition, which caused you chronic pain?

 5             MR. CRAIG:

 6                  Object to the form.  Can you -- I

 7             think I know the context, but it was

 8             a little broad just the way it was

 9             asked.  You mean at the time of the

10             stop?

11             MR. FAHRENHOLT:

12                  Yes.  I'll strike that.

13   MR. FAHRENHOLT:

14        Q.  While you were on the sidewalk, did

15   you hand a bag of heroin to Logan Carroll?

16        A.  No, sir.

17             MR. CRAIG:

18                  Object to the form.  Hold up --

19             While you were on the sidewalk, did

20             you hand the bag to Logan --

21             MR. FAHRENHOLT:

22                  Yes.

23             MR. CRAIG:

24                  I'll withdraw the objection, I'm

25             sorry.  You can answer that.
```

```
 1              THE WITNESS:

 2                   No, sir.

 3  MR. FAHRENHOLT:

 4       Q.   While you were on the sidewalk, did

 5  you hand any Tramadol pills to Logan Carroll?

 6       A.   No, sir.

 7       Q.   While you were on the sidewalk, did

 8  Logan Carroll give you any cash?

 9       A.   No, sir.

10       Q.   I want to be clear, I don't want to

11  know the substance of any conversations you

12  had with your lawyers, but how did you come

13  into contact with the MacArthur Justice

14  Center?

15           MR. CRAIG:

16                   He's specifically asking not what

17              any lawyer told you, but how did you

18              come to meet us?

19           THE WITNESS:

20                   They came to me.

21  MR. FAHRENHOLT:

22       Q.   The MacArthur Justice Center

23  approached you.

24       A.   (Nods head up and down)

25           MR. FAHRENHOLT:
```

1              Okay.  I have no further
2         questions.
3         MR. CRAIG;
4              May I -- before you end your
5         examination, I do want to withdraw,
6         and I think the witness, our client,
7         answered the question anyway, but the
8         first of your list of questions on
9         this most recent series about the
10        heroin, asking him whether he had
11        heroin in his possession; he did
12        plead guilty to possession of heroin,
13        so just so the record is clear, I
14        will withdraw my Fifth Amendment
15        objection to that.
16             And if you want to repose that
17        question, I will withdraw our
18        instruction to the witness not to
19        answer.
20   MR. FAHRENHOLT:
21        Q.  Is it correct at the time of your
22   arrest that you were in possession of 17
23   individually wrapped bags of heroin?
24        MR. CRAIG:
25             You can answer.

1          THE WITNESS:

2               Yes.

3    MR. FAHRENHOLT:

4         Q.  And I believe it's my understanding

5    from earlier, you are not, yourself, a user

6    of heroin; is that correct?

7              MR. CRAIG:

8                   You can answer that.

9              THE WITNESS:

10                  Yes, sir.

11             MR. FAHRENHOLT:

12                  I believe that will end my

13             questions.

14                        EXAMINATION

15   BY MR. CRAIG:

16        Q.  So I do have some questions.  Mr.

17   Terrell, let me start with this.  We took a

18   break briefly a little bit ago, and I just

19   want to be clear for the record, where were

20   you during that break?

21        A.  Outside smoking.

22        Q.  You were outside smoking?  And were

23   any of the three of your attorneys there with

24   you during that break?

25        A.  No, sir.

```
 1        Q.  So let me ask you about -- we talked
 2   -- you answered questions from Mr. Fahrenholt
 3   about your injuries to your head.  And I
 4   believe, if I'm not mistaken, you testified
 5   that you had a laceration that required
 6   stitches above your right eye; is that
 7   correct?
 8        A.  Yes, sir.
 9        Q.  What do you know -- strike that.
10            What was the cause of the lacerations
11   over your right eye?
12            MR. FAHRENHOLT:
13                Object to the form of the
14            question, but he can answer.
15            THE WITNESS:
16                I was kicked and punched right
17            there, so I think that's where the
18            injury come from.  That's what you're
19            asking me?
20   MR. CRAIG:
21        Q.  That's what I'm asking you.  What I'm
22   asking you is where did the injury come from?
23        A.  From the State Trooper.
24        Q.  Well, from the State Trooper, but
25   from what particular actions of the State
```

1  Trooper?

2       A.  From him punching me and kicking me

3  in the head and face area.

4       Q.  Okay.  So I'm a little confused about

5  your earlier testimony, so I want to kind of

6  walk back through it.  And I want to start

7  from the point at which you're on the

8  bicycle.  You are trying to get around a car

9  that was on Burgundy Street?

10      A.  Yes, sir.

11      Q.  Do you remember starting from that

12  point to your previous testimony with Mr.

13  Fahrenholt?

14      A.  Yes, sir.

15      Q.  Okay, so remind me what direction --

16  from what side of Burgundy to -- well, just

17  trace your path.  You're on St. Peter, on the

18  bike, the car is there, you want to go around

19  it, which way did you go?

20      A.  I turned left to go behind the car

21  because the car is still at the corner, about

22  to cross the intersection.  I'm not going

23  across because the car -- I can't cross in

24  front of it because it's about to start

25  moving.  I know that already.  So I'm going

1    around it to go behind it because I know the

2    next car got to stop, you know what I mean?

3        Q.   Okay.

4        A.   That's why I'm taking a left on

5    Burgundy, because I could have just crossed

6    straight across Burgundy, you know what I

7    mean?

8        Q.   Yes.

9        A.   But a car was coming so I went around

10   it because I'm on a bike, and that's about as

11   far as I got.

12       Q.   And so the time while you were

13   crossing Burgundy, you were in the

14   intersection, or around the intersection of

15   Burgundy and St. Peter?

16       A.   Yes, sir, like about a car length off

17   the block because, you know, I'm going around

18   the car.  He stopped at the intersection, so

19   I'm like, I got to go around him.

20       Q.   Okay, and you just said you turned

21   left?

22       A.   Yeah, left on the block.

23       Q.   And then at some point when you're in

24   the road on the bike, something happened.

25   And your testimony, I think, is that's the

1  point where you were tased, --

2      A.  Yes, sir.

3      Q.  -- is that what you said before?

4      A.  Yes, sir.

5      Q.  So you're tased, you're on the bike,

6  what direction are you falling -- what side

7  of you is falling?

8      A.  I'm falling straight this way,

9  because keep in mind, I'm in the middle of a

10  turn, and I fell.

11      Q.  Okay, so let the record reflect that

12  you're moving your hand parallel with the end

13  of the table, with the edge of the table in

14  the conference room, you're turning it --

15      A.  Right, say right, because I'm going

16  back like around the car.

17      Q.  So you -- to go around the car, you

18  turned left and you were beginning to turn

19  right?

20      A.  Yes, sir.

21      Q.  Okay, to continue down St. Peter; is

22  that --

23      A.  Across the street, yeah.

24      Q.  And then you fell which direction?

25      A.  I fell this way.

1       Q.  And what direction is that?

2       A.  I'm going to say left.

3       Q.  Well, you --

4       A.  That's right, that's my left.

5       Q.  Okay, which is it?

6       A.  Right.

7           MR. CRAIG:

8               And let the record reflect that

9           during this entire -- during his

10          entire answer, the witness was

11          turning his hand to the right, even

12          when he was saying left.

13  MR. CRAIG:

14      Q.  Okay, so let's make sure because this

15  gets confusing.

16      A.  It does.

17      Q.  And I'm very sorry, like counsel

18  opposite, to have to repeat this.  When you

19  fell off the bike, which side of you fell

20  towards the pavement?

21      A.  My -- well, the front of me fell.  It

22  was like this.

23      Q.  Okay.

24      A.  I can't -- I can't --

25      Q.  I understand -- okay, I'm sorry.

1       A.  Well, I guess I can't -- I'm trying

2   to describe it the best way I can, you know

3   what I mean?

4       Q.  Yes, we know.

5       A.  When I fell off the bike, I know what

6   direction I fell in because I was holding the

7   bike, and I'm looking because I'm well aware

8   there was a car right there, you know what I

9   mean?

10      Q.  And you were facing traffic?

11      A.  There you -- no, I'm -- you can say

12  traffic coming to me.  I'm facing traffic

13  because I'm crossing, you know what I mean?

14      Q.  Yes, sir.  Yes, because you are --

15  because you're going across Burgundy --

16      A.  There you go.

17      Q.  -- with the intention of turning back

18  onto St. Peter to continue going in the same

19  direction on St. Peter to your brother's

20  house?

21      A.  Yes, indeed -- yes, sir.

22      Q.  And so what -- and so what side of

23  your head struck the pavement when you went

24  down?

25      A.  The left side of my face struck the

1  pavement.

2       Q.  Okay, this is where I'm getting

3  confused.  Because you've been -- and I'm

4  honestly confused, because you've been, the

5  whole time you've been motioning, you've been

6  motioning to your right.

7       A.  Yes, sir.  But if I'm looking -- are

8  you ready?

9       Q.  I'm always ready.

10      A.  If I'm looking to my left -- I'm

11  looking in the way that traffic going,

12  because I am aware there is a car right here.

13      Q.  Okay.

14      A.  I'm going down, I can't control that.

15      Q.  Yes.

16      A.  Because that's inevitable, you know

17  what I mean?  I'm going down and I can't

18  control it, but I'm looking because I'm

19  trying to see where I'm falling.  There's a

20  car here now, you know what I mean?

21      Q.  Right.

22      A.  I have to see -- you know what I

23  mean?  Because I know I'm falling, I can't

24  control it, I'm going down.  I can't move, I

25  can't do nothing, I'm going down.  So my best

1  option is to look, you know what I mean?

2      Q.  Okay.

3      A.  And I just fell.

4      Q.  So you fell to your right, but the

5  left side of your head is what struck the

6  pavement?

7      A.  Yes, sir.

8      Q.  So let me just make sure I understand

9  it from this perspective.  For Burgundy --

10  one direction down Burgundy is towards Canal

11  Street, correct?

12      A.  Yes, sir.

13      Q.  And one direction is like the

14  Marigny, I guess, Esplanade.  Okay.

15          You talked about your wrists in your

16  testimony with Mr. Fahrenholt; do you

17  remember that?

18      A.  Yes, sir.

19      Q.  I want to show you a picture that's

20  already been provided in our discovery to Mr.

21  Fahrenholt.  I'm sorry, sir, I only have one

22  picture of it, but there it is.  Do you

23  recognize that picture?

24      A.  Yes, sir.

25      Q.  What is it a picture of?

77

1        A.  My wrist.

2        Q.  And this is a bandage that's

3   apparently been taken off.  And then what is

4   this pinkish spot on your wrist?

5        A.  That's my skin.

6        Q.  And do you know how it came to be

7   that that flesh was scraped off your skin?

8        A.  Yes, sir.

9        Q.  What happened?

10        A.  When I was handcuffed, he grabbed me

11  and pulled me to the sidewalk, and that's

12  where those injuries occurred from, from the

13  handcuffs on my wrist.

14        Q.  Which -- where were your wrists when

15  they were handcuffed?

16        A.  Behind my back.

17        Q.  So in your previous testimony, I

18  think you said you were dragged --

19        A.  Yes, sir.

20        Q.  -- by one of the troopers to the side

21  of the street?

22        A.  Yes, sir.

23        Q.  What -- how -- can you describe what

24  part of the trooper was holding what part of

25  you for that dragging?

78

1        A.   Rephrase it -- I mean, repeat it.

2        Q.   Yeah, see, he's not the only one that

3   asks bad questions.

4             What part of the trooper was holding

5   you and pulling you?  It was his hand, of

6   course, where was his hand?

7        A.   On the handcuffs -- on the chain of

8   the handcuffs.

9        Q.   Which were behind you?

10       A.   Yes, sir.

11            MR. CRAIG:

12                 That's all I have.  It's actually

13            not all I have.  I misunderstood

14            something.

15  MR. CRAIG:

16       Q.   Mr. Fahrenholt also asked you about

17  prescriptions that you were given during the

18  time you were incarcerated.  And you talked

19  about a prescription that you were given at

20  Hunt, and I don't remember the name of the

21  prescription.  Were you prescribed anything

22  at any other of the facilities which you were

23  housed?

24       A.   Yes, sir.

25       Q.   And where were you when you were

1  prescribed something else?

2      A.  I was in Orleans Parish Prison when I

3  first got it.

4      Q.  And do you recall what you were

5  prescribed in Orleans Parish Prison?

6      A.  I can't think of the name of the

7  pill, but I was prescribed something for PTSD

8  because I went saw -- I filled out a mental

9  health card, and I want to say a psychiatrist

10  but I can't say she was a psychiatrist, I

11  don't know for a fact, you know what I mean?

12  But I went and talked to her, and she

13  prescribed me some medicine to help me sleep.

14      Q.  And did you ultimately take that

15  medicine?

16      A.  Yes and no.

17      Q.  In what way yes, and what way no?

18      A.  In the beginning I took it because I

19  was sleep deprived, you know what I mean?  To

20  see if it would work, but then it don't work

21  so I just stopped taking it, you know what I

22  mean?

23      Q.  And did you go to Hunt before or

24  after Orleans?

25      A.  After.

1      Q.  And when you were prescribed the drug

2  that you named at Hunt, did you take that

3  drug?

4      A.  Yes, sir.

5          MR. CRAIG:

6              I think that's all we have --

7          that's all we have.  Oh, I'm sorry,

8          I'm going to mark this as Exhibit 1

9          to the deposition.

10                  RE-EXAMINATION

11  BY MR. FAHRENHOLT:

12     Q.  I just want to follow-up on the left

13  side and right side and where you were, just

14  so that I can understand.  So there is a car

15  at the intersection of Burgundy and St. Peter

16  -- on Burgundy, stopped at a stop sign at St.

17  Peter; is that correct?

18     A.  Yes, sir.

19     Q.  And you turned --

20     A.  I said Burgundy.  Say Burgundy,

21  because Burgundy is the one-way.

22     Q.  And you turn onto Burgundy for the

23  purpose of looping around the back of this

24  car?

25     A.  Yes, sir.

1      Q.  And the car then pulls away?

2      A.  Yeah, as I was going around it, it

3  was starting, you know, to go on his journey.

4      Q.  So you had turned to the right on the

5  bike at some point?

6      A.  Yeah, I went this way, to turn the

7  corner to get behind the car, then I turned

8  back around, you could say right across the

9  street.

10      Q.  Okay.  Where were you looking at that

11  time?

12      A.  I was looking, like I told you, I was

13  going across the street so I'm looking

14  straight, and when I knew I was going down,

15  'cause I couldn't think of nothing else but

16  going down.  I just knew to look this way

17  because I had the presence of mind that a car

18  was right here.  Does that make sense -- am I

19  explaining it right?  I mean, I'm telling you

20  for you to understand?

21      Q.  I think I understand what you're

22  saying, yes.  So your head was turned to the

23  left, or you turned your head to the left.

24          MR. CRAIG:

25              Object to the form.

82

1  MR. FAHRENHOLT:

2      Q.  I guess, when you were tased, was

3  your head straight and then you turned it to

4  the left, or was your head already turned and

5  looking to the left when you were tased?

6          MR. CRAIG:

7              Object to the form.  You can

8          answer.

9          THE WITNESS:

10             I'm going to say I don't know

11         because I can't say if I was watching

12         this burgundy car, you know what I

13         mean, or I was watching my direction,

14         you know, what I mean, at the moment.

15         I just know when I got tased, I had a

16         present of mind that that car was

17         there.  Does that make sense?  I just

18         knew that -- that's like walking in a

19         hole in the street, you know what I

20         mean?  If I know the hole there, I

21         don't give a damn if it's dark or

22         not.

23  MR. FAHRENHOLT:

24      Q.  And you fell to the right side of the

25  bike, so the side back towards St. Peter

1    Street; is that correct:

2           MR. CRAIG:

3                  Object to form.

4           THE WITNESS:

5                  I fell this way, right.

6    MR. FAHRENHOLT:

7        Q.  And you were motioning -- you were

8    moving your hand over to the right side; is

9    that accurate?

10       A.  Motioning my hand, yes, sir, --

11       Q.  Okay.

12       A.  -- to the right side.

13       Q.  And your head is turned to the left?

14          MR. CRAIG:

15                 Object to the form.

16   MR. FAHRENHOLT:

17       Q.  Yes or no?

18       A.  I'm going to say -- I'm going to say

19   I don't know.  Because, listen, I can't say

20   for a fact whether my head was this way.  I

21   just know when I fell, I looked this way.

22   That's all.

23       Q.  Okay, so you fall to the right with

24   your head turned to the left, and it's your

25   testimony that the left side of your face hit

```
 1    the street; is that correct?
 2              MR. CRAIG:
 3                   Object to the form.
 4              THE WITNESS:
 5                   Yes, sir.
 6    MR. FAHRENHOLT:
 7         Q.  Okay.  One other follow-up on
 8    something I asked earlier.  When did the
 9    MacArthur Justice Center approach you about
10    representing you, if you recall?
11         A.  I'm going to say this, I don't know
12    because I can't tell you was it a week or was
13    it four days, you know what I'm saying?
14         Q.  Was it before you pled guilty?
15         A.  Yes, sir.
16              MR. FAHRENHOLT:
17                   Okay, that's good enough.  I have
18              no other questions.
19              MR. CRAIG:
20                   We have no further questions,
21              also.
22    (The deposition was concluded at 3:05 p.m.)
23
24
25
```

85

1               REPORTER'S CERTIFICATE

2

3       This certification is valid only for a

4   transcript accompanied by my original

5   signature and original required seal on this

6   certificate.

7       I, CYNTHIA M. HARE, Certified Court

8   Reporter in and for the State of Louisiana,

9   as the officer before whom this testimony was

10  taken, do hereby certify that ZACHARY

11  TERRELL, after having been duly sworn by me

12  upon authority of R.S. 37:2554, did testify

13  on the 1st day of May 2019, at New Orleans,

14  Louisiana, as hereinbefore set forth in the

15  foregoing 85 pages; that this testimony was

16  reported by me in the Voicewriting reporting

17  method, was prepared and transcribed by me or

18  under my personal direction and supervision,

19  and is true and correct to the best of my

20  ability and understanding; that the

21  transcript has been prepared in compliance

22  with the transcript format guidelines

23  required by statute and rules of the board;

24  that I am informed about the complete

25  arrangement, financial or otherwise, with the

1  person or entity making arrangements for
2  deposition services; that I have acted in
3  compliance with the prohibition on
4  contractual relationships, as defined by
5  Louisiana Code of Civil Procedure Article
6  1434 and rules of the board; that I have no
7  actual knowledge of any prohibited employment
8  or contractual relationship, direct or
9  indirect, between a court reporting firm and
10 any party litigant in this matter, nor is
11 there any such relationship between myself
12 and a party litigant in this matter; that I
13 am not related to counsel or to any of the
14 parties hereto, I am in no manner associated
15 with counsel for any of the interested
16 parties to this litigation, and I am in no
17 way concerned with the outcome thereof.
18      This 10th day of May 2019, Metairie,
19 Louisiana.
20
21      _____
22      CYNTHIA M. HARE, C.C.R. NO2010007
23
24
25

FILE NUMBER: AD03FFB                    DATE: July 3, 2019

# LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF:   Zachary Terrell

DATE OF DEPOSITION:   May 1, 2019

CASE: Terrell v. Pichon et al., No. 2:18-cv-5787

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|---|---|---|---|
| 9 | 10 | Briquette | correct spelling |
| 9 | 11-12 | Briquette | correct spelling |
| 9 | 14 | Briquette | correct spelling |
| 14 | 18 | Guy Stockrider | correct spelling |
| 38 | 12 | delete and change to: "The right side of my face." | The questions re: right/left were confusing, especially with the questioner sitting across from me. His left was my right and vice-versa. This confusion repeated various times. |
| 38 | 15-16 | delete all and change to: "Yes." | Confusion about directions (right/left) |
| 39 | 20 | delete and change to: "No, the right side." | Confusion about directions (right/left) |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this ____3____ day of ___7___, 20_19_,

at ___Orleans___, ___LA___
      (City)              (State)


(Signature)

FILE NUMBER:    AD03FFB                                            DATE: July 3, 2019

**LETTER TO DEPOSITION OFFICER/ERRATA SHEET**

DEPOSITION OF:    Zachary Terrell

DATE OF DEPOSITION:    July 3, 2019

CASE: Terrell v. Pichon, et al., No. 2:18-cv-5787

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|------------------------|
| 39 | 24 | Delete all and change to: | Confusion about directions |
|    |    | "No, the left side of my | |
|    |    | face was on the ground." | |
| 49 | 24 | Add: "But I was kicked and | Question mis-stated my testimony |
|    |    | punched on my right side." | |
| 59 | 8 | Delete: "and resisting arrest" | I was wrong about the exact |
|    |    | and change to "and resisting | charge |
|    |    | an officer." | |
| 63 | 8 | Guy Stockrider | Correct spelling |
| 76 | 10 | Delete "left", change to "right" | Confusion about directions |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.



EXECUTED this ___3___ day of ___7___, 20_19_.

at _Orlleans_____
        (City)

_____  __L A_____
(Signature)                        (State)

FILE NUMBER:     AD03FFB                          DATE: July 3, 2019

## LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF:     Zachary Terrell

DATE OF DEPOSITION:     May 1, 2019

CASE: Terrell v. Pichon, et al., No. 2:18-cv-5787

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|----------------------|
| 85 | 5 | Delete all and change to: | Confusion about directions |
|  |  | "No. 1 fell to the right with |  |
|  |  | my head turned to the right, |  |
|  |  | and the left side of my face |  |
|  |  | hit the pavement." |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this _____3_____ day of _____7_____, 20 _19_,

at _New Orleans_                     _LA_
         (City)                              (State)

_____
                (Signature)

STATE OF Louisiana )
                   )SS.
COUNTY OF Orleans  )
Parish

I, the undersigned, declare under penalty of perjury that I have read the
foregoing transcript, and I have made any corrections, additions, or deletions that I
was desirous of making; that the foregoing is a true and correct transcript of my
testimony contained therein.

EXECUTED this ___3___ day of ___7___, 20_19_.

At New Orleans, La.
   (City)            (State)