Transcript of the Testimony of

# Troy Pichon

May 14, 2019

ZACHARY TERRELL v. TROOPER TROY PICHON, TROOPER
JEFFREY ROACH, LIEUTENANT DERRELL WILLIAMS, AND
CAPTAIN DARRIN NAQUIN, each in their individual c



COURT REPORTING & LITIGATION SUPPORT

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ZACHARY TERRELL                    )
                                   )
VERSUS                             ) NO.
                                   ) 2:18-cv-05787
TROOPER TROY PICHON, TROOPER       ) SECTION: E
JEFFREY ROACH, LIEUTENANT          )
DERRELL WILLIAMS, AND CAPTAIN      )
DARRIN NAQUIN, each in their       )
individual capacities              )

DEPOSITION OF TROOPER TROY PICHON
TAKEN AT BURGLASS & TANKERSLY, LLC
5213 AIRLINE DRIVE
METAIRIE, LA 70001
ON TUESDAY, MAY 14, 2019 AT 8:58 A.M.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1    APPEARANCES:
2    REPRESENTING PLAINTIFF:
3       LAW OFFICE OF ELIZABETH CUMMING
         BY:  ELIZABETH CUMMING, ESQUIRE
4        1040 ST. FERDINAND STREET
         NEW ORLEANS, LA 70117
5        elizabeth.cumming@ecumminglaw.com
6        and
7        RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
         BY:  EMILY WASHINGTON, ESQUIRE
8        AND: JIM CRAIG, ESQUIRE
         4400 S. CARROLLTON AVENUE
9        NEW ORLEANS, LA 70119
10
11   REPRESENTING DEFENDANTS:
12      BURGLASS TANKERSLY, LLC
         BY:  GREGORY FAHRENHOLT, ESQUIRE
13       5213 AIRLINE DRIVE
         METAIRIE, LA 70001
14
15
16   REPRESENTING STATE OF LOUISIANA, LOUISIANA
     DEPARTMENT OF PUBLIC SAFETY:
17
         LOUISIANA DEPARTMENT OF PUBLIC SAFETY
18       BY:  JENNIFER DEL MURRAY, ESQUIRE
         OFFICE OF LEGAL AFFAIRS
19       P.O. BOX 66614
         BATON ROUGE, LA 70896
20       jennifer.murray@dps.la.gov
21
22
23
24
25   REPORTED BY:  ANNA COATES, CCR, RPR
```



1                   E X H I B I T   I N D E X

2   EXAMINATION BY:                              PAGE

3       MRS. WASHINGTON............................ 5

4       MR. FAHRENHOLT............................281

5

6   REPORTER'S CERTIFICATE......................283

7

8

9

10

11

12

13                 E X H I B I T   I N D E X

14  NO.             DESCRIPTION                  PAGE

15  EXHIBIT 56  TASER TRAINING RECORDS............70

16  EXHIBIT 57  TRAINING RECORDS..................76

17  EXHIBIT 58  EIS REPORT........................88

18  EXHIBIT 59  CELLULAR PROGRAM ENROLLMENT......122

19  EXHIBIT 60  ELIGIBILITY FOR PERMANENT STATUS.137

20  EXHIBIT 61  MAP OF FRENCH QUARTER............178

21  EXHIBIT 62  TERRELL INCIDENT REPORT..........259

22

23

24

25



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and among
counsel for the parties hereto that the deposition
of the aforementioned witness may be taken for all
purposes permitted within the Louisiana Code of
Civil Procedure, in accordance with law, pursuant
to notice;

That the formalities of reading, signing,
sealing, certification and filing are specifically
NOT waived;

That all objections, save objections as to
the form of the question and responsiveness of the
answer, are reserved until such time as this
deposition, or any part hereof, is used or sought
to be used in evidence.

* * * * * * * * *

ANNA COKER COATES, RPR, CCR, Certified Court
Reporter in and for the State of Louisiana,
officiated in administering the oath to the
witness.




```
 1              TROOPER TROY PICHON,
 2  AFTER HAVING BEEN FIRST DULY SWORN BY THE
 3  ABOVE-MENTIONED COURT REPORTER, DID TESTIFY AS
 4  FOLLOWS:
 5  EXAMINATION BY MRS. WASHINGTON:
 6       Q.   Good morning, trooper.
 7       A.   Good morning.
 8       Q.   Would you please state your full name
 9  just for the record?
10       A.   Yes, ma'am.  Troy Anthony Pichon.
11       Q.   And before we get into this, I just want
12  to put on the record that we have some outstanding
13  requests for documents in this case that I won't
14  be able to ask you about today.
15       A.   Yes, ma'am.
16       Q.   So we're going to go through the
17  material that has already been produced by your
18  counsel, but we're going to stipulate, with your
19  counsel's agreement, to hold your deposition open
20  to be completed once we receive those outstanding
21  documents, with the remaining deposition time.
22       A.   Yes, ma'am.
23       Q.   Have you had any previous deposition
24  experience?
25       A.   No, ma'am.  This is my first time.
```



1      Q.   Okay.  So I just want to go over a few

2  ground rules before we get started.  We have a

3  court reporter sitting at the end of the table.

4  She is going to be taking down everything that I

5  say and everything that you say.  So it's best if

6  we can have yes, no, verbal answers, rather than

7  head nodding or shaking, just so we have a clear

8  record at the end.

9           The oath that you were just administered

10  is the same as if you were in a court of law.  And

11  basically, the purpose of today is just for me to

12  ask you questions and find out as much as I can

13  about the events that are underlying this lawsuit.

14  So I'm just asking for full, truthful answers to

15  the best of your ability.  Does that make sense?

16      A.   Yes.

17      Q.   If at any point during the deposition

18  you remember something else, want to supplement an

19  answer, want to correct something you said before,

20  just let me know, and we can do that on the

21  record.  Okay?

22      A.   Yes.

23      Q.   If I ask a question that is confusing or

24  complicated or makes no sense to you, please just

25  let me know.  I am happy to rephrase the question



1   or try to ask it a better way.  If you don't ask
2   me for clarification, I'm going to assume that you
3   understood the question and are answering the
4   question that I asked.  Okay?
5         A.   Okay.
6         Q.   If you need a break at any point today,
7   just let us know.  All that I ask is that I finish
8   my question that I'm on, that you give your
9   answer, and then I'm happy to take a break.  Okay?
10        A.   Yes, ma'am.
11        Q.   And lastly, are there any medications or
12  substances that you are on that would prevent you
13  from giving truthful answers today?
14        A.   No, ma'am.
15        Q.   Okay.  I'm hoping we can start just with
16  a bit of background on your education and work
17  history.
18        A.   Yes.
19        Q.   When did you graduate from high school?
20        A.   1998.
21        Q.   Okay.  Where did you attend high school?
22        A.   Sarah T. Reed Senior High School in New
23  Orleans.
24        Q.   Did you attend college?
25        A.   Yes, ma'am.



866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    Q.   Where did you attend college?

2    A.   I went to Delgado for a brief period of

3  time, and I went to Upper Iowa University, where I

4  got my bachelor's degree, and I'm currently still

5  enrolled and working on my master's degree.

6    Q.   What is your bachelor's in?

7    A.   Criminal justice.

8    Q.   When did you receive that degree?

9    A.   Last year, July.  I'm not sure.

10   Q.   2018?

11   A.   Yes, ma'am.

12   Q.   Is that an online course or something

13  that --

14   A.   No, ma'am.  It's in Jackson Barracks, on

15  campus.

16   Q.   Okay.

17   A.   They cater to a lot of military and law

18  enforcement personnel.

19   Q.   Okay.  And you said you still have some

20  continuing studies?

21   A.   Yes, ma'am.  Currently enrolled, working

22  on my master's degree.

23   Q.   Okay.  What subject matter is that in?

24   A.   Homeland security, emergency management.

25   Q.   When do you expect to complete that?



1        A.    Maybe this time next year.

2        Q.    Do you have any military experience?

3        A.    No, ma'am.

4        Q.    Okay.  And we're obviously going to talk

5    about your employment with the state police.  Just

6    to create a timeline, when did you start with the

7    state police?

8        A.    I joined the state police in 2009,

9    November 30th.

10       Q.    Did you have prior law enforcement

11   experience?

12       A.    Yes, ma'am.  I was with the New Orleans

13   Police Department from May of -- I'm sorry.  I got

14   it mixed up.

15       Q.    That's okay.

16       A.    State police, I started in 2014.

17       Q.    Okay.

18       A.    November 30th, 2014.  New Orleans Police

19   Department, I started in 2009, May of 2009.

20       Q.    Okay.  You were with NOPD from May of

21   2009 --

22       A.    '09 to November 30th, 2014.

23       Q.    Okay.  What were you doing prior to

24   NOPD?

25       A.    I was a New Orleans fireman.



1    Q.    When did you start that employment?

2    A.    May 21st, 2000.

3    Q.    Did you have any other employment

4  between your high school graduation and starting

5  with the fire department?

6    A.    Yes, ma'am.  I worked while I was in

7  high school.

8    Q.    Okay.  And for the, I guess, couple of

9  years after you graduated?

10   A.    I'm sorry?

11   Q.    Did you have other employment after you

12 graduated high school?

13   A.    Yes.  I worked for Atlas Van Lines,

14 loading and unloading furniture.

15   Q.    Okay.  I want to go back to your

16 employment with NOPD.  It looks like you were

17 there for about 5 years; is that correct?

18   A.    That's about right.

19   Q.    Can you tell me about the ranks that you

20 had when you were at NOPD?

21   A.    Just from recruit, being in the academy,

22 graduating academy, going to probationary status,

23 and then to full-commissioned officer after my

24 probation status period was up.

25   Q.    And what were your assignments when you

1    were with the police department?

2        A.    I was assigned to NOPD 6th District,

3    second platoon.  Then maybe 2 years into my

4    employment with New Orleans Police Department, I

5    was moved to the task force.

6        Q.    What is the task force?

7        A.    Proactive patrol unit specific to the

8    6th District.

9        Q.    So that was also in the 6th District?

10       A.    Yes, ma'am.

11       Q.    Okay.  When you were working with the

12   6th District for your first 2 years, what were

13   your kind of daily job tasks?

14       A.    I was responsible for answering calls

15   for service, writing reports in regards to

16   accidents or any kind of domestic violence

17   situations or anything that was deemed a crime.

18   And any arrests that we made, required a report.

19       Q.    Okay.  When you moved to the task force,

20   how did your sort of job responsibilities change?

21       A.    We specifically wasn't tasked with

22   answering for calls for service.  We helped out

23   with code 2, what they call code 2 calls.  And

24   basically we were responsible for assisting the

25   platoon with backing up some of the officers on



1    code 2 calls, and just doing proactive patrols in

2    high-crime areas where we have a lot of problems

3    with shootings and drug activity and guns.

4        Q.    What is a code 2 call?

5        A.    That's just basically an increased level

6    of response for officers to get to a particular

7    location, wherever -- say you call 911, say

8    somebody is breaking in your house, that would be

9    a code 2 call; versus an accident, where there's

10   no injuries, you're not going to go lights and

11   sirens and blowing through red lights and possibly

12   get in an accident for an accident where no one is

13   hurt or no danger to the public or a life.

14       Q.    Okay.  And you mentioned that the task

15   force was a proactive patrol unit.  Can you just

16   sort of break down that term for me a little bit?

17       A.    Proactive patrol?

18       Q.    Yes, please.

19       A.    It's basically you go out, and, like I

20   said, we were tasked with going into areas where,

21   through crime tracking, that they have problems in

22   particular areas with guns or shootings, armed

23   robberies, that sort of thing.  And we were tasked

24   with just saturating the area, trying to give a

25   visual officer presence in that area to try to



1  curb the crime in that particular area.

2      Q.   You mentioned that all of this work was

3  in the 6th District.  What is the rough geographic

4  area?

5      A.   All right.  The 6th District, their

6  territory runs typically from Calliope to -- it

7  used to be Louisiana Avenue, but after the 2nd

8  District gave up some of the territory, I believe

9  we went up into Amelia Street.  I don't, you know,

10 exactly remember.  It's been a while.  But from

11 Tchoupitoulas to, say, up around Xavier, around

12 Carrollton and Palmetto, but not on the other side

13 of Palmetto, where the Exxon gas station is.

14     Q.   When you were working in the 6th

15 District prior to working with the task force,

16 were you doing foot patrol?

17     A.   No, ma'am.  We patrolled in marked

18 vehicles.

19     Q.   Okay.  What about when you were working

20 with the task force, was that also vehicle

21 patrolling?

22     A.   Most of it.  We did get out sometimes,

23 walk around, talk to neighbors, try to get

24 information about who was doing what.

25     Q.   Okay.  Was that specifically related to



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1   the code 2 calls that you would go out to respond
2   to?
3        A.    No.  It's more or less had to deal with
4   our proactive patrol type.  We get information
5   from citizens about who was breaking in cars, who
6   was robbing people.  Most of the time, the people
7   in the area knew who was shooting, selling drugs,
8   where they hide the drugs, where they hide the
9   guns.  So we get information from people, because
10  they were just sick and tired of getting bullets
11  flying through their house.  So we'll walk around
12  and talk to the neighbors.
13       Q.    Okay.  When you were working with NOPD,
14  did you receive any write-ups or other counseling
15  for any disciplinary infractions?
16       A.    Yes.  We always got complaints.
17       Q.    Can you tell me a little bit more about
18  that?
19       A.    Just when you're dealing with criminal
20  element, they typically -- especially if they have
21  a particular area they sell drugs in, they don't
22  want you in that area messing with them, so
23  they'll file a complaint against you to keep
24  you -- hopefully keep you from going back around
25  there and messing up their drug trade.  So a lot



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1   of defense attorneys were advising their clients
2   to go and file complaints against officers so that
3   we won't go in there and interrupt their business
4   or mess with them.  So they'll file complaints in
5   hopes that we won't come back around there and
6   mess up their drug trade.
7         Q.   So these were complaints that were filed
8   by citizens?
9         A.   People that we had interaction with.
10  Typically not -- it wasn't typically no outside
11  influence.  It was always just the people that we
12  had interaction with.
13        Q.   Okay.  And when there was one of these
14  complaints from members of the public, how was
15  that communicated to you when you were at NOPD?
16        A.   They gave you a letter, letting you know
17  that it was an open complaint against you and what
18  rules you supposedly had violated.  And, I mean,
19  after that, that was pretty much it until you --
20  they determine.  You had to come in and give a
21  statement.  Then they'll notify you, set up a time
22  and date for you to give a statement.  After that,
23  they'll get back with you, let you know whether
24  the complaint was sustained, not sustained or
25  unfounded.

1      Q.   As a result of any of the complaints

2   against you when you were with NOPD, was there

3   ever any action taken, either disciplinary or

4   retraining?

5      A.   I can't remember.

6      Q.   Okay.  Do you know if there were ever

7   any complaints against you that came from NOPD,

8   like a professional complaint rather than a

9   citizen?

10      A.   Well, most of the complaints that --

11   like I said, if a citizen say I cursed at them,

12   then that will be a professionalism complaint

13   based off of NOPD rules.  So that's what they

14   would list the complaint as, a professionalism

15   violation.  So I don't think they specifically

16   went after officers for violations, unless it was

17   something else that they were looking for.  They

18   typically had to have some outside influence

19   before they start looking at any particular

20   violations of any of the NOPD rules.

21      Q.   Okay.  And so you left NOPD in 2014,

22   correct?

23      A.   Yes, ma'am.

24      Q.   And what was your reason for leaving

25   NOPD?



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1       A.    My reason, I just felt like I wasn't

2    moving ahead like I wanted to.  I wanted to get

3    promoted, take promotional exams.  NOPD, at the

4    time, wasn't offering too many exams for

5    promotion.  And I had been promised several

6    positions within NOPD, to get out of the task

7    force, you know, something a little less

8    egregious, where I don't have to get all these

9    complaints, dealing with criminals.  So I elected

10   to come to state police and start fresh and start

11   new.

12       Q.    Okay.  You mentioned wanting to move out

13   of the task force.  What positions were you hoping

14   would open up at NOPD?

15       A.    I was slated to join the SWAT team at

16   some point in time during my tenure with NOPD, or

17   maybe even detective position, where I was able to

18   investigate armed robberies, shootings, that

19   nature, where I didn't have direct contact with

20   going out and dealing with people with guns and

21   drugs all the time.

22       Q.    Okay.  Do you remember an investigation

23   that involved you and a few other officers in

24   2014, having to do with details and paperwork

25   regarding details?



1      A.   No, I don't particularly remember that

2  investigation.

3      Q.   Do you know about the time that you left

4  NOPD, if there were any open complaints or

5  investigations that involved you?

6      A.   I can't say if there was or was not.

7      Q.   Okay.  Do you know if other members of

8  the task force or people that you worked with in

9  the 6th District also were receiving complaints?

10      A.   Yes.  We typically all -- if one of us

11  got a complaint, we all got a complaint.

12  Typically, everybody that was involved in the

13  situation was investigated related to what they

14  knew or what they didn't know about any particular

15  complaint.

16      Q.   And I'm aware that when you were with

17  NOPD, I believe you were wounded in a shooting; is

18  that correct?

19      A.   Yes, ma'am.

20      Q.   Can you tell me just a little bit about

21  what injuries you suffered during that shooting?

22      A.   Suffered a gunshot wound to my upper

23  right hamstring.  The bullet went through and

24  through, and it hit my left leg and went down my

25  pants leg and exited out of the bottom of my pants

1  leg.

2      Q.   Was this in 2013?

3      A.   Yes.

4      Q.   Okay.

5      A.   October 28.

6      Q.   Were you hospitalized as a result of

7  this?

8      A.   For that night and part of the day the

9  next day, and I was discharged.

10     Q.   Okay.  Did you have any leave of absence

11 from NOPD as a result of the injuries?

12     A.   I was on injured reserve -- well, I

13 don't know what they call it, but I was out for at

14 least 6 months before I went back to work.

15     Q.   Okay.  Did you receive any treatment

16 after your time in the hospital related to that

17 shooting?

18     A.   What type of treatment?

19     Q.   Any type of treatment; physical therapy,

20 for example?

21     A.   Yes, I went to physical therapy.  They

22 did some tests and stuff to make sure that I was

23 able to run and do different things with my leg,

24 and that it wouldn't affect my performance as

25 being an officer, having to run and jump fences,



1   that type of stuff.

2       Q.   Did you receive any therapy or

3   counseling, sort of more mental health treatment

4   related to the shooting?

5       A.   No, ma'am.

6       Q.   Okay.  When you were hired with the

7   state police that we're going to talk about in

8   just a second, did they know about the shooting

9   that you were involved in with NOPD?

10      A.   Yes, ma'am.

11      Q.   Okay.  Was it something that was

12  discussed during your hiring at all?

13      A.   Yes.  It was discussed at my interview

14  with state police.

15      Q.   Okay.  Do you remember what that

16  discussion was about?

17      A.   No.  I remember they particularly asked

18  me -- it's the way they assembled their interview

19  board or their hiring board.  About three or four

20  higher command staff with the state police sit,

21  and they have a chance to ask -- each of them have

22  a chance to ask you a question.  I remember one

23  particular question was that, it was, name a time

24  when you felt like you went above and beyond duty

25  and that sort of thing or whatever.  I just kind

1    of expounded on my situation, being shot, you

2    know, from the subject was shooting at my

3    sergeant, and having to address him and try to

4    draw his gunfire from my sergeant, not knowing if

5    he was injured, and taking the heat on myself and

6    getting in the shootout with this guy.

7         Q.   Okay.

8         A.   And then getting wounded and the guy

9    running off.  It was just one of those things I

10   was just trying -- came to my mind when they asked

11   that question.

12        Q.   So you brought it up in your interview

13   with the state police?

14        A.   Yes.

15        Q.   Okay.  Have you worked with any other

16   law enforcement departments?

17        A.   No, ma'am.

18        Q.   It sounds like you were with the fire

19   department for a pretty long period of time,

20   right?

21        A.   Yes, ma'am.  About 9 and a half years.

22        Q.   What was your basic assignments when you

23   were working with the fire department?

24        A.   I started off as a firefighter riding in

25   the back of the truck.  And then a point in time I


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

1    moved up to a specialized unit, firing squad.

2    They specialize in trench rescue.  Like, people

3    get stuck in elevators, we had to repel down and

4    get them out and repelling off of buildings.

5    Like, for a number of situations, where we may

6    have to go in and rescue people, we trained for

7    that.  And at some little later on, after being

8    with the firing squad, I got promoted to an

9    operator, which is the person that actually drives

10   and operates the water pumps and stuff on the fire

11   truck.

12        Q.   Okay.  Does this account for all of your

13   education and employment sort of between high

14   school and the state police?

15        A.   Yes.

16        Q.   Have we talked about all of that?

17        A.   Yes.

18        Q.   Okay.  Then let's move on to state

19   police.  I think you indicated that you were hired

20   in 2014; is that correct?

21        A.   Yes, ma'am.

22        Q.   Let's back up for one second, just to

23   close out the fire department.  You left from the

24   fire department to go directly to NOPD?

25        A.   Yes, ma'am.



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1    Q.   Okay.  Why did you leave the fire
2  department?
3    A.   Just at the time I was with the fire
4  department, when new mayor took over, they cut our
5  overtime and our ability to make extra cash, money
6  to support your family, of course.  I mean, we
7  made about, at that time, we was probably making
8  $11 an hour --
9    Q.   Wow.
10    A.   -- to run in burning buildings.  So when
11  they cut the overtime out of our salaries, it
12  really took a dramatic hit in the paycheck.
13  Looking at NOPD, and I knew I had a bunch of
14  friends that were officers, so they talked to me
15  about coming over to NOPD.  So I decided to go
16  over there, check it out, see what was -- see what
17  it was about.  I kind of enjoyed doing it, because
18  it gave me a chance to really help people in the
19  community that I grew up in, especially having the
20  majority of my family live in New Orleans.  So it
21  gave me a direct, you know, ability to try to keep
22  bad people off the street, so my family can live
23  their lives without getting involved in,
24  unfortunately, some bad situation, you know.  I
25  had a bunch of family and friends was killed in



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    the streets of New Orleans over my lifetime.  So I
2    just saw it as an opportunity to help out the
3    community.
4          Q.    Okay.  Had you applied to the police
5    department prior to, I guess, when you went there
6    eventually at the -- in 2009?
7          A.    With New Orleans?
8          Q.    Had you applied to the New Orleans
9    Police Department, basically?
10         A.    Yes, I did.
11         Q.    When did you apply before?
12         A.    I can't remember.  It was a while back
13   before I actually got hired on.
14         Q.    Do you know why you hadn't been hired
15   previously?
16         A.    Yes.  The guy -- the recruiter that had
17   my application, he had recently got promoted to
18   sergeant, and he gave my file to someone else.
19   And somehow, my file got stuck at the bottom of a
20   box, and nobody ever did -- never did anything
21   with it.  So in 2009, when I reapplied, I told
22   them that I had an application in before, and I
23   never heard anything back from them.  And like I
24   said, I didn't push the issue back then, because I
25   was making, doing all right with the fire

1    department.  So I didn't really see no need to

2    push the issue.  So when I explained to them what

3    happened, somebody went back and looked through.

4    And that's when I got a call back, said, "look,

5    your file got overlooked somehow.  We don't know

6    what happened.  You were cleared to get hired, you

7    just ain't get the call."  So that's what they

8    explained to me what happened.

9           Q.    Okay.  So you started at the state

10   police at the end of 2014, correct?

11          A.    Yes, ma'am.

12          Q.    When did you graduate from the state

13   police academy?

14          A.    I want to say April of 2015.

15          Q.    Okay.  So since 2015 to the present, can

16   you just walk me through what assignments you've

17   had with the state police?

18          A.    Yes, ma'am.  Right out of the academy, I

19   went to Troop B, where we were responsible for

20   crashes and traffic patrol.  We mainly deal with

21   speeders and seatbelt violations and DWI stuff.

22   After getting off of the FTO phase of training

23   with state police, I went to -- I was assigned to

24   the west bank of Jefferson Parish, where again my

25   duties was the same; traffic enforcement,

1   answering calls for service for accidents.  And

2   somewhere along the lines, I was transferred to

3   Troop N in New Orleans, where I worked for a

4   couple of years before being transferred to

5   narcotics.

6        Q.   Do you remember roughly when you joined

7   Troop N?

8        A.   No, ma'am.

9        Q.   Okay.  Do you remember when you joined

10  narcotics?

11       A.   Not exactly.

12       Q.   Okay.  So it seems like we're dealing

13  with about 4 years that you've been with the state

14  police.  Do you have kind of just a rough estimate

15  of how much time you spent with each of those

16  assignments?

17       A.   Probably was at the troop for about a

18  year and a half, 2 years at the most.  I think I

19  probably did about another year with Troop N, and

20  then been with narcotics the rest of the time.

21       Q.   Okay.  When you say "narcotics," is that

22  under the Bureau of Investigations?

23       A.   Yes, Bureau of Investigations.  We a

24  HIDTA group, which means we're a section of the

25  drug enforcement administration.  We get funded --



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    we get federal funds through DEA and federal
2    government to conduct narcotics investigations.
3    We typically deal with mid to upper level drug
4    dealers.
5         Q.    Is that your current assignment?
6         A.    Yes.
7         Q.    Where is that headquartered?
8         A.    We're in the Benson Towers.
9         Q.    In New Orleans.
10              So when you were with Troop B, it sounds
11   like you were mostly doing traffic patrol; is that
12   correct?
13        A.    Yes, ma'am.
14        Q.    What was your work when you were with
15   Troop N?
16        A.    Troop N was a little different.  The
17   focus for Troop N was officer presence in the
18   French Quarter and keeping crime at bay, you know,
19   just officer presence.  Seeing more officers
20   available in the area kind of, typically, most of
21   the time, it deters a lot of crime.  But at some
22   point in time, we were there to assist NOPD if
23   they got a situation where they needed multiple
24   officers to respond.  It was more or less an
25   officer safety situation for New Orleans Police

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    Department, since they were short of manpower.  So

2    we were there to help supplement their manpower

3    and assist them with calls for service.

4         Q.   And were you mostly doing vehicle patrol

5    with Troop N?

6         A.   It's about 50/50.  We did foot patrol on

7    Bourbon Street for a period of time at the

8    beginning of the shift.  Then the second half of

9    the shift, we were in vehicles patrolling.

10        Q.   So 50/50 between foot patrol and vehicle

11   patrol?

12        A.   More or less.  70/30, because we were

13   Bourbon Street for 4 hours in the 12-hour shifts.

14        Q.   The 70 being the foot patrol or vehicle?

15        A.   30 being foot patrol, 70 being vehicle

16   patrol.

17        Q.   Okay.  I want to move to talking about

18   some of the training that you received and talk

19   about a few specific areas of your work.  When you

20   were with NOPD, did you have some sort of

21   introductory academy?

22        A.   Yes.

23        Q.   Okay.  Do you remember how long that

24   course was?

25        A.   I believe that NOPD academy was at least



1    6 months.  They count it by weeks.  I think it's,
2    like, 24 weeks.
3        Q.   Okay.  And what kinds of subject matter
4    was covered in the academy?
5        A.   Legal affairs, traffic investigation,
6    patrol functions.  We did use of force.  We did
7    defensive tactics, shooting, vehicle operations,
8    basically driving a vehicle, patrol vehicle,
9    increased speed, that sort of thing.
10       Q.   You mentioned that you had training on
11   patrol.  Was that geared towards foot patrol?
12       A.   No.  They didn't particularly -- they
13   left it up to your FTO to teach you how they
14   operate, actually, in the field.  But the academy
15   was just to introduce you to it and kind of give
16   you an overview of what it is, what it entails,
17   foot patrol versus vehicle patrol, that type of
18   thing.
19       Q.   Okay.  So you did also participate in an
20   FTO program at NOPD?
21       A.   Yes.
22       Q.   Okay.  Was patrolling something that was
23   covered during your particular FTO experience?
24       A.   Yes.
25       Q.   And what kind of topics or simulations



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

```
1    were covered during your --
2         A.    Basically patrol officer functions,
3    writing reports, answering calls for service,
4    responding to emergencies, like a shooting or
5    something, crime scene preservation, making sure
6    that we preserve crime scenes and keep, you know,
7    any potential pedestrians or anybody that can take
8    the crime scene out of the crime scene area, that
9    particular stuff.
10        Q.    And when you moved over to the state
11   police, I think we discussed that you were in an
12   academy for quite a few months; is that correct?
13        A.    Yes.
14        Q.    What was the course work subject matter
15   that was covered in the state police academy; do
16   you remember?
17        A.    The same as NOPD.
18        Q.    Okay.  Did you receive a curriculum when
19   you were at the state police academy?
20        A.    Yes.
21        Q.    Okay.
22        A.    State police did have some differences
23   from NOPD, because two different agencies did
24   functions, and their rules and policies are
25   different.  So state police may be able to do some
```



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1  stuff that NOPD don't do, just by policy-wise.

2       Q.   Okay.  Can you tell me a little bit more

3  about what those differences were or what specific

4  areas might have been different in the state

5  police training?

6       A.   More or less had to deal with, like,

7  vehicle pursuits.  State police allows legal

8  intervention, or you can -- we do rolling road

9  blocks and boxing in vehicles, that type of stuff.

10 NOPD, that was unheard of.

11      Q.   Okay.  You used the term "legal

12 intervention."  What is that exactly?

13      A.   That's basically if we were involved in

14 a situation or pursuit with a vehicle, and it's

15 getting too dangerous to where the public life, we

16 consider the public may be in extreme danger

17 because of it, we allow the pursuit to continue,

18 we can use legal intervention in the pursuit.

19      Q.   Is that a specific technique?

20      A.   No.

21      Q.   What does that mean exactly?

22      A.   Just whatever you can do to get that

23 vehicle stopped, you stop it.

24      Q.   Does that include things like pit

25 maneuvers?

1    A.    No, we don't do pit maneuvers.

2    Q.    I guess I'm just trying to understand

3  what exactly legal intervention is, because it

4  seems like a term of art, and I am not a cop.

5    A.    No, ma'am.  Like I say, it's just

6  whatever you can do to get that vehicle stopped,

7  you do it.  Like I say, we use stop sticks, any

8  other means you may want to use to get a vehicle

9  stopped.

10    Q.    Was there any other part of the state

11  police academy that covered topics that you didn't

12  cover with the NOPD?

13    A.    I can't remember at this point.

14    Q.    Okay.  When you were with the state

15  police academy, did you have testing as part of

16  that academy?

17    A.    Yes.

18    Q.    Can you tell me a little bit about the

19  testing?

20    A.    The testing was typically done on

21  Sundays when we had to report back to the academy.

22  State police, we were required to stay on state

23  police campus throughout, the Monday through

24  Friday, the times that we were training.  So it's

25  pretty much set up like a military-style academy,

1    where we had to physically live in barracks and

2    stay on campus.  We weren't allowed to go home

3    until the weekends.  That was up to the command

4    staff if they allowed you to go home or not.  But

5    we typically went home on Friday evenings, and we

6    had to report back to the academy on Sunday

7    evening.  We got back to the academy on Sunday

8    evening, we were required to make our beds and get

9    ready for the next day.  PT assessment, which is

10   roughly about 5 o'clock in the morning, we had to

11   get up and go run and do all our PT stuff.

12        Q.   Okay.

13        A.   But when we got back at 5 in the evening

14   on Sundays, like I said, after doing all our

15   chores, we were required to take tests every

16   Sunday.

17        Q.   Would that test be on whatever subject

18   matter you guys had just covered?

19        A.   Yes.

20        Q.   Okay.  Was there sort of a final test at

21   the end of the academy?

22        A.   Yes.

23        Q.   I guess I'm wondering what did you have

24   to do in order to pass out of the academy?

25        A.   Well, if you already POST certified,



1    which I was already POST certified through NOPD,
2    all we had to do was take an LSP test.  Basically
3    was a POST test they adopted and say, okay, if you
4    POST certified, you still got to pass this test.
5    Now, anybody that wasn't POST certified had to
6    take the POST test, which covered all the subject
7    matters that we went through throughout the entire
8    academy.
9          Q.    Okay.  And I think you mentioned that
10   when you finished the academy with the state
11   police, you also had an FTO program; is that
12   correct?
13         A.    Yes.
14         Q.    Okay.  Tell me a little bit about the
15   LSP FTO program that you participated in.
16         A.    It was pretty much set up the same way
17   as the NOPD FTO academy.  You go with a primary
18   FTO for a period of time.  At some point in time,
19   you move to a secondary FTO, and a third FTO, and
20   then you go back to your primary FTO.
21         Q.    Did you do your FTO program with someone
22   from Troop B?
23         A.    Yes.
24         Q.    Okay.  And I think you described that
25   work as traffic patrol, DUI, that sort of work; is



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    that correct?

2         A.    Yes.

3         Q.    Okay.  Since the academy and your FTO

4    program, have you received additional training

5    from the state police?

6         A.    Yes.  It was related --

7         Q.    Tell us about that.

8         A.    -- to narcotics work.  I went one week,

9    basic narcotics school, where they teach you the

10   functions of narcotics, handling CIs, different

11   subjects that they teach you in this basic

12   narcotics class.  Being new to narcotics,

13   particularly with state police, you know, being up

14   in the DEA, like I said, we focus on mid to upper

15   level drug dealers.  So it kind of give you, lay

16   out a basis for you of how to conduct the

17   investigations into these people and what to look

18   for, type of stuff, investigation that's available

19   to you and what to use and that kind of stuff.

20        Q.    Is this narcotics training course that

21   you took when you were moving over to BOI?

22        A.    Once I moved over to BOI.

23        Q.    Is there any other training that you've

24   received with the state police?

25        A.    I can't remember offhand.  It's been a


AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1  number of different -- like I said, we trained for

2  different things and recertify every year.  So

3  it's all jumbled up.  It's kind of hard to pick

4  out what specific stuff that I have trained for,

5  that I previously hadn't been trained on, just

6  recertified in.

7      Q.   What has to be recertified every year?

8      A.   Like, your Taser, your LIDAR radar

9  certificate, your VWI, Intoxilyzer

10  recertification, to operate the DWI machines, that

11  sort of stuff.

12      Q.   Okay.  Is that part of some sort of

13  in-service training, or is that separate from

14  that?

15      A.   No.  That's just something besides

16  in-service training that we have to do once a

17  year.

18      Q.   Do you also have in-service training

19  with the state police?

20      A.   Yes.

21      Q.   How often does that happen?

22      A.   Once a year.

23      Q.   What topics are covered during the

24  in-service trainings?

25      A.   With the time constraints, basically



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond  LA  70404   Fax 985.419.0799

```
1    they cover whatever POST requires for them to
2    cover, officers to keep POST certifications.
3    Firearms, we have to shoot the POST course with
4    our firearms during the in-service.  We do driving
5    defensive stuff and traffic stops, you know.  They
6    mainly focus on stuff that we typically deal with
7    as troopers.
8         Q.   Okay.  Did you receive a copy of the
9    state police policy and procedure manual when you
10   started with the agency?
11        A.   Yes.
12        Q.   Okay.  Was that something that you
13   received in hard copy?
14        A.   No.  I believe it was electronic
15   version.
16        Q.   On the computer?
17        A.   Yes.
18        Q.   Was that something that you received
19   during the academy?
20        A.   Yes.
21        Q.   Was that something that you were tested
22   on when you were at the academy?
23        A.   I can't remember.
24        Q.   Okay.  If there's any updates that are
25   made to state police policy or procedures, do you
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   receive notification of that?

2       A.   Yes.

3       Q.   How is that notification provided?

4       A.   We get an e-mail notification that some

5   system -- I forgot the name of it right

6   particularly now -- but notify you that there's a

7   new policy that's been updated.  You have to

8   physically go in there and read it and say that

9   you read it, for the supervisor to get a

10  notification to get your name off this list that

11  they put together of people who hadn't read the

12  policy -- the new updated policy.  Then you get a

13  nasty-gram from your supervisor or somebody above

14  him that you need to go in and read this policy.

15      Q.   Has that occurred for you?

16      A.   Once, yes.  Like I said, we be busy, so

17  sometimes we don't get to our e-mails right away.

18      Q.   Okay.  When you were in the academy, and

19  you got the entire manual, was there a requirement

20  for you to read the manual?

21      A.   Yes.

22      Q.   Okay.  Was there any sort of system

23  where they verified that at that time?

24      A.   I don't remember that they actually had

25  anything in place to verify.



866.870.7233   P.O. Box 1554  Hammond, LA  70404   Fax 985.419.0799

1        Q.   We're going to talk about this in a
2    little bit more detail later.  But have any of the
3    in-service trainings that you've had with the
4    state police dealt with foot patrols?
5        A.   Foot patrols?  Not particularly foot
6    patrols.  Like I say, I know we do vehicle stops,
7    traffic stops, that sort of thing, but in-service
8    is mainly geared toward patrol.  And patrol
9    functions within the state police are mainly
10   traffic enforcement.
11       Q.   Okay.  Do you know if the state police
12   has a policy that deals with foot patrols
13   specifically?
14       A.   I have to refer to the policy to figure
15   that out.
16       Q.   So you're not sure?
17       A.   Not sure.
18       Q.   Okay.  When you were with NOPD, did you
19   receive any training that was specific to doing
20   foot patrolling versus being in a vehicle?
21       A.   It's same function.  You're in a marked
22   patrol car in uniform versus you're walking in
23   uniform.  You get the same reaction from criminals
24   that you would if you was in a marked unit or
25   walking on foot patrol.

1      Q.    Okay.  We talked about the state police

2   policy and procedure manual.  Is there any other

3   set of policies or manual that governs your work

4   with the state police?

5      A.    The state law.

6      Q.    Okay.  Anything else that the state

7   police has generated?

8      A.    No, not the state police generated.

9      Q.    I think you mentioned that part of the

10   academy course with the state police was on legal

11   issues; is that correct?

12      A.    Yes.  NOPD and state police cover legal.

13      Q.    What's covered in that course section?

14      A.    Basically, they go over supreme court

15   cases, which governs what police can and cannot

16   do.

17      Q.    Okay.

18      A.    And be sure that you understand what's

19   required of you as a police officer, what

20   boundaries you can step to and what you can't step

21   to.  And basically, those supreme court cases are

22   precedent.  So they govern what's already been

23   established as behavior that officers can and

24   cannot partake in.

25      Q.    Okay.  I want to talk specifically about



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    a few state police policies and some of the areas
 2    of your law enforcement practice.  I'm hoping to
 3    talk first about arrests and searches, that
 4    general topic.  What is your understanding of a
 5    stop?
 6         A.    A stop?
 7         Q.    Correct.
 8         A.    Depends on what type of stop.
 9         Q.    Okay.  What are the different types of
10    stops?
11         A.    You have pedestrian stops, which is
12    basically a Terry stop, Terry versus Ohio, which
13    governs what officers can stop people walking down
14    the street; versus a vehicle stop, where you might
15    stop a vehicle for a particular traffic violation.
16         Q.    Is there a difference between those two
17    types of stops --
18         A.    Yes.
19         Q.    -- other than obviously the vehicle?
20         A.    Yes.
21         Q.    What are the differences?
22         A.    Basically with a vehicle stop, like I
23    said, you got to have a reason to stop a vehicle
24    based off of traffic violations; change lanes
25    without using a signal, ran a stop sign, disregard
```



1   a red light, that type of stuff.  With a
2   pedestrian stop, you have to have reasonable
3   suspicion to believe that that person either
4   committed a crime, is about to commit a crime or
5   has committed a crime, to conduct a Terry stop and
6   question that person as to his whereabouts and his
7   identity.
8        Q.   I think you may have just sort of
9   defined what you meant by it, but just so I'm
10  sure:  You used the term "reasonable suspicion."
11       A.   Yes.
12       Q.   What does that mean, in your
13  understanding?
14       A.   Having knowledge or suspicion that the
15  person is about to commit a crime, has committed a
16  crime or is in the commission of committing a
17  crime.
18       Q.   Okay.
19       A.   Like, if I'm driving down the street,
20  see somebody bust a window to a car, it might be
21  their car, I don't know that, but I might stop
22  them and figure out what they're doing.  They say,
23  "hey, this is my car, I locked my keys in the
24  car," then, of course, provide identification,
25  verify that's their car, and let them go on about


AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1  their business.

2     Q.   Okay.  Did you receive training with the

3  state police on conducting stops?

4     A.   Vehicle stops?

5     Q.   Sure.  Let's start with vehicle stops.

6     A.   Yes.

7     Q.   Okay.  And what training did you receive

8  on vehicle stops?

9     A.   We basically just -- like I said, you

10 see a violation, there's a number of traffic

11 violations in the state books that you can stop a

12 vehicle for.  So if you stop them for any one of

13 the particular violations of state law, you can

14 request -- like I said, we, state police, request

15 drivers to exit their vehicles and come to the

16 rear of their vehicle, and we conduct our

17 interviews at that point; driver's license,

18 registration, insurance, issue a ticket, and allow

19 them to continue on with their trip.

20     Q.   Did you receive training with the state

21 police on pedestrian stops?

22     A.   Nothing other than the legal aspect of

23 it, knowing when you can and when you cannot stop

24 a pedestrian.  Most of the stuff you learn with

25 stopping pedestrians, just basically going out



1  there and doing policing.  Like I said, being in

2  New Orleans Police Department for 5 and a half

3  years I was with them, I learned the different --

4  a bunch of different techniques on -- or just my

5  basic understanding and knowledge from actually

6  going out there doing it, that I develop a sense

7  for when somebody may or may not be doing

8  something wrong.

9       Q.   Okay.  And I think you said that

10  pedestrian stops were not something that were

11  covered in your state police FTO program; is that

12  correct?

13       A.   Well, like I said, the Troop B, it was

14  mainly on the highway.  So you rarely have

15  pedestrians on the highway.  You do, and so we do

16  come into contact with pedestrians sometimes.  We

17  get someone walking on the highway, which is

18  unsafe, so we'll stop, escort them off of the

19  interstate.  We'll put them in the back of our

20  vehicle.  We're required to pat them down, if they

21  have a bookbag with them, and if they were

22  traveling for any particular reason.  I typically

23  kept the bookbag up front with me, and I put them

24  in the back, because I didn't want them to get

25  access to a weapon, if they did have one, before

1 escorting them off the highway to a safe location.

2      Q.   When you are performing a pedestrian

3 stop, what actions do you take?

4      A.   It depends on the person.

5      Q.   Okay.  How do you go about initiating a

6 pedestrian stop?

7      A.   First, when I approach somebody, I

8 explain to them why I'm stopping them.  Say, "hey,

9 look, you know, this is the reason why I'm

10 stopping you.  You have an ID on you?"  If they

11 provide ID, just check and make sure they're not

12 wanted.  And if they don't give me any indication

13 that they be armed or they start acting nervous or

14 suspicious, I typically just let them go on about

15 their business.  Sometimes I may not even run

16 their name if they're just chill and don't seem to

17 worry about anything.

18      Q.   Okay.  So we talked about stops, and I'm

19 hoping to move to arrests.  What is your

20 understanding of an arrest?

21      A.   It is the physical taking of a person by

22 another person in physical restraint by either

23 force or non-force.

24      Q.   Do you understand an arrest to be

25 different than a stop?

1     A.    Yes.

2     Q.    What are the differences, in your

3  understanding?

4     A.    Arrest, you need probable cause to

5  arrest someone.  Stop is just reasonable

6  suspicion.

7     Q.    And we talked about reasonable

8  suspicion.  What is your understanding of probable

9  cause?

10    A.    Probable cause is basically used by the

11 courts to determine if an officer had reason to

12 arrest the person.  Like I said, if I suspect them

13 of -- I might have started at reasonable

14 suspicion, thinking that, okay, this guy has a gun

15 on him.  I'm going to stop him and check him out,

16 if I see a bulge in his waist, he keeps grabbing

17 at it, he's looking back at me, not wanting to

18 make eye contact, or he'll just kind of glance at

19 me, what I call, stare.  They stare straight, like

20 you're not even there.  That's just not normal to

21 me.  I look at behaviors of people that just

22 typically don't seem normal, for a normal person

23 just minding their business not doing anything.

24 So if I come to a stop and I stop you, and as I'm

25 speaking with you, you get nervous, and you start

1  looking around like you're looking for avenue of
2  escape to try to run, and if I go to -- if I see a
3  bulge even more prevalent once I stop you and go
4  to pat you down, and I feel something that I know
5  is consistent with being a firearm, then I'll take
6  you into custody and arrest you for illegal
7  carrying of a weapon, taking they don't have a
8  concealed weapon permit.
9      Q.   Were you provided with training by the
10  state police about articulating probable cause
11  when you're -- after you've made an arrest or when
12  you're going to make an arrest?
13     A.   Not really.  Like I said, just something
14  that you have to establish and learn from doing
15  the job and having FTOs to teach you and show you
16  what constitutes an arrest and what's probable
17  cause and that kind of stuff.  Like I said,
18  someone that never been a police officer, coming
19  through state police academy, it's fairly new to
20  them, so they have to learn on the fly, on a whim.
21  Like I said, just getting out there doing it, you
22  kind of establish your own feel for it and your
23  own method of dealing with arrests.
24     Q.   Okay.  We talked about how you would
25  initiate a stop.  What is your method for



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    initiating an arrest?

2        A.    Initiating an arrest?

3        Q.    Correct.

4        A.    Typically if the person is not being

5    violent or fleeing or refusing to place his hands

6    behind his back, typically just involves ask the

7    person put their hands behind his back and place

8    the handcuffs on them.

9        Q.    Okay.  Is there questioning involved

10   during an arrest?

11       A.    Depends on the type of arrest it is.

12       Q.    Okay.  Can you tell me a little bit more

13   about that?

14       A.    Like I said, for gun, you know, you may

15   or may not ask, where did he get the gun, or, you

16   know, is the gun -- you just ask basic questions;

17   what's your name, date of birth, that kind of

18   stuff, for identification purposes, booking

19   purposes; versus you're asking him particularly

20   about the weapon or the charge that they've been

21   accused of; "hey, did you purchase the gun on the

22   street; is it yours; is it legal; is it stolen?"

23   You know, they can choose to answer or not answer

24   those questions.  Some of the other questions,

25   like I said, your name, date of birth, that's just

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    stuff we need for booking.  That means that don't
2    hurt them by answering the questions.
3         Q.   Okay.  And you mentioned handcuffing.
4    Is there physical contact that's part of an
5    arrest?
6         A.   Yes.
7         Q.   Okay.  What kind of physical contact
8    goes into an arrest?
9         A.   Physically -- you got to physically --
10   not forcefully, but you have to grab somebody's
11   hand to place the handcuff on them so you don't
12   injure their wrist, that sort of thing.
13        Q.   Okay.  Were you trained on applying
14   handcuffs by the state police?
15        A.   Yes.  NOPD and state police.
16        Q.   What is your understanding of Miranda
17   rights?
18        A.   Basically, the rights given to people to
19   either self-incriminate themselves or give -- or
20   exercise their right to remain silent and exercise
21   their 5th Amendment right not to self-incriminate
22   themselves.  I'm sorry.
23        Q.   Okay.  I guess, what is the
24   relationship, in your understanding, between
25   Miranda and arrests, like we've been speaking



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    about?

2        A.    Like I said, Louisiana law requires

3    everybody arrested to be Mirandized.    It's

4    basically explaining to them that they have the

5    right not to answer questions, that they have the

6    right to an attorney if they choose to answer

7    questions, if they choose to start answering

8    questions, they have the right to stop answering

9    at any time, consult with an attorney, if they

10   cannot afford an attorney, it can be provided for

11   them.    Just letting them know what rights, as an

12   accused person, that you don't need to answer

13   questions, even though I'm in law enforcement

14   capacity and I'm in somewhat figure of authority,

15   you don't have to answer my questions if you

16   choose not to.

17       Q.    Okay.    When, during an arrest, do you

18   advise someone of these rights?

19       A.    Immediately after placing them into --

20   placing them under arrest.

21       Q.    Okay.

22       A.    You advise them of their rights and what

23   they're being charged with.

24       Q.    And I think you mentioned earlier in the

25   context of arrests and how you initiate an arrest



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

1    what you would do when someone isn't violent or
2    isn't fleeing.  What do you do if somebody is?
3         A.    Depends on what crime you suspect them
4    of committing.  If I suspect somebody of
5    committing a simple burglary of a vehicle, which
6    is going on a lot in New Orleans right now, and I
7    don't think they have a firearm on them, it may
8    just be as simple as just running after them and
9    catching them and placing them in handcuffs until
10   we determine why you're running, you know.  We
11   have 20 cars with the windows bust out on the
12   street, you were running, I see you throw this
13   hammer down, just trying to figure out if you're
14   involved with these windows being smashed on these
15   cars or not; versus somebody fleeing, and if I
16   know they're armed, like armed robbery.  If he
17   robbed somebody with a gun, and I'm 2 blocks away
18   and en route to location, and they give a
19   description of the person that just robbed
20   somebody with a gun, and I see this person that
21   fit the description, I go to stop them and talk to
22   them, they take off running, well, I'm already
23   expecting him to be armed with a firearm.  Now, if
24   it's a real gun or fake gun, I don't know, but I'm
25   suspecting that if someone say that he pointed a



1   gun at their face and robbed them, that the
2   subject is going to be armed with a firearm, and
3   I'm going to deal with that a little different;
4   versus somebody, like I said, just breaking in
5   vehicles with a hammer or something, and they
6   throw the hammer down and take off running.
7        Q.   So it seems like your approach to the
8   arrest is different depending on if you think the
9   person is armed; is that correct?
10       A.   Yes.
11       Q.   You mentioned that there might be some
12  other differences.  Are there other factors that
13  you consider in initiating an arrest?
14       A.   Yes.  You're talking about as far as,
15  like, somebody take off running?
16       Q.   Sure.  I mean, I think we're talking
17  about different ways that you might arrest
18  somebody, and I'm just wondering if there's other
19  factors that you're considering other than whether
20  or not they're armed.
21       A.   Well, just from my experience, not --
22  every arrest somewhat is different.  You never
23  have same thing happen on each arrest.  So you
24  just, like I said, you want to try to do it as
25  peaceful as possible.  Sometimes that's just not


866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    going to happen.

2         Q.   Okay.

3         A.   You have some people that -- I mean, we

4    execute a search warrant where a guy jumped out a

5    four-story window, broke both legs and still tried

6    to run from us.  So, you know, you get people that

7    desperate, they just don't want to give up their

8    freedom, you never know what they're going to do.

9    Subject got shot, he just didn't want to go back

10   to jail, so he was willing to kill me and my

11   sergeant to keep from going back to jail.

12   Unfortunately, he went back to jail.  So that

13   didn't work out too good for him.

14        Q.   Do you conduct searches during stop?

15        A.   No.

16        Q.   Okay.

17        A.   If we just stopping somebody for

18   reasonable suspicion, I'm only going to pat them

19   down if I think they're armed.  And you're just

20   checking for weapons at that point.  Now, a search

21   is only after you arrest that person.  You want to

22   check them, make sure they don't have any weapons

23   or contraband or narcotics on them or something

24   that could be harmful to you if you allow them to

25   get in the back of your police vehicle with.

```
1        Q.    Were you trained on conducting searches
2   by the state police?
3        A.    Yes.
4        Q.    Okay.  I'm going to show you what was
5   previously marked as Exhibit 35.  Have you seen
6   this policy before?
7              I'm not going to quiz you on it.
8        A.    Oh, okay.  I was just reading to make
9   sure it was the right policy.  All right.
10       Q.    I know it is quite long, so I'm not
11  going to quiz you on it.  I'm just wondering
12  whether or not you recognize this policy?
13       A.    Yes, ma'am.
14       Q.    Okay.  Is this the policy that instructs
15  members of the state police in how to conduct
16  arrests and searches?
17       A.    Yes.
18       Q.    Okay.  Are you familiar with the term
19  "bystander intervention?"
20       A.    Bystander intervention?  No, that's new
21  term to me.  I kind of, just from the word itself,
22  I kind of get an understanding of what it means.
23       Q.    Okay.  But you haven't heard it before?
24       A.    No.
25       Q.    Have you heard the term "active
```



1    bystandership?"

2        A.    No.

3        Q.    Have you heard the term "failure to

4    intervene?"

5        A.    Yes.

6        Q.    Okay.  What does that term mean to you?

7        A.    Failure to intervene is basically if you

8    had a duty to act, and you refuse -- and you

9    didn't, that you could be liable for any

10   repercussions that may have been caused by your

11   inaction or failure to act.

12       Q.    Okay.  What do you understand as when

13   you have a duty to act in that scenario?

14       A.    Well, it's different for law enforcement

15   officer than civilians.

16       Q.    I'm asking for law enforcement.

17       A.    Oh, law enforcement.

18       Q.    Yes.

19       A.    For law enforcement officers, you have a

20   duty to act especially if somebody's life is in

21   danger.  You're required to place yourself in

22   harm's way to protect the public from any

23   impending danger that may or may not be present.

24       Q.    Okay.  Is it your understanding that law

25   enforcement officer would have a duty to act based

1  on things a fellow law enforcement officer is

2  doing?

3       A.   Depends on what you perceive as

4  intervening.

5       Q.   Okay.  I guess I'm wondering whether or

6  not it's your understanding that a law enforcement

7  officer would have a duty to intervene if they

8  witnessed another law enforcement officer doing

9  something that was wrongful or illegal?

10      A.   Yes.

11      Q.   Okay.  Can you tell me a little bit more

12 about what that duty consists of?

13      A.    If I was on the scene with an officer,

14 and he was -- and he was using force that I felt

15 was unreasonable, then, of course, I would be able

16 to intervene, stop him from, one, using the force

17 on that person and, two, notifying the proper

18 supervisor or higher rank up of what happened and

19 what I observed.

20      Q.   Okay.  Have you ever intervened in that

21 way with a fellow law enforcement officer?

22      A.   No.

23      Q.   Okay.

24      A.   I never had to.

25      Q.   Did you ever receive any training on

1    that type of intervention with another officer

2    while you've been with the state police?

3         A.   I can't remember.

4         Q.   Okay.  Do you remember if you received

5    any training on that type of intervention when you

6    were with NOPD?

7         A.   I believe we talked about it.  I don't

8    think there was any specific scenario where we

9    actually got up there, two people doing something,

10   you had to go in there and stop it.  It was more

11   or less just a verbal; hey, this is how you deal

12   with this situation, and this is what you need to

13   do.

14        Q.   Okay.  What did they tell you that you

15   needed to do?

16        A.   First, stop the act that you may deem

17   unreasonable and then notify next, your rank, of

18   the situation.

19        Q.   Okay.  Do you know if the state police

20   has any policy that deals with intervening with a

21   fellow officer?

22        A.   I can't remember.

23        Q.   Okay.  I believe you mentioned receiving

24   training from the state police on uses of force;

25   is that correct?



1      A.    Yes.

2      Q.    Okay.  And that the state police has a

3  policy on use of force, correct?

4      A.    Yes.

5      Q.    We're going to go over it in a minute.

6            What training have you received from the

7  state police on what constitutes force?

8      A.    It's basically use the minimal amount of

9  force necessary to effect an arrest.  You don't

10  want to -- like you said, you don't want to go

11  over the scope of your authority in effecting an

12  arrest.  Now, we're allowed to use at least one

13  step higher on the force continuum to effect an

14  arrest.  So if somebody is wanting to fight, I can

15  go to a level of force higher than that, one step

16  higher than that to effect that arrest.

17      Q.    Okay.  You just used the term "force

18  continuum."  Can you define that or describe that

19  for me?

20      A.    Yes.  Force continuum basically starts

21  with officer presence.  Just me being in uniform

22  as a law enforcement officer, most people -- most

23  reasonable people will see that as authority

24  figure and allow you to do your job, and they'll

25  comply with whatever you ask them to do.  I



1  believe the next step is using verbal commands,

2  you know. That's when I get forceful with you;

3  hey, put your hands behind your back, don't move,

4  stand here. I start manipulating or giving you

5  verbal commands to do something that I want you to

6  do. Then I believe the third deal on the force

7  continuum be like OC spray or -- I'm not sure if

8  Taser is or the OC spray. It changed so much over

9  the years. But I know you go to, like, so if a

10  person wants to fight, I can spray them with OC

11  spray or tase them. Then the next use of force on

12  the continuum would be, like, impact weapons, if I

13  had a baton or closed-fist strikes, that sort of

14  thing. Then next force continuum be, like, lethal

15  force. So somebody who's armed with a dangerous

16  instrument, I can use at least some deadly force

17  to protect myself or protect somebody else from

18  immediate danger.

19      Q. Okay. And is this continuum something

20  that you were trained on by the state police?

21      A. Yes.

22      Q. Okay.

23      A. And NOPD.

24      Q. And NOPD, okay. And you just talked

25  about it a little bit, but how do you determine



1    what level of force you can use?

2         A.    Like I said, you use one step higher

3    than whatever aggression the person that you're

4    attempting to arrest is using.  So if they're just

5    being non-complaint and not listening to your

6    commands, then you can go hands on, put your hands

7    and physically handcuff them, if you have

8    reasonable probable cause to arrest them.  Now, if

9    they want to fight, then you can go to OC spray or

10   Taser.  If they have a dangerous instrument, then

11   you can go up until lethal force, taking that

12   person is threatening you or somebody else with

13   that lethal weapon.

14        Q.    You said if somebody wants to fight you.

15   What does that look like?

16        A.    I don't know if you've ever been in a

17   fight, but. . .

18        Q.    Not many in my time, so you're going to

19   have to help me out.

20        A.    Basically, they're coming at you.  And,

21   I mean, if you ever seen somebody angry, their

22   facial features change.  They clinch fists.  They

23   put their feet, just posture themselves in a

24   manner look like they're about to physically

25   attack you, or if they're going to physically



1    attack you or at least resist, you know.

2    Typically, sometimes when we go to arrest people,

3    they'll tense up, because they don't want to go to

4    jail.  I think in their mind, they're

5    contemplating whether they want to fight or

6    flight.  Either they're going to fight, or they're

7    going to try to get away and run.  And sometimes

8    we get them in handcuffs quick enough to where we

9    get that -- before they finish processing that

10   thought, we already got them in handcuffs.  So

11   it's null and void at that point.

12        Q.   Okay.  I'm going to show you a document

13   that was previously marked as Exhibit 19 in these

14   depositions.

15        A.   Yes.

16        Q.   Do you recognize this policy?

17        A.   It appears to be state police

18   use-of-force policy.

19        Q.   Okay.  So this would be the policy that

20   instructs state police troopers on how and when to

21   use force; is that correct?

22        A.   For the most part, yes, ma'am.

23        Q.   Okay.  Is there other instruction or

24   policy that's outside of this actual document?

25        A.   Not to my knowledge.



1      Q.   Okay.  I want to talk specifically about

2   CEWs, conducted electrical weapons, or Tasers.

3      A.   Yes, ma'am.

4      Q.   Okay.  And I believe if you look at page

5   151 of the policy, it's section 6.  It talks about

6   use of non-deadly force; is that correct?

7      A.   Yes.

8      Q.   And it lists some authorized weapons

9   there.  I'm wondering if you can tell me -- we

10  were just talking about the use-of-force

11  continuum -- where do each of those authorized

12  weapons fit on that continuum?

13          MR. FAHRENHOLT:  Object to the form of

14          the question.  But to the extent he can

15          answer, he can answer.

16          THE WITNESS:  So basically, you want to

17          go through A, B, C and D?

18  EXAMINATION BY MRS. WASHINGTON:

19      Q.   Yes.  I'm wondering, in your

20  understanding -- we can take the first one.  The

21  first one is OC spray, correct?

22      A.   Yes.

23      Q.   And then it mentions two different types

24  of batons?

25      A.   Yes.



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1      Q.   And then the last one is a Taser; is

2  that correct?

3      A.   Yes.

4      Q.   I'm wondering if you can order them for

5  me, in your understanding, based on the continuum

6  that you described earlier?

7      A.   On force continuum?

8      Q.   Correct.

9      A.   Like I said, it's changed over the

10  years.  So I have to refer to this policy to see

11  exactly where they put it, because they go back

12  and forth with OC spray and Taser and then batons

13  and closed fist.  They change it up every other

14  year or whatever.  So I'm not sure exactly what

15  this policy reads, what the use-of-force

16  continuum.  Trying to see.

17      Q.   Does this listing of A through D, with

18  these authorized weapons, does that reflect the

19  use-of-force continuum?

20      A.   Not the entire use-of-force continuum.

21      Q.   Okay.  But would they be in that order

22  on the continuum?

23      A.   No.  Taser would be above the expandable

24  and the side-handle baton, PR24.

25      Q.   Okay.  Do you know --



1    A.   It would be a lower level of force than
2  the expandable baton or the PR24.
3    Q.   Okay.  Do you know if this policy
4  specifically describes the use-of-force continuum?
5    A.   That's why I was just looking through
6  it, trying to figure out where it is, if they had
7  it listed in this particular policy.  I don't see
8  the use-of-force continuum in this particular
9  policy, though.
10   Q.   Okay.  Is there another location where
11 the state police would have laid out the
12 use-of-force continuum?
13   A.   It was in our curriculum in the academy.
14 I'm not sure if they actually put it into a
15 policy.  Policy is so big, it's hard to remember
16 exactly everything that's in it.
17   Q.   Okay.
18   A.   But I'll have to refer back to it or
19 read it.
20   Q.   Okay.  On Tasers, I'm looking at the
21 second page of the policy, it's page 152.  Section
22 9 says, "use of Taser;" is that correct?
23   A.   Yes.
24   Q.   Okay.  Under section 9, it's subpart 6
25 there, it says, "officer shall use CEWs only when



1   such force is necessary to protect the officer,

2   the subject or another party from physical harm

3   and other less intrusive means would be

4   ineffective;" is that correct?

5        A.   Yes.

6        Q.   Okay.  Are there risks associated with

7   using a Taser?

8        A.   Yes.

9        Q.   What is your understanding of the risks

10  associated with using a Taser?

11       A.   It depends on your perception and what

12  you perceive as a threat.  So just, like I said,

13  just using the Taser is just falling hazard.  If

14  somebody -- when you tase somebody, they don't

15  have access to their muscles.  So they can't

16  physically put their hands out or control their

17  fall.  So once you zap somebody, and they fall,

18  they fall and hit the ground or they -- like, it's

19  a number of different instances that can hurt

20  somebody when you tase them.

21       Q.   Okay.  I'm looking at page 153, which is

22  the next page in your exhibit, and I'm looking at,

23  it's subsection 10, Roman Numeral 10.  It states

24  to begin with, "CEWs should not be used on certain

25  individuals except where lethal force would be



1    permitted."  Is that what it reads right there?

2         A.   And the second part of it is, "where the

3    officer has reasonable cause to believe there is

4    an imminent risk of serious physical injury."

5         Q.   Correct.  And it goes on to talk about

6    the officers determining the reasonableness of the

7    use of a CEW based upon the circumstances; is that

8    correct?

9         A.   Yes.

10        Q.   Okay.  And under that, it lists some of

11   the individuals that this paragraph is discussing,

12   correct?

13        A.   Yes.

14        Q.   And I'm looking specifically at subpart

15   G, which says, "individuals whose position or

16   activity may result in serious injury or death;

17   e.g., falls from height, operating vehicles."  Is

18   that correct?

19        A.   Yes.

20        Q.   And would that refer to some of the

21   risks that you've just discussed in the use of a

22   Taser?

23        A.   Depends on how you interpret this policy

24   subsection G.  From heights means it could be

25   somebody standing on a soapbox or somebody on a

1    roof of a house.  So basically, it depends on what

2    type of height considered that you're talking

3    about.  Somebody standing on the roof, of course,

4    I don't want to tase them, and they fall off the

5    roof.  The risk of them hurting themselves is way

6    greater from them falling than them standing on a

7    cardboard box on the side of the road or something

8    like that, versus somebody operating a motor

9    vehicle and somebody operating another form of

10   transportation.

11        Q.    Okay.  Like what?

12        A.    Well, of course, if you tase somebody in

13   a motor vehicle, and they don't have access to

14   their muscles, car crash can tear up a lot of

15   stuff; versus somebody operating another mode of

16   transportation may not injure nobody but

17   themselves if they were to lose control of their

18   muscles and fall off.

19        Q.    Okay.  Is injury to the person being

20   tased part of this consideration?

21        A.    I'm sorry?

22        Q.    Is injury to the person being tased a

23   part of this reasonableness consideration?

24        A.    It depends on what you suspect this

25   person -- what crime you suspect this person has



1   committed.  Of course, like I said, going back to
2   somebody armed with a firearm or robbing somebody,
3   you perceive them to be armed with a firearm.
4   You're not concerned with their safety, because at
5   this point, you're using force to tase this person
6   to subdue them and take them into custody, so you
7   don't want put yourself in a situation where you
8   have to use deadly force.  So sometimes Taser can
9   be used as a deescalation method so you don't use
10   a level of force that may be justified.  You might
11   have seen videos of officers tasing people with
12   guns in their hands, just so they don't have to go
13   to a deadly force situation immediately.  We try
14   to take -- you try to use as less amount of force
15   possible to take this person into custody.  And
16   sometimes, unfortunately, that's not the case.
17       Q.   Okay.  I want to make sure I understand
18   what this list of individuals in this subsection
19   10 is.  And going back to that first line, it's my
20   understanding that the individuals in this list
21   are the certain individuals that CEWs should not
22   be used on except where lethal force would be
23   permitted or where the officer has reasonable
24   cause to believe that there is an imminent risk of
25   serious physical injury; is that correct?



1      A.   Yes.

2           MR. FAHRENHOLT:  Object to the form of

3           the question.

4  EXAMINATION BY MRS. WASHINGTON:

5      Q.   We were talking about lethal force a

6  little bit.  Is death a risk associated with use

7  of Tasers?

8      A.   I guess it can be.  From training we

9  received, there's a minimal -- it's very minimal

10  that somebody can be killed by being tased, but I

11  guess it can happen in certain situations.

12     Q.   Okay.  That section 10 that we were

13  talking about, that talks about lethal force, what

14  is your understanding of when lethal force would

15  be permitted?

16     A.   When, like I explained earlier, my life

17  or somebody else's life is in danger, lethal force

18  is the only option available for me to use to

19  protect myself or somebody else from great bodily

20  harm or imminent danger or death.

21     Q.   Okay.  Were you issued a Taser as part

22  of your work with the state police?

23     A.   Yes.

24     Q.   Do you remember when you were first

25  issued a Taser?



1    A.   No.

2    Q.   Okay.  Have you had a Taser for most of

3 your employment with the state police?

4    A.   Yes.

5    Q.   Did you have a Taser when you were

6 employed by NOPD?

7    A.   Yes.

8    MRS. WASHINGTON:  I'm going to show you

9    a few pieces of paper that I am marking

10    as Exhibit 56.

11    (EXHIBIT 56 MARKED FOR IDENTIFICATION)

12 EXAMINATION BY MRS. WASHINGTON:

13    Q.   Feel free to look through these.  It's

14 my understanding that these are training records,

15 your training records, regarding Taser and Taser

16 recertification; is that correct?

17    A.   That's what it appears to be, yes,

18 ma'am.

19    Q.   Okay.  And the first page, the date on

20 that Taser recertification is May of 2015; is that

21 correct?

22    A.   Yes.

23    Q.   Were you certified prior to that date?

24    A.   With NOPD, I was.  Different agencies

25 certify their personnel and different things.  I'm



```
 1   not sure if this is the date of certification, or
 2   this is the date they actually issued our Tasers
 3   to us.  We have been trained prior to, and we
 4   didn't receive Tasers until we graduated from the
 5   academy, and we were issued all our equipment.
 6   Just like our patrol vehicles, we didn't get
 7   issued our patrol vehicles until we graduated that
 8   day, but we went and drove in patrol vehicles
 9   during our course in vehicle dynamics or whatever
10   you want to call it.
11        Q.   Do you remember if you received Taser
12   certification during the state police academy?
13        A.   Yes.
14        Q.   Okay.  So you would have been certified
15   at some point while you were in the state police
16   academy?
17        A.   Yes.  Require us to actually physically
18   get tased.  I remember that vividly.
19        Q.   How was that?
20        A.   Horrible.  I don't know if you've ever
21   been tased before.  I've been tased twice.
22        Q.   I have not.  I'm looking at the second
23   page of the exhibit that I gave to you.  And it
24   appears to be another Taser recertification dating
25   from March of 2016; is that correct?
```



1   A.   Yes.

2   Q.   And then the third page is again from

3   October of 2016.  It indicates that it's a Taser

4   recertification; is that correct?

5   A.   Yes.

6   Q.   Okay.  Do you remember being recertified

7   on those dates?

8   A.   If it's on there, I have to be.  I can't

9   specifically remember the dates.

10  Q.   And the last two pages of this document

11  are again about Taser recertification.  It appears

12  to be sort of a log of your previous

13  recertification; is that correct?

14  A.   Yes.

15  Q.   Okay.  And it lists 12/12/2014, as a

16  previous recertification; is that correct?

17  A.   Yes.

18  Q.   That would have been when you were in

19  the LSP academy?

20  A.   Yes.

21  Q.   And then it mentions that May 2015 date

22  that we discussed earlier, correct?

23  A.   Yes.

24  Q.   And then the current date on this form

25  for the recertification -- or I guess I'm not



1    exactly sure what that current date signifies, but

2    this is from November of 2018; is that correct?

3         A.    Yes.

4         Q.    Neither of those 2016 recertification

5    dates are listed in this log, correct?

6         A.    It's not on the log.

7         Q.    Is there any documentation of

8    recertification in 2017?

9         A.    No, not that I see.

10        Q.    How about 2018?

11        A.    According to this, 11/29/2018.

12        Q.    So that's the date on this last log?

13        A.    Yes.

14        Q.    Okay.  Do you remember if you were

15   recertified in 2017?

16        A.    I'm pretty sure I had to be, yes, ma'am.

17        Q.    Okay.  Do you have a specific memory of

18   that recertification?

19        A.    No, ma'am.

20        Q.    Okay.  Do you know how the state police

21   keeps a record of your Taser recertifications?

22        A.    Taser instructor, who deals with the

23   recertifications, they're required to go in and

24   put everyone's training records in that were

25   recertified on what particular date.



1          MRS. WASHINGTON:  Okay.  For the record,
2          I'll just ask that any additional
3          training or recertifications for Trooper
4          Pichon that haven't been made available
5          be provided.
6          MR. FAHRENHOLT:  Okay.
7          MRS. WASHINGTON:  Thank you.
8          MR. FAHRENHOLT:  Also, for the record,
9          you've requested that directly from
10          state police, but I will ask.
11          MRS. WASHINGTON:  Okay, thank you.
12   EXAMINATION BY MRS. WASHINGTON:
13        Q.   Do you know what happens if you don't
14   receive your Taser recertification annually?
15        A.   To my knowledge, you're not allowed to
16   carry a Taser until you're either recertified or
17   gone through the whole entire course again.
18        Q.   Okay.  Have you used the Taser that was
19   issued to you while you've been with the state
20   police?
21        A.   Yes.
22        Q.   Do you know even approximately how many
23   times you've deployed your Taser?
24        A.   No, I can't recall.
25        Q.   Okay.  Are you able to give me a



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1  ballpark figure?

2      A.    Probably can count on one hand, if I had

3  to guess.  At least five or maybe less.

4      Q.    Okay.  Five or less is the amount of

5  times in the entirety of your employment with the

6  state police that you've deployed your Taser?

7      A.    Yes, if I had to guess.

8      Q.    What about when you're with NOPD, did

9  you deploy your Taser?

10      A.    Yes.

11      Q.    Okay.  I'm going to ask you again, do

12  you have a ballpark figure on how many times that

13  would have been?

14      A.    No.  I can't guestimate with NOPD.

15      Q.    You think it would have been more times

16  than you've deployed it with state police?

17      A.    I can't say.

18      Q.    You mentioned deescalation earlier.

19  Have you received training with the state police

20  on deescalation techniques?

21      A.    Yes.

22      Q.    Okay.  What did that training consist

23  of?

24      A.    Verbal communication, verbal -- what

25  they call verbal judo, talking someone down,



 1    getting them to respond to your commands without

 2    having to use force.

 3          Q.    Is there a state police policy that

 4    deals with deescalation?

 5          A.    I'm not sure.

 6                MRS. WASHINGTON:  Okay.  I'm going to

 7                mark another document as Exhibit 57.

 8                (EXHIBIT 57 MARKED FOR IDENTIFICATION)

 9    EXAMINATION BY MRS. WASHINGTON:

10          Q.    Again, these appear to be training

11    records for you, Trooper Pichon; is that correct?

12          A.    Yes.

13          Q.    The first page is dated from December of

14    2014, which would have been when you were in the

15    academy; is that correct?

16          A.    Yes.

17          Q.    And the class title is "integrated use

18    of force?"

19          A.    Uh-huh (AFFIRMATIVE RESPONSE).

20          Q.    Do you remember what that course was

21    about?

22          A.    As I explained earlier, is basically

23    when you can and cannot use force on a person,

24    like passive resistance versus active resistance.

25          Q.    Can you define those terms for me?



1      A.    Passive resistance, basically if I had

2  to sum it up, just basically someone just not

3  physically or actively resisting arrest.  They may

4  be just sitting in one spot and refusing to put

5  their hands behind their back.  They're not

6  fighting.  They just stiffened up and just sitting

7  there and refusing to obey, listen to your verbal

8  commands.  Active resistance would be someone who

9  might be actively fleeing or fighting or

10 attempting to fight you, strike you or whatever.

11 That would be considered active resistance.

12     Q.    Okay.  Is the term "integrated" in this

13 class title particularly meaningful; does that

14 mean anything to you?

15     A.    No, ma'am.

16     Q.    Okay.  The second page of the exhibit

17 that I just gave you is dated March of 2016.  And

18 the course appears to be titled "use of force and

19 legal aspects."  Is that correct?

20     A.    Yes.

21     Q.    And the troop section indicated on this

22 is CID Region 1; is that correct?

23     A.    Yes.

24     Q.    Would this have been training that you

25 were provided after you moved over to BOI?

1      A.   Yes.

2      Q.   Okay.  Do you remember this training?

3      A.   No, ma'am, I don't.

4      Q.   Okay.  So I'm guessing you don't know

5  what was covered in this course?

6      A.   I couldn't say.  Like I said, this is --

7  I don't know if this was in-service or some other

8  period of time where we may have went to some

9  particular training.

10     Q.   Okay.  You don't have any memory of this

11 training?

12     A.   No, ma'am.

13     Q.   Have any of the in-service trainings

14 that you've received with the state police focused

15 on use of force?

16     A.   Yes.

17     Q.   What topics were covered in those

18 in-service trainings?

19     A.   It varies from year to year.  They don't

20 have one specific scenario as far as use of force.

21 You know, they put us in different situations, see

22 how you react to it.  And, like I say, if

23 something new from the previous year happened, and

24 they feel like it would be a good training tool

25 for us to learn, then they'll implement that into

1    use-of-force situation.  And just to elaborate on
2    it, one particular year, they had situation where
3    an officer shot a bad guy.  And the police showed
4    up, guy was in regular clothes, he had his badge
5    and his gun in his hand.  He told them, "hey, I'm
6    a police officer."  Police shot him.  So they
7    implemented that into our training, one day if we
8    ever run across that, you have something to think
9    about.  You run across a situation, you pull up,
10   you see a guy, somebody on the ground shot, you
11   don't automatically assume that this is a bad guy
12   and shoot up another officer.
13        Q.   When did that occur?
14        A.   I can't remember what year, but that
15   just came to my memory.
16        Q.   Some point while you've been with the
17   state police?
18        A.   Yes.  That just came to my memory as one
19   of the situations they put us in, and the use of
20   force deal that we did during in-service.
21        Q.   Okay.  You mentioned earlier that there
22   had been changes to or updates to the use-of-force
23   continuum, correct?
24        A.   Yes.  Like I said, it changes as
25   technology evolve and different things evolve for

1    departments, and they start getting different

2    equipment.  It usually change the use-of-force

3    continuum.

4         Q.   Do you know if the changes to the

5    use-of-force continuum have been covered in state

6    police in-service trainings?

7         A.   I'm not sure.

8         Q.   Okay.  You don't remember them being

9    covered?

10        A.   Like I say, we go through a list of

11   different training scenarios.  It's hard to

12   determine what's new, what's old.  Like I said,

13   they just throw so much different things at you,

14   get you to think.

15        Q.   But you don't have a specific memory of

16   the continuum changes being covered in an

17   in-service training?

18        A.   Not particular changes, no, ma'am.

19             MR. FAHRENHOLT:  If you have a segue

20             soon, we can break.

21             MRS. WASHINGTON:  We can go off the

22             record.

23             (RECESS 10:34-10:38 A.M.)

24   EXAMINATION BY MRS. WASHINGTON:

25        Q.   I am going to show you a document that



1  has previously been marked as Exhibit 22.  It

2  indicates "P.O. 216, Early Identification System,"

3  at the top; is that correct?

4      A.   Yes.

5      Q.   Is this the state police's policy on

6  early identification system?

7      A.   Yes, ma'am.

8      Q.   Also known as EIS?

9      A.   Uh-huh (AFFIRMATIVE RESPONSE).

10      Q.   What training have you received from the

11  state police on the EIS?

12      A.   EIS is more or less an administrative

13  policy.  They really hadn't -- didn't go into

14  great detail with it, other than there's certain

15  instances that occur throughout your career.  If

16  it occurs within a certain period of time, that it

17  triggers an EIS situation, where they have to do

18  an audit or whatever on your situations and

19  determine whether or not you need some additional

20  training or if something else is -- just as a way

21  of the department determining whether or not

22  you're a risk factor to them.

23      Q.   And I think you just sort of referenced

24  it, but what is your understanding of when an EIS

25  report would be produced on an officer?



1    A.    Like I said, if you look at section 5, A

2  through G, is any of those situations that fall

3  within a certain timeframe, I believe, what, 30

4  days or maybe a year.  I can't remember without

5  reading.

6    Q.    Sure.  So I'm looking at --

7    A.    The 90-day period and the 12-month

8  period, six or more, subsection 6.

9    Q.    Right.  So subsection 5 that you just

10  referenced says, "the following criteria are

11  considered risk indicators and shall be included

12  in the EIS?"

13    A.    Yes.

14    Q.    It goes on to list different types of

15  events, including uses of force, pursuits, weapon

16  discharges, disciplinary action, complaints.

17    A.    Vehicle crashes, yes.

18    Q.    Okay.  And then that subsection 6 is

19  what you were just referencing, that a threshold

20  event consists of the combined occurrence of

21  either, A, three or more of the criteria in a

22  90-day period; B, six or more of the criteria in a

23  12-month period; is that correct?

24    A.    Yes.

25    Q.    What is your understanding of how the



1  state police keeps track of these risk indicator

2  events on a given officer?

3      A.   When you're involved in any one of these

4  particular deals, if it's something that you

5  initiated, of course, you got to do database and

6  explain what you did, why you did it.  And it goes

7  into database, I guess, that they can track and

8  see who all was involved in what at what date and

9  time, whatever, versus something like a

10  disciplinary action.  That will be something that

11  the supervisors may have to enter into some kind

12  of supervisory database that they keep track of

13  it.  I guess some point in time, they're able to

14  stroke of a key and determine, okay, yes, he had

15  this many pursuits, this many Taser deployments,

16  this many disciplinary actions.  And they'll look

17  at the timeframe and see if it meets the threshold

18  for activating EIS.

19      Q.   Is that kind of list of these risk

20  indicator events something that you would have

21  access to?

22      A.   Not -- only the use of -- like I said,

23  it's things that we put into the database, use of

24  force, pursuit database, like I said, weapons

25  discharge.  Something that we discharge our



1    firearm on duty, it's going to be handled by

2    somebody else.  It will be nothing that we do

3    other than give a statement on why we discharged

4    firearm.  So that would be something that might be

5    inputted into a system by somebody else.

6        Q.   And that's not something you would have

7    access to?

8        A.   Yes.

9        Q.   Okay.  So you're responsible, I think,

10   for writing the reports based on some of these

11   types of events, correct?

12       A.   Yes.

13       Q.   But I guess I'm asking if there's any

14   kind of log or list of these risk indicator events

15   for each officer that the officer him or herself

16   would have access to?

17       A.   Not to my knowledge.

18       Q.   Okay.  If a trooper is working multiple

19   assignments, let's say their permanent assignment

20   and then maybe working some overtime for a

21   different assignment, do you know how those two

22   units would keep track of these risk indicator

23   events?

24       A.   Like I said, it goes all into same pool,

25   you know.  Once you're an employee, and you're

1    involved in anything, whether you're on duty or
2    off duty or working overtime, it all goes into the
3    same pool.  So it wouldn't be, say, okay, on duty
4    use of force versus overtime use of force versus
5    off duty use of force.  I don't think they
6    separate them like that.  Just as an employee,
7    you -- whatever use of force, it all goes into the
8    same pile.
9           Q.    So you would expect there to be one
10   mechanism for keeping track of all of these risk
11   indicator events on one officer?
12          A.    Yes.
13          Q.    Okay.  What is your understanding of
14   what happens after an EIS report is produced after
15   there's been one of these threshold events?
16          A.    Like I said, some higher-ups, I guess,
17   make a determination what needs to happen, if the
18   officer needs additional training or if he needs a
19   counseling session where they sit down, or they
20   may send you through the academy, whole block of
21   instruction that cadets get in that particular
22   instruction.  Say, if somebody crashes three or
23   four vehicles in a 90-day period, then they may
24   send them back through the whole entire driving
25   course that the recruits get, which is, like, 2

1    weeks' worth of driving.  They may send them back

2    through that class to figure out what's going on

3    with the driving, why they're having so many

4    accidents and that type of thing.

5        Q.   Okay.

6        A.   Or it may be something, go back through

7    an 8-hour class.  Like I said, it's all determined

8    by somebody with a higher paygrade than mine.

9        Q.   And when there is an EIS report on a

10   trooper, is the trooper aware that that report is

11   being produced?

12       A.   Yes.

13       Q.   Okay.  How is the trooper made aware of

14   the report?

15       A.   Notified by your supervisor that an EIS

16   report has been produced on the situation.  And

17   they're required to write, I think, a brief

18   narrative on each incident and what it involved

19   and what type of force was used.  And they submit

20   it to, like I said, somebody higher up.  I'm not

21   sure who, but somebody higher up gets it.  And I

22   guess they determine who -- at that point, makes

23   the decision on what type of additional training

24   or if there's no recommendation for any additional

25   training.  Like I said, may even include

1    termination or something.  I'm not sure.

2         Q.   Okay.  The EIS report that's produced,

3    is that gone over with the trooper?

4         A.   Nothing other than the specific

5    incidents that triggered the EIS report.  They

6    look at it.  Like I said, the supervisor requires

7    you to write a report on each incident, brief

8    narrative on each incident and what type of force

9    was used.  So supervisors get some input from you

10   as to, you know, what particular use of force.

11   Like I said, they may have -- they have access to

12   the uses of force.  So they're able to see what

13   reports that you reported, pursuit or use-of-force

14   situation that's in your thing.  Like I said, they

15   just get a brief general description of what

16   happened.

17        Q.   Okay.  So just to make sure I'm clear:

18   When the supervisor is writing the narrative for

19   the EIS report, the supervisor speaks to the

20   trooper about each of the events that's going to

21   be listed in the report?

22        A.   Yes.

23        Q.   Okay.

24        A.   Yes.  That's how it's been handled with

25   me in the past.



1      Q.   Okay.  So you said "that's how it's been

2  handled with me in the past."

3      A.   Yes.  Different supervisor may do

4  different things, I'm not sure --

5      Q.   Sure.

6      A.   -- standard protocol of dealing with

7  EIS, as regards to submission of the EIS report to

8  higher-ups by supervisors.

9      Q.   Okay.  Has an EIS report been generated

10  regarding events that you've been involved in?

11      A.   Yes.

12      Q.   How many times has an EIS report been

13  generated on you?

14      A.   Just one particular that I remember.

15      Q.   Okay.  Do you remember when that was

16  from?

17      A.   No.  I can't remember exactly the dates

18  or times that it was activated.

19            MRS. WASHINGTON:  I'm going to show you

20            a document that I'm going to mark as

21            Exhibit 58.

22            (EXHIBIT 58 MARKED FOR IDENTIFICATION)

23            MR. FAHRENHOLT:  Is this one that was

24            already marked?

25            MRS. WASHINGTON:  It may have been, but



```
 1              for the sake of the record, we are going
 2              to mark it again.
 3              MR. FAHRENHOLT:  Sure.
 4     EXAMINATION BY MRS. WASHINGTON:
 5         Q.   So I just handed you a document that's
 6     four pages long.  It's marked as Exhibit 58 now.
 7     The front -- or the first page is a cover letter
 8     of some sort dated August 18th, 2016.  And then
 9     the other three pages appear to comprise what's
10     titled "EIS form," and includes your name; is that
11     correct?
12         A.   Yes.
13         Q.   Is this the EIS report that you were
14     referencing a minute ago?
15         A.   Yes.
16         Q.   Have you seen this cover letter from
17     Captain Naquin to Major Saizan before?
18         A.   No, ma'am.
19         Q.   Have you seen this EIS form before,
20     pages 2 through 4 of this exhibit?
21         A.   No, ma'am.
22         Q.   What is your understanding of what this
23     EIS form is?
24         A.    It's basically listing -- like I said,
25     looking at the different -- I guess 90 days that
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1  triggered the EIS report, I had two vehicle

2  pursuits and two uses of force within a 90-day

3  period.

4      Q.   It appears that first incident is

5  actually both a vehicle pursuit and a use of

6  force; is that correct?

7      A.   Vehicle pursuit, use of force, yes.

8      Q.   Okay.  Speaking chronologically, the

9  first event that's listed on this EIS form would

10 be June 3rd of 2016, a use of force; is that

11 correct?

12     A.   Yes, if you look back at the dates.

13     Q.   Correct.  Did anyone speak with you

14 about this particular use of force?

15     A.   What you mean speak?  Of course, once we

16 use force on somebody, we contact the supervisor

17 on duty, and they're required to come out and give

18 them a brief rundown on why you used force and

19 what force was used.

20     Q.   Do you remember anyone speaking to you

21 about this use of force while this EIS form was

22 being prepared?

23          MR. FAHRENHOLT:  Which one are we

24          talking about?

25          MRS. WASHINGTON:  We're talking about

1       June 3rd, 2016.  It's event Number 4.

2       THE WITNESS:  Event 4.

3       MR. FAHRENHOLT:  Do you want to just

4       read so you understand what she's

5       asking?

6       THE WITNESS:  Yes, I'll read.

7           From what I gather, you're asking

8       me if someone spoke to me before the

9       EIS?

10      MRS. WASHINGTON:  Let me do this --

11      MR. FAHRENHOLT:  I just want you to

12      understand what the incident is that

13      she's asking you about.

14      THE WITNESS:  Okay.

15  EXAMINATION BY MRS. WASHINGTON:

16      Q.   I'm going to hand you what was

17  previously marked as Exhibit 24, which is actually

18  the use-of-force report for this incident.

19      A.   Okay.

20      Q.   Just in case that is helpful to you.

21      A.   All right.

22      MR. FAHRENHOLT:  Just take a look at it,

23      and then answer her questions.

24      THE WITNESS:  Okay.

25



EXAMINATION BY MRS. WASHINGTON:

1    EXAMINATION BY MRS. WASHINGTON:

2         Q.    Do you remember this use of force?

3         A.    Not exactly.

4         Q.    Do you remember if anyone spoke with you

5    after you submitted this use-of-force report

6    regarding this incident?

7         A.    No, ma'am.

8         Q.    Okay.  This particular use of force, I

9    believe, is listed as event 4 in this EIS form; is

10   that correct?

11        A.    I'm sorry?

12        Q.    Event --

13        A.    Yes, I was reading event 4.

14        Q.    Sure.  Event 4 matches up with the

15   use-of-force report that is marked as Exhibit 24;

16   is that correct?

17        A.    I'm about to read it to get a better

18   understanding.

19        Q.    Sure.

20        A.    Just in this part goes into more detail

21   as to what happened, who was involved.

22        Q.    I'm mostly asking whether or not you

23   recognize it as the same incident.

24        A.    I think I remember this incident

25   somewhat, but some of the details are still kind



1    of blurry to me.

2        Q.   Okay.  Do you remember if anyone spoke

3    with you regarding this incident when the

4    narrative for the EIS form was being created?

5        A.   I'm not sure.

6        Q.   Okay.  You don't have any specific

7    memory?

8        A.   No, ma'am.

9        Q.   Okay.

10        A.   Like I said, typically with any arrest

11    we make, we're required to put what we call a gist

12    into database, which generates the incident

13    numbers for state police.  We're required to put a

14    gist in that incident report.  So they may have

15    gathered this information from that.

16        Q.   Okay.  Who authored the narrative under

17    event 4?

18        A.   I'm not sure.  I may have, or my

19    partner, Trooper Dickerson, may have.  I'm not

20    sure who entered it into the desk log.  With me,

21    typically, if I make an arrest, I'll typically do

22    my own paperwork.

23        Q.   So you would have authored the

24    use-of-force report potentially?

25        A.   Yes.  The use of force, if I was the



1   officer committing the force or reporting the

2   particular force used on the person.

3       Q.   Do you know who prepared this EIS form

4   that we're looking at?

5       A.   No, ma'am.

6       Q.   Okay.  There is also a use of force from

7   June 21st, 2016, which is listed as one of the

8   events on this EIS form; is that correct?

9       A.   June 21st, yes, ma'am.  This will be

10   event 3.

11       Q.   I'm going to hand you what was

12   previously marked as Exhibit 25, which is a

13   use-of-force report that I believe reflects this

14   incident, but take a look at it and let me know.

15       A.   Okay.  I remember this specific

16   situation.

17       Q.   Okay.  Do you remember if anyone spoke

18   with you about this use of force after you

19   submitted your report on the incident?

20       A.   No, ma'am.

21       Q.   Just so I'm clear, no one spoke with you

22   regarding this incident after you submitted the

23   use-of-force report?

24       A.   Not to my knowledge.

25       Q.   Okay.  Did anyone speak with you about



1    this particular incident when this EIS form that

2    includes that event was being created?

3         A.   Yes.

4         Q.   Okay.  Tell me about that conversation.

5         A.   It just basically explained to me that

6    the EIS was being generated, and they explained

7    the different events which led up to the EIS being

8    generated.  Just briefly explained to me the

9    situations and kind of refreshed my memory as to

10   which uses of force that they were generating EIS

11   for.  So if it was something that wasn't mine,

12   then I could be, like, no, that ain't me, this is

13   somebody -- had to be somebody else's situation.

14        Q.   Do you remember who you had that

15   conversation with?

16        A.   No, ma'am.

17        Q.   Was it -- you mentioned, I think,

18   plural, multiple people.

19        A.   Yes.

20        Q.   It was multiple people that you spoke

21   with?

22        A.   About what?

23        Q.   About the creation of this EIS form.

24        A.   I have two sergeants and one lieutenant,

25   so I don't know which one of the three.  I'm



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    pretty sure one of them did speak to me regarding

2    the EIS report.

3         Q.   Do you have a specific memory of that

4    meeting or that conversation regarding the EIS

5    form?

6         A.   The EIS form, no, ma'am.  Like I said,

7    other than, I remember being told that I had an

8    EIS situation being generated, and sat down and

9    discussed it.  Like I said, it may have been one

10   sergeant or may have been both of them, I can't

11   remember.

12        Q.   Okay.  You mentioned that one of the

13   purposes of that meeting is to make sure that

14   these were actually incidents that you were

15   involved in; is that correct?

16        A.   To my knowledge, yes.

17        Q.   Okay.  Do you remember disputing your

18   involvement in any of the incidents contained in

19   the EIS form?

20        A.   Other than some of the incidents that

21   they refer to in my EIS were situations where I

22   might have been a passenger in the vehicle we were

23   in pursuit with, or me and another officer were

24   involved in a situation where we had to use force

25   on somebody.  So just being a part of it kind of



1  puts you into that.  Like I say, if I'm with

2  another trooper, and he has to use force on the

3  subject, and he mentions me in the use of force,

4  then that counts as my use of force, also.

5       Q.   Okay.  Do you remember if any of the

6  events that are listed in this EIS form are ones

7  in which you disputed the degree to your

8  involvement like you just described?

9       A.   Not without having to read these

10  particular incidents.

11       Q.   Okay.

12       A.   I'll be able to give you a better

13  understanding of which ones.  Probably, like I

14  said, if it was a pursuit situation, where I was

15  just a front passenger, and I was with another

16  trooper that was driving, and we were in the

17  active pursuit chasing the vehicle, then, like I

18  said, by policy, he mentions me in there as the

19  passenger in the vehicle, then that goes on my

20  record also as a pursuit.

21       Q.   Okay.  Well, we just went over the uses

22  of force from June 3rd and June 21st, 2016.  Did

23  you dispute your involvement in either of those?

24       A.   Looking at these particular incidents, I

25  think all these were initiated by me.

1    Q.   Okay.  I'm going to ask you to look at

2    what's described as event 2 in this EIS form,

3    which is the vehicle pursuit from July of 2016.  I

4    apologize that I do not, in fact, have a report on

5    this incident to provide to you.

6    A.   I can read it just from this event.

7    Q.   Correct.  I'm asking just about the

8    narrative that's included in the EIS form, if you

9    want to take a minute to look at that.

10   A.   Yes, ma'am.

11        I remember that particular incident.

12   Q.   Okay.  Do you remember if you authored

13   or submitted a pursuit report related to this

14   incident?

15   A.   Yes.

16   Q.   Okay.  Do you remember if anyone spoke

17   with you about this incident after you authored

18   that pursuit report?

19   A.   No.  I believe they review -- at some

20   point, I got to guess that someone reviews all

21   these reports that's generated.  And I don't know

22   if it's training academy staff or who does.  But

23   after I submitted my use of force, my pursuit

24   policy deal, I never received any notification

25   from someone other than them notifying me about

1    this EIS deal involving that situation.

2        Q.    Do you remember speaking with anyone

3    regarding this event 2 pursuit while this EIS

4    report was being created?

5        A.    Other than speaking with the supervisors

6    in regards to the EIS report.

7        Q.    Okay.  And then the first event that's

8    listed on this log of events of the EIS form, is

9    the vehicle pursuit/use of force that dates from

10   July, again, July 28, 2016.  And I'm going to hand

11   you what was previously marked as Exhibit 26,

12   which is a use-of-force report that I believe

13   corresponds to this event.  But please take a look

14   at it and let me know.

15       A.    Yes, I remember that particular event.

16       Q.    Okay.  And there's a use-of-force report

17   on it, which we just reviewed as Exhibit 26,

18   correct?

19       A.    Yes.

20       Q.    Would there also have been a pursuit

21   report that was separately created?

22       A.    Yes.  It should have been, but I'm not

23   sure if the use of force may trump the pursuit

24   deal and may have to list it all into the one

25   report.



1       Q.   Okay.

2       A.   Now, I can't tell you if I did a pursuit

3   policy and a use-of-force report.  It may have or

4   it may have not.  I'm not sure.

5       Q.   Okay.  Do you remember anyone speaking

6   to you about this event after you authored that

7   use-of-force report?

8       A.   Nothing other than when the EIS report

9   was generated.

10      Q.   So prior to the generation of this EIS

11  form, no one had spoken to you about this

12  July 28th, use of force; is that correct?

13      A.   That's correct.

14      Q.   Am I correct in understanding that in

15  the creation of this EIS form, like we've been

16  discussing, someone did talk to you about what's

17  listed as event 1?

18      A.   Yes.

19      Q.   And this is the same conversation that

20  you were discussing previously in your testimony?

21      A.   Yes.

22      Q.   If you turn to the last page of this EIS

23  form, in the section that says, "disposition."

24  The second sentence there says, "each incident

25  described above was debriefed with Trooper Pichon,


Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1  supervisors and all troopers involved in the

2  incidents."  Can you tell me whether or not you

3  were debriefed as described in that sentence?

4      A.   Like I said, when the EIS report was

5  generated, supervisors called me into the office

6  and went over these four incidents.  That told me

7  that the EIS report was being generated because of

8  these four incidents.

9      Q.   Okay.  Do you know whether or not those

10 supervisors who spoke to you also spoke with the

11 other troopers that are mentioned in these events?

12     A.   I'm not sure if my supervisor spoke with

13 them or if their supervisor spoke with them.

14     Q.   Do you know if they were spoken to at

15 all in the process of generating this EIS report?

16     A.   I'm not sure.

17     Q.   Okay.  On the front page of the EIS

18 form, the supervisor's name is listed as

19 Lieutenant Bradley; is that correct?

20     A.   Yes.

21     Q.   Who is Lieutenant Bradley?

22     A.   That's my lieutenant.  He's in charge of

23 narcotics and the detective bureau.

24     Q.   Okay.  And on this EIS form, under your

25 shift assignment, it says, "Troop B/NOCED;" is



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    that correct?

2         A.   Yes.

3         Q.   And this is happening in August of 2016;

4    is that correct?

5         A.   Yes.

6         Q.   Okay.  What exactly does Troop B/NOCED

7    mean under your shift assignment?

8         A.   NOCED is New Orleans Criminal

9    Enforcement -- division.  I forgot what the D

10   stands for, I'm sorry.  But Troop N, or NOCED, as

11   called back then, is lodged within the Troop B

12   generally.  So Troop N is not a permanent troop

13   per se, but they do have a command staff and

14   troopers assigned to it.

15        Q.   Okay.

16        A.   But hasn't been established through, I

17   guess, whatever state procedure to actually create

18   a permanent deal in New Orleans to have a troop

19   specifically assigned to New Orleans.  So it still

20   falls under Troop B area of responsibility.  Troop

21   B covers Orleans, Jefferson, Plaquemines,

22   St. Bernard, St. Charles and St. John.

23        Q.   Okay.  You indicated that Lieutenant

24   Bradley is in narcotics and the detective bureau.

25   At the time of this EIS form, were you already



1  working for narcotics?

2      A.   I may have; I may have not.  At the time

3  this EIS form may have been generated, I'm pretty

4  sure I was if Lieutenant Patrick Bradley was

5  overseeing the EIS forms.

6      Q.   Okay.

7      A.   I typically work overtime in New Orleans

8  while I was assigned to narcotics.  So it may have

9  been this situation may have occurred while I was

10  in narcotics, it just happened while I was working

11  overtime in Troop N.

12      Q.   Okay.  Let me ask you this:  When you

13  were with Troop B, what was your chain of command

14  at that time?

15      A.   I had two sergeants, lieutenant, and

16  then eventually from lieutenant, there's the troop

17  section commander.

18      Q.   Okay.  Was Lieutenant Bradley in that

19  Troop B chain of command?

20      A.   I can't remember where Lieutenant

21  Bradley was at the time that I was at Troop B.

22      Q.   Okay.  But Lieutenant Bradley is in the

23  chain of command, now that you've been in the

24  narcotics division?

25      A.   Yes.  He wasn't my specific lieutenant



1     when I was at Troop B.

2          Q.    Okay.

3          A.    My lieutenant at Troop B was Lieutenant

4     Midkiff.

5          Q.    When you were working with Troop N, what

6     was your chain of command there?

7          A.    We had specific sergeant for my unit,

8     for my group.  Like, there's A, B, C and D.  So I

9     was on team A.  So we had two sergeants assigned

10    to team A.  At the time, like I said, Troop N

11    didn't have a full-fledged command staff.  So I

12    think there was one lieutenant that oversaw all

13    three or four shifts, then you had troop section

14    commander.

15         Q.    Okay.  Was Lieutenant Bradley in that

16    chain of command when you were working with Troop

17    N?

18         A.    I can't recall.

19         Q.    Okay.

20         A.    I don't believe he was, but I can't say

21    yes or no.

22         Q.    Okay.  After you spoke with whoever it

23    was that you spoke with about this EIS report, did

24    you ever hear about this EIS report again?

25         A.    No, ma'am.



1      Q.   Okay.  And I think you indicated that

2  you had never seen the cover letter that I have on

3  this Exhibit 58; is that correct?

4      A.   That's correct.

5      Q.   Okay.  So you're not aware of what

6  happened with this EIS report after you spoke with

7  your supervisor?

8      A.   No, ma'am.

9      Q.   Okay.  Are you aware of any EIS report

10  specifically regarding you that would have been

11  generated prior to August of 2016?

12      A.   Prior to August of 2016, I'm not sure.

13      Q.   Okay.  Do you know whether or not you

14  were involved in any of those risk indicator

15  events like uses of force or pursuits that would

16  go, you know, onto an EIS log prior to August of

17  2016?

18      A.   I may have.  I'm not sure.

19      Q.   Okay.  I'm going to show you a document

20  that was previously marked as Exhibit 27.  Ignore

21  the Exhibit 11 sticker at the bottom of that.

22  That is related to something else.  Have you ever

23  seen this form before?

24      A.   No, ma'am.

25      Q.   Okay.  I'm looking at the top of the



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    form, and it says, "Troop N EIS report log;" is
2    that correct?
3         A.   Yes.
4         Q.   And next to trooper, someone has
5    handwritten "Trooper Troy Pichon;" is that
6    correct?
7         A.   Yes.
8         Q.   And then in this log, there appears to
9    be five incidents that are listed, ranging from
10   June 18th of 2017 through June 16th of 2018; is
11   that correct?
12        A.   Yes.
13        Q.   Do you know if there's any incidents
14   from the last event that was listed on the EIS
15   report in 2016, until the first incident that's
16   listed on this EIS report log in 2017, that would
17   be the risk indicator events that we've talked
18   about before?
19        A.   I'm sorry, ask that question again.
20        Q.   Sure.  That was very long.  I'm trying
21   to make it simple, but it's kind of complicated.
22             What I'm interested in knowing is:  This
23   EIS report, the last event on it is from July of
24   2016, correct?
25        A.   Yes.



1    Q.   And then the first event that's listed

2  on the EIS report log, which --

3    A.   6/18/17.  So you want to know if there

4  was any uses of force between that time period?

5    Q.   Uses of force, pursuits.

6    A.   Roughly about a year?

7    Q.   Correct.

8    A.   I'm not sure.

9    Q.   You don't know?

10    A.   Yes.

11    Q.   It's possible there would be some of

12  these risk indicator events that you were involved

13  in that fall between that time period?

14    A.   I'm not sure.

15    Q.   Where would those events, whether

16  they're uses of force or pursuits, do you know

17  where they would be logged or tracked for EIS

18  purposes?

19    A.   In the same databases that you were able

20  to get all this information from.

21    Q.   Okay.  Looking at this EIS report log

22  from Troop N, the last entry there is from June of

23  2018.  And if you kind of look to the right, there

24  is a Y indicated in the column for three incidents

25  in 90 days; is that correct?



1    A.    Three incidents in 90 days, yes.

2    Q.    And then if you further look to the

3  right, there's another Y marked under the column

4  for EIS review required; is that correct?

5    A.    Yes.

6    Q.    Are you aware of an EIS review occurring

7  based on this triggering event in June of 2018?

8    A.    I'm not sure.  I can't remember.

9    Q.    Okay.  Do you remember anyone reviewing

10 an EIS report with you similar to the one that we

11 looked at in Exhibit 58?

12   A.    Again, I can't remember.

13   Q.    Okay.  You don't have any specific

14 memory of an EIS report being generated based on

15 this June 2018, triggering event?

16   A.    No, ma'am.

17   Q.    Okay.  Do you know if there are any

18 events, whether they're uses of force or pursuits

19 or anything else that was in that risk indicator

20 event list, that you've been involved in since

21 this June 2018, event?

22   A.    One particular incident.

23   Q.    Okay.  So there would be at least one

24 incident that you're aware of that would qualify

25 as an EIS event?



```
 1         A.    Yes, that I am aware of.
 2         Q.    Do you know where events that have come
 3   after June 2018, that are EIS-type events, would
 4   be logged?
 5         A.    No, not exactly.  It was a situation
 6   where investigation was conducted.
 7         Q.    Okay.  Have you ever seen a document
 8   like this Troop N, EIS report log before?
 9         A.    No, ma'am.
10         Q.    Have you seen it for any other trooper
11   assignment that you've had?
12         A.    No.
13         Q.    The investigation that you just
14   mentioned, has that concluded?
15         A.    No.
16         Q.    Oh, one last question on the EIS.  Are
17   you aware of any other -- of any troopers that
18   have had retraining, like you talked about
19   earlier, as a result of an EIS report?
20         A.    No, not to my knowledge.
21         Q.    Okay.  Are you aware of any troopers
22   that have been counseled, like you mentioned
23   earlier, as a result of an EIS report?
24         A.    Well, those things are typically held
25   confidential between supervisors and that person.
```



1    So I wouldn't know.

2          Q.    But you're not aware of any?

3          A.    No, ma'am.

4          Q.    Are you aware of any officer who's been

5    disciplined or suspended in any kind of way as a

6    result of an EIS report?

7          A.    Not to my knowledge.

8          Q.    Okay.  And as a result of the 2016 EIS

9    report that you were involved with, was any action

10   taken related to you?

11         A.    No.

12         Q.    Okay.  Did you receive any counseling as

13   a result of it?

14         A.    No.

15         Q.    Okay.  Did you receive any retraining as

16   a result of it?

17         A.    No.

18         Q.    Okay.  And you weren't disciplined in

19   any kind of way as a result of that EIS report?

20         A.    No, ma'am.

21         Q.    Okay.  I'm going to show you a document

22   that was previously marked as Exhibit 40.  At the

23   top it says, "P.O. 211 disciplinary;" is that

24   correct?

25         A.    Yes.



```
 1        Q.    And do you recognize this as the state
 2   police disciplinary policy?
 3        A.    Yes, it appears to be state police
 4   disciplinary policy.
 5        Q.    Okay.  I'm looking at section 2 --
 6   subsection 2, that says, "supervisors may counsel
 7   employees for minor deficiencies."  Do you see
 8   that?  It's the first page of this exhibit, page
 9   49.
10        A.    Role of supervisors?
11        Q.    Yes.  It's the second paragraph there
12   that starts "supervisors may counsel employees for
13   minor deficiencies."
14        A.    Okay.
15        Q.    Do you see that?
16        A.    Yes.
17        Q.    And the second sentence there says,
18   "such counseling should be documented in a letter
19   of counseling acknowledged by the supervisor and
20   the employee;" is that correct?
21        A.    Yes.
22        Q.    Okay.  Is this the type of counseling
23   that you were referring to earlier that may be
24   given to an officer?
25        A.    Yes.
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

1       Q.    Okay.  Have you ever been provided with

2   counseling?

3       A.    Yes.

4       Q.    Okay.  What subject was the counseling

5   related to?

6       A.    Whenever there was a use of force or

7   pursuit, supervisor required to debrief you

8   regarding that particular incident.

9       Q.    Okay.  So do you remember being

10  counseled regarding a use of force?

11      A.    What you mean, as far as counseling?  We

12  call it debriefing, pretty much.  Same thing, I

13  guess, but. . .

14      Q.    What is it --

15      A.    A counseling is -- to me, a counseling

16  means that you did something wrong.  You get

17  counseled to correct that action.  A debriefing is

18  just basically explaining what happened and why

19  you did what you did.  A supervisor will kind of

20  take that into account when looking at your

21  actions and if it was warranted and if he needs to

22  further take any action against you for whatever

23  action you took.

24      Q.    So a debriefing, in your understanding,

25  is different than the counseling that's being



1  mentioned in this disciplinary policy?

2      A.   Yes.

3      Q.   Okay.  Am I correct in understanding

4  that following a use of force, there is a

5  debriefing that occurs?

6      A.   Yes.

7      Q.   Okay.  Is that something that has

8  happened with every use of force that you've been

9  involved in?

10     A.   Yes.

11     Q.   Tell me about what that interaction

12  looks like.

13     A.   It's basically immediately after

14  whatever situation, supervisor comes and pulls you

15  to the side.  And you have to explain to him what

16  happened, the events leading up to whatever caused

17  you to use force or vehicle pursuit.  And he makes

18  a determination on whether your actions are

19  warranted and by state police policy.

20     Q.   Okay.  Is that a debriefing that happens

21  on the site of the event?

22     A.   Yes.

23     Q.   Okay.  And so is that conversation that

24  would happen prior to you writing the use of force

25  or pursuit report?



1    A.   Depends on availability of the

2  supervisor, if he's off doing something else.  I

3  typically try to do my use of force and pursuit

4  policy immediately after a situation.  Then, like

5  I said, if the supervisor is not available, which

6  you know, he's required to sign the gist.

7  Whenever you arrest somebody in New Orleans, we

8  write a gist, basically laying out our reason for

9  probable cause for arrest.  He reads the gist, and

10  he has to sign it, saying that he agrees with your

11  findings and authorizes you to arrest this person.

12    Q.   So that's a sign-off on the actual

13  arrest itself; is that correct?

14    A.   Yes.

15    Q.   Just to make sure I understand, I think

16  you just indicated that the supervisor would come

17  to the site of the use of force; is that correct?

18    A.   Yes, correct.

19    Q.   Or to the, I guess, end of the pursuit;

20  is that correct?

21    A.   Yes.

22    Q.   Okay.  And when the supervisor comes,

23  that's when this debriefing that you're talking

24  about would happen?

25    A.   Yes.



1    Q.   Okay.  And if the supervisor is on site
2  to do the debriefing, I assume that you wouldn't
3  have had a chance to write your report at that
4  time; is that correct?
5    A.   The final report or the initial booking
6  information?
7    Q.   The actual use-of-force report, like the
8  documents --
9    A.   It depends, like I said, how far he is,
10 his availability.  I mean, you have one supervisor
11 supervising eight troopers.  You got other people
12 with arrests, he has to stop.  Especially if we
13 have a situation where it's done, we got the guy
14 in the back of the car, and we're sitting there
15 waiting on the tow truck to come tow the vehicle
16 for whatever, he'll show up.  We'll explain to him
17 then.  By that time, we've done did all the
18 paperwork and everything we need.  Sometimes we're
19 actively pursuing the vehicle.  Depending on how
20 long the vehicle pursuits takes, he may come there
21 immediately.  So he may debrief us before we have
22 a chance to do use of force.  I just can't say
23 specifically for each incident that this happened,
24 this is how it goes in this sequence, and it's
25 like that for every incident.

1    Q.   Are there uses of force where a
2 supervisor does not show up to the actual scene of
3 incident?
4    A.   No, ma'am.
5    Q.   Okay.  Are there pursuits where a
6 supervisor doesn't show up to the scene of the
7 pursuit?
8    A.   No, ma'am.
9    Q.   Okay.  Looking back at the disciplinary
10 policy that we were speaking about, I'm looking
11 again at that first page under 2, role of
12 supervisors, little Roman Numeral 3, which says,
13 "deficiencies in training may be corrected through
14 in-service training or special training set up by
15 the supervisor."  Do you see that?
16    A.   Yes.
17    Q.   Okay.  Have you ever been provided with
18 training to correct a deficiency in the way that's
19 described in this policy?
20    A.   No, ma'am.
21    Q.   Okay.  Are you aware of any other
22 trooper or state police employee that's been
23 provided training to correct a deficiency?
24    A.   No, ma'am.
25    Q.   Okay.  I'm going to show you a document

```
1   that's been marked as Exhibit 16.  The top of this
2   document says, "P.O. 402 communications;" is that
3   correct?
4        A.   Yes.
5        Q.   And this would appear to be the
6   Louisiana State Police policy on communications;
7   is that correct?
8        A.   Yes.
9        Q.   Have you received training from the
10  state police regarding communications?
11       A.   Yes.
12       Q.   What did that training consist of?
13       A.    It's FTO program, where they give you
14  the proper etiquette to use while transmitting on
15  the radio.  Especially, the troop is kind of
16  unique, because you got to call the desk officer
17  to get a tow truck versus call the dispatchers to
18  get something else.  It's kind of unique situation
19  at the troop.  In New Orleans, it's a little more
20  simple; whereas, if you need something, you just
21  call the dispatcher on the radio, and you'll be
22  able to relay any information directly to the
23  dispatcher.
24       Q.   Okay.  So when you were referencing the
25  complications with the troop, you're talking
```



1  about, like, Troop B and the road patrol
2  activities?
3       A.   Yes, road patrol activities is a little
4  different than working New Orleans.  We don't talk
5  to state police dispatches while we're in New
6  Orleans.  We use NOPD dispatch to communicate.
7       Q.   Okay.  Tell me a little bit more about
8  that communication in New Orleans.  You said you
9  only talked to NOPD dispatch, correct?
10      A.   Yes, for day-to-day activities.  We may
11 contact the troop dispatchers at some point if we
12 need them to run a gun or run the VIN number for
13 stolen vehicle, so that we can recover the stolen
14 vehicle, or if the gun is stolen, we get it
15 recovered through Troop B.  We have the option to
16 call NOPD and get them to recover the stolen
17 vehicle or stolen gun or whatever or check to see
18 if it was stolen.
19      Q.   When you're talking about these calls
20 and dispatch, you're talking about radio
21 communications; is that correct?
22      A.   Yes.
23      Q.   Okay.  What NOPD radio frequencies do
24 you use when you're working in New Orleans?
25      A.   Now, Districts 1 and District 8



1   typically are patched together, which means they

2   are combined.

3       Q.   Okay.

4       A.   Sometimes they separate them during

5   major events; sometimes they put them together.

6   So it depends.  You can have your radio set to

7   dispatch 1, or you can have your radio set to

8   dispatch 8, NOPD dispatch 8.  You can still hear

9   both transmissions.

10      Q.   Okay.  Are there any other NOPD

11   frequencies that the state police uses in New

12   Orleans?

13      A.   Yes.  District talk channels and DIU,

14   which is the detectives' channels.

15      Q.   Those last two channels that you talked

16   about, the district talk channels and the DIU, are

17   those channels that you ever used in your work in

18   New Orleans?

19      A.   Depends.  Like, if we're trying to relay

20   information, we don't tie up the dispatch channel,

21   because she's putting out calls, people relaying

22   information.  Somebody gets involved in a deadly

23   force situation, where they need the emergency

24   air, you're not talking about, hey, I need a tow

25   truck for this car.  We go to talk channel to do



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1  that work.  That's basically that we can

2  communicate back and forth without interrupting

3  the activities of the dispatch.  DIU channel is,

4  like I said, we get a stolen car from a particular

5  district, we'll call detectives in that district

6  and say, "hey, look, we recovered a stolen car

7  from your district, can you go to DIU channel."

8  They'll call DIU channel, give them the specifics;

9  "we found this car parked on the side of the road,

10  ran the plate, it was stolen.  We learned it was

11  stolen out of y'all district under this item

12  number, and we're recovering it.  Do y'all want to

13  do anything with it?  Have y'all had any other

14  instances with this vehicle, robberies or

15  burglary, anything with this car?  Y'all might

16  want to take it for evidentiary purposes, or can

17  we just release it to the owner versus towing it

18  to the tow yard?  Do you want to come get it and

19  bring it to NOPD's evidence cage?"

20        Q.    Are there any state police frequencies

21  that are used when working in New Orleans?

22        A.    They typically use B dispatch 2.

23        Q.    That refers to the Troop B dispatch?

24        A.    Yes, Troop B dispatch 2.  Again, like I

25  said, they usually use that as a talk-around



channel, just so they won't interrupt the normal

flow of dispatching and officers conducting

business.

        Q.    Okay.  When you were with Troop B, did

you have a radio?

        A.    Yes.

        Q.    Was that a radio in the vehicle?

        A.    I had two radios; portable radio and

mobile radio.

        Q.    When you were with working with Troop N

or the Criminal Enforcement Detail, did you have a

radio?

        A.    Yes.

        Q.    Okay.  What kind of radio is that?

        A.    Portable and mobile radio.  I was riding

with -- depends if you're riding with somebody.

Some of the pool cars they have don't have mobile

radios, you only have a portable.

        Q.    You would always have a portable radio,

correct?

        A.    Yes.

        Q.    And maybe sometimes --

        A.    That's the radio we carry on our gun

belt.  The mobile radio is the ones that's

actually physically mounted to the vehicle.



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

1      Q.    In your work now with narcotics, do you
2    carry a radio?
3      A.    Yes.
4      Q.    Is that a portable radio?
5      A.    Portable radio.
6      Q.    Have you ever used a cell phone for
7    state police communications?
8      A.    No, ma'am.
9      Q.    Okay.
10     A.    I've been in police too long to do that.
11   I know better than that.
12     Q.    Do you have a cell phone that you use
13   now in your narcotics work?
14     A.    No.
15           MRS. WASHINGTON:  Okay.  I'm going to
16           ask you about a document that I am going
17           to label Exhibit 59.
18           (EXHIBIT 59 MARKED FOR IDENTIFICATION)
19   EXAMINATION BY MRS. WASHINGTON:
20     Q.    This form, at the top, says "Department
21   of Public Safety and Corrections Cellular Program
22   Enrollment;" is that correct?
23     A.    Yes.
24     Q.    It appears to be a request from Trooper
25   Troy A. Pichon, in the beginning of 2018, for a



```
 1    stipend to use your personal cellular device for
 2    purposes of your duty as a state police
 3    investigator; is that correct?
 4         A.    Yes.
 5         Q.    Okay.  What is this form?
 6         A.    That form is to get a reimbursement from
 7    the department for communication between you and
 8    your supervisor while you are on duty for any
 9    particular reason.
10         Q.    Okay.  So do you have a cell phone that
11    you use for work purposes?
12         A.    No.  You're talking about as far as
13    enforcement purposes or for personal use?
14         Q.    Well, I'm reading, I guess, the
15    narrative on this cellular program enrollment.
16    And it says, "my cellular device is used on and
17    off duty to fulfill my duties as a Louisiana State
18    Police investigator."  It goes on to talk about
19    supervisors contacting a person while in the
20    field, dispatching assignments, receiving updates
21    on those assignments, requesting support and
22    specialized units to assist in those
23    investigations.  I'm asking whether or not the
24    Louisiana State Police has provided you with this
25    stipend to use a cell phone as part of your duties
```

```
 1    as a state police investigator?
 2         A.   See, I'm in narcotics, so we work --
 3    we're on call.  So if I'm on call, they have -- I
 4    don't have my radio on, so they have to call me on
 5    my cell phone, say, "hey, we got a call-out, we
 6    need you to report to Troop B.  They stopped a car
 7    with 10 kilos of heroine in it."
 8              "All right, I'm en route."
 9         Q.   So you do have a personal cell phone?
10         A.   Yes.
11         Q.   And the state police provides you with a
12    stipend to offset business costs of that personal
13    cell phone; is that correct?
14         A.   Not anymore.
15         Q.   Okay.
16         A.   They did at one particular time, but
17    they don't take it out of my check anymore.  You
18    need to update this form every so often, and it
19    wasn't worth it.
20         Q.   Do you remember how long you were
21    receiving a stipend from the state police?
22         A.   No.
23         Q.   Do you remember if it was more than 6
24    months?
25         A.   I don't remember.
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Q. The cell phone that you had at the time of this request form that we're looking at --
A. Yes.
Q. -- is that still the cell phone that you have?
A. No.
Q. Okay. Is the number the same?
A. No.
Q. Okay. Do you remember when you changed cell phone numbers?
A. I've been done got rid of that phone. It's been a while.
Q. Okay. I'm going to show you what was --
MR. FAHRENHOLT: Are we transitioning?
MRS. WASHINGTON: We are transitioning.
(RECESS 11:39-11:46 A.M.)
EXAMINATION BY MRS. WASHINGTON:
Q. I am going to show you a document that was previously marked as Exhibit 41. The top of this document is "P.O. 1109 MDT, MVR internet/intranet."
A. Yes.
Q. And it's kind of a lengthy policy, but it appears to deal in part with mobile video audio recording equipment; is that correct?

1    A.    Yes.

2    Q.    And mobile video audio recording

3 equipment would include what people like me would

4 refer to as dash cameras; is that correct?

5    A.    Yes.

6    Q.    What is your understanding of when a

7 dash camera should be used?

8    A.    It's supposed to be used -- well, I

9 wouldn't say supposed -- but during any stop or

10 any vehicles or any other stop that you may

11 initiate while on duty.

12    Q.    Okay.  Were you provided with training

13 on use of a dash camera by the state police?

14    A.    Yes.

15    Q.    When did you receive that training?

16    A.    During FTO training.

17    Q.    So when you were doing the Troop B road

18 patrol activities; is that correct?

19    A.    Yes.

20    Q.    Okay.  And I'm looking at the top of the

21 second page of that exhibit, which is page Number

22 333.  It indicates officers operating patrol

23 vehicles equipped with recording equipment shall

24 record all traffic stops, pursuits, arrests and/or

25 incidents.



1    A.   I'm sorry, where are you reading at?

2    Q.   I'm sorry, I'm on the second page of the

3    exhibit, the very top paragraph where it says,

4    "officers operating patrol vehicles equipped with

5    recording equipment shall record all traffic

6    stops, pursuits, arrests and/or incidents.

7    Officers shall also record other events,

8    situations and circumstances, including but not

9    limited to armed encounters, acts of physical

10   violence and felonious activity;" is that correct?

11   A.   Yes.

12   Q.   That's your understanding of when a dash

13   camera should be activated?

14   A.   Yes.

15   Q.   Okay.  What vehicles have you been

16   issued while with Louisiana State Police?

17   A.   I had -- when I first got out of the

18   academy, I had Crown Victoria, Ford Crown

19   Victoria, and I was issued a Chevy Tahoe, and then

20   I had a Dodge Durango unmarked vehicle.  I am

21   currently driving a black Dodge Charger.

22   Q.   Is the Charger marked?

23   A.   No, ma'am.  It's unmarked.

24   Q.   The first two vehicles that you

25   mentioned, the Crown Victoria and the Tahoe, were

1   both of those marked vehicles?

2        A.   Yes.

3        Q.   When did you change to the unmarked

4   vehicles?

5        A.   When I went to narcotics.

6        Q.   Okay.  The Crown Victoria and the Chevy

7   Tahoe, the two marked units that you had, were

8   those equipped with dash cameras?

9        A.   Yes.

10       Q.   Okay.  Have either of your unmarked

11  units been equipped with dash cameras?

12       A.   No.

13       Q.   Okay.  Do you know in general if there

14  are unmarked units that are equipped with dash

15  cameras?

16       A.   I'm not sure.

17       Q.   Okay.  Do you know of anyone with an

18  unmarked unit that has a dash camera?

19       A.   Not in my unit.

20       Q.   Okay.  The unmarked Durango that you

21  had, was it equipped by the state police in any

22  kind of way?

23       A.   It was a state police vehicle.

24       Q.   Okay.  It didn't have any markings on

25  the outside?



1    A.    No.

2    Q.    Did it have lights?

3    A.    Yes.

4    Q.    Did it have a siren?

5    A.    Yes.

6    Q.    But no camera?

7    A.    No camera, no decals.

8    Q.    Okay.  And the Charger that you have

9    currently, it is also unmarked?

10          (OFF-THE-RECORD DISCUSSION)

11   Q.    The Charger that you have now, is it

12   equipped with lights?

13   A.    Yes.

14   Q.    Does it also have a siren?

15   A.    Yes.

16   Q.    But it has no decals?

17   A.    No decals.

18   Q.    And no camera?

19   A.    No camera.

20   Q.    I'm going to show you what was

21   previously marked as Exhibit 17.  The top of this

22   document reads "P.O. 1117, body worn cameras;" is

23   that correct?

24   A.    Yes.

25   Q.    This is the state police's policy on



1   body-worn cameras, correct?

2          A.    Appears to be, yes, ma'am.

3          Q.    Okay.  The effective from date at the

4   top of the first page of this document is

5   January 24th, 2017; is that correct?

6          A.    Yes.

7          Q.    Are you aware of any body-worn camera

8   policy that existed prior to this effective date?

9          A.    No, ma'am.

10         Q.    Okay.  So this, to your knowledge, is

11  the first state police policy on body-worn

12  cameras?

13         A.    To my knowledge, yes.

14         Q.    Okay.  Have you received training from

15  the state police on use of body-worn cameras?

16         A.    No.

17         Q.    Okay.  Have you been issued a body-worn

18  camera?

19         A.    No.

20         Q.    Have you received any information about

21  when a state police trooper with a body-worn

22  camera would activate that device?

23         A.    No.

24         Q.    Did you have a body-worn camera when you

25  were with NOPD?



866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    A.    Yes.

2    Q.    Okay.  How many years at NOPD did you

3  have a camera?

4    A.    Probably my last year.

5    Q.    Your last year?

6    A.    Yes.

7    Q.    Okay.  What was your training like at

8  NOPD on the use of that camera?

9    A.    They had -- the people that issues the

10  camera and deals with all the stuff, they came

11  actually and showed us how to use the cameras,

12  activate them, turn them off, when they're on

13  standby mode and all that kind of stuff.

14    Q.    Okay.  Where did you wear the body-worn

15  camera on your body when you were with NOPD?

16    A.    In the center of my chest, in my

17  uniform.

18    Q.    Is that something that you wore on a

19  daily basis for the year that you had it?

20    A.    Yes.  I don't even think it was the

21  whole entire year.  After I got shot, I was out 6

22  months.  We got issued the body cameras when I was

23  out.  When I came back to work, that's when I

24  actually started to use it for the few months I

25  was with NOPD, before going to state police.



1   Q.   Were you provided with any information

2   as to why NOPD was starting to issue body-worn

3   cameras?

4   A.   To my knowledge, it was a tool that they

5   were implementing to further assist with

6   investigations, protecting the officers or

7   protecting the general public from officers that

8   were probably doing some wrongdoing.

9   Q.   Okay.  Is it your understanding that

10  there are members of the state police who have

11  been issued body-worn cameras?

12  A.   Yes.

13  Q.   Okay.  Have you ever worked with other

14  officers who were wearing body-worn cameras?

15  A.   I haven't -- yes.  Yes, I have.

16  Q.   Okay.  In what capacity was that?

17  A.   In a patrol.  We were out patrolling,

18  and person that I was with had a body-worn camera.

19  Q.   Where was that patrol happening?

20  A.   French Quarter, New Orleans.

21  Q.   So with your Troop N work; is that

22  correct?

23  A.   As I was working overtime.

24  Q.   Okay.  Were you in narcotics at that

25  point in time?



1    A.   Yes.

2    Q.   But working an overtime shift in the

3  quarter?

4    A.   Yes.

5    Q.   Okay.  Did that officer that you were

6  with, that had the camera, activate the camera

7  during that patrol?

8    A.   Yes.

9    Q.   Do you remember why it was activated?

10   A.   We probably stopped the vehicle, or we

11  did some other kind of enforcement action, where

12  he turned it on.  And when we done, turned it off.

13   Q.   Okay.  Does anyone in narcotics have a

14  body-worn camera?

15   A.   No.

16   Q.   Okay.  Does anyone, I guess, in the

17  Bureau of Investigations generally have a

18  body-worn camera?

19   A.   I'm not sure.

20   Q.   Okay.  But not in your unit?

21   A.   Not in my unit.

22   Q.   Okay.  I'm going to show you a document

23  that was previously marked as Exhibit 18.  The top

24  of this document is "P.O. 1112, pursuit/road

25  block."  Actually, misspelled, it's "pusuit," but



1    I believe it's supposed to be pursuit.  And this
2    appears to be a policy dealing with pursuits and
3    road blocks; is that correct?
4         A.    Yes.
5         Q.    This is the state police policy on
6    pursuits and road blocks?
7         A.    Yes.
8         Q.    Is it your understanding that this
9    policy deals with vehicular pursuits?
10        A.    Yes.
11        Q.    Okay.  Is there any other state police
12   policy that deals with foot or pedestrian
13   pursuits?
14        A.    Not to my knowledge.
15        Q.    Okay.  Are foot pursuits covered in this
16   policy, to your knowledge?
17        A.    Doesn't appear to be.
18        Q.    Okay.  You mentioned before when we were
19   talking about NOPD and the state police, that you
20   received training from the state police on
21   pursuits?
22        A.    Yes.
23        Q.    Okay.  When did that training occur?
24        A.    I'm not sure.  Sometime during my cadet
25   phase where I was in training academy.



1      Q.    So as part of the academy training?

2      A.    Yes.

3      Q.    Did you receive further training as part

4    of the FTO program?

5      A.    As far as pursuits?  If we were actually

6    involved in one, yes, they kind of explained to me

7    what happened.

8      Q.    If it came up --

9      A.    Yes.

10      Q.    -- when you were with your FTO?

11      A.    Yes.

12      Q.    Have there been any in-service trainings

13    with the state police having to do with pursuits?

14      A.    Yes.

15      Q.    Okay.  What topics were covered in those

16    in-service trainings?

17      A.    Like I said, it varies from year to

18    year.  Rolling road blocks, might do spike strip

19    application deployment, may do just basic

20    pursuits, stopping at intersections, checking up,

21    make sure you don't just blow red lights behind a

22    subject, that type of stuff.

23      Q.    Okay.  And you mentioned previously that

24    the NOPD pursuit policy differs from the state

25    police pursuit policy; is that correct?



1    A.   Yes.

2    Q.   What is your understanding of the NOPD

3  pursuit policy?

4    A.   Well, it's changed since I was last

5  there.  So I don't know what their current policy

6  is as far as pursuits are concerned.  As far as my

7  understanding, is that they cannot pursue any

8  vehicle for nothing less than violent felony

9  crime.

10    Q.   Okay.  When you were with NOPD, what was

11  their pursuit policy?

12    A.   I'm not exactly sure.  I can't remember.

13    Q.   Okay.  What is the Louisiana State

14  Police's policy on when you can initiate a

15  pursuit?

16    A.   It varies.  It's basically discretion.

17  It's up to the discretion of the trooper and the

18  supervisors involved in the situation, you know.

19  There's a number of factors involved with

20  initiating the pursuit and terminating the

21  pursuit, so. . .

22    Q.   Can you -- I guess I'm trying to

23  understand the difference that you highlighted

24  between the NOPD policy, as you understand it, and

25  the state police policy.  Can you tell me a little

1    bit about what's different about a state police

2    policy?

3         A.    State police does allow you to pursue

4    for property crimes, stolen vehicles, that sort of

5    thing.  NOPD, according to my knowledge, don't

6    have -- they don't want you to pursue anything,

7    nothing less than somebody that shot and killed

8    somebody or armed robbery, something to that

9    nature.  It got to be a violent felony.

10               MRS. WASHINGTON:  Okay.  I'm going to

11               show you a document that I am marking as

12               Exhibit 60.

13               (EXHIBIT 60 MARKED FOR IDENTIFICATION)

14    EXAMINATION BY MRS. WASHINGTON:

15         Q.    The top of this document says

16    "eligibility for permanent status."  Do you

17    recognize this form?

18         A.    No, ma'am.

19         Q.    Okay.  It's dated October 6, 2016, and

20    references Troy Pichon; is that correct?

21         A.    Yes.

22         Q.    Okay.  Am I correct in understanding

23    that when you're initially hired by the state

24    police, there's some probationary status period?

25         A.    Yes.



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

1    Q.    Okay.  What is your understanding of
2  probationary versus permanent status?
3    A.    Probationary status just means within a
4  certain timeframe, if you have any infractions or
5  any situations where the department feels that
6  they need to part ways with you, that you won't
7  be -- you won't be protected through any of the
8  civil service or state police commission rules
9  governing permanent status employees.
10    Q.    Okay.  And looking at the document that
11  I just handed you, there's a box that's checked
12  next to "recommend permanent status effective,"
13  and it's dated November 29, 2016; is that correct?
14    A.    Yes.
15    Q.    Do you recognize that date or, I guess,
16  approximate date as when you received permanent
17  status with the state police?
18    A.    I don't recognize it, but if they have
19  it on there, I tend to believe it's accurate.
20    Q.    Okay.  Were you informed of when you
21  achieved permanent status with the state police?
22    A.    It's typically from 2 years from the
23  date of hire.
24    Q.    Okay.
25    A.    So November 29th, would have been about



 1    right --
 2         Q.    That's right.  Because you started --
 3         A.    -- from 2014.
 4         Q.    That makes sense.  One last question on
 5    the state police pursuit policy, as you understand
 6    it.  You mentioned being able to pursue for
 7    property crimes.  Does the state police also
 8    provide for pursuits for drug offenses?
 9         A.    Depends, yes.
10         Q.    Okay.  What about traffic or --
11         A.    Traffic violations?
12         Q.    -- vehicle violations, correct?
13         A.    Like I said, up to the individual
14    trooper and the supervisor on duty at the time.
15         Q.    But there would be some circumstances
16    having to do with traffic or vehicle?
17         A.    Yes.  Like I said, it's a number of
18    things that goes into a vehicle pursuit that the
19    supervisor and individual trooper himself looks at
20    to determine whether it's worth pursuing this
21    vehicle versus terminating it and just letting it
22    go.
23         Q.    Okay.  You are aware that we're all here
24    doing this deposition because of a lawsuit that
25    has to do with an arrest that occurred in June of



1  2017, correct?

2      A.   Yes, ma'am.

3      Q.   I want to talk for a minute about some

4  of the state police's operations in New Orleans in

5  that time period, June of 2017.

6      A.   Okay.

7      Q.   Okay.  What is your knowledge of what

8  the state police's presence was in New Orleans in

9  2017?

10     A.   Basically, state police role was to

11 assist NOPD with manpower issues in the French

12 Quarter.  NOPD was having trouble with retaining

13 officers and having an established presence in the

14 French Quarter.  You might have two officers

15 working any given time, which wasn't enough to

16 cover the entire French Quarter.  So supplement

17 that with state police, you have more officers in

18 the area to assist with answering code 2 calls and

19 just providing a police presence in the area, to

20 keep crime down in the French Quarter.

21     Q.   Okay.  I'm going to show you a document

22 that was previously marked as Exhibit 11.  The

23 first page says "cooperative endeavor agreement,"

24 and is dated September of 2015.  Have you seen

25 this document before?



1        A.    No, ma'am.

2        Q.    Are you aware of any agreement between

3    the City of New Orleans and the Louisiana State

4    Police?

5        A.    Well, I was aware that there was some

6    type of agreement in place, but I wasn't sure of

7    the details or anything that was pertained in this

8    agreement.

9        Q.    Okay.  I know you said that you have not

10    seen this document before, but I want to flip to

11    the last two pages just to ask about your

12    understanding of a couple of terms that are used

13    in this document.  Looking at page 16 of the

14    document, if you look under section B, which says

15    "obligations of the state through the

16    superintendent of LSP," under B1, it says,

17    "provide as many full-time LSP officers as

18    possible based on revenue collected by the

19    district, but no less than 15 officers at given

20    time for proactive patrols under this agreement,

21    as assigned by their supervisor or commander for a

22    period of 5 years, beginning on January 1st,

23    2016," correct?

24        A.    Yes.

25        Q.    This uses the phrase "proactive



```
 1   patrols."  And I believe you mentioned that phrase
 2   earlier today; is that correct?
 3       A.   Yes.
 4       Q.   Remind me what your understanding of a
 5   proactive patrol is.
 6       A.   It's basically going out curbing crime
 7   before it happens, looking for guns before they
 8   get the chance to rob anybody or shoot anybody
 9   with that gun, stop a narcotics transaction before
10   somebody get ahold of a bad bunch of heroine and
11   kill a bunch of tourists visiting the city, that
12   sort of thing.
13       Q.   Are these patrols vehicle patrols?
14       A.   It could be varied, foot patrol, vehicle
15   patrol.
16       Q.   It could be both?
17       A.   Yes.
18       Q.   Okay.  On page 17, which is the last
19   page of that document, I'm looking at Number 9,
20   which says, "ensure that detail officers are
21   trained to handle public safety situations that
22   are specific to a tourist-dense French Quarter and
23   educated on the city code ordinances that are
24   pertinent to patrolling in the district."
25       A.   Yes.
```



1    Q.   I'm wondering if you received training,
2  like that mentioned in part 9, about public safety
3  situations in the tourist-dense French Quarter
4  from the state police, when you were working with
5  Troop N?
6    A.   From NOPD, I did.  State police -- like
7  I said, I'm from New Orleans.  So I didn't
8  really -- I understood the French Quarter.  I've
9  been there my whole life.  So if they did offer
10  any training, like I said, it wasn't issued to me.
11  I didn't get it.
12    Q.   So you didn't receive any training on
13  your work in the French Quarter?
14    A.   No, not from state police.
15    Q.   Okay.  Do you know if any other state
16  police troopers received training for work in the
17  French Quarter?
18    A.   I'm not sure.
19    Q.   Okay.  We were looking at state police
20  policies previously.  Were there any modifications
21  that were made to the regular state police
22  policies for your work in the French Quarter?
23    A.   I'm not sure.
24    Q.   Okay.  Are you aware of any
25  modifications to the policies related to working



1  in the French Quarter?

2      A.   I know just with pursuits in particular,

3  in the French Quarter itself, there's -- no, they

4  do not pursue vehicles within the confines of the

5  French Quarter, just because of the high volume of

6  pedestrian traffic.  So a vehicle takes off in the

7  French Quarter at any particular high-traffic

8  time, we will not pursue that vehicle.

9      Q.   Okay.  How were you informed about that

10  French Quarter pursuit policy?

11      A.   Supervisor basically was, like, if

12  you -- do not initiate a pursuit within the French

13  Quarter.  If you do, we will terminate.

14      Q.   Okay.  So this was instruction that you

15  received from supervisors overseeing your work in

16  the French Quarter?

17      A.   Yes.

18      Q.   Okay.  Were there any other

19  modifications that you remember specific to

20  working in the French Quarter?

21      A.   Not to my knowledge.

22      Q.   Okay.  Do you remember when you received

23  that instruction about no pursuits in the French

24  Quarter?

25      A.   Somewhere along the time when I was

1    assigned to the French Quarter.

2        Q.   Okay.  Would you have received that

3    instruction during a briefing of some sort?

4        A.   Maybe at roll call.

5        Q.   Okay.  And roll call would have been --

6        A.   Pre-shift meeting.

7        Q.   Where does that take place?

8        A.   At troop office, Troop N office.

9        Q.   Okay.  So other than that change to the

10   pursuit policy to not pursue in the quarter --

11       A.   I don't think it was a change to the

12   policy.  Supervisors have the authority to

13   terminate a pursuit at any time they feel

14   necessary.  And they are -- they made it specific

15   that they would not let a pursuit go on in the

16   French Quarter with all the pedestrian traffic.

17   So, like, before you even start a pursuit, just

18   kill it, because if you start one, I'm going to

19   kill it.

20       Q.   So it was just instruction you were

21   provided?

22       A.   Well, it wasn't instruction.  It was

23   just, basically, if you start one, I'm going to

24   tell you no, so don't do it.

25       Q.   But otherwise, when you were working



1    with Troop N in the French Quarter, you were

2    operating under Louisiana State Police policies?

3         A.    Yes.

4         Q.    Okay.  I'm going to show you what was

5    previously marked as Exhibit 13.  The front page

6    says "Louisiana State Police New Orleans Criminal

7    Enforcement Detail," and has dates from March 2015

8    through December 2015; is that correct?

9         A.    Yes.

10        Q.    Have you seen this document before?

11        A.    Let me look through it a second.

12        Q.    Sure.

13        A.    Yes.  I was provided with this document

14   before.

15        Q.    Okay.  Do you remember when you were

16   provided with the document?

17        A.    At some point when I started working

18   Troop N, they gave me a copy of this.

19        Q.    Okay.  Do you remember if you were

20   working with Troop N during the time period that's

21   on this front cover page, in 2015?

22        A.    I can't remember.

23        Q.    Okay.  What is your understanding of how

24   the term "Troop N" and the term "NOCED" relate to

25   each other; are they the same?



1    A.   Yes, for the most part.  Like I said,
2  it's just a play on words, New Orleans Criminal
3  Enforcement Detail versus Troop N.  I don't know.
4  Maybe it's just their preference, what they call
5  it, I don't know.
6    Q.   Okay.  So you received this plan when
7  you started work with Troop N?
8    A.   Yes.
9    Q.   Did you receive any other operational
10  plans during the time you've worked with Troop N?
11    A.   Only during special events.
12    Q.   Okay.  What kinds of special events
13  would have operational plans?
14    A.   Mardi Gras, French Quarter Fest.  We got
15  a million festivals, so you take your pick.  So
16  any one that came through the French Quarter that
17  we were possibly assisting NOPD with, provide
18  security for, had an operational plan.
19    Q.   Okay.  Do you remember if there was any
20  special event or special operational plan in place
21  in June of 2017?
22    A.   I'm not sure.
23    Q.   Okay.  Do you remember Operation Summer
24  Heat that was in effect during 2017?
25    A.   Yes, I remember that.



866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1      Q.   Did you participate in that operation?

2      A.   No.

3      Q.   Okay.  Do you know what the relative

4  dates of that operation would have been?

5      A.   I know it was during the summertimes,

6  summer dates.  I'm not sure of the exact date,

7  timeframe.

8      Q.   Okay.  You mentioned being with Troop B

9  to begin with.

10     A.   Yes.

11     Q.   And then you mentioned being with Troop

12  N following that; is that correct?

13     A.   Yes.

14     Q.   Were you permanently assigned to Troop

15  N?

16     A.   Yes.

17     Q.   Okay.  Do you know the approximate dates

18  of your permanent assignment with Troop N?

19     A.   No, ma'am.

20     Q.   Okay.  How would I find out that

21  information?

22     A.   I'm sure they have -- should have it in

23  state police records somewhere.

24     Q.   Okay.  So there would be some notation

25  in your records of when you were --



1     A.   Trooper assignment, yes.

2     Q.   So for some period of time, you were

3 permanently assigned to Troop N?

4     A.   Yes.  Now, I'm not sure, since Troop N

5 is its own animal, if they still have me listed as

6 Troop B and just loaned me to Troop N.  I don't

7 know how they work that.

8     Q.   Okay.  At some point, you were then

9 permanently assigned to narcotics; is that

10 correct?

11     A.   Yes.

12     Q.   Okay.  And once you were permanently

13 assigned to narcotics, you were no longer

14 permanently assigned to Troop N?

15     A.   No, ma'am.

16     Q.   Okay.  Since being with narcotics, have

17 you still worked overtime with Troop N?

18     A.   Yes.

19     Q.   Okay.  How do those Troop N overtime

20 shifts work?

21     A.   They give you a list of dates available,

22 the time slots, and they only have a specific

23 number of positions available, and you're able to

24 put your name in.  They'll let you know -- you

25 know, once they fill up the slots, then they shut



1    it off to anybody else signing up for that

2    particular date that slots were available.

3        Q.    So you basically sign up or volunteer

4    for an overtime shift that's available?

5        A.    Yes.

6        Q.    Okay.  When you were permanently

7    assigned to Troop N, what were your duties and

8    responsibilities?

9        A.    Patrol the French Quarter, like I said,

10   proactive patrol, assist in NOPD code 2 calls,

11   respond to citizen complaints, that sort of thing.

12       Q.    Okay.  And when you work these overtime

13   shifts with Troop N, what are your duties during

14   those overtime shifts?

15       A.    Same.  Yes, same.

16       Q.    Okay.  When you report for one of these

17   Troop N overtime shifts, is there any kind of

18   shift briefing that happens?

19       A.    Yes.

20       Q.    Okay.  What happens during a shift

21   briefing?

22       A.    You go over the events of the previous

23   shift, if there was something that needed to be

24   relayed to -- you know, like, if they were having

25   a rash of armed robberies in the quarter, they



1  give us a description.  If NOPD provided a photo

2  of a particular subject wearing a particular type

3  of clothing, they'll provide a photo to everybody,

4  so we'd be on the lookout for the subject, or if

5  some kind of threat or some kind of incident going

6  on or some kind of special assignment that was

7  going on, they'll relay that information.  Just

8  take roll to make sure everybody was currently

9  there and on time.

10        Q.   And at those briefing sessions, were you

11  provided with information about who else was

12  working on that shift?

13        A.   Other than just seeing them next to you,

14  and then they paired you up with another trooper.

15  You rode two-man units in Troop N.

16        Q.   That pairing would happen at --

17        A.   At the briefing, yes.

18        Q.   Okay.  You mentioned previously that you

19  weren't provided with any training prior to

20  working in New Orleans by the state police; is

21  that correct?

22        A.   What type of training?

23        Q.   Any type of specialized training based

24  on being assigned to work in the French Quarter.

25        A.   What type of specialized training?



```
 1        Q.    Any training.

 2        A.    Being a police officer.

 3        Q.    Okay.

 4        A.    I mean, I don't know -- I don't see what

 5   kind of specialized training you need policing the

 6   city, especially me having 5 years with NOPD.

 7        Q.    Okay.  I'm just asking whether or not

 8   the state police provided any training when you

 9   were assigned to Troop N.

10        A.    I don't think there's no special

11   training for Troop N.

12        Q.    When you work overtime with Troop N, and

13   an arrest occurs or an incident occurs, what type

14   of reporting or documentation do you do to record

15   that event?

16        A.    Like, when we're booking somebody into

17   the jail?

18        Q.    Sure.  I'm just wondering when you're

19   working with Troop N and, let's say, an arrest is

20   made.

21        A.    You do a New Orleans Police Department

22   face sheet and gist.  That's for booking purposes.

23   Then we do LSP report, state police report, on

24   that incident, forward it to the district

25   attorney's office.
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    Q.   So for each arrest that would occur when

2  you're working with Troop N, both would be the

3  NOPD face sheet and gist for booking and then a

4  separate LSP report; is that correct?

5    A.   Yes.

6    Q.   You mentioned that when you work with

7  Troop N, you're paired up with another officer; is

8  that correct?

9    A.   Yes.

10    Q.   So --

11    A.   Most of the overtime guys.

12    Q.   So if there's two officers involved in

13  an arrest or even more than two officers involved

14  in an arrest, how is it determined who's going to

15  write up those reports and paperwork that you just

16  described?

17    A.   It's basically up to those two officers,

18  who decide to write the report.

19    Q.   Are there timelines by which you're

20  supposed to author those reports?

21    A.   Yes.

22    Q.   Okay.  What are the timelines?

23    A.   It's reasonable time forwarded to the

24  district attorney's office for screening.  It

25  varies case to case.  So there's no set, you need




1    to have in by this many days, I believe.  Like I

2    said, as long as you get it in a reasonable time,

3    or the DA's office will call and be looking for

4    it.

5         Q.   You indicated that the NOPD face sheet

6    and gist is something that is needed for booking

7    the person into the jail?

8         A.   That's for booking purposes and for

9    determining the bond, magistrate and the defense

10   attorney at the bond hearing, something to go on

11   as far as the facts that ultimately led to the

12   arrest of that person.

13        Q.   So that's a report that would be

14   prepared when the person is being booked into the

15   jail?

16        A.   Yes.  Like I said, they call it a gist,

17   because it's just a brief narrative of the events

18   leading up to the arrest.

19        Q.   Okay.  If a use of force occurs while

20   you're working with Troop N, what sort of

21   documentation is produced of that incident?

22        A.   As far as you have to do a use-of-force

23   report, state police database.

24        Q.   Okay.

25        A.   And if you send them to the hospital,



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond, LA  70404   Fax 985.419.0799

1    you get paperwork from the hospital once they

2    release the subject.

3         Q.   Okay.

4         A.   In Orleans Parish Jail, if you tase

5    somebody or use force on anybody, they will not

6    accept them.  So you have to take them to the

7    hospital.

8         Q.   The state police use-of-force report

9    that you just mentioned, is there a timeline for

10   completing that report following any use of force?

11        A.   I believe so.

12        Q.   Okay.  What is your understanding of the

13   timeline?

14        A.   I'm not -- I can't remember at this

15   point in time.  I know it's a timeframe you have

16   to have it done.  I believe by the end of your

17   shift or at least before the beginning of your

18   next shift.

19        Q.   Okay.  The NOPD face sheet and gist that

20   you discussed, those are forms that NOPD created?

21        A.   Yes.

22        Q.   Okay.  When you're working with the

23   state police and Troop N, how do you access those

24   NOPD forms?

25        A.   We have electronic or hard copies of the



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    forms.

2         Q.    Okay.

3         A.    We could go to 8th District Station if

4    we don't have any.

5         Q.    Did you receive training from the state

6    police on using those NOPD forms?

7         A.    Yes.

8         Q.    Okay.

9         A.    Which I already knew how to use it, so I

10   didn't pay no attention to it.

11        Q.    What did the training, to the extent

12   that you remember any of it, consist of?

13        A.    It showed you how to fill out the forms

14   correctly and what the district attorneys look for

15   in these forms and what to put in the particular

16   boxes for the forms.  I probably had a hand in

17   training a few people myself on how to use it.

18        Q.    Okay.  The NOPD forms have item number

19   associated with them; is that correct?

20        A.    Yes.

21        Q.    And that's an NOPD item number?

22        A.    Yes.

23        Q.    And then the state police report would

24   also have an item number; is that correct?

25        A.    Yes.



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1       Q.   And that's an LSP item number?

2       A.   Well, it's report number.  Then you --

3 somewhere in the report, you put the LSP item

4 number in there, and you reference the NOPD item

5 also in your report.

6       Q.   Okay.  After you complete the NOPD face

7 sheet and gist for an arrest, what happens, like

8 physically happens, to those documents?

9       A.   You bring them to the jail.  You bring

10 the arrested person to the jail.  You turn those

11 documents over to the sheriff's office, who

12 creates a file for that subject.  I guess -- I'm

13 not sure how they operate, but they forward that

14 information to the district attorney's office,

15 like I said, for bond hearings and that sort of

16 thing.

17       Q.   Does the state police maintain a copy of

18 those face sheets and gists?

19       A.   I maintain a copy of it myself.  I'm not

20 sure what other troopers do.  I make a copy of it

21 for myself.

22       Q.   What do you do with the copies that you

23 make?

24       A.   Attach it to my LSP report.

25       Q.   Is that maintained electronically?

1      A.    No.  Hard copy.

2      Q.    Okay.  Are you familiar with the New

3   Orleans Police Department consent judgment?

4      A.    Consent decree?

5      Q.    Yes.

6      A.    I'm somewhat familiar with it.

7      Q.    Okay.  You're aware that there is one?

8      A.    Yes.

9      Q.    Okay.  Were you with the police

10  department when the consent decree was issued?

11     A.    The beginning phases of it.

12     Q.    Okay.  What was your understanding at

13  the time you were with NOPD and it was entered

14  about what the consent decree was?

15     A.    I think it was a good thing for the

16  department.  It definitely had a lot of stuff that

17  NOPD needed to change and some forward-thinking

18  ideas that they recommended.  So I thought it was

19  a good deal, especially the body-worn cameras.

20  That was a big relief for me, getting all those

21  complaints, where I was able to document on my

22  body camera some of the events that people were

23  claiming happened didn't happen.  So that saved me

24  a lot of grief as far as having complaints and

25  stuff with the department.

1    Q.   So is it your understanding that as a

2  result of the consent decree, that NOPD changed

3  some of their policies and practices?

4    A.   Yes.

5    Q.   Okay.  Do you remember if you were

6  provided --

7    A.   They were court-ordered changes, but I

8  don't think they wanted to change them.  Like I

9  said, some of the policies that were changed

10  needed to be changed.

11    Q.   But there were changes?

12    A.   Yes, court-ordered changes.

13    Q.   Were you provided with copies of

14  policies that had been changed when you were at

15  NOPD?

16    A.   I can't remember.

17    Q.   Okay.  Do you --

18    A.   I'm pretty sure we did, but it's vague

19  memory at this point.

20    Q.   Okay.  Do you remember receiving any

21  training that related to policies that had been

22  changed because of the consent decree?

23    A.   Yes.  When they started implementing

24  changes, we were notified, and we actually had to

25  sign off, I believe, on those policies, saying



1  that we read them.

2       Q.   Okay.  You just mentioned the body-worn

3  cameras.  Did you have any other experiences when

4  you were at NOPD where you felt like the consent

5  decree changed the way that you practiced your

6  policing duties?

7       A.   Yes.  Like I said, just the change of

8  policies.  You got to change.  You can't continue

9  doing the same thing you were doing with different

10  policies in place.  So, of course, we had to adapt

11  and change related -- as it related to the

12  policies that were put forth.

13       Q.   Okay.  When you were with NOPD and there

14  were these changes to policies, did you ever feel

15  that those changes restricted or inhibited your

16  ability to perform your law enforcement duties?

17       A.   No, ma'am.

18       Q.   Okay.  Do you know if there were other

19  officers that you worked alongside at NOPD who you

20  felt like the consent decree impacted their

21  ability to do their police work?

22       A.   They may have.  I'm not sure.

23       Q.   Okay.  Not to your knowledge?

24       A.   No, ma'am.  I didn't get involved in all

25  that.

1     Q.   Okay.  Since working with the state

2   police, have you received any information about

3   the New Orleans Police Department consent decree?

4     A.   No.

5     Q.   Okay.  Have you had any discussions with

6   anyone while at the state police regarding the

7   consent decree?

8     A.   Just friends that I have currently still

9   working for New Orleans Police Department.

10     Q.   Okay.  What have those discussions

11   consisted of?

12     A.   Just basically the changes in policies

13   versus from when we were police officers together

14   until now, just how a lot of things have changed.

15     Q.   Okay.  Have you had conversations with

16   anyone inside of the state police regarding the

17   NOPD consent judgment?

18     A.   No, ma'am.

19     Q.   Okay.  You said that you've talked to

20   people who are still at NOPD about the consent

21   judgment since you've been with the state police?

22     A.   Yes.

23     Q.   What is your current opinion on the NOPD

24   consent decree?

25     A.   Like I said, I think it was some changes



1  that needed to be made, some good changes to be

2  made.  So looking at it, like I said, seeing what

3  the department is now and the way they police, I

4  think it's a good deal that they're able to get

5  the trust of the community back with that

6  department and look forward, as far as policing is

7  concerned, and doing what's right for people.

8      Q.   Okay.  Did the entry of the consent

9  decree, while you were with NOPD, impact or

10 influence your decision to leave the department at

11 all?

12     A.   No, not at all.

13          MRS. WASHINGTON:  Okay.  I'm going to

14          move to a new chapter.  Do you want to

15          take a break now, or should we continue?

16          MR. FAHRENHOLT:  Let me get a status.

17          MRS. WASHINGTON:  We can go off the

18          record.

19          (RECESS 12:32-12:35 P.M.)

20 EXAMINATION BY MRS. WASHINGTON:

21     Q.   Like I said earlier, you're aware that

22 this lawsuit concerns an arrest of Zachary Terrell

23 that occurred in June of 2017, correct?

24     A.   Yes, ma'am.

25     Q.   And you were involved in that event?



1      A.    Yes, ma'am.

2      Q.    Do you remember the incident with

3  Mr. Terrell?

4      A.    Yes.

5      Q.    What was your assignment on the day that

6  this incident occurred?

7      A.    We were assigned to the French Quarter

8  area.  We had did our stint on Bourbon.  And me

9  and Trooper Roach had just went to the office, and

10  we had gotten something to eat.  So we had just

11  finished eating when we left the office just prior

12  to this situation.

13      Q.    This was one of those Troop N overtime

14  shifts that you were working?

15      A.    Yes, ma'am.

16      Q.    What time had your shift started?

17      A.    Typically started at 1800.

18      Q.    Okay.  And you mentioned having done

19  your stint on Bourbon.

20      A.    Yes.

21      Q.    What did you mean by that?

22      A.    Roll call starts at 6.  We typically get

23  out of roll call at 7.  We're assigned to Bourbon

24  Street from at least 6:30 to 7:00 until 10:00 p.m.

25  The NOPD promenade unit -- that's what they call



1   them -- promenade guys come out on Bourbon Street.

2   They're responsible for Bourbon Street from 10

3   until whenever their shifts are over.

4        Q.   Okay.  What do you do for the time that

5   you're on Bourbon Street?

6        A.   We're required to stay on Bourbon

7   Street.  We walk up and down the street.  And

8   whatever concerns the business owners have about

9   loitering or any kind of nuisance, if they're

10  having a complaint or somebody that's in the bar

11  that they want to get removed out of, we'll assist

12  them with that.  Just basic officer presence.

13       Q.   Okay.  Were you assigned that night to

14  all of Bourbon Street for those hours?

15       A.   It varies.  Sometimes depend on the

16  number of people working.  They'll say, all right,

17  you got from this block to this block, somebody

18  else have, you know, just go on.  So make sure

19  they have coverage throughout the whole strip of

20  Bourbon.  Sometimes it may be, like, we don't have

21  as many people working, we may just freely roam

22  throughout Bourbon.  We might walk from 100 block

23  to 800 block and back and forth.

24       Q.   You mentioned that you were with Trooper

25  Roach; is that correct?



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

 1      A.   Yes, ma'am.
 2      Q.   He was the officer that you had been
 3   partnered with for that shift?
 4      A.   Yes.
 5      Q.   Have you worked with Trooper Roach
 6   previously?
 7      A.   New Orleans, I'm not sure if we worked
 8   previously together with state police.
 9      Q.   Okay.
10      A.   I know with NOPD, he was assigned to the
11   SWAT team, and I was in the 6th District.  So we
12   never really particularly worked in the same unit
13   together.
14      Q.   Okay.  You knew of him when you were
15   with NOPD?
16      A.   Yes.
17      Q.   Okay.  What did you know about him,
18   aside from the fact that he was with SWAT, when
19   you were with NOPD?
20      A.   He was a breacher.  He was guy that
21   breached the doors for the SWAT team, and that he
22   was a boxer.  He's, like, the box.
23      Q.   Was there anything else that you knew or
24   heard kind of about his reputation when you were
25   both at NOPD?



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1    A.    Not really.  I mean, like I said, the
2    SWAT guys are real tightknit group, so they don't
3    really deal with too many outsiders.  I was kind
4    of comfortable with some of the guys, but they
5    never really discuss personal dealings with each
6    other or nothing.
7    Q.    Okay.  And after being with the state
8    police, you don't remember having worked with
9    Trooper Roach before this night?
10   A.    No, I can't remember if we rode together
11   before that night or not.
12   Q.    Okay.  Did you know that he was with the
13   state police?
14   A.    Yes.
15   Q.    Okay.  Did you know anything about his
16   reputation with the state police after you were
17   both with the state police?
18   A.    No, ma'am.
19   Q.    Okay.  You referenced that you and
20   Trooper Roach went back to the office after
21   Bourbon Street that night; is that correct?
22   A.    Yes.
23   Q.    Where was the office located?
24   A.    We went to the Cabildo, what we call the
25   Cabildo, office right outside the Cabildo



1    building.  I believe it's 300 block of St. Peter.

2         Q.   Okay.

3         A.   It's just before Royal Street.

4         Q.   Okay.  And you mentioned getting

5    something to eat; is that correct?

6         A.   Yes.  We had gotten something to eat.

7    We went to the office to sit down and eat.

8         Q.   Okay.  So you picked up food somewhere

9    and then ate at the office of the Cabildo?

10        A.   Yes.

11        Q.   What time do you remember leaving after

12   having eaten that evening?

13        A.   I mean, like I said, we got off of

14   Bourbon at 10.  Probably went and ate.  Like I

15   said, I mean, I'm not sure how long it took us to

16   eat.  It was just prior to the incident with

17   Mr. Terrell that we decided to wrap it up and go

18   out on patrol.

19        Q.   Okay.  And had you done anything else

20   during your shift that evening prior to the

21   incident with Mr. Terrell?

22        A.   By Bourbon Street?

23        Q.   Just in general.

24        A.   I'm not sure if we made any arrests or

25   not before that situation.  I don't believe we



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

did, but I can't be 100 percent sure without
looking at something to see what we did that day.
Like I say, all I know is we went to Bourbon, went
to the office and ate, and then we left the office
just prior to the encounter with Mr. Terrell.

     Q.   Do you remember if you had a roll call
briefing that night?

     A.   Yes.

     Q.   Okay.  Do you remember if there was any
particular activity or incidents that were covered
during that roll call briefing?

     A.   I can't recall.

     Q.   But nothing stands out to you right now?

     A.   No, ma'am.

     Q.   Okay.  Do you remember if there was
anything else that was going on in the quarter
that evening?

     A.   Not that I recall.

     Q.   Okay.  What were you dressed in for this
June 17th, shift?

     A.   Full state police uniform, short sleeve.

     Q.   That's the dark blue uniform?

     A.   Yes.  With the stripe, pinstripe on the
pockets and stuff, yes.

     Q.   Did you have, like, a full duty belt?



```
 1        A.    Yes.
 2        Q.    What else did you have on that uniform?
 3        A.    Full duty belt, my bulletproof vest,
 4   full uniform.  Typically wear my little shiny
 5   shoes, want to look nice.  That's about it.
 6        Q.    What about the hat?
 7        A.    No.  We don't like the hat.  We leave
 8   that in the car.  We're required to wear it on
 9   Bourbon Street, though.
10              Don't tell nobody that.  It hurts your
11   head right here (INDICATING).
12        Q.    So you had the hat, but perhaps were not
13   wearing the hat?
14        A.    No.  The hat was in the back.
15        Q.    Okay.  Did you have a vehicle on that
16   night?
17        A.    I was riding shotgun with Trooper Roach.
18        Q.    Okay.  How had you, I guess, gotten to
19   your shift; did you have your own vehicle that you
20   drove there?
21        A.    Yes.  I drove my vehicle to the briefing
22   office.  And when they paired us up, I just
23   grabbed whatever stuff I need for the shift and
24   put it in Trooper Jeff Roach's vehicle, and we
25   departed the location together.
```



1    Q.    Okay.  What was the vehicle that you
2    were assigned or driving at that time?
3    A.    That Jeff Roach was driving?
4    Q.    No.  Your actual vehicle.
5    A.    I believe I was in that Durango at the
6    time.
7    Q.    But the Durango was --
8    A.    Didn't have any markings.  It had lights
9    and sirens, but no markings or anything that
10   suggest that it was a police vehicle.
11   Q.    Okay.  So on this day, you drove the
12   Durango to get to the briefing?
13   A.    Yes.
14   Q.    But you left it at the office?
15   A.    Yes.
16   Q.    Do you remember what you took out of the
17   Durango to put into Trooper Roach's vehicle that
18   night?
19   A.    Yes.  That hat is one.  I usually get my
20   rifle, my ER-15 rifle, and probably some documents
21   that we may need, traffic tickets if Roach didn't
22   have any.  Just that's about it.
23   Q.    Okay.
24   A.    Raincoat or jacket if it was cold.
25   Q.    Okay.  And what vehicle did Trooper



866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    Roach have that you-all were in that night?

2          A.    He had a marked Louisiana State Police

3    Tahoe.

4          Q.    And how was that vehicle equipped other

5    than being marked?

6          A.    It had overhead lights, state police

7    decals on the side, push bumper on the front.

8    What else?

9          Q.    Did it have a dash camera?

10         A.    Yes, I believe it did.

11         Q.    It would have had sirens?

12         A.    Yes.

13         Q.    You indicated that the incident with

14   Mr. Terrell started shortly after you-all ate your

15   food?

16         A.    Yes.

17         Q.    I'm hoping that you can describe for me

18   and walk me through this interaction with

19   Mr. Terrell in as much detail as you remember.

20         A.    I know on that particular day, we had

21   just left the office, crossed over Royal, crossed

22   over Bourbon.  We got to Dauphine.  That's when I

23   saw Mr. Terrell and a white guy standing on the

24   left side of the street on the sidewalk.  I saw

25   the guy reach Terrell an undisclosed amount of



866.870.7233   P.O. Box 1554  Hammond  LA  70404   Fax 985.419.0799

1    money.  As they saw a marked unit, they both
2    grabbed their cell phones and started talking on
3    their cell phones immediately.  And it kind of
4    caught me offguard.  I'm like, well, I really
5    don't feel like dealing with this, I just ate, I
6    don't want to run after nobody.  So I told Jeff
7    Roach, I'm like, "Jeff, them dudes just did a hand
8    to hand.  Now they're trying to play it off like
9    we didn't see it.  Look, I tell you what, make the
10   block.  If they're still standing there, we'll
11   stop and talk to them.  If they're not, we'll just
12   let them go about their business and be done with
13   it."
14           So as we made the block, we come back
15   around the second time.  Once we turned onto
16   St. Peter from Dauphine Street, they were still
17   standing there.  They were still in the block.  As
18   we started slow rolling towards them, Mr. Terrell
19   got on his bicycle and began to pedal down the
20   sidewalk towards Burgundy Street.  The white guy
21   was still standing there.  He was looking down at
22   his hand, like as if he was looking at something.
23   We stopped the vehicle right where the white guy
24   was standing.  Mr. Terrell was still riding down
25   towards Burgundy on the sidewalk.


AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1        Trooper Roach approached the white guy

2    and, you know, introduced himself, say, hey, you

3    know, police, whatever.  I remember the guy

4    throwing both hands up, like, almost touching the

5    top of the roof.  He just let out this real loud

6    squeal, like he was real, real startled.  And I

7    was walking down the block to stop Mr. Terrell.  I

8    asked him to stop his bike.  He looked back at me.

9    I said, "stop your bike."  And he looked back at

10   me a second time and continued to ride on.

11       At that point, I ran back to the unit, I

12   jumped in the passenger side.  I yelled at Jeff

13   Roach to get in the car.  I said, "dude don't want

14   to stop.  Get in the car."  So we just left the

15   white guy standing there with his hands raised.

16   We drove down the block, caught up to Mr. Terrell

17   who was still slow rolling on his bike on the

18   sidewalk.  Jeff rolled down the driver's side

19   window and put the vehicle-mounted spotlight in

20   his face.

21       I'm, like, "hey, bro, stop your bike,

22   stop your bike."  He continued to ride.  He looked

23   dead at us, and he just continued to ride.  We're

24   like, "stop your bike."  I'm yelling at him from

25   the passenger side, "stop the bike."  He just kept



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1   rolling.

2         So when we got to the intersection, it

3   was a vehicle coming.  So Jeff stopped the marked

4   unit.  The vehicle took off.  We couldn't --

5   Mr. Terrell then turned left on Burgundy going in

6   the wrong direction against traffic on his bicycle

7   in the street.  So I exited the patrol car, and I

8   started approaching him.  I started running when I

9   saw that he wasn't stopping.  So I went to run to

10   try to hurry up and get ahold of him before he can

11   try to flee.

12         As I started running, he stood up on his

13   bicycle and began to pump.  If you ever rode a

14   bike when you was a kid, you try to go fast, you

15   stand up on your bike and try to really get some

16   momentum on those pedals to get the bike to going

17   fast.  The only thing that caught me offguard with

18   him is, he was holding one of the handlebars with

19   his hand, and he had his other hand clutched on

20   his waistband.  As I'm running behind him, I'm

21   giving him verbal commands to stop his bike, stop

22   his bike.  He looked back at me as I yelled the

23   second time.  Then he turned around, and he still

24   trying to go fast, but he holding on with one

25   hand, which caught me as a little odd.  Usually,



1  as a kid, you're trying to pump to go fast on a

2  bike, you have as much leverage as you can with

3  both hands on the handlebars.  So I'm, like, man,

4  this dude must have a gun, he about to turn around

5  and shoot me.

6         So when I yelled at him a second time,

7  he spun around.  That's when I decided to deploy

8  my Taser, because it was so many pedestrians out,

9  I didn't want to get into a deadly-force situation

10  with this guy in the middle of Burgundy Street and

11  some innocent people behind me get shot or, God

12  forbid, some innocent people behind him get shot,

13  because we are shooting at each other in the

14  middle of Burgundy Street.  So I elected to deploy

15  my Taser.

16         The Taser hit him.  He locked up.  The

17  bike drifted to the right, struck the curb, and he

18  fell off the bike.  At that point, I was running

19  right on top of him.  I said, "turn over, put your

20  hands behind your back."  He just kind of laid on

21  his back, with his eyes -- like, what just

22  happened to me.  So I asked him to roll over again

23  and put his hands behind his back.

24         At that point, Jeff Roach was running up

25  behind me as he was rolling over.  He rolled over.



1　I handcuffed him.  We rolled him over onto his
2　buttocks, because he had the probes still in his
3　back.  So I didn't want to lay him on his back.  I
4　told Jeff, I said, "he dropped something in the
5　street."  I remember seeing something fall from
6　his person when I was running behind him.  I
7　didn't know what it was.  It was something shiny.
8　Jeff Roach went back to the street and found a
9　blister pack of Tramadol pills.  I immediately
10　recognized it to be Tramadol because of my time in
11　narcotics.  "All right, so this is what you was
12　trying to hide.  I don't know if you had it in
13　your waistband or what you was doing.  Like, bro,
14　you could have got killed reaching in your
15　waistband like that.  I'm telling you to show me
16　your hands and stop the bike."
17　　　　　　　So at that point, we began patting him
18　down.  I placed him under arrest, told him he's
19　under arrest for resisting arrest and being in
20　possession of Tramadol pills.  Jeff Roach start
21　patting down his right pocket, at which point he
22　found some heroine in his right pocket.  I checked
23　his left pocket and found some money, and I
24　think -- I believe the money was in his left
25　pocket with the Tramadol pills and the plastic



```
 1    bag, and he had some more blister packs.  Some of
 2    the pills were just loose in the clear plastic.
 3    So I grabbed that out his pocket.  And I told him
 4    that -- you know, I already knew it was heroine,
 5    and I knew the pills were Tramadol pills.  So I
 6    told him that he was under arrest, resisting,
 7    possession with intent to distribute heroine and
 8    Tramadol pills.
 9             I called supervisor, told him that I had
10    a Taser deployment, that I'm going to need him out
11    there on the scene.  I requested EMS for
12    Mr. Terrell, because when he fell off the bike, he
13    had scraped just above his eye and his top lip
14    when he wiped out on the bike and hit the
15    concrete.  He had some road rash.
16             So EMS showed up.  They took him and
17    transported him to University Hospital, to get
18    checked out.  And me and Jeff Roach went to the
19    office and did a booking paperwork to have him
20    booked into the jail.  After we finished the
21    booking paperwork, we went to University Hospital,
22    relieved the troopers that were at the hospital
23    with him.  We sat there with him for a little
24    while longer, at which point they discharged him.
25    And we brought him to jail, had him booked into
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    the jail.

2         Q.    Is there anything else about this

3    interaction with Mr. Terrell that you remember

4    that you didn't just tell me about?

5         A.    No.

6         Q.    Okay.  I want to follow up on a couple

7    of these points that you talked about.

8              MRS. WASHINGTON:  I'm wondering if now

9              might be a good time to take a break

10             before we get into that.

11             MR. FAHRENHOLT:  I can check again.

12             (RECESS 12:55-1:21 P.M.)

13   EXAMINATION BY MRS. WASHINGTON:

14        Q.    So I want to follow up on a few of the

15   parts of your interaction with Mr. Terrell that

16   you just told me about.  Okay?

17        A.    Okay.

18             MRS. WASHINGTON:  And to help us do so,

19             I am going to hand you a map, a blank

20             map of part of the French Quarter that

21             I'm going to mark as Exhibit 61.

22             (EXHIBIT 61 MARKED FOR IDENTIFICATION)

23   EXAMINATION BY MRS. WASHINGTON:

24        Q.    I'm going to give you a pen, as I'm

25   hoping kind of as we work through this, we can



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1  mark where some things happen.

2      A.   Yes, ma'am.

3      Q.   Just so we're oriented, sort of agree

4  what's on the map, this is sort of a middle

5  portion of the French Quarter, we can see Rampart

6  on one side, sort of down to Chartres --

7      A.   Decatur.

8      Q.   -- all the way to Decatur and then kind

9  of between St. Louis and Dumaine, at least; is

10 that correct?

11     A.   Yes, ma'am.

12     Q.   Okay.  So when you left the Cabildo --

13 well, can you mark on here where or approximately

14 where the Cabildo is with a 1?

15     A.   With a 1?

16     Q.   Yes.

17     A.   It's right here by Pirate's Alley.

18     Q.   You were leaving from the Cabildo,

19 correct, before you encountered Mr. Terrell?

20     A.   Yes.

21     Q.   What route did you take from the

22 Cabildo?

23     A.   Went straight down St. Peter towards

24 Burgundy.

25     Q.   Okay.  And where were the individuals



1    that you saw on St. Peter when you first noticed
2    them?
3         A.   Mr. Terrell and the white guy was
4    standing right here.  You want me to put an X or 2
5    or something (INDICATING)?
6         Q.   2 would be great.
7         A.   Standing in the middle of the block on
8    the left-hand side.
9         Q.   Okay.  You're marking a location on
10   St. Peter that's between Dauphine and Burgundy,
11   correct?
12        A.   Yes.
13        Q.   Would you mind just making an arrow that
14   demonstrates where you -- how you moved between
15   what you've marked as point 1 and point 2?
16        A.   (WITNESS COMPLIES).
17        Q.   Okay.  So you're reflecting that you
18   drove on St. Peter towards Rampart Street,
19   correct?
20        A.   Yes.
21        Q.   And you and Trooper Roach were in
22   Trooper Roach's vehicle at that point?
23        A.   Yes, ma'am.
24        Q.   You indicated -- well, when were you
25   first able to observe the two individuals that you



1    mentioned?

2         A.   When we got to this intersection right

3    here (INDICATING).

4         Q.   You're referring to the intersection of

5    St. Peter and Dauphine, correct?

6         A.   Yes.

7         Q.   Would you mind marking the location

8    where you first observed the individuals with a 3

9    on the map.

10        A.   (WITNESS COMPLIES).

11        Q.   And describe for me exactly what your

12   observations were of these two individuals

13   initially?

14        A.   They were standing face to face on the

15   sidewalk.  They were both riding bicycles.  So

16   they were straddling the bicycles.  Mr. Terrell

17   had his bicycle between his legs, but with his

18   feet planted on the ground.  The other gentleman

19   was also straddling his bicycle with both feet

20   planted on the ground.

21             As we started to traverse the

22   intersection, when I looked to my left, I could

23   see the guy giving Terrell an unknown amount of

24   money, reached it out to him.  Terrell took it.

25   And he went to try to give him something, but then



1    immediately upon watching us, he went into his

2    pocket, but he came out with his phone.

3         Q.   Okay.

4         A.   And the guy, the other guy looked up at

5    us, and he grabbed his phone.  They both started

6    talking on the phone, but they're still standing

7    face to face, which caught me as odd.  Okay, why

8    all of a sudden y'all grab the phones?  Y'all was

9    just in the middle of whatever y'all was doing.

10   Why not just continue the conversation or

11   whatever?  Why would you get on the phone if you

12   got a person directly in front of you that you

13   could be talking to or whatever?  It just struck

14   me as odd that both of them picked up phones and

15   pretend to play like they're talking on the

16   phones.  That, along with me seeing the money

17   exchange, all right, maybe something up with these

18   dudes.

19        Q.   Just so I understand, both Mr. Terrell

20   and the white male had bicycles that they were

21   straddling, correct?

22        A.   Yes.  The bicycles between their legs,

23   and they both had their feet planted on the

24   ground.

25        Q.   They were stationary at that point?



1     A.   Stationary.

2     Q.   And you indicated that you saw the white

3 male provide Mr. Terrell with money; is that

4 correct?

5     A.   Yes.

6     Q.   And that after providing Mr. Terrell

7 with the money, you observed Mr. Terrell take out

8 his phone; is that correct?

9     A.   He went to reach in his pocket, and then

10 he saw us, and that's when he reached into his

11 other pocket and pulled out his phone.

12     Q.   Okay.  How do you know that Mr. Terrell

13 saw you?

14     A.   He looked up at us.  Like I said, as he

15 started talking on the phone, he had his head

16 down.  He kept cutting his eyes at our unit as we

17 drove past the first time.

18     Q.   And you indicated that the white male

19 also took out a phone and began talking on that?

20     A.   Yes.

21     Q.   Okay.  And during the time you were

22 making these observations, was your vehicle

23 moving?

24     A.   Yes.

25     Q.   Okay.  What communication was occurring



1  between you and Trooper Roach at this point in
2  time?

3       A.   He was driving.  At that point, I didn't
4  even know if he had saw what I had saw.  I'm,
5  like, "Jeff, these two dudes just did a hand to
6  hand.  I think we caught them in the midst of it."
7  He's, like, "who?"  I said, "these two right here
8  on these bikes."  So as we drove past, kind of
9  looked at them.  I said, "well, look, make the
10 block.  Bro, I don't feel like running after
11 nobody.  I really don't want" -- I said, "just
12 make the block.  If they're still standing there,
13 we'll check them out.  But if they part their ways
14 and they go their separate ways, we'll just leave
15 it alone."  I said, "I just ate, I'm full, I
16 really don't feel like dealing with this."  As we
17 made the block, we come back around, they was
18 still together.

19      Q.   So I want to break that down a little
20 bit.  Do you know if Trooper Roach observed these
21 two individuals?

22      A.   Only after -- I know he observed them
23 after I pointed them out to him.  I don't know if
24 he observed the hand-to-hand deal.

25      Q.   You don't know if he observed what you



```
 1    suspected was a hand-to-hand transaction?
 2        A.    No, I don't know.
 3        Q.    And it's my understanding from what you
 4    just said that you spoke to Trooper Roach about
 5    your observations; is that correct?
 6        A.    Yes.
 7        Q.    And were you in the block on St. Peter
 8    between Dauphine and Burgundy when these
 9    communications with Trooper Roach were happening?
10        A.    Yes.  We were pretty much on side of
11    them driving past them at a slow pace, when I
12    pointed them out to him.
13        Q.    Okay.  What time would this be at
14    approximately?
15        A.    This was at night.
16        Q.    Okay.  Sometime after 10, when you left
17    Bourbon?
18        A.    Exactly.
19        Q.    What was the lighting like, if you
20    remember, on St. Peter?
21        A.    It was fairly lit on that block at
22    night.  The street lights, and I know all the
23    people have lights on their homes in that area, so
24    it was fairly lit, considering it was dark at
25    night.
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1     Q.    Okay.   And you had mentioned previously
2    there being pedestrians in the quarter.   Were
3    there people on St. Peter other than these two
4    individuals?
5     A.    Oh, yes.   There was a bunch of people
6    out.
7     Q.    Do you remember anything about the
8    traffic conditions that night?
9     A.    Vehicle traffic?
10    Q.    Yes.
11    A.    No, not specifically about vehicle
12    traffic.
13    Q.    Okay.
14    A.    Saturday night is typically your busiest
15    night down in the French Quarter.   Most people off
16    work, so you get a lot of people come down and
17    party.   Then you got a lot of people from out of
18    town come in on the weekends.   So Saturday night
19    is pretty much the busiest night.   Friday is
20    pretty thick, but not as bad as Saturday.   And
21    Sunday, it start to taper off, because a lot of
22    people getting ready to leave or getting ready for
23    work.
24    Q.    So you mentioned that Mr. Terrell looked
25    at the unit; is that correct?



866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

1     A.   Yes.

2     Q.   Do you remember whether or not the white

3  male, who he was with, also looked at the unit?

4     A.   At some point, when we came up on side

5  of him, he had his phone out, he started talking

6  on his phone, too.  He kind of cut his eyes over

7  at us, also.

8     Q.   Okay.  Just so I make sure I understand,

9  did you see Mr. Terrell give anything to the white

10  male?

11     A.   No, not at that time.

12     Q.   Okay.  Who made the decision to make the

13  block and come back to St. Peter?

14     A.   I did.  I told Jeff, I said, "look, make

15  the block.  If they're still standing there

16  together, we'll stop and check them out.  If not,

17  if they go on their separate ways, we're just

18  going to leave it alone."

19     Q.   Why didn't you stop when you first

20  passed them on St. Peter?

21     A.   Like I said, I was full, I had just

22  eaten, and I didn't feel like running after

23  somebody.

24     Q.   Okay.

25     A.   Which wound up happening anyway.



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1       Q.   Okay.  Can you describe for me the route

2   that you-all took after you passed their location

3   on St. Peter?

4       A.   After we passed them, we turned right

5   onto Burgundy towards Orleans.  We made the right

6   turn on Orleans and came back up to Dauphine and

7   made the block and came back around.

8       Q.   Okay.  Can you outline that with the pen

9   on the map to indicate the route that you-all

10   took?

11       A.   (WITNESS COMPLIES).

12       Q.   Okay.  At this time, did the state

13   police vehicle have any lights or sirens

14   activated?

15       A.   No.

16       Q.   Do you remember how long it took for you

17   to make the block and return to St. Peter?

18       A.   Not at exact time.  I mean, maybe a

19   minute or less.

20       Q.   Okay.  When you returned to St. Peter,

21   what is the first thing you remember seeing?

22       A.   They were both standing there together.

23   And as we turned the corner from Dauphine onto

24   St. Peter, Mr. Terrell getting on his bicycle,

25   began pedaling in the opposite direction.



1    Q.    Okay.  So when you first turned back

2  onto St. Peter, Mr. Terrell and the white male

3  were in the same location as where you had first

4  seen them?

5    A.    Yes.

6    Q.    And that's the location that's marked by

7  a 2 on this map; is that correct?

8    A.    Yes.

9    Q.    Did you see Mr. Terrell give the white

10 male anything at this time on this second

11 observation?

12   A.    No.

13   Q.    Okay.  So you never saw Mr. Terrell give

14 anything to the white male?

15   A.    No.

16   Q.    What happens when you return to

17 St. Peter for the second time?

18   A.    When we returned for the second time, we

19 stopped the police vehicle directly adjacent to

20 where the white guy was standing on the sidewalk.

21 Jeff -- we both exited the vehicle.  Jeff

22 approached the white guy, and I started going down

23 the block to ask Mr. Terrell to stop his bicycle.

24   Q.    Okay.

25   A.    I start yelling out to him to stop his



1    bike.  He looked back at me.  I said, "stop your

2    bike."  He looked back again and kept riding.

3         Q.    Let me ask you this:  You mentioned a

4    minute ago that when you turned onto St. Peter,

5    you observed Mr. Terrell on his bicycle and

6    rolling away towards Rampart; is that correct?

7         A.    Yes.

8         Q.    Was he already on the bike and moving

9    towards Rampart when you-all stopped the vehicle?

10        A.    When we turned the corner, he mounted

11   the bike, and then started to ride off.  When we

12   stopped the vehicle, he was already in motion.

13        Q.    Okay.  You mentioned that you stopped

14   the vehicle.  Was that in the middle of the street

15   on St. Peter?

16        A.    Yes.  We were blocking traffic.

17        Q.    That would have been basically right

18   next to where you marked a 2 on the map; is that

19   correct?

20        A.    Yes.

21        Q.    Do you remember if the vehicle was

22   running?

23        A.    What vehicle?

24        Q.    The vehicle you were in.

25        A.    Oh, yes.  We left it running, yes.



1     Q.    Okay.   Did you and Trooper Roach have a
2  conversation about stopping the vehicle?
3     A.    No.   I don't particularly -- like I
4  said, just from being police officers, when we
5  stop the vehicle, that's when we exited.   Wherever
6  he chose to stop it, that was on him.
7     Q.    Okay.   Did you speak with Trooper Roach
8  about what you were going to do when you exited
9  the vehicle?
10     A.    I can't remember if we specifically said
11  you go after this dude, I'm going to go talk to
12  this dude.   We just exited.   Like I said, the
13  white guy was still standing on the sidewalk on
14  his side of the vehicle.   So when I seen him
15  approaching him, I just automatically went to stop
16  Mr. Terrell.
17     Q.    Okay.   Who made the decision to stop
18  these two individuals?
19     A.    I did.
20     Q.    Okay.   And what was the reason for
21  stopping the individuals?
22     A.    I suspected them doing a hand-to-hand
23  narcotics transaction.
24     Q.    Okay.   So what offense had you suspected
25  that they committed?

1          A.    Reasonable suspicion that they was

2    involved in a narcotics transaction.

3          Q.    Okay.  Did you have any information or

4    knowledge about future offenses that these two

5    individuals would be committing?

6          A.    Future?

7          Q.    Yes.

8          A.    No, ma'am.

9          Q.    Okay.  Did you have reason to believe

10   that these individuals were a threat to you?

11         A.    A threat to me?

12         Q.    Yes.

13         A.    At the point where Mr. Terrell began

14   fleeing on his bicycle and grabbing his waistband.

15         Q.    I'm asking about at the time when

16   you-all stopped the car on St. Peter and exited

17   the vehicle to stop these individuals, did you

18   have any information about these individuals being

19   a threat to you?

20         A.    Well, we don't know.  Anybody is a

21   threat to you.  You don't know until you actually

22   get to dealing with these people if they're a

23   threat or not.  I didn't know Mr. Terrell prior to

24   meeting him, so I didn't know if he pose a threat

25   to me or not at that point.  But we assume



1    everybody is a threat to you until you prove

2    otherwise that there's not a threat.

3         Q.   Okay.  You indicated that Trooper Roach

4    approached the white male?

5         A.   Yes.

6         Q.   When you-all exited the vehicle, did the

7    vehicle have lights or sirens activated at that

8    point?

9         A.   No.

10        Q.   Do you know whether or not the dash

11   camera in the vehicle was activated?

12        A.   The dash camera is typically activated

13   when you turn the lights on.  Seeing that we

14   didn't turn the lights on, I don't think it

15   activated.

16        Q.   Okay.  Did you observe Trooper Roach's

17   interaction with the white male?

18        A.   It was short and brief, because as I was

19   trying to stop Mr. Terrell, he didn't stop his

20   bike, I ran back to the car and told Jeff to get

21   in.  And we jumped in the car, and that's when we

22   drove up and drove up on side of Mr. Terrell.  And

23   Jeff began using the vehicle-mounted spotlight to

24   get his attention, flash the light in his eyes.

25   He looked at us.  We said, "stop your bike."  He

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    kept riding.  Then I started yelling, "stop your

2    bike, stop your bike."  And he kept riding.

3         Q.    So what did you observe of Trooper

4    Roach's interaction with the white male?

5         A.    Just that he was approaching him, and he

6    was announcing that, look, "police, bro, let me

7    see your hands."  And that's when the guy threw

8    both hands up like he was trying to touch the

9    stars.  He just let out this God awful, like,

10   squeal, like he was startled.  And at that point,

11   like I said, when I realized Terrell wasn't

12   stopping his bike, I ran back to the car and told

13   Jeff to get in.

14        Q.    Did you hear Trooper Roach question the

15   white male at all?

16        A.    No.

17        Q.    Did you hear him speak to him?

18        A.    Like I said, I heard him saying "state

19   police."

20        Q.    Okay.

21        A.    And from that point on, I focused my

22   attention on Mr. Terrell.

23        Q.    Okay.  Do you remember Trooper Roach

24   searching the white male?

25        A.    No.  I don't believe he had time to do

```
1    that.  It's all happening in a matter of seconds.
2         Q.   Okay.  It was your belief at that time
3    that the white male had purchased narcotics; is
4    that correct?
5         A.   Yes.
6         Q.   What happened to the white male?
7         A.   Well, as we began running behind
8    Mr. Terrell and taking him into custody, when he
9    went back around there to look for him, he was
10   gone.
11        Q.   Who went back to look for the white
12   male?
13        A.   I think Jeff Roach went back, if I'm not
14   mistaken.  Somebody went back, look, see if the
15   white dude still around there.  Of course, we knew
16   he was gone.  He wasn't going to stick around and
17   wait to get arrested by the police for trying to
18   buy heroine.
19        Q.   When did you speak with someone about
20   going back to look for the white male?
21        A.   I didn't.  But like I said, working with
22   Jeff, we worked NOPD together doing neighborhood
23   patrol, like I said, we got this dude, all this
24   heroine, this is the reason for our stopping him,
25   we was going look for this dude to see if he was
```



```
 1   still around there, because that's part of our
 2   initial complaint, the reason why we was stopping
 3   them.  We thought they was doing hand-to-hand
 4   narcotics transaction.  See this dude giving him
 5   money, he just so happens to have 19 bags of
 6   heroine in his pocket.
 7        Q.   Do you remember asking anyone to go back
 8   to look for the white male?
 9        A.   Not specifically, no.
10        Q.   Okay.  Were you present when Trooper
11   Roach asked anyone to go back and look for the
12   white male?
13        A.   I can't remember.
14        Q.   Okay.
15        A.   I don't know if we ask anybody or not.
16   Like I said, it's common practice.  That was the
17   reason for our stop, stopping both of these
18   subjects.  It was just unfortunate we had to
19   divert all our attention on one subject, where we
20   couldn't stop both of them and have them together.
21   Like I said, if they wasn't doing anything, then
22   they would have been going on about their
23   business.
24        Q.   Do you have any specific knowledge of
25   someone going back to look for the white male?
```



```
 1        A.    I didn't.  I don't know who else went.
 2        Q.    Okay.  Did you use the radio at all to
 3   ask someone to go and look for the white male?
 4        A.    I just said -- I didn't.
 5        Q.    Okay.  Did you hear any radio traffic
 6   about someone going to look for the white male?
 7        A.    I don't recall.
 8        Q.    Okay.  Do you know the name of the white
 9   male?
10        A.    No, ma'am.
11        Q.    Okay.  Do you know whether he was ever
12   arrested?
13        A.    No, ma'am, not on my case.
14        Q.    Okay.  When you exited the vehicle on
15   St. Peter, Mr. Terrell was already on his bicycle
16   and moving towards Rampart, correct?
17        A.    I'm sorry?
18        Q.    Is that correct?
19        A.    When the initial stop, yes.
20        Q.    Correct.  And you indicated that you
21   were walking behind where Mr. Terrell was on his
22   bicycle on the sidewalk?
23        A.    Well, I was in the street.  He was on
24   the sidewalk.  I was coming at him on an angle.
25   As he was riding, I was yelling at him to stop his
```



 1  bike, stop his bike.  He looked, kept riding.  I
 2  said, "stop the bike."  He looked back again, and
 3  that's when he refused to stop.  That's when I ran
 4  back to my car, because he had a good little
 5  distance on me.  So I didn't feel like I'd be able
 6  to run him down and grab him in enough time versus
 7  getting in the unit and trying to cut him off.
 8       Q.   Okay.  So you were in the middle of the
 9  street on St. Peter?
10       A.   Yes.  I was walking in front of our unit
11  that was blocking traffic, and I was walking in
12  front of the car in the street.  He was on the
13  sidewalk.
14       Q.   Okay.  Was Mr. Terrell ahead of you on
15  the sidewalk?
16       A.   Yes.
17       Q.   Okay.  What exactly did you say to
18  Mr. Terrell when you were in the street on
19  St. Peter?
20       A.   I said, "stop your bike."  He looked at
21  me.  I said, "stop the bike."  He looked back at
22  me again, and he kept riding.
23       Q.   Were you walking at this point in time?
24       A.   Yes.
25       Q.   Okay.  What speed was Mr. Terrell going



```
 1   on his bike?
 2        A.   I'm not sure.
 3        Q.   Okay.
 4        A.   He was at a slow pace.  He wasn't going
 5   very fast.
 6        Q.   Do you remember seeing anything else
 7   relative to Mr. Terrell at this point in time?
 8        A.   As far as?
 9        Q.   Did you make any observations about
10   Mr. Terrell other than him being on the bike?
11        A.   Just refusing to stop upon my command to
12   stop.
13        Q.   Okay.  You made a decision to return to
14   the vehicle; is that correct?
15        A.   Yes.  Ran back to our marked unit, told
16   Jeff Roach to get in.  I said, "dude, I want to
17   stop this bike."  We drove down and caught up to
18   him just before Burgundy.
19        Q.   So you spoke to Trooper Roach and
20   indicated that you wanted to get back in the
21   vehicle; is that correct?
22        A.   Yes.
23        Q.   Okay.  Once you returned to the vehicle,
24   you continued down St. Peter?
25        A.   Yes.
```



1    Q.   And I believe that you indicated before
2  that you pulled alongside Mr. Terrell; is that
3  correct?
4    A.   Yes.
5    Q.   Were you still on St. Peter at this
6  point in time?
7    A.   Yes.
8    Q.   And he was still on the sidewalk?
9    A.   Sidewalk.
10    Q.   Okay.  And just to clarify, the sidewalk
11  we're referring to would be on the side of the
12  street towards Canal?
13    A.   Yes.
14    Q.   Okay.  You spoke about light earlier
15  that was focused on Mr. Terrell.
16    A.   Uh-huh (AFFIRMATIVE RESPONSE).
17    Q.   What light is that?
18    A.   If you can picture a police car, there's
19  a light just in front of the driver's front window
20  on the A-pillar of the vehicle.  There's a black
21  light, and you twist it.  It turns, and it goes
22  all kind of different ways.  We call that a
23  spotlight.  Usually when we stop a car, you might
24  see a police officer with that light shining on
25  the person's vehicle illuminating the inside of



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   it.
 2          Jeff Roach took that light and shined it
 3   into his eyes as he was riding the bike and told
 4   him to stop the bike.  With the window down, we
 5   was yelling out the car at him to stop, stop,
 6   stop.  And he still refused.
 7      Q.   So you indicate that the light was being
 8   shined at Mr. Terrell and into his eyes; is that
 9   correct?
10      A.   Into his face.  And then Jeff was, like,
11   moving it back and forth to get his attention;
12   like, bro, stop the bike.
13      Q.   You would have been parallel with
14   Mr. Terrell at that time?
15      A.   That's correct.
16      Q.   Do I understand that -- was the window
17   of the vehicle down?
18      A.   Yes.
19      Q.   Okay.
20      A.   Driver's side window was down.
21      Q.   Okay.  And were you speaking to
22   Mr. Terrell?
23      A.   We both were yelling at him.
24      Q.   Okay.  What did you yell at him?
25      A.   To stop the bike.
```



COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1      Q.    And what did Trooper Roach yell at him?

2      A.    Jeff kept telling him, "dude, stop the

3  bike.  Stop your bike right there.  Stop it."

4      Q.    Okay.  At this time, were any other

5  lights activated on the police unit?

6      A.    No.

7      Q.    Was the siren activated?

8      A.    No.

9      Q.    Okay.  Based on what you said before,

10  would the dash camera have been activated at this

11  time?

12      A.    No.

13      Q.    What happens when you get to the corner

14  of Burgundy?

15      A.    When we got to the corner of Burgundy

16  and St. Peter, Burgundy is a one way going towards

17  Orleans, so Jeff stopped the car.  There was a

18  vehicle there.  The vehicle pulls off.  Terrell

19  turns left on Burgundy going in the opposite

20  direction against traffic.  Jeff just couldn't

21  turn the car and go against traffic the wrong way

22  chasing this dude on the bike.  So I jumped out of

23  the car, and I began running behind him on foot.

24      Q.    Could you mark on the map with a Number

25  4 where you jumped out of the vehicle?





1      A.    Right here at this intersection

2    (INDICATING).

3      Q.    Okay.  What direction did you proceed

4    from that intersection?

5      A.    Once he was riding his bike this

6    direction, and I began running behind him.  Right

7    when I got off, I started running behind him, he

8    was traveling against traffic on Burgundy.

9      Q.    When you got out of the vehicle, did you

10   move in front of the vehicle?

11     A.    Yes.

12     Q.    Okay.  And you indicated with an arrow

13   that you're moving basically towards Canal on

14   Burgundy from St. Peter; is that correct?

15     A.    Yes.

16     Q.    When you got onto Burgundy, where was

17   Mr. Terrell?

18     A.    He was just ahead of me.

19     Q.    Okay.  Can you roughly estimate how far

20   ahead of you he was?

21     A.    When he first turned the corner, he's

22   probably about 30 feet ahead of me.  As I started

23   running, he sees me running, he stood up on the

24   bike and tried to pedal fast.  I probably closed

25   the gap about 10 to 15 feet.  And I'm yelling at



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    him at this point, "stop the bike." He's looking

2    back. I yelled at him again, "stop the bike." He

3    looked back again. He's clutching his waistband,

4    so I'm thinking he's armed. As I'm getting

5    closer, I didn't want him to turn and start firing

6    at me, so I just deploy my Taser. And it made

7    contact with him, and that's when he wiped out.

8        Q.   After you exited the vehicle at the

9    corner of St. Peter and Burgundy, could you see

10   the vehicle and Trooper Roach anymore?

11       A.   No. I wasn't focused on where the

12   vehicle was. I was just -- like I said, my

13   attention was drawn to him, especially looking at

14   the fact I thought he was armed. I didn't even

15   know where Jeff was. I didn't know if he got out

16   the car, if he turned behind me. I didn't know

17   where he was at that point.

18       Q.   Did you hear any sirens from the vehicle

19   while you were running after Mr. Terrell?

20       A.   No, ma'am.

21       Q.   Did you see any lights from the police

22   vehicle while you were running after Mr. Terrell?

23       A.   No, ma'am.

24       Q.   Okay. You indicated that you were

25   yelling at Mr. Terrell as he was on his bike on



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1   Burgundy; is that correct?

2          A.    Yes.

3          Q.    And what were you yelling at him at that

4   time?

5          A.    To stop, stop, stop your bike.

6          Q.    Okay.  You described before that

7   Mr. Terrell started going faster at this point in

8   time; is that correct?

9          A.    Yes.  When he saw me starting to run,

10   that's when he stood up on the bicycle.  He had

11   one hand on the handlebar, other hand clutching

12   his waistband, and he was trying to pedal while

13   standing up on the bicycle to go fast.  But I

14   don't think he had enough leverage or enough

15   stability on the bike, since he was just holding

16   it with one hand, to go faster.  And that's when

17   he looked back.  When I was yelling at him, like

18   start gaining, closing the distance on him, he

19   looked back a second time, and that's when I

20   deployed my Taser.

21          Q.    You mentioned that when you were on

22   Burgundy after you exited the vehicle, that

23   Mr. Terrell looked back at you; is that correct?

24          A.    Yes.

25          Q.    Okay.  And you mentioned that he stood



1    up and began to try to pedal?

2        A.    Yes.

3        Q.    And you mentioned noticing that he had

4    one hand on the handlebars, correct?

5        A.    Yes.

6        Q.    When you had seen him on the bike on

7    St. Peter, where were his hands?

8        A.    When he was riding slow?

9        Q.    Yes.

10        A.    He had both hands on the handlebars, and

11    he was sitting down on the seat.

12        Q.    Okay.  When was the first time that you

13    noticed him only having one hand on the handlebar?

14        A.    When I exited the vehicle and started

15    running behind him.

16        Q.    Okay.  And you could observe which of

17    Mr. Terrell's hands was on the handlebar?

18        A.    If you have my report, I think I

19    documented in my report.  I can give you a

20    definite answer.

21        Q.    Okay.  Yes, we're going to go through

22    the report in a bit, and we can pick back up on

23    that.

24              You indicated that Mr. Terrell's other

25    hand was in his front waistband; is that correct?

1    A.   Yes.  He was clutching his waistband
2  with his other hand.
3    Q.   Okay.  And this was when he was on
4  Burgundy; is that correct?
5    A.   Yes.
6    Q.   And this is when you would have been
7  running behind him; is that correct?
8    A.   Yes.
9    Q.   How were you able to see Mr. Terrell
10  clutching his front waistband?
11    A.   When I was running behind him and giving
12  him verbal commands, he spun around on the bike to
13  look back to see where I was at one time.  And
14  then when I yelled out to him again to stop his
15  bike, he did it again.  Like I said, looking at
16  his hands, we're trained to watch people's hands.
17  People can only kill you with their hands.  They
18  can't shoot you -- they might could shoot you with
19  their toe, but it's kind of hard with shoes on.
20  So we're trained to watch people's hands.  I'm
21  immediately looking at his hands, watching his
22  hands.  Like I said, I saw one hand on the
23  handlebars.  I'm looking at the other hand
24  clutching his waistband.  Which in my knowledge
25  and experience, most drug dealers carry guns,

1  especially in the French Quarter.

2      Q.   Okay.  So am I correct in understanding

3  that it was only when Mr. Terrell turned around to

4  look at you that you could see where his other

5  hand was located?

6      A.   Yes.

7      Q.   Okay.

8      A.   I knew it wasn't on the handlebars.  I

9  knew he only had one hand on the handlebars.  I

10 didn't know where his other hand was until he

11 spun, and I was able to see he was clutching his

12 waistband.

13     Q.   Okay.  You indicated before, running

14 behind the bicycle, you were able to close the

15 distance between you and Mr. Terrell; is that

16 correct?

17     A.   Yes.

18     Q.   Where were you located at the time that

19 you deployed your Taser?

20     A.   Probably about right here in front of

21 the arrow.

22     Q.   Could you mark that with a Number 5.

23     A.   (WITNESS COMPLIES).

24     Q.   And I believe you indicated that

25 Mr. Terrell was about 15 feet in front of you?



```
 1        A.    10 to 15 feet, roughly.
 2        Q.    Okay.  And were you in the middle of the
 3   street on Burgundy?
 4        A.    Yes.  We were in the travel lanes,
 5   vehicle travel lanes, when all this went down.
 6        Q.    And Mr. Terrell was on the bike in the
 7   actual street on Burgundy?
 8        A.    Yes.
 9        Q.    Okay.  Prior to deploying the Taser, did
10   you tell Mr. Terrell that you were going to deploy
11   your Taser?
12        A.    Yes.  Gave verbal commands.
13        Q.    Okay.  What did you verbally command
14   him?
15        A.    "You're going to get tased."
16        Q.    Okay.
17        A.    I kept yelling for him to stop.  He
18   looked back.  I said, "stop your bike."  I said,
19   "show me your hands," when I realized he was
20   clutching his waistband.  I said, "show me your
21   hands.  Show me your hands."  And that's when I
22   deployed my Taser.
23        Q.    You deployed your Taser after asking him
24   to show you his hands?
25        A.    Yea -- yes, I'm sorry.
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1        Q.    Okay.  How long after exiting the
 2   vehicle lapsed before you deployed your Taser?
 3        A.    I probably ran maybe 20 yards before I
 4   deployed it.
 5        Q.    I don't know how fast you run.
 6        A.    According to the people in the area, I
 7   was pretty fast.  They was all yelling and
 8   screaming about me being fast.
 9        Q.    Who was yelling and screaming?
10        A.    Some of the pedestrians in the area.
11        Q.    There were people on Burgundy?
12        A.    Like I said, that's part of the reason
13   why I didn't want to get into a lethal force
14   encounter with this guy in the street because of
15   all those people that were out.  So that's why I
16   like to use the Taser versus pulling a gun and me
17   and him get into a shootout at the location.
18        Q.    And these people, at some point in time,
19   commented on how quickly you were running?
20        A.    Yes.  They were cracking jokes and
21   stuff.
22        Q.    When did that happen?
23        A.    That was immediately after Mr. Terrell
24   was tased and on the ground and handcuffed.  There
25   was people walking up the street cracking jokes.
```



1    They were all drunk.

2        Q.   You mentioned that after Mr. Terrell was

3    tased, his bike skidded out; is that correct?

4        A.   Well, when Taser took effect, his

5    muscles locked up.  His bike drifted to the right.

6    It was still upright, but when it got to the curb,

7    both wheels struck the side of the curb and went

8    over with him on it.  And that's when he wiped out

9    and skinned up his face.

10       Q.   Okay.

11       A.   He fell onto the sidewalk off the bike.

12       Q.   Okay.  Would that be the sidewalk on --

13       A.   Rampart Street side.

14       Q.   Of Burgundy?

15       A.   Yes.

16       Q.   Okay.  What did you do after Mr. Terrell

17   fell off of the bike?

18       A.   I still had my Taser in my hand.  The

19   probes were still in him, and wires were still

20   connected.  At that point, I told him to roll

21   over, because he was laying on his back.  Like I

22   said, I could see his eyes were big; like, what

23   just happened to me.  And I told him to roll over

24   and put his hands behind his back.  Like I said,

25   at this point, I don't know if he's still armed or

1  not.  So I still have the Taser trained on him;

2  like, "look, you're going to get it again, turn

3  over, put your hands behind your back."  So as he

4  started to roll over, put his hands behind his

5  back, I started to handcuff him.  That's when Jeff

6  Roach came up behind me.  We handcuffed him and

7  rolled him over and sat him up.  I patted him

8  down, make sure he didn't have no weapon in his

9  waistband.  I didn't find a weapon.  I told Jeff

10  to go back and see if he could find what he

11  dropped in the street.  I said, "something fell

12  when I was chasing him."  That's when Jeff went

13  back and found the blister pack with Tramadol in

14  the middle of the block.

15      Q.   So when you approached Mr. Terrell after

16  he had fallen off of the bike and you still had

17  your Taser out, he was on his back on the sidewalk

18  at that point in time?

19      A.   Yes.

20      Q.   Okay.  Did you see his fall from the

21  bike?

22      A.   Yes.

23      Q.   Okay.  Did he fall onto his back?

24      A.   No.  He rolled, kind of.  If this is the

25  bicycle, he hit the curb, the bike went over,



```
 1   like, and rolled over on his back.  As the
 2   momentum from the bike falling, he hit the ground,
 3   and then he rolled onto his back and slid a little
 4   bit.  And that's when I was, like, right up on
 5   him, told him to turn over, roll over and put his
 6   hands behind his back (INDICATING).
 7        Q.   So it sounds, from your description,
 8   like he fell, and as part of the fall, rolled onto
 9   his back?
10        A.   Yes.
11        Q.   Okay.  And it's my understanding, from
12   your description, that he was falling to the
13   right?
14        A.   Right.
15        Q.   When you approached Mr. Terrell and told
16   him to roll onto his stomach and put his hands
17   behind his back --
18        A.   Yes.
19        Q.   -- and he complied with that order?
20        A.   Yes.
21        Q.   Was Trooper Roach there when you
22   handcuffed Mr. Terrell?
23        A.   Right as I'm finished handcuffing him,
24   that's when Jeff showed up.
25        Q.   Okay.
```



```
 1        A.   We sat him up on his butt.  He's still
 2   seated on the sidewalk.  That's when -- at that
 3   point, he got a little combative.  He got a little
 4   angry, I guess by being tased and falling off the
 5   bike.
 6        Q.   Okay.  Can you describe that for me?
 7        A.   Describe what?
 8        Q.   You said he got a little combative?
 9        A.   Yes.  He just talking crap.  We was,
10   like, "okay, you're going to jail now."
11        Q.   So it was just verbal that you're
12   describing?
13        A.   Yes.  We get it all the time.  So it
14   wasn't nothing.
15        Q.   You handcuffed Mr. Terrell?
16        A.   Yes.
17        Q.   Okay.  And you handcuffed him behind his
18   back?
19        A.   Yes.
20        Q.   Was he still lying on the ground at that
21   time?
22        A.   No.  We sat him up on his back.
23   Handcuffed him while he was laying down, then I
24   immediately sat him up.
25        Q.   Okay.  But he was lying on his stomach
```



1    when you handcuffed him?

2        A.    Yes.

3        Q.    Where was Mr. Terrell positioned after

4    you and Trooper Roach had sat him up?

5        A.    He was still seated on the sidewalk.  He

6    was seated on his butt with both legs stretched

7    completely out, sitting up, with his hands

8    handcuffed behind his back.

9        Q.    Just in the middle of the sidewalk?

10       A.    Yes.  We was blocking the sidewalk at

11   that point.

12       Q.    When did you direct Trooper Roach to go

13   and retrieve the item that you had seen?

14       A.    After we had him cuffed, and Jeff was

15   there, I say, "look, go see what he dropped."  I

16   said, "something fell from when I was running

17   behind him."  That's when Jeff left.  I'm still

18   standing there holding him up, keeping him from

19   falling over.  Like I say, he had just been tased.

20   I've been tased before.  It feel like somebody

21   beat you with a bat when you get tased.  I told

22   Jeff, "go see what he dropped in the street."  I

23   figured it was some kind of contraband or

24   something.  I wasn't sure what it was.  It was

25   shiny, because the blister pack had aluminum back

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    on it.  Jeff was, like, "this is what he dropped?"
2    I said, "yes, that's what I saw fall from him."
3    It was in the middle of the street.  Like I say,
4    cars had been passing, it wasn't run over, so I
5    knew it had to be his.  Then when we went in his
6    pocket -- placed him under arrest, went in his
7    pocket, and found more Tramadol pills on him.  I
8    was, like, oh, yes, this is his.
9         Q.   Okay.  When did you see this item fall?
10        A.   When I tased him, and he went down on
11   the bike, and then the bike started drifting, I
12   seen it when it fell.  And then he hit the curb
13   and wiped out.
14        Q.   So you saw this item fall from
15   Mr. Terrell after you had tased him?
16        A.   Yes.
17        Q.   Okay.  How long did it take Trooper
18   Roach to go and retrieve this item?
19        A.   Matter of seconds.  It was, like,
20   probably to the door, standing where she is
21   (INDICATING).
22        Q.   So can you approximate how far away the
23   item was from where you were located?
24        A.   20 feet probably.
25        Q.   Okay.  Could you see Trooper Roach when



1　he was going to retrieve the item?

2　　　A.　No, because I was holding up Mr. Terrell

3　keeping him from falling over and hurting himself

4　more.

5　　　Q.　Okay.　When Trooper Roach returned with

6　this silver item --

7　　　A.　Yes.

8　　　Q.　-- did he provide it to you?

9　　　A.　Yes.　He showed me what it was.　I said,

10　"yes, that's what it was."　I said, "it's

11　Tramadol."　Like I said, I immediately knew what

12　it was.　I said, "so that's what you were selling

13　that dude; Tramadol?"　I said, "you did all this

14　for Tramadol?"

15　　　Q.　Are you speaking to Mr. Terrell at this

16　point in time?

17　　　A.　Yes.　I said, "dude, you made me tase

18　you off this bike for Tramadol?　I thought you had

19　a gun."　Like I say, he was combative at that

20　point.

21　　　Q.　He was combative at that point?

22　　　A.　Well, just talking.　Yes, it wasn't

23　nothing major.　It was just talking.

24　　　Q.　And you mentioned that there had been

25　traffic on Burgundy, but the thing that had



1 been -- the item was still in the street; is that

2 correct?

3     A.   Yes.  This was prior to him going down

4 the block the wrong way.  Traffic had done came

5 down the street.  Like I said, when we came to the

6 intersection, there was a vehicle that just drove

7 down that stretch of roadway and crossed over in

8 front of our vehicle as I was getting out to go

9 behind him.

10     Q.  Was there traffic coming towards you on

11 Burgundy while you were running after Mr. Terrell?

12     A.   I can't recall.

13     Q.   Okay.

14     A.   We never had any vehicles that came

15 through after the situation was chilled, and we

16 had him in custody.

17     Q.   Okay.  So the cars that you just

18 mentioned passing when you were talking about the

19 items still being in the street, when did those

20 cars pass?

21     A.   Prior to me chasing him and tasing him

22 and falling off the bike.

23     Q.   So you're referring to vehicles that

24 would have already passed?

25     A.   Already passed and ran over it if it was



1    there prior to me chasing him and all that other

2    stuff.

3         Q.   Okay.  When Trooper Roach returned with

4    the item from the street, you were speaking to

5    Mr. Terrell at that time?

6         A.   Yes.

7         Q.   Okay.  What do you remember saying to

8    Mr. Terrell?

9         A.   Say, "dude, you made me tase you off

10   your bike for Tramadol?  I thought you had a

11   pistol."  Like I said, he was combative at that

12   point, verbally combative.  He was just talking.

13   Like, "all right, well, you're going to jail

14   then."

15        Q.   Do you remember what Mr. Terrell said?

16        A.   No, ma'am.

17        Q.   Okay.

18        A.   I wasn't paying attention.

19        Q.   Did Trooper Roach say anything to

20   Mr. Terrell?

21        A.   Not that I recall.

22        Q.   Did Trooper Roach say anything to you?

23        A.   Just normal; contact the rank, what you

24   need me to do, what paperwork we need.

25        Q.   You indicated before that you and



1 Trooper Roach searched Mr. Terrell; is that

2 correct?

3     A.   Yes.

4     Q.   Can you describe for me how that search

5 was conducted?

6     A.   Yes.  When Jeff came back with a pack of

7 Tramadol pills, and I placed Terrell under arrest,

8 I patted down his left side, Jeff patted down his

9 right side.  That's when Jeff say, "man, this dude

10 got a whole bag of stuff on him."  He pulled it

11 out his pocket.  I said, "man, this dude got

12 heroine."  So Jeff holding it.  So as I'm patting

13 down his left pocket, I found more Tramadol pills

14 in his left pocket.

15     Q.   Was Mr. Terrell seated when you were

16 conducting the search?

17     A.   I can't remember.  I want to say he was

18 still seated.  We were both on either side of him.

19     Q.   Okay.  Did you question Mr. Terrell at

20 all?

21     A.   No, ma'am.

22     Q.   Okay.  Other than the items that you

23 suspected to be narcotics that you recovered from

24 Mr. Terrell, do you remember recovering any other

25 personal items from Mr. Terrell?



1      A.   We took all his personal belongings out

2   of his pocket and put it together so we can give

3   it to the jail, once we give him to the jail.

4      Q.   Okay.  Did you arrest Mr. Terrell?

5      A.   Yes.

6      Q.   Okay.  When did that happen?

7      A.   Once Jeff Roach found the pack, blister

8   pack of Tramadol pills.

9      Q.   So after Trooper Roach had returned and

10  found the item in the street and come back to you

11  and Mr. Terrell?

12     A.   Advised him that he was under arrest at

13  that point, yes, ma'am.

14     Q.   Okay.  What charges was Mr. Terrell

15  being arrested on?

16     A.   Possession of Tramadol, before we found

17  the additional heroine and the extra Tramadol

18  pills.  Then I had him with possession with intent

19  to distribute both drugs.

20     Q.   Okay.  You mentioned that you were still

21  holding the Taser when you approached Mr. Terrell

22  on the sidewalk; is that correct?

23     A.   Yes.

24     Q.   And the prongs from the Taser were

25  located where?



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1          A.    In his back.

2          Q.    Okay.  Were the Taser prongs removed

3    from Mr. Terrell?

4          A.    Yes, by EMS, I believe.  They removed

5    them once they got on the scene.

6          Q.    Okay.  Who contacted EMS?

7          A.    I did.  I told -- relayed to the

8    dispatcher that we needed EMS on the scene, that

9    subject was tased, and we needed EMS.  And

10   dispatcher requested EMS to our location.

11         Q.    Okay.  And you were using the personal

12   radio that you carry?

13         A.    The portable radio, yes.

14         Q.    What dispatch were you speaking to, to

15   radio for EMS?

16         A.    NOPD dispatch 1 and 8.  I didn't speak

17   directly to EMS on the radio.  Spoke to the

18   dispatcher, and she request EMS.  They're all in

19   the same building, so she probably just yelled

20   across the cubicle.

21         Q.    But you called in on the radio to

22   dispatch?

23         A.    Yes, to start EMS unit to my location.

24         Q.    Okay.  When did EMS arrive?

25         A.    It was shortly after we had placed him



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    under arrest.

2        Q.    Okay.  Did you contact EMS after the

3    search had been conducted?

4        A.    I'm not sure.  I want to say, yes.

5    After we found the extra heroine and Tramadol

6    pills on him, that's when I went ahead and

7    contact, told the dispatcher we need EMS.

8        Q.    And in the search of Mr. Terrell, did

9    you recover a weapon?

10       A.    No.

11       Q.    And you searched his person in full,

12   correct?

13       A.    Yes.

14       Q.    Other than radioing dispatch to call for

15   EMS, did you use the radio to communicate anything

16   else about this incident?

17       A.    Only to the supervisor that I needed him

18   to the scene, that we had a Taser deployment.

19       Q.    And who was the supervisor?

20       A.    I believe Sergeant Bellue.

21       Q.    Okay.  How did you communicate with

22   Sergeant Bellue?

23       A.    On the radio.

24       Q.    Which frequency did you use?

25       A.    I can't remember if I called him on NOPD



1    dispatch 1 or B dispatch 2.

2        Q.   When you're radioing for the sergeant

3    because there's been a use of force, what do you

4    call out over the radio?

5        A.   Nothing.  Just ask for Troop N

6    supervisor, any available Troop N supervisor

7    that's available.  And one of them key up; "I need

8    you out here, I got a Taser deployment."  Like,

9    "all right, I'm on my way."

10       Q.   Okay.  Do you remember communicating

11   with the supervisor to come out for this incident?

12       A.   Yes.

13       Q.   Okay.  When did you contact the

14   supervisor?

15       A.   Immediately after requesting EMS.

16       Q.   Did a supervisor come out to the scene?

17       A.   Yes.

18       Q.   And that was Sergeant Bellue?

19       A.   Yes, ma'am.

20       Q.   Do you know when he arrived on the

21   scene?

22       A.   It was -- I'm not exactly sure.

23       Q.   Do you know if it was after EMS had

24   arrived?

25       A.   I can't remember.



1        Q.    How would he have gotten to your
2    location?

3        A.    In a police car.

4        Q.    Do you remember where his police vehicle
5    would have been parked?

6        A.    No, ma'am.

7        Q.    What did the sergeant do when he arrived
8    on the scene?

9        A.    Pulled me to the side, asked me what
10   happened.  I explained to him the circumstances
11   regarding the Taser deployment and Mr. Terrell
12   being arrested.  Showed him the evidence that we
13   recovered off his person.  He was, like, "all
14   right.  I'm going to get somebody to bring him up
15   to the hospital with EMS.  You and Jeff go to the
16   office and start doing your paperwork, get him
17   booked, and go relieve them once you finish."  I
18   said, "all right."

19       Q.    Okay.  Did the sergeant do anything else
20   while he was on scene with you-all?

21       A.    Other than just direct resource.  Like I
22   said, he just stood there on the scene until EMS
23   left and we all cleared from the scene.

24       Q.    Okay.  You mentioned previously that
25   there were people on Burgundy at the time of this

1 use of force, correct?

2     A.   Yes.

3     Q.   Did you speak with any of those?

4     A.   No, ma'am.

5     Q.   Okay.  Do you know if anyone else spoke

6 with those witnesses?

7     A.   No, ma'am.

8     Q.   Were the Taser prongs removed at the

9 scene by EMS?

10     A.   I'm not sure at what point they removed

11 them.  Typically, they remove them at the scene,

12 but I don't know.  It's up to them whether they

13 remove them there or they wait until they get to

14 the hospital to remove them.

15     Q.   Just so I understand, the Taser prongs

16 are in the body and then attached to wires that

17 attach to the actual Taser, correct?

18     A.   Well, attached -- in the skin, attached

19 to wires.  And there's cartridges that we put in

20 and take out of the Taser that, once we deploy it,

21 we can take them off and throw them away and put a

22 new one in.  So it's attached to a cartridge that

23 we put into the Taser that's attached to the

24 Taser.

25     Q.   Okay.  Had you taken the cartridge out



```
 1    of your Taser?
 2         A.    Yes.
 3         Q.    Okay.  When did that occur?
 4         A.    It was immediately after.  Once we had
 5    him handcuffed and everything was chill, I took
 6    the cartridge out and reholstered my Taser into my
 7    Taser holster.
 8         Q.    Where do you hold your Taser?
 9         A.    On my left side in the front, just side
10    of my extra magazines.
11         Q.    So in your front, on your left side?
12         A.    Yes.
13         Q.    Okay.  Does the Taser record some
14    documentation of it being deployed?
15         A.    Yes.  Whenever there's a Taser
16    deployment, we have to get it downloaded from a
17    Taser instructor.  They hook it up to whatever
18    device goes into the computer, and they download
19    it.  Tell you, I guess, the cycle, how many
20    cycles, 5-second cycles you deployed, how many
21    times you pulled the trigger and that kind of
22    stuff.
23         Q.    Okay.  Was there a download of that
24    information from this deployment of your Taser?
25         A.    Should have been, yes, ma'am.
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1       Q.   Okay.  You said someone from Taser does

2  the --

3       A.   No.  Someone from the state police

4  that's a certified Taser instructor.  They'll

5  typically take your Taser after you have a

6  deployment, hook it up to the machine and download

7  it to whatever system they use to track Taser

8  deployments.  Like I said, tell you when you armed

9  the Taser, what time you armed it, I mean, when

10  you deployed it, what time you deployed it, how

11  many 5-second deployments you pulled the trigger.

12  And they give you all that information on the

13  Taser.

14       Q.   Okay.  Do you remember the information

15  about this use of force being downloaded?

16       A.   I don't know the particular information

17  from the Taser download, no, ma'am.

18       Q.   I guess I'm wondering, did you provide

19  your Taser for this information to be downloaded?

20       A.   Yes.

21       Q.   Okay.  When would that have occurred?

22       A.   Immediately after.  Once we book

23  Mr. Terrell into the jail, went back to the

24  office.  And I forgot who, but one of the Taser

25  instructors downloads the Taser.  Now, it don't



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1    have to be immediately done, but you have to get
 2    it done at some point in time.
 3         Q.   Okay.  Do you know where the information
 4    that is downloaded from the Taser is stored?
 5         A.   No, ma'am.  I'm not a Taser instructor.
 6    I couldn't tell you where they put it at.
 7              MRS. WASHINGTON:  We will follow up in
 8              writing, but, Greg, I'm just going to
 9              request any information related to the
10              Taser that was deployed in this
11              incident, any information that was
12              downloaded from it that might be
13              available.
14              MR. FAHRENHOLT:  Okay.
15    EXAMINATION BY MRS. WASHINGTON:
16         Q.   Mr. Terrell was transported to the
17    hospital by EMS?
18         A.   Yes.
19         Q.   Did you accompany Mr. Terrell to the
20    hospital?
21         A.   No, ma'am.
22         Q.   Where did you go after Mr. Terrell left
23    for the hospital?
24         A.   Me and Trooper Roach went back to the
25    office, and we did the NOPD face sheet and booking
```



1    sheet.  And we went to the evidence room, logged

2    his drugs into evidence at NOPD's evidence room.

3    Then we went to the hospital and relieved the

4    troopers that was at the hospital with

5    Mr. Terrell.

6         Q.    Okay.  And the office that you went to,

7    is that the Cabildo office that you referenced

8    earlier?

9         A.    Yes, ma'am.

10        Q.    And where is the NOPD evidence room

11   located?

12        A.    It's on Magnolia -- I don't know if they

13   consider it Earhart or Calliope, one of those

14   streets.

15        Q.    Then you and Trooper Roach went to UMC?

16        A.    Yes.

17        Q.    Do you remember what time you arrived at

18   UMC?

19        A.    No, ma'am.

20        Q.    You stayed with Mr. Terrell at UMC until

21   he was --

22        A.    Discharged.

23        Q.    -- discharged?

24        A.    Yes, ma'am.

25        Q.    Do you remember how long that was?



1    A.   It was a lengthy time.  By him falling

2 off the bike and scraping his face, I believe they

3 did CAT scans and all kind of tests on him, make

4 sure he didn't have any injuries to his head or

5 anything of that nature, other than the road rash

6 from the concrete.

7    Q.   Okay.  Did you speak with Mr. Terrell at

8 all when you were in the hospital with him?

9    A.   Yes.  He had calmed down at that point.

10 We really didn't talk much about the incident.  We

11 just -- you know, I just told him, "all right,

12 look, bro, wasn't nothing personal."  I said, "you

13 didn't want to stop your bike.  I thought you had

14 a gun, and I tased you."  He was, like, "yes, I

15 know."  That was the gist of our conversation.

16    Q.   Was there anything else that you

17 discussed with Mr. Terrell?

18    A.   No, ma'am.

19    Q.   Did Trooper Roach have any conversations

20 with Mr. Terrell in the hospital?

21    A.   Not to my knowledge.

22    Q.   Okay.  You transported Mr. Terrell to

23 the jail; is that correct?

24    A.   Yes, me and Trooper Roach.

25    Q.   Okay.  Were you still in Trooper Roach's



1    vehicle?

2        A.    Yes.

3        Q.    Okay.  Have you had any conversations

4    with other people of the state police about this

5    arrest?

6        A.    No.

7        Q.    Have you had any conversations with

8    people at the state police regarding the use of

9    force on Mr. Terrell?

10       A.    In regards -- personal conversations

11   or --

12       Q.    Any conversations.

13       A.    I guess they had -- people -- other

14   troopers arrived out there during this incident.

15   So they may have asked what happened.  Probably

16   just briefly told them what happened, and that was

17   it.

18       Q.    So troopers other than Sergeant Bellue

19   arrived to this incident?

20       A.    Yes.

21       Q.    Okay.  Who else arrived?

22       A.    I don't know.  It was a long time ago.

23   I can't tell you who was there, who wasn't.

24       Q.    Can you estimate the number of other

25   troopers who would have arrived?



1      A.   No, ma'am.

2      Q.   What did the other troopers who arrived

3  on the scene do?

4      A.   Nothing.  Just making sure everything

5  was straight, what we call code 4; meaning,

6  there's no -- like I said, once we got on the

7  radio, said we just had a subject run from us,

8  Taser deployment, they all came to see if we

9  needed assistance with anything.  Once they

10  realized that we was good, we needed no more

11  further assistance, they would all cut back and

12  went back to their locations, what they were

13  doing.

14      Q.   This would have been other troopers who

15  were working with Troop N?

16      A.   Yes.

17      Q.   Other than the troopers who responded to

18  the scene of the use of force, have you spoken

19  with anyone at the state police since then about

20  the use of force?

21      A.   No, ma'am.

22           MRS. WASHINGTON:  Okay.  Can we take a

23           break really quickly.

24           (RECESS 2:24-2:31 P.M.)

25



EXAMINATION BY MRS. WASHINGTON:

1

2     Q.   You mentioned that other troopers

3 responded to the scene of this incident with

4 Mr. Terrell, correct?

5     A.   Yes.

6     Q.   Did those troopers radio that they were

7 headed to the scene?

8     A.   I'm not sure.

9     Q.   Okay.  Did you hear that come across the

10 radio?

11     A.   No.

12     Q.   Okay.  Did they respond to the scene

13 based on your radio traffic?

14     A.   I assume so.

15     Q.   Okay.  Were there any other witnesses

16 that you know of to this event with Mr. Terrell?

17     A.   No, ma'am.

18     Q.   Okay.  At any point during this

19 interaction with Mr. Terrell, did you hit

20 Mr. Terrell?

21     A.   No, ma'am.

22     Q.   At any point during this interaction,

23 did you kick Mr. Terrell?

24     A.   No, ma'am.

25     Q.   At any point, did you drag Mr. Terrell?



1        A.    No, ma'am.

2        Q.    Okay.  I'm going to play for you an

3    audio recording that we received and ask you a few

4    questions about it.

5        A.    Yes.

6        Q.    This is Exhibit 49, that was previously

7    marked.

8              (AUDIO RECORDING PLAYING)

9              MRS. WASHINGTON:  Let's play it one more

10             time as loud as we can.

11             (AUDIO RECORDING PLAYING)

12   EXAMINATION BY MRS. WASHINGTON:

13       Q.    Can you identify who's speaking on that

14   call?

15       A.    Yes.  That's me.

16       Q.    And do you know when that call was made?

17       A.    No, ma'am.  I'm not sure.  From

18   listening to it, sounds like I was giving

19   somebody's information to run it through one of

20   the databases to see if he had any outstanding

21   warrants or something.  That's typically when we

22   give somebody's name and date of birth.

23       Q.    Okay.  Would that have been a radio

24   call?

25       A.    Yes.



1    Q.   Okay.  I believe that we were informed
2  that it was retrieved from a frequency called
3  narc.  Are you aware of that frequency?
4    A.   Narc, B narc?
5    Q.   We were just told narc.  But are there
6  frequencies that are titled narc?
7    A.   Yes.  It's narcotics channel that we use
8  when we conducting our narcotics surveillance and
9  stuff.
10    Q.   Okay.  And what are those channels used
11  for?
12    A.   Just talk around channels.  Like I say,
13  each individual, like the Bureau of Investigation
14  has detectives, they have IFAT, which is insurance
15  fraud, auto theft.  Each individual division has
16  their own regular frequency channel.
17    Q.   Would the narc channel be a regular
18  dispatch channel?
19    A.   No.
20    Q.   Okay.  Do you know what the purpose of
21  that radio call was?
22    A.   Like I say, I can only guess that I was
23  relaying his information to get somebody to run
24  his name through any one of the databases to check
25  for warrants.



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    Q.   Based on what you told me previously,
2 there was radio traffic that you made to the
3 dispatcher asking for EMS assistance; is that
4 correct?
5    A.   Yes.
6    Q.   Would that be different from the audio
7 recording that we just heard?
8    A.   If that was through state police -- you
9 have to contact NOPD to get a copy of that
10 recording.
11    Q.   I'm just asking whether or not the
12 communication that you had with the dispatcher
13 discussing the need for EMS, whether that was
14 included in the audio recording we just heard?
15    A.   Like I said, I don't know where that
16 recording originated from.  It could have very
17 well been NOPD channels.  I'm not sure.  But from
18 what you're telling me, narc channel, that's state
19 police channels.  I requested EMS on NOPD channel.
20    Q.   Okay.  And I believe you also indicated
21 previously that you had radioed for a supervisor;
22 is that correct?
23    A.   Yes.
24    Q.   And that also -- well, what channel
25 would that have gone out over?



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1      A.   I'm not sure.  Would be NOPD or be
2    dispatch 2.
3      Q.   The recording that we just heard, would
4    that have been your radio traffic asking for a
5    supervisor?
6      A.   No.  If you say it was on narc channel,
7    it wouldn't have been there.
8      Q.   Okay.  We'll follow up, but we've asked
9    for audio recordings in this incident.  This is
10   the only one that we have been provided.
11     A.   If you requested it through state
12   police, you're not going to get NOPD recordings.
13   You got to request that specifically from NOPD.
14     Q.   Okay.  So all of the other
15   communications, radio communications that you had
16   related to this incident, were on NOPD dispatch
17   channels?
18     A.   Yes, ma'am.
19     Q.   Okay.  I'm going to show you a video
20   now.  This is marked as Exhibit 46.  We can just
21   play it through once, take a look at it, and then
22   I'm going to ask you some questions about it.  We
23   can watch it as many times as you need.
24     A.   Yes, ma'am.
25           (VIDEO PLAYING)





```
1           MR. FAHRENHOLT:  Just as a question,
2           sometimes when you play this, it has an
3           overlay of time on it, and sometimes it
4           does not.  Is that something you control
5           playing the video?
6           MRS. WASHINGTON:  That's what I actually
7           just asked Liz.  So I have not adjusted
8           the video in any way.  It's my
9           understanding that there's a caption
10          associated with the video as we received
11          it.  On the video player that I was
12          using yesterday, I have to actually say
13          "captions on."
14          MR. FAHRENHOLT:  Okay.
15          MRS. WASHINGTON:  And so I'm asking
16          right now, actually, if we can figure
17          out how to put the captions on.  I
18          believe it's under "subtitle."
19          MR. FAHRENHOLT:  Thank you.
20          MRS. WASHINGTON:  Correct.  So we can
21          watch the video again with the captions
22          now turned on.
23          (VIDEO PLAYING)
24   EXAMINATION BY MRS. WASHINGTON:
25        Q.   I'm just going to ask you, in looking at
```



1   the video, can you confirm that the caption that

2   appears is 6/17/17, the time stamp appears to be

3   2357, and indicates L-80 and J. Roach; is that

4   correct?

5       A.   Yes, ma'am.

6       Q.   Do you know what this recording is?

7       A.   Looks like Jeff -- I don't know if I was

8   in the vehicle with him at the time, but he may

9   have been driving back through the location where

10  we attempted to stop Mr. Terrell and the location

11  where he ran and was tased.

12      Q.   When you say "driving back through,"

13  what do you mean by that?

14      A.   Maybe he was documenting the route that

15  he took or whatever.  Just, I don't know.  It's

16  hard to explain what that was, because it wasn't

17  even nothing going on in the video.  So I don't

18  know exactly what was going on here.

19      Q.   Okay.  Do you have any memory of being

20  in Trooper Roach's video when that video was being

21  created?

22      A.   I can't say.  It's been a while.

23      Q.   Okay.  Do you know what the location is

24  that's featured in that video?

25      A.   It looked like the French Quarter



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    somewhere.  It might be St. Peter and Burgundy
2    area.  That's what it looked like to me.
3        Q.    Okay.  Did you see anything in that
4    video that was related to this incident with
5    Mr. Terrell?
6        A.    Nothing other than location.
7        Q.    Okay.  Did you see any people in the
8    video that were related to the incident with
9    Mr. Terrell?
10       A.    No, ma'am.
11       Q.    Is Mr. Terrell in that video?
12       A.    No, ma'am.
13       Q.    Are you in that video?
14       A.    No.
15       Q.    Is Trooper Roach in the video?
16       A.    No.
17       Q.    I'm going to show you a series of images
18   that were previously marked as Exhibit 45.
19       A.    Yes.
20       Q.    Do you recognize the person in the
21   picture?
22       A.    That looks like Mr. Terrell.
23       Q.    You can take a look through the pages of
24   that exhibit, and I'm going to ask you a few
25   questions.



1        The first few pages of this exhibit

2    shows Mr. Terrell's face; is that correct?

3        A.   Yes.

4        Q.   And I'm not asking for your medical

5    opinion or anything like that, but looking at the

6    first page, can you describe to me the injuries to

7    Mr. Terrell that you can observe in those

8    photographs?

9        A.   It looks like his eye is swollen shut.

10   He has some, looks like, stitches above his eye

11   and his nose and top lip.

12       Q.   Which eye are you referring to?

13       A.   His right eye.

14       Q.   Okay.  And in the second page of this

15   exhibit, it looks like there's a bandage above and

16   kind of to the side of his right eye; is that

17   correct?

18       A.   Bandage?  I don't know exactly --

19       Q.   Second page.

20       A.   -- when these photos were taken.

21       Q.   Correct.  I'm just confirming that the

22   second page of this exhibit shows a bandage above

23   his right eye.

24       A.   Yes, ma'am.

25       Q.   Okay.  And the third page appears to



1    show the injuries that you just talked about to

2    the front of Mr. Terrell's nose and his upper lip

3    and kind of the connecting region between the nose

4    and lip; is that correct?

5         A.   Yes.

6         Q.   What is your understanding of how

7    Mr. Terrell suffered those face injuries?

8              MR. FAHRENHOLT:  Object to the form of

9              the question.  You can answer.

10             THE WITNESS:  Huh?

11             MR. FAHRENHOLT:  You can answer.

12             THE WITNESS:  Oh.  Like I said, this

13             somewhat depicts what he looked like

14             that particular night, but this looks

15             like he's already in the cell at the

16             time these photos was taken.  So I'm not

17             sure if he got in an altercation in jail

18             and took these photos or if this depicts

19             actual injuries he sustained during our

20             alter -- our situation.  Like I said, I

21             took photos of all his injuries at the

22             hospital prior to him being booked into

23             the jail.  And this -- like I said, some

24             of the injuries depict his injuries

25             before.  But some of this other stuff,



```
 1              I'm not sure where this come from
 2              (INDICATING).
 3    EXAMINATION BY MRS. WASHINGTON:
 4         Q.    Okay.  I'm going to ask you about the
 5    photos that you took, but let's just finish
 6    working through these images.  I'm looking at the
 7    fourth page of this exhibit, which is kind of
 8    bird's eye view of the top of the head,
 9    Mr. Terrell's head.
10         A.    Yes.
11         Q.    Do you see an injury to sort of the
12    middle of the top of his head?
13         A.    Yes.  I'm looking at it.
14         Q.    Okay.  Do you have any knowledge of how
15    Mr. Terrell sustained that injury?
16         A.    I don't believe so.
17         Q.    Okay.  And I'm looking then at the
18    last -- well, the next two images in this exhibit,
19    which show bandages over Mr. Terrell's wrists, a
20    bandage to his right elbow and a bandage to his
21    right knee; is that correct?
22         A.    Yes.
23         Q.    Do you know how Mr. Terrell sustained
24    injuries to those locations?
25         A.    No, ma'am.
```



1          Q.   Okay.  The last two images of this
2     exhibit show Mr. Terrell's wrists, but with the
3     bandages that we just saw being lifted up; is that
4     correct?
5          A.   Yes.
6          Q.   And both of the images show sort of a
7     portion of skin that has been scraped off, removed
8     from Mr. Terrell; is that correct?
9          A.   Yes.
10         Q.   Do you know how Mr. Terrell suffered
11    those injuries?
12         A.   No, ma'am.
13         Q.   The injuries to Mr. Terrell's arms and
14    legs that are documented in these photographs, did
15    you see those at the time of the incident you were
16    involved in?
17         A.   If I didn't take a picture of them, I
18    didn't see them.
19         Q.   Okay.  So you indicated that you took
20    pictures of Mr. Terrell at some point that
21    evening?
22         A.   Yes.
23         Q.   When were those photographs taken?
24         A.   While he was at the hospital.
25         Q.   At UMC?



1      A.    Yes.

2      Q.    What did you use to take those

3  photographs?

4      A.    Digital camera that's issued by state

5  police.

6      Q.    Do you remember what injuries you took

7  photographs of that night?

8      A.    His eye, his lip.  And I have to look at

9  the photos themselves to see what other injuries,

10  but we usually -- I usually document person's

11  injuries, especially in a use-of-force situation.

12  Every injury that doctors went over, that's what I

13  typically document.  And if I didn't document the

14  scrapes on his arms or top of his head or anything

15  of that nature, then I'm not sure how he sustained

16  those injuries.

17      Q.    Okay.  And the digital camera, did you

18  then download the images from that camera?

19      A.    Yes.  I have an SD card that goes into

20  the digital camera we would retrieve the photos

21  from.  It goes directly into our report.

22      Q.    Is that directly into the use-of-force

23  report?

24      A.    No.  It goes into our state police

25  report, arrest report.



1      Q.   Okay.  Do you keep a separate file just
2   of the photos that you've taken?
3      A.   No.
4      Q.   Okay.  So --
5      A.   Be typically on my SD card.  Once I
6   finish with a case, and it's been adjudicated, I
7   delete the files.  I delete the photos off of it,
8   because those SD cards only hold so many photos.
9   Being in narcotics, we take a lot of pictures when
10  we do search warrants, narcotics-based search
11  warrants.
12     Q.   Do you know where the photographs that
13  you took of Mr. Terrell would be located?
14     A.   I probably deleted them off my SD card
15  by now.
16     Q.   Do you know if the photographs that you
17  took are attached to any report related to this
18  incident with Mr. Terrell?
19     A.   My state police report.
20     Q.   I'm going to show you a document that
21  was previously marked as Exhibit 51.  Looking at
22  the first page of this exhibit, it's titled
23  "Orleans Parish Sheriff arrest register;" is that
24  correct?
25     A.   Yes.



1    Q.   What is this document?

2    A.   Looks like the booking information

3  intake thing that the sheriff's office use when

4  they book somebody into jail for a particular

5  charge.

6    Q.   Okay.  Is it your understanding that

7  OPSO generates this document?

8    A.   Yes.

9    Q.   Okay.  And this is generated when a

10 person is being --

11   A.   Booked into the jail, yes.

12   Q.   Okay.  The information that's contained

13 in this arrest register, did you have any role in

14 providing the information contained in this

15 document?

16   A.   Like I said, we provide face sheet

17 gists.  They may take the information from that

18 and put it onto this register for purposes of

19 tracking these individuals as they go through the

20 jail system.

21   Q.   Okay.  And this particular arrest

22 register is for Zachary Terrell; is that correct?

23   A.   Yes.

24   Q.   And the arrest date is listed as

25 6/17/2017, correct?



1     A.    Where is that?

2     Q.    About halfway down the page in the

3  middle.

4     A.    Yes.

5     Q.    Okay.  And next to that, it talks about

6  the booking date and time as being 6/18/2017, at

7  7:44 a.m.; is that correct?

8     A.    Yes.

9     Q.    So this would be the arrest register

10  from Mr. Terrell being booked into the Orleans

11  jail following the incident that we've been

12  discussing; is that correct?

13     A.    Yes.

14     Q.    I'm going to show you what was marked as

15  Exhibit 2, which is a larger and color image --

16  oh, sorry, 52.  I misspoke.  Do you recognize this

17  as Mr. Terrell?

18     A.    Yes.

19     Q.    Okay.  Does this appear to be a color

20  image of the booking photo that's contained in

21  Exhibit 51?

22     A.    52?

23     Q.    51 is the arrest register.

24     A.    Oh, yes.

25     Q.    Looking at the photo at the bottom.



1      A.   Yes.

2      Q.   Okay.  Are some of the injuries that we

3  just looked at in the photographs I showed you,

4  are they shown in the photograph that Mr. Terrell

5  had at booking?

6      A.   Yes.

7      Q.   Okay.  I want to look at the other two

8  pages of Exhibit 51.  The first one is, it has New

9  Orleans Police Department at the top, and incident

10  report checked; is that correct?

11      A.   New Orleans Police Department at the

12  top.  Yes.

13      Q.   Is this what you -- this type of form

14  what you referred to as a face sheet previously?

15      A.   Yes.

16      Q.   And this also appears to be related to

17  Zachary Terrell, and this 6/17 incident; is that

18  correct?

19      A.   Yes.

20      Q.   Did you create this face sheet?

21      A.   Yes, ma'am.

22      Q.   Okay.  And the item number that's listed

23  at the top, F2169217, that would be the NOPD item

24  number?

25      A.   Yes.



866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    Q.    Okay.    There's a section here that says
2    "lighting;" is that correct?
3    A.    Yes.
4    Q.    And there's a capital F in that box.
5    A.    Uh-huh (AFFIRMATIVE RESPONSE).
6    Q.    What does the F stand for?
7    A.    Fair.
8    Q.    Okay.
9    A.    If you look at the codes box at the
10   bottom, it gives you a general idea of what each
11   individual box represents.  Let me see.  That one
12   or -- no, it don't have it in the codes box.  But
13   it's three different -- it's good lighting, fair
14   lighting or poor lighting.  That's the three
15   choices we have.
16   Q.    Is fair a determination that you made in
17   completing this form?
18   A.    Yes.
19   Q.    Was that describing the lighting at the
20   location of the arrest?
21   A.    Yes.
22   Q.    Okay.  I know we spoke earlier about the
23   lighting on St. Peter, which you said was pretty
24   good, correct?
25   A.    Yes.



```
 1          Q.    I forgot to ask you at the time, but how
 2    was the lighting on Burgundy?
 3          A.    It was fairly poor on -- the lighting on
 4    Burgundy was a little darker than it was on
 5    St. Peter.
 6          Q.    Okay.  So this description of the
 7    lighting as fair, where does that refer to?
 8          A.    St. Peter Street.
 9          Q.    Okay.  I'm looking a little bit down
10    that same page.  There's a couple of other boxes.
11    One of them says "sobriety;" is that correct?
12          A.    Yes.
13          Q.    There's a capital S in that box; is that
14    correct?
15          A.    Yes.
16          Q.    This is one where there's a key at the
17    bottom of the page, correct?
18          A.    Uh-huh (AFFIRMATIVE RESPONSE).
19          Q.    So S is standing for sober on this
20    incident report?
21          A.    Yes.
22          Q.    Directly next to it there's a box that
23    says "injury," correct?
24          A.    Yes.
25          Q.    And a Y, I assume, standing for injured?
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1   A.   For yes, for injury.

2   Q.   At the bottom of this sheet, it has your

3   name as the reporting officer as well as Trooper

4   Roach as reporting officer; is that correct?

5   A.   Yes.

6   Q.   Then it appears that there's a

7   supervisor's signature and badge number?

8   A.   Yes.  That's his unit number.  Looked

9   like N-8.

10   Q.   Who is N-8?

11   A.   Sergeant Bellue.

12   Q.   Sergeant Bellue is the sergeant who

13   responded to the scene of the incident with

14   Mr. Terrell?

15   A.   Yes.

16   Q.   Okay.  The last page of this exhibit has

17   "New Orleans Police Department gist sheet" at the

18   top; is that correct?

19   A.   Yes.

20   Q.   This is the gist form that we talked

21   about earlier today?

22   A.   Yes.

23   Q.   Okay.  Did you create this document?

24   A.   Yes, ma'am.

25   Q.   And you would have authored the

1    narrative that's contained in this document?

2        A.    Yes.

3        Q.    Okay.  Did you speak with Trooper Roach

4    in creating this document?

5        A.    As far as?

6        Q.    Did Trooper Roach contribute to this

7    document?

8        A.    No.  I wrote the gist.  I let him read

9    it, see if he was okay with what I wrote, and that

10   was it.

11       Q.    So you drafted the narrative?

12       A.    Yes.

13       Q.    And you provided the narrative to

14   Trooper Roach?

15       A.    Yes.

16       Q.    Okay.  Did he communicate any concerns

17   or changes to the narrative to you?

18       A.    No, ma'am.

19       Q.    Okay.  I'm going to show you next what

20   was marked as Exhibit 53.  Do you recognize this

21   document?

22       A.    Yes, ma'am.

23       Q.    And what is this?

24       A.    This is a state police database used to

25   track incidents and give the state police item



1    numbers.

2         Q.    Okay.   Did you create these state police

3    arrest documents?

4         A.    Yes.

5         Q.    Okay.   When was this created?

6         A.    Immediately after arrest.

7         Q.    Okay.   Would this have been created at

8    the office?

9         A.    We could do it in our units.   We have

10   access to it on our MVT.

11        Q.    Do you remember where you were when you

12   created this arrest report?

13        A.    No, ma'am.

14        Q.    Okay.

15        A.    This is just a tracking mechanism for

16   state police to track the arrest.   It's not an

17   actual arrest report, per se.   It goes to the DA's

18   office.   It's just something that state police

19   uses to track incidents.

20        Q.    Internally?

21        A.    Yes.

22        Q.    And you authored the narrative for this

23   arrest report?

24        A.    Yes.

25        Q.    Okay.   Would you have provided a copy of



1   this narrative to Trooper Roach?

2        A.   No, ma'am.  Like I said, it was only

3   accessible during -- from computer.

4        Q.   Okay.

5        A.   So like I said, when you read the gist

6   and was all right with the gist, the narrative,

7   this pretty much the same as the gist.

8        Q.   So you completed this by yourself?

9        A.   Yes.

10       Q.   Okay.  On the -- I guess it's the third

11  page of this -- actually, the first page of yours.

12  I'm looking at a slightly different copy.  But the

13  first page that says "arrest report" at the top,

14  there is a section, about almost halfway down,

15  that says "injury codes."  Do you see that?

16       A.   Yes.

17       Q.   It says, "D," with a capital letter?

18       A.   Uh-huh (AFFIRMATIVE RESPONSE).

19       Q.   What does D indicate?

20       A.   Minor injuries.

21       Q.   Okay.  Is that some kind of --

22       A.   That's state -- well, we use injury

23  codes on traffic accidents.

24       Q.   Okay.

25       A.   When we do a traffic accident, A or B,



1  the most fatal, would be a fatal accident.  When

2  we say E -- it goes from A to E.  E will be no

3  injury.  So D will be minor, so on.  As you go up

4  to A, it would be fatal.  So B will be

5  incapacitating, got broken bones, that kind of

6  stuff.  We indicate what type of injuries they

7  have on here by a letter code.

8      Q.   Okay.  On the sheet that actually

9  contains the narrative of the arrest, there's

10 reference to two units, both HQ-283, as well as

11 L-80; is that correct?

12     A.   Yes.  That was my unit number at the

13 time, and that was Trooper Roach's unit number at

14 the time.

15     Q.   So L-80 is the unit that you-all were in

16 that whole night?

17     A.   Well, yes.  Trooper Roach was assigned

18 to Troop L at the time.  And L-80 was his unit

19 number.  I was in narcotics.  So my unit number

20 was HQ-283.

21     Q.   So HQ-283 was the Durango that I think

22 you referenced earlier at the time?

23     A.   Not a specific vehicle.  It follows the

24 individual.

25     Q.   Okay.  The vehicle you had that night --



1      A.   Now, marked units, they have their
2   actual unit number on the plates on their
3   vehicles.  But me being in narcotics, we just have
4   a regular Louisiana plate on it.
5      Q.   Looking at the narrative of that arrest
6   report -- I actually asked you that already.
7   Never mind.
8           The very end of the narrative on that
9   arrest report, probably on your last page, it
10  says, created on server 6/17, and then it has
11  11:44:35 p.m.; is that correct?
12     A.   Yes.
13     Q.   What does that date and time stamp
14  indicate?
15     A.   That basically just let you know when I
16  opened up that item, that particular item, and
17  created it.  I might have not put all this
18  information in at the time, but I started it or
19  opened it up and created that item.  Might have
20  went back at a later date and filled in all this
21  personal information.
22     Q.   Okay.
23          MRS. WASHINGTON:  I am going to show you
24          a document that I'm marking as 62.  It
25          is our new color version of a document

1          that has previously been entered.

2          (EXHIBIT 62 MARKED FOR IDENTIFICATION)

3    EXAMINATION BY MRS. WASHINGTON:

4          Q.   Are you ready?

5          A.   Yes.

6          Q.   What is this document?

7          A.   It's a state police incident report.

8          Q.   Okay.  Is this the incident report that

9    was completed based on this interaction and arrest

10   of Zachary Terrell?

11         A.   Yes.

12         Q.   Okay.  And who created this case report?

13         A.   I did.

14         Q.   I just have a couple of questions about

15   it.  The first one is looking at page 3 of the

16   report.  There is a listing for a bike, a Road

17   Master.

18         A.   Yes.

19         Q.   What is this vehicle?

20         A.   That's the bike Mr. Terrell was riding

21   when he was arrested.

22         Q.   Okay.  And there appears to be about

23   three photos of the bike; is that correct?

24         A.   Yes.

25         Q.   Who took those photos?



1        A.   I did.

2        Q.   Okay.  Where were those photos taken?

3        A.   On Burgundy Street, on the scene where

4    Mr. Terrell was arrested.

5        Q.   It also indicates on that page, next to

6    storage location, "released to friend."  Do you

7    see that?

8        A.   Yes.

9        Q.   Can you tell me what that means?

10       A.   He had -- some guy was walking down the

11   street, said, "man, can I take his bike?"  I'm

12   like, "you want to give this dude this bike?"

13   He's, like, "man, I don't care.  He can take it."

14   I said, "all right.  You know this dude?"  He

15   said, "man, let him take it."  So we let the guy

16   take the bike.

17       Q.   Do you know the name of that individual?

18       A.   No, ma'am.  He didn't want to leave his

19   name.

20       Q.   Okay.  I'm looking at both the initial

21   complaint paragraph on page 8, as well as the last

22   paragraph on page 9.  And there are references to

23   an unknown white male.  Is that the white male

24   that we were speaking about earlier?

25       A.   Yes.



1    Q.   Okay.  You mentioned that you took
2    photographs of Mr. Terrell at UMC.
3    A.   Yes.
4    Q.   And that all of the photographs that you
5    took of Mr. Terrell's injuries would be part of
6    the LSP incident report; is that correct?
7    A.   Yes, they should have been.
8    Q.   Okay.  Do you see any of the photographs
9    of Mr. Terrell's injuries that you took as part of
10   this LSP incident report?
11   A.   No, I don't see them on this arrest
12   report.
13   Q.   Do you see any photographs that you took
14   of Mr. Terrell's injuries on this case report?
15   A.   No.  This look like to be his booking
16   photo on the front.
17   Q.   Okay.  So none of the photographs that
18   you took of Mr. Terrell and his injuries are
19   included in this incident report?
20   A.   Not in this report, no, ma'am.
21   Q.   Okay.  Is there another report that they
22   would be included with?
23   A.   Maybe on the use-of-force report.
24   Q.   Okay.
25   A.   I'm not sure.


Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1      Q.    The last question I want to ask --
2  Trooper Pichon, I'm going to show you what was
3  previously marked as Exhibit 34.  This is a black
4  and white copy, sort of copy, of the same incident
5  report.
6      A.    Okay.
7      Q.    I'm showing it to you, because I'm
8  hoping you can look at the last page, which is the
9  signature page.
10      A.    Yes.
11      Q.    The color version that we believe
12  doesn't appear to actually have signatures on the
13  last page.  But looking at that black and white
14  exhibit, which was Exhibit 34, do you see
15  signatures on the last page?
16      A.    Yes.
17      Q.    So you have signed it as the
18  investigation officer; is that correct?
19      A.    Yes.
20      Q.    And then there's a signature for the
21  investigation supervisor, correct?
22      A.    Yes.
23      Q.    And that is listed as Sergeant Trent
24  Cuccia; is that correct?
25      A.    Yes.



1      Q.   And who is Sergeant Cuccia?
2      A.   That was my current supervisor at the
3  time of the incident.
4      Q.   Okay.  Was he your supervisor in
5  narcotics?
6      A.   Yes.
7      Q.   Okay.  Was he part of the Troop N chain
8  of command?
9      A.   No.
10     Q.   He was part of the BOI chain of command?
11     A.   BOI, yes.
12     Q.   Okay.  That's all for that one.  I'm
13  going to show you now what was previously marked
14  as Exhibit 55.
15          Do you need to take a break for a
16  minute?
17     A.   No.  I was just looking at something.
18     Q.   Do you recognize the document that's
19  marked as Exhibit 55?
20     A.   Yes.
21     Q.   What is that document?
22     A.   It appears to be the use-of-force
23  report.
24     Q.   Okay.  Related to Mr. Terrell?
25     A.   Yes.



1    Q.   Okay.  And did you create this document?

2    A.   Yes.

3    Q.   One question I forgot to ask you about

4  the incident report that we just talked about:

5  Were you responsible for creating the entire state

6  police incident report?

7    A.   As far as the -- yes.

8    Q.   The content of the report, the

9  narrative?

10   A.   Yes.

11   Q.   Okay.  Did you provide a copy of that

12  report to anyone?

13   A.   No.

14   Q.   Okay.  How did Sergeant Cuccia review

15  that report?

16   A.   Wait, I'm confused now.  You lost me.

17   Q.   I'm sorry.

18   A.   You're talking about the arrest report

19  from state police item number or the arrest report

20  that was sent to the district attorney's office?

21   Q.   I'm talking about the state police case

22  report that we reviewed as Exhibit 62.

23   A.   Yes.  What's your question?

24   Q.   So Sergeant Cuccia had signed off as the

25  supervisor, correct?



```
1        A.    Yes.

2        Q.    How was he provided with the report for

3   his review?

4        A.    I had submitted it to him for review.

5        Q.    Was that done electronically?

6        A.    Yes.

7        Q.    Had anyone else reviewed the report you

8   had authored?

9        A.    Other than the district attorney's

10  office, I don't believe so.

11       Q.    Okay.  Was a copy of the report provided

12  to Trooper Roach?

13       A.    No, not to my knowledge.

14       Q.    Okay.  You indicated that the case

15  report is submitted to the district attorney's

16  office; is that correct?

17       A.    Yes.

18       Q.    How does that submission happen?

19       A.    Through Troop N.

20       Q.    Okay.

21       A.    Since it was originated in Troop N, I

22  provided them with a copy of it and turned it over

23  directly to Troop N, to forward to the district

24  attorney's office.

25       Q.    When you turn it over to Troop N, is
```



1  that electronic transmission of the document?

2     A.   No.   Physical.   Had to go drop it off to

3  the secretary at Troop N, and she gets a copy of

4  it and brings it to the DA's office.

5     Q.   So it's a hard copy that you take to

6  Troop N?

7     A.   Yes.

8     Q.   And then a hard copy that Troop N takes

9  to the district attorney?

10    A.   Yes.

11    Q.   Okay.   Looking at Exhibit 55, the

12 use-of-force report, you just indicated that you

13 created this document; is that correct?

14    A.   Yes.

15    Q.   The date on the top of the report is

16 6/18/2017; is that correct?

17    A.   Yes.

18    Q.   I want to make sure, is this the same

19 incident with Mr. Terrell that we've been

20 discussing?

21    A.   Yes.

22    Q.   The date of the incident in the other

23 reports that we've been looking at is 6/17/2017?

24    A.   Yes.

25    Q.   Okay.   Why is the date on the



1    use-of-force report 6/18/2017?

2        A.    Well, we arrested him at 11:44.  So

3    going into the next day would have been 6/18.

4    Then according to your booking information that

5    you provided, we didn't book him in the jail until

6    7:44.  And I probably was tired, went to sleep,

7    then came back to work, and put this information

8    in.

9        Q.    But it's the same incident that we've

10   been talking about?

11       A.    Yes.

12       Q.    Okay.  Looking at the, I guess it's

13   Number 21, as part of this report, section 21.  It

14   talks about photos by, and it says, "Trooper Troy

15   Pichon;" is that correct?

16       A.    Yes.

17       Q.    What photos is this referring to?

18       A.    Photos taken of his injuries.

19       Q.    And you indicated a minute ago that the

20   photographs that you took of Mr. Terrell at UMC

21   could be attached to the use-of-force report; is

22   that correct?

23       A.    They should have been, yes.

24       Q.    Okay.  Am I correct that there are no

25   photographs of Mr. Terrell attached to the



1    use-of-force report that we are looking at?

2        A.    No, there's no photos.  I'm trying to

3    see what box that indicates, because you're

4    attaching them to it as an attachment.  So if they

5    didn't click on the thumbnail to open up the

6    attachment to review the photos, then we probably

7    wouldn't have got them.

8        Q.    So the photographs would have been

9    attached electronically?

10        A.    They should have been, yes, ma'am.

11        Q.    Okay.

12        A.    I'm trying to see what box shows where

13    you attached the photos.  Like I say, the only box

14    number, right after 37, say "photos taken," I put

15    "yes."  But I'm trying to figure out exactly where

16    would they be stored on this database.

17        Q.    If they had been attached

18    electronically, would they still exist in the

19    database where this report is stored?

20        A.    They should be, yes.

21        Q.    I'm looking at the boxes at the end of

22    this use-of-force report, that indicate kind of

23    the sign-off on this report.  The first box

24    indicates reporting officer's printed name, Troy

25    Pichon, correct?



1        A.    Yes.

2        Q.    And the date under that is July 5th,

3    2017, correct?

4        A.    Yes.

5        Q.    What is that date stamp?

6        A.    You got me.  I'm not sure.

7        Q.    Okay.  Do you know --

8        A.    I don't know why it's timestamped that

9    far after the incident.

10        Q.    Okay.  Do you remember when you

11    completed this report?

12        A.    Should have been on the 18th, when I

13    opened it up.

14        Q.    Okay.  Is there a step you have to take

15    in order to submit the report for review?

16        A.    Yes.  Once you finish it, you hit save,

17    and it saves it to use-of-force database.

18        Q.    Okay.  Do you remember when you

19    submitted it for review?

20        A.    Should have been that date that I opened

21    it up on the 18th.

22        Q.    Do you know that you submitted it on the

23    18th?

24        A.    If I opened it up, I submitted it on the

25    18th.

1    Q.    Okay.  There is a few other signature
2    boxes, one being the supervisor's signature?
3    A.    Yes.
4    Q.    Okay.  And that's Trey Bellue; is that
5    correct?
6    A.    Yes.
7    Q.    And we already spoke about him as the
8    sergeant.
9    A.    You see, he signed it on 7/3.  So he
10   couldn't approve it if I closed it out on 7/5.  So
11   I don't know what's going on.
12   Q.    That is exactly what I am trying to
13   understand.  Can you open up a use-of-force report
14   after you've completed it?
15   A.    I'm sorry?
16   Q.    Is there an ability to open up a
17   use-of-force report after you've written it?
18   A.    Yes.  You can go into your own
19   use-of-force reports and open it up.
20   Q.    Do you know if, when you open up a
21   use-of-force report after saving it and submitting
22   it, if the --
23   A.    Timestamp changes?  It may have.
24   Q.    Do you remember, were you opening this
25   use-of-force report after submitting it?



1      A.   I don't remember.  But if the timestamp

2 say I did, I must have.

3      Q.   Okay.  Do you remember editing this

4 use-of-force report after it had been submitted?

5      A.   No.  Once it's submitted and signed off

6 by supervisor, you cannot edit it.

7      Q.   The actual reporting officer is no

8 longer able to edit it?

9      A.   No, ma'am.

10     Q.   Okay.  Did Sergeant Bellue speak with

11 you about this use of force?

12     A.   Yes, on the scene.

13     Q.   Did he speak to you after you had

14 submitted this use-of-force report?

15     A.   I can't remember.

16     Q.   Okay.  Darrin Naquin is listed here as

17 the section commander; is that correct?

18     A.   Yes.

19     Q.   Who is Darrin Naquin?

20     A.   He's a major with the state police right

21 now.

22     Q.   What was his, I guess, role in reviewing

23 this report?

24     A.   He was the captain of Troop N at the

25 time.

1    Q.   Okay.  Did Captain Naquin speak with you
2    about this use of force?
3    A.   No, ma'am.
4    Q.   And then the last signature that's on
5    here is Derrell Williams, and he is listed as the
6    training academy director; is that correct?
7    A.   Yes.  I believe, at the time, he was
8    training academy director.
9    Q.   Does he have a different position now?
10   A.   I believe so, yes.
11   Q.   Did Derrell Williams speak with you
12   regarding this use of force?
13   A.   No, ma'am.
14   Q.   Did he communicate with you about it in
15   any way?
16   A.   No.
17   Q.   Okay.  Other than Sergeant Bellue being
18   on scene, did Sergeant Bellue, Darrin Naquin or
19   Derrell Williams communicate with you about this
20   use of force at all?
21   A.   No.
22        MRS. WASHINGTON:  Can we go off record
23        for just a second.
24        (RECESS 3:23-3:25 P.M.)
25



EXAMINATION BY MRS. WASHINGTON:

1      Q.   Am I correct in understanding that you
still work overtime shifts with Troop N?

      A.   Not -- I haven't worked there since
maybe about February.

      Q.   Okay.  Do during your work with Troop N,
either in your permanent assignment capacity or
when working overtime, have you been involved in
other incidents involving uses of force?

      A.   You have a list of them, yes.

      Q.   Okay.  Do you remember how many use of
force incidents you've had working in New Orleans?

      A.   If you can consider in pursuits and
other stuff, no, I don't have a clear.

      Q.   What about just uses of force?

      A.   I can't remember.

      Q.   Okay.

      A.   I indicated earlier, it had to be less
than five.

      Q.   Less than five uses of force?

      A.   Yes.

      Q.   That's during your time with the state
police?

      A.   Yes.

      Q.   Okay.  Are you familiar -- we spoke



         1    about Lieutenant Bradley earlier; is that right?
         2         A.   Yes.
         3         Q.   Okay.  He was on that EIS form that we
         4    looked at, correct?
         5         A.   Yes.
         6         Q.   At -- what was his role in relation to
         7    you in 2016?
         8         A.   2016?
         9         Q.   Yes.
        10         A.   Can't remember exactly where Lieutenant
        11    Bradley was at, at that point in time.  At the
        12    time the EIS was --
        13         Q.   Correct?
        14         A.   Well, he had to be my current lieutenant
        15    at the time.  If he ordered the EIS report.
        16         Q.   Okay.  Would that have been in your
        17    narcotics assignment?
        18         A.   Yes.
        19         Q.   Okay.  Do you still have any relation to
        20    Lieutenant Bradley?
        21         A.   Yes.  He's still currently my
        22    lieutenant.
        23         Q.   Okay.  In narcotics?
        24         A.   Yes.
        25         Q.   We spoke about sergeant Cuccia, who was



1    on the LSP case report related to Mr. Terrell,

2    correct?

3         A.    Yes.

4         Q.    Does he still have any chain of command

5    relationship to you?

6         A.    Yes.  He's still currently the sergeant

7    in narcotics.

8         Q.    Okay.

9              MRS. WASHINGTON:  Can we take a break

10             and go off record.

11             (RECESS 3:28-3:32 P.M.)

12   EXAMINATION BY MRS. WASHINGTON:

13        Q.    We spoke about Captain Naquin earlier.

14        A.    Yes, ma'am.

15        Q.    Do you remember if you spoke with him

16   when you were being hired by the state police?

17        A.    Being hired by state police?

18        Q.    Yes.

19        A.    I couldn't tell you who sat on my

20   interview board.

21        Q.    Did you have conversations with anybody

22   else at the state police about being hired, other

23   than the panel that you described earlier?

24        A.    As far as?

25        Q.    Any conversations you might have had,



```
 1   either formal parts of the interview process or
 2   informal meetings?
 3        A.   I stopped a couple of troopers that I
 4   didn't know, like, "hey, look, I'm interested in
 5   coming over, how is it."  Other than that, no.
 6        Q.   Okay.  Do you remember having an
 7   individual conversation with Darrin Naquin around
 8   the time that you were applying to the state
 9   police?
10        A.   I think I did have a conversation during
11   the hiring process.  He was -- at the time, he was
12   the commander of Troop C.
13        Q.   Okay.
14        A.   And since you brought it up, the way the
15   state police works, you get three choices.  You
16   get your first choice, second choice, third
17   choice.  His troop was my second choice.  So set
18   up a meeting with him, sit down with him and
19   discuss possibly coming to Troop C if Troop B
20   didn't have any availability.
21        Q.   Okay.  Do you remember anything else
22   about the conversation that you had with him?
23        A.   No.  He just basically asked me about
24   myself and where I was from and what I've done.
25   Just general questions, ask me about family, you
```



1    know.  I guess he wanted to get a feel what type

2    of person I was.  If he was going to consider me

3    coming to Troop C at the time, he just wanted to

4    be sure that I was somebody that might fit into

5    Troop C area, like I said.  But, unfortunately, I

6    went to Troop B, for him, and he didn't have the

7    chance to select me.

8        Q.   Did you speak with him about your work

9    with NOPD at that time?

10       A.   I'm not sure.  I believe I discussed it.

11   Told him about my time at NOPD and what had been

12   going on, NOPD stuff I've done in my law

13   enforcement career and just to kind of give him a

14   basis about my experience with law enforcement.

15       Q.   Okay.  Just a few final questions.  How

16   did you first hear that Zachary Terrell had filed

17   a lawsuit regarding his arrest?

18       A.   Saw it on the news.

19       Q.   Okay.  What news?

20       A.   One of them.  The Advocate or somebody

21   reported it.

22       Q.   Was this on TV?

23       A.   I believe it was on a news article, if

24   I'm not mistaken.

25       Q.   Did you receive any other notification

1    regarding the lawsuit?

2        A.    Only after I saw it on The Advocate, did

3    I receive formal notification that a lawsuit had

4    been filed.

5        Q.    And prior to seeing it on the news, did

6    you remember the arrest of Mr. Terrell?

7        A.    It had went to the back of my mind.

8    Like I said, once the case was over with, I went

9    on continuing doing my job.  And when they brought

10   it up, I kind of had to go back and remember what

11   happened.  I was, like, okay, I remember that

12   case.  Then I kind of reflected on what happened

13   from that point on.

14       Q.    Okay.  After Mr. Terrell had been

15   arrested and the case report had been provided to

16   the district attorney's office, were you contacted

17   by the DA related to his prosecution at all?

18       A.    No, ma'am.  I didn't know where the case

19   stood or what had happened, that he even pled

20   guilty, until The Advocate reported in the

21   newspaper that he pled guilty.

22       Q.    So didn't know about the resolution of

23   the arrest until you saw the news article?

24       A.    Yes.

25       Q.    Before the -- before you saw the news

1 article, before the lawsuit, had you spoken to

2 anybody about the arrest of Mr. Terrell?

3     A.   No.

4     Q.   And after you knew about the lawsuit but

5 before your deposition today had been scheduled,

6 did you review any documents to refresh your

7 memory about this incident?

8     A.   I sat down with my attorney, and we went

9 over some information.

10     Q.   Okay.  What documents did you review in

11 preparing for your deposition?

12     A.   My case report from the arrest.  I don't

13 think we specifically looked at the use-of-force

14 report, but we did look at the case report.

15     Q.   The case report is the state police --

16     A.   The arrest report that was sent to

17 district attorney's office.

18     Q.   Okay.  And since the lawsuit has been

19 filed, have you spoken with anybody else, other

20 than your counsel, about Mr. Terrell's arrest for

21 this case?

22     A.   No, ma'am.

23           MRS. WASHINGTON:  As we mentioned

24           earlier, we're holding the deposition

25           open pending the production of



```
 1              additional documents.  And I'm going to

 2              reserve the remainder of our time today

 3              to question you about those documents

 4              when they're produced.  And your counsel

 5              and I will arrange a time and a date to

 6              have you return for questioning on those

 7              documents.  But I'm finished with my

 8              questions for you today.  So thank you.

 9         THE WITNESS:  Yes, ma'am.

10         MR. FAHRENHOLT:  I did want to note on

11              the record we will agree to do so, but

12              only to the extent that questions deal

13              with any documents that are produced or

14              any new information that is discovered

15              in those documents.

16         MRS. WASHINGTON:  Okay.

17         MR. FAHRENHOLT:  I do have a few quick

18              questions.

19         MRS. WASHINGTON:  Do we want to state

20              the amount of time on the record?

21         MS. MURRAY:  Go off.

22         (RECESS 3:37-3:38 P.M.)

23         THE COURT REPORTER:  5 hours, 43

24              minutes.

25    EXAMINATION BY MR. FAHRENHOLT:
```



1      Q.   Mr. Pichon, earlier you were asked what

2  charges were filed based on your report.  And you

3  had mentioned there was a possession charge and a

4  possession with intent to distribute charge.  Were

5  there any other charges associated with your

6  arrest?

7      A.   Yes, resisting arrest.  He had three

8  total charges.

9      Q.   Okay.  What was your basis for charging

10  Mr. Terrell with resisting arrest?

11      A.   The fact that he refused to stop, and he

12  ran from us, and he was not obeying officer's

13  command to stop.

14      Q.   Do you know what the disposition of that

15  charge was?

16      A.   I guess he pled guilty to all three

17  charges.

18          MR. FAHRENHOLT:  Okay.  I have no other

19          questions.

20          MRS. WASHINGTON:  Thank you.

21          (DEPOSITION CONCLUDED AT 3:40 P.M.)

22

23

24

25



1          WITNESS' CERTIFICATE

2

3      I, TROOPER TROY PICHON, read or have had the

4   foregoing testimony read to me and hereby certify

5   that it is a true and correct transcription of my

6   testimony, with the exception of any attached

7   corrections or changes.

8

9

10

11

12

13      _____          _____

14      DATE SIGNED            TROOPER TROY PICHON

15

16

17

18      INITIAL ONE:

19

20      _____ Read with no corrections.

21

22      _____ Read and correction sheet attached.

23

24      DATE TAKEN:  MAY 14, 2019

25



REPORTER'S CERTIFICATE

1                        REPORTER'S CERTIFICATE

2        This certification is valid only for a

3  transcript accompanied by my original signature

4  and original seal on this page.

5        I, ANNA C. COATES, CCR, RPR, do hereby

6  certify that TROOPER TROY PICHON, to whom the oath

7  was administered, after having been duly sworn by

8  me upon authority of R.S. 37:2554, did testify as

9  herein above set forth in the foregoing 283 pages;

10  that this testimony was reported by me in the

11  stenotype reporting method, was prepared and

12  transcribed by me and is a true and correct

13  transcript to the best of my ability; that the

14  transcript has been prepared in compliance with

15  transcript format guidelines required by rules of

16  the board; that I have acted in compliance with

17  the prohibition on contractual relationships, as

18  defined by Louisiana Code of Civil Procedure

19  Article 1434 and in rules and advisory opinions of

20  the board; that I am not related to counsel or the

21  parties hereto, nor am I otherwise interested in

22  the outcome of this matter.

23  _____      _____

24  DATE             ANNA COATES, CCR, RPR

25                LOUISIANA CCR NO. 97018



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799