Transcript of the Testimony of

# LIEUTENANT PATRICK BRADLEY

May 31, 2019

ZACHARY TERRELL v. TROOPER TROY PICHON, ET AL



C O U R T   R E P O R T I N G   &   L I T I G A T I O N   S U P P O R T

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | |
|---|---|
| ZACHARY TERRELL, | NO. 2:18-cv-05787 |
|     Plaintiff, | |
| | SECTION: E |
| v. | |
| | JUDGE: MARTIN C. |
| TROOPER TROY PICHON, | FELDMAN |
| TROOPER JEFFREY ROACH, | |
| LIEUTENANT DERRELL | MAG: MICHAEL B. NORTH |
| WILLIAMS, and CAPTAIN | |
| DARRIN NAQUIN, each in | DIVISION: 5 |
| their individual | |
| capacities. | |
|     Defendants. | |


DEPOSITION OF LIEUTENANT PATRICK BRADLEY,
taken at the MACARTHUR JUSTICE CENTER, 4400 SOUTH
CARROLLTON AVENUE, NEW ORLEANS, LOUISIANA 70119,
in the above-entitled cause on the 31st day of
May, commencing at 9:36 a.m.

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1    APPEARANCES:

2

3    ATTORNEYS REPRESENTING THE PLAINTIFF, ZACHARY

4    TERRELL:

5

6         LAW OFFICE OF ELIZABETH CUMMING

7         1040 St. Ferdinand Street

8         New Orleans, Louisiana  70117

9         Phone: (504) 291-6990 |Fax: (504) 291-6995

10        (BY: Elizabeth Cumming, Esquire)

11        E-mail: Elizabeth.cumming@ecumminglaw.com

12        (BY: Emily Washington, Esquire)

13        emily.washington@macarthurjustice.org

14        (BY: James Craig, Esquire)

15        jim.craig@macarthurjustice.org

16

17   ATTORNEYS REPRESENTING THE DEFENDANT, TROY

18   PICHON, ET AL:

19

20        BURGLASS TANKERSLY, L.L.C.

21        5213 Airline Drive

22        Metairie, Louisiana  70001

23        Phone: (504) 836-0431 |Fax: (504) 836-2221

24        (BY: Craig J. Canizaro, Esquire)

25        E-mail: ccanizaro@burglass.com
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

 1   APPEARANCES CONTINUED:

 2

 3   ATTORNEYS REPRESENTING THE LOUISIANA STATE

 4   POLICE:

 5

 6        LA DEPT OF PUBLIC SAFETY & CORRECTIONS

 7        7979 Independence Boulevard

 8        Baton Rouge, Louisiana  70806

 9        Phone: (225) 925-6146 | Fax: [!FAX3]

10

11        (BY: Jennifer D. Murray, Esquire)

12        E-mail: jennifer.murray@dps.la.gov

13

14

15

16

17

18

19

20

21

22

23   REPORTED BY:CHERIE' E. WHITE

24             CCR (LA), CSR (TX), CSR (MS), RPR

25             CERTIFIED COURT REPORTER



1  E X A M I N A T I O N   I N D E X

2

3  BY:                                      PAGE

4

5   Ms. Cumming                               6

6   Mr. Canizaro                            350

7

8            E X H I B I T S

9

10  NO.   DESCRIPTION                        PAGE

11

12   72     E-mail from Naquin to Kennedy,    113

13          Troop N, Training List

14   73     8/9/16 Use-of-Force Report        192

15   74     6/16/18 Use-of-Force Report       275

16   75     Planning & Evaluation Form        283

17

18

19

20

21

22

23

24

25



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically NOT waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

*    *    *    *

CHERIE E. WHITE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath.



1          LIEUTENANT PATRICK BRADLEY,

2     after having first been duly sworn by the

3     above-mentioned court reporter, did testify as

4     follows:

5     EXAMINATION BY MS. CUMMING:

6          Q.     Good morning.  Could you please

7     state your name for the record?

8          A.     Patrick Bradley.

9          Q.     Good morning, Lieutenant Bradley.

10    My name is Elizabeth Cumming.  I am an attorney

11    for the plaintiff in this case and we are here

12    today to -- to take your deposition.  Have you

13    ever had your deposition taken before?

14         A.     Yes.  I've -- I think I've had a

15    couple over the years.

16         Q.     Okay.

17         A.     It's been quite a while, though.

18         Q.     Okay.  And what were the -- the

19    circumstances of those previous depositions?

20         A.     The depositions, I think primarily

21    traffic accidents at law firms once or -- once or

22    twice in New Orleans over the years, but, like I

23    said, that's been quite a while for those.

24         Q.     Okay.  And when you say traffic

25    accidents, as a -- as a law enforcement officer?



```
1         A.      Yes, ma'am.

2         Q.      Okay.

3         A.      Yes.  Yes, ma'am.

4         Q.      All right.  So I'm sure in those

5  instances the attorney taking the deposition

6  probably went over a lot of the same ground rules

7  I'm about to go over, but just to refresh your

8  memory.  You have just taken an oath.  It's the

9  same oath that you would take as if you were in a

10 court of law.  So what we are giving here today

11 is sworn testimony, so just be mindful that --

12 that everything you say here today is under oath,

13 so be as accurate as -- as you can be.

14            We have the court reporter who

15 administered the oath.  She is taking down

16 everything that we say, so that in order to have

17 a nice, clean transcript, it's important that you

18 answer verbally yes or no rather than shaking

19 your head.  If you start indicating on your body,

20 I -- I may start narrating --

21        A.      Okay.

22        Q.      -- that for you just so it all --

23        A.      Yes, ma'am.

24        Q.      -- gets reflected in the transcript.

25            It is important that you also, you
```



1    know, let me get my question out and then you
2    respond so that we can have a clear transcript.
3    If I ask a question at some point that is
4    unclear, which I promise will happen at some
5    point today, just ask me to clarify it, ask me if
6    I can phrase it another way and I will do my best
7    to -- to make it a better question.  If I ask you
8    a question and you answer it, I'm going to assume
9    that you understand the question.
10              If at some point you need to take a
11   break, that's completely fine.  If I've got a
12   question that I've asked you, just go ahead and
13   answer my question and then it's perfectly fine
14   for -- for you to ask for a break.
15         A.    Yes, ma'am.
16         Q.    Is there any reason that you cannot
17   give accurate, truthful testimony today,
18   medication, sleep deprivation, illness or any
19   other reason?
20         A.    No, ma'am.
21         Q.    I'd like to just relatively quickly
22   run through a little bit of your education and
23   work history.  Did you go to high school?
24         A.    I did.
25         Q.    And did you graduate?



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

1      A.      I did.

2      Q.      Where did you graduate from?

3      A.      I graduated from Brother Martin High

4  School here in New Orleans in 1989.

5      Q.      Okay.  And did you have any other

6  education after high school?

7      A.      Yes, ma'am.  I have a -- I believe

8  in '94 I completed an associate's degree in

9  criminal justice from Delgado Community College

10  in New Orleans.

11      Q.      Uh-huh (affirmatively).

12      A.      And in '01 I completed a bachelor of

13  criminal justice at Loyola here in New Orleans.

14      Q.      Okay.  So '94 is the associate's and

15  2001 is the bachelor's?

16      A.      I believe so, yes, ma'am.

17      Q.      Okay.  Any other graduate level post

18  bachelor?

19      A.      No, ma'am.

20      Q.      Okay.  Do you have any military

21  experience?

22      A.      I do.  I -- I spent a total of eight

23  years, six -- what they call six by two contract

24  in the Marine Corps reserve from 1990, and I was

25  honorably discharged in 1998.  Six of those years



```
 1    were active reserve; two were inactive where I
 2    was still obligated, but I no longer went on
 3    duty, I guess you could say.  But so a total of
 4    eight years in the Marine Corps Reserve.
 5          Q.    Okay.  And when you were in the
 6    reserve, were you ever deployed?
 7          A.    No, ma'am.
 8          Q.    Okay.  And while you were a
 9    reservist, you also had other employment; is that
10    correct?
11          A.    I did.  When I went in in '90, I
12    was -- I was 19 years old.  I was working at a
13    grocery store.  It was a Canal Villere at the
14    time, but it isn't there any more, like other
15    things, but -- but in 1992, I became a
16    New Orleans police officer while I was still a
17    Marine reservist.
18          Q.    Okay.  All right.  And tell me a
19    little bit about -- well, let me -- let me ask
20    this.
21          A.    Okay.
22          Q.    From 1989 to '92, did you have any
23    other employment other than --
24          A.    It would have been that grocery,
25    Canal Villere, as a teenager.
```



1     Q.    Got it.  Okay.  And so 1992 you
2   joined the NOPD?
3     A.    Yes.
4     Q.    Okay.  Can you tell me about your --
5   your work experience and career at NOPD?
6     A.    Yeah.  Well, in 1992, I went, got
7   hired, went to the training academy.  Upon
8   graduating from the training academy, I was
9   assigned to the 7th District in New Orleans East
10  where I worked until June of 1994.
11    Q.    Uh-huh (affirmatively).  And what
12  were -- what was your assignment in the 7th
13  District?
14    A.    Initially, I was on the -- a
15  patrolman and just a patrolman in District 1 on
16  the -- on the regular shift; and after sometime
17  on the shift, I was assigned to the 7th District
18  task force, which is also a district level
19  patrolman, but it was a proactive enforcement
20  unit that concentrated in high crime areas or
21  whatever the district commander deemed was a
22  priority.
23    Q.    Uh-huh (affirmatively).
24    A.    So it was more proactive rather than
25  answering calls on the radio.



1    Q.    And I want to make sure that we are

2  speaking the same language, so help me understand

3  proactive.

4    A.    Proactive would be more

5  self-initiated work as opposed to a call --

6  answering calls for service on the radio, which

7  we were responsible for that too.

8    Q.    Uh-huh (affirmatively).

9    A.    We would go on, I guess, in

10  progress, what they'd call Code 2s.  We would go

11  on things like that, but we didn't generally get

12  sent to calls by -- by the dispatcher on that

13  unit unless -- unless they got shorthanded and

14  requested it.

15    Q.    Uh-huh (affirmatively).

16    A.    So that would have been the

17  difference.

18    Q.    So you were -- you were sort of --

19  tell me if this is correct.  You were identifying

20  things -- things that needed to be done or things

21  to do in the course of your shift; would that be

22  correct?

23    A.    Yeah.  I would say more

24  self-initiated activity or concentrated area

25  enforcement, areas that the district commander



1  deems --

2      Q.    Okay.

3      A.    -- deems a priority.

4      Q.    Okay.  All right.  So I guess I'm

5  trying to understand a little better the -- the

6  self-initiated activity.  What -- what would the

7  activity part of that be?

8      A.    Consists of self-initiated traffic

9  stops or suspicious person stops.  You know, a

10  lot of -- a lot of what we did in that unit was

11  street level narcotics enforcement.

12            One thing I remember, there was a

13  rash of -- there was a rash of armed robberies at

14  one point in time, just to -- to give you an

15  example, where there were a lot of carjackings

16  were taking place.  And over a period of time,

17  they got a description of a vehicle, it was a

18  vehicle stolen in a carjacking, and they were

19  doing a whole lot of them in the 7th and 3rd

20  Districts, which is kind of Lakeview area.

21            And so that became a priority for

22  that district to solely look for this, so we

23  proactively went and looked for this car.  At

24  that point, they had a make, model, license plate

25  and everything, so we ended up -- we did locate

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1  it, find them, and capture the guy.  He was, you

2  know, wanted for a whole bunch of armed robberies

3  and things like that.

4          So it was more just, like I said,

5  whatever the district commander deemed; and we

6  weren't tied to answering 50 -- you know, 50

7  callback log or whatever it was back then in the

8  early '90s, so --

9          Q.    Okay.  And then in June 1994, you

10 said that was the end of your assignment in the

11 7th District.  What happened then?

12         A.    Actually, I actually left the

13 New Orleans Police Department in June of 1994 and

14 was sent to -- to work for the Gulfport,

15 Mississippi Police Department.  I moved to the --

16 to the gulf coast for sometime and became a

17 police officer in Gulfport.

18         Q.    Okay.  And how long were you in

19 Gulfport?

20         A.    To February of -- to February of

21 1997.

22         Q.    Okay.  And what were your

23 assignments in Gulfport?

24         A.    Pretty similar to New Orleans.  I --

25 I was a -- I was hired as a lateral -- well, at



1    that time, they -- they had annexed a lot of area

2    that was prior to that as part of the county, so

3    they were hiring a lot of prior police officers

4    to their area.  So I was -- I was hired and I

5    went to a brief training period with another,

6    like an FTO, field training program, and I was

7    put on patrol on a regular shift like similar to

8    how I did in New Orleans.

9         Q.    And what -- what led to the -- the

10   move from NOPD to Gulfport PD?

11        A.    I was very young at the time and it

12   seemed like at that time a lot of the -- the

13   things were building up in the -- on the coast,

14   and I thought over a period of long-term, it was

15   a -- was a wise career move because, you know,

16   they were growing and it looked -- you know, and

17   they had a lot of resources with the -- with the

18   casinos and things like that.  So it just seemed

19   like the area itself was booming and some

20   other -- some other guys I knew were -- were --

21   had interviewed with them and was speaking highly

22   of the department, so I just kind of looked into

23   it and ended up --

24        Q.    Uh-huh (affirmatively).

25        A.    I was in my early 20s.  I didn't



1    have a whole lot of reasons to not try something

2    new, so it was -- it was pretty much just that

3    and I thought it was -- for the future, it was

4    going to be an up and coming department that

5    would have been a wise career move at that time.

6          Q.    Okay.  And then February 1997

7    what -- what happened next?

8          A.    I got hired on by the Louisiana

9    State Police, and I've been working in one

10   capacity or another ever since.

11         Q.    Okay.  And what led to that, that

12   move from Gulfport to LSP?

13         A.    I -- I did well in Gulfport and I

14   enjoyed it, but it -- it -- being in law

15   enforcement, being from New Orleans, it -- it --

16   honestly once I was somewhere else, it meant more

17   to me to -- to work where I was from and my home,

18   so it was -- I started -- had some -- some guys I

19   worked New Orleans with had went to Louisiana

20   State Police.

21              So I started going through the

22   process and looking into it and I thought it

23   would be a good way to come back home to the

24   New Orleans area and, you know, with the -- about

25   five years of experience I had at that point

1    and -- and, you know, some of the education and

2    stuff that I had done, that it would have been --

3    again, that was another career step that I

4    thought was a -- was a good move. I was -- quite

5    honestly, I was a little homesick in Gulfport

6    and, again, being the type of work that it is, it

7    just meant a little bit more to me to -- to be a

8    police officer where I was from, quite honestly,

9    I guess.

10           Q.    Uh-huh (affirmatively).  Okay.

11           A.    No big -- no big mystery exit or

12   anything.  I just -- you know, I just thought

13   it -- thought it was -- would be a good move, you

14   know.  Again, I was in my early 20s with all of

15   it.  I never thought too much back then about

16   those things.

17           Q.    Okay.  So you started in

18   February 1997.  What -- what was -- what was the

19   position that you started with them with?

20           A.    Well, I was hired and went through

21   the training.  That was Louisiana State Police

22   training academy --

23           Q.    Uh-huh (affirmatively).

24           A.    -- which was pretty long at that

25   time.  It was, I think, 17 weeks, if I remember



1    correctly, and I was assigned to Troop B

2    initially.  And it was where it is today in

3    Kenner, the physical station, the physical troop

4    level.

5            Q.    And what were your -- when you were

6    assigned to Troop B, what were you doing?

7            A.    I was -- I was a -- as a -- as a

8    state trooper, I initially went through a field

9    training officer's program and then I was a road

10   trooper at -- at Troop B.  I primarily worked on

11   the west bank back then, but I was in your basic

12   traffic enforcement that -- that troopers do at

13   Troop B.

14           Q.    And the FTO program that you went

15   through, what -- what all did that include?

16           A.    Boy, you going back a ways.  It was

17   you -- you went through several phases of riding

18   and being critiqued by other more experienced

19   troopers, and they just kind of mentor you and

20   teach you to reinforce things from the academy

21   until they -- until it's deemed that you're --

22   you get to go on your own.

23           Q.    Okay.  Are there -- do you -- do you

24   recall are there any specific areas that -- that

25   absolutely must be covered in the FTO program,



```
 1   like kind of a required curriculum?
 2          MR. CANIZARO:
 3               Let me object to the form.  You mean
 4          now or when he went in '97?
 5          MS. CUMMING:
 6               When he was getting started.
 7          THE WITNESS:
 8               I don't recall anything specific,
 9          just can you, I guess, handle yourself
10          competently without somebody; because at
11          the -- at the beginning level, a trooper's
12          about -- you know, you are by yourselves
13          and oftentimes you cover a lot of area.
14          So just, you know, are you competent with
15          traffic stops and -- and -- and handling
16          people on side, talking with people on
17          side the road and being safe and all the
18          things that come with, I would say, first
19          level law enforcement.
20   BY MS. CUMMING:
21          Q.    Uh-huh (affirmatively).  Okay.  And
22   did you ever work as an FTO trainer?
23          A.    I did not.
24          Q.    Okay.  And so about how long were
25   you doing sort of the -- the traffic enforcement
```



```
 1    work at Troop B?
 2         A.    I -- I went -- I went to a
 3    plainclothes investigations fairly -- fairly
 4    quickly.  I -- sometime in 1999, I went to
 5    narcotics, our narcotics division, and for the
 6    most -- for the majority of my career, I've been
 7    in -- in plainclothes or investigative
 8    positions --
 9         Q.    Uh-huh (affirmatively).
10         A.    -- since then --
11         Q.    Okay.
12         A.    -- for -- for the most part.
13         Q.    So you went to plainclothes.  Would
14    that have been within Troop B or --
15         A.    B would be the troop -- all
16    plainclothes personnel for state police are
17    technically considered headquarters out of
18    Baton Rouge, but it would be the -- it would be
19    the New Orleans field office, which Troop B
20    encompasses.
21         Q.    Okay.
22         A.    So yes.  The -- the -- initially,
23    the actual physical office was at Airline and
24    Labarre in Metairie.  There's a -- the old
25    Pelican building there and I think maybe a
```



1    Regions Bank I was telling somebody earlier; but

2    it was physically in Metairie, the office, but it

3    covered the same parish as troop -- I was

4    responsible for the same parish as Troop B is

5    responsible for.

6         Q.    Okay.  But technically, you were --

7    you would have been assigned to headquarters,

8    right?

9         A.    Yeah.  My supervisor -- yes, ma'am.

10   It wouldn't be the chain of command at Troop B.

11   It would have been technically headquarters --

12        Q.    Uh-huh (affirmatively).

13        A.    -- but the field office of

14   New Orleans.

15        Q.    And I've heard other -- other

16   witnesses talk -- talk about the Bureau of

17   Investigation, the BOI.  Would that be your chain

18   of command?

19        A.    That's part of -- yes, ma'am.

20   That's part of BOI and the sections within BOI

21   that have supervisors and things of that nature,

22   different sections within.  It would be -- the

23   entire plainclothes state police would be

24   considered the Bureau of Investigation.

25        Q.    Okay.  Got it.  So that was -- that

1    was roughly, I don't know, a year and a half, two

2    years after -- after doing traffic enforcement?

3            A.    Yes, ma'am.

4            Q.    Okay.  What made you, you know, go

5    from traffic enforcement to the plainclothes

6    narcotics?

7            A.    Initially, I actually got a phone

8    call from another trooper that was in narcotics

9    and he asked -- there was an opening in narcotics

10   and just asked me why -- asked me why I didn't

11   put in for the opening; and I responded to him

12   that I didn't know there was an opening.  So, you

13   know, he -- he -- he kind of pressed upon me that

14   he thought I might be a good fit for that, and if

15   I was interested, suggested I go talk to the

16   sergeant at the time; and -- and I don't know if

17   I brought a copy of my résumé or just put in for

18   it.  I don't know exactly what it was, but yeah.

19   It -- I was -- I don't want to say I was

20   recruited to it, but it was somebody approached

21   me and asked --

22           Q.    Uh-huh (affirmatively).

23           A.    -- I guess thought that maybe I

24   would be a good fit for the section.

25           Q.    Okay.



1      A.      So they -- somebody approached me
2   about an opening that I didn't know existed until
3   he approached me.
4      Q.      Do you recall who it was that
5   approached you?
6      A.      John Schmidt, who is a -- who is an
7   HSI agent today, Homeland Security person.
8      Q.      Okay.  And you -- you said that --
9   you know, that you hadn't known about the
10  opening.  How were -- how would those openings to
11  BOI be posted?
12     A.      At that time, I didn't -- didn't
13  know, but now that I'm in BOI, we have e-mails
14  and databases and stuff.  We have today what I
15  would consider a bulletin board that you can kind
16  of go look at, but generally speaking on the road
17  back then, you didn't have computer.  Everybody
18  and everything now is at the tip of your fingers,
19  but back then you -- you might not really, unless
20  -- I don't know really back then how you were
21  notified.  I guess if you had rollcall and said,
22  hey, maybe I could lose a couple of my guys and
23  go to the academy.  You know, you didn't
24  always -- you know, you didn't always know about
25  that because you had less guys, you know.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    Q.    Yeah.

2    A.    You could lose some guys that you

3  need or something like that into another section.

4    Q.    Uh-huh (affirmatively).

5    A.    But today there's a little bulletin

6  board you can check and see such and such in

7  Lafayette or, you know, somewhere else and you

8  can -- there's usually a timeframe you put in for

9  it and you go through interviews and things like

10  that.

11    Q.    So, and -- and that would -- that

12  would be anybody who's doing traffic enforcement

13  right now, they -- they can look at that bulletin

14  board and -- and know?

15    A.    Oh, but yeah.  That's pretty --

16  yeah.  Everybody's got access to that or another

17  section if I wanted to leave one deal and then go

18  do some -- you know, if you're -- if you were

19  interested in a transfer.

20    Q.    Uh-huh (affirmatively).

21    A.    But yeah, back then it wasn't at

22  your fingertips.  I guess, you might have to find

23  out at the troop, you know, through photocopy or

24  something saying, hey, there's an opening if you

25  are interested.



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

1    Q.    Okay.  Do you recall roughly when --
2  when it changed that, you know, there was a
3  slightly more centralized location for -- for job
4  openings and -- and things like that that -- that
5  everybody at the state police could have access
6  to?
7    A.    No.  I just -- I think just as
8  society went a little more paperless then --
9  then -- you know, when for myself, once I got in
10 the plainclothes where now you have -- you know,
11 you have an office, you have a computer and
12 things like that, and generally speaking than if
13 you were in a patrol car every day, you didn't
14 have that.
15   Q.    Uh-huh (affirmatively).
16   A.    So I don't want to commit to a year
17 when that -- that that was more accessible to you
18 than others; but I think just as the -- the
19 evolution of doing reports on -- you know, when
20 things went from handwritten to computer, I think
21 it just got more that way.  Where like now the
22 troopers on the road would have their e-mails and
23 they's check their e-mails, I never -- I never
24 knew I had it.  When I was -- initially, I don't
25 even know -- if I had one, I didn't know it



 1    because I didn't have a computer to check it.  I

 2    think it's just as it evolved to more of a --

 3    could be all your reports are on computers now

 4    where they were handwritten back then.  So I just

 5    think -- I don't want to say a year, but as that

 6    went to a more technical way like everybody is,

 7    you know.

 8         Q.    Okay.  So when you -- when you moved

 9    over to -- to plainclothes, can you run through

10    what -- what you have done in that for the --

11         A.    Yeah.

12         Q.    -- last roughly 20 years?

13         A.    Let's see.  In '99, I went to

14    narcotics.  I was in narcotics for approximately

15    five years and I went -- I -- I briefly was

16    transferred back to -- I was briefly -- briefly

17    transferred back to Troop B around 2004 for a

18    short period of time; and since then from 2004,

19    I'll -- I'll just give you the sections I've been

20    in.

21         Q.    Uh-huh (affirmatively).

22         A.    I've been in gaming casino section.

23    From there, there was a -- they started a unit

24    called the special crimes unit that would

25    concentrate on child -- child exploitation cases


AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1  and financial crimes.  That was kind of -- that

2  at the time was a detail position, but it hadn't

3  become a standalone section.  It's now kind of a

4  standalone section called SVU, but it was kind of

5  under the umbrella of detectives, but it was kind

6  of its own thing at the time.  That kind of

7  evolved -- when that -- that didn't become a

8  standalone section, that kind of involved me

9  moving, going into general detectives.  Exactly

10  what year that morphed into that, somewhere

11  probably around '06 or something.  I'm -- I'm

12  kind of guesstimating that, but --

13          Q.     Uh-huh (affirmatively).

14          A.     -- but I was assigned to general --

15  general assignment detectives.  But I still

16  concentrated on some of those other things that I

17  was doing in the special crimes things, so they

18  kind of just almost merged those two things

19  together.  I was in general detectives until

20  2013, I believe, November where I was promoted to

21  sergeant.

22          Q.     Uh-huh (affirmatively).

23          A.     I was promoted to sergeant in

24  gaming, was there for a relatively short period

25  of time and I was -- I was asked to go transfer



1  to the insurance fraud auto theft section of

2  state police. And I was the -- I was the

3  sergeant over that -- over that section, which is

4  a part of BOI and -- and -- but it's -- it's not

5  general detectives. It's a specific group of

6  detectives that do those two disciplines.

7      Q.  Uh-huh (affirmatively).

8      A.  And I was in that capacity until

9  April of 2016 when I was promoted to lieutenant.

10  I was promoted to lieutenant back in uniform at

11  what's now considered Troop N, the -- the

12  continuous troop down in New Orleans. From

13  there, while at -- while at Troop N shortly --

14  shortly before I was transferred back to where I

15  was planning to be and where I'm at now, they

16  briefly had a plainclothes group at Troop N that

17  they moved me over as the -- as the lieutenant

18  over a small group of guys that did -- was doing

19  plainclothes work just concentrating in -- in

20  areas of the French Quarter.

21          That only lasted a short period of

22  time, and I think the administrations changed and

23  stuff and they decided they wasn't going to go

24  forward with -- at that time with plainclothes

25  guys down in Troop N. It was just going to -- it



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    would be more just guys from BOI, not -- not

2    specifically assigned to Troop N.

3            And in August of 2017, I -- I was

4    transferred where I'm at today as the -- as the

5    OIC of -- of CID regional, CID Region 1, which is

6    the New Orleans field office; and I'm responsible

7    for the narcotics section, the general detectives

8    and the insurance fraud auto theft, three squads

9    within CID, which is criminal investigations in

10   the New Orleans field office, and that's my job

11   right now.

12        Q.    Okay.  That's your job currently?

13        A.    Yes, ma'am.

14        Q.    And just to unpack, you -- you gave

15   me CID; you said OIC.

16        A.    Officer in Charge.  I'm sorry.

17        Q.    Okay.

18        A.    That's -- that's why I described it.

19   They -- they have --

20        Q.    Okay.

21        A.    They have their sergeants in each of

22   those three groups and I'm their immediate

23   supervisor.

24        Q.    Okay.  And your rank is currently

25   lieutenant?



1    A.    Yes, ma'am.

2    Q.    So the move back to Troop B back in

3  2004, what -- what precipitated that?

4    A.    Yeah.  There was a -- there was an

5  incident when an -- with an individual that I

6  worked with that -- that I -- I think I was a

7  recipient of a little collateral damage.  He

8  was -- got involved -- got involved an informant,

9  for lack of better terms, and -- and some things

10  happened with that that -- and me and him worked

11  closely together, so we were pretty much without

12  explanation.  They moved people around, and I was

13  a result of that getting moved around, so --

14    Q.    Were you -- was this considered like

15  a demotion or --

16    A.    No.  It was a transfer.  It's not a

17  demotion or it's not a disciplinary action.  It's

18  a -- you serve at the -- the pleasure according

19  to where your assignment's at, so it was just

20  kind of -- but I think after -- after a while it

21  was -- went back to -- it would have gone back to

22  plain clothes, but nothing related to myself.

23  But -- but yeah, it just kind of -- sometimes

24  they shake up.

25    Q.    Who was the individual that was at



1    the center?

2        A.    The guy I worked closely with at the

3    time, Keith Schumacher.  He's no longer a

4    trooper.

5        Q.    Okay.  Okay.  And all of these

6    assignments have -- in terms of just your

7    geography, have you always been in the greater

8    New Orleans metro area?

9        A.    Yeah.  Almost 100 percent of it.  I

10   did a part of my five years in narcotics.  I did

11   spend a short period of time on the northshore in

12   Troop L area.  They -- they -- they asked me to

13   go over there for a while because there was maybe

14   some manpower, they were short over there.  That

15   was relatively a brief period of time, but I

16   would say 99 percent of my entire career has been

17   in -- in the -- in the greater New Orleans area,

18   which takes you out of the area from time to

19   time, but -- but primarily New Orleans.

20       Q.    Okay.  So you mentioned the

21   promotion to lieutenant and -- and kind of going

22   back into uniform for that promotion?

23       A.    Yeah.

24       Q.    Well, let me -- let me ask this.

25   The -- the promotion process, do you have to



1   actually apply for that?

2          A.    Yes.  Every year -- every year I

3   think around May there's a promotional test

4   that's given at our department.  Initially, you

5   have to have five years on the job to take the

6   test to become a sergeant, to -- to attempt to

7   become a sergeant.

8                And to test for lieutenant, what you

9   have to have is two years as a -- at least as a

10  sergeant and then there's a -- there's a test

11  that's given, a standard test that everybody's

12  given.  They -- grades -- grades come out and

13  then they -- they put out a pass point; and if

14  you've made that, you've made that grade, then

15  you can put in for -- you know, if -- for

16  example, if it's a lieutenant who doesn't have a

17  grade of whatever, if your grade's competitive,

18  if they put out an announcement at Troop N they

19  have an opening for a lieutenant, everybody

20  interested that qualifies can put in, and then at

21  that time the top five grades of all the people

22  that put in make the list.  From that list, you

23  then usually interview with somebody in that

24  chain of command and then it's -- it's decided

25  from there.



```
 1            Q.    Got it.   Okay.   So when did you take
 2      the lieutenant test?
 3            A.    Oh, that -- let's see.   I was
 4      promoted in 2016 around, I think, in April, so I
 5      likely would have taken the test around May of
 6      2015 --
 7            Q.    Okay.
 8            A.    -- for -- for that current grade to
 9      be effective, good, a good grade.
10            Q.    Okay.   So there's a -- there's a
11      time period, like if you take the lieutenant test
12      and then nothing comes open for however long,
13      then you've got to retake it --
14            A.    Yeah.   There's been --
15            Q.    -- if you want to be re-eligible?
16            A.    There's been some ebb and flow to
17      that over the years.   In recent years, some -- if
18      it's the same material, you have the option of
19      keeping your grade or retaking it.   If you retake
20      the test and -- and -- and you don't get as good
21      as that one, well, that one's gone.   You got the
22      bad -- the bad grade.   But most -- most of the
23      times I took it, you had -- you had to take it
24      every year even if, you know, it kind of expired.
25      But -- but some colonels, I think, have had
```

1   different philosophies where, if it's the same

2   material as last year, they will let you. I

3   don't think it's went past -- I don't know if

4   they're going past two years, but you -- there's

5   been -- you can make that decision; do I want to

6   stand on what I did previously or try to test

7   again and get a better grade.

8         Q.   Okay. So how many lieutenant tests

9   did you end up taking?

10        A.   I think that's the first time I -- I

11   think that's the first time I ever took it was --

12   was that time when I got promoted.

13        Q.   Okay.

14        A.   So --

15        Q.   And for -- if you know, for -- for

16   most people, how many times do they end up taking

17   the lieutenant test?

18        A.   I think that varies. I mean, when I

19   made sergeant, I had 16 years on the job, but I

20   was -- so, but I made lieutenant relatively short

21   after the sergeant thing, so I think it just kind

22   of -- sometimes it just depends. I don't -- I

23   don't want to venture to say what -- what that

24   would be. Some guys probably a few; some

25   probably first time out. It just kind of depends



```
 1    on the -- you know, that given situation.
 2         Q.    And the sergeant, everything that
 3    you are talking about with the lieutenant's test,
 4    you know, it's good for a certain period of time?
 5         A.    Yes, ma'am.
 6         Q.    And that applies to the
 7    sergeant's --
 8         A.    Yes, ma'am.
 9         Q.    -- test as well?  Okay.
10         A.    Yeah.
11         Q.    And, if -- if you know, would that
12    also apply to the captain's test or --
13         A.    Yes.  All the -- all the tests are
14    given on the same day and just whatever one you
15    are taking you take.  So yeah, it's all the --
16    it's all the same thing applies.
17         Q.    And how many times did you take the
18    sergeant test?
19         A.    I don't know, to be honest with you.
20    Early -- early, I didn't -- early in my career,
21    during my more detective years and stuff like
22    that, I didn't always -- I didn't know every year
23    it was available to take it since, you know, when
24    I just had five years on the job.  Back then, it
25    wasn't really on my radar, but, you know, as I
```

1    got to be a little bit older, I took it; so I
2    really don't remember.  A handful probably.  I
3    would say no more than four or five times,
4    something like that, but I had to take the
5    sergeant test a few times before getting
6    promoted.
7            Q.    Okay.  So you talked about the --
8    you were promoted to lieutenant at Troop N, so
9    did you actually affirmatively apply for that
10   position at Troop N?
11           A.    Yeah.  At the -- at the -- they --
12   as it became -- as yeah.  At some point, they
13   posted an opening for a lieutenant and there was
14   actually a couple lieutenants that they were
15   making permanent positions, or not like permanent
16   forever, but at that time hard -- hard positions
17   and they did.  They -- but they didn't use -- at
18   the time, it was they considered like the
19   New Orleans enforcement detail or some verbiage
20   like that.  We didn't -- because we had been
21   there a while now, that's kind of been considered
22   an actual troop now, Troop N; but at the time, it
23   was listed like New Orleans Enforcement Detail or
24   something like that, and they put out actual --
25   an actual opening for lieutenant.


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1      Q.     Uh-huh (affirmatively).

2      A.     So I -- whatever the rank was that I

3  had at the time, I don't recall, I put in and I

4  made that list.

5      Q.     So, and we have been talking about

6  Troop N, but let's -- let's backtrack a little

7  bit and can you tell me what Troop N actually is?

8      A.     Yeah.  Troop N is -- is a -- is a

9  group of -- of state police personnel that's

10 assigned primarily to the French Quarter area of

11 New Orleans, specifically to the French Quarter

12 to -- to patrol those areas, to supplement and

13 help New Orleans police -- New Orleans police,

14 8th District, which is what encompasses the

15 French Quarter.

16     Q.     And do you know roughly when Troop N

17 was created?

18     A.     Actually -- actually being called

19 Troop N, I'm guessing maybe sometime around 2017,

20 but we have been in and out of New Orleans in

21 recent years for kind of one -- one reason or

22 another as a request from New Orleans or -- and

23 when -- when officially they -- I'm trying to

24 think.  In I want to say around '13 when I -- in

25 2013 when I became the sergeant over there over



1    in auto theft, we -- we were in New Orleans for a
2    while and then, you know, this phase would kind
3    of end.  It -- I think it just kind of evolved
4    later on to where we were down there more on kind
5    of -- on a kind a permanent basis.
6              So we have always -- since I've been
7    on the job, we have worked in New Orleans for,
8    you know, Mardi Gras, different things like that,
9    so -- but as far as when it became kind of a
10   standing -- I would say Troop N itself being
11   called Troop N, I would say roughly maybe around
12   2017 timeframe, but we were -- you know, there
13   was kind of other phases, I guess, of -- of
14   troopers physically being in New Orleans, but it
15   wasn't called, I guess, Troop N at the time.  I
16   don't know if that answers your question clearly,
17   but several -- a few years now we have been
18   assisting NOPD down there in the French Quarter
19   area.
20        Q.    Okay.  So it's sort of been an
21   evolution and Troop N is -- is really just a
22   name.  It's a designation for operating in
23   New Orleans; is that fair to say?
24        A.    I'd say that's pretty fair to say.
25   Yeah.  It -- the people permanently assigned down


866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1  strictly to that French Quarter area of

2  New Orleans, yes, ma'am.

3        Q.    Okay.  And the -- the assignment

4  of those people down in New Orleans, have

5  there -- you sort of talked about this -- this

6  presence of -- of assisting and supplementing the

7  8th District.

8        A.    Uh-huh (affirmatively).

9        Q.    Have there been -- let me see how to

10  ask this.  Is there a unique set of job

11  responsibilities or duties that come with that

12  New Orleans assignment?

13        A.    I would say -- I would say it's a

14  little -- I would say it's a little unique from

15  the other troops that are primarily traffic

16  enforcement entity where, you know, we -- we --

17  in Troop N working in conjunction with

18  New Orleans, we -- we take a little bit more of a

19  role of a -- we would historically be more of a

20  local police role where they'd answer the things

21  that are traditionally New Orleans job calls for

22  service and enforcement things down in the French

23  Quarter that often time could be a foot beat type

24  thing or so.  It's a little -- I would say it's a

25  little different from the other troops, but it's



1    not out of the ordinary things for working in

2    New Orleans.

3          Q.    Uh-huh (affirmatively).

4          A.    I guess that's -- that's good

5    enough.

6          Q.    Yeah. So, and you were talking

7    about -- you said they had -- had put out for --

8    for several lieutenants positions. Who's the

9    "they"?

10          A.    The department, the -- the Louisiana

11    State Police, the department. It's generated

12    through, like I said, that bulletin board. It

13    comes out on a bulletin board who would -- what

14    entity within the state police is responsible for

15    posting it; but ultimately, the colonel approves

16    it, we going to have, you know, two lieutenant

17    openings down there. But who -- who -- how it's

18    exactly posted, I'm not sure whose responsibility

19    that is. But, you know, you hear there's an

20    opening, then you go to the -- and if you -- you

21    fall within those qualifications, you can apply

22    for it.

23          Q.    Okay. And do you know who was --

24    who was responsible or who was involved with

25    setting up Troop N or the state police presence



1    in New Orleans before it was called Troop N?

2         A.    No.  I would say 100 percent of the

3    time period I was down there, Darren Naquin was

4    the captain over -- over the -- the group of

5    people when I was there, but it initially

6    started, who was responsible for physically

7    putting -- putting it together, I'm not -- I

8    don't know who that was or what personnel was

9    responsible for that.

10        Q.    Okay.  And so you came in in 2016 as

11   a lieutenant, correct?

12        A.    Correct.

13        Q.    All right.  Can you tell me a little

14   bit about what that role looked like at Troop N?

15        A.    Each -- at that time, there were --

16   and I believe it's that way today.  There was --

17   there was two different rotations of troopers

18   that was four teams made up of six troopers on

19   each -- each team and they worked 12-hour shifts.

20   That's like, you know, some guys were off when

21   the other guys were working and there was --

22   there were two teams.  I believe it was like team

23   A, team C, and there were sergeants that were --

24   that were on those -- on those, in charge of

25   those teams and I was -- I was the lieutenant



1    over, I guess, half of that rotation.

2          Q.    Okay.  And it's -- there are two

3    terms that -- that -- that have come up, the

4    criminal enforcement detail and Troop N.  Can

5    you -- is there a difference between the two?

6          A.    No.  No, not in my mind.  It's the

7    same thing.  It just after the more permanent it

8    became, it got the designation of Troop N.

9          Q.    Uh-huh (affirmatively).

10         A.    So I think they got -- I think it

11   was an informal term initially for the -- you

12   know, the more we -- as we stayed down there,

13   they called it -- I'm -- I'm -- it may not be the

14   exact in New Orleans Enforcement Detail,

15   something to that effect, but -- but yeah.  That

16   pretty much just became Troop N, that --

17         Q.    Uh-huh (affirmatively).

18         A.    And yeah.  That's -- I don't -- I

19   don't think there's a difference.

20         Q.    Okay.  So the responsibilities would

21   have been the same?

22         A.    Yes, ma'am.

23         Q.    Okay.  And when you were -- when you

24   became lieutenant at -- at Troop N, where were

25   you living?



1        A.     Let's see.  2016.  I was living
2  in -- I was in St. Tammany Parish, but I just --
3        Q.     Uh-huh (affirmatively).
4        A.     -- but I just -- I -- in recent
5  years, I moved from I believe it's -- I believe
6  it's where I live today in Lacombe, Louisiana.
7        Q.     Okay.  So would you commute in to --
8  to New Orleans --
9        A.     Yes.
10        Q.     -- for each shift?
11        A.     Yes.
12        Q.     About how long is that drive?
13        A.     Kind of depends.  When -- when I
14  came in, I -- I worked -- back then, I worked a
15  lot with noon to midnight, so it wasn't a lot of
16  traffic; and I would say it's probably less than
17  an hour I could -- I would be there easily.
18        Q.     Okay.
19        A.     Yeah.
20        Q.     So you were usually working noon to
21  midnight, correct?
22        A.     Yeah.  That -- that fluctuated
23  depending on if there was, you know, work later,
24  if there were different festivals and stuff that
25  happens in the French Quarter; but basically,

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   I'd -- I'd have to get the exact hours, but I

2   kind of did -- the two -- the two shifts I was

3   responsible, I kind of split my time. When I

4   came in at noon, it was still part of the day

5   shift, and then as the nightshift, I was at work.

6   So it was a way to kind of have coverage over

7   both of -- of the -- of that, then you would have

8   sergeants that were there that followed that as

9   well. So it would change sometimes, but -- but,

10   by and large, I -- I recall working noon to

11   midnight most of the time.

12       Q.   Okay.

13       A.   So traffic wasn't -- I mean, getting

14   to work was not a problem. By then, it's usually

15   all right.

16       Q.   All right. And when you came to

17   Troop N in 2016, was there -- was there an

18   operations plan in place or anything that you

19   were able to look at?

20       A.   They did have an -- I'm not sure

21   what they called it, but like they did have a --

22   well, we'll call it a manual, but kind of a

23   how-to on a lot of different things because

24   guys -- guys were being assigned to different

25   parts of the area might not have been as familiar


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

1    with a lot of the paperwork and things that in

2    Orleans Parish has all kind of different

3    variables in their paperwork things and stuff

4    like that.  So there was -- there was kind of --

5    there was something like that.  I can't remember

6    what -- exactly what they -- they called it, some

7    sort of a -- kind of almost like a welcome

8    letter-type thing:  Hey, if you going to be

9    working down here, you need to know these things.

10    But I -- I don't remember a formal being handed,

11    you know, a unique manual to that or anything.

12          Q.    Do you recall, you know, when

13    that -- when that sort of welcome letter or

14    welcome packet would have been put together?

15          A.    I don't know who -- when it was put

16    together, but it was just something that would be

17    on the desktop there, like it was more of an

18    instructional ways to -- to do some of the

19    paperwork and stuff.  It was -- and -- and I

20    remember it being on a desktop where if -- you

21    know, if a guy came in from somewhere else, they

22    had to, for example, know how to fill out a

23    municipal summons in New Orleans.  It kind of

24    gives you the -- and, you know, a lot of places

25    has one court and here is multiple courts and --

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    so it was more of that kind of thing and it was

2    just sort of it was available for you to refer to

3    at the -- at the -- the office there.

4         Q.    Okay.  Was there anything that, you

5    know, talked about, you know, in New Orleans

6    you're -- you're going to be doing some more -- I

7    think you referred to it as sort of more local

8    law enforcement activity and here are some --

9    here's -- here's how to do that or anything like

10   that?

11        A.    Not that I -- not that I recall

12   anything else written down thing like I'm

13   referring to the other thing, not that I -- not

14   that I remember.

15        Q.    Okay.  What about was there any

16   training on -- to that effect that was offered?

17        A.    I'm -- I'm not sure specific to the

18   guys.  When I got there, there were guys that

19   were -- had already been working there; but I --

20   I do know that over -- I do know over the years

21   whenever they had operations that we've done in

22   New Orleans, they -- they've put on different

23   training and -- and things, so I wouldn't --

24   specific to right before I got there, I don't

25   have any recollection of, but I do know that



1  historically we've done training sessions when
2  guys were getting ready to get deployed into the
3  city and things like that.
4          So I don't -- I don't recall
5  anything definite right now, but I do know that
6  has happened and -- and there's been things like
7  that in the past where they put, you know -- they
8  going to send troopers in for one reason or
9  another, you know, before Mardi Gras, something
10  like that.  Sometimes they will put on a
11  little -- a little training about some of the
12  stuff being encountered down there.  But -- but
13  prior to me going there, I don't know of
14  anything.  I didn't -- you know, I didn't go to
15  boot camp for Troop N before I was -- when I was
16  promoted or anything like that.
17      Q.    And the -- the prior trainings that
18  you are talking about, when --
19          Well, let me ask this.  Where would
20  they have been done?  Would they have been done
21  at the city or the academy?
22      A.    I would say probably at our academy.
23  We have a -- we have a training facility in
24  Zachary, Louisiana.
25      Q.    Uh-huh (affirmatively).



1    A.    Like there's been times in the past
2  where I've known that to happen, but again,
3  exactly relative to what time period that you are
4  referring to, I don't know of specifically.
5    Q.    Okay.  And do you -- do you recall
6  yourself going through any of those trainings?
7    A.    I don't -- I don't remember the --
8  this is -- I'm going back years before any of --
9  any of what you-all are asking me today, but
10 there was a -- there was -- there was a -- there
11 was some reason we were going to New Orleans in
12 the -- in the past, and I would be totally
13 guessing on a year, but I do remember they sent a
14 bunch -- a bunch of guys to our training academy
15 and we did things like, you know, I don't know,
16 traffic stops and things they might -- they might
17 encounter down here.  But it was -- it was -- and
18 it was for something that predated all of Troop N
19 and things like that, so -- but yeah, I had when
20 I was much younger for things, you know, for
21 New Orleans.
22   Q.    Do you remember roughly what time
23 period that would have been?
24   A.    Maybe early 2000s or some --
25 something to that effect.  You know, it may be --

1    you know, it could be something as simple, okay,

2    for New Year's we send in X amount of troopers

3    down there and -- and, you know, so they could

4    put on a little thing.  I mean, that's kind of --

5    you know, I'm trying to remember what that would

6    have been specifically for, but -- because, I

7    mean, I've been going to New Orleans for many --

8    you know, I mean, I was a New Orleans policeman,

9    so it's -- it's not really an out of the ordinary

10   thing for me to have to go to New Orleans, but

11   they -- they have done different trainings and

12   things like that in the past.

13        Q.    Okay.  So, and -- but I want to make

14   sure I understand.  When you were a lieutenant at

15   Troop N, if -- if new guys came in, do you recall

16   any training being offered to them about, you

17   know, how -- how their responsibilities might be

18   different than the -- the traffic enforcement?

19        A.    No.  Not a specific thing that they

20   would have been sent to or anything like that,

21   no.

22        Q.    Okay.

23        A.    I don't -- I don't recall that.

24        Q.    All right.  Was there any kind of

25   training that -- that you recall?



1        A.    No.  It was -- other than they

2    generally rode two -- two-man cars and they would

3    likely be put with somebody that's been down

4    there for a while; but -- but specifically, no.

5        Q.    Okay.  And just so I'm clear, the --

6    the -- when you came in, the folks that had been

7    there when you came in, do you -- do you know or

8    did you ever hear them talk about any training

9    that they had received when they came in?

10        A.    No, not -- I don't specifically

11    recall that, no.

12        Q.    Okay.  So you talked about the --

13    the criminal enforcement detail and you were

14    talking about sort of that brief period that

15    there was a plainclothes sort of subsection of

16    Troop N.  I don't -- I don't know what the --

17        A.    Yeah.

18        Q.    -- what the verbiage would be.  Were

19    there any other operations in New Orleans that

20    you were aware of when you were at Troop N?

21        A.    From guys specifically assigned to

22    Troop N?

23        Q.    Anything that was happening,

24    anything that the state police were doing, either

25    involving guys from Troop N or involving guys



1    from any other part of the state police?

2        A.    At the time, I don't recall

3    specifically; but, I mean, I've been in BOI most

4    of my career and I've worked primarily in -- you

5    know, as an -- as an investigator before Troop N

6    or any of that existed, I -- I worked, you know,

7    as a narcotics agent.  I, by and large, worked in

8    Orleans Parish, Jefferson Parish.  So we have

9    always been in New Orleans, so there's probably

10    been guys -- you know, there's probably been guys

11    from the narcotics section while I was in Troop N

12    that had cases in there, but not where I said,

13    hey, guys, can you-all come down here and do this

14    specific thing; but Orleans Parish has always

15    been part of -- of our responsibility or area

16    of -- of -- that we operated in.

17           So to answer your question, I've

18    always -- I've pretty much worked in and around

19    New Orleans my whole career, so I'm sure there

20    were other sections that did things in

21    New Orleans while I was part of Troop N.

22        Q.    Okay.  But is there anything that

23    you recall, like any specific operation that was

24    sort of targeted to -- to New Orleans

25    specifically?



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1          A.     While I was down there, no.  I don't
 2    recall that.
 3          Q.     Okay.  And in your -- okay.  And
 4    when you were at Troop N, who -- who were you
 5    supervising?
 6                 Let me ask this.  What was your
 7    role?  You talked a little bit about sort of --
 8          A.     Yeah.
 9          Q.     -- the two shifts?
10          A.     Yeah.  I would consider myself a
11    shift lieutenant over the -- I think -- I believe
12    it was AC rotation at the time.  There would have
13    been six troopers that came in and, I guess, 6:00
14    to 6:00 a to p and then guys would come in p -- p
15    to a, and I would have -- in that particular
16    rotation, there would have been a lieutenant that
17    when we were off after working a 12-hour shift,
18    when we -- on our days off, there would be
19    another group.
20          Q.     Uh-huh (affirmatively).
21          A.     And at that time when I was -- there
22    were I think initially two or there was -- I
23    believe there was three sergeants that worked on
24    that rotation with me and I would have been their
25    immediate supervisors; and then they -- and then
```

1   under them would be the -- the -- I guess it
2   would be 12 total, 6 and 6 troopers that were --
3   were assigned down there.
4        Q.   Okay.  So you were supervising both
5   troopers and sergeants; would that be correct?
6        A.   Yeah.
7        Q.   Okay.  All right.  And, you know,
8   when we talk about supervising, what -- what does
9   that mean?  What does that entail?
10       A.   Just kind of over -- over -- oversee
11  what's going on down there.  I mean, you
12  monitoring.  You know, I'd monitor the radio who
13  would be available.  I got -- obviously between
14  -- there's a front line supervisor, the sergeant
15  between me and the troopers, but I -- when I was
16  there, I was aware of things that were going on.
17  If something -- something big happened, you know,
18  I would be out on the scene and things like that,
19  but more or less overseeing the -- the -- that
20  the shift was running smoothly, you know.
21       Q.   Okay.  And so would that also mean
22  checking over paperwork?
23       A.   Sergeants did a lot of the -- the
24  day-to-day approving reports and stuff like --
25  stuff like that.



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1      Q.     Uh-huh (affirmatively).

2      A.     I would -- I would -- I'd approve

3  things from time to time, but with three

4  sergeants, a lot of the day-to-day reports

5  they -- as I recall, they approved more than I

6  did at the time.

7      Q.     Okay.  But in your -- in your

8  supervision of the sergeants, would -- would part

9  of your job be to -- to make sure that the

10  sergeants were -- were doing what they needed to

11  do in terms of checking the paperwork?

12      A.     Yeah.  And I would -- I would --

13  from time to time, I would -- I would check.  If

14  I got there before them, I would check.  Most of

15  the time, they were really -- they -- they had it

16  all in order.

17             You know, if it was -- there would

18  be -- if they had a box where they had a bunch of

19  approved reports, from time to time, I would look

20  through that stuff.  But they were -- they had

21  been down there for quite a while when I got

22  there, so a lot of the -- a lot of the day-to-day

23  operations they were really efficient at.  So --

24  so the reports and things like that, they -- they

25  approved more often than I would have.

1       Q.   Okay.  Okay.  And in terms of how --

2  how Troop N was -- was being managed, would you

3  have -- would you have sort of staff meetings or

4  how would the supervisors get together and talk?

5       A.   Well, every day we went -- every --

6  every day we went to -- every day we went to

7  work, there was a rollcall in the beginning of --

8  of -- at 6:00 o'clock in the morning, the

9  dayshift, the nightshift; and whatever overlapped

10  when I was there, I would sit in on that -- on

11  that one.  And yeah, just -- just basically on

12  day to day -- just touching base on day to day.

13  And then I would meet with just the sergeants

14  from time to time, we would discuss whatever, you

15  know, whatever changes or better protocols as far

16  as paperwork goes.

17           But by and large, just each day,

18  you -- you would just touch base before the guys

19  go out on the shift and -- and pass on whatever

20  that's going on that day or whatever.

21       Q.   Uh-huh (affirmatively).  What sorts

22  of things would -- would you pass on?

23       A.   What I would -- a lot of times what

24  I would pass on, things like -- I would -- and I

25  don't remember exactly what day it was, but I



1 would attend meetings at the 8th District that

2 was like com stat, what they call com stat

3 meetings and the commander in the 8th District

4 would be there. My -- my commander, captain at

5 the time, Darren Naquin, would be there and it

6 was open to the public. The public could come in

7 if they had any issues that they were concerned

8 about in the French Quarter. Detectives from

9 NOPD 8th District would come and talk about, you

10 know, I guess different crime trends that are

11 happening at the time and I -- I'd try to make

12 good notes on that and I would -- that's some of

13 the things I would go pass on to the sergeants.

14 So like problems that the 8th

15 District is having, if there's a rash of vehicle

16 burglaries in -- on, you know, Iberville Street

17 or there's a parking garage that -- you know, a

18 parking garage that a hotel is complaining

19 because people are shooting up drugs in the -- in

20 the stairwells and somebody got robbed going to

21 their car or something and we try to kind of gear

22 some of our -- gear our patrolling to some of

23 those areas that they were having problems.

24 So those -- those are some of the

25 things that I would try to pass on. I would go



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   to meetings where I would try to find trends.
 2   We'd kind of try to cater what we are doing to --
 3   to help some of those problem areas, if possible.
 4        Q.    Okay.
 5        A.    So --
 6        Q.    So it -- so sort of trying to -- to
 7   communicate with the -- with the 8th District
 8   and -- and let people know as they were going out
 9   on patrol kind of these --
10        A.    Yep.
11        Q.    -- these are things to kind of look
12   out for?
13        A.    Yes, ma'am.
14        Q.    Okay.  So that would be covered in
15   the -- the -- the rollcall?
16        A.    True, yes, ma'am.
17        Q.    All right.  And then you talked --
18   you said that you would have -- you would have
19   meetings with your sergeants and -- and talk
20   about sort of possible changes to protocols or
21   paperwork and things like that, correct?
22        A.    Yes.
23        Q.    What sorts of things would that
24   cover?
25        A.    Well, sometimes over the years since
```



1    I'm working in New Orleans, sometimes they --
2    either NOPD or, of course, they'll -- they may do
3    something differently just in -- you know, an
4    example would be, you know, like if they are
5    going to -- if they going to -- you know, certain
6    charges that are maybe state charges that happen
7    more commonly, they may make a -- they may make a
8    change at the court that, okay, this -- this
9    charge is going to now go to municipal court
10   rather than criminal district court, so now we
11   are going to do this on a summons rather than
12   the -- the long booking paperwork.
13             So just kind of lodge those kind
14   of -- you know, that -- sometimes those things
15   would ebb and flow, like, oh, no, we -- no, these
16   three charges, now we doing it this way as far as
17   just -- just it's all the same thing other than
18   you are reflecting it different ways.  So
19   sometimes like we would just -- we would just try
20   to kind of stay current on those kind of things.
21        Q.    Uh-huh (affirmatively).  Okay.  So,
22   and those -- those changes and -- and efforts to
23   sort of try and, you know, adjust to -- to make
24   sure that things made sense with how you-all were
25   practicing, would that be written down in any



1    way?

2         A.    Sometimes it would get -- they

3    would -- things would get through, would be sent

4    down through NOPD and it would be a -- I'm trying

5    to think of an example.  You know, like -- like,

6    for example, now if somebody's caught with a

7    small amount of, say, marijuana or something, you

8    can basically cite them and -- and -- and where

9    it wouldn't have to make a physical arrest, and

10   at some point something would come down saying

11   that, okay, now if it's under this -- you know,

12   if it's less than an 18-wheeler load of

13   marijuana, then you don't have to physically

14   bring them.  It would just be like little things

15   like that that would -- of how that would kind of

16   -- like you could potentially change into the

17   way -- like if the court's overwhelmed with

18   certain things --

19        Q.    Uh-huh (affirmatively).

20        A.    -- they may say, okay, well, you can

21   let them -- you know, you can write a summons for

22   this, that or the other and it would be -- you

23   know, I don't -- I don't recall anything in-house

24   that we actually have, but sometimes there would

25   be things that would come through from us from



1  the city on some level --

2        Q.    Uh-huh (affirmatively).

3        A.    -- and we'd say, okay, well, now we

4  can -- we can do a summons for this and you just

5  pass that on to the guys, things like that.

6        Q.    Okay.  And so if -- if it was coming

7  from the city, then -- then it was usually in a

8  written form --

9        A.    Yeah.

10       Q.    -- was your experience?

11       A.    Yeah.  I don't want to speak of

12  something I don't recall specifically seeing.

13       Q.    Uh-huh (affirmatively).

14       A.    But we -- there were, you know, they

15  had -- at one time, we had a list of different

16  laws that you could now -- they -- even though

17  they were -- historically speaking, if it's a

18  state statute, it goes to criminal district

19  court.  If it's a city ordinance, it goes to

20  municipal court.  Well, some state statutes are

21  so common, I mean, some misdemeanors, they -- at

22  some point in the history of the City of

23  New Orleans, they said, okay, well, now, you

24  know, this -- even though traditionally we go to

25  criminal district court, it's going to get routed

1     through municipal court now.

2          Q.    Uh-huh (affirmatively).

3          A.    So it would just be a change in

4     protocol.  You are still -- still addressing the

5     same problem, but it would be -- I mean, I -- I

6     can't think of an example to give you.

7               You know, like a possession of

8     stolen property under certain value or something

9     that may be -- you know, instead of flooding the

10    criminal district court with that, they would

11    handle it through the municipal court, but

12    they -- but it may be we might have a copy of

13    those things in there to refer to if we get the

14    situation, okay, now you got to go to municipal

15    court with that, something like that.

16         Q.    Okay.  And would -- you spoke about

17    Captain Naquin.  Would he participate in -- in

18    the rollcall briefings?

19         A.    He -- he would if he was -- I

20    wouldn't say as a matter of common place, but if

21    he was there, he would.

22         Q.    Okay.

23         A.    He would.

24         Q.    And what was his participation in

25    the rollcall briefings?



1       A.      He -- he would -- he would on
2   occasion maybe sit in on it and pass something
3   along, but he -- he would -- really the only time
4   he would really specifically, if we had -- you
5   know, say it was Mardi Gras and there was a
6   hundred troopers or something coming to
7   New Orleans, then he would be formally addressing
8   everybody; but on the day-to-day stuff, if he was
9   there, he might sit in it, but he wasn't -- he
10  didn't formally put on rollcall or anything like
11  that.
12      Q.      Okay.  Was there -- was there
13  anything that was provided in writing to the
14  troopers or -- or any notes or anything like that
15  that came out of the rollcall meetings?
16      A.      Like on a day-to-day basis you mean?
17      Q.      Uh-huh (affirmatively).
18      A.      No.  We might pass on like, I think,
19  our BOLOS, you know, be on a look out if there's
20  a warning, you know, if they had something happen
21  major the night before, a shooting or
22  something -- or something like that, they
23  might -- we might pass on copies of wanted
24  persons and things like that.  That's the only
25  thing I recall off the top of my head --

1        Q.    Okay.

2        A.    -- physically giving guys that

3  rollcall.

4        Q.    All right.  Okay.  But there

5  wouldn't be any -- there wouldn't be anything

6  prepared prior to rollcall that would be e-mailed

7  out or -- or provided at rollcall?

8        A.    No, ma'am.

9        Q.    Okay.  And there wouldn't be any

10  notes made in the course of rollcall to say we

11  covered X, Y and Z topic?

12        A.    No.  No, not that -- not that I

13  participated in.  You know, if somebody's more

14  formal than me, I guess it's possible they'd be,

15  but no, there's no requirement for -- that's --

16  you know, that's not a -- a thing.

17        Q.    Okay. All right.  And the -- the

18  com stat, the 8th District's meetings that --

19  that you-all were talking about, you know, was

20  there anything that was generated, any -- any

21  meeting minutes or notes or anything like that

22  that was generated?

23        A.    Not through state police that I

24  recall.

25        Q.    Okay.



1           A.     You know, we may -- we may -- we

2    may -- we may go there.  We may bring anything

3    significant that we encountered the previous

4    week, we may -- we -- we would pass on.  Each --

5    like when those detectives passed up, they would

6    come to us at some point, do you-all have

7    anything; and we would say, yeah, in this certain

8    area, we had three arrests for this or whatever.

9    So we -- we would try to pass on things that

10   might be applicable to something that they would

11   be working, but -- but there was nothing I would

12   say formal minutes generated, like a record --

13           Q.     Yeah.

14           A.     -- or anything like that, no, ma'am.

15           Q.     And so when you talked about passing

16   on that information, how would that happen?

17           A.     Usually if I was there with

18   Captain Naquin, he would just -- he would stand

19   up and say, hey, we -- you know, there was this

20   happened and, you know, he would just -- he would

21   just give high -- kind of highlight what he felt

22   was significant things to pass on to the -- to

23   the 8th District personnel.

24           Q.     Okay.

25           A.     Which they were in -- which is part



1    of what they were -- we were there for that, and
2    then they would have asked us if we had anything
3    and we would --
4         Q.    Okay.
5         A.    -- usually pass on anything
6    significant that happened.
7         Q.    Okay.  But that wouldn't go into an
8    e-mail or something like that?
9         A.    Not that I'm aware of, no, ma'am.
10        Q.    Okay.  And -- and sort of getting a
11   little bit deeper into that, I guess, could
12   you -- could you just walk me through the
13   logistics how NOPD and LSP would communicate, you
14   know, below the -- the level of Captain Naquin?
15   Would LSP troopers use NOPD forms, for example?
16        A.    Well, yeah.  We historically -- for,
17   you know, say, booking, we -- we have -- we -- we
18   generated our own.  You know, like, for example,
19   in BOI, we have our own -- our own reports, but
20   for booking -- for booking purposes, yeah, we
21   pretty much use everything NOPD down there.
22   Their -- I don't know how familiar you are with
23   their like -- I think we call it face sheet and
24   gist sheets.  If we -- I caught somebody with,
25   you know, narcotics or something, we would -- it



1   would be booked exact same way as NOPD would do

2   it.

3               Now, as a detective with

4   New Orleans -- as a detective with state police,

5   the difference would be that we -- we generally

6   as a detective for handling an investigation in

7   Orleans Parish, all the -- all the booking-type

8   initial stuff would -- would -- that would be an

9   attachment to my overall big report that I'm

10  making and we -- we -- we general -- the

11  difference between us and NOPD is we would -- we

12  would hand deliver our reports to the district

13  attorney's office where theirs would generate

14  through the department because we are an outside

15  agency.

16              But the on-the-street stuff, the

17  initial booking purposes at the jail, it would be

18  the same.  It would be the same.  It would be

19  NOPD forms.

20       Q.    Okay.  All right.  And so, and

21  how -- how would that access happen, just to make

22  sure that I understand?  Was there like a pile of

23  hard copy NOPD forms?

24       A.    Yeah.  But, I mean, I've just

25  always -- you know, we have always had them and



1     now guys probably have it on a thumb -- a blank

2     one on a thumb drive and you just -- you got

3     to -- you know, it's probably all electronic now.

4     But yeah, at one time, I -- you know, when I

5     first went to narcotics, I had what's called a

6     bus box and had a -- you know, just a little

7     school Tupperware thing with everything you might

8     need on a case and I had blanks of -- of all that

9     stuff.

10              Initially, you could go to any

11    district and just go, hey, I'm state police, can

12    I get a pack of them or whatever and then you can

13    just make -- you get your one and make a million

14    Xerox copies of it, you know.  So yeah, we just

15    always had it -- it available to us.

16          Q.    And so then once that -- once that

17    form got filled out, you said you would actually

18    have to take it to the DA.  Would NOPD get a copy

19    of -- of whatever NOPD form had been completed?

20          A.    No.  As a -- as a -- I'm not sure on

21    the -- on the -- the summons and all that if

22    they -- if they would get a copy, but generally

23    speaking if it's -- if it's from us, they

24    wouldn't.  Now, if we worked something in

25    conjunction with them and they needed a copy for



1    one reason or another; but as a matter of every

2    day practice, though, there's no -- there's no

3    requirement.

4              If I -- if I go walk out this door

5    right now and, you know, catch somebody doing

6    something, I don't -- I'm not obligated to make a

7    copy of that and bring it to -- to -- to NOPD.  I

8    may notify them if I think it's something they

9    need to know that's applicable or something they

10   may be working; but no, not as a matter of every

11   day practice.

12        Q.    Okay.  So I know a lot of the NOPD

13   forms have -- have a space for an item number.

14   Would -- would Louisiana State Police have --

15   have to generate that item number?

16        A.    We would.  We -- we -- we -- we

17   generate an NOPD item.  If we are in New Orleans,

18   we generate an NOPD item number for everything we

19   do.

20        Q.    Okay.  How do you --

21        A.    Or either --

22        Q.    How do you do that?

23        A.    You -- we -- we -- you could either

24   call the command desk on the phone if you sitting

25   in the office; but generally speaking, you just



1    call over the -- over the -- we have NOPD

2    channels on our radios.  We also would have a

3    district we work and we just -- we just call

4    dispatch and ask for an item number for, you

5    know, whatever it is that we need.

6          Q.    Okay.

7          A.    And -- and I think as far as NOPD

8    goes, every time you go, an item is pretty much

9    generated every time you do anything, you know,

10   hey -- but yeah, we use NOPD item numbers as

11   well.

12         Q.    Okay.  And when you say call

13   dispatch, who's dispatch?

14         A.    For an NOPD item number, it would be

15   NOPD.

16         Q.    Okay.  So it would be NOPD dispatch?

17         A.    Yes, ma'am.

18         Q.    Okay.  So NOPD is aware that there's

19   an item number that's been generated --

20         A.    Yeah.  They --

21         Q.    -- correct?

22         A.    Yeah.  They generate it.

23         Q.    Okay.  So -- so they have to --

24         A.    Yeah.

25         Q.    There's an item number.  Is there



1    any -- do you know what is attached to that item

2    number on the NOPD side?

3        A.    I would -- you would have to ask the

4    command desk or dispatch.  I'm -- I'm guessing

5    it's, you know, who -- who the -- what officer's

6    handling that and what -- you know, the signal

7    disposition and just to kind of -- some of the

8    basics of -- of the -- of that incident.  You

9    know, like if you -- three years from now if I

10   looked up on the date and time, they could go

11   back and see this item number was that.  So I

12   don't -- I really don't know personally what they

13   all enter into it, but they just -- you know,

14   when you -- when you call out, you -- you tell

15   her who you are, your -- your -- your unit number

16   or whatever your call sign is and they -- they --

17   they generate the item for you.

18       Q.    Okay.  All right.  So, but you have

19   no idea what --

20       A.    What exactly they capturing.

21       Q.    -- what actually is attached?

22       A.    Yeah.  And I just don't -- you put

23   yourself out on something, you handle it, and

24   then you -- you give a disposition when you

25   are -- when you are done.



```
 1            Q.    Uh-huh (affirmatively).
 2            A.    So they -- they are capturing --
 3     capturing all that.  I'm sure they note something
 4     to be state -- you know, notate something for
 5     state police, so -- so they are not looking for
 6     it within NOPD.
 7            Q.    So the -- the disposition, I want to
 8     make sure I understand that.  Well, what is that?
 9     What are you talking about?
10            A.    The -- the -- the end of that thing.
11     There's -- there's different dispositions and
12     that's a little bit complicated from --
13            Q.    Okay.
14            A.    I don't know if the other people
15     have talked about it, the -- the way the -- how
16     to explain this.  This is kind of getting
17     complicated.
18            When you -- if a New Orleans
19     policeman goes out on a call and you -- you
20     handle something that doesn't require a report or
21     just, I don't know, somebody's complaining a dog
22     got lost, you catch the dog and bring the dog
23     back and everything's good that, you know,
24     there's a disposition called NAT, Necessary
25     Action Taken, certain -- certain signals require
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

1    an RTF, a Report To Follow.

2                However, a state police that works

3    in New Orleans, every item number that we get

4    through -- through NOPD, we mark it up NAT, even

5    if it's an RTF, because they know because it's

6    just -- it's just a -- the item number's only a

7    log number to say, hey, state police handled

8    that, whatever there, and they might put in the

9    notes that -- that our 2 NAT is really a -- is

10    really a drug arrest or a shooting or something

11    like that; because if we mark it up RTF in their

12    system, the system is telling that particular

13    district within the New Orleans Police

14    Department, because they are the local department

15    responsible for this area, that it tells them

16    that that report is -- is going to NOPD.  So they

17    are going to be calling the 5th District saying

18    where is this; oh, no, state police handled that.

19                So in certain signals you can't make

20    NAT, so if I'm going out there on a, you know,

21    shooting scene or something like that, I'll say

22    it's, you know, 21 NAT to -- to state police,

23    that tells them state police is doing that

24    shooting report and they are going to hand

25    deliver it to the district attorney's office if



1    they need a copy.

2        Q.    Uh-huh (affirmatively).

3        A.    And I don't know the exact

4    protocols, but we -- there's a protocol

5    established through -- through Troop N and NOPD

6    where, if any of those 21 NATs are -- are UCR,

7    you know, your UCR mandatory reporting-type

8    crimes we have, there's a -- a point of contact

9    that's set up so they know.

10            So if I'm -- I'm handling a homicide

11   and it's like 21 NAT, like -- like it was

12   nothing, they will know that 21 NAT was really --

13   you know, it's noted that it was a homicide

14   handled by the state police and they're going to

15   be handling it, but we'll -- we'll -- at that

16   point, we'll send copies of all those to someone

17   in NOPD -- I don't know who that is -- that

18   would -- so they meet those mandatory reporting

19   requirements.

20       Q.    Okay.  So if it's something -- and

21   UCR is Uniform Crime Reporting?

22       A.    Yeah.  Like, you know, your major --

23   your major crimes.  So if -- if I handle a 21 NAT

24   but it was really a -- you know, an aggravated

25   kidnapping or something, those -- those -- those



1    stats wouldn't show that, but we -- we have
2    addressed that through -- through other means
3    because their -- their system, I don't think,
4    counts outside agencies to markup the --
5              Like I can't -- I can't make a -- if
6    -- if a homicide, which is a 30, it's impossible
7    to make that NAT in the system.  Yeah, because a
8    single 30 is NAT, but it's NAT because state
9    police is really doing the RTF, which is going to
10   be hand delivered rather than the -- the captain
11   at the 8th District going where's the report,
12   where's the report.  Well, it's really a state
13   police report.
14             So it's just a -- you know, I don't
15   know why; but that's why when we get items, they
16   are always a 21 NAT regardless of what they are,
17   but it's also addressed what they really are.
18   But it's just you can't just go to New Orleans
19   and -- in New Orleans, everything is tracked
20   through an item number.
21        Q.    Uh-huh (affirmatively).
22        A.    So we can't just generate a state
23   police number and say, okay, well, we did this in
24   New Orleans.  You got a -- it's -- it all marries
25   up to an NOPD item number at some point.  I don't



1    know if that makes sense.

2         Q.    I think so.  I want to unpack a

3    little bit of that, though.  So there's a drug

4    arrest.  The -- the trooper calls, gets the NOPD

5    item number, tells the dispatcher I'm state

6    police, I'm just asking for an item number for

7    the report, and so the -- you're -- you're -- and

8    I know you are not NOPD --

9         A.    Uh-huh (affirmatively).

10        Q.    -- so I'm -- I'm just asking for

11   your understanding of what happens on -- on that

12   side.  The dispatcher then create -- generates

13   that item number, gives that to the state police

14   and then the NOPD system puts the -- the

15   disposition Necessary Action Taken, NAT?

16        A.    Yes.

17        Q.    And that's -- and there's nothing

18   linked to that item number in NOPD's system?

19        A.    Yeah.  It's linked.  It's in -- in

20   their system.  It says state police got it, got

21   that item number on that date and time.

22        Q.    Okay.

23        A.    So if somebody asks them, well, this

24   happened, they will know to refer it to us.

25        Q.    Will it have the -- the trooper



1    identification number --

2           A.    Yes.

3           Q.    -- or the trooper name?

4           A.    Yeah.  And it would likely have, you

5    know, the -- the time, the location you went out

6    on it, you know, and -- and -- and I -- I

7    personally used to always say, I guess -- there's

8    an area for notation.  I would say can you just

9    note in there that it's in reference to a --

10   whatever that other code is.  So like if you had

11   that they went back five years later and said,

12   oh, 21 NAT by state police but it was a -- it was

13   a narcotics arrest, but it was a battery or

14   something, you know.

15          Q.    And is that -- now, the note field

16   that you are talking about, is that on -- is that

17   information that they are -- they are giving to

18   the dispatcher or is that a separate form that

19   they complete?

20          A.    No.  That -- that -- that would be

21   just something I verbally put on the radio,

22   ma'am, can you -- can you note that it's in

23   reference to a -- some other number.  I've --

24          Q.    Okay.

25          A.    I've never seen what that -- that



1   field is or whatever, but that's just -- that's

2   just so I know they know it's not -- that there's

3   more to it, or if, you know, they look at that,

4   they will know that on those reports state police

5   did a report on it.

6        Q.    Uh-huh (affirmatively).

7        A.    It's not just a 21 NAT because I

8   talked to somebody on the street corner for five

9   minutes and that was it.  It was actually a case.

10       Q.    Okay.

11       A.    So that -- that's -- that's kind of

12  been one of them I'm just -- I know it's hard to

13  explain, but it's just kind of how it is when

14  we -- we get a -- we get a 21 report and they

15  know it's us and -- and there's -- there's things

16  put into place to where they know that it's us.

17       Q.    Uh-huh (affirmatively).

18       A.    And it's -- it's more that they know

19  it's not an NOPD report that would be channeled

20  through the way that the system is set up

21  in-house for them.

22       Q.    Okay.  All right.  Has there been

23  any discussion about having the state police just

24  go ahead and, you know, submit whatever it is

25  they need to submit to -- to state police but



1   also just submit any NOPD forms that are

2   completed to NOPD?  Has that ever come up as a

3   possibility?

4           A.    I don't know -- I don't want to --

5   not that I'm aware of on an -- on an every day

6   type thing, you know.  I don't know.  They --

7   they don't want the hundred reports we generate

8   on top of the hundred that they are generating.

9   I mean, I don't know, but -- but no, not that I'm

10  aware of.  Maybe above me is looking at that, but

11  I'm not aware of anything like that.

12          Q.    Okay.  And we talked a little bit

13  about some of the -- the com stat meetings and

14  things like that.  Is there any other information

15  that NOPD is providing to state police that you

16  can think of?

17          A.    My -- my recollection is primarily

18  through those -- those meetings.  I mean, that

19  would be -- that would take place every week.

20                For a period of time, they -- they

21  had -- they had a city-wide com stat meeting

22  where I attended some meetings with

23  Captain Naquin where every district is at the --

24  at that -- they -- they redid some protocols on

25  that; and then after a while, it just went to


866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1　the -- the district level with that 8th District

2　because that's -- that's where -- where we were

3　working and stuff.

4　　　　Q.　　Uh-huh (affirmatively).

5　　　　A.　　So that would primarily be what I

6　recall things getting passed on.

7　　　　Q.　　Okay.

8　　　　MS. CUMMING:

9　　　　　　　Okay.　We -- we had started to touch

10　　　　　on this, but I -- I kind of want to just

11　　　　　make sure I understand.　I'm going to show

12　　　　　you what's been previously marked as

13　　　　　deposition Exhibit 16.

14　　　　(Document tendered.)

15　BY MS. CUMMING:

16　　　　Q.　　It's the -- well, do you recognize

17　this document?

18　　　　A.　　Yes.　It looks like a photocopy of

19　part of our state police policy and procedure.

20　　　　Q.　　Okay.　That is my understanding of

21　what it is as well.　And it's policy 402 about

22　communications, correct?

23　　　　A.　　Yes.

24　　　　Q.　　Okay.　So you talked about for

25　Troop N that they would call dispatch, NOPD



1    dispatch specifically to generate an item number;

2    and I want to -- let me -- let me just ask this

3    generally.  What -- how did Troop N communicate?

4         A.    We -- we communicated directly on

5    the NOPD channel.  I believe it was Channel 8,

6    the 8th and the 1st District on the same channel,

7    and I believe it was Channel 8; but we -- we --

8    we called out directly the -- to NOPD's

9    dispatcher and responded to calls that way.  We

10   all -- we all the guys, most the guys had -- also

11   had -- one of them had an in-car radio and a

12   portable radio we monitored.  We also utilized

13   Troop B Dispatch 2 for any just LSP back and --

14   back and forth-type traffic that, you know, you

15   wasn't calling out for an item or -- or anything

16   like that.

17              So my recollection is that we

18   primarily worked on NOPD's channel for purposes

19   of responding to calls and things like that, but

20   we also monitored Troop B's Dispatch 2 for

21   other -- for other traffic.  Like we wouldn't --

22   we wouldn't run names or do some of those

23   administrative things on the NOPD channel because

24   they are putting out calls constantly, so we --

25   we would have somebody -- at that time, I think



1    they had somebody working where like, hey, can

2    you run this license plate or can you check a

3    name, things like that would be handled on that

4    Troop B Dispatch 2 channel, which was a Troop B

5    designated channel.

6          Q.    Okay.  So -- so running names,

7    running license plates.  What about if there was

8    a -- a call for a state police supervisor, like a

9    sergeant or a lieutenant, what channel would that

10   go out on?

11         A.    From NOPD or --

12         Q.    From -- from state police, from a

13   trooper.

14         A.    I guess it kind of would depend.  If

15   it was a -- if it was a scene where they just

16   responded to something and they -- there was a

17   big, I guess, something going on where they were

18   just directly dealing with the -- on the NOPD

19   channel but it might of -- you know, if it was

20   just they weren't on something and they just were

21   going to call a sergeant and say, hey, are you

22   available for a phone call or can you meet me at

23   such and such, they -- they could go over

24   Dispatch 2 with -- with that.

25         Q.    Uh-huh (affirmatively).



1       A.    I don't know of -- I think it

2  could -- it could go up either way.  Now, if you

3  just -- if you in the middle of something and --

4  and, you know, everything would just be handled

5  probably over at NOPD, but then in a

6  non-in-progress situation, you would probably

7  just call on Dispatch 2, to that particular

8  supervisor.

9       Q.    Okay.  So I'm going to drill down

10  onto the non-in-progress situation.  When did

11  the -- when does something stop being in

12  progress?

13       A.    Well, I guess if I rolled up on

14  something and all of a sudden, you know, we

15  was -- there was a car chase or something and I'm

16  not going to -- you know, I'm not going to put

17  the -- with a dispatch and you doing all that,

18  but if I was just in -- in my car and I just had

19  to call the other LSP personnel, we wasn't

20  dealing with a crime scene or we were out with

21  suspects or something like that, I would think

22  that would be appropriate just, hey, can you --

23  can you, you know, come over here.

24          But if you're, you know, jumping

25  over fences or something like that, you not going



1  to go, oh, let me -- let me switch back to the

2  car radio, it's got Dispatch 2 on it, let me --

3  because, you know, whenever you are -- you're

4  engaging in something that would put yourself on

5  with NOPD, I guess it just depends on what --

6  what would be the more common sense way at that

7  time where, you know, if you -- if you're in a

8  nonstressed situation and you sitting in your car

9  and you just call Dispatch 2 --

10          Because -- because any -- anything

11  that you putting over the NOPD channel, you

12  putting more formal type because the whole -- the

13  whole, you know, dispatcher, they putting out

14  calls and stuff, like, okay, well, can you -- can

15  you run a VIN number on another channel or

16  something, you know, or if you -- so if you're

17  handling stuff like that, you would -- you

18  would -- you would stay off of the NOPD radio

19  with, I guess, nonemergency type -- type things

20  that you are not formally -- you know, they

21  putting out calls --

22          Q.    Uh-huh (affirmatively).

23          A.      -- and stuff like that, so you are

24  not running your plates, or if you are just

25  calling a sergeant because you need him to meet



1   you to sign something or whatever, you would

2   probably do that on Dispatch 2.

3           Q.    Okay.  So, and -- and if a call goes

4   out on -- on a Troop B dispatch, the response is

5   going to come back on Troop B dispatch; is

6   that -- let me change that because I think I'm

7   using the wrong -- the wrong words.

8               If someone uses the Troop B channel

9   to run a name or for whatever reason, is the

10  response they are going to get back, is that

11  going to be on Troop B dispatch?

12          A.    Yes.

13          Q.    Okay.  And the -- and the same

14  question for -- for NOPD for Channel 8, if

15  something goes out on Channel 8, is the response

16  going to come back on --

17          A.    Yes.

18          Q.    -- Channel 8?

19          A.    Yes, ma'am.

20          Q.    Okay.  And how the -- you sort of

21  talked about the -- if you're -- if you're out

22  hopping fences, dispatch might only be available

23  to you on the -- on the car radio; is that

24  correct?

25          A.    No.  I'm saying if -- if something



1    like that, you just -- you formally on -- we --
2    we worked off of NOPD's channel.
3         Q.    Uh-huh (affirmatively).
4         A.    But if you had to -- you know, if
5    NOPD -- if NOPD, if they working on Channel 8, if
6    they going to run a name or something like that,
7    they would probably switch over to a channel
8    that's not a -- the dispatcher, you know.
9    They -- somebody at the station, hey, can you
10   check this or --
11              That was our equivalent, Dispatch 2,
12   for -- for those things; but we all -- everybody
13   that worked in the 8th District was on Channel 8.
14   They put out an alarm at a residence or they put
15   out something in progress, armed robbery in
16   progress, everything pretty much in that sense
17   was handled through the NOPD dispatch.
18        Q.    Okay.
19        A.    So the dispatch was more like a talk
20   channel for like, hey, I got a -- you know, can
21   you come meet me out here, I'm -- I got a -- I
22   need this signed off on before I take the guy to
23   jail or something like that.
24        Q.    So you are -- so on the -- on the
25   personal radio, you have access to both, you just

1   have to talk between the two by physically

2   turning a dial; is that correct?

3          A.    Yeah.  Yes.  I don't -- I don't know

4   if every one of the car radios had all the NOPD

5   channels programmed in it or not, but generally

6   speaking, they have that -- they would have that

7   ability, yeah.

8          Q.    Okay.  So on the personal radio that

9   you are carrying with you, do you have access to

10  both?

11         A.    Yes.

12         Q.    You have access to the Troop B

13  dispatch?

14         A.    Well, the troop -- the Dispatch 2

15  would be, yeah.  The -- yeah.  You are not on

16  that -- you would have to go back to that

17  channel.  You know, I said Troop B's dispatch --

18         Q.    Right.

19         A.    -- with the guys working in the

20  troop, then they are on the NOPD channel, but you

21  would have to go back to that tier and go back

22  to -- to -- to Dispatch 2, which would -- would

23  be a state police channel.  You're not --

24         Q.    Okay.  Well --

25         A.    You are not simultaneously hearing



1    both of -- doing both of them.

2         Q.    Right.

3         A.    But that one device has the ability

4    to hear both --

5         Q.    Right.

6         A.    -- of those channels.

7         Q.    Right.  So -- so you talked about

8    running names.  What about if there are -- there

9    had been a use of force and EMS was -- was

10   required, how would that call go out?

11        A.    Probably -- I guess, technically you

12   would do it either way.  If it was -- if it was

13   way after the fact and the -- is it you rolling

14   up on something and it's -- like if it's, you

15   know, a real bad situation, you probably just

16   going to be right there on the NOPD thing, but if

17   you -- if -- if everything's de-escalated and

18   you've been there for -- for a while, you could

19   potentially call on the Troop B, hey, can you

20   send an EMS over here to come look at this guy

21   because he's got high blood pressure.

22            I mean, more times than not, people

23   go in the hospital for -- for existing things.

24   On occasion that that might not be like you go

25   there and there's blood everywhere and you're --



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    you not going to -- you know, it's going to be
2    right then and there.
3         Q.    Uh-huh (affirmatively).
4         A.    But so it kind of could've been -- I
5    feel like it could be both depending on the
6    scenario.
7         Q.    Okay.  All right.  What about after
8    a use of force, would a trooper have to call a
9    supervisor to -- after?
10        A.    Yeah.  If something -- if -- if a
11   use of force happened, more than likely the
12   supervisor would probably make the scene at some
13   point or -- or he's probably going to notify him
14   that something that did happen and which -- which
15   very well could be on the dispatch too.  But,
16   again, all of that kind -- all the side kind of
17   stuff like that, you going to -- that the -- you
18   try probably not to tie up the main dispatch
19   because in New Orleans they putting stuff out
20   constantly, you know.  So it's just one of
21   them -- one of them deals, but -- but that
22   could -- you know, if what you -- if you had a
23   situation once it de-escalated, I could see him
24   getting on the dispatch too and saying, hey,
25   sarge, can you come over -- can you come out

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    here, we had a use of force.  That would be

2    acceptable.

3           Q.    Okay.  All right.  And in the -- in

4    the communications policy, this is Exhibit 16 at

5    two, Roman Numeral ii, it -- it talks about

6    "Commissioned officers leaving their units during

7    a tour of duty shall inform the troop by radio or

8    other forms of communication of their location."

9           How -- how does that part of the

10   policy play out in -- in practice in New Orleans?

11          A.    Which -- which one is that now?

12          Q.    I'm looking at No. 2, and then it's

13   little Roman Numeral, small ii.  You see where

14   I'm at?

15          A.    Oh, two, two.  I'm sorry.

16          Q.    Uh-huh (affirmatively).

17          A.    I don't specifically recall all the

18   specific requirements with that, but by -- a lot

19   of Troop N units are by definition foot -- on

20   foot patrol.

21          Q.    Uh-huh (affirmatively).

22          A.    So, again, it's a little unique to,

23   you know, if I'm on the highway, I'm going to be

24   out of my car for a period of time.  They --

25   they -- part of what they are expected to do is



1    be outside of the car for -- for Troop N.

2         Q.    Uh-huh (affirmatively).

3         A.    So what exactly was -- was laid out

4    back then, I don't know, but it was that, you

5    know, we were in a relatively small area of

6    responsibility.  So off the top of my head, I

7    don't recall exactly how they -- they handled

8    that requirement, but foot patrol was part of the

9    operation down there, so it was -- they were

10   expected to be on foot a lot of times.

11        Q.    Okay.  So they were -- yeah.  I want

12   to come back to that in a second.  What about was

13   there ever a portion of the evening when they

14   would be in a unit, a vehicle --

15        A.    Yes.

16        Q.    -- and driving around?

17        A.    Yes.  And that kind of -- I don't

18   recall off the top of my head, but there were

19   certain hours where we were -- we were -- we

20   covered the -- the Promenade, which is Bourbon

21   Street primarily, and then there was -- then NOPD

22   primarily handled that and they would be -- they

23   would be on patrol after that more often.

24        Q.    And when you say "on patrol," you

25   mean in a vehicle?



```
 1          A.     In -- in a vehicle, yeah.  Yeah,
 2    vehicle patrol --
 3          Q.     Okay.
 4          A.     -- yes, ma'am.
 5          Q.     So in the course of a vehicle
 6    patrol, trooper -- the troopers were leaving the
 7    vehicle, would -- would this provision apply
 8    where they would have to call in and say we
 9    are -- we are leaving because of --
10          A.     Oh.
11          Q.     -- X, Y or Z reason?
12          A.     Yeah.  I think that would be more if
13    you are out of your vehicle for -- you know,
14    that's -- that's not like, hey, I'm getting
15    flagged down by somebody on the corner over here,
16    so we are getting -- physically getting out of
17    our car.
18          Q.     Uh-huh (affirmatively).
19          A.     I think that's going to be if -- if
20    that -- I -- I take that as you are going to be
21    out of pocket for some period of time while I'm
22    out of my car.  Maybe you're going to eat or
23    something and you're not going to be available
24    for a period of time.
25          Q.     Uh-huh (affirmatively).
```

1     A.     It's not, hey, I saw something and I
2   had to jump out of my car and go address
3   something.  So you don't need permission every
4   time you literally -- physically literally exit
5   your vehicle is my interpretation of that.
6     Q.     Okay.  All right.  And so you were
7   talking about the expectation that they would --
8   that the troopers in New Orleans would be on foot
9   patrol for at least part of the evening, correct?
10     A.     Yeah.
11     Q.     Okay.  But this is -- this is
12   distinct from -- from the responsibilities in
13   other troops; is that correct?
14     A.     Yes.
15     Q.     Okay.  Is there any training that's
16   provided on foot patrol at -- at the academy?
17     A.     Not that I'm specifically aware of
18   right now.
19     Q.     Okay.  And for people who are coming
20   into Troop N, was there any training that was
21   provided on foot patrols?
22     A.     Not that I'm specifically aware of.
23     Q.     Okay.  And are you aware of any
24   training that -- that the state police provide on
25   foot patrols at all?



1    A.    Not -- not specifically for foot

2  patrol as a -- as a separate entity to any other

3  type activity, no, ma'am.

4    Q.    Okay.

5    MS. CUMMING:

6        All right.  So I want to move to

7        Exhibit 17, it's previously marked

8        Exhibit 17.  This is the body-worn camera.

9    (Document tendered.)

10    MS. CUMMING:

11        And then I'm also going to go ahead

12        and show you what's been previously marked

13        Exhibit 41.

14    (Document tendered.)

15  BY MS. CUMMING:

16    Q.    So --

17    A.    You want this one, ma'am

18  (indicated)?

19    Q.    You can just keep it there.  So do

20  you recall whether or not body-worn cameras were

21  being used by Troop N?

22    A.    The -- the body-worn cameras were

23  initially issued at a point when I was down

24  there.  They were very new.  They were very new

25  when I was down there.  I don't remember



1    specifically when it was; but yeah, they --
2    they -- when I was assigned down there, they
3    became a -- a requirement at some point; but
4    I'm -- I don't have a lot -- I don't have -- I'm
5    not heavily knowledgeable about -- about them,
6    but they did come in while I was down there --
7          Q.    Okay.
8          A.    -- you know, briefly during --
9    during that.  They -- they had been in effect
10   while I was still down there, but not very long
11   before I moved on.  So I -- I don't know a whole
12   lot about them, but other than that we have them
13   and it's body-worn cameras, so --
14         Q.    Okay.  So that would have been 2016,
15   2017?
16         A.    Yes.
17         Q.    So, and did -- were you involved in
18   any way in the rollout of the body-worn cameras?
19         A.    No.  I was there when they came to
20   us, but no, not the -- not the rollout or
21   teaching anybody how to use them or anything like
22   that.
23         Q.    Uh-huh (affirmatively).  Did you
24   ever get issued a body-worn camera?
25         A.    I did, briefly.



1    Q.    Okay.  And so you were issued a

2 body-worn camera.  Did you -- did you ever use

3 it?

4    A.    Uh-huh (affirmatively), yes, ma'am,

5 I did.  But I -- yeah, I did use it.

6    Q.    Okay.

7    A.    Like I said, it was -- it was very

8 new.

9    Q.    Okay.

10    A.    It was very new, but I was -- but

11 yeah, I -- I did use it.

12    Q.    Can you tell me about the occasions

13 when you used it?

14    A.    Really, a lot of times if I was

15 in -- if I was back at the office, whatever

16 reason, obviously it would be off; but if I went

17 out, if I responded to something with some other

18 troopers and stuff, I would -- I would -- I would

19 activate it while I was out on things.

20    Q.    Uh-huh (affirmatively).

21    A.    So -- so I don't remember

22 specifically a given situation, but if it was I

23 was out on a scene of something, you know, while

24 I -- it was still in progress, I would -- I

25 would -- I would have it on; but I wouldn't --



1    obviously if I'm not out on the street, I

2    wouldn't have it on.

3         Q.    Okay.  And do you recall what the

4    guidelines were for when -- when you would need

5    to activate the body-worn camera?

6         A.    My understanding was when --

7    whenever -- you know, when -- really whenever you

8    are encounter -- encountering anybody in -- in

9    the public.

10        Q.    Uh-huh (affirmatively).  Okay.  In

11   the training that -- that -- did you receive

12   training on the body-worn camera?

13        A.    I recall -- I recall there being --

14   I don't recall who it was, but at -- at Troop N,

15   at the office we had down there at the Port of

16   New Orleans when they first came in, everybody

17   had to come and they did kind of walk -- walk us

18   through the how-to, how to operate it.

19        Q.    Okay.

20        A.    So yeah.  But, again, it was a new

21   gadget and I'm not going to say I walked away

22   from that being a complete expert on it, but --

23   but I did.

24        Q.    Okay.  So they -- they showed you

25   how to work.  Did they give you any training on



1  this policy?

2        A.    I'm sure there was copies of it, but

3  I don't -- I don't recall specifically that day

4  of doing that, looking at the policy.  I don't

5  recall.

6        Q.    Okay.  Okay.  So -- so you would

7  have been issued this policy, and how would this

8  policy have gotten to you?  Let me ask that.

9        A.    The -- the entire policy and

10  procedures is -- is online now.  We have

11  databases.  And now -- it wasn't like that then.

12  Now if a new policy or policy change happens, you

13  are -- you're prompted via e-mail to go in and --

14  and -- and acknowledge that change that you've

15  seen it.  And so if it's a new policy like what

16  this would have been, that would -- that would

17  come in the way of our overall policy and

18  procedure.

19        Q.    Okay.  And do you recall was -- was

20  every troop across the state issued body-worn

21  cameras?

22        A.    When -- I think the time period when

23  I was there, Troop N I think were the first ones

24  to get it; and they was, as they got them in,

25  they rolled them out.



1              When I was at Troop N, I don't know
2    100 percent, but I believe that at that time we
3    were the only ones that had them --
4         Q.    Uh-huh (affirmatively).
5         A.    -- because it was like they just
6    came out and they hadn't made it to the other
7    parts of the state yet, so --
8         Q.    And who at Troop N was actually
9    wearing the -- the body cams?
10        A.    Anybody assigned to Troop N, all
11   those troopers.
12        Q.    What about people that were coming
13   in to -- to work at Troop N but who weren't
14   assigned?
15        A.    At that time, probably not because I
16   don't think it had made its way to where
17   everybody had one yet.
18        Q.    Uh-huh (affirmatively).
19        A.    So yeah, there would be guys working
20   down there that -- that could potentially not
21   have them yet.
22        Q.    Okay.  How many people were assigned
23   to Troop N at the time?
24        A.    Trooper-wise I think it was six per
25   shift, so that would be 24.  I want to say 30



1  something, including the supervisors.

2        Q.  Uh-huh (affirmatively).  And -- and

3  how many people were coming in who weren't

4  assigned to Troop N but were just working?

5        A.  On any -- they had a -- I think it

6  would vary.  I would be -- I would be guessing,

7  but there -- there may be a handful of guys

8  coming in on an overtime basis to supplement

9  the -- the guys from Troop N; and in those early

10  days, they likely would not have a body-worn

11  camera yet.

12        Q.  Okay.  So, and the -- and the guys

13  that were coming in to supplement, would there be

14  an effort to try to pair them with someone who --

15  who was assigned to Troop N?

16        A.  Yeah.  I think to some degree if

17  they hadn't been down there at all, there would

18  be or if it's somebody that's familiar with

19  the -- the area.  I don't think as a -- I don't

20  want to lock it down as a -- as a definite thing,

21  but -- but yeah, you wouldn't -- you know, you

22  would -- you would probably team up with

23  somebody, say if it was their first time working

24  down there with somebody that had been -- but I'm

25  not going to say they had a firm policy of that.

1          But, you know, in general, I
2  wouldn't send two guys out there that -- that
3  completely don't know what they are doing as far
4  as all the different protocols and stuff, even if
5  they probably -- even if they were guys that they
6  could -- they could handle whatever they
7  encounter but may not know how to document it and
8  all because they are from -- from another area or
9  something like that.  But, in general, yes, but
10  not as a firm policy, no.
11          Q.    Okay.  What about for -- what about
12  for -- two questions.  Let me ask this one first.
13          Were there guys who were not
14  necessarily assigned to Troop N but who -- who
15  would work Troop N frequently?
16          A.    Yes.
17          Q.    Okay.  About -- of the people who
18  are coming in to supplement, what rough
19  percentage would you say are the guys that would
20  come in and work Troop N frequently?
21          A.    I don't know.  Some guys work more
22  often than others, but I -- I don't know.  I
23  would -- I would -- I would regularly see some of
24  the same -- some people more frequently than
25  others.



1       Q.      Uh-huh (affirmatively).

2       A.      But I don't know if one was way --

3  like they are always here and there.  You know, I

4  saw this guy once.  I don't -- I don't -- it kind

5  of would just vary of who -- who would -- who

6  could get the -- the opening or whatever.

7       Q.      Uh-huh (affirmatively).

8       A.      I don't -- I don't feel comfortable

9  giving an exact percentage.  You know, most of

10  the guys that they -- if that -- the guys that

11  like to work it would try to get on the list.

12  The guys that didn't, you might never see them.

13       Q.      Uh-huh (affirmatively).

14       A.      You know, so it just kind of

15  depends.

16       Q.      Okay.  So would you -- so I know you

17  don't want to give an -- an exact percentage, but

18  let me -- let me ask this:  Like more than

19  50 percent of the -- of the guys who were coming

20  in to supplement, would they -- would -- would

21  they be complete newbies to -- to New Orleans,

22  never -- never patrolled in New Orleans before?

23       A.      After we had been there for a while,

24  I would say yeah.  Most guys had -- had been

25  doing it fairly -- fairly regular.



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1     Q.    Okay.  So including the -- the guys

2  who are not technically assigned to Troop N?

3     A.    Yeah.  They would probably work it

4  fairly often when they could get down there.

5     Q.    Okay.

6     A.    You know, it's when they are off

7  from their regular assignments, so it wouldn't --

8  but --

9     Q.    And when you say would get the slots

10  for overtime, was there any kind of preference

11  given to people who had previously worked in

12  New Orleans?

13     A.    No.  We had a -- we had a little

14  sign up, online sign up thing, and at a certain

15  date, it went out and it had different -- it had

16  different times and -- and dates and kind of

17  first come, first serve if you -- if you put your

18  name on it.  And as long as you -- you know, if

19  you put your name on it and never showed up or

20  something -- but in general, if there was no

21  reason why you shouldn't get it, it was kind of a

22  first come, first serve on that.

23     Q.    Okay.  So who -- when -- when

24  troopers are being paired up to go out, who's

25  making that pairing?



1    A.    I think a lot of times the sergeant

2  over the shift.  It was just the regular guys

3  that would say, hey, you -- you with this one and

4  that one.

5    Q.    Uh-huh (affirmatively).

6    A.    And then after a while, it's just

7  kind of guys gravitated toward who they kind of

8  worked with or gelled with; or some guys, they

9  would just -- they would team up, or if one

10  wasn't there, we -- the sergeants more times than

11  not.  But -- but we were kind of flexible if guys

12  were comfortable working together and they did

13  well together, then it kind of almost became them

14  two guys always riding together.

15    Q.    Okay.  All right.  So was there any

16  effort to try and, you know, not -- not put

17  two -- two guys who are working overtime

18  together?

19    A.    No.  I -- I wouldn't say

20  specifically.  No, not that I recall.

21    Q.    Okay.

22    A.    I wouldn't specifically keep them

23  apart because they were on overtime and --

24    Q.    Was there any effort to try once --

25  once the body cameras came in, was there any



1    effort to try to pair one person who had a body

2    camera with someone who may not have a body

3    camera?

4         A.    I don't recall specifically.  So I

5    wasn't -- I wasn't there very long with the

6    camera, so I don't know.  Not -- I don't recall

7    anything specifically when I was there.

8         Q.    Do you have --

9               Well, let me ask this.  What -- what

10   is your understanding of why -- why the -- the

11   body cameras came in, why they started?

12        A.    I -- I don't know what prompted the

13   actual decision, but I -- I view it as a safety

14   measure for -- you know, for the -- it's just

15   an -- I mean, I don't know.  Everything --

16   everything's a camera now.  I -- I don't want to

17   venture to say what the motive was to initially

18   get them, but I don't know what came into the

19   decision, what -- what prompted the, yeah, it's a

20   good thing or not, you know, to have them.

21        Q.    Well, what is your -- what is your

22   opinion on the body cameras?  What is your

23   understanding?

24        THE WITNESS:

25               Is it okay to give my opinion on



1    that?

2    MR. CANIZARO:

3        Object to form.  If you want to give

4    your opinion, go ahead.

5    THE WITNESS:

6        I -- I -- I mean, I don't -- I don't

7    know.  I don't -- I don't -- I don't think

8    I need to be on camera for everything I do

9    in my job to -- to prove that I'm doing

10    the -- doing the right thing, but I'm not

11    bothered by having it either.  I don't

12    know.  I'm kind of indifferent to it, to

13    be honest with you.  I just see it as an

14    evolution of the -- the way things are.  I

15    assume I'm on camera.  I assume -- I hope

16    you-all aren't, but I assume, I mean, I

17    am, you know.

18        I -- I -- especially in this line of

19    work, I mean, you deal with the -- the

20    public all the time.  I -- from the time I

21    leave my driveway to the time I'm in my

22    house, I assume I'm on film.  So honestly,

23    it really doesn't -- it really doesn't

24    bother me and -- and it can really --

25    really help you in many regards because



1      people don't always tell the truth about

2      their encounter --

3    MS. CUMMING:

4           Uh-huh (affirmatively).

5    THE WITNESS:

6           -- with police and -- and -- and so

7      I think it could be -- could be a good

8      thing.  I think more times -- I think more

9      times than not it's going to show what our

10     true intentions are out there, you know,

11     and it's not something that I'm -- I'm

12     afraid of.  It's something I assume in the

13     French Quarter it's literally wall-to-wall

14     cameras.  So if you think that you are not

15     being taped, you are not real wise.

16           So it's -- yeah, I'm indifferent to

17     it one way or the other.  I don't think --

18     I don't think I need it to do my -- I

19     don't think it's needed to -- to show that

20     I'm doing my job, but the fact that it's

21     there doesn't bother me.

22   BY MS. CUMMING:

23     Q.    And you started to touch on this a

24   little bit, but just to -- just to make sure I

25   understand.  What is your understanding of -- of,



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   you know, the function of the cameras?
 2         A.    I would -- I -- I think it's -- I
 3   think it's -- I mean, obviously for the general
 4   public, it's their -- you know, it's them to
 5   check against what you are saying as being the
 6   trooper; but I look at it more as a way to -- to
 7   show that what you are doing is truthful and --
 8   and it could be really to save -- it could help
 9   you safety-wise.  You know, if you get out of the
10   car and that little red light is going on, that
11   guy might think twice before he tries -- you
12   know, if it's you and you are in the middle of
13   nowhere with this guy, he can know that, hey, if
14   I try to attack this officer, then it -- you
15   know, it could be on -- it could be evidence of
16   that happening.
17               So I think -- I think by and large,
18   it could be evidence to help you and then it
19   could vindicate you when things aren't always
20   put -- put forth, but -- but I don't know.
21   Again, I don't -- I don't think I need that to
22   prove I'm telling the truth, but I don't -- it
23   doesn't bother me that it's there --
24         Q.    Okay.
25         A.    -- you know.
```



```
 1          Q.     Okay.  So do you -- well, do you
 2     know why Troop N was the -- the first of the
 3     troops to get the -- the body cams?
 4          A.     They didn't -- they didn't
 5     specifically -- my interpretation is that
 6     that's -- there's a lot more activity that, you
 7     know, like I say, we -- we pretty much embedded
 8     over there in NOPD on a, you know, regular troop
 9     that doesn't have just -- just the nature of what
10     the calls are and what it is, you're -- you're
11     more likely -- it's just reality is you are more
12     likely to have use-of-force encounters and things
13     like that just because the nature -- nature of
14     big city police and as opposed to if you are in a
15     rural area and you might only deal with three
16     people all night long.  You know, you deal with
17     three people in two minutes in -- in New Orleans,
18     so it's -- it becomes common sense why it's to be
19     used in the city other than some of the more
20     rural areas.
21          MS. CUMMING:
22               Okay.  And turning to what's been
23          previously marked as Exhibit 41, we have
24          got what is referred to as the mobile data
25          terminals and mobile video audio reporting
```



```
 1              equipment.
 2          (Document tendered.)
 3     BY MS. CUMMING:
 4          Q.    If I just refer to this as the dash
 5     cam policy, will that --
 6          A.    I can --
 7          Q.    -- make sense?
 8          A.    I can live with that, yes, ma'am.
 9          Q.    Okay.  So I want to ask generally
10     what is your understanding of how the state
11     police use dash cams generally?
12          A.    Generally, my understanding is the
13     vehicles that have dash cams, when you -- when
14     you activate, they are utilized when making
15     traffic stops.  They -- they -- and I believe --
16     again, I'm not a technical whiz and I had -- it's
17     been a while since I dealt with them, but the --
18     my understanding is when you turn on your lights,
19     your blue lights, your -- the camera's
20     activated --
21          Q.    Okay.
22          A.    -- and it documents it.  It's --
23     it's -- it was the technology before the body
24     cam.  You know, it's -- it's the body cam for the
25     car.
```



1    Q.  Okay. So it's the body cam for the

2 car. Okay. So -- and that kind of leads into

3 the next question of, you know, when -- when --

4      Actually, let me back up and ask

5 this. You said it's for the vehicles that are

6 equipped with dash cams. What vehicles are

7 equipped with dash cams and which ones are not?

8    A.  Again, I'm not going to recall

9 specifically on a trooper. A trooper assigned in

10 uniform at a troop on patrol is going to have a

11 dash cam. A trooper that doesn't normally -- is

12 not normally assigned a marked unit that checks

13 out a pool car, which is like an extra old car,

14 depending on availability and depending on those

15 things. I don't recall if the pool vehicles at

16 Troop N, to be quite honest with you sitting here

17 today, had those, but it would not surprise me if

18 some pool vehicles did not have them just because

19 they are the older cars that are not prioritized.

20    Q.  Uh-huh (affirmatively).

21    A.  They wouldn't generally have that

22 equipment if they didn't have enough extra ones,

23 so -- so yeah, any -- any -- any unit that's

24 assigned to a trooper would have -- would -- I'd

25 be surprised if they didn't have one, unless it



866.870.7233 P.O. Box 1554 Hammond LA 70404 Fax 985.419.0799

1    was malfunctioning and getting fixed or something

2    like that.  We had extra -- we had pool vehicles

3    at Troop N in various degrees of age and I don't

4    recall to what extent they had those or not.

5         Q.    Okay.  And when you say some -- a

6    vehicle that's assigned to a trooper, does that

7    include marked and unmarked vehicles?

8         A.    No.  No unmarked units -- no

9    unmarked cars have cameras in them.

10        Q.    Okay.  All right.  And when troopers

11   would be working overtime and coming into

12   New Orleans, would they bring their assigned

13   vehicle with them to New Orleans?

14        A.    Yes.

15        Q.    Okay.  And so that assigned vehicle

16   would have a dash camera in it?

17        A.    If -- if they were a uniformed

18   patrol, a uniformed trooper.  Now, if a detective

19   came in that had an unmarked vehicle, for

20   example, and they had to check out a pool

21   vehicle, it could potentially not have one if it

22   was an old car that they were issued they were

23   using for those -- those purposes there, if their

24   every day unit is not a marked police car.

25        Q.    Okay.  So you talked a little bit



1   about how the state police would use these dash

2   cams generally. How were they being used in

3   New Orleans specifically?

4        A.    I think it would be -- I think it

5   would be the same way -- same way that the other

6   troops would handle that.

7        Q.    Okay. So, and what is your -- what

8   is your understanding of when a dash cam

9   should -- should be turned on, either with the

10   lights or is there a manual way to turn it on --

11        A.    Yeah, I think so.

12        Q.    -- without the lights?

13        A.    And, again, I don't know. There may

14   be various versions of it. I -- I'm really not

15   real knowledgeable about the technology. But

16   yeah, when -- whenever you are -- whenever you

17   are initiating an activity with a member --

18   member of the public --

19        Q.    Uh-huh (affirmatively).

20        A.    -- turn it on until such time that

21   that situation is -- is, I guess, de-escalated or

22   it's -- you know, everything is kind of -- it's

23   showing that it's not going to be -- it's --

24   everything is going to be consensual and you go

25   about your business that some -- you know, if



```
1    you -- you going to make an arrest on the side of
2    the road and you'll be sitting out there for an
3    hour waiting for a tow truck, I think at that
4    point that the situation's under control, at some
5    point I think you -- turning it off would be
6    fine; but while you're engaging in that initial
7    reason why the encounter is taking place, the
8    unit should be activated.
9           Q.    Okay.  And that would apply
10   universally in New Orleans out on the road that
11   that's the policy --
12          A.    Yeah.  If you --
13          Q.    -- and that applies everywhere?
14          A.    If you are equipped, if you have
15   that available to you, I would say yeah.
16          MR. CANIZARO:
17              Can we take a quick break?
18          MS. CUMMING:
19              Yes.
20      (A short recess was taken at 11:27 a.m.)
21          MS. CUMMING:
22              We can go ahead and get started.  So
23          I want to show you what we are going to
24          mark as Exhibit 72.
25      (Exhibit 72 marked and tendered.)
```



BY MS. CUMMING:

1

2     Q.    This is going back to the question

3 of the -- the body cams that we were talking

4 about earlier.  Take a look at this.  Is this

5 something that you have seen before?  So it looks

6 like it's an e-mail, it looks like, from

7 Lance Kennedy or, sorry, from Darrin Naquin to

8 Lance Kennedy and it's the Troop N roster,

9 correct?

10    A.    Yes.  I have -- I've never seen this

11 e-mail, but that's what it appears is what you

12 are saying is the case.

13    Q.    Okay.  And it's got the -- the list

14 for Troop N, correct?

15    A.    Correct.

16    Q.    All right.  And it looks like it's a

17 training list?

18    A.    Correct.

19    Q.    Okay.  Do you know what this

20 training is for?

21    A.    My guess is this is what I spoke of

22 when they came and gave us the orientation on the

23 body cameras.  I don't -- I believe Lance Kennedy

24 is an academy person who was part of the -- the

25 rollout of the cameras, and it looks like -- it



866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

1    looks like this is all the -- the Troop N

2    personnel.  So I think it would have been

3    something where, okay, everybody had to come in

4    for -- for this.  So I'm guessing it's when they

5    issued out, the -- the day they issued out

6    those -- the cameras that I spoke of when we had

7    to go to the -- to the office.

8        Q.    Okay.  So, and we have got -- do --

9    do you see your name on here?

10       A.    I do.

11       Q.    Okay.  And you are listed as N4,

12   correct?

13       A.    Correct.

14       Q.    And that N in the beginning of that

15   is -- indicates the troop assignment?

16       A.    Correct.

17       Q.    Okay.  There are a couple that are

18   not N.  So Thomas Bellue; John Cannon; May,

19   Roger May, it looks like; and Brooke Hebert

20   looked like they are all A.

21       A.    Yes.

22       Q.    Correct?

23       A.    Yes.

24       Q.    Okay.  Do you know why it would be

25   that there would be -- and if -- if they have



1    that A designation, are they assigned to Troop N?

2          A.     I think -- I think in some cases

3    some of the troops -- like Troop A is the

4    Baton Rouge area; and in some cases they

5    didn't -- they would send somebody for a period,

6    like a rotation and they would -- they would go

7    back to the troop.  So I think until -- and I

8    wasn't -- I wasn't in charge of issuing the N

9    numbers or anything, but I think -- I think if

10   somebody wasn't going to be there necessarily

11   permanently or if their troop wasn't giving them

12   up permanently, they would just -- they would

13   stick with their regular number because they were

14   ultimately going to be going back to Troop A.

15         Q.     Okay.

16         A.     So they may have been working

17   Troop N on a daily basis, but -- but that troop

18   hadn't said, okay, you got them, now you keeping

19   them.  So they wouldn't necessarily issue them an

20   N plate because they weren't sure at that point

21   yet that they were going to be a permanent

22   Troop N person.

23         Q.     Okay.

24         A.     And so --

25         Q.     All right.  But they were on sort of



1    a long long-term detail?

2         A.    Yeah.  I would say that's -- that's

3    pretty accurate, yes, ma'am.

4         Q.    Okay.  And so this is from

5    January 4th of 2017, correct?

6         A.    Correct.

7         Q.    All right.  And I'm -- I'm looking

8    back.  You left Troop N in August of 2017,

9    correct?

10        A.    Yeah.  In -- in August of 2017, I

11   was back in CID, but there was several months

12   prior to that that I would have been, you know,

13   Troop N but working in a plainclothes capacity.

14   So I have to do a little homework on exactly

15   how -- how several months prior to that

16   August 2017 I was still part of Troop N, but I

17   wasn't a uniform assignment any longer.

18        Q.    Okay.

19        A.    So, you know, if you back up August

20   maybe two or three months, I wouldn't have been

21   dealing with the body worn stuff like toward --

22   I'd be guessing, but maybe June, July, and August

23   or May, June, July, something to that effect.

24        Q.    Okay.

25        A.    But -- but yes, I was completely

1    gone from Troop N in August of 2017.

2         Q.    Okay.  So you would have had

3    conservatively maybe five months with the body

4    cameras?

5         A.    Probably.  I was probably on the --

6    on the high end probably about five months.

7         Q.    Okay.

8         A.    So that's -- that's probably pretty

9    accurate, yes, ma'am.

10        Q.    Okay.  So five months you were

11   dealing with the body cams.  Okay.  And are you

12   aware of any other troops that were -- that were

13   issued body cameras or that -- that participated

14   in this January training?

15        A.    Not that I'm aware of, no, ma'am.

16        Q.    Okay.  Okay.  I want -- and let me

17   ask this.  When you -- so everybody's issued the

18   body cameras, so they started to use them from --

19   from this date, from this January 4th date pretty

20   much?

21        A.    That's my recollection, yes, ma'am.

22        Q.    Okay.  So everybody's wearing them

23   from January 4th on?

24        A.    I believe so.

25        Q.    Was there any -- you talked about



1     the pooled cars.  Were there any pool body
2     cameras that would be available for anybody
3     coming in?
4           A.    Not that I recall.
5           Q.    Okay.
6           A.    No, not at -- no.
7           Q.    Do you know why that would have
8     been?
9           A.    No.  I don't know if they only had a
10    certain amount in at that point and not
11    everybody -- not everybody was issued one yet
12    individually, so my assumption is they didn't
13    have extras at that point.
14          Q.    Okay.  Okay.  So there was no -- if
15    you were not on this list, then you -- and -- but
16    you were working in -- in New Orleans.  You
17    wouldn't have had a body camera --
18          A.    That's my recollection --
19          Q.    -- correct?
20          A.    -- yes, ma'am.
21          Q.    And when you left Troop N -- well,
22    let me ask this.  When you were working in a
23    plainclothes capacity at Troop N, were you using
24    a body camera?
25          A.    No, ma'am.



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond  LA  70404     Fax 985.419.0799

1       Q.     Okay.  And when you left Troop N to
2  go to BOI, were you -- did you bring your body
3  camera with you?
4       A.     No.  I ultimately gave it to the
5  lieutenant that took that role that I was in.
6       Q.     Okay.
7       A.     But no.  I gave -- I gave it up.
8       Q.     Okay.  All right.
9  MS. CUMMING:
10             Okay.  So I want to show you what's
11        been previously marked as Exhibit 18.
12     (Document tendered.)
13  BY MS. CUMMING:
14       Q.     And this is the pursuit and -- and
15  road block policy from the Louisiana State Police
16  policies and procedures, correct?
17       A.     Okay.  Yes, ma'am.
18       Q.     Okay.  And we can -- we can get into
19  some of the details of this, but -- but just to
20  your knowledge and understanding, when would a
21  road pursuit be appropriate?
22       A.     You mean to pull over a vehicle and
23  they fled rather than pulling over?
24       Q.     Any time.
25       A.     Yeah.  When -- you know, if



1    you're -- if you're attempting to pull them over

2    for a legitimate reason and they don't -- they do

3    not stop and -- and then you are justified in

4    pursuing at that point.

5         Q.    Okay.  So it's -- it's any -- if

6    there's any legitimate reason for a stop and the

7    person doesn't stop, then -- then a pursuit would

8    be authorized under this policy; is that correct?

9         A.    Well, it may be -- it would maybe be

10   initiated, then it would be up for the supervisor

11   to determine various factors to see if it was --

12   if it's worth allowing it to continue or to

13   potentially break it off for various -- various

14   reasons.

15        Q.    Okay.  And you said, you know, that

16   the supervisor could break it off for various

17   reasons.  Tell me -- tell me what some of those

18   reasons might be.

19        A.    The traffic at the -- you know, at

20   the time of day, the traffic control speeds,

21   what's the initial -- what information do you

22   have on the initial stop.  You know, is it -- is

23   it relatively minor in nature.  And you're -- you

24   know, you're not going to go 200 miles per hour

25   on the shoulder of the road in -- on the high



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1  rise in bumper-to-bumper traffic if, you know,

2  the guy's got an expired driver's license.  But,

3  you know, if there's a body in the trunk, you

4  probably might risk it, so you just weigh out

5  what -- what the violation might be.  I don't

6  mean to be lighthearted about it, but what -- you

7  weigh out what the violation is or what you know

8  at that time the violation is, you weigh that

9  against safety to the general public, you know.

10       Q.    Okay.  And so what are some of the

11  risks that are associated with a driving pursuit,

12  road pursuit?

13       A.    A pedestrian, vehicle crash, whether

14  it's the police or the -- or the suspect, and

15  injuries that -- with that, general public

16  pedestrians, you know, getting hit, things like

17  that basically, just injury, safety-type

18  purposes.  That would be my primary concern, you

19  know.

20       Q.    Okay.  And so we are talking about

21  road pursuit in a car.  What about a foot

22  pursuit, when would a foot pursuit be

23  appropriate?

24       A.    A foot pursuit generally would

25  happen if you -- you know, if you -- you



```
1    observe -- and obviously, that's a little bit
2    different because you don't have the inherent
3    danger with, you know, vehicles moving at a
4    hundred -- at high speeds.
5              But if you -- if you observe --
6    if -- you know, if I were to be on foot patrol
7    or -- or vehicle patrol and I thought I
8    observed -- observed something that made me
9    believe a crime may be taking place that would --
10   that would give me a legal reason to encounter an
11   individual and felt pretty strongly about those
12   indicators and then he -- he ran from me, I
13   would -- I would be justified in chasing them
14   and -- and attempting to catch and detain them
15   for -- for investigative to -- to further see why
16   did they -- why did they run.
17             Generally speaking, you don't just
18   run from the police if you are -- so it would
19   be -- you know, it would be based on some
20   observations that you made.
21        Q.   Okay.  And so is there any
22   distinction between like a road pursuit and a
23   foot pursuit in your understanding?
24        A.   Yeah.  Yeah.  I equate those --
25   those -- the -- the -- the things I mentioned as
```



```
 1   a vehicle pursuit, whether there was different
 2   injuries and things like that could take place.
 3   I don't know of -- I don't know of a time when --
 4   I mean, a foot pursuit's not going to happen for
 5   30 minutes where you -- you know, you're probably
 6   going to end up in a situation where are they
 7   jumping a fence and they will be setting up a
 8   perimeter kind of type situation.
 9             You know, a supervisor's rarely
10   going to come into play where like I got to
11   decide to cut off a foot pursuit or not.  Like,
12   you know, after two blocks, everybody's sucking
13   wind and the guy's like hiding in the -- on the
14   roof or something and we setting up.
15             So those things I mentioned don't
16   really apply to a foot pursuit.  You know, a foot
17   pursuit is just trying to catch up to them to
18   further investigate what you got.  It's not --
19   you know, you don't have primary units and
20   secondary units and, you know, how's the traffic
21   and all.  It's kind of a different animal than --
22   than those guidelines for vehicle pursuit.
23        Q.    Okay.  Is there any policy -- you
24   were talking about some of the differences
25   between, you know, what's in this pursuit policy
```



1  and -- and how a foot patrol happens.  Is there

2  any policy on foot patrol --

3          A.     I'm not --

4          Q.     -- or foot pursuit?

5          A.     Specifically not that I'm aware of,

6  no.

7          Q.     Okay.  And is there any training

8  that -- that troopers get either at the academy

9  or in-service on foot pursuits?

10         A.     No, not -- not specifically outside

11 of our regular training, our, I would say,

12 in-service.  There was times when we may have had

13 specific training to go to New Orleans, but I

14 don't recall anything specific for pursuits.

15         Q.     And -- and just -- just so that I'm

16 clear, that the times that you had talked about

17 sort of in the early 2000s, that there might have

18 been some -- some trainings offered?

19         A.     Yeah.

20         Q.     Prior to going to New Orleans, do

21 you remember if that included foot pursuit?

22         A.     I don't recall specifically.

23         Q.     Okay.  And so you talked a bit about

24 that the -- your understanding of the state

25 police policy is that if there's a proper reason



1    to initiate a vehicle stop and the vehicle

2    doesn't stop, then a road pursuit can begin and

3    then the supervisor -- well, tell me about the

4    supervisor's role --

5            A.    Yeah.

6            Q.    -- in that.

7            A.    The supervisor would come on the air

8    and you -- you would ask questions -- you would

9    first in the -- in the -- in the case in

10   New Orleans, often times we would -- we would get

11   on the air and say it's a trooper, we are

12   authorizing a pursuit, and then we would kind of

13   come on the air and -- and determine whether to

14   allow it to go on and we would -- we would ask

15   what's the road conditions, what are the speeds

16   and things like that, and -- and -- and you --

17   you would be the authority if it -- if you cut it

18   off.

19            Now, the trooper's got the ability,

20   they are there, so they could -- they could break

21   it off at any time if they feel they -- if they

22   feel they need to, but you -- you would be asking

23   those questions about the -- you know, the

24   pedestrians in the -- in the area, what speeds

25   are you-all at, what's the traffic -- traffic



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

 1    conditions and -- and things like that and you --
 2    and you from the radio would either cancel it or
 3    allow it to continue.
 4          Q.    Okay.  So I want to unpack that a
 5    little bit, so help -- maybe -- maybe just walk
 6    me through this.
 7                So you are a trooper in New Orleans,
 8    someone has pulled away from an attempted stop,
 9    and you are engaging in a vehicle pursuit.  What
10    do you do next?
11          A.    You would get on there and say some
12    indication, you know, that there's signal codes
13    that would indicate a pursuit, but there's
14    also --
15          Q.    Let me -- let me interrupt you right
16    there.
17          A.    Uh-huh (affirmatively).
18          Q.    When you say "get on," "get on the
19    radio;" is that correct?
20          A.    Yes.  Well --
21          Q.    Okay.  And get on -- what channel
22    would you get on?
23          A.    In a -- in a -- in a situation like
24    that, I would -- it would be NOPD's channel --
25          Q.    Okay.



```
 1          A.    -- because you're -- you're --
 2   you're -- that's the radio you're on and clearly
 3   that's -- that's what everybody's monitoring.
 4   You are going to have everybody coming to you.
 5          Q.    Okay.
 6          A.    So you are not like calling your
 7   buddy on the cell phone and saying the guy's
 8   running from me.
 9          Q.    Uh-huh (affirmatively).
10          A.    You are on the big channel with the
11   dispatcher and -- and supervisors from NOPD,
12   supervisors from us.  Everybody can hear -- hear
13   what's going on.
14          Q.    Okay.  And when you say "the
15   dispatcher," are you referring to the NOPD --
16          A.    Yes.
17          Q.    -- dispatcher?
18          A.    Yes.  In a --
19          Q.    Okay.
20          A.    -- in a Troop N situation, yes.
21          Q.    Okay.  All right.  So -- so you get
22   on the radio, you make a call out over the NOPD
23   channel that -- and -- and what -- what --
24          A.    Yeah.
25          Q.    -- what is included in that call?
```



1    A.    Yeah.  You would -- you would -- you

2    would have -- you would have called in your stop;

3    hey, I'm stopping a car at such and such, Canal

4    and whatever and such and such or whatever; hold

5    on; it doesn't look they are stopping.  Okay.

6    They not stopping; we in pursuit.  Or you might

7    say a code request, an air cleaner.

8         And so 1028 is generally a layman's

9    term for pursuit, but it's -- it's really

10   requesting everybody stay off the air, we --

11   we -- we dealing with a -- with a vehicle

12   pursuit.

13        Q.    Okay.

14        A.    And -- and then from there, you just

15   start monitoring it.  You know, you start asking,

16   well, what -- what -- you know, what are you

17   chasing him for.  You might have just ran a plate

18   and the car came back stolen or they may have --

19   it could have been a number of scenarios.  They

20   may have put out a BOLO earlier in the night of

21   an armed robbery vehicle, you know, a green such

22   and such has been doing armed robberies back

23   here.  You -- you find one fitting that

24   description, all of a sudden they running from

25   you.  It's a possibility you got, you know, some



```
 1   bad guys that are running from you, so you --
 2   you -- they -- they transmit that that pursuit's
 3   happening, you get it, and -- and then you are --
 4   you're following guys that responded to them.
 5               What we -- we normally do is once
 6   you have two -- two units involved in it, that
 7   secondary -- that secondary guy that gets
 8   involved will handle radio transmissions so the
 9   guy -- the lead guy can concentrate on -- on
10   driving.
11               And then from there you just -- you
12   try to ascertain why they -- why you -- why you
13   stopping them in the first place.  It might be
14   that -- that BOLO that you handed them in and --
15   and that the 8th District sent over and it might
16   be some really -- you know, some bad things or --
17   or it could be somebody that don't have their
18   driver's license.  You got to weigh those things
19   out why are they running from you, and sometimes
20   you pulling them over for something minor, but
21   they really did do something bad.
22               So you never really know 100
23   percent, but you -- you know, there's more than
24   just the minor thing that they are running for
25   could be really serious, but all those other
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    things come into -- come into play that they --
2    that they -- whether you allow it to go on or
3    not.
4         Q.    Uh-huh (affirmatively).
5         A.    You know, because if it's something
6    real bad and you cut it off, they go somewhere
7    else and -- and kill ten people and you broke it
8    off; but you don't break it off and they -- you
9    know, so you kind of really have to weigh the
10   pros and cons of the situation.
11             At some point, if they do pull over
12   and we do what we call a felony vehicle stop
13   where you are basically calling everybody out of
14   the -- you know, giving verbal orders and you
15   getting everybody out of the car until you can
16   safely have everybody handcuffed, nine times out
17   of ten they going to at some point bail out of
18   the car and it's going to become a foot -- a foot
19   pursuit at that point --
20        Q.    Uh-huh (affirmatively).
21        A.    -- where you try the best you can.
22   They going to get -- they going to start jumping
23   fences and go somewhere, so you going to try to
24   get a perimeter -- establish a perimeter.  You
25   may call for a K-9; you may, you know, just get



1  extra people out there; and you may -- and you
2  may or may not catch them ultimately, but that's
3  generally how it happens.  You know, once they --
4  you pulling them over for some reason that --
5  that they -- that they -- you became aware of
6  them, you know, whether you ran, you know, the --
7  the license plate.  You know, a lot of these
8  temporary plates are more -- very often they will
9  have counterfeit inspection stickers, things that
10 are minor traffic violations, but often times
11 it's stolen cars and things that they put these
12 things on.
13             So that's -- a lot of times it's
14 stolen cars that initiate -- that initiate it and
15 it's just weigh -- it's weighing out the -- you
16 know, weighing out the risk of injury that, well,
17 you let him go and try to catch him another time.
18 So in general, that's kind of how it -- how it
19 goes down.
20             Q.    Okay.  And when -- when you are
21 talking about sort of what you are weighing, the
22 supervisor -- the supervisor who is listening on
23 the radio who's not necessarily -- well, let me
24 ask this.  Is the supervisor involved in the
25 actual pursuit?


866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

1          A.     Well, you usually -- usually not.
2     You may be responding and trying -- trying to get
3     there; but I guess you could, you know, if you're
4     out, if a sergeant or a lieutenant's out, you
5     know, he's patrolling, he sees something, it --
6     it -- it could be him.  You know, at that point
7     somebody else is.  So another supervisor, they
8     kind of jump in and take that roll, or at that
9     point you just use your own discretion whether,
10    you know, the same things you would be asking the
11    guy, if it's not you, if it is you, you thinking
12    of those -- thinking of those -- those same
13    things.
14         Q.     So if it's a supervisor that's
15    engaged in the pursuit, is -- is that -- is
16    there -- is there someone that that supervisor is
17    calling to -- to say, hey, you know, I'm -- I'm
18    doing this?
19         A.     You would probably be putting it
20    out.  You know, you would probably be saying,
21    okay, now I'm at speeds of this.
22         Q.     Uh-huh (affirmatively).
23         A.     You know, if -- if I'm the -- if I'm
24    the lieutenant and it's happening, it's late at
25    night, just I could be the highest ranking person



866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

1  at -- working at the -- at the time, you know.

2  So late at night it's unlikely a captain above

3  would be out there, so I would probably just make

4  the call.  But most times if you the highest guy,

5  I'm -- I'm -- you know, I'm not necessarily going

6  to be the guy out stopping ten people or

7  whatever.

8       Q.    Uh-huh (affirmatively).

9       A.    I'm just kind of overseeing

10  everything; because in the event of that, you

11  want to be kind of separated from the situation

12  to make those -- those judgment calls and stuff.

13       Q.    Okay.  So -- so have you yourself as

14  a lieutenant been involved, like, you know,

15  received radio traffic or radio call about a

16  pursuit, have you been involved in asking those

17  sorts of questions about, okay, what are the

18  conditions --

19       A.    I have a lot of --

20       Q.    -- what is he doing?

21       A.    A lot of times they will start

22  putting that -- they are -- they are -- they know

23  and they are putting it out, but -- but yeah, I

24  have -- I have -- I have been on occasion where

25  pursuit's kicked off when I've been there,



1    been -- been working.

2        Q.    Okay.  And did that happen when you

3    were at Troop N in New Orleans?

4        A.    Yes.

5        Q.    Okay.  About how many times?

6        A.    It would be sometime -- sometimes if

7    a sergeant's already out and about, he may take

8    that -- take that role and I'm just kind of

9    monitoring that the sergeant's doing that thing.

10   They may have me specifically getting on the air

11   and asking about those things maybe two or three

12   times.

13        Q.    Okay.  And --

14        A.    Yeah.

15        Q.    And how many times were you

16   monitoring, you know, what -- how the sergeant

17   was handling the situation?

18        A.    Probably a few more than that.  You

19   know, it -- I could guess.  I don't know.

20   Maybe -- maybe ten or so.  I don't know.  I'm

21   just kind of guessing.  You know, it's -- it's a

22   long -- vehicle pursuits happen, but not -- you

23   know, a lot of times it's -- it kind of initiates

24   and then they run out of the car.  It's kind of

25   by the time you really are establishing that



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

1    role, it's kind of ended.  You know, they -- they

2    go a block and they jump out the car and run and

3    things like that, but on occasion you'll get

4    the -- they get on I-10 and it's -- it's on for a

5    while, you know, and that's when you really got

6    to kind of -- because just in nature the

7    geographics of the French Quarter, long pursuits

8    are not really going to happen unless they make

9    it to the interstate or something like that.

10          Q.    Uh-huh (affirmatively).

11          A.    Today, it's just -- it's not real

12   possible.  It's a tight grid of, you know -- but

13   pursuits happen, you know.

14          Q.    In the French Quarter?

15          A.    Yeah.

16          Q.    Okay.  Vehicle pursuits in the

17   French Quarter?

18          A.    Yeah.  But more than likely, they

19   going to -- I mean, they will pull away onto, you

20   know, your Esplanade or, you know, the river,

21   Decatur and all.  You know, you -- rarely you

22   going to be in -- in where all the pedestrians

23   and people are in or they barricaded areas where

24   there's no vehicles and all; but yeah, in and

25   around that French Quarter area, you have vehicle



1    pursuits.

2         Q.    Okay.  When you have been -- when

3    you've been on the radio and when you've been the

4    one asking -- asking the questions, have you ever

5    terminated a pursuit?

6         A.    I do not recall one that I've

7    terminated down there.

8         Q.    When you have been listening in on

9    the sergeant's, kind of monitoring the pursuits,

10   have you ever heard a sergeant terminate a

11   pursuit?

12        A.    Not that I recall, not that I recall

13   a specific incident, no.

14        Q.    Okay.  Has a trooper in any of the

15   pursuits that -- that you were -- were listening

16   in on on the radio, has the trooper ever

17   terminated a pursuit?

18        A.    Not that I recall specifically, no.

19        Q.    Okay.  And are you aware of any

20   pursuits during your time at LSP that were

21   terminated just generally?

22        A.    I'm sure there has, but I can't -- I

23   can't point to a specific one that I recall when

24   I was on duty.

25        Q.    Okay.  All right.  So I want to --



1    let me see where I want to go next.  So are --

2    have you had any opportunity to review any of the

3    NOPD policies?

4          A.    No.

5          Q.    Okay.  And have you had any

6    opportunity to talk with -- with anybody at NOPD

7    or at LSP who happens to love reading NOPD

8    policies or anybody who's read any of the NOPD

9    policies about -- about what the NOPD policies

10   talk about?

11         A.    No.

12         Q.    Okay.  And are you familiar with any

13   of the, you know, parameters of the NOPD road

14   pursuit policy?

15         A.    No formal policies, no.

16         Q.    Okay.  What about informal policies?

17         A.    I think the general understanding is

18   that they don't pursue.  I don't know that that's

19   an across the board policy or just -- you know,

20   so yeah.  I -- I'm not going to speculate what

21   their -- but I think in general they don't pursue

22   very often, but I don't know to what level that's

23   kind of an understanding or written policy.  I

24   really have no idea.

25         Q.    Okay.  So, but you're -- let me ask



1    this.  In your experience in New Orleans, would

2    state police pursue for things that NOPD would

3    not pursue?

4          A.    Well, if they -- yeah.  I mean, I

5    think the understanding was they generally didn't

6    pursue and we generally will if -- if we feel

7    it's warranted.

8          Q.    Uh-huh (affirmatively).

9          A.    But, again, policy-wise, I don't

10   know.  In practice, I think so, yeah.

11        Q.    Okay.  And let's look to -- well,

12   let me -- let me ask this.  In the state police

13   policy, are -- are you allowed to break traffic

14   laws in the course of a pursuit?

15        A.    Yes.  Well, you have -- you have

16   your -- your standard guidelines with a, you

17   know, Code 1, Code 2, code -- those -- those

18   things, so I'd have to review exactly what; but

19   if you were -- there would be an impervious Code

20   2 situation, you can exceed the -- exceed the

21   speed limit and -- and -- and disregard traffic

22   controls as -- you know, if you T-bone somebody

23   in the intersection, it's still your fault, but

24   you have the latitude to use discretion in doing

25   that example, going through a red light if -- if

1  you can't -- just it's -- it's not -- doesn't

2  give you magic power to just blow through things

3  and you are not going to hurt anyone, so -- so

4  yeah, you can.

5       Q.    And you were talking about Code 1,

6  Code 2, Code 3.  Help me understand that.

7       A.    And, again, this is going back like

8  to when I first started in New Orleans, the Code

9  1 is -- it's not an emergency, just proceed

10  normal.

11       Q.    Uh-huh (affirmatively).

12       A.    You know, Code 2 is I believe you

13  could exceed the speed limit by as much as -- as

14  10 miles per hour, maintaining traffic as -- as

15  you can.  I'd have to really review that, but

16  it -- it -- as things are more emergency, you

17  have a little latitude on how quickly you respond

18  and more latitude you have to -- but exactly the

19  verbiage, it's -- it's probably been 20 years, so

20  I don't want to speculate exactly.

21       Q.    Uh-huh (affirmatively).

22       A.    But you do have some discretion

23  as -- as the situation is more heated, you know.

24       Q.    Okay.  So -- so the more -- how to

25  phrase it.  Is it fair to say that the more



```
 1    concern there is about -- well, no.  Let me -- as
 2    you put it, the more heated the situation is,
 3    the -- the more discretion you have; is that
 4    correct?
 5         A.    The more emergency a situation, you
 6    know, if you are responding to somebody getting,
 7    you know, hurt or something like that, you're --
 8    you're not expected to just, you know, finish
 9    lunch and get there whenever, so it's -- it's
10    you -- you can escalate your response as the
11    situation gets -- necessitates.
12         Q.    Okay.  Okay.  So if it's -- if it's
13    a bad brake tag but the license plate is coming
14    back as not stolen, it's just an expired brake
15    tag or something, would -- but the person just
16    doesn't stop for whatever reason, what code would
17    that fall under?
18         A.    Well, I think you can, if they are
19    just not -- if they are just not stopping, then
20    you're not going to -- you're probably not going
21    to be in a high speed situation.  You are going
22    to follow behind them, put on the radio; and if
23    you have that somebody, an very elderly person
24    that's just clueless of your -- you being back
25    there and you might follow them five miles to
```



1    their driveway and they didn't -- they didn't see

2    you.  So you are not in a pursuit, but they are

3    not stopping.  But if that paper plate in there,

4    like, you know, they going to war over it, there

5    might be a body in the trunk too, you know.

6         Q.    Uh-huh (affirmatively).

7         A.    So the -- the actual speed on what

8    you are allowed, it's -- it's more the discretion

9    of what the weighing out what danger there is to

10   the general public or even that -- even that --

11   that suspect.

12        Q.    Okay.

13        A.    So if they are just not stopping,

14   you -- those things are probably not going to

15   apply because you are going to be sitting behind

16   them going, okay, now she's pulling into

17   Walmart's parking lot.  You going to go out and

18   talk to her.

19             If that paper plate calls for them

20   to do all kind of crazy stuff, it's probably

21   more -- more -- you know, probably more to it.

22   So I think all of those, is it worth it to --

23   is -- is what they did worth you breaking it off

24   or -- you know, because it could be -- if it's

25   real bad, you could be potentially liable for



1      letting that -- cutting -- you know, if you cut

2      something off and -- and they really just did

3      something heinous --

4              Q.      Uh-huh (affirmatively).

5              A.      -- it's just one of those fluid

6      situations that, you know, it -- it's so many

7      variables to it; but -- but I think you got to

8      weigh out what are they doing, something where

9      some innocent person is going to get hurt and you

10     could just say we will get them another day, or

11     they did something to the point where if we let

12     them go and try to get them tomorrow, then, you

13     know --

14             Q.      Okay.

15             A.      But I hate to be so hypothetical,

16     but it really is just, you know --

17             Q.      Okay.

18             A.      -- that many possibilities.

19             Q.      Okay.  And so you were talking about

20     kind of going through red lights and speeding.

21     Is there ever a situation when going the wrong

22     way down a one way would -- would be an

23     appropriate response or -- or be something that

24     could happen in a pursuit?

25             A.      I think it potentially could if --



866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

1    depending on, you know, 5:00 o'clock in the

2    morning and everything's a ghost town and you

3    going -- you going up a half a block because I

4    think you could -- you could -- you could explain

5    why that was -- that was -- I wouldn't out of

6    hand say that that's not okay.

7         Q.    Okay.  So, but that -- but that

8    calculation, it sounds like it depends on time of

9    day and likely traffic and -- and what the reason

10   was, correct?

11        A.    Yes.  Like I kind of -- they all

12   kind of fall under that when it comes to pursuits

13   because it's so -- it's such a fluid scenario,

14   you know.

15        Q.    Okay.  And what about the road

16   pursuits that we have been talking about, can

17   those happen in unmarked vehicles?

18        A.    No.

19        Q.    Okay.  So a road pursuit can only

20   happen in a marked vehicle?

21        A.    Yeah.  If you -- if you in an

22   unmarked car and you observe something, you

23   supposed to get a marked car there as much as

24   possible.

25        Q.    Uh-huh (affirmatively).



1    A.    You know, you can be behind

2 something and saying this is happening, but we

3 are not allowed to initiate pursuits in -- in

4 unmarked cars.

5    Q.    Okay.  All right.  And so turning to

6 this policy, I just want to make sure we are --

7 again, we are speaking the same language.

8         What is -- I think we -- we sort of

9 defined pursuit, but help me understand legal

10 intervention.  What -- what does that mean?

11    A.    Legal intervention is when if a --

12 if -- if a pursuit is going on -- if a pursuit's

13 going on for an extended period of time and --

14 and you -- and like you didn't break it off for

15 whatever reason, you felt you didn't need to

16 break it off and you -- it's an option of

17 terminating that pursuit of basically taking --

18 taking a new intervention and using a common term

19 as a pit maneuver.  You could -- you could hit --

20 hit the suspect vehicle in an attempt to make

21 them spin out and -- and end the pursuit.

22    Q.    Okay.  So it's an intentional

23 hitting of another vehicle to try and end a

24 pursuit?

25    A.    Correct.



```
 1          Q.     Okay.  I want to go on to -- well,
 2   let me -- let me ask this.  Are you -- are you
 3   aware of -- have you ever been made aware of any
 4   troopers going the wrong way down a one way in
 5   the French Quarter --
 6          A.     No.
 7          Q.     -- in the quarter?
 8          A.     Just in general?
 9          Q.     Uh-huh (affirmatively).
10          A.     I -- I don't recall.  I have not --
11   not that I'm -- not that I'm aware of.
12          Q.     Okay.
13   MS. CUMMING:
14                 All right.  I want to turn to what's
15                 been previously marked as Exhibit 19.
16                 This is the use-of-force policy.
17            (Document tendered.)
18   BY MS. CUMMING:
19          Q.     And before we dive into this, can
20   you tell me a bit of what you are understanding
21   is of -- of -- of the Louisiana State Police's
22   use-of-force policy is?
23          A.     I guess just in general the use of
24   force is that, you know, what force you need to
25   safely effect an arrest and you have deadly force
```



1  and nondeadly force; deadly force being that
2  force that a reasonable person would believe that
3  death or serious bodily injury could happen as a
4  result of that, shooting somebody or something
5  like that, or anything -- anything else being
6  anything lesser being nondeadly force.
7        Q.   Okay.  So if there is a fear for
8  safety -- I just want to make sure I
9  understand -- is that there's a fear for the
10 trooper's personal safety or someone else's
11 personal safety, then -- then deadly force is
12 a -- is a possibility of lethal force?
13       A.   Well, if you think somebody's life
14 is --
15       Q.   Right.
16       A.   You know, if -- it's just thinking
17 of that trooper or -- or if somebody else's life
18 is potentially in jeopardy or serious bodily
19 injury.
20       Q.   Okay.  And then -- and so that's
21 when lethal force could -- could potentially be
22 used, correct?
23       A.   Correct.
24       Q.   Okay.  And lethal force and deadly
25 force, that's the same thing; is that right?



1    A.    Yeah.  I think deadly force is the

2    verbiage in the policy.

3          Q.    Okay.

4          A.    Yes, ma'am.

5          Q.    All right.  And then for -- for

6    the -- the nonlethal or nondeadly force, when --

7    when would you use that?

8          A.    To effect -- I guess to effect other

9    kind of arrests that would not rise to the level

10   of -- of -- of deadly force.  You know,

11   somebody's -- somebody, you know, may have a

12   weapon, may not have a weapon or -- or is -- or

13   is actively -- actively resisting, but it -- it's

14   you don't fear that they are going to kill you,

15   but, you know, and -- you know, so -- so fighting

16   them, you know, if somebody's attacking you,

17   you're -- you can fight back, but if it's -- you

18   know, it might not rise to the level of where you

19   would need deadly force, but to -- to gain under

20   control lesser situations, basically resisting

21   arrest types of situations.

22         Q.    Okay.  And what sorts of nonlethal

23   or less lethal types of -- of force are available

24   to -- to state police?

25         A.    State police have -- we have batons.



1    That's not -- not generally used as much any

2    more.  We have TASERs and OC spray and then, you

3    know, you're, you know, fighting the old fashion

4    way.

5           Q.    All right.  So you have your hands

6    up?  You have fists up?

7           A.    Yeah, yeah, your hands, you know,

8    physically subduing somebody or -- or, you know,

9    you have TASER -- you have the TASER and the --

10          Q.    Uh-huh (affirmatively).

11          A.    -- the spray, the OC spray.

12          Q.    Okay.  In looking at this policy on

13   the -- on the first page of the policy, at -- at

14   No. 6 where it says use of nondeadly force, it's

15   got kind of a list of authorized weapons, which

16   it looks like that's -- that's some of the stuff

17   you were just talking about.

18          A.    Yes, ma'am.

19          Q.    So you see at Roman Numeral ii and

20   then it's got A through D?

21          A.    Yes.

22          Q.    Are those listed in any particular

23   order, to your knowledge?

24          A.    Not that I -- not -- no, not that I

25   know of, no, ma'am.

1       Q.   Okay.  And so TASER is on this list.

2  Let me ask this.  Did you receive training on

3  TASER when you were at the academy?

4       A.   No.  Initially, when I came on the

5  job, no.

6       Q.   And -- and why was that?

7       A.   Because it didn't exist yet.

8       Q.   So when -- when did TASER come into

9  the department?

10      A.   I'm not sure because, again, a lot

11  of my career was in investigations and it

12  probably came online well before I actually had

13  one.  So I'm not sure when us as an agency

14  started using it, to be perfectly honest with

15  you.

16            You know, when I came on, the baton

17  was the -- the main thing that you carried, but I

18  know at some point the taser kind of -- kind of

19  came into play; but I'd -- I'd be guessing to --

20  to know what -- what year.

21      Q.   Okay.  And your attorney will --

22  will tell you don't -- don't guess.  So, but --

23  and -- but for you personally, when -- when did

24  you first start carrying a TASER?

25      A.   Golly.  The first time I had one.  I

1  think around 2013 when I -- when I -- when I was

2  a sergeant in -- when I was a sergeant in auto

3  theft, the -- the current sergeant was leaving

4  and they -- and had -- they had one assigned to

5  the office for when -- when they went on warrants

6  and things like that; and I think that's the

7  first time I technically had my own issued,

8  and -- and I have one now.

9       Q.    And did you receive training when it

10  was issued to you?

11       A.    Yeah.  When we first had it issued,

12  we went through a -- there's a little class they

13  put on that shows you how to use it and what --

14  what -- how it works and parameters and all that.

15       Q.    And so when you say "those

16  parameters" --

17       A.    Well, where it --

18       Q.    -- what does that mean?

19       A.    Where it falls and, you know, that

20  nondeadly force, kind of wear your baton and --

21  and those things.

22       Q.    Okay.

23       A.    But -- but yeah, we did -- to carry

24  it, you have to go to a class on it.

25       Q.    Do you recall anything else that was



1    taught in the class?

2         A.    Specifically, no.

3         Q.    Okay.

4         A.    That was later on in the game when

5    it came along; and, quite honestly, I don't

6    utilize it very -- I don't have the occasion to

7    use it very -- to carry it very often.

8         Q.    Do -- I'll just represent to you

9    that we have had testimony from other people that

10   they had to be tased in order to carry a taser.

11        A.    Oh, I was tased.

12        Q.    Do you recall that?

13        A.    I was tased at one time.

14        Q.    Okay.

15        A.    As a matter of fact, it was one of

16   these previous training sessions that you talk

17   about we were going to send people into

18   New Orleans and they were -- and they were given

19   TASERs.

20        Q.    Uh-huh (affirmatively).

21        A.    I was with the academy and we did --

22   we did get -- we did get tased, but it was -- it

23   was in one of those things I was telling you,

24   okay.  They put us through a little thing and I

25   guess that was around the time that the tasers



1   were coming; so yeah, I have been tased.

2         Q.   Okay.

3         A.   That will be the only time that ever

4   happens, I promise you.

5         Q.   What -- what was that experience?

6         A.   It is not fun at all.  It was --

7         Q.   Okay.

8         A.   It was -- no.  I mean, it's just

9   uncomfortable, but it -- it's -- it's short, but

10   it -- you wouldn't volunteer for it if you didn't

11   have to.

12         Q.   Okay.  And so in 20 -- so, but that

13   was -- that was in that early 2000s; is that

14   correct?

15         A.   Right.  That was going to be well

16   before Troop N.

17         Q.   Okay.  And when you went through

18   that -- you know, that early 2000s training, were

19   you carrying a TASER?

20         A.   I don't -- I think I went through

21   that, but at that time, I don't think I was

22   issued one.  I think I just got certified at the

23   time, if -- if I'm recalling correctly.

24         Q.   Okay.  So you weren't actually

25   issued one until 2013?



1         A.      Correct.

2         Q.      Okay.  So in 2013 you -- you

3    received training on how to -- to use the taser,

4    and did you receive training on kind of when to

5    use the taser?

6         A.      I don't recall exactly what the --

7    what the class specifically entails, but yeah, we

8    have to certify with it.  I'm sure there's a

9    little class that explains all that, but I don't

10   to the extent recall exactly what -- what sitting

11   here today.

12        Q.      Okay.  Have you ever had to use your

13   TASER?

14        A.      Have not.

15        Q.      Okay.  And in that -- in that class,

16   did they -- do you recall did they -- did they

17   talk about any of the risks associated with

18   TASER?

19        A.      I don't recall to what extent

20   they -- they went through that.

21        Q.      All right.  Aside from the class,

22   just generally are you aware of any risks

23   associated with TASER?

24        A.      Not specifically as far as -- you

25   know.  No, not -- you know, it may -- nothing,



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond  LA  70404   Fax 985.419.0799

1    just I've heard people with other preexisting

2    medical conditions could -- it could -- could

3    aggravate that, but I don't -- I don't know of

4    any specific thing that I've been told about it.

5          Q.    Okay.  Are you aware of any -- well,

6    let me ask this.  Are there any times when --

7    when a taser should not be used because it's --

8    it's more dangerous to use in certain

9    circumstances?

10          A.    Yeah.  I'm more thinking of times

11    when it wouldn't be authorized to do -- to do so.

12    I can't think of anything specifically.  You

13    know, obviously if somebody's handcuffed or

14    something, you wouldn't tase them.  But one -- I

15    can't think of anything if you are in a situation

16    where it's valid to do so.  I can't think of

17    anything.

18          Q.    Okay.  So, well, let's -- let's

19    unpack some of that a little bit.  You were

20    talking about when -- when you are authorized to

21    tase or not authorized to tase, and the example

22    you gave was handcuffing.  Any other instances

23    you're aware of?

24          A.    Well, usually, I mean, other than

25    a -- you know, I guess I was thinking you



```
 1    wouldn't just tase somebody for -- you know, for
 2    no given -- no -- for no reason.  That would --
 3    that would -- I can't think of when that would be
 4    not a safe when to do it.  It would just be a
 5    legitimate reason to do it.
 6              Q.    Uh-huh (affirmatively).
 7              A.    So --
 8              Q.    So let me ask this and -- and -- and
 9    we can turn to the policy, but just if you -- if
10    you know or if you can remember, when -- when is
11    it permissible to tase someone in your
12    understanding?
13              A.    I would say if somebody's in a
14    resisting arrest situation, if somebody --
15    somebody's not -- not complying, they -- they --
16    I don't think they have to necessarily be
17    actively fighting you; if it's -- if it's just a
18    situation where -- you know, any -- any situation
19    where you're going to avoid really fighting
20    somebody.  If you going to fight somebody, put
21    your hands on them and wrestle them to the
22    ground, the -- the -- the TASER is a -- is an
23    option to -- to de-escalate that from getting --
24    you know --
25              Q.    Uh-huh (affirmatively).
```



1          A.     -- you weigh out what's -- you know,

2     what's a -- what's a heavier thing to do, tase

3     somebody that lasts for a couple of seconds or

4     you're -- you know, it's a knock down, drag out

5     fight in the -- in the middle of the street.

6          Q.     Uh-huh (affirmatively).

7          A.     So if it's a situation where

8     somebody's not -- not going to comply and you

9     have a law -- you know, you have a lawful reason

10    to arrest them and they just -- they just refuse,

11    I think that the -- my opinion is the tase would

12    be authorized to prevent that from becoming a

13    violent situation.

14         Q.     Okay.

15         A.     Because they are -- they're --

16    they're acknowledging that they're not going to

17    comply.

18         Q.     Okay.

19         A.     So you get in a fight with them or

20    you just end it like that.  So I think those

21    would -- it would be on the same level --

22         Q.     Uh-huh (affirmatively).

23         A.     -- physically, getting into a

24    physical encounter with somebody or -- or just

25    utilizing the taser.



1    Q.    Okay.  So I want to look at the
2  use-of-force policy, and it looks like it's got
3  an effective date from August 11th, 2016.  So
4  what is your understanding of the -- the
5  significance of that date?
6    A.    That you -- that -- my understanding
7  is that's like the latest version of -- I -- I
8  wouldn't say that it's necessarily when they came
9  up with a taser policy, but it would be that
10  we'll often get updates to policies sometimes and
11  I think that's like the latest.
12    Q.    Okay.
13    A.    You know, so if there's nothing in
14  there later than that, that's the last time this,
15  the use-of-force policy was -- was updated.
16    Q.    Okay.  So this is -- this is sort of
17  the most -- the most updated use-of-force --
18    A.    Should --
19    Q.    -- policy?
20    A.    It should be.  If not, there's one
21  after this one, yes, ma'am.
22    Q.    Okay.  And do you recall the last
23  time that you read through this policy?
24    A.    No.  Probably studying -- probably
25  studying for the promotional test a couple years



```
 1   ago, but --
 2           Q.    Uh-huh (affirmatively).
 3           A.    Probably so.  It's probably been --
 4           Q.    Okay.  That lieutenant's exam?
 5           A.    It's -- probably so --
 6           Q.    Okay.
 7           A.    -- yeah.
 8           Q.    So, and you might have taken that in
 9   2015 possibly or --
10           A.    Yeah.
11           Q.    Okay.  So --
12           A.    Yes, ma'am.
13           Q.    So this might not have been the
14   policy you studied, this --
15           A.    Yeah.  It may have some minor tweaks
16   since then, yeah.
17           Q.    Uh-huh (affirmatively).
18           A.    Usually, it's not a whole set of
19   differences, but they may add something or
20   whatever.
21           Q.    Okay.  So I want to go to the second
22   page of this; and in the Section 9, it looks like
23   this is all on --
24           A.    The back of the first page or --
25           Q.    Yes, the back of the first page.  So
```



1    Section 9 is -- is on use of TASER, correct?

2          A.    Yes, ma'am.

3          Q.    Okay.  And then where it has kind of

4    the little Roman Numeral vi, the -- the vi?

5          A.    Okay.

6          Q.    You see where I'm at?

7          A.    Yeah.

8          Q.    Is your understanding of this

9    policy, the -- the vi says, "Officer shall use

10   CEWs only when such force is necessary to protect

11   the officer, the subject or another party from

12   physical harm.  A less intrusive means would be

13   an effective officer should avoid multiple

14   repeated, prolonged, extended Continuous EW

15   exposure and less necessary," etc.

16                So is your understanding of that

17   paragraph -- or do you recall reading that

18   paragraph at any point?

19         A.    I probably have, but specifically --

20         Q.    All right.

21         A.    -- when, I don't remember.

22         Q.    And would this be the -- the -- the

23   guideline, this paragraph would be a guideline

24   for -- for when state police can use TASER?

25         A.    I think so, yeah.



1   Q.   Okay.  And then looking over at sort

2   of the -- the next page, page 3, so it's 153 at

3   the bottom?

4   A.   Yeah.

5   Q.   And then we are at little Roman

6   Numeral x, the x?

7   A.   Okay.

8   Q.   It's got, "CEW should not be used on

9   certain individuals except for lethal force would

10  be permitted or where the officer has reasonable

11  cause to believe there is an eminent risk of

12  serious, physical injury."  And then it -- it

13  goes on to provide a list of people for whom --

14  and both people based on status and also kind of

15  situation for whom TASER shouldn't be used,

16  unless lethal force would be authorized.  Is this

17  a -- is this a statement of the state police's

18  policy?

19  A.   Yes.

20  Q.   Okay.  And so that list includes

21  like you -- you had talked about earlier,

22  individuals who are handcuffed, people who are

23  visibly pregnant, people who are elderly, small

24  children, frail people, people who have been

25  recently sprayed with OC spray.  Do you know why



1　that would be?

2　　　　A.　　I'm not sure that -- I think the

3　potential of the TASER reacting with the --

4　the -- the OC contents, but I -- I'm not -- I'm

5　not educated in that, but I know -- but yeah.

6　Like we don't carry -- you carry -- you don't

7　carry both of them and so it may be for those

8　reasons, but I don't know exactly why; but I -- I

9　do know that that's a --

10　　　　Q.　　Okay.

11　　　　A.　　-- that that's -- that that's a

12　policy.

13　　　　Q.　　Okay.  And then the other is

14　individuals whose position or activity may result

15　in serious injury or death, so falls from a

16　height operating vehicles.  Do you know why that

17　is -- is part of the policy?

18　　　　A.　　Yeah.  I guess, yeah.  If they're

19　incapacitated and they fall from a -- I guess for

20　injury purposes, if they fell from a -- I guess

21　on top of them, tase somebody on top of a roof or

22　something and they -- you know, that could --

23　that could cause an injury.

24　　　　Q.　　Okay.

25　　　　A.　　So you want to -- you want to avoid



1  that when possible.

2        Q.    Okay.  So -- so a situation in which

3  someone -- if someone is -- is not able to

4  control their -- their movements, then -- then

5  that could create an injury to them?

6        A.    Could.

7        MR. CANIZARO:

8              Object to form.

9  BY MS. CUMMING:

10        Q.    So, and then individuals in

11  circumstances where a water rescue would likely

12  be required, what is your understanding of -- of

13  that?

14        A.    If you tase somebody on a bridge and

15  they fell in the river or something, you probably

16  would avoid that, would want to avoid that.

17        Q.    Okay.  All right.  And then

18  individuals who are actually perceived to be

19  mentally ill, that would be another instance

20  according to policy of when you would avoid

21  tasing someone, unless lethal force would be

22  authorized, correct?

23        A.    Correct.

24        Q.    Okay.  So -- so these are all

25  instances, according to Louisiana state policy,



1    when -- when a taser should not be used unless
2    lethal force or deadly force would be something
3    that would be authorized; is that correct?
4         A.    Correct.
5         Q.    Okay.  So I -- let me -- let me ask
6    this then.  You had said earlier lethal force or
7    deadly force is authorized when there is a threat
8    of -- of death or -- or, yeah, death to a trooper
9    or someone else; is that correct?
10        A.    Yeah.  Or you -- you perceive
11   something where you think your life could be in
12   danger.
13        Q.    Okay.  All right.  So let me ask
14   this then.  Is -- is lethal force a reasonable
15   response to effect a non-felony arrest when the
16   individual doesn't pose a danger to the officer
17   or to anyone else?
18        MR. CANIZARO:
19             Object to form.
20        MS. CUMMING:
21             You can answer.
22        THE WITNESS:
23             Well, say -- can you say that again?
24   BY MS. CUMMING:
25        Q.    Sure.  Is lethal force a reasonable



1    response to effect a non-felony arrest when the

2    individual does not pose danger to the officer or

3    anyone else?

4            A.    Yeah.  If the -- if that officer

5    does not perceive that -- that he poses such

6    danger, then no, it would not be.

7            Q.    Okay.  Now, what about to effect a

8    felony arrest, again, when the individual does

9    not pose a danger to the officer or anyone else?

10           MR. CANIZARO:

11                Object to form.

12           THE WITNESS:

13                I would say if he doesn't pose that

14           threat or that -- that threat is not

15           perceived, I would say no, it wouldn't be.

16   BY MS. CUMMING:

17           Q.    Okay.  And we have talked a little

18   bit about this already, but after a use of force

19   occurs, does the trooper -- does the trooper have

20   to notify anybody?

21           A.    Yes.  A supervisor is notified.

22           Q.    Okay.  And when you say

23   "supervisor," what -- what level are we talking

24   about?

25           A.    Their -- their -- their immediate



1    supervisor.  A sergeant would be sufficient for

2    that.

3         Q.    Okay.  Is there a circumstance when

4    a lieutenant would be notified?

5         A.    Could -- yeah.  Could be if -- if

6    there wasn't a sergeant available and the

7    lieutenant's out there, it could -- it could --

8    for purposes of -- of that, it -- yeah, it could

9    be if -- if a sergeant's not available, but it --

10   it doesn't require a lieutenant as opposed to a

11   sergeant.

12        Q.    Okay.  And -- and that

13   communication, that can be done on the radio?

14        A.    Yes.  Yes.  You could call in and

15   say, hey, I deployed -- deployed my taser, yes,

16   ma'am.

17        Q.    Is there any other way that that --

18   that communication could happen of informing the

19   supervisor?

20        A.    Not unless the -- unless the

21   supervisor's close enough to where they wouldn't

22   require a radio.  You know, if you were already

23   on foot patrol on Bourbon Street and he's right

24   there on the road, somebody could say, hey, this

25   just happened down here, but by and large it



1    would be the radio.

2         Q.    Okay.  So it would be on the radio

3    for the most part.  Would there -- would there

4    ever be a reason for it to be on a cell phone?

5         A.    Could potentially if -- if --

6    perhaps if there's a -- perhaps if there's a

7    plainclothes operation or sometimes if we are out

8    on undercover it seems we might have one person

9    that has access to a taser in case something

10    really would happen like that, and sometimes in

11    certain capacities it's impractical to have a

12    portable radio and you may -- you may have to do

13    that.  Sometimes we do things by communicating

14    with cell phones in a -- in a kind of a -- more

15    an undercover type thing, but in general when you

16    are -- if you are in uniform with a radio on your

17    hip, it -- it would be on the radio.

18         Q.    Okay.  Okay.  And still on this

19    page 153, it talks about after TASER deployment,

20    data shall be downloaded within 72 hours by the

21    officer's supervisor, but you see where I'm at?

22    It says Roman Numeral 15, xv, a little further,

23    it's about three quarters of the way down the

24    page.

25         A.    X -- oh, xv after.  Data should be



1  downloaded by within 72 hours by the officer's

2  supervisor.  Okay.

3       Q.    So the officer's supervisor, who --

4  who would review that -- that TASER data

5  download?

6       A.    When I was down there, they had --

7  they had certain individuals were -- were -- were

8  trained in downloading information from it and

9  one of -- one of my sergeants at the time was --

10 was such a person.  So if -- if -- if you didn't

11 physically have -- yeah.  It's usually one of the

12 sergeants that down -- it was somebody available

13 that -- that was able to -- to do that.

14      Q.    Okay.  Do you recall which sergeant?

15      A.    I know out of my sergeants, I know

16 he's a lieutenant now, Chad Guidry was -- was

17 certified to do the downloads.  I recall him

18 specifically.  That was in my chain of command.

19      Q.    Okay.  So that would have been in

20 the 2016, 2017 time period when you were there?

21      A.    Yes, ma'am.

22      Q.    Okay.  Anybody else?

23      A.    I think -- I think he's a lieutenant

24 now, but I believe Trey Bellue was a sergeant

25 there at the time.  I believe he dealt with the



1  tasers as well.

2       Q.    Okay.

3       A.    So he -- he didn't work on my

4  rotation, so I'm not 100 percent, but I seem to

5  recall that he was as well.

6       Q.    Okay.  And then the -- the next

7  section it talks about --

8             Well, let me ask you this.  You, as

9  a lieutenant, would you ever have any reason or

10  opportunity to review that data?

11       A.    The taser itself, I -- I -- I don't

12  recall reviewing that stuff while I was down

13  there, no.

14       Q.    Okay.  Do you -- do you recall ever

15  reviewing -- let me back up and ask this.  The

16  sergeants that were downloading that data, were

17  they creating any reports or anything like that

18  or trying -- putting -- putting the data into

19  some sort of comprehensible English that would be

20  understandable?

21       A.    Yeah.  I -- I'm not sure of the --

22  the physical stuff on the TASER, but we do -- we

23  do have a Use-of-Force Report that is generated

24  as a result of the use of force, including a

25  taser deployment, and that's -- that's its own,



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1   oh, like a -- like a database where, so if

2   somebody's involved in the use of force,

3   that's -- that's -- that Use-of-Force Report is

4   generated that has a little gist of what happened

5   and -- and those kind of things.  So the

6   actual -- the actual data on the taser itself,

7   I'm not sure.  I know it's downloaded, but I'm

8   not aware of that being, I guess, inputted into

9   any other thing.

10          Q.   Okay.  So you're not aware.  You

11  don't -- let me ask this.  Are you aware, do you

12  recall reviewing any reports, other than the

13  use-of-force reports that you are talking about,

14  but any other reports that were generated based

15  on the taser data?

16          A.   No.  No.

17          Q.   Okay.  All right.  And then the next

18  section, that xvi, "All issued TASERs shall be

19  downloaded every three months."  Do you -- do you

20  recall who was tasked with that?

21          A.   I do know Chad Guidry did that a lot

22  when the -- when the timeframe came up.  He

23  downloaded everybody's stuff.

24          Q.   Okay.  And -- and would it have been

25  sergeant -- then Sergeant Guidry who was



1    responsible for tracking what --

2        A.    Yeah.

3        Q.    -- what TASER needed to be

4    downloaded?

5        A.    Yeah.  I think every -- I think

6    every three months -- every -- whatever the

7    designation was, every three months they just

8    kind of made everybody aware.  Like if, you know,

9    you come in for rollcall or something, he would

10   be -- he would take them and do them for you.

11       Q.    Okay.  Okay.  So we were talking

12   about the use-of-force reports; and on page 154,

13   so under Section 10, it talks about use-of-force

14   reporting.  It talks about the electronic

15   Use-of-Force Report.  Is that the report that you

16   are referring to?

17       A.    Where does -- where does it mention

18   electronic?  I'm -- oh, yes.  Yes.  I'm sorry.

19   Yes.  That -- that is what I'm referring to.

20       Q.    And so it says "Any discharge of a

21   firearm for purposes other than training or" --

22             Let me -- let me just ask this.  It

23   says training or recreation.  So if a trooper

24   discharges a firearm for recreation, what -- what

25   context would that be?



```
 1            A.    I would guess that would be like
 2    going to a shooting range when you are off duty
 3    or something like, you know, when you're -- it's
 4    not a -- not a work-related thing.  Like on my
 5    day off, I might -- I can -- I don't think I ever
 6    have because I'm not that interested in -- in
 7    spending all my time going to the shooting range
 8    because I go -- we got to go often enough at
 9    work, but --
10            Q.    Uh-huh (affirmatively).
11            A.    Yeah.  I would say like if you going
12    to practice on your time off or something like
13    that, that would --
14            Q.    Okay.  All right.  But could that
15    also encompass, I don't know, like shooting your
16    gun in the air --
17            A.    No.
18            Q.    -- on New Year's Eve?
19            A.    No, no, no, absolutely not.  That
20    would -- just for reference other than -- other
21    than training, recreation, no, that would be
22    under unauthorized shooting your weapon, no.
23    Yeah, recreation would be a controlled like, you
24    know, off -- off -- yeah, off duty.  Yeah.  No.
25    Yeah, yeah.  No.  Let me just end it with no,
```

```
 1   not -- not that.
 2           Q.     Okay.
 3           MR. CANIZARO:
 4                  Is that how you enjoy recreation?
 5   BY MS. CUMMING:
 6           Q.     I just had to ask.  Recreation is --
 7           A.     Not shooting out headlights on your
 8   spare time, that's not what they are referring
 9   to.
10           Q.     Okay.  All right.  So, and then at
11   that -- that Roman Numeral ii down there, it
12   says -- that little ii, it says "The supervisor
13   shall review the Use-of-Force Report, indicate
14   whether the actions taken by the officer complied
15   with policy and procedure and training."  So can
16   you tell me about your role in that review
17   process?
18           A.     I think the way that report -- the
19   way that report is set up, if a -- if a sergeant
20   does the use of report -- does the Use-of-Force
21   Report that's done, and then the next level in
22   that, it goes to -- it goes to the commander of
23   the section.  So it kind of would -- if -- if I
24   did the Use-of-Force Report on somebody, if I was
25   the one working, it would get sent to the -- I
```



1    would send it to the captain, but also if the
2    sergeant does it, I would probably be made aware
3    of that, but -- but that electronic report would
4    go to the commander of the section, which would
5    be the -- the captain, and -- and I know that
6    because I had to get clarification before.
7              So really the -- the lieutenant
8    doesn't have to do the use of force, but once it
9    goes -- once whoever does do it, the sergeant or
10   lieutenant, the commander of that section has to
11   review that and from there it gets sent to the
12   training academy.  So the training academy has to
13   get it from the commander of a section who would
14   be a captain above me.
15        Q.    Okay.  So -- so a supervisor -- in
16   this instance, it sounds like -- I just want to
17   make sure I understand -- it's three layers of
18   review, either a sergeant or a lieutenant, the
19   commander, who is usually a captain?
20        A.    Captain, yes, ma'am.
21        Q.    And then the -- usually a major, who
22   is the training academy director?
23        A.    I believe so.  That's my --
24        Q.    Okay.
25        A.    That's my understanding of it.



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

```
 1          Q.    Okay.  And so you as a lieutenant
 2   wouldn't necessarily be reviewing a sergeant's
 3   use of -- a use of force that a sergeant did the
 4   initial work?
 5          A.    Not necessarily, correct.
 6          Q.    Okay.  All right.  If a -- if a
 7   sergeant is the one who actually used the force,
 8   him or herself --
 9          A.    Yeah.
10          Q.    -- who would deal with that?
11          A.    He would probably contact -- I'd
12   probably have to initially do that.
13          Q.    Okay.
14          A.    I'd probably have to do -- I would
15   be that first line.
16          Q.    Okay.  All right.  And so supervisor
17   in this context, in the policy context means,
18   though, that first, second, and third layer of
19   review and everybody's looking to see --
20          A.    Yes.
21          Q.    -- if that Use-of-Force Report is --
22          A.    Yeah.
23          Q.    -- a current policy and procedure?
24          A.    Correct.
25          Q.    Okay.  And so if -- if something
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond, LA 70404    Fax 985.419.0799

1    sneaks by the -- that first layer of review, then

2    the captain would have an obligation to really

3    check and -- and say -- and go back and say, hey,

4    I think there's a question here or something --

5            A.    Correct.

6            Q.    -- to that effect?

7    MR. CANIZARO:

8                  Object to form.

9    BY MS. CUMMING:

10           Q.    Okay.  And -- and when you were

11   talking about you had to get clarification,

12   unpack that for me a little bit.

13           A.    Yeah.  Because we'll -- since I've

14   been in the command, I've -- I've one time

15   approved -- I approved one one time in the

16   commander's slot that came from a sergeant and

17   I -- I thought commander was just a term of like,

18   hey, who -- you know, who's in charge of that

19   particular area at the time, so I -- but the

20   training academy wants it to ultimately come from

21   a captain.

22                  So since I've been in my current

23   role, I've had to -- I -- I know what I'm telling

24   you is the case because I've been told it has to

25   come from the captain.



1        Q.      Okay.

2        A.      So, you know, if -- if I were to

3    approve that third level when it would be with --

4    with -- you know, if the captain, say, was out of

5    town or something, I'd have to say I'm sending it

6    to you, but the captain looked at it and he

7    says -- so in that final one, it has to be a

8    captain.

9        Q.      And when you say "the final one,"

10   the -- the final one before it goes to the

11   training --

12       A.      Correct.

13       Q.      -- academy?

14       A.      That's yes.  Yes.

15       Q.      All right.  Do -- do you recall when

16   that was that -- that you got -- got that

17   clarification?

18       A.      I would say within the last year

19   here, just -- I don't remember what the scenario

20   was, but yeah, it's been since -- well, since

21   I've been finished with Troop N.  But there was

22   a -- somebody that had a use of force in --

23   and -- and that's when I found -- I talked to

24   somebody at the academy and they said that we --

25   it needs to come from the captain, so it was



1    unrelated to anything at -- at Troop N, when I

2    was -- when I was working at Troop N.

3           Q.    Okay.  How -- how did you get notice

4    of that, of, you know, this is our -- this is our

5    procedure and this is what -- how you've got to

6    follow it; how did you get notice of that?

7           A.    Well, that's -- I think the sergeant

8    probably contacted me and said I had use of force

9    for -- for so and so and I think -- I think in

10   that -- I think in that particular that we --

11   some of our databases you -- you send it to the

12   next level and they get -- and then you get

13   prompted by e-mail, so you know you have

14   something you have to go look at in -- in the

15   system.

16          Q.    Uh-huh (affirmatively).

17          A.    I don't remember specifically how

18   that one -- how that one works.  It's been a

19   while since I've looked -- I've seen it, but it

20   may be that the sergeant approved it and they

21   sent it to me on accident instead of the captain,

22   so then I had to --

23          Q.    Okay.

24          A.    -- make sure that they knew it was

25   the captain.



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    Q.    Okay.  And -- and when -- when
2  whoever it was at the training academy got back
3  to you, did they send you an e-mail?  Did they
4  call you?
5    A.    Called me and just said yeah, we --
6    Q.    Okay.
7    A.    -- we need it to come from the
8  captain.
9    Q.    Okay.  And was there any
10  documentation of that?  Like did they -- did they
11  say, hey, you know, we -- we clarified this --
12  this procedure?  Like did they include that in a
13  memo or anything like that?
14    A.    No.  Just the database just says
15  commander, so if you are -- if you are looking at
16  what commander is, it's self-explanatory, but --
17    Q.    Uh-huh (affirmatively).
18    A.    So no, it doesn't, no.
19    Q.    Okay.  So on the -- on the
20  use-of-force reports, in -- in what circumstances
21  would you expect a trooper to submit a
22  Use-of-Force Report?  We have -- we have -- we
23  have already covered firearm destruction.
24    A.    Yeah.  Not recreation.
25    Q.    Any -- right.



1         A.    But a tase -- a taser deployment.
2 Really any -- any -- any physical altercation
3 that really was, you know, anything that -- that
4 I guess you would interpret as a fight or they
5 actively resist and then you had -- you know, you
6 had to throw somebody on the ground, you had
7 to -- you had to, you know, use defensive
8 measures to effect the arrest. It was to any --
9 any extent really not compliant arrest, you
10 are -- you are going to fill -- fill use of force
11 out.
12         Q.    Okay. Are you going to fill out a
13 use of force for like each person -- like if
14 you -- if there's an incident with multiple
15 people and there are multiple people against whom
16 you have had to use force, would you fill out a
17 Use-of-Force Report for each person?
18         A.    If you were with somebody, I would
19 say the person who primarily was in -- you know,
20 if -- if me and you are working together and I
21 tase them, I would probably be the one to do it
22 and it would be indicated in the little synopsis
23 that we had patrol together and -- and this
24 happened.
25         Q.    Uh-huh (affirmatively).



```
 1              A.    But I think in a fight situation
 2    where each person did something significant
 3    enough to where -- but, in most cases, the
 4    primary, that would be kind of the primary person
 5    that -- that had that encounter.  So it would
 6    probably be that the person that really had to
 7    use the force primarily and incorporate --
 8    incorporate within that everybody.  If --
 9              Q.    Uh-huh (affirmatively).
10              A.    -- if we all involved in one
11    incident, I don't think you can have like five
12    because everybody was grabbing an arm and a leg,
13    you know.
14              Q.    Right.
15              A.    But if I was the one that really had
16    to -- you know, I got -- you know, I had to
17    really fight him or he punched me in the face or
18    something like that, probably the primary person
19    with everybody else mentioned in it.
20              Q.    Okay.  And -- and what about if
21    there are multiple people, so -- so you -- you
22    come upon a scene and there are like six -- six
23    people all kind of tangled up together and you
24    have to use force on three different people, are
25    you going to file one Use-of-Force Report for
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   each of those three people?

2           A.    I'd have to look at the actual form.

3   It's been a long time.  If it --

4           Q.    Okay.

5           A.    -- if it calls for multiple

6   suspects, I would suggest putting it all on one

7   incident.

8           Q.    Okay.

9           A.    But it may not -- you may have to in

10  that situation.

11          Q.    Okay.

12          A.    Or seven guys, everybody tasers

13  them, then maybe you have to do seven of them,

14  you know, but --

15          Q.    Uh-huh (affirmatively).

16          A.    But by and -- by and large, if

17  there's a primary kind of person, then it can be

18  incorporated; but I -- I don't know if --

19          Q.    Uh-huh (affirmatively).

20          A.    -- if that actual form kind of -- I

21  don't know if it calls for multiple suspects in

22  the form or not, but if it's three people you've

23  dealt with and it only counseled one of them,

24  then you would in that situation do three --

25          Q.    Okay.



1      A.     -- you know.

2      Q.     And how -- how long after an

3  incident would you expect someone, a trooper

4  to -- to submit a Use-of-Force Report?

5      A.     You would pretty much immediately be

6  notified of it, but I think -- I think just in --

7  just the next practical -- whatever's practical.

8  I don't know if there's an official.  It could

9  be, but it's usually done pretty -- pretty close

10  after it happens.  If it's -- happens at

11  5:00 o'clock in the morning and it's on their

12  days off, it could be a couple days until they

13  come back, but I think it's just a reasonable

14  timeframe afterwards that they get that; so you

15  would be made aware of it immediately --

16      Q.     Okay.

17      A.     -- you know.

18      Q.     And -- and you as a lieutenant, how

19  would you be aware of a use of force?

20      A.     I would just be -- I would be -- the

21  sergeants would let me know, but if it's a -- if

22  it's in every -- if it's just in -- if it's, you

23  know, no real extenuating circumstances and it's

24  just that, I wouldn't necessarily have to be

25  notified of every single thing that happened.



1  But if it's significant enough where if somebody

2  went to the hospital, well, they would probably

3  just call, give me a heads up on that.

4         Q.    Okay.  Okay.  So a hospital run.

5  Any other circumstances when -- when you would

6  get a heads up?

7         A.    But it's really not uncommon almost.

8  You know, if you sneezed within the last few

9  days, you going -- you going to the hospital is

10  not really uncommon any more, so -- but if -- but

11  if it's -- if somebody's really, you know, in bad

12  shape or something like that; but I take a little

13  bit of a step back on every other hospital run

14  because that's, you know, real common nowadays.

15        Q.    Uh-huh (affirmatively).

16        A.    But a lot of times the jail, it

17  doesn't take a whole lot to have to take somebody

18  to the hospital.  So if it was something they

19  felt that, you know, this is a little out of the

20  ordinary, you have to be aware of it, you know.

21        Q.    Okay.

22        A.    So --

23        Q.    Can you think of any other

24  circumstances; so not every hospital run, but --

25  but what other --



```
1        A.      Well --
2        Q.      -- circumstance would -- would --
3        A.      I mean, if somebody, you know -- it
4    just -- I don't know.  Maybe you were tased and
5    then an hour later some kind of medical condition
6    kicked in and maybe they -- you know, they --
7    they -- they took a turn for the worse or
8    something and it's, you know, every day -- every
9    day things.  I don't think I have to be notified
10   on every single thing because you going to -- you
11   know, you read reports and you going to kind of
12   know that those things happen.
13            But every time you -- every time you
14   got to put somebody on the ground and handcuff
15   them, you know, I don't think I need to be
16   notified of that, but if it's a kind of unusual
17   injury or something like that or a trooper was --
18   you know, somebody spit in the trooper's face and
19   he's HIV positive or something, you know, like
20   you really have some extra concern whether --
21   whether, you know, on -- on either side of the
22   altercation that maybe they say, hey, we had this
23   situation, a guy spit on them and it's HIV
24   positive, so and so's going to the hospital
25   himself, you know, the trooper or something like
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

 1  that, so just want to give you a heads up on it

 2  that that's going on.

 3        Q.    Okay.  And so after the -- the

 4  Use-of-Force Report is submitted, how long after

 5  that would a supervisor review the use of force?

 6        A.    I think pretty soon afterwards

 7  because you -- like I said, you are prompted, so

 8  you have to go in there and -- and -- and approve

 9  it for it to go to the next level.  So usually

10  that wouldn't -- you know, if -- if -- if I'm

11  made aware that I have to do one, we pretty much

12  do it immediately.

13        Q.    Uh-huh (affirmatively).

14        A.    You know, when -- when it's

15  practical.  So you wouldn't -- I can't think of a

16  situation where a trooper would fill one out and

17  a sergeant just let it sit in there, sit, you

18  know, for a long period of time, but I guess if

19  he got real busy, it might sit for a day or so;

20  but once they are really aware of it, then hey,

21  yeah, I did it, it's in there, they going to go

22  review it and send it to the next level.

23        Q.    Do you know is there a certain like

24  policy, like it has to be done within 48 hours or

25  anything like that?



1    A.    Not that I'm aware of.  Not that I
2  know of.
3    Q.    Okay.
4    A.    Not that I'm aware.
5    Q.    And as the -- as the first line
6  supervisor, the first person that's doing the
7  review, is there anything that the supervisor is
8  going to look at outside the four corners of that
9  Use-of-Force Report?
10    A.    I mean, they're going to --
11  they're -- they are going to get that trooper's
12  full report of that incident, so I guess they
13  would -- they would -- yeah.  They would -- they
14  would look -- you know, that -- that Use-of-Force
15  Report is probably going to be a snapshot of the
16  logistics, but their -- their -- their arrest
17  report or whatever the situation is is going to
18  be in detail how it all unfolded.
19    Q.    Uh-huh (affirmatively).
20    A.    So yeah, ultimately, the
21  Use-of-Force Report.
22    Q.    So the super -- the first line
23  supervisor would read not just the Use-of-Force
24  Report, but would also go back and read the
25  actual arrest report?

```
 1          A.     Yes.
 2          Q.     Okay.  And for the -- I know -- I
 3    know you're not a captain and I know you're not a
 4    major, but to the extent that you know, do the --
 5    the captains and the majors who are reviewing the
 6    Use-of-Force Report down the line, are they --
 7    are they looking at anything outside of the four
 8    corners of that report?
 9          A.     I don't know exactly what their
10    protocol is, but they -- yeah.  I don't want to
11    speculate what -- what they do, but they would
12    have access to anything the sergeant did, you
13    know, if they -- if they wanted to look beyond
14    that, that, you know, for whatever reason they
15    would have access to the report just like
16    everybody else would.
17          Q.     Okay.  Would it be -- was it -- does
18    the arrest report get attached to the
19    Use-of-Force Report?
20          A.     I don't think so.  I don't think so.
21    You -- you could -- no, I don't think so.  They
22    may just refer to the case number on it.  I --
23    I -- I don't believe so.  Like I said, it's been
24    a while since I looked at it, but I don't think
25    there's a spot to attach to the actual
```



1    Use-of-Force Report.

2         Q.   Okay.  So -- so if you were looking

3    at the Use-of-Force Report in kind of one

4    database, you would have to go to another place

5    to -- to get the --

6         A.   I think so.  I think so.

7         Q.   Okay.  And is there anything else

8    that -- other than the arrest report, is there

9    anything else that you-all are looking at?

10        A.   No.  If there's a use of force

11   involved in the arrest, it would be -- it would

12   be in his -- his comprehensive report and all the

13   details of that in -- in that use of force, yeah,

14   I think and --

15        Q.   What about an incident report?

16        A.   In -- in -- in what context?

17        Q.   Would that be another -- is there

18   any other report generated that --

19        A.   Yeah.  The internal book really is

20   the arrest report.  You know, if I -- if I -- if

21   I stop you on the street and I arrest you, you

22   would take them to jail with that initial

23   New Orleans booking stuff that we talked about,

24   but then you -- we -- as the state police, we

25   generate our -- a report ourselves and -- and



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1  the -- those miscellaneous forms would be

2  attachments; you know, maybe a photograph, maybe

3  a booking sheet, all the little preliminary stuff

4  that -- a tow sheet if you towed his car, you

5  know.

6           Q.    Uh-huh (affirmatively).

7           A.    But there's a -- you generate a

8  report that has, you know, from -- from A to Z

9  everything that happened with that incident.

10          Q.    Okay.  All right.  And so that A to

11 Z report that you are talking about, what -- what

12 is the name for that?

13          A.    That --

14          Q.    What is that called?

15          A.    Our system is called IRS, our

16 Instant Report System, but --

17          Q.    Right.

18          A.    -- we kind of getting into in-house

19 terminology.

20          Q.    Uh-huh (affirmatively).

21          A.    You know, you have your incident.

22 Within that, you can classify things in an

23 incident report, a case report there, but by and

24 large that -- that IRS system is going to be our

25 documentation to generally speak in a case report



1    if you arrested somebody and -- and you are

2    taking them to jail.

3         Q.    Okay.  And so would that be distinct

4    from -- so I just want to make sure and we

5    will -- we will get into sort of what all these

6    various documents look like in a second, but

7    there's the -- there's the IRS report that would

8    include the incident report that is sort of the A

9    to Z of everything that's associated with the

10   incident?

11        A.    Yeah.

12        Q.    Is there also a separate arrest

13   report?

14        A.    No.  The -- the -- some people call

15   it an arrest.  I just call it basically a booking

16   sheet that's going to be the -- in the case of

17   New Orleans, it would be the arrest report, in --

18   in -- in that context would be the New Orleans

19   face sheet and "Gist" form.  It would just --

20   arrest report.  I -- I -- I refer to it as

21   booking sheet because it's just, you know, that

22   -- that arrest report, incident report, case

23   report.  That IRS generated report is your

24   report.

25        Q.    Okay.  Okay.  Yeah.  We -- we may --



1    we might come back to this when we have got some
2    of that -- some of the actual forms in front of
3    us to help unpack that a little bit.
4          A.    Yes, ma'am.
5          Q.    Okay.  So, but there would be an
6    additional report that the first line supervisor
7    would be looking at, correct, in addition to the
8    Use-of-Force Report?
9          A.    The -- the IRS report.
10         Q.    Okay.  All right.  So -- and in
11   your -- your review of the Use-of-Force Report,
12   is there -- is there any effort to sort of try
13   and identify if there is any sort of boiler plate
14   or kind of cookie cutter language that, you know,
15   is like the -- the trooper is using the same
16   language to describe a situation, like various
17   situations over and over and over again, it's not
18   very descriptive?
19         A.    I've never been aware of that, have
20   a person look at enough of the same person's to
21   say, oh, it's the same thing, you know.  No.
22   I -- I'm not aware of anything like that.
23         MS. CUMMING:
24              Okay.  I want to show you what we
25              are going to mark as Exhibit 73.



```
 1           (Exhibit 73 marked and tendered.)
 2    BY MS. CUMMING:
 3           Q.    Do you recognize this document?
 4           A.    Yes, ma'am.  That's the Use-of-Force
 5    Report we have just been discussing.
 6           Q.    Okay.  So this is the Use-of-Force
 7    Report form and this one is dated August 9th,
 8    2016, correct?
 9           A.    Yes.
10           Q.    Okay.  And if you flip over to the
11    back, this is one that you reviewed kind of in
12    that first layer of review, correct?
13           A.    Which page are you looking at?
14           Q.    The very last page.
15           A.    Oh.  Yes.
16           Q.    Okay.  And so this was done on the
17    9th.  It looks like you reviewed it on the 15th,
18    correct?
19           A.    Okay.  Yes.  I'm sorry.  I was
20    looking at the one above it.  Yes.
21           Q.    And the -- and the one above looks
22    like it's 8/22/2016, Trooper Bellue.  I'm sorry.
23    Sergeant Bellue, correct?
24           A.    Correct.
25           Q.    And then it's got the commander's
```



1    signature.  That's Captain Naquin, correct?

2        A.    Yes.

3        Q.    And then it's got the academy

4    director's signature.  That would be now

5    Captain Lynch?

6        A.    I'm not sure what he does.  I guess

7    I'll take your word for it.

8        Q.    This was done on the 500 block of

9    Bourbon Street; and if you go to 27, so on the

10   second page you see how there's sort of a number

11   of blocks?

12       A.    Yeah.

13       Q.    All right.  I'm sorry.  Let me --

14   let me go back to the first page.  It looks like

15   the -- the reason for contact was "other," and

16   then reason force was necessary was to assist

17   other agency effect arrest, correct?  I'm sorry.

18   I'm on the first page.

19       MR. CANIZARO:

20            15 and 16.

21       THE WITNESS:

22            Yes.  Okay.

23   BY MS. CUMMING:

24       Q.    Okay.  And it notes at Box 26 that

25   the person was under the influence of alcohol or



1    drugs --

2          A.    Okay.

3          Q.    -- right?  And there are two

4    officers present, one -- one person resisting.

5    And it looks like the level of resistance was

6    active resistant, "uses physical strength in

7    achieving" -- "achieving resistance.  Pulls away,

8    wrestling."

9                Is this -- this No. 27 where it has

10   like level three, is this -- do you know how this

11   box gets filled in?  Is it like a drop-down menu?

12   Do you have to type it?

13         A.    I think it is a -- God.  It's been a

14   while since going -- I think it's -- I think it's

15   a click.  I don't know if it's a drop down, but

16   it's a -- you pick which -- which one.  I

17   don't -- I don't -- yeah, I don't think that's

18   just typed in.

19         Q.    Okay.

20         A.    But I'd have to go back and look at

21   it to see exactly what the format is, but --

22         Q.    Okay.  And then where it's got

23   explain, is this section typed in?

24         A.    Yes.

25         Q.    And so it sounds like based on the


866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1  explanation on -- of the level of resistance that
2  the person was running away from NOPD on foot.
3  Trooper Bellue caught up, was telling him to
4  stop, he didn't comply, and then Trooper Bellue
5  tased the -- the person in the back and that
6  the -- the person was stopped.
7           Do you have an indication from this
8  what precisely this person was doing other than
9  running away from NOPD?
10          A.    Yeah.  I -- I'm just looking at
11  above that where -- you know, it looked -- it
12  looks like he fled after there was a struggle
13  with NOPD, you know, pulling away, resisting, and
14  physical strength and achieving resistance.  So
15  just I -- I don't recall any of this actual
16  incident, but it seems as though he was fighting
17  with NOPD when he ran off and that was a -- that
18  was a result of ending any physical altercation,
19  but I'd probably have to look at the actual IRS
20  report to recall the details.  I don't -- I
21  don't --
22          Q.    So based on -- so based on what --
23  what is in front of you here, there -- there
24  isn't any indication of what was happening with
25  NOPD prior?  There --



```
 1          MR. CANIZARO:
 2               Object to the form.  Other than what
 3          he just said, the previous answer?
 4          MS. CUMMING:
 5               Well, if we can have the witness
 6          testify?
 7          MR. CANIZARO:
 8               Well, then asked and answered, but
 9          you can answer it again.
10          THE WITNESS:
11               What was the question?
12     BY MS. CUMMING:
13          Q.    So in the explanation that's given,
14     is there any narrative account of -- of what was
15     happening with NOPD prior to the -- to the
16     flight?
17          MR. CANIZARO:
18               Same objection.
19          THE WITNESS:
20               Yeah.  I'm not -- right here in
21          front of me, no, I don't have that.  But
22          just -- just the -- like you said, the --
23          the active resistant title given to it;
24          but exactly what was going on, I'd
25          probably have to refer to the more
```



1        in-depth report on that.
2   BY MS. CUMMING:
3        Q.    Okay.  All right.  And so, but --
4   but this is a sort of automatically populated
5   level three and that automatically gets populated
6   as uses physical strength and achieving
7   resistance, correct?
8        A.    I believe so.
9        Q.    Okay.  All right.  And then at
10  No. 30, levels of control, reasonable officer's
11  response, is there any difference in that -- in
12  the narrative that's offered at -- at No. 27 and
13  No. 30?
14       A.    No.  It's the same.
15       Q.    Okay.  Would you expect to see some
16  kind of a different account explaining why the
17  force was necessary?
18       A.    No.  Because he's really -- yeah.
19  He's really got the same explanation for those
20  two categories, so no.  That -- that's not -- to
21  me not an issue.
22       Q.    Okay.  Do you see anything in here
23  that indicates that the -- that this person who
24  was fleeing posed any kind of physical risk to
25  either the NOPD or the -- or the trooper at the



1     time the taser was deployed?

2          A.    I'm just looking -- I'm just looking

3     at that level three that was checked saying that

4     there was -- it appeared there was a physical

5     altercation going on with the guy that -- that

6     prompted the pursuit and that that would -- that

7     taser was to prevent further physicality, you

8     know.

9          Q.    Okay.  But he -- according to the

10    explanation, he's fleeing on -- on foot, correct?

11         A.    Yes.

12         Q.    Okay.  And -- and the taser strikes

13    him in the back, correct?

14         A.    Uh-huh (affirmatively).

15         Q.    Okay.  Is there any -- other than

16    the level three that -- that is automatically

17    populated from the drop down or whatever menu, is

18    there anything in the narrative that -- that --

19         A.    Yeah.  From that narrative, I don't

20    know what the active resistant was --

21         Q.    Okay.

22         A.    -- by just looking at this.

23         Q.    Okay.  And from this narrative, is

24    there any indication of any physical danger that

25    this individual posed to either the NOPD officer



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1  or the trooper?

2        A.    I would say yes because they listed

3  it as active resistant.

4        Q.    But from the narrative?

5        A.    Well, I don't think you can

6  separate -- you know, it's part of that same

7  field.

8        Q.    Uh-huh (affirmatively).

9        A.    So from -- from that Block No. 27,

10  it's listed as active resistant, so I would -- I

11  can't separate that from his decision to deploy

12  the TASER.

13        Q.    Okay.  And -- and then looking to

14  the last page of this, it says approximate

15  distance from subject.  It didn't -- well, let me

16  go back up to the top.

17            It says probes were deployed, and so

18  when probes are deployed -- you see where I am on

19  that last page?

20        A.    (Indicated.)

21        Q.    Yeah.  You had it right, last page.

22        A.    The one with the little dot?  Oh.

23        Q.    Yeah.

24        A.    Oh, okay.  Just a -- yeah.  Probe

25  deployed, yes.  Yes, I see that.



1        Q.    So where it's got "probes deployed,"
2    what does that -- what does that mean?
3        A.    Yeah.   That's when you deploy the
4    taser and the actual probes shoot from the taser
5    and into the -- into the suspect.
6        Q.    Okay.  And so that -- that would
7    usually be at a distance?
8        A.    Correct.
9        Q.    Okay.  And then here it actually
10   gives us the approximate distance, and that's 10
11   feet?
12       A.    Where is the 10 feet?  I'm sorry.
13       Q.    At approximate distance.
14       A.    Oh, okay.  Got you.  Yes.
15       Q.    Okay.  So -- so what is your
16   understanding of what that 10 feet means?
17       A.    That he was approximately 10 feet
18   from him when he deployed the TASER.
19       Q.    Okay.  So this individual was 10
20   feet away with his back to the trooper and the
21   NOPD officer fleeing on foot.  Based on that
22   information that's contained in this report, is
23   there an indication that this person at the time
24   he was tased posed a physical threat on either
25   the NOPD officer or the trooper?



```
1          MR. CANIZARO:
2               Objection.  Asked and answered.
3          THE WITNESS:
4               At that -- again, it's hard to
5          separate that from the totality of it
6          because if he's already committed
7          batteries on -- on officers, at that point
8          they are pursuing -- you know, they --
9          he's committed crimes and they are
10         pursuing him to -- to arrest him for the
11         active resistant portion that's just taken
12         place, so I don't -- I don't see how to
13         separate the apprehending him after
14         batteries took place, you know.
15    BY MS. CUMMING:
16         Q.    Let's take a look at the
17    use-of-force policy again.  The use-of-force
18    policy says at page -- at that Section 9,
19    page 5 -- or sorry, page 152, Section 9 and then
20    Roman Numeral v.  That v.  I'm sorry.  That six.
21    That vi.  "Officer shall use CEWs only when such
22    force as necessary to protect the officer, the
23    subject or another party from physical harm."
24               And so the question is not what had
25    happened before, but what was happening at the
```



1  time that this individual was tased.  According
2  to this Use-of-Force Report, he's 10 feet away,
3  his back was to the trooper and to the NOPD
4  officer.  Did he pose a physical risk to either
5  the NOPD officer or the trooper according to what
6  is contained in this report?
7          MR. CANIZARO:
8              Let me object to the form of the
9          question.  Again, it's argumentative; it's
10         asked and answered; and it calls for
11         speculation.
12         MS. CUMMING:
13             I'm asking for his -- what he
14         understands, his --
15         MR. CANIZARO:
16             Well, you are asking him to ignore
17         part of what he said he needs to consider.
18         You are asking him to ignore that and
19         that's why --
20         MS. CUMMING:
21             Your objection is noted.
22         MR. CANIZARO:
23             -- I'm objecting to the form of the
24         question.
25         MS. CUMMING:



```
 1              You can answer.
 2         THE WITNESS:
 3              My understanding is they just --
 4         they just had -- from this, it would
 5         appear they had a physical altercation
 6         with him.  So now when they do catch him,
 7         he's not just going to just give up at
 8         this point.  So the taser is to prevent
 9         further physical altercation.  So now
10         he's -- he's tasing him as -- as to -- to
11         stop the -- the second fight that's
12         getting ready -- that -- that would
13         happen.  He's -- he's already proven by
14         actively resisting that he's already
15         committed crimes by -- by whatever the
16         fight took -- took place.  So when he
17         catches him, he's not now -- that's a
18         result of -- of ending it, you know,
19         the -- the taser in this situation.
20    BY MS. CUMMING:
21         Q.    Okay.  So a pre-emptive strike;
22    would that be fair?
23         A.    No.  Well -- well, they are now
24    apprehending him from what has just already taken
25    place --
```


AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Okay.

 2          A.    -- you know.

 3          Q.    Okay.  Do you recall reviewing this

 4    Use-of-Force Report?

 5          A.    I do not.

 6          Q.    Okay.  Do you -- do you recall if

 7    you reviewed the IRS when you reviewed this

 8    incident report?

 9          A.    I do not.

10          Q.    Okay.  Is it your -- let me ask

11    this.  When you are reviewing use-of-force

12    reports, do you look at anything outside of

13    the -- the Use-of-Force Report as a -- as a

14    matter of routine or habit?

15          A.    I haven't reviewed many -- enough of

16    these to really have a routine; and this

17    particular one, I really don't recall it --

18          Q.    Okay.

19          A.    -- at all, to be honest with you,

20    but --

21          Q.    Okay.  How many -- roughly, how many

22    use-of-force reports do you think you've

23    reviewed?

24          A.    I -- I actually haven't reviewed --

25    haven't reviewed many with this particular form.
```



1    Maybe a handful at the most.

2          Q.    Okay.  More than five?

3          A.    I would say probably not.

4          MS. CUMMING:

5                Okay.  I want to show you what's

6          been previously marked as Exhibit 40.

7        (Document tendered.)

8    BY MS. CUMMING:

9          Q.    And this is the disciplinary policy,

10   correct?

11         A.    Yes.

12         Q.    Okay.  And -- well, let me ask just

13   generally what is your -- what is your

14   understanding of this policy?

15         A.    This is the policy that establishes

16   the different levels of -- of discipline.  Yeah,

17   it looks like this -- this out -- it appears as

18   though it's a part of the policy that outlines

19   the different levels of discipline.

20         Q.    Okay.  And you as a -- as a

21   supervisor -- and it's got a -- it's got a

22   section on role of supervisor.  What is -- what

23   is your role in this disciplinary process?

24         A.    Let's see.  "Shift lieutenant or

25   anyone of higher rank may immediately relieve



1   from duty any members of the state police

2   subordinate to him and assigned to" -- "and

3   assigned to his supervision when employee's not

4   fit for duty or his continued presence on the job

5   poses an immediate threat or danger to the

6   public.  Safety of an efficient operation is a

7   public service.  The ranking officer taking the

8   action shall immediately notify the commander of

9   the action taken and shall cause an investigation

10  of the employee to be undertaken."

11        Q.   So that's the -- that's the policy.

12  Is there -- can you tell me about the practice of

13  it?  How does -- how do you function as a

14  supervisor in supervising employees and

15  implementing this disciplinary policy?

16        A.   I -- personally, I mean, I -- I

17  just -- I -- main thing in the role of the

18  lieutenant primarily -- primarily the -- would be

19  sergeants that I would immediately evaluate and

20  just all my -- all -- all -- everybody in

21  general.  I would -- I would -- I would just

22  generally note people's work performance; and if

23  there's -- there's anything that would cause, you

24  know -- you know, any -- anything that might

25  affect their -- their evaluation, I would make --



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond, LA 70404   Fax 985.419.0799

1    I would make note of that.  And because each --

2    each year there's an evaluation and I -- I kind

3    of jot little things to kind of make -- make

4    notes along the way so I can have an accurate

5    understanding of kind of that person's work

6    performance as -- as the -- as the year goes on.

7    I'm not sure exactly what --

8         Q.    Okay.  So -- so you sort of keep

9    running notes.  And when you are saying "notes,"

10   are you talking about like you actually have

11   physical notes that you keep in a file or --

12        A.    Yeah.  More -- more -- a lot of it I

13   just kind of make -- make note of something -- if

14   it's something I think I really want to remember,

15   I might make a little -- you know, a little

16   informal jot down something or like keep a copy

17   of something if -- and it would be more like

18   along the lines of just work performance and

19   things like that.

20        Q.    What sorts of things would you make

21   a note of?

22        A.    I guess it would be more -- more

23   like work performance in -- in the way of -- in

24   my current role, like I don't know.  Their

25   handling of reports, timely -- you know, mistakes



1  on things, timely paperwork or, you know,
2  somebody's late all the time, you know, just --
3  just, you know, basic things like that; are
4  they -- are they -- are they where they're at
5  when they supposed to be there.
6          I can't recall a specific incident,
7  you know, as far as, I don't know, just using
8  something specific.  I'm just -- just kind of in
9  general some -- some of these things like
10  demotions or whatever, I haven't -- haven't -- I
11  don't have a lot of first-hand knowledge of those
12  types of incidents happening, so is there
13  anything specific you are --
14          Q.    Well, I'm just sort of trying to get
15  a sense of -- of how -- how you operate in --
16  within -- within this policy, how this policy
17  actually works in -- in practice.  So -- so this
18  is -- that's helpful.
19          When you are talking about this sort
20  of kind of keeping notes throughout the year of,
21  you know, report writing and -- and timely --
22          A.    Yeah.
23          Q.    -- you know, tardiness at work and
24  things like that, do you have like a file on each
25  subordinate that you sort of keep all these notes



1   in?

2         A.    Yeah.  Well, I generally -- I have

3   generally, well, folders of just different --

4   different things that pertain to them.  It

5   could -- it wouldn't have to necessarily do with

6   that, but it could be, you know, a copy of, I

7   don't know, just -- just kind of anything.  If

8   there's -- they are on a -- some sort of task

9   force or something, I got to keep a copy of it,

10   just anything that pertains to them, I might want

11   to go back and look at.

12         But, you know, something if -- you

13   know, I don't want to say everybody's perfect

14   that I work -- work with, but a lot of -- you

15   know, a lot of guys I work day to day, it's not

16   like every day something -- some big concern pops

17   up.  But, you know, if something -- something --

18   I'm made aware of something that I have to

19   address, I -- I would or have, but -- but, you

20   know, and then -- from then, I may make note

21   after I'm made aware of something.  Well, okay,

22   let's see if -- if -- if this improves over time.

23   And -- and usually, it's -- it's -- it's not

24   public things.  It's like, you know, it might be

25   their work product and being available and -- and



1    taking their share of, you know, the workload and

2    things of that nature.

3          Q.    Uh-huh (affirmatively).  Okay.  And

4    you indicated that you -- you hadn't really had

5    that much to do with -- with demotions.  What

6    about, you know, initiating an investigation,

7    have you ever -- have you ever had to approach a

8    commander, any -- any of your supervisors to say,

9    hey, I'm -- I'm worried about trooper so and so?

10         A.    I'm trying to think.  There was a --

11   how to -- I guess it would fall under that, but I

12   had a -- there was an incident on a trooper that

13   worked down at Troop N and -- and he was kind

14   of -- he was kind of leaving early and -- and --

15   and some things like that and I'm trying to -- I

16   don't remember exactly.

17                We -- we called him in, we

18   documented it and -- and had to make the captain

19   aware of that and he's no longer -- he's -- he's

20   no longer on the job.  But yeah, that was -- that

21   was something where, you know, something would

22   happen late at night, he was never available and

23   he was kind of not where he was supposed to be,

24   and so we -- we documented that, counselled him

25   on it, and -- and made the captain aware of that.



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1    That's probably while I was down there.  That's

2    probably the only thing I remember really having

3    to reel somebody in and say, hey, this is -- you

4    are messing up kind of thing.

5            Q.    You say he's no longer on the job.

6    He's still with the state police?

7            A.    No.

8            Q.    Okay.

9            A.    No.

10           Q.    All right.  Who -- who was it?

11           A.    What was the guy's name.  His last

12   name was Barnes.  I don't remember his first name

13   off the top of my head, but it was -- it was --

14   it was basically leaving your -- your work

15   assignment before you should and --

16           Q.    Uh-huh (affirmatively).

17           A.    And --

18           Q.    And when you talked about -- you

19   said that it was sort of noted down and then it

20   was -- you offered counselling on it.  Can you

21   tell me about the counselling?

22           A.    Yeah.  Well, no.  We -- we -- we

23   realized that he was leaving his -- his work

24   assignment before he should and --

25           Q.    Uh-huh (affirmatively).



1    A.    And -- and made the captain aware of

2  it and -- and we gave him an opportunity to kind

3  of fix his -- fix his behavior.  So we -- we --

4  me and a -- me and one of the sergeants, I

5  believe, we did.  We called him in, made him

6  aware of what -- what the situation was; and --

7  and he said, hey, I'm going to -- you know, he

8  had been going through some personal things at

9  the time that we was trying to be understanding

10 about.  And once I left Troop N, some of those --

11 some of those things continued and he ended up --

12 it ended up getting a little more formal and he

13 went and he ended up resigning; but that was that

14 particular situation.

15    Q.    Uh-huh (affirmatively).  Do you

16 recall being involved with kind of that -- a

17 disciplinary process like that for anybody else?

18    A.    What did I do?  I had to -- I had

19 to -- not -- not exactly like that, but I had to

20 handle a -- what they call a non -- non-IA, which

21 is kind of Internal Affairs.  It's kind of an

22 Internal Affairs thing that Internal Affairs is

23 not going to handle certain things that I guess

24 are of lesser seriousness that they send to us.

25    Q.    Uh-huh (affirmatively).



```
 1          A.     So we had a -- we had a young guy

 2     that -- that it was an issue of some paperwork

 3     being -- being altered, but it was -- it was like

 4     a court date type thing and -- and I had to do a

 5     little investigation and -- and pull what

 6     policies were violated.  And, in that situation,

 7     that -- that went to Internal Affairs and they

 8     decided what the disciplinary action was --

 9          Q.     Uh-huh (affirmatively).

10          A.     -- so that was a little bit

11     different.  That would be -- that would be --

12     that -- that's a little different than me saying,

13     hey, I'm -- I'm initiating this because I'm

14     observing things that was -- I was assigned to --

15     to do that.

16          Q.     What -- what policies were violated

17     in that circumstance?

18          A.     I'd have to go back and look at it,

19     but it was -- it fell under the conduct, you

20     know, conduct unbecoming, and -- and I'd have to

21     go back and look at what -- what all it was.

22     It's been -- been some time.

23          Q.     Do you recall roughly when that was?

24          A.     It was when I was down at Troop N.

25     Probably '16ish, maybe 2016.
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    Q.    Okay.  And -- and who was the
2  trooper who was involved with that?
3         A.    Trooper Panetta.
4         Q.    Okay.  And do you recall what --
5  what the actual official outcome of all that was?
6         A.    I'm not sure I was -- there was, but
7  I was, I think, transferred before.  I don't know
8  if it was an -- I don't want to speculate exactly
9  what it was, but it was -- something did happen.
10        Q.    Okay.  So functionally you as a --
11  as a lieutenant, do you have any say in whether
12  or not someone gets disciplined for -- for an
13  infraction or a concern that -- that you raise
14  about a subordinate's work quality?
15        A.    You mean if it's initiated from
16  somewhere other than myself or would I be --
17        Q.    Well, in -- in any circumstance, do
18  you have -- do you have any role in -- in --
19        A.    Determining what happens?
20        Q.    Yeah.
21        A.    No.  In that case -- you know, in
22  that case I mentioned, no.  You know, if -- if
23  I -- I have the discretion of if somebody's -- if
24  somebody's just messing up and it's something
25  that can be corrected, I have -- I have the -- I



1    have the discretion of doing maybe a little
2    letter of counselling with them; and that's kind
3    of an in-section type thing that if -- if it
4    corrects itself, it doesn't go further into a
5    formal discipline.
6            Q.    Uh-huh (affirmatively).
7            A.    So I would say that would be a
8    little discretion as far as on more minor things
9    to try and correct, you know, correct behavior on
10   a -- without it being a formal disciplinary
11   action.  It's not considered a discipline, but
12   that would be one example where I would have a
13   little bit of a -- you know, I would have to
14   start off with something more -- you know, more
15   serious discipline action if it's, I think,
16   something you can just bring them in and say,
17   hey, you need to be -- you know, you need to be
18   aware of this.
19           Q.    Okay.  So -- so you can sort of --
20   you can issue letters of counselling then if you
21   feel it's necessary?
22           A.    Correct.
23           Q.    Okay.  All right.  What sorts of
24   things have you issued letters of counselling
25   for?



```
 1          A.     I did it one -- I did an auto theft
 2   one time on -- on -- on just somebody's work --
 3   work production.
 4          Q.     Uh-huh (affirmatively).
 5          A.     That's the one I can think of off
 6   the top of my head, just, hey, you know, you need
 7   to -- you need to pick up what you're -- what
 8   you're doing and this is -- it's a way to let
 9   them know that you're not -- you know, it's a way
10   to let them kind of correct it before --
11          Q.     Uh-huh (affirmatively).
12          A.     -- you know, it gets -- it -- it
13   gets worse, I guess.
14          Q.     Okay.  So they -- they weren't doing
15   enough work --
16          A.     Yeah.
17          Q.     -- basically?
18          A.     Not --
19          Q.     Okay.
20          A.     Yeah, yeah.
21          Q.     All right.  Anything else?
22          A.     Can't think off the top of my head
23   right now.
24          Q.     Okay.
25          A.     No.  That's -- that's the one that
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   comes to light because it's -- yeah.  That's the

2   one that comes to mind right now.

3          Q.    Okay.  What about additional

4   training, do you have any -- say if -- if you

5   notice that someone is either not performing the

6   way they should or -- or, you know, for whatever

7   reason and you think that that extra training --

8          A.    No.

9          Q.    -- might help, do you have any say

10  in being able to refer someone for that?

11         A.    I may, but I -- I don't ever recall

12  having that -- I've never had that situation

13  where that's -- that's -- I've noticed something

14  that I'd maybe send them back to the academy or

15  something.  I've never had that situation.

16         Q.    Okay.  And when we have been talking

17  about, you know, kind of your role in the

18  disciplinary process, this -- this includes

19  your -- your role at Troop N as lieutenant,

20  correct?

21         A.    Yeah.  Well, the -- the counselling

22  I just mentioned was -- I was in another job, but

23  yeah, that would include that.

24         Q.    Okay.  All right.  Got you.

25         MS. CUMMING:

1           Okay.  I want to turn to what's been
2      previously marked as Exhibit 22, hand that
3      to you.
4      (Document tendered.)
5 BY MS. CUMMING:
6      Q.    And this is a state police policy on
7 the Early Identification System, correct?
8      A.    Yes.
9      Q.    Or the EIS?
10     A.    Correct.
11     Q.    Okay.  What is your understanding of
12 this policy?
13     A.    Yeah.  This is kind of just -- this
14 is like another, I guess, ladder of checks and
15 balances on what guys -- guys are doing if --
16 yeah.  It's -- it's a -- it's another form of
17 identifying certain -- certain situations,
18 pursuits, use of forces and -- and including
19 TASERs or thing -- things of that nature.  We --
20 we document those use of forces.  And my -- my
21 recollection is if somebody has three of one of
22 those things within a 90-day period, I believe
23 there's a review of it --
24     Q.    Uh-huh (affirmatively).
25     A.    -- of -- of those incidents.  And if



1  there's been six in, I think, a year, it would --
2  so if -- if somebody had or commander so and so
3  had four use of forces in -- in -- in X amount of
4  time, we would -- we would -- we would take those
5  previously generated EISs, which would be, now
6  that I'm thinking about it, in conjunction with
7  the Use-of-Force Report and all of this.
8         Honestly, I wouldn't -- this one I
9  wasn't -- I didn't -- wasn't recalling this at
10 the moment when we were talking about the
11 Use-of-Force Report, but this would be another
12 report that would be generated in conjunction
13 with -- with the use of force, and that's --
14 those would be -- copies of that would be
15 maintained at Troop N.  And once -- once a
16 certain level, if three or four of them, had
17 three or four or three or more happened in a
18 period of time, then a review of that would
19 happen; and I recall -- I recall a couple of
20 times when I had to review a group of them.
21     Q.    Uh-huh (affirmatively).
22     A.    And -- and -- and basically for
23 that, I'd go back and look at those, use those
24 synopses of those use of forces and -- and -- and
25 see if I -- see if anything in those to me --



1    Q.    Uh-huh (affirmatively).

2    A.    -- seemed like a red flag or

3  inappropriate or something like that.  And, like

4  I said, I don't recall doing many reviews, but

5  the couple, so maybe several that I did.  I don't

6  recall ever seeing anything that was, oh, man,

7  this is a -- this is a problem.

8    Q.    Uh-huh (affirmatively).

9    A.    But that -- that's -- that's the

10  gist of what the EIS system is.  It's -- it's

11  basically an in-house checks and balances of us

12  with each other, you know.  If -- if somebody's

13  doing use of force every day and then you have to

14  go back and if it looks like it's -- if it's --

15  if it's maybe not, you know, if it -- if you look

16  back at the justification of it and see why it's

17  happening so -- so frequently, and that's the

18  gist of what -- what that is.

19    Q.    Okay.

20    MR. CANIZARO:

21        Can we take another quick break?

22    MS. CUMMING:

23        Sure.  Yeah.

24    (A short recess was taken at 1:37 p.m.)

25  BY MS. CUMMING:



1    Q.    So we were talking about the EIS?

2    A.    Yes, ma'am.

3    Q.    And you had just kind of given me an

4  account of -- of your understanding of the

5  policy.  I want to go back and unpack some of

6  that.  So you had said that EIS was sort of like

7  another check and it -- it sounds like another

8  kind of way of tracking things.

9          I want to just make sure I

10  understand.  In your memory and understanding,

11  what are the various ways that the state police

12  have of kind of tracking performance and

13  performance indicators?

14    A.    Well, really what we just discussed,

15  the use -- those use-of-force forms.

16    Q.    Uh-huh (affirmatively).

17    A.    And this is -- I think the EIS I --

18  I consider a little bit of a more informal way of

19  -- kind of in, within that workplace, so just

20  kind of keeping track of those -- those incidents

21  to see if -- if maybe there are some -- some

22  issues.  And it just -- other than just noting

23  work performance and reports and -- and those

24  things, I think those would be the more formal

25  things that I can think of that would involve use



1    of force.

2         Q.    Okay.  All right.  And why -- in

3    your understanding, why is that important?

4    What's the value of this?

5         A.    Of the EIS system?

6         Q.    Uh-huh (affirmatively).

7         A.    I guess -- I guess to keep tabs on

8    what -- what our personnel is engaged in.  If --

9    if -- you know, if -- if -- if certain things are

10   happening with great frequency, like with, you

11   know, some things it all -- it all -- you know,

12   say, like fleet crashes.  Well, I mean, you

13   could -- you could be in multiple fleet crashes

14   and not have fault in any of them; but I think

15   it's -- it's just a way to, hey, if this happens

16   frequently, take a look at it and make sure there

17   aren't any other extenuating circumstances that I

18   have to take a harder look at.  I don't think on

19   its face it's a problem if -- if you have these

20   things.  It's just a way for us to keep an eye on

21   it and make sure that it's not becoming a -- you

22   know, a problem.

23        Q.    Okay.  So -- and you referenced

24   fleet crashes.

25        A.    I'm sorry.  At fault.  I'm looking



1    here at at-fault vehicle crashes.

2           Q.    Okay.  And you are looking at

3    that -- at that Roman Numeral v and talking about

4    the criteria that are considered --

5           A.    Yes.

6           Q.    -- as indicators.  Okay.  All right.

7    So -- so taking -- these are things you would

8    want to kind of take a closer look at.  And I

9    guess to kind of drill -- drill down further into

10   that, like what is the -- what is the value of

11   kind of take -- taking a close look at what's

12   going on?

13          A.    Well, looking at the circumstances

14   of each one of those and making sure that we

15   are -- we are operating in the parameters that

16   we -- that we should be.

17                You know, if -- hypothetically, if

18   every single person -- you shouldn't have to

19   fight every single person you run into, but, you

20   know, if -- if -- so in those -- in those periods

21   of time, if you have had several, it's just --

22   it's a way of us to take an extra look and look

23   at the details of those, was -- was everything

24   that we did warranted, everything that trooper

25   did warranted.  So it's just a way for us to kind

1     of self police ourselves to make sure that we are

2     not -- that we are staying within the scope of

3     what we should be doing, how we should be

4     conducting ourselves.

5          Q.    Okay.  All right.  And so you were

6     sort of talking about this in -- in conjunction

7     with the use-of-force reports as well.  And the

8     use-of-force reports we were talking about, you

9     reviewed the report and then, you know, the --

10    the incident report is available for -- for

11    review as well, correct?

12         A.    Yes.

13         Q.    Okay.  And in the Use-of-Force

14    Report context, is there -- is there any kind of

15    outside investigation beyond something that that

16    trooper wrote?  Is there any kind of interview of

17    other witnesses or, you know, hunting down video

18    or anything like that that happens when you are

19    reviewing the Use-of-Force Report?

20         A.    No.

21         Q.    Okay.

22         A.    Not -- not -- not without some sort

23    of a complaint from the public or something, you

24    know.  If just in an every day thing, I wouldn't

25    just go seek out those things, but things like



1   videos and all would be -- you know, those would

2   all be available through the report, the -- the

3   incident -- you know, the IRS report.

4         Q.    Uh-huh (affirmatively).

5         A.    You know, if -- if some -- if

6   something didn't sit right based on the EIS and

7   things like that, you could go further.  If it

8   was a -- in the case of a traffic stop, but there

9   was a video, I guess, you know -- and there's not

10   going to be video on every situation, but -- but

11   no.  Just -- just on its face, every use of force

12   is not going to lead to some long, you know,

13   investigation about it.

14         Q.    Okay.  All right.  And then -- and

15   so in the EIS context -- and I think you -- you

16   started to touch on it, but just to -- just to be

17   clear.

18            In the EIS context, if you are going

19   back and you are looking at someone who's got a

20   bunch of these -- these kind of risk indicator

21   events, what are you looking at -- what are you

22   looking at then?

23         A.    The ones that I recall, the --

24   the -- and I said I only did a couple of reviews

25   when I was down there.  The ones that I recall



1  reviewing were other EISs that were generated

2  when that -- when the incident, a singular

3  incident happened.  So if -- if 90 days passes

4  and somebody had five, you know, five use of

5  forces, you know, two use of forces, a vehicle

6  pursuit and all these -- all these things, I

7  would -- I would -- I would take the EISs that

8  were generated at the time often time by -- by

9  the sergeant that was -- that was working at the

10  time and I would -- I would look -- I would look

11  at those and then, you know, generate a synopsis

12  of each of those; and then -- and then I would

13  conclude whether I saw anything that looked, you

14  know, alarming about those incidents.

15          Q.   Okay.  So would you look -- you

16  know, was there -- was there ever a time that you

17  would look outside of the -- the four corners of

18  whatever it was that the sergeant had put

19  together?

20          A.   That -- those were -- those were

21  fairly -- fairly detailed and it kind of -- it

22  kind of -- it spelled out what happened, and none

23  of the ones that I recall doing prompted me to go

24  further than what was in those EIS reports.

25          Q.   Okay.  I have -- I have questions,


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA  70404   Fax 985.419.0799

1  but I think -- I think they might be answered if

2  we keep -- if we keep kind of plowing through

3  this policy.

4           So your role in the EIS, it sounds

5  like you were reviewing EIS reports that were

6  compiled by sergeants; is that right?

7       A.    Yeah.  Yes, ma'am.

8       Q.    Okay.

9       A.    Like I said, only a few of -- I've

10  only done a couple of the reviews, maybe several

11  where I was taking existing EISs that -- I don't

12  know 100 percent without looking at them, but it

13  would likely be a sergeant that had generated

14  those; and often times they made me aware that I

15  had a -- so and so -- I had an EIS last night on

16  so and so and it -- it's -- that's going to be

17  his third one.  So they would -- they would, you

18  know, put all the previous ones and -- and make

19  me aware of that, then I knew I had to sit down

20  and kind of look at them and generate a review of

21  them.

22       Q.    Okay.  So -- so maybe -- maybe

23  the -- the question is this:  In this, in the

24  Section 2, it says -- it talks about the -- the

25  section commander shall maintain an EIS file.



1    What -- what is the EIS file?

2         A.    That -- that's just those previous

3    ones I'm talking about.  We just kept them

4    in-house at the -- at the troop -- the -- the

5    port building that we were at at the time.

6         Q.    Okay.

7         A.    So when -- when one happens today

8    and that puts them within that -- within that

9    realm --

10        Q.    Uh-huh (affirmatively).

11        A.    -- I would go get that folder on

12   whoever the individual is and go back and look at

13   those and I would generate a review based on

14   that.

15        Q.    Okay.  So I'm trying to -- I think

16   I'm getting tripped up on vocabulary.  So the --

17   the thing that the sergeant generates, what

18   does -- what does that look like?

19        A.    Yeah.  It -- it --

20        Q.    What does that consist of?  Uh-huh

21   (affirmatively).

22        A.    There was -- I don't believe we have

23   any sort of database to where the use of force

24   is.  It was -- it was just a document that we --

25   that we -- that we generated -- that we generated



866.870.7233   P.O. Box 1554  Hammond  LA  70404   Fax 985.419.0799

1    so they would have an EIS report.  I don't have

2    it in front of me what -- but it would be like

3    a -- it would just be a synopsis of that incident

4    and -- and their -- their review and summation of

5    what it was; and after several of those happened,

6    I would be made aware of it and I would review

7    several of the ones that had already been

8    previously documented in the past.

9         MS. CUMMING:

10             Okay.  I want to show you two things

11        that just keep -- keep them close at hand.

12        The first is what's been previously marked

13        as Exhibit 27, and this is the Troop N EIS

14        log.

15        (Document tendered.)

16   BY MS. CUMMING:

17        Q.    Is that the EIS report that you are

18   talking about with the -- that the sergeants

19   create?

20        A.    No.  I'm thinking of more of a --

21   this -- I don't know if this came sometime later,

22   but I'm thinking of more of a -- more of just

23   like a Word document with those, I guess,

24   synopsis -- synopses of --

25        Q.    Yeah.



```
 1            A.     -- of each incident, not --
 2            MS. CUMMING:
 3                   So I'm going to show you what's been
 4            previously marked as Exhibit 23, and I'm
 5            turning to the back of the pages.  It's
 6            Bates 16059 and 16060.
 7          (Document tendered.)
 8   BY MS. CUMMING:
 9            Q.     Is that what you are talking about?
10            A.     Yes.  This would be -- this would be
11   more of what I'm referring to.  It would document
12   those incidents and the dates, and then I
13   would -- I would -- I would address each one of
14   those events.
15            Q.     Okay.
16            A.     So yeah, that --
17            Q.     We are -- we are going to go through
18   the document --
19            A.     Yeah, yeah.
20            Q.     -- and do that.
21            A.     It -- I -- I recall this being more
22   of the format of what I'm talking about.
23            Q.     That's what you are talking about.
24   Okay.  So the sergeants would generate that?
25            A.     Yeah.  They would -- they would
```



1   generate like a singular one, and then -- then

2   when a review came, I would incorporate -- I

3   would incorporate a form with all -- all of those

4   previous ones on there and then make a

5   determination if there -- if all those were --

6   were in my opinion justified or no red flags

7   involved and then from there those would be

8   considered, but -- but, you know, that would --

9   that would satisfy that review of --

10          Q.    Got it.  Got it.  Got it.  Okay.

11          A.    This --

12          Q.    All right.

13          A.    So example, this one was -- yeah.

14  See, this (indicated) would have been generated

15  by me with however many events there was.

16          Q.    So -- so -- so wait a second.  Let's

17  go slow here.

18          A.    Okay.

19          Q.    So when -- when you are pointing at

20  "this one," you are -- you are pointing to

21  Exhibit 23 and you are pointing to that 16059,

22  the -- the back of page 1 and page 2?

23          A.    Yes.

24          Q.    You said this would have been

25  generated by you?



1        A.    Yeah.

2        Q.    Now, when you say "this," are you

3 talking about the -- the synopses of the events

4 or are you talking about the compilation of the

5 report?

6        A.    Yeah.  The compilation of it.

7 The -- the events would have been taken from

8 previous singular ones done likely by a sergeant,

9 and then I would have been made aware once the

10 threshold of how many of them happened.

11        Q.    Right.  Okay.  So then let -- let's

12 go back to -- to before all of these got

13 compiled.  So let's take just, for example, that

14 Event 1, and it's got the date of 2/1/2017.

15 How -- how does this paragraph come into

16 existence?

17        A.    That paragraph was likely generated

18 by one of these forms as a singular event prior

19 to the three occurring.  So I would have -- I

20 would have -- I likely -- and, you know, I likely

21 passed all those previous ones into that or wrote

22 it just based on the previous ones that were --

23 that were done.  I probably didn't cut and paste

24 it because it's on a hard document like this

25 (indicated), so I probably took it just off the



1    previous ones, documented those three, and then
2    made a summarization if I felt that those were
3    all justified.
4           Q.    Okay.  So -- so after a use of
5    force, there is a document that is generated by a
6    sergeant that is a summary of the use of force --
7           A.    It would --
8           Q.    -- events?
9           A.    It basically would be something like
10   this (indicated), but it would be the one
11   incident.
12          Q.    Okay.  You are -- you're indicating
13   that -- that paragraph?
14          A.    That Event 1.
15          Q.    Yeah.  Okay.
16          A.    That Event 1.
17          Q.    Right.
18          A.    So that -- that happened today and
19   it's in a file there.  Something else happens
20   three weeks down the road, something happens
21   within that 90-day period, then that file is
22   pulled out, trooper -- trooper X had three, a
23   combination of those things that we mentioned:
24   The at-fault or pursuit, use of force, and then
25   once -- once that threshold is met, then I'll go



1 in and look at those three events and I'll make a

2 determination how I think about it. And then

3 from -- from me, it got -- I believe it got

4 forwarded up to Captain Naquin after -- after I

5 completed all that.

6      Q. Okay. All right. So the document

7 where -- let me ask this. Where would the

8 document be that would be sort of the original --

9      A. That would be --

10      Q. -- thing?

11      A. -- the hard copy for that Troop N.

12      Q. Okay. So it's a hard copy of this

13 original, this -- you know, whatever the sergeant

14 wrote for this event?

15      A. That -- exactly, yes, ma'am.

16      Q. Okay. And that is separate or

17 additional to the Use-of-Force Report; is that

18 correct?

19      A. Yeah. That -- that's separate than

20 that database that we discussed earlier, yes,

21 ma'am.

22      Q. Okay. And that's that Exhibit 73 --

23      A. Yes.

24      Q. -- that we were talking about

25 earlier?



1      A.     Yes.

2      Q.     Okay.  All right.  Okay.  And so

3  this -- this goes back to the shall maintain an

4  EIS file, so I -- I want to make sure that I'm --

5  that I'm real clear on what the EIS file is.

6      A.     Yeah.  That's just a hard copy thing

7  that we do in-house at -- at Troop N that, you

8  know, all these previous ones should be -- should

9  be in a hard copy form somewhere in -- on a -- on

10 file there.

11     Q.     Okay.  And if -- if a trooper is not

12 actually assigned to Troop N, would they still

13 have an EIS file at Troop N?

14     A.      If they were coming in for -- off

15 the top of my head, I don't recall if I've done

16 them on people that were not all assigned there,

17 so I don't -- I -- I believe so, but I don't know

18 100 percent if that would be referred back to

19 their home Troop A, you know, A, so and so had a

20 use of force last night, to do it there.

21           I don't -- I don't know the answer

22 off the top of my head how they are -- how they

23 are handling that because I -- I believe the ones

24 that I reviewed were all people within Troop N at

25 the time, so I'm not 100 percent sure how they



1  handled that with the outside.

2      Q.    Okay.  All right.  Who -- who was --

3  who was actually the person who was actually

4  maintaining the EIS files?

5      A.    I know who there -- those are --

6  they had an administrative trooper,

7  Trooper Rhonda Trapani, who was kind of the

8  administrative person at Troop N.  She -- she

9  maintained a lot of the -- got -- organized a lot

10 of the paperwork type stuff.

11     Q.    Uh-huh (affirmatively).

12     A.    If -- I don't know if she

13 specifically dealt with the EIS, but -- but it

14 would have been -- it would have been -- I

15 believe it would have been her or -- or just, you

16 know, the -- in general, the sergeants.  We have

17 a folder on everybody that just, you know, every

18 time you did one or went in there.  And when a --

19 when a certain threshold was met, they -- they

20 made the lieutenant aware of it and we did this.

21     Q.    Okay.  All right.  And so -- so

22 just -- just to be clear, who was responsible for

23 determining when the threshold was met?

24     A.    Well, that's -- that's -- that's in

25 policy of the -- of the --



```
1        Q.     Uh-huh (affirmatively).  You're --
2   you're looking at Exhibit 22?
3        A.     Exhibit 22.
4        Q.     Uh-huh (affirmatively).
5        A.     Number -- Roman Numeral six, vi, is
6   three or more criteria, 90 -- of -- of those
7   categories, within a 90-day period, or six within
8   a year.
9        Q.     Okay.
10       A.     So the ones that I recall doing, I
11  was made aware of is -- I don't know if they were
12  periodically or, you know, if they were -- they
13  periodically checked them and they kind of --
14  kind of checked to make sure when those
15  thresholds were coming that we -- that we did
16  that.
17       Q.     Who --
18       A.     So we --
19       Q.     Who did the checking?
20       A.     So that's what I'm saying.  I -- I
21  always had a sergeant that made me aware of it.
22  I don't know if they went in and -- and I don't
23  know if they had -- you know, they didn't have a
24  big thing that prompted on the computer, oh, this
25  is the third one; but I -- I -- I don't know if,
```

1    you know, as -- as they -- I guess as they -- I'm

2    just -- I'm kind of speculating.  As they did one

3    and they put it in a folder, they -- they might

4    have looked -- and I think this might have

5    been -- and, again, I'm not 100 percent

6    remembering this one specifically.  I think this

7    was -- this -- this was an idea they came up with

8    later that --

9            Q.    You're --

10           A.    -- was kind of --

11           Q.    You're looking at Exhibit --

12           A.    The little spreadsheet looking

13   thing.

14           Q.    -- 27?  Okay.

15           A.    So this -- I want to say this might

16   have been kind of like in the file of all these

17   and you could kind of -- it was kind of a quick

18   glance to see, you know, if I -- I went to -- I

19   did one today and put it in the file, I could go,

20   oh, yeah, it's within 90 days, we need to -- it

21   was kind of like a spreadsheet of the overall

22   reports that I'm mentioning.

23                So when somebody got -- you know,

24   when somebody -- when an EIS was generated, you

25   could check in that folder and see if they had,



1  you know, those -- the allotted number within

2  that timeframe.

3        Q.    Okay.

4        A.    And that would generate the review.

5        Q.    Okay.

6        A.    But I don't know -- I can't say that

7  it was so and so's job to -- to know that.  I

8  think it was just as the sergeants did them, they

9  became aware that it was within those timeframes.

10       Q.    Okay.  Okay.  Is there -- was there

11  any discretion about what -- what would be

12  entered into the EIS file and what wouldn't be?

13       A.    No, not that I'm aware of.  If it

14  fit one of those things and --

15       Q.    Uh-huh (affirmatively).

16       A.    -- and it was noted, it would, yeah.

17  I -- I don't -- I can't say, okay, he had a use

18  of force, but let's not do one.  I'm not aware if

19  that ever happened.

20       Q.    Okay.  So if it's something that

21  generated a Use-of-Force Report, then -- then it

22  would go into the -- the EIS --

23       A.    Yeah.  I would --

24       Q.    -- file?

25       A.    I would think generally it would



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    coincide with it, yes, ma'am.

2        Q.   Okay.  All right.  And you -- and

3    you talked about you -- you were not certain.

4    And -- and I'm not trying to trick you or -- or

5    trap you.  There's going to be an EIS report we

6    are going to talk about in a second, but it's for

7    somebody that is not assigned to Troop N.  So

8    I'll just represent to you that there are --

9        A.   Okay.

10        Q.   -- people not assigned to Troop N

11    that -- that got EIS reports generated from

12    Troop N.

13        A.   From Troop N.  Okay.

14        Q.   But your -- you know, just -- just

15    in your understanding, if someone was not

16    officially assigned to Troop N but worked Troop N

17    and also had another official assignment, do you

18    have any idea how the EI -- you know, would the

19    EIS file be maintained in some kind of a central

20    location?

21        A.   Not that I know of.  Not -- not that

22    I know of the current process for that, no --

23        Q.   Okay.

24        A.   -- outside.  Troop N's the only --

25    only location that I'm aware of where it's --



866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

1    that's housed -- where those are housed where
2    they had those.
3        Q.   So if -- if you had someone -- well,
4    let's say -- let's say where you are now at at --
5    in BOI, if -- do you have -- do you have an EIS
6    reporting system?
7        A.   I don't -- since I've been in this,
8    I have -- you know, again, I'm in the -- I'm in a
9    spot where if I -- things are planned out and
10   things, but I have not -- I haven't done an EIS
11   in the way that at Troop N over where I'm at now.
12       Q.   Okay.  Do you know if there's an EIS
13   file that's being maintained?
14       A.   Not that I'm aware of.
15       Q.   Okay.  And -- and then let's say
16   like Troop L or Troop B or some -- some place
17   that's a -- that's a regular fully --
18       A.   Sure.
19       Q.   -- established troop?
20       A.   My thought would be yes, but I don't
21   know intimately those -- those troops, but I
22   would -- I would think so, yes.
23       Q.   Okay.
24       A.   The -- the -- the patrol -- each
25   patrol troop I would think would, but I don't --



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    I don't have personal knowledge of those.

2         Q.    Would -- would have an EIS file on

3    each person assigned to that troop, correct?

4    That's what you mean?

5         A.    Or as -- as that incident happens,

6    one would be generated and probably started at

7    that point.

8         Q.    Okay.  Sure.

9         A.    I would think they did, yeah.  I

10   don't --

11        Q.    And -- and, in your understanding,

12   that would -- that would likely be physically

13   kept at the troop, correct?

14        A.    Likely, yes.

15        Q.    Okay.

16   MS. CUMMING:

17             Jennifer, we will just re-urge that

18        any documents related to EIS reports be

19        produced, including any underlying

20        documents that were used to create the EIS

21        reports previously produced by the state

22        police.

23   MS. MURRAY:

24             Is there a date range or just --

25   MS. CUMMING:



1          Can we go off for a second.

2      (A short recess was taken.)

3  BY MS. CUMMING:

4      Q.    And so your understanding of the EIS

5  file and the way that the EIS is maintained is

6  that it's all hard copied.  There's no like

7  computer --

8      A.    Right.

9      Q.    -- central computer system?

10      A.    Yes, ma'am.  That's my

11  understanding.

12      Q.    Okay.  Okay.  And do you recall --

13  as a lieutenant, have you ever actually generated

14  the -- an EIS report that would go into the --

15  the file prior to like the -- the compiled report

16  but for an individual incident?

17      A.    I have not.

18      Q.    Okay.  And this Exhibit 27, the

19  Troop N EIS report log, was this a document that

20  was in use when you were at Troop N?

21      A.    It looks -- it looks a little

22  familiar.  I think it was something they were --

23  they -- they had came up with while -- while I

24  was there to -- and I think it was more of -- I

25  don't want to say cover letter, but it was, I



1   think, something that stayed in the front of the

2   file that kind of really just maintained the

3   bullet points of the date and stuff like that.

4   It -- I want to say I remember it kind of being

5   created while I was down there.

6         Q.    Okay.

7         A.    But it was -- yeah. It does look

8   familiar, but it's -- it's -- I don't -- I don't

9   recall really using it.

10         Q.    Okay.

11         A.    Probably so.

12         Q.    Do you know was anything used prior

13   to the adoption of that form? Do you know was

14   anything used prior to -- to track --

15         A.    And I think it was just the

16   actual -- the -- the reports I mentioned before

17   that were filed, the ones with the synopsis

18   style.

19         Q.    Okay. Do you know who created that

20   Troop N log?

21         A.    I do not.

22         Q.    Do you have any idea whose

23   handwriting that might be?

24         A.    It's not mine. No, I -- I do not.

25         Q.    Okay. Do you have any -- not



1    guesses, but educated theories or hypotheses
2    about whose handwriting that might be?
3         A.    No.  It's kind of neat, but not neat
4    enough to -- not necessarily a female's
5    handwriting where I -- you might speculate that.
6    But no, I really have no idea to be honest with
7    you.
8         Q.    Okay.  All right.  And do you have
9    any, again, education -- educated hypothesis
10   about like what rank might have been completing
11   something like this?
12        A.    I -- I would say a sergeant, but --
13   likely a sergeant or possibly a lieutenant.
14        Q.    Okay.  Okay.  If there were -- and
15   do you -- if you don't recall, that's fine, but
16   do you recall roughly when that form would have
17   been adopted?
18        A.    No.  Maybe -- '17ish, 2017ish.
19   Yeah.  I'm not really sure.
20        Q.    But -- but you're not sure when in
21   2017?
22        A.    No.  No.
23        Q.    Okay.  Okay.  But after the adoption
24   of that form, would it -- is it your
25   understanding that any use of force would have



1  been entered onto that?

2       A.    Yeah.  I would -- I would -- I would

3  think so.  But I -- I remember this being

4  created, but I don't -- I don't remember to what

5  extent it was -- it was used in conjunction with

6  those other forms.  But yeah, once it was

7  created, I would assume everything would -- the

8  intent was to have everything entered on there.

9       MS. CUMMING:

10           Okay.  So I want to show you what's

11           been previously marked as Exhibit 28.

12      (Document tendered.)

13  BY MS. CUMMING:

14       Q.    And this is a May 6th, 2018

15  Use-of-Force Report, correct?

16       A.    Correct.

17       Q.    All right.  And if you flip to the

18  second to last page, I'm sure you would agree on

19  here you were not the supervisor on this?  And

20  this say that Troy Pichon was the reporting

21  officer and then the Commander Naquin and

22  Captain Williams signed off on it as the higher

23  ranking supervisors, correct?

24       A.    Correct.

25       Q.    So you would -- would you anticipate



1    that -- that if the Troop N EIS report log had --
2    had been in use that this would be on that report
3    log?
4            A.    Yeah.  Again, I -- I don't recall to
5    what extent this was being used or when that was
6    implemented.
7            Q.    Uh-huh (affirmatively).
8            A.    But once it was implemented, I would
9    think that would be -- that would be the intent
10   is to use it.
11           Q.    Okay.  Would you expect this to
12   generate an EIS report by a sergeant?
13           A.    What does it tell?  It's a use of --
14   was it a taser or what was that circumstance?
15           Q.    Take a -- take a look through it.
16   It looks like, yes, use of TASER, if you look at
17   30.
18           A.    Yeah.  I think that would be a
19   criteria that would generate an EIS.
20           Q.    Okay.  And the sergeant who
21   generates an EIS report, would that be the same
22   sergeant who -- who is the -- the supervisor that
23   signs off on the Use-of-Force Report itself
24   usually?
25           A.    I would say likely, but I don't know

1   if it's -- it's not necessarily mandated, but it

2   would probably be likely.

3        Q.   Okay.  All right.  So this is

4   something that -- that should be tracked in the

5   EIS system, correct, this Exhibit 28?

6        A.   Yeah.

7        MS. CUMMING:

8            Okay.  And then I'm going to show

9            you what's been previously marked as

10          Exhibit 29.

11     (Document tendered.)

12  BY MS. CUMMING:

13        Q.   And this is dated June 18th, 2007.

14  Here's another use of TASER, Use-of-Force Report.

15  It's again by Trooper Pichon, this time signed

16  off by Sergeant Bellue and Captain Naquin and

17  Captain Williams.

18          And does this appear to be the same

19  incident as the first entry on this EIS Troop N

20  log?

21        A.   It appears so, yes, ma'am.

22        Q.   Okay.  And even with this entry in

23  the EIS report log, would you expect that there

24  would be an EIS report generated as a result of

25  this 6/18/2017?



1        A.     I'm -- I'm not sure -- I'm not

2    100 percent sure if when this was created it was

3    intended to replace the thing I'm referring to

4    because this -- this was relatively new when I

5    was there, so I'm not -- once they started doing

6    this, maybe some of those long form synopsis,

7    they may have -- they may have done this in lieu

8    of that.  I don't want to say 100 percent that --

9    that they would -- necessarily both had to be

10   generated.

11            I didn't really -- I don't really

12   recall dealing with this form.  I think it was --

13   it must have been fairly new or I never got a

14   review as a result of this being used.  So it's

15   possible that once they started this, they didn't

16   do the ones I'm mentioning after that.  I don't

17   recall 100 percent the intent if it was -- if

18   this was to replace or if it was just kind of a

19   snapshot of those other ones.

20       Q.    Okay.

21   MR. CANIZARO:

22            For the record, you were referring

23       to Exhibit 27 during the -- every time you

24       said "this" during that last answer?

25   THE WITNESS:

 

1             Yes, sir.
2    BY MS. CUMMING:
3         Q.    So, and you left in 2017, correct,
4    roughly August?
5         A.    Yeah.  August 2017, I was completely
6    out of Troop N, but sometime prior to that, I was
7    in a plainclothes capacity where I didn't deal
8    with this; and this may have been the time
9    they -- they may have made this to -- their
10   intent might have been to replace the -- the
11   longer, you know, narrative style ones that I
12   mentioned before.
13        Q.    Okay.
14        A.    So I don't want to -- I don't want
15   to say because there's not one like that
16   generated in conjunction with this that it may
17   have -- this may have been to replace that.
18        Q.    Okay.  Do -- do you know who took
19   over your -- your role as a -- as a lieutenant?
20        A.    Lieutenant Hasselbeck.
21        Q.    Hasselbeck?
22        A.    Jody Hasselbeck.
23        Q.    Okay.  All right.  So, but with
24   that, going back to that Exhibit 28, that May 6th
25   Use-of-Force Report, since that's not on -- on



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
1    this Troop N EIS log, it's possible there might
2    be an EIS report, the old -- old long form report
3    that you are talking about --
4         A.    Yes.
5         Q.    -- correct?
6         A.    Correct.
7         Q.    Okay.
8         A.    Quite possibly, yes.  I would even
9    say likely since this one starts at -- at the
10   June date, but again, I don't -- I don't know
11   100 percent.
12        MS. CUMMING:
13             Okay.  And then I'm going to show
14        you what's been previously marked as
15        Exhibit 30.
16        (Document tendered.)
17   BY MS. CUMMING:
18        Q.    So this is dated June 25th, 2017.
19   The -- the previous two that -- that we have been
20   looking at, Exhibit 29 and 28, both -- both list
21   Troop N as the troop.  This one lists BOI.
22   Would -- but it looks like it -- it occurs in
23   New Orleans, 1101 Loyola Avenue, the Greyhound
24   station.  You understand that to be Orleans,
25   correct?
```



1    A.    Yes.

2    Q.    Okay.  So this is a Use-of-Force

3  Report detailing both Trooper Bordelon and

4  Trooper Pichon's engaging in -- in a use of

5  force.  Looks like Trooper Bordelon is the one

6  that actually submitted the report.

7            Would you expect this to generate an

8  EIS entry of some sort as to Trooper Pichon?  And

9  if you want to take a look at the second page,

10  it's Bates 642 right in the back of your first

11  page.

12    A.    Let me see.  Last page.

13    Q.    Uh-huh (affirmatively).

14    A.    (Complied.)

15    Q.    So you see in the narrative at 27

16  where it's describing a level of resistance, it's

17  talking about Trooper Pichon catching up with

18  the -- with the person, grabbing the person as he

19  was driving -- diving under the train, pulling

20  him out from under the train, you know,

21  pushing -- pushing the person.

22            Do you recall or -- or would you

23  expect to see some kind of an EIS entry for this?

24    A.    That's a pretty in-depth use of --

25  use-of-force form.  I don't know if that was --



1  maybe at the time, they used kind of a judgment

2  call thing.  To me, that -- that's -- personally,

3  that's a little bit of a borderline for me to --

4  for it -- I mean, it -- it's a use of force, you

5  had to restrain him, but to me, this -- just

6  being subjective, this -- this kind of -- I

7  would -- I would look at this as almost an

8  overabundance of -- of caution, when in doubt, do

9  the use-of-force kind of thing.

10         Why there's not an EIS in -- in --

11  in BOI, our reports are so in-depth and things

12  like that, maybe -- you know, I don't know why

13  this didn't automatically generate an EIS with --

14  with it.  I don't know.  They may have felt this

15  was sufficient at that documentation.  I don't

16  have a direct answer why there's not an ES -- EIS

17  with it, but I think -- I think generally

18  speaking a use of force would coincide with --

19  with an EIS, but I -- I don't know if this would

20  have necessarily -- yeah.  I mean, that's a use

21  of force to an extent, but it wasn't really a --

22  I know it's kind of a -- kind of a judgment call

23  whether a use of force was needed in my opinion

24  on -- on that.

25         Q.    Okay.



1         A.    But -- but why not an EIS, I would

2   have to -- I would have to really kind of go back

3   into a specific and see, check and see as far as

4   an EIS being developed with it.

5         Q.    Okay.  So if -- if there's -- if

6   there's sort of a judgment call component on

7   whether or not an EIS report is -- is generated,

8   if there's a Use-of-Force Report, who makes

9   that -- who makes that call?

10        A.    Yeah.  I don't --

11        Q.    Who decides?

12        A.    I don't -- I don't know why

13   automatically there wasn't an EIS.  I guess, I

14   was speculating.  To me, the judgment call was on

15   needing to do the use of force and that kind of

16   thing in the first place, but once you did do a

17   use of force, I don't know why there wasn't an

18   ES -- EIS if there wasn't one.  But I'd have

19   to -- have to check on that, but -- but I don't

20   have an immediate answer why there isn't an EIS

21   to -- to marry up with this.

22        Q.    Okay.  All right.  So -- so your --

23   because the Use-of-Force Report was generated,

24   your expectation would be that there would also

25   be an EIS report generated --



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
1        A.    I -- I would --
2        Q.    -- correct?
3        A.    I would -- I would think so,
4   normally in a patrol situation, but in an -- in
5   an investigative role that -- that doesn't really
6   do the EIS stuff on a regular basis, they may
7   have felt at the time this was sufficient
8   documentation.
9        Q.    Okay.  Where -- so as -- as noted at
10  the beginning, this is -- this says troop and
11  it's got BOI rather than Troop N.  Would you
12  expect to see this reported as part of
13  Troop N's --
14       A.    No.
15       Q.    -- EIS log?
16       A.    No.  This would be separate.  This
17  would be -- have nothing to do with Troop N.
18       Q.    Okay.  Would there be some way of
19  because the -- the troopers involved are -- are
20  in Orleans and because we know Trooper Pichon
21  works for -- for Troop N on a fairly regular
22  basis, would there be some way that -- that this
23  BOI Use-of-Force Report would be tracked in
24  Troop N's EIS?
25       A.    No, I don't think so.  I don't think
```



1   it would go to troop --

2          Q.    Okay.

3          A.    I don't think it would go to Troop N

4   if he wasn't doing anything Troop N related.

5   This would have been -- this would have been in

6   his narcotics role.

7          Q.    Okay.

8          A.    And the Greyhound station is out --

9   outside of the scope of Troop N.

10         Q.    Okay.

11         A.    It -- it wouldn't have anything to

12  do with Troop N.

13         Q.    All right.  But if we take -- I just

14  want to take Exhibits 28, 29, and 30 altogether.

15  We have three use-of-force reports generated:

16  One on 5/6/2017, one on 6/18/2017, and one on

17  6/25/2017, all that concern Trooper Pichon.

18               Would this -- these three taken

19  altogether, if entered into the EIS system, would

20  that trigger an EIS review?

21         A.    Which ones are we talking about,

22  the --

23         Q.    Talking about Exhibits 28, 29, and

24  30, so the -- the May 6th, 2017; June 18th, 2017;

25  and 6/25/2017.



1    A.    Yeah.  Those would be within

2  those -- those timeframes, but to -- the way my

3  understanding is, each of those work sections, I

4  don't -- I don't know that there's a

5  centralized -- you know, being that it's

6  different sections, I don't know that they would

7  automatically be aware that there was three

8  happening in this time -- in that timeframe.

9    Q.    Okay.  And I -- I think we touched

10  on this a little bit earlier, but I just want to

11  make sure we are -- we are clear.  The narcotics

12  section, are they maintaining a physical EIS

13  file?  So -- so this use of force for the BOI,

14  would there -- would there be an EIS report?

15    A.    Yeah.  I -- that's in an --

16    Q.    Uh-huh (affirmatively).

17    A.    In an investigator's role, I --

18  honestly, I have to check to see if there's an

19  EIS file for -- for guys that work in that

20  capacity.  Use of force would generate, but I --

21    Q.    Uh-huh (affirmatively).

22    A.    -- have to look into the -- the --

23  the EIS aspect of that.

24    Q.    Okay.  So -- so you're not sure?

25    A.    No.



```
 1              Q.      Okay.
 2              A.      Right.
 3              Q.      Okay.  Who -- who would know?
 4              A.      I could -- I could find out.  I
 5     mean, I -- I work in BOI currently and I don't
 6     know specifically of any EIS files before I got
 7     there.
 8              Q.      Uh-huh (affirmatively).
 9              A.      And I haven't -- since I've been
10     here, I'm not -- I'm not aware of any, but I
11     could -- I could -- I could find out to -- to
12     what the criteria would -- are we required in
13     addition to use of force to generate that because
14     it's -- it's a hard copy in the section kind
15     of -- kind of thing if we were --
16              Q.      Uh-huh (affirmatively).
17              A.      -- if that's -- if that file is
18     required as well for investigators.
19              Q.      So -- so you don't know who -- who
20     would be responsible for it, who would know off
21     the top of their head?
22              A.      I mean, I supervise the -- the --
23     the narcotics guys, but like I said, I don't -- I
24     don't know if the EIS is required, but I would --
25              Q.      Uh-huh (affirmatively).
```



1      A.    That's something I would have to
2 look into to see if that's --
3      Q.    Okay.
4      A.    -- that needs to be maintained.
5      Q.    Okay.
6      MR. CANIZARO:
7           Elizabeth, you mind if I ask one
8      clarifying question on Exhibit 30 before
9      we move on, just --
10      MS. CUMMING:
11           Let -- let's go off the record for
12      just a second.
13      (A discussion was held off the record.)
14      MS. CUMMING:
15           Okay.  So we are moving on to
16      Exhibit 31.  This has been previously
17      marked as 31.
18      (Document tendered.)
19 BY MS. CUMMING:
20      Q.    And so this is dated April 1, 2018.
21 And so a bit earlier we were talking about
22 incident reports and arrest reports and the
23 various reports that are -- that are generated,
24 and so this might be an occasion to kind of delve
25 into that a bit.



1             This here notes arrests not
2   involving accident or injury, and then if you --
3   if you flip over a couple of pages, it's got an
4   arrest report.  That's the caption at the top,
5   and then it's got what's called a case report,
6   which looks like it's nine pages.  And then --
7   yeah.
8             That's -- so we have got something
9   that's titled Arrests, we have got something
10  that's titled Arrest Report, and then we have got
11  something that's titled Case Report.  What of
12  these goes into that IRS that you were talking
13  about?
14       A.    Okay.  The IRS report is starting --
15  well, purposes of -- of the stapled packet; one,
16  two -- the -- the backside of the second page
17  looks like --
18       Q.    So you are talking about Bates
19  No. Terrell 3697?  The -- the Bates number is
20  right down here (indicated) at the bottom.
21       A.    No.  I'm talking about the first one
22  that's got the -- it's got case report at the
23  top.  It's going to be --
24       Q.    Okay.  So you are talking about
25  Bates No. 3699?



1    A.    Yes.

2    Q.    Okay.

3    A.    That is our incident case report

4    reports.

5    Q.    Okay.

6    A.    And everything after that is a part

7    of that IRS -- let me just make sure.

8    Q.    Okay.

9    A.    Our IRS report.

10   Q.    Okay.  So this -- so this is the IRS

11   report that you are talking about?

12   A.    Correct.

13   Q.    And this would be the thing that

14   would be available for anybody who was looking at

15   use-of-force reports, they could also go into the

16   system and look at -- at what's called the case

17   report, correct?

18   A.    Correct.

19   Q.    Okay. All right. All right.  What

20   about these -- these reports that are titled

21   Arrests and --

22   A.    Yeah.  This --

23   Q.    -- what's titled Arrest Report?

24   A.    This is -- there is a -- a desk log

25   at Troop N that is maintained for each shift.



1    Q.    Uh-huh (affirmatively).

2    A.    And these, it's kind of like a

3    running -- a running log of everything that

4    happens throughout that night.  So, you know, if

5    there's an -- if there's an arrest, you -- you

6    generate an arrest on the desk log and you put a

7    synopsis of the details in it, and it's kind of a

8    check -- kind of a check by the numbers kind

9    of -- kind of thing, but on a -- in a -- in a --

10   in any kind of substantial arrests, it's going to

11   generate one of these IRS reports is your actual

12   report.

13           But in some very minor issues -- I'd

14   have to revisit the exact procedures they are

15   doing now, but some very minor issues where you

16   are only generating a municipal summons, which

17   looks like a ticket, that some of those very

18   minor things don't always generate a full IRS

19   report, so those are captured within that desk

20   log.

21   Q.    Uh-huh (affirmatively).

22   A.    So this is kind of a desk log and --

23   and all the different -- all the different fields

24   and all the different things I don't recall off

25   the top of my head; but it's -- basically, you



1   know, if you have an arrest, you call up -- call

2   up the sergeant who's sitting -- who's in there

3   or you -- I think the guys have the ability to go

4   in the -- in their computer systems in the car

5   and type all of this stuff out.  So it's kind of

6   like the part of that activity for that shift.

7           Q.    Okay.

8           A.    So it's not a -- not a -- really an

9   arrest report on it, but it's basically the --

10  it's the desk log of that -- the kind of bullet

11  points of that arrest that's going to follow

12  within IRS report.

13          Q.    Okay.  Okay.  So turning to the --

14  to the contents of that, it's -- it's

15  Trooper Pichon and he's attempting to -- to block

16  someone who's trying to ride off on a bicycle,

17  and Trooper Pichon grabs hold of him, and the

18  person begins to pull away and he's twisting, and

19  Trooper Pichon struggles with him and, you know,

20  this -- this sort of continues until they find

21  some evidence on him.  Would this -- do you --

22  are you aware of this incident?

23          A.    I don't recall the incident.

24          Q.    Okay.  Do -- do you happen to recall

25  if there was a Use-of-Force Report generated from



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1   them?

2       A.    I do not.

3       Q.    Based on what you see just in -- in

4   this arrest section, would -- would this be

5   something that you would expect to generate a

6   Use-of-Force Report?

7       A.    To me, that's kind of a judgment

8   call thing.  I don't know if that would, to me,

9   automatically generate a use of force that didn't

10  seem like there was -- I guess, I don't think it

11  would have been wrong to do it, but it -- it

12  wasn't like a -- I don't know.  You know, I mean,

13  I guess that's --

14      Q.    So -- so the judgment calls that you

15  are talking about, so was that --

16      A.    That doesn't seem to me like a, you

17  know -- you know, it was -- you know, I -- I'm

18  not really alarmed that if there wasn't one, but

19  it wouldn't be wrong to do it.  They -- he

20  physically encountered him, but I think that

21  would be -- I feel like that would be a kind of a

22  judgment call.  It wasn't a -- no injuries.  It

23  was kind of a grabbing-type thing just kind of

24  getting him under control kind of situation.

25  So --

1        Q.    Well, there's a line two, "Troopers
2   Pichon and Cavalier took the subject to the
3   ground, placed him in cuffs."  Does that -- does
4   that change your opinion at all?
5        A.    Just kind of placing him to -- no.
6   That doesn't really change, you know.
7        Q.    Okay.  So -- so you were talking
8   about it's a judgment.  So -- so in this
9   Exhibit 31 and Exhibit 30 that we were talking
10  about the Use-of-Force Report from -- from BOI,
11  you said both of those were sort of judgment
12  calls.  Who -- who makes the -- who makes the
13  determination of whether or not to file a
14  Use-of-Force Report?
15       A.    I guess supervisor that would be
16  aware of the -- of the incident that was -- was
17  working with him at -- at the time.
18       Q.    Okay.  And what is your
19  understanding of -- of when you would -- you
20  know, when a trooper would need to -- to file a
21  Use-of-Force Report if there was a physical
22  encounter?
23       A.    I mean, I don't think any -- I don't
24  think any time you have to put your hands on
25  somebody to -- you know, if somebody's getting

1 ready to break away and you get them under

2 control or you got to kind of put them on the

3 ground to get handcuffs, to me you need

4 substantial -- well, you know, once a substantial

5 struggle kind of takes place and it was really,

6 you know, fighting, again, where that line is

7 every time you -- every single time you have to

8 effect an arrest, I mean, I don't think you need

9 to generate use of force every single time

10 somebody's like, huh, you get them under control

11 kind of thing. So, you know, I think there is a

12 little discretion in that, in some of those

13 encounters with that. *Somebody at the "huh"

14 says "that's right."

15         Q.   Okay. And -- and the discretion is

16 the supervisors, correct?

17         A.   I -- I guess, if there -- if there's

18 a level of physical. Once there's a level of

19 physical activity, he may say we think it rises

20 to where we should do the use of force or if the

21 person was -- got under control real quick and

22 collectively decided, hey, it's, you know, not --

23 not needed I would -- I would think. But

24 ultimately, the supervisor on the scene would --

25 would say yeah or nay. If, you know, he would



1  think it would assist, no; I mean, we need to do

2  it, I guess.

3      Q.   Okay.  Would -- so the trooper could

4  say I -- I don't think we need a use of force on

5  this or I'd like to file one and the -- the

6  supervisor -- does the supervisor take that into

7  account in deciding whether or not to file it?

8      A.   You know, if they think -- I mean,

9  the supervisor, they think you should and they --

10  and they don't want to, then they going to -- you

11  know, I guess sometimes if we don't go by out of

12  an abundance of caution, I don't -- I don't think

13  we need to, but, you know, it can't hurt.  You

14  know, you can do one on every single time you

15  encounter a human if you -- if, you know, you

16  really wanted to be overly, you know, which I

17  guess that's the way it will be one day.  But

18  yeah, I don't think -- I don't think a supervisor

19  is going to not not do it because, you know,

20  it -- you know, I think it ultimately is the

21  supervisor that's going to decide.

22      MS. CUMMING:

23          Okay.  I want to show you what's

24          been previously marked as Exhibit 33.  And

25          this is dated 4/27/2018.



1      (Document tendered.)

2  BY MS. CUMMING:

3      Q.    Now, this says incident report up at

4  the top.  What is in our galaxy of -- of various

5  reports that are generated, what is an incident

6  report?

7      A.    Yeah.  This is going to be -- this

8  is another one of these desk log-type -- type --

9  type things if you look at -- yeah.  With -- with

10  the arrest report on the next page, it's all that

11  same number, which generated through that --

12  that, which is this Troop N.  It -- yeah.  It's

13  going to be the -- like the -- so those are all

14  different fields within like the desk entry.

15  That's not the -- like the IRS report.  It's --

16  it's just a -- it's like the running tally of the

17  activity at that Troop N for that day.

18      Q.    Okay.  So it's the IRS report is --

19  is like it's the thing that says case report up

20  at the top --

21      A.    Correct.

22      Q.    -- right?  And then it's got arrest

23  report, which is similar to -- to what was in

24  that Exhibit 31 that we were talking about.  But

25  this -- this incident report, is this -- is this



1  a distinct thing from the -- the report that's
2  captioned Arrest that's kind of at the very front
3  of Exhibit 31?
4          A.    Yeah.  I think it's a -- I think
5  it's just kind of a part of it, like the
6  incident, the page that's incident just gives you
7  the basic information, then arrest is going to
8  have the arrested -- the arrest information on
9  it.  It's all just kind of like the incident.
10  It's -- it's like the desk log entry of that
11  incident, that troop -- that troop, you know.
12          Q.    So if you've got something that is
13  generated that has like this arrest up at the top
14  like we have at the beginning of Exhibit 31, are
15  you also going to have something that an incident
16  report like the -- is at the front of Exhibit 33?
17          A.    Yeah.  I -- I don't know in which
18  situations each of those little fields are
19  necessary, but they -- they are all just -- they
20  are all just -- they are really just desk log
21  entries of the -- the IRS report that -- that's
22  coming, so I don't know when they just do
23  incident.
24          Q.    Uh-huh (affirmatively).
25          A.    An incident report might be -- and



1  in this case, it looks like the -- the incident

2  report field and -- and the arrest they may

3  have -- they -- yeah.  I don't know when exactly

4  one would generate over the other.  It -- it

5  may -- it may be just duplications in some ways.

6          Q.    Uh-huh (affirmatively).

7          A.    You could -- I would think if there

8  isn't -- if there's an incident that you -- you

9  deal with out there that's significant that

10 doesn't involve a physical arrest, you could just

11 do the incident; but once there's an arrest, you

12 put it into the arrest as well.

13         Q.    Okay.

14         A.    So I would have to -- I would have

15 to go back into those old numbers and say, you

16 know, what incident -- what -- which required

17 each of those -- of those things.

18         Q.    Okay.  All right.  So, and then

19 getting into the -- the actual substance of this,

20 we've got again Trooper -- Trooper Pichon; and

21 this is April 27th, 2018, and it indicates he's

22 working in a plainclothes fashion at this point.

23 And if someone's working in a plainclothes

24 fashion, does that mean that they were in a

25 marked unit, unmarked unit; you have any idea?



1      A.      Likely -- likely unmarked, but I
2  have to see what the -- the -- what the situation
3  was.  Yeah.  I believe in this situation,
4  Trooper Pichon was in an unmarked vehicle and
5  observed what he observed and he called -- called
6  marked units to come in and --
7      Q.      Okay.
8      A.      -- and assist with a stop on that.
9      Q.      So he was in an unmarked vehicle
10 and -- and it looks like he was following the
11 vehicle and telling --
12     A.      Telling them to get -- to get, yes,
13 to get the uniformed.
14     Q.      Well, it -- so I'm looking at the
15 first page.  It says -- it looks like so he was
16 in an unmarked vehicle and he's following the
17 vehicle and he's providing information about
18 the -- the location of the vehicle to NOPD.
19 And -- and NOPD officers ended up not pursuing
20 the vehicle when the vehicle didn't -- wouldn't
21 stop.  But Trooper Pichon continued to follow the
22 vehicle in his unmarked unit; is that correct?
23     A.      Yeah.  But I -- I believe -- I
24 believe from there when -- when -- when NOPD
25 didn't pursue that, the state police marked

1    troopers got -- they kind of got involved.

2         Q.    Okay.  But it -- from here, there's

3    a period of time in which NOPD has not -- has

4    opted not to pursue, but Trooper Pichon is

5    continuing to pursue and then -- and contacts

6    Troop N --

7         A.    Yeah.

8         Q.    -- correct?

9         A.    He's following them, getting --

10   getting more cars -- cars there, yeah.  He --

11        Q.    Okay.

12        A.    He was not actively pursuing him in

13   this, but he -- I believe he witnessed a shooting

14   or something and he was -- and he -- he was

15   trying to keep them in sight to -- while -- while

16   calling in marked -- marked cars.

17        Q.    Well, it looks like he heard -- he

18   heard gunshots, but he didn't actually see him

19   shooting, correct?

20        A.    Yeah.  I think he heard it from --

21   well, he was in close proximity to -- to a

22   vehicle, yeah.  And -- and I remember when this

23   happened he clearly followed behind those

24   vehicles to get marked -- to get marked cars in

25   on -- in --



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

```
 1          Q.      Okay.
 2          A.      -- in pocket for this, but he was --
 3          Q.      So, and --
 4          A.      He was in an unmarked car.
 5          Q.      Okay.  And on the EIS report log,
 6    Exhibit 27, we have a date April 27th, 2018, and
 7    it's got the St. Anthony at -- at North Prieur it
 8    looks like and then it's -- it's listed as a
 9    pursuits, correct?
10          A.      That's -- that's this scenario right
11    here.  Yeah.
12          Q.      Okay.
13          A.      So yeah.  That -- that -- that
14    does --
15          Q.      So this is a pursuit that is as --
16    it's listed as a pursuit in this Troop N EIS log?
17          A.      Looking at this, it looks like
18    that -- that person wouldn't have considered this
19    a pursuit.  I mean, he was on the radio the
20    entire time calling for marked units; so yeah,
21    that's --
22          MS. CUMMING:
23                  Okay.  I want to show you what's
24          been pre -- or what we are going to mark
25          as Exhibit 74.
```



```
 1          (Exhibit 74 marked and tendered.)
 2        MS. CUMMING:
 3              You guys are going to have to share.
 4  BY MS. CUMMING:
 5        Q.    All right.  And this is from
 6  June 2018, correct?
 7        A.    Yes.
 8        MS. CUMMING:
 9              Okay.  And I have lost my copy.  I'm
10        sorry.  Can I steal yours back?
11        MR. CANIZARO:
12              (Tendered.)
13  BY MS. CUMMING:
14        Q.    And this is a Use-of-Force Report,
15  correct?
16        A.    Yes.
17        Q.    And, again, involving Trooper Pichon
18  and this -- it looks like this occurred, it's got
19  the date of incident June 16th, 2018, 500 block
20  of Bourbon Street, correct?
21        A.    Yes.
22        Q.    Okay.  And this is -- it -- it
23  sounds like Trooper Pichon showed up and there
24  was a bunch of stuff happening; and if you read
25  the -- the details section, there are about three
```



1    different interactions with three different

2    people that -- that he has.

3           MR. CANIZARO:

4                  Who's "he" there?

5           MS. CUMMING:

6                  Trooper Pichon.

7    BY MS. CUMMING:

8           Q.    Do you know which -- which of the --

9    so the three interactions are -- the first is he

10   shows up, and there's an NOPD officer who's

11   trying to detain someone who was armed with a

12   firearm; and Trooper Pichon handcuffs him and is

13   conducting a pat down, places him against the --

14   the marked unit, is conducting a pat down until

15   he's informed that -- that this person has

16   already been disarmed by the NOPD.

17                  And then there is another

18   interaction with a black female in a yellow dress

19   who is, I guess, having some kind of interaction

20   with -- with Trooper Pichon and he attempts to

21   escort her away, and someone else intervenes and

22   is able to calm her down.

23                  And then there's a third interaction

24   in which there -- he was assisting with loading

25   an irate female who was arrested for battery into



1  the rear of Johnny Brown's unit and -- yeah.

2        So do you have an understanding

3  looking at this what -- which interaction this

4  Use-of-Force Report is talking about?

5        A.    That's why I'm going to read it real

6  quick.

7        MS. CUMMING:

8             Sure.

9        MS. MURRAY:

10            Elizabeth, on our second page?

11       MS. CUMMING:

12            Uh-huh (affirmatively).

13       MS. MURRAY:

14            We have a different -- a 6/10/2018

15       with Jeffery Argrave at the top and not --

16       MS. CUMMING:

17            Oh.

18       MS. MURRAY:

19            So I don't know if that got stapled

20       wrong or --

21       MS. CUMMING:

22            It might have.

23       MS. MURRAY:

24            You have a different -- whole

25       different report on the second page of



```
1           ours.  It is a completely --
2      MS. CUMMING:
3           Well, here.  Let's --
4      MS. MURRAY:
5           -- different incident.  Okay.
6      MS. CUMMING:
7           Let's go off of this (indicated)
8      one.  Lieutenant, if you want to just go
9      ahead and look at this one and we will
10     just mark that one and -- and enter it,
11     and if your counsel wants to look at it
12     first --
13     MS. MURRAY:
14          Just a minute.
15     MR. CANIZARO:
16          I could also --
17     MS. CUMMING:
18          Yeah.
19     MS. MURRAY:
20          This is the one with Jeffery Argrave
21     and a diagram of --
22     MR. CANIZARO:
23          Yeah.
24     MS. MURRAY:
25          -- somebody's body and --
```



```
 1            MR. CANIZARO:

 2                 That's the one --

 3            MS. MURRAY:

 4                 This page here (indicated).

 5            MS. CUMMING:

 6                 This is -- yeah.

 7            MR. CANIZARO:

 8                 That's the one we're asking about.

 9            MS. CUMMING:

10                 This is the --

11            MS. MURRAY:

12                 That's the -- right.

13            MS. CUMMING:

14                 Yeah.

15            MS. MURRAY:

16                 Okay.  This is --

17            MS. CUMMING:

18                 Right.

19            MS. MURRAY:

20                 Okay.

21            MS. CUMMING:

22                 Right.

23            MS. MURRAY:

24                 This (indicated) is something else.

25            MS. CUMMING:
```



1          Right.

2      MS. MURRAY:

3          Someone else.  Okay.

4  BY MS. CUMMING:

5      Q.    So now that you've had a chance

6  to -- to read it?

7      A.    Yeah.  I --

8      Q.    Do you know what's going on there?

9      A.    I'm looking at the front page where

10  it says, "Standing arm bar escort to a stationary

11  object."  So escorting somebody to a police car.

12  I don't recall.  "Assisting with loading irate

13  female in the police car."  That -- that would

14  that would kind of be my guess that he -- he

15  escorted an irate female to the police car and he

16  decided to do use of -- I'm just saying that from

17  the standing arm bar escort to stationary object,

18  but --

19      Q.    But you're not sure?

20      A.    No.

21      Q.    Okay.  All right.  And just to look

22  at the Troop N EIS report log, Exhibit 27, this

23  has the date June 16th, 2018.  It's got 500

24  Bourbon Street.  Is this the same Use-of-Force

25  Report that's entered on the log that -- that --



 1        A.     It -- it matches the location and
 2   date --
 3        Q.     Okay.
 4        A.     -- and time, yes.
 5        Q.     So -- so your -- your understanding
 6   would be that this is the --
 7        A.     The EIS to go along with this
 8   (indicated), yes.
 9        Q.     Okay.  All right.  And this
10   indicates that the -- the EI -- EIS log indicates
11   that an EIS review is required.  Do you see where
12   I'm looking?  And it's required because there
13   were three incidents within 90 days, correct?
14        A.     Correct.
15        Q.     Okay.  Are you aware of whether any
16   EIS review was ever actually done?
17        A.     Just looking at this, I'm not aware.
18        Q.     Okay.  And you have been Pichon's
19   supervisor since August of 2017 in the narcotics
20   unit; is that correct?
21        A.     Yes.
22        MS. CUMMING:
23             Okay.  I want to go through what we
24             are going to mark as Exhibit 75.
25   BY MS. CUMMING:



```
1         Q.     So this -- this EIS review, would
2    that be -- who -- who would have done that at
3    that time period in 2018?
4         A.     That's what I'm wondering, if that
5    was -- if -- if that would have got kicked over
6    to -- to us to do.  I'd -- I'd have to see what
7    the current protocol of that is.  I'm not sure --
8         Q.     Okay.
9         A.     -- exactly.
10        Q.     So your understanding is, if within
11   Troop N there was an EIS review triggered, just
12   basic -- exclusively on events at Troop N, not
13   including anything that happened at BOI, that
14   that might have gone over to narcotics; is that
15   correct?
16        A.     I'd rather not speculate.  I'm not
17   sure if that's the -- would be the assumption or
18   not, but I will --
19        Q.     Do you know who at -- at narcotics
20   would have done that EIS review, if one was done?
21        A.     Myself -- myself, if it was within
22   2018.  That's what I'm saying.  I -- I have -- I
23   have not done one.
24        Q.     Uh-huh (affirmatively).
25        A.     So I have to -- I'm going to have to
```



1    see what's -- how we were made aware of the ones

2    down there, if they are not doing them down --

3    down there, so I'm not -- I'm not sure exactly

4    how that's supposed to --

5         Q.    Okay.

6         A.    -- happen.

7         Q.    So you as his supervisor at

8    narcotics currently would have -- would have done

9    that EIS review if it had been sent from Troop N

10   over to BOI, correct?

11        A.    Correct.

12        Q.    Okay.  All right.  Are you -- are

13   you aware of any -- of any review that has been

14   done --

15        A.    Oh, no.

16        Q.    -- in 2018?

17        A.    No.

18   MS. CUMMING:

19             Okay.  So I want to show you what's

20        been previously marked or what we are

21        going to mark as Exhibit 75.

22        (Exhibit 75 marked and tendered.)

23   BY MS. CUMMING:

24        Q.    And this is a planning and

25   evaluation form.  And if you look over on the --



1   the back of the first page, it's got your

2   signature, correct, in step two, second level

3   evaluator?

4         A.    Yes.

5         Q.    Okay.  What is the step two, second

6   level evaluator; what does that mean?

7         A.    The -- for the troopers in the

8   section, the sergeant -- the sergeant does their

9   evaluation and then the lieutenant is the second

10  level evaluator on with the -- the -- with the --

11  what the sergeant rate -- rates within that.

12        Q.    So what are you doing?

13        A.    This is a -- this is a yearly eval.

14        Q.    Right.

15        A.    You are -- they are -- you are --

16  you are planning the expectations.  We have done

17  that at the beginning of the year; and then at

18  end of the year, the sergeant is -- is rating

19  them and I -- I either concur with what they rate

20  them at, or if -- if I have a difference of

21  opinion, we -- we will discuss that.  But that --

22  that's me -- that's me signing off onto

23  sergeant's evaluating the trooper at --

24        Q.    All right.  So -- so if you sign

25  this, that means you agree with what the sergeant



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    wrote --

2         A.    Yes.

3         Q.    -- correct?  Okay.  And if you are

4    signing off, are you writing any part of this?

5         A.    No.  I wouldn't do -- I would do the

6    writing portion for the sergeants, but the -- the

7    sergeants do the ones for the troopers, so --

8         Q.    Okay.

9         A.    -- yes.  No.  I wouldn't have wrote

10   the actual comments on it.

11        Q.    Okay.  But you would have looked at

12   the actual comments?

13        A.    Yes.

14        Q.    Okay.  Did you ever have any

15   conversation with Sergeant Cuccia about this?

16        A.    Well, is that about anything in

17   particular or just the entire contents?

18        Q.    The entire thing.

19        A.    I'm sure I may have in -- in

20   general, but -- but I don't recall specifics, but

21   in general, I would discuss the ratings with the

22   sergeants.

23        Q.    Okay.  Do you recall having any

24   conversations with Mr. Pichon about this

25   documentation?



1      A.    No.

2      Q.    So this evaluation, it runs from

3  July of 2017 when -- that was when the planning

4  session was, through August 2018, correct?

5      A.    Yes.   That's -- that's what it

6  shows, yes.

7      Q.    Okay.   And so this time period

8  encompasses a lot of the -- the EIS risk

9  indicator events that we were just talking about,

10  correct?

11      A.    Correct.

12      Q.    Okay.   And an EIS review was

13  actually triggered during this time period,

14  correct?

15      A.    Yeah.   Like I said, looking at this

16  (indicated), I have to review that (indicated),

17  but it -- it looks as -- yes, according to

18  that --

19      Q.    Okay.

20      A.    -- that indication.

21      Q.    But just to -- just to be clear, you

22  don't recall reviewing any EIS file or doing any

23  EIS review during -- during this evaluation --

24      A.    No.

25      Q.    -- or during this time period?



```
 1          A.     No.
 2          Q.     Okay.  Do you recall reviewing any
 3   of the incidents the EIS triggering events that
 4   happened during this time period?
 5          A.     No.
 6          Q.     Okay.  Would -- would that normally
 7   be part of the performance evaluation review?
 8          A.     It -- it -- it could be, but those
 9   sergeants would generally -- you know, use of
10   forces that were involved, though, the totality
11   of his -- his work product would have involved
12   taking that into -- into account.
13          Q.     Okay.  And looking at the last page
14   of this review, in the documentation and
15   comments, it's got, you know, some -- some
16   general comments about -- about Trooper Pichon's
17   performance, and then -- and it talks
18   specifically about filling in at Troop N and
19   notes you continuously find yourself in the
20   middle of high profile crimes and you do not shy
21   away from these matters, and then specifically
22   cites to the April 27th, 2018 incident, which
23   this describes as finding himself in the middle
24   of a shooting and that NOPD failed to take
25   assertive action, but he used good judgment,
```



1   radioed for assistance, which resulted in the

2   apprehension of the suspects.  This doesn't

3   include any reference to this April 27th, 2018

4   event as a -- as a pursuit, correct?

5          A.     In the -- correct.

6          Q.     Okay.  And so there's no -- there's

7   no discussion of the fact that what in the EIS

8   log is referred to as a pursuit, which was --

9   would have been in an unmarked car, there's no

10  discussion of that in here.  In fact, he's

11  specifically praised for that event, correct?

12         A.     Correct.

13         Q.     And so one of the things you talked

14  about earlier as being the important -- the

15  important role of an EIS or use-of-force tracking

16  and reporting system is to look at what -- what

17  troopers are doing and -- and making sure that

18  it's consistent with -- with policy and making

19  sure the troopers are doing what they are -- what

20  they are supposed to do; is that fair?

21         A.     Uh-huh (affirmatively), yes, ma'am.

22         Q.     And so we have got -- we have got an

23  incident in which a trooper has engaged in what

24  is classified in at least one state police

25  document as a pursuit in an unmarked vehicle



1   that's being specifically praised, correct?

2        A.    Correct.

3        Q.    Do you see any inconsistency in the

4   messaging to Trooper Pichon on that?

5        A.    My knowledge of that incident, that

6   Trooper Pichon did not engage in a pursuit.  He

7   did radio ahead for uniformed troopers.  So my

8   question is why would they classify it on this

9   because I did not and do not still view that as a

10  pursuit.  I think Trooper Pichon was -- was

11  absolutely aware that he was in an unmarked car

12  and continuously tried to radio ahead, but -- but

13  was aware of the type of vehicle he was keeping

14  in view and was making continuous efforts while

15  trying to keep that vehicle in sight to get more

16  units there.  So from my knowledge of the

17  incident, I don't agree that that was a pursuit.

18       Q.    Okay.  Do you agree that he was

19  following the -- the vehicle?

20       A.    Yes.

21       Q.    Okay.  And so you -- you do not see

22  any inconsistency because you regard that as a

23  pursuit?

24       A.    I guess my question would be why do

25  they label it as a pursuit when I personally



1    don't view it as a -- as a pursuit.

2         Q.    Okay.

3         A.    So yes, that -- that was an -- that

4    was an incident that I -- I felt should have been

5    very much praised.  That was a -- yeah.  That was

6    a -- quite honestly, a very heroic incident and

7    Trooper Pichon did excellent work on that day in

8    my -- in -- in my opinion.

9         Q.    Okay.  The next incident is

10   April 6th, 2018 or at least on this it's -- it's

11   listed as the next bullet point; and it indicates

12   that Trooper Pichon was present on an

13   investigation with other members of LSP HIDTA,

14   and there was an attempt to what is referred to

15   as sometimes a carjack.  Sergeant Cuccia -- which

16   resulted in Sergeant Cuccia's discharging a

17   firearm, and then it talks about Trooper Pichon's

18   playing a valuable part in the apprehension of

19   one of the suspects.

20              Was there -- was there any concern

21   about -- and just to be clear, Sergeant Cuccia --

22   did Sergeant Cuccia draft this evaluation?

23        A.    These comments?

24        Q.    Uh-huh (affirmatively).

25        A.    Yes.  Wait.  Excuse me.  Yeah.  Give



1    me one second on that.

2           Q.    Sure.

3           A.    Okay.  Follow me on this one.

4    When -- when -- in the beginning of this session,

5    when the planning portion of this evaluation took

6    place, you see where Lieutenant Mark Fontenot is

7    listed as the lieutenant?

8           Q.    Uh-huh (affirmatively).

9           A.    And Trent Cuccia is listed as the

10   sergeant?

11          Q.    Uh-huh (affirmatively).

12          A.    When you come to the evaluation

13   portion, at the time of the planning,

14   Mark Fontenot was an acting lieutenant in the

15   position I'm in now.

16          Q.    Uh-huh (affirmatively).

17          A.    After the planning, by the time the

18   evaluation came around, Mark -- they -- I took

19   the role as the lieutenant in the section and

20   Mark Fontenot went back to his -- the -- the

21   detailed lieutenant rank had expired and he went

22   back to being the sergeant.  So reading --

23   reading this, it would have been

24   Sergeant Mark Fontenot who -- he evaluated him

25   and did -- and wrote those comments.



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    Q.    Okay.  All right.  And what -- what

2  was Trooper Pichon's role in this incident?

3    A.    This -- this particular situation,

4  our narcotics section, we -- we -- they were on

5  Broadway Street in the City of New Orleans doing

6  surveillance on an ongoing narcotics

7  investigation.  During -- cutting to the chase on

8  it, during -- during this -- during this --

9  during this surveillance, Sergeant Cuccia was

10 sitting at the corner of Broadway and another

11 side street I don't recall off the top of my

12 head.

13          During that period of time, somebody

14 pulled the door handle and attempted to carjack

15 him and did not realize it was a police officer

16 sitting in the -- in the vehicle.

17    Q.    Uh-huh (affirmatively).

18    A.    That vehicle fled and a perimeter

19 was set and -- and one of the occupants of the

20 vehicle was -- was apprehended.  During the

21 portion when the -- when the -- when the vehicle

22 fled, Sergeant Cuccia put out a description of

23 the vehicle, the vehicle quickly got out the area

24 and got away.  Trooper Pichon assisted in setting

25 up the perimeter; and I don't know to what



866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

1    extent, but I believe helped when they located

2    the -- the person that was arrested in the -- in

3    the backyard in the neighborhood.

4         Q.    Uh-huh (affirmatively).

5         A.    But what really came into play

6    was -- was -- it was earlier on this -- earlier

7    on this day when Trooper Pichon was just doing --

8    going through his regular work duties, he saw

9    a -- he remembered seeing a vehicle that fit the

10   description of this vehicle and he -- actually,

11   he ran the -- he ran the license plate, but at

12   the time because it -- it was -- they were

13   driving erratically or some -- something prompted

14   him to check that license plate thinking it was

15   potentially a stolen car.  It didn't come back

16   stolen --

17        Q.    Uh-huh (affirmatively).

18        A.    -- so he went about his business,

19   though.  This was -- like this was the morning

20   before this happened that night.

21        Q.    Uh-huh (affirmatively).

22        A.    So after this incident happens, that

23   evening Trooper Pichon approaches us and says,

24   you know what?  What was the description of that

25   vehicle?  I ran a license plate earlier in the



866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    day of this vehicle that was driving this way.  I

2    ran the plate and I was doing whatever.  I was

3    doing other duties --

4         Q.    Uh-huh (affirmatively).

5         A.    -- so I didn't call anything else

6    further than that because it didn't come back

7    stolen.  Well, I went back in the -- in the

8    computer system where he ran that plate and it

9    was stolen.  It just hadn't been reported at the

10   time he ran it; and through other follow-up

11   investigation by the -- by the detective side of

12   the house, they ended up -- actually, the vehicle

13   he saw before any of that happened earlier in the

14   day was the vehicle and we ended up locating the

15   vehicle.  It had been recovered at a tow yard,

16   and it was instrumental in -- in the follow up on

17   that investigation.

18        Q.    Uh-huh (affirmatively).

19        A.    So it was -- because of

20   Trooper Pichon's heads-up observations earlier in

21   the day, it was instrumental in --

22        Q.    Uh-huh (affirmatively).

23        A.    -- it was instrumental in

24   identifying -- figuring out what -- exactly which

25   vehicle was engaged in the shooting.



1      Q.     Okay.

2      A.     It was that -- that was -- that was

3  what was being implied by those comments, that

4  that, you know, was an example of -- of, you

5  know, above and beyond heads up -- heads-up

6  observations on Pichon's part.

7      Q.     Okay.  Was he present at the

8  shooting?

9      A.     He was -- he was part of that -- he

10  was in the area of that narcotics operation, but

11  not where -- not where it happened.  They --

12  after they fled and -- and some of the -- the guy

13  that ran out of the car, he -- they knew what

14  they were doing, block searches and they located

15  the guy in the backyard.

16      Q.     Okay.

17      A.     But there was no -- no use of force

18  or anything involved.

19      Q.     Okay.  All right.  Are you aware

20  of -- of Trooper Pichon's involvement in any

21  other uses of force or pursuits or shootings

22  since June of 2018?

23      MR. CANIZARO:

24          Object to form.

25      THE WITNESS:



1          Sir?

2     MR. CANIZARO:

3          I'm objecting.  You can answer, if

4     you can.

5     THE WITNESS:

6          Yeah.  Trooper Pichon has been

7     involved in a -- in a shooting since this.

8 BY MS. CUMMING:

9     Q.    Okay.  What was his involvement?

10     MR. CANIZARO:

11          I just note a continuing objection

12     to any questions about that shooting, but

13     subject to, you can answer.

14     THE WITNESS:

15          It's an ongoing investigation and

16     I'm not allowed to discuss any details

17     about that particular investigation.

18 BY MS. CUMMING:

19     Q.    Okay.  So going back to -- going

20 back to Exhibit 22 and Exhibit 27, is there

21 any -- is there any discretion as to whether or

22 not an EIS review should be done?

23     A.    No.  I think -- I think once those

24 numbers are there, one should be done.

25     Q.    Okay.



```
 1           A.    So -- so if that was the case,
 2     whether I agree with, you know, who -- if
 3     something was in pursuit or not in pursuit, if it
 4     was documented as that, a review should have been
 5     done.
 6           Q.    Okay.
 7           A.    So that -- that may be an oversight
 8     that I have to look into it.
 9           Q.    Okay.  Can you think of any reason
10     that an EIS report, once it's -- it's kind of
11     triggered an EIS review, once it's been triggered
12     by a number, is there any reason why -- why it
13     would be or should be delayed?
14           A.    No.
15           Q.    Okay.  I want to go back to
16     Exhibit 23.
17           A.    Yes, I think I have it.
18           Q.    Yeah.  It's that collection of EIS
19     reports.  So I want to go back to sort of at the
20     back of this collection of reports.  It's Bates
21     No. 16086, and it's dated October 3rd, 2017.  It
22     looks like this (indicated).
23                 So we are at Bates No. 16086, and
24     this is -- this is from Captain Naquin.  It's
25     dated October of 2017.  Would you have been at
```





1    Troop N at this time?

2         A.    October of 2017.  I think so.

3         Q.    Okay.  You think -- you think you

4    would have?

5         A.    Yeah.  Yeah, I would -- I would have

6    been, yes.

7         Q.    Are you sure about that?

8         A.    October of 2017.  Oh, wait.  I went

9    to -- okay.  I'm getting '18 -- '17 is when --

10   no, I was not.

11        Q.    Okay.

12        A.    Sorry.  My '18 is --

13   MR. CANIZARO:

14             Your brain --

15   THE WITNESS:

16             It was a long night.

17   MR. CANIZARO:

18             You need a break or --

19   THE WITNESS:

20             No.  I'm fine.

21   BY MS. CUMMING:

22        Q.    All right.  So this is from

23   Captain Naquin; and if you look at the third

24   paragraph, it indicates that this review would

25   have been conducted sooner, but so and so, the



1  trooper, was assigned to Operation Summer Heat

2  task detail, and if they have a higher

3  probability of being involved in numerous EIS

4  threshold events and that Captain Naquin decided

5  to postpone any formal EIS reviews and any

6  personnel assigned to this task force until after

7  the assignment ended.  Have you ever heard of --

8  of anything like that?

9       A.    No.  But I haven't heard that -- no,

10  I haven't.

11       Q.    Okay.

12       A.    No.

13       Q.    And just to look back at -- at the

14  EIS -- and don't worry.  You are -- you are not

15  directly involved in this, but just to confirm.

16            Just to look back at -- at the

17  incidents that on the basis of this EIS review,

18  it looks like if you -- if you go sort of to

19  16089, there's a May 8th incident, there's a

20  May 31st incident, and there's a June 7th

21  incident; so that's three incidents within

22  90 days, correct?

23       A.    Which ones are you pointing out,

24  June 7th?

25       Q.    I'm pointing to the one at the



1    bottom, Events:  The seventh incident that's May

2    8th, 2017; the sixth incident, which is May 31st,

3    2017; and the fifth incident, which is June 7th,

4    2017.  So those three incidents are three in

5    90 days, correct?

6         A.    Yes.

7         Q.    And so that would trigger an EIS

8    review, correct?

9         A.    Correct.

10        Q.    Okay.  And do you know when

11   Operation Summer Heat was started?

12        A.    Specifically, no.  It was -- I

13   assume it was that summer of -- well, let's see.

14   May.  No.  It was the summer of '17.

15        Q.    Okay.

16        A.    But I -- I don't remember the

17   specific dates.

18        Q.    Okay.  And -- and if I represent to

19   you that it started July 1st, would -- would you

20   have any --

21        A.    Not --

22        Q.    -- reason to --

23        A.    Certainly could have been, yes.

24        Q.    Okay.  All right.  So three

25   incidents in 90 days prior to the beginning of



1 the operation that -- that Captain Naquin cited
2 as to reasons for delaying the EIS. Do you have
3 any understanding or awareness of why that EIS
4 review might have been delayed under any LSP
5 policy or practice?
6          A.    No, ma'am.
7          Q.    Okay. Would you have been the
8 lieutenant in charge of -- or one of the
9 lieutenants over Troop N in May of -- of 2017?
10          A.    May of 2017. That, yes. But that
11 may have been during that window when I was in
12 plainclothes, doing a plainclothes portion of
13 it --
14          Q.    Okay.
15          A.    -- shortly before I got transferred.
16          Q.    And when you were doing that
17 plainclothes thing in -- in Troop N, did you have
18 your regular duties as a lieutenant? Would you
19 have been doing EIS reviews as a lieutenant?
20          A.    I don't recall doing any during that
21 time, but --
22          Q.    Okay.
23          A.    -- I wouldn't have been a part of
24 the every day patrol EISs.
25          Q.    Okay. Okay. So I want to turn back



1  to the front of Exhibit 23, and this is

2  February 22nd, 2017.  It's the cover letter from

3  Captain Naquin to Major Sansone.  Do you know who

4  actually wrote that cover letter?

5         A.    This form right here (indicated)?

6         Q.    Yes.

7         A.    No.  I mean, on its face, I would

8  say Captain Naquin, but I -- I wasn't there when

9  he did it, so --

10        Q.    Okay.  So you are not certain?

11        A.    No.

12        Q.    And then flipping over, we -- we

13  talked a little bit about this earlier, but this

14  is what's called the -- it looks like it's titled

15  the EIS form threshold incident, correct?

16        A.    Yes.

17        Q.    All right.  And then it's got on the

18  -- sort of the second page of this, it's got

19  supervisor completing the report.  Whose

20  signature is that?

21        A.    This (indicated) third page?

22        Q.    Uh-huh (affirmatively).

23        A.    Mine.

24        Q.    That's your signature.  Okay.  So

25  you completed this report, correct?



```
 1              A.    Correct.
 2              Q.    Okay.  And you were talking earlier
 3    about some of the -- the process by which you do
 4    that.  You referred to the -- the EIS report that
 5    is actually filed by the sergeant, correct?
 6              A.    Correct.
 7              Q.    Okay.  And -- and, in this incident,
 8    you cannot recall if you -- if you authored
 9    the -- the synopses that we see here or if they
10    were drawn from the sergeants' reports; is that
11    correct?
12              A.    Correct.
13              Q.    Okay.  As you were compiling this
14    EIS report, would you have looked at anything
15    outside of the sergeant's EIS report?
16              A.    I don't recall looking at anything
17    else outside of this --
18              Q.    Okay.
19              A.    -- for EIS, no.
20              Q.    Okay.  So you would have only looked
21    at whatever the sergeant generated?
22              A.    Correct.
23              Q.    And do you have any awareness or
24    knowledge of what a sergeant would have looked at
25    in generating a -- the synopsis or EIS report
```



1    that you would have looked at to generate this?

2         A.    No.  Other than at -- at the -- in

3    close proximity to the time it actually occurred,

4    probably that -- the desk log that we mentioned

5    and -- and the -- the report, the actual --

6         Q.    Uh-huh (affirmatively).

7         A.         -- the actual -- you know, or maybe

8    just speaking actually with the trooper at

9    that -- that time of occurrence.

10        Q.    Okay.

11        A.    So they are -- they are closer to

12   the time it happened because of when they are

13   generating it, so just the report and the

14   paperwork generated from that arrest at the time.

15        Q.    Okay.  So paperwork generated by the

16   trooper, an interview with the trooper, him or

17   herself, correct?

18        A.    Correct.

19        Q.    Okay.  Are you aware of any other

20   investigation, any witness statements, video or

21   anything like that being collected and -- and

22   examined as the sergeant is writing the synopsis?

23        A.    Not specifically that I know of, no.

24        Q.    Okay.  And in the process of

25   compiling these EIS reports, have you ever looked



1  at anything outside of the -- the reports that --

2  that are generated by either the trooper or the

3  sergeant, so any witness statements, video,

4  anything like that?

5        A.    No.

6        Q.    Okay.  And then we have got your

7  disposition, and is this a paragraph that you

8  wrote?

9        A.    Yes.

10       Q.    And, in the second sentence, it

11  indicates -- so it indicates that -- that this

12  review is happening because the policy has been

13  triggered basically and then it says, "Each

14  incident described above was debriefed with

15  blank."  Blank would be the -- the person who --

16  the trooper, correct?

17       A.    Correct.

18       Q.    Okay.  How did you know that each

19  incident was debriefed?

20       A.    Well, yeah.  When I -- when I

21  completed a review, I would meet with them.  I

22  would meet with them briefly and say, I looked at

23  all -- all these -- you know, I did a review on

24  these three incidents, you know, and everything

25  looked -- everything looked good; and I may



1   discuss a couple things with them, but that's

2   basically me touching base with them, letting

3   them know that I looked at it and I felt it

4   was -- everything was good -- good to go.

5        Q.   Okay.  So -- so the debriefing you

6   are describing is a debriefing with you?

7        A.   Correct.

8        Q.   What sort of things do you talk

9   about in those debriefings?

10       A.   If -- if I looked at -- if -- if

11  everything I looked at seemed to be alright, it

12  might just a little brief, you know, just kind of

13  letting them know that, okay, I'm -- I'm -- these

14  are -- these are -- this is all good, so there

15  wouldn't be, oh, I got another one and now this.

16            So it was I don't remember anything

17  specific about if -- if I felt that those

18  incidents were -- were -- were within policy and

19  they -- and they -- they did what -- what they

20  should have done.  It may have been just touching

21  base with them and I had reviewed them and

22  everything is -- everything looked -- looks good.

23       Q.   Okay.

24       A.   I mean --

25       Q.   Would you -- was there ever an



1   occasion which you did not see -- in which
2   everything did not look good?
3           A.    No.
4           Q.    Okay.
5           A.    Not on the ones I reviewed.
6           Q.    Okay.  Can you ever recall ever
7   having to engage in a more extensive conversation
8   with a -- with a trooper because you had a
9   concern about something that you saw?
10          A.    No.
11          Q.    Okay.  When you would speak with
12  troopers, was there -- would the trooper --
13          Let me see how to ask this.  If
14  you -- if you were touching base with the
15  trooper, what did you feel like your -- your
16  primary responsibility was in -- in these
17  debriefing sessions?
18          A.    Well, primarily it was to review to
19  see if there was any red flags of wrongdoing.  So
20  my intention on those is once I reviewed them and
21  if it was -- I mean, I was -- you know, if I
22  would have seen something that would have
23  concerned me, I would have -- it would have been
24  more of a counselling-type situation, but when
25  I -- I didn't feel that way, I felt it was -- I



```
 1   was to notify them to kind of reassure them
 2   that -- that they are not under some -- some sort
 3   of intense scrutiny over something they did
 4   because it's -- guys -- guys down there are asked
 5   to do a lot of difficult tasks, and I think it's
 6   important to when they are in a dangerous
 7   situation or they have to make split second
 8   judgment calls, it's important for them to hear
 9   it from me that you did a good job, you know.
10   And --
11          Q.    Uh-huh (affirmatively).
12          A.    -- use of forces happen, you know,
13   and so it's high crime areas that they are
14   expected to -- to work in.  So my intent on ones
15   where they -- if they didn't do anything wrong,
16   it's important for me to let them know that, that
17   they are doing a good job even though these
18   things are generated as a result of high speed
19   chases and fights and those things that -- that
20   happen.
21          Q.    Okay.
22          A.    So in a situation where they didn't
23   do anything wrong, I felt it was important for me
24   to let them know, hey, I reviewed it, you good
25   because then they know they -- that's kind of off
```



 1     their shoulders if they were in an incident or
 2     something of that type.
 3          Q.   Okay.  So there was a degree of
 4     reassurance that -- that you felt was your
 5     responsibility?
 6          A.   The ones I did because they --
 7     they -- they were by -- by my -- by my review, it
 8     was --
 9          Q.   Uh-huh (affirmatively).
10          A.   -- I didn't see any reason for them
11     to be counselled for any wrongdoing and in a
12     situation like that.
13          Q.   Okay.  All right.  And do you
14     ever -- did you ever have any occasion to offer
15     counselling to -- to any trooper that you sat
16     down with?
17          A.   Down there for use of force things,
18     no, I didn't.  I had -- I don't recall.
19          Q.   What about pursuits, fleet crashes,
20     things like that?
21          A.   No, not that I recall.
22          Q.   Okay.  All right.  So primarily it
23     was to sort of offer reassurance then is -- is
24     how this -- this was functioning --
25               MR. CANIZARO:



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1              Object --
 2   BY MS. CUMMING:
 3        Q.    -- when you were doing it, correct?
 4        MR. CANIZARO:
 5              Object to the form of the question.
 6        THE WITNESS:
 7              Yeah.  Like I said, in -- in the
 8         scenarios that I had when they were clear,
 9         there -- if -- you know, if -- if they did
10         something that I thought was problematic,
11         I would have addressed that, but in these
12         situations, the speeds were not --
13        MS. CUMMING:
14              Uh-huh (affirmatively).
15        THE WITNESS:
16              -- so -- so I was more -- I didn't
17         know there would be a big counselling
18         session because I didn't feel it was
19         necessary, so it was more letting them
20         know that it had been reviewed and done
21         and to let them know that --
22        MS. CUMMING:
23              Uh-huh (affirmatively).
24        THE WITNESS:
25              -- you know, I was good with the
```



1      action that they took.
2  BY MS. CUMMING:
3      Q.    Okay.  Okay.  What about when the --
4  when the troopers would come in to -- to meet
5  with you, did the -- did they sort of provide or
6  did you ever ask for an account of -- of why they
7  took the action that they did?
8      A.    No.  Not that, you know, I felt I
9  had enough information to -- I knew --
10     Q.    Uh-huh (affirmatively).
11     A.    -- I knew what was -- what was going
12  on.
13     Q.    Okay.  And in the next sentence, it
14  says "Each incident was determined to be
15  justified and that acted" -- "and that so and so
16  acted within the confines of LSP policy and
17  procedure."
18          So who -- who made that
19  determination that it was justified and that a
20  person was --
21     A.    Yeah.
22     Q.    -- acting within policy and
23  procedure?
24     A.    Well -- well, I -- I did as far as
25  the review goes, but from me it would go to



1    Captain Naquin and I think it goes up to the

2    major from him, which would have been

3    Carl Sansone at that -- at that time.

4         Q.    Okay.

5         A.    But according to me looking at those

6    incidents, that -- that was my assessment to the

7    captain.

8         Q.    So your assessment to the captain is

9    this -- these are justified in the same policy

10   and procedure?

11        A.    Yes.

12        Q.    Okay.  And there's the line "no

13   further action taken."  What does that mean?

14        A.    Well, that means -- that means in

15   those incidents I reviewed that -- that those are

16   kind of cleared and -- and, you know, the -- the

17   way -- the way my understanding was how to handle

18   them, once, you know, if I review a certain

19   number of them, once -- once I reviewed them,

20   then, you know, say, if they had three and I

21   reviewed it and they got another one, it would --

22   it would take another three to get another

23   review.  It wouldn't be like, you know, now

24   number four you had -- you use three and you

25   just -- you always got three every time you get

1    one for -- forever.  So that would -- that was

2    just my way of saying that these three are -- are

3    kind of clear and -- and, you know, moving on

4    from there.

5         Q.    Okay.  So sort of doing a reset?

6         A.    Yes.  And that's one way, I guess,

7    you could kind of look at it.

8         Q.    Okay.  And would you -- would you

9    have had any -- any authority or responsibility

10   to -- to recommend any kind of training or

11   disciplinary action or counselling or anything

12   like that as a result of your -- your review?

13        A.    Sure.  If I'm going to make that

14   determination and review it like it went out to

15   the captain and it would -- it would have been

16   taken into consideration.

17        Q.    Okay.  And would that

18   recommendation, would that have come here in this

19   disposition section kind of where the no further

20   action taken --

21        A.    Yeah.

22        Q.    -- is?  Okay.

23        A.    Right.

24        Q.    All right.

25        A.    Yes.  I'm sorry.



1   Q.   All right.  We have got -- on the
2   next page, we have got another one from
3   March 2017; and, again, this is an EIS review
4   that you had done.  And this -- again, you -- you
5   indicate that each incident described was
6   debriefed with the trooper, and then it also says
7   supervisors and all troopers involved in the
8   incidents.  So what would that debriefing entail?
9   I'm sorry.  You see where I'm --
10       A.   No, ma'am.  Which --
11       Q.   It's Terrell 16064 is the Bates
12  number.
13       A.   (Indicated.)
14       Q.   Yeah.  There you go.  So it talks
15  about debrief with supervisors and troopers
16  involved in the incidents.  So you're -- in this
17  instance, what does that debriefing look like?
18       A.   Yeah.  I -- I think that would be as
19  similar as -- as what we just spoke of.
20       Q.   Uh-huh (affirmatively).
21       A.   I didn't -- I don't recall in any of
22  them any of these, the EISs, having where it
23  was -- it was much more than me telling them I
24  reviewed them and everything looked -- looked --
25  looked good.



```
 1          Q.    Uh-huh (affirmatively).
 2          A.    So it would have been similar to
 3    what we just spoke of in the other one.
 4          Q.    Okay.  All right.  Did anybody offer
 5    you like an EIS review form or -- or offer you,
 6    you know, language to use in -- in an EIS review?
 7          A.    No, not that I recall, no.
 8          Q.    All right.  And we have touched on
 9    this, but I just want to be very clear.  Did you
10    ever do an EIS review that -- that required any
11    kind of corrective action plan?
12          A.    No.
13          Q.    Okay.
14    MR. CANIZARO:
15              You need a break?
16    THE WITNESS:
17              No.  Keep rolling it.
18    MS. CUMMING:
19              Actually, if you want to take a
20    break, that's fine.
21    MR. CANIZARO:
22              How much do we have left, an hour?
23    MS. CUMMING:
24              Well, yeah.  We are getting close.
25    MR. CANIZARO:
```



1    It's 3:40 and we started at 9:30.

2         MS. CUMMING:

3              Uh-huh (affirmatively).

4         MR. CANIZARO:

5              And we've taken a couple breaks, an

6         hour break.

7         (A short recess was taken.)

8         MS. CUMMING:

9              Okay.  So we are back on.  Okay.  So

10        I want to turn to a specific EIS report

11        from August 18, 2016.  This has been

12        previously marked as Exhibit 58.  Here you

13        go.

14        (Document tendered.)

15   BY MS. CUMMING:

16        Q.    Do you recall -- so this is dated

17   August 18th, 2016.  This is the EIS review for

18   Trooper Pichon from 2016, correct?

19        A.    Correct.

20        Q.    Okay.  And it looks like we have got

21   four uses of -- or three uses of force and two

22   vehicle pursuits; one -- four total incidents.

23   One is both a pursuit and a use of force,

24   correct?

25        A.    Correct.



1    Q.    Okay.  I'm looking at that -- at

2   that second page and then we have got kind of a

3   listing of the synopses of -- of events.  Do you

4   recall how you generated the -- the synopses of

5   these events?

6    A.    Specifically, no.  But I would

7   have -- I would have gotten the event 1, 2, 3 and

8   4 from previous EISs --

9    Q.    Uh-huh (affirmatively).

10   A.    -- compiled them in this one report,

11   and then -- and then made the disposition similar

12   to the other ones.

13   Q.    Okay.  And it looks like -- and --

14   and this is your signature at the -- at the last

15   page, correct?

16   A.    Yes.

17   Q.    Okay.  And it looks like you did

18   this report.  The date is August 10th, 2016; is

19   that correct?

20   A.    Yes.  That's when it's dated.

21   Q.    Okay.

22   A.    So --

23   Q.    And we have got -- in looking at the

24   dates of the events, we have got one on 6/3/2016;

25   one on 6/21/2016; one on July 19th, 2016; and a



1    fourth on July 28th, 2016, correct?

2         A.    Uh-huh (affirmatively).

3         Q.    Okay.

4         A.    Yes, ma'am.

5         Q.    So the -- under the policy, the

6    triggering event would have properly been

7    July 19th, 2016; is that correct?

8         A.    Correct.  Yeah.  The -- the one

9    could have been done on the 30 -- or the 30 date,

10   yes.

11        Q.    Okay.  And do you know why there

12   wasn't any EIS review done until this fourth

13   event?

14        A.    No, ma'am.  Just it was probably --

15   that's when they probably realized there had been

16   that -- that -- that many events.

17        Q.    Okay.

18        A.    Now, I don't recall why it's four

19   and wasn't done after the third one.  That's --

20        Q.    Uh-huh (affirmatively).

21        A.    Sorry.  I don't know.

22        Q.    That's okay.  I forgot to say at the

23   beginning of my spiel earlier today that "I don't

24   know" is a perfectly acceptable answer, so --

25                 And there -- it looks like there's



1  about 12 days between the -- the last event,
2  7/28/2016 and 8/10/2016 roughly?
3       A.    Correct.  Yeah.  They -- I mean, I
4  don't -- I don't see that as any sort of -- at
5  the -- by the time we got around to doing a
6  review, that was four instead of three.
7       Q.    Uh-huh (affirmatively).
8       A.    You know, I had -- that's --
9       Q.    Okay.  Roughly, usually, how long
10 does it take to -- to do a review after an EIS
11 review has been triggered?
12      A.    I don't know.  Just -- just when you
13 have the time to sit down and -- and kind of do
14 it.  I mean, I would do something like this if
15 I -- if I -- if I had the whole -- if I had
16 that -- that day of if I didn't have meetings or
17 some other thing and I -- and I said, well, we
18 can do a review and it was in front of me, then I
19 would sit down and I would do it in that day.
20      Q.    Okay.
21      A.    You know, it was --
22      Q.    Okay.  So there's no -- there's no
23 like policy requirement to do it on a -- on a
24 particular day?
25      A.    Not that I'm aware of, no.



1          MS. CUMMING:

2              Okay.  And I want to show you what

3          has been -- I'm -- I'm just going to show

4          you these altogether, what would have been

5          previously marked as Exhibits 24, 25, and

6          26.

7          (Documents tendered.)

8     BY MS. CUMMING:

9          Q.    All right.  And these are all use of

10    force reports, correct?

11         A.    Correct.

12         Q.    And these are -- well, let me ask

13    you this.  Are these the corresponding use of

14    force reports for three of the incidents that are

15    listed in this EIS report?

16         A.    Three -- three of them?

17         Q.    Uh-huh (affirmatively).

18         A.    Yes.

19         Q.    Okay.

20         A.    Yes, it appears so.

21         Q.    All right.  And -- and I -- I don't

22    have any paperwork to show you for the July 19,

23    2016 because it's a vehicle pursuit.

24         A.    Okay.

25         Q.    And -- and we just -- we don't have



1  that, so --

2        A.    Okay.

3        Q.    Did you -- do you recall reviewing

4  these use of force reports as you were compiling

5  this EIS form?

6        A.    I do not.

7        Q.    Okay.  And so you're -- you don't --

8  do you have any specific memory of -- of creating

9  the -- the synopsis?

10       A.    No, not -- not specifically.  I

11 mean, I'm not doubting that I did it, but -- but

12 I don't recall exactly.

13       Q.    Okay.  So I want to direct your

14 attention to Exhibit 26 and Event 1.  And if you

15 look at Bates No. 4918, which is -- it looks like

16 this (indicated).  It's in Exhibit 26.

17       A.    Okay.

18       Q.    Okay.  So I want you to just do a

19 side-by-side comparison of the synopsis of Event

20 1.  And, you know, what -- what we have here is

21 redacted, but we can -- we can piece it together,

22 I think, and -- and what is written in

23 Trooper Pichon's explanation in his Use-of-Force

24 Report.

25       A.    Yeah.  It appears to be the same



1    verbiage.

2         Q.    Okay.  It's -- it's the same --

3         A.    Uh-huh (affirmatively).

4         Q.    -- thing?  Okay.

5         A.    Yeah.

6         Q.    All right.  So, and do you have any

7    recollection of -- of looking at anything outside

8    the four corners of the Use-of-Force Report, the

9    synopsis that was possibly created by the

10   sergeant --

11        A.    Yeah.  It would have --

12        Q.    -- or anything like that?

13        A.    It would have been a synopsis of --

14   of -- of what they already put, and then it -- it

15   wouldn't be uncommon for what I have on here to

16   be what they had on that because I'm basically

17   evaluating what they put on each of those

18   things --

19        Q.    Okay.

20        A.    -- so --

21        Q.    Okay.  So -- so who would have

22   written -- in Exhibit 26, who would have written

23   this explanation section?

24        A.    I -- I believe it would be -- yes.

25   And it could be Trooper Pichon or it could be the



1   sergeant after ascertaining what happened.

2          Q.    Okay.

3          A.    I know it says here in third person

4   sometimes they do things.  You know, it could be

5   Trooper Pichon himself, but I'm not -- I think it

6   could be either.  I don't want to -- I don't want

7   to commit to say it was definitely Pichon or one

8   of the sergeants on that one.

9          Q.    Okay.  And the -- the supervisor

10  here is listed as Joe Cuccia or Cuccia.  Would

11  that be -- in the Use-of-Force Report, would that

12  be the sergeant?

13         A.    Oh, in the --

14         Q.    In the Use-of-Force Report,

15  Exhibit 26, the last page, it lists the reporting

16  officer's name as Troy Pichon, correct?  And so

17  that --

18         A.    Correct.

19         Q.    And -- and then the supervisor's

20  signature is listed as Joe Cuccia?

21         A.    Correct.

22         Q.    Okay.  And so would Joe Cuccia be

23  the sergeant that you were talking about?

24         A.    Correct.

25         Q.    Okay.  So this narrative could have



1   either been written by Trooper Pichon or

2   Sergeant Cuccia, correct?

3          A.    Correct.

4          Q.    Okay.  And so the -- the person who

5   would have written the synopsis, do you know what

6   sergeant that would be?

7          A.    For this (indicated)?

8          Q.    For --

9          A.    Oh, for the --

10         Q.    For the --

11         A.    It probably would have --

12         Q.    Yeah, for the EIS form.

13         A.    I would -- I would believe

14  Sergeant Cuccia, but the -- the -- the use of

15  force itself, yeah, I would -- I would think

16  Sergeant Cuccia.

17         Q.    Okay.  And then for Event No. 3,

18  let's look at Exhibit 25.

19         A.    (Complied.)

20         Q.    And just compare that same page

21  where -- where it's Terrell 5044, and where it

22  says explain and it's got that narrative section,

23  compare the -- the wording in Event 3 with that

24  section.

25         A.    Same as the previous situation,



1    same -- same narrative.

2          Q.    Okay.  So it's the -- it's the same

3    narrative.  And do you know who would have

4    written this section in Exhibit 25, the

5    Use-of-Force Report?

6          A.    I -- I would -- I would say likely

7    Pichon, who was the actual person involved in the

8    use of force, but I don't know if that's -- I

9    don't want to speculate that it might have been a

10   sergeant kind of getting the information and --

11   and -- and putting it in; but I believe the use

12   of force itself would be the -- the trooper

13   involved.

14         Q.    Okay.

15         A.    But I don't know 100 percent that

16   that would be the case.

17         Q.    Okay.  So the trooper involved is

18   the most likely person to have written this --

19   this explanation section in the Use-of-Force

20   Report, Exhibit 25?

21         A.    I believe so, yeah.

22         Q.    Okay.  And do you know who would

23   have been -- and this Use-of-Force Report

24   indicates that Paul Chamorro was -- was the

25   supervisor who reviewed it --



```
1          A.     Correct.

2          Q.     -- correct?  Okay.  Is he a

3    sergeant?

4          A.     Correct.

5          Q.     Okay.  Would you expect that

6    sergeant, Sergeant Chamorro, to have completed

7    whatever EIS report needed to be done?

8          A.     Yes.

9          Q.     Okay.  Okay.  And we have got

10   Event 4, and let's compare with Exhibit 24.

11   It's -- Exhibit 24 is dated June 3rd, 2016.

12   Event No. 4 is dated June 2, 2016.

13         A.     What event number, Event 4?

14         Q.     Event 4, yes.

15         A.     It's the one labeled June 3rd on

16   the --

17         Q.     Yes.  So -- so my question is would

18   it be your understanding that these are -- that

19   these are the same event, just -- just misdated,

20   or are there two different events?  What -- what

21   is your understanding of the relationship between

22   Event 4 and the Use-of-Force Report in

23   Exhibit 24?

24         A.     Yeah.  That appears -- it appears to

25   be two different narratives.
```



1      Q.    Okay.  It's two narratives.  So I'll
2   just refer you to that -- that Box No. 27, Levels
3   of Resistance.  And it's talking about subject
4   kept his left arm, hand underneath the body; and
5   this is all referring to "action taken with
6   myself," and this is submitted by Trooper Pichon,
7   correct, and Deputy Micah Smith with the OPCSO?
8           And on the -- sort of further down
9   into the discussion of Event 4 on the -- on the
10   last page of the EIS form, it's talking about
11   Trooper Pichon, Deputy Micah Smith with the
12   OPCSO?
13      A.    Okay.  I didn't -- I was looking at
14   that as being a trooper, so I don't know -- is
15   this Smith mentioned over here (indicated)?
16           Okay.  They do mention -- okay.
17   Because I -- I first saw him with Dickinson over
18   here (indicated) and then Micah Smith; so at
19   first glance I was thinking it might have been.
20      Q.    So this -- this narrative, this
21   Event 4 and, you know, what is included in the
22   Use-of-Force Report in Exhibit 24, it looks like
23   they have got -- they have got some of the
24   same -- the same players:  OPCSO Deputy
25   Micah Smith and, you know, it's the same sort of



```
 1    force that's being described:  Under-the-arm lock
 2    take down.  But this -- this is clearly -- in the
 3    EIS form, there's clearly a different narrative
 4    than in the Use-of-Force Report in Exhibit 24.
 5    So do you know where the narrative from Event
 6    No. 4 came from?
 7           A.    Yeah.  I haven't -- I haven't read
 8    it in its entirety, but --
 9           Q.    Uh-huh (affirmatively).
10           A.    -- but I would have -- it would have
11    been from the EIS generated that this came from.
12           Q.    Okay.  So Event 4 would probably
13    have actually come from a -- from the EIS report?
14           A.    Correct.
15           Q.    Okay.
16           A.    Yeah.  Like there's -- there's no
17    hard -- you know, if -- if what's on this is kind
18    of clearcut, I think they could take pretty much
19    the verbiage from that because it -- it's all in
20    that incident.
21           Q.    Uh-huh (affirmatively).
22           A.    But it -- there's nothing saying
23    this (indicated) is going to be identical to this
24    (indicated); but -- but I would have -- if my
25    recollection is correct, I would have taken this
```



1   from the EIS specific and not the -- not the
2   Use-of-Force Report.
3          Q.      Okay.  All right.  I see.
4          A.      Because that's what I would have
5   been looking -- just if my memory serves me,
6   that's what I would have been looking at.
7          Q.      Okay.  And looking at the last page
8   of -- of Exhibit 24, it -- it looks like the
9   supervisor there is Paul Chamorro, the sergeant.
10  Is that -- is that likely the sergeant who would
11  have written the EIS report for this incident?
12         A.      Likely, yes.
13         Q.      Okay.  And in the course of
14  compiling this 2016 use of force or EIS report,
15  did you interview any witnesses associated with
16  any of these events?
17         A.      No, ma'am.
18         Q.      Did you review any video associated
19  with any of these events?
20         A.      No, ma'am.
21         Q.      Did you look at anything outside of
22  the EIS report that would have been generated?
23         A.      No, ma'am.
24         Q.      Okay.  Did you discuss the EIS
25  report with anybody when you generated this?

1     A.     No.  Other than I -- like I said in

2  the previous ones, I probably touched base with

3  Trooper Pichon at some point today and I reviewed

4  these and everything looks good.  Again, I

5  don't -- in the EISs I reviewed, I don't remember

6  them requiring my opinion at the time, any kind

7  of counselling tone, you know, type meetings --

8     Q.     Okay.

9     A.     -- but -- I don't remember.  I

10  couldn't tell you a specific meeting that I had.

11     Q.     And in the -- in the disposition

12  section, it says, "Each incident described above

13  is debriefed with Trooper Pichon, supervisors,

14  and all troopers involved in the incidents."

15          Did that debriefing, did that happen

16  altogether as a -- as a group or did you have

17  separate meetings with each of those?

18     A.     Probably not.  I would have likely

19  been in the office with the other supervisors and

20  they knew I did a review, and then when --

21  when -- you know, usually if the trooper comes in

22  for rollcall, I'll catch them at the end of

23  rollcall or -- or something like that.  So it --

24  it's -- I don't remember specifically, but it's

25  unlikely that I had everybody at the same exact



 1   time.

 2        Q.    Okay.  And this indicates no further

 3   action taken, correct?

 4        A.    Correct.

 5        Q.    Okay.  Do you recall having any

 6   discussion with Captain Naquin and Major Sansone

 7   or anybody else for a corrective action plan?

 8        A.    No, ma'am.  A copy of this would

 9   have went to the captain, but I don't recall

10   speaking with him on anything.

11        Q.    Okay.  Okay.  So generally can you

12   tell me -- well, let me ask this.  Do you know

13   Trooper Jeffrey Roach?

14        A.    I know Trooper Roach.  Not fairly

15   recently, I don't know him really personally.  I

16   know he's a relatively new trooper, but I know

17   who he is to that extent.

18        Q.    How do you know who he is?

19        A.    I just -- he just -- he works --

20   he -- I know him now from working in our gaming

21   division and -- but he works I believe physically

22   at the -- at a casino, but I'll see him from time

23   to time and I've been introduced to him, but I

24   haven't had a previous relationship with him

25   before becoming a state police.



1    Q.    Okay.  We hear he has a lovely

2    office in the basement of Harrah's.

3    A.    Well, that's -- that's -- they do

4    have a basement over there, but I was assigned

5    there one time, but it's been quite -- quite a

6    while since I've been in the --

7    Q.    So have you ever -- aside from sort

8    of that -- that limited interaction in the gaming

9    division, have you ever had any other

10   professional or personal interaction with

11   Trooper Pichon or Trooper Roach?

12   A.    No.  I've -- I've been -- I -- I

13   think since he came on, I've been on one scene

14   where I was assisting another section where we

15   were both just kind of assisting and just kind of

16   casual conversation, never been a part of any

17   sort of enforcement activity.  We -- you know, I

18   was on the scene for a search warrant with

19   another investigative team where he was at and

20   asked to assist and we just kind of informally

21   met out there, but -- but a very -- probably less

22   than five interactions with him, you know, just

23   here and there.

24   Q.    Okay.  And in those interactions,

25   what are your impressions of him?

```
 1          MR. CANIZARO:
 2               Object to form.
 3          MS. CUMMING:
 4               Go ahead.
 5          THE WITNESS:
 6               Oh, I'm sorry.  Just -- just the
 7          format.  No.  He seems like a nice -- you
 8          know, I get along with him.  He's -- you
 9          know, I mean, he seems -- seems like a
10          nice guy.  He's always been professional
11          when I've been around him.
12     BY MS. CUMMING:
13          Q.   Okay.  Did you have any interactions
14     with him when he was working detail or overtime
15     shifts with Troop N?
16          A.   No.
17          Q.   Okay.  Do you know if he did that
18     frequently?
19          A.   No.  I'm not a -- I'm not a -- well,
20     I don't remember -- I don't know when he came on
21     exactly, but I don't -- I don't physically
22     remember meeting him while I was assigned to
23     Troop N at all.
24          Q.   Okay.  What about Trooper Pichon,
25     you -- you are currently his supervisor; is that
```



1   correct?

2        A.    Correct.

3        Q.    Okay.  What is the history of

4   your -- your relationship with Trooper Pichon?

5        A.    Trooper Pichon, the first -- the

6   first time I think I ever met Trooper Pichon is

7   when we worked for the New Orleans Police

8   Department.  I used to work the Saints games as

9   a -- just an off-duty detail and I met Troy

10   Pichon here and there.  There's been times when I

11   was assigned to a similar section and just -- I

12   just kind of met him informally that -- so I

13   didn't -- before he came on the state police, I

14   hadn't met him.  I didn't -- I didn't really know

15   him.

16          And then when I was at Troop N, I

17   met Troy or I seen Troy down there and I was

18   like, yeah, yeah, because when we met, I think he

19   was maybe in the process of state police at the

20   time I met him at the -- at the Saints game, and

21   then I -- next time I saw him, he was -- you

22   know, he's on with state police.

23          And so I got to know him a little

24   bit at Troop N, and then -- and then -- but while

25   I was at Troop N, he was transferred to our --



1  our narcotics division and now presently that's

2  one of the sections I'm responsible for, so -- so

3  we now work -- he works under my umbrella, so to

4  speak.

5          Q.    Uh-huh (affirmatively).

6          A.    I guess you could call it that way.

7          Q.    Okay.  So when you say he was at

8  Troop N, was he actually ever assigned to

9  Troop N?

10          A.    If I remember, Troy Pichon came from

11  Troop B to Troop N, but I -- by the time they --

12  again, it's kind of a designation.  By the time

13  they designated a Troop N, I think he had been

14  transferred to BOI, so I don't think he ever was

15  designated as N, whatever.  I think he -- when he

16  was down there assigned to whatever, you know, we

17  called it previously, New Orleans Enforcement

18  Details they had from Troop B, from Troop B.  So

19  yeah, he was in the -- you know, in that sense

20  when it was prior, I think he left prior to them

21  calling it Troop N, if that makes sense.

22          Q.    Okay.  And so would that have been

23  also prior to you coming -- coming in as a

24  lieutenant at Troop N?

25          A.    No.  It would have -- I -- I -- I --



1  they -- they started -- they -- it became Troop N

2  while I was there, so it -- I got there shortly

3  before the whole designation of Troop N.

4       Q.   Okay.  All right.  So there was --

5  if I got the timeline correct, there was a period

6  of time where Trooper Pichon was actually

7  assigned to New Orleans and you were also a

8  lieutenant at New Orleans?

9       A.   Correct.

10      Q.   Okay.  All right.  And do you -- do

11 you recall when it was that -- that

12 Trooper Pichon was not -- was moved from his

13 assignment at -- in New Orleans to -- to BOI?

14      A.   Not exactly.  My guess would be

15 maybe early 2017, but that would be guessing.  It

16 was when I was -- when I was still down there

17 prior to the plainclothes thing I was involved

18 in, so probably early 2017 would be just a guess,

19 would be an educated guess.

20      Q.   Okay.  So you -- you were sort of

21 aware of and kind of knew Trooper Pichon when he

22 was -- he was at NOPD prior to -- to the coming

23 to state police, correct?

24      A.   Yeah.  I just met him when he was

25 with the NOPD.  I never did -- I never did



```
 1   encounter him at work, just I met him while we
 2   were working this or while he was working the
 3   Saints game.
 4        Q.    Uh-huh (affirmatively).
 5        A.    When -- when -- state police, we
 6   had -- we had some assignments inside and we
 7   would rove the -- the outside the -- the
 8   different areas of the -- of the -- the seating
 9   areas and I would -- I would stop and -- and talk
10   with the different New Orleans police officers
11   that were on fixed posts in there and say, hey,
12   do you need anything, just kind of touched base
13   with them.  And I kind of just casually would run
14   into him at those Saints games, but I never
15   worked in a -- like a joint operation or anything
16   like that on -- on the actual work, you know, but
17   I did meet him on a detail.
18        Q.    Did he ever talk to you about --
19   about joining the state police?
20        A.    Like I think he had mentioned that
21   he -- I think he may have been somewhere in the
22   process that, you know, it just came up that he
23   was interested in applying for state police.
24        Q.    Did -- did he give you any
25   indication, did you-all talk about why he was
```



1    interested?

2           A.    I don't remember going that far with

3    it, too in depth.

4           Q.    So, and what are your -- what are

5    your impressions of Trooper Pichon?

6           A.    My personal -- my personal opinion

7    is Troy Pichon is -- I've been a police officer

8    for 27 years; and I know everybody's got a job to

9    do, but in 27 years, Troy Pichon is probably the

10   best street police officer I have ever met.

11   Barring the 27 years I've been a New Orleans

12   police officer, I've been a Gulfport police

13   officer, I've been a state trooper, I've worked

14   undercover, I've been in dangerous situations,

15   Troy Pichon's the kind of guy, if he gets off

16   work at 6:00 o'clock and somebody's doing wrong

17   at 5:59, Troy don't look the other way.  You

18   know, he's going to -- he's going to take action

19   and do what he's got to do.  I think the world of

20   the guy.  I think he's -- like I said, he's one

21   of the best instinctive police officers.  He's

22   going to -- he's going to find the bad guys.

23   He's not going to look the other way.  If it's

24   time for lunch and he sees a bad guy, he's

25   missing lunch if he's supposed to go somewhere



1    after.

2            So Troy Pichon is as good as they

3    come.  I think the world of him and I would trust

4    him with my life.  That's the way I feel about

5    him personally --

6          Q.    Uh-huh (affirmatively).

7          A.    -- so --

8          Q.    Okay.  And what about

9    Captain Naquin, can you tell me a little bit

10    about your -- your history with him?

11          A.    Yeah.  Captain Naquin, I actually

12    did not know Captain Naquin.  I knew of him

13    because he -- he was the -- he was the captain of

14    Troop C, which is Houma; and I rarely worked --

15    with the exception of some brief times in

16    detectives, I -- I didn't work down there a lot,

17    so I didn't know Captain Naquin when he became

18    the -- the Troop N commander, so he actually --

19    so I interviewed with -- for -- when I applied

20    for lieutenant.

21            So I was like I've been around --

22    around the New Orleans area for a million years;

23    everybody knows me well; I'm going to interview

24    with the one guy who's a complete -- I'm a

25    complete stranger to.



866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

```
 1          Q.     Uh-huh (affirmatively).
 2          A.     But -- but I felt good about the
 3   interview and I got -- you know, I ended up
 4   getting a lieutenant's position down there and I
 5   feel he's a very level headed guy as the -- as
 6   the captain.  I'm not with him constantly, but
 7   I -- I feel I have a very good rapport with him
 8   and I think he's a -- I think he's an excellent
 9   leader and excellent supervisor.
10              But, again, up until that
11   assignment, I didn't -- I didn't go to work with
12   him before that; but -- but Major Naquin --
13   Captain Naquin is a -- is a very good, effective
14   leader in my opinion.
15          Q.     Okay.  You said that you were not --
16   because he was -- he was the captain, you were
17   not really with him.  What -- what was -- what
18   was he doing in New Orleans?
19          A.     Oh, I mean -- I mean on a -- on a
20   basic night, say, if I worked, you know, noon --
21   if I worked late at night or something like that,
22   I didn't; but I -- I -- we -- we did interact
23   quite a bit during daytime hours if I had to go
24   to the different meetings and things like that;
25   but it wasn't like a -- it's not like a -- you
```



1  know, like a partner that you are in a car with
2  every day.  He was the troop commander.
3        Q.    Uh-huh (affirmatively).
4        A.    You know, so it's not like every day
5  everything he -- he was primarily doing, I guess,
6  like the big picture stuff, like meeting with the
7  8th District and things like that; but, I mean, I
8  did see him quite often, but I tend to work later
9  hours being -- being responsible for a shift.
10  And as the troop commander, he -- he had more
11  like the daytime meetings and things into that
12  nature; but -- but whenever -- whenever we had
13  like a festival type thing, you know, your Bayou
14  Classic, your -- you name it --
15        Q.    Uh-huh (affirmatively).
16        A.    -- you know, the cucumber festival
17  or whatever's going on that weekend, he would
18  work -- he would work late on those -- on those
19  occasions.  But so I had a good rapport with him.
20  I just didn't know him that well before that, and
21  he's from kind of a different -- that -- the
22  bayou, so to speak, and then so -- but -- but
23  we've -- I've gotten to know him since then and
24  I'd consider him a friend at this point.
25        Q.    And what about we -- we haven't



1  really -- really talked too much about him, but

2  now captain -- Captain Williams,

3  Derrell Williams, what is your history with him?

4        A.    Yeah.  I don't -- I don't know

5  Derrell Williams well, other than over the years

6  he's had different capacities at the training

7  academy.  So I think he was probably there when I

8  got tased when we spoke about that earlier and --

9  and -- and just things like -- like that.

10        Q.    Do you hold that against him?

11        A.    Yeah.  Yeah.  I'm scarred for life.

12  But he -- but no, he -- I don't know exactly

13  what -- what -- I don't know where he -- he

14  worked initially when -- before he was a trained

15  academy guy, but I -- he would know me if he saw

16  me, but it's just like from training situations

17  and being in Baton Rouge.  I've never worked any

18  kind of real life things with him.

19        Q.    Do you have any impressions of him?

20        A.    He seems like a very nice, cordial

21  guy.  I don't know much about him, but he's

22  always very pleasant when I see him out here in

23  the -- in the street and stuff.  I -- he's -- I

24  think he's -- you know, once I got to know him, I

25  think he was already kind of in the supervisor



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    world and stuff, but he's a -- he's a nice guy.

2          Q.    Okay.  All right.  And just

3    generally, what did you do to prepare for the

4    deposition today?

5          A.    Well, it's been a very busy week and

6    I tried to come in June, but since you-all wasn't

7    having that, I really didn't prepare at all.  I

8    did -- I did -- I did -- I did briefly look at

9    the report that I thought that this was -- that

10   this centered around just to kind of familiarize

11   myself with -- with what that was.

12         Q.    Uh-huh (affirmatively).

13         A.    But that was about it.

14         Q.    Okay.

15         A.    I briefly talked to Major Naquin

16   and -- and -- and not about any details about

17   what happened, but just, you know, see if I had

18   to pack a lunch or it was going to be a light

19   day.  So I just -- you know, just to kind of get

20   an idea about -- about, you know, where -- what

21   the details were about coming down and stuff; but

22   I didn't -- I didn't -- I really didn't know too

23   much of the scope of it, but I knew in general

24   the -- the incident that it was centered around.

25         Q.    Uh-huh (affirmatively).



1   A.   So --
2   Q.   So prior to reviewing the report for
3   the deposition, did you have any memory of
4   this -- of the incident?
5   A.   No, I didn't.  I did not.
6   Q.   Okay.
7   A.   I don't -- I'm not sure exactly when
8   it happened, but I -- I don't think I was around
9   that night or if it -- if it was a Troop N thing
10  and I was there, I might have been off or I -- I
11  didn't know -- I didn't have any personal
12  knowledge of it.
13  Q.   Okay.  All right.  And do you recall
14  when you -- when you first heard about this
15  lawsuit?
16  A.   I think I did hear -- I did -- I did
17  hear -- I don't know about the specifics.  I
18  think just in my -- in my daily workings up
19  there, I think I heard that there was one, but
20  I -- I didn't know like the exact details or
21  anything like that.
22  Q.   Uh-huh (affirmatively).
23  A.   So --
24  Q.   Have you heard about other lawsuits?
25  A.   Yeah.  I know of there being a -- I



1   know there was another incident that is -- that
2   was some proceedings and stuff about some of my
3   guys had to go testify on that, but I don't
4   recall exactly what -- what it was about.
5   Something I wasn't involved in, but I know -- I
6   don't know if it was this apparatus or -- or
7   another place of business that -- that
8   prompted --
9           Q.    Apparatus.  I like that.
10          A.    -- prompted that, but I know there
11  was some other incident where some of our
12  narcotics guys had to testify.
13          Q.    Okay.  And are you aware of any
14  actions that have been taken as a result of -- of
15  any previous lawsuits to this litigation?
16          A.    No.  No, ma'am.
17          Q.    Okay.  And you mentioned that you --
18  you kind of touched base with captain -- is he
19  major now?
20          A.    Yes, he is a major.
21          Q.    Oh.  Oh, okay.
22          A.    Yeah, yeah, he's a major.
23          Q.    All right.  I demoted him without
24  meaning to.  Major Naquin, who I'm sure told you
25  that we have three heads and spit fire?




866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    A.    No.  He was actually -- I don't
2  know.  He's not that kind.
3    Q.    Okay.
4    A.    He's -- he's laid back, but he --
5  like I said, we didn't -- we didn't talk about
6  specifics --
7    Q.    Okay.
8    A.    -- just that, you know, you probably
9  going to be there for a while.  They just going
10  to ask you a whole bunch of different --
11  different things, you know, so -- which I knew,
12  you know.  I mean, I've been in court before and
13  stuff.
14    Q.    Okay.  Did you -- did you talk with
15  any of the other defendants in this action?
16    A.    No.
17    Q.    Okay.  And I'm not asking for
18  content, but did you have any preparation
19  sessions with counsel prior to this deposition?
20    A.    No.
21    Q.    Okay.
22    A.    Oh, no.  Wait.  I'm -- I'm sorry.
23    Q.    Uh-huh (affirmatively).
24    A.    Mr. Greg did call me and --
25  yesterday to -- to just to touch base with me



```
1   because he wasn't going to -- going to be here or
2   something like that.
3           Q.    Okay.
4           A.    And so we had that meeting.
5   MR. CANIZARO:
6               He means Mr. Greg --
7   MS. CUMMING:
8               Greg Fahrenholt.
9   THE WITNESS:
10              Yeah.  I just thought of it now.
11  I'm sorry.
12  MS. CUMMING:
13              Yeah.
14  THE WITNESS:
15              Greg.  But -- but yesterday I spoke
16          with him very briefly, but quite honestly,
17          I was in the middle of a bunch of other
18          stuff and it was a very brief phone call.
19          He said you have to --
20  MS. CUMMING:
21              Okay.
22  THE WITNESS:
23              So it was -- it wasn't too much of a
24          session.
25  BY MS. CUMMING:
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Okay.  And any contacts with any
 2    other lawyer from the state police?
 3          A.    No.  Just other than them telling me
 4    that I had to come.
 5          Q.    Okay.  And you are -- you are
 6    motioning to Ms. Jennifer Murray?
 7          A.    Ms. Jennifer, yeah.  Ms. Jennifer
 8    did reach out to me via e-mail.
 9          MS. CUMMING:
10               Okay.  Let's go off for just a
11          second while I confer with my --
12          MS. MURRAY:
13               Elizabeth, before you go, let me
14          make sure.  You want me to find the use of
15          force reports that generate --
16          MS. CUMMING:
17               The --
18          MS. MURRAY:
19               -- the EIS summaries; is that --
20          MS. CUMMING:
21               The E -- so what the testimony was
22          today, my understanding, and we are on the
23          record and -- and we have the witness
24          here, so correct me if I'm wrong, but
25          the -- there is an EIS report that gets
```



```
 1          generated after any kind of --
 2     MS. MURRAY:
 3          EIS.
 4     MS. CUMMING:
 5          -- EIS indicator incident.
 6     MS. MURRAY:
 7          Okay.
 8     MS. CUMMING:
 9          And so what we are asking for is the
10     EIS report that was generated that was
11     used by Lieutenant Bradley or any other
12     lieutenant used to generate an EIS review.
13     MS. MURRAY:
14          Okay.  Okay.
15     MS. CUMMING:
16          Okay.
17     MS. MURRAY:
18          And, if I'm recalling correctly, we
19     are talking about like January 1st, 2015
20     like to the end of 2017 in the original
21     subpoena?
22     MS. CUMMING:
23          I need to look back at the original
24     subpoena.
25     MS. MURRAY:
```



```
 1              Okay.
 2         MS. CUMMING:
 3              I'll look at that and tell you
 4         before we leave.
 5         MS. MURRAY:
 6              Okay.
 7         MS. CUMMING:
 8              Let's go off the record real quick
 9         while I confer with my co-counsel, but I
10         think we are on the homestretch.
11       (A short recess was taken.)
12         MS. CUMMING:
13              We have no further questions for
14         you, Lieutenant.  Your counsel may.
15         MR. CANIZARO:
16              You have any?
17         MS. MURRAY:
18              No.  I'm good.
19   EXAMINATION BY MR. CANIZARO:
20         Q.    All right.  One thing I wanted to
21   clear up.  You were questioned about Exhibit 30
22   and Exhibit 31, these other reports?
23         A.    Yes.
24         Q.    Your testimony, as I recalled it,
25   you -- you used the word "borderline" and -- and
```



1    "discretionary."  Were you -- when you used those

2    terms, were you referring to the use of force

3    itself or were you referring to the need for a

4    Use-of-Force Report to be generated from --

5          A.    I was referring to the -- the need

6    to generate a Use-of-Force Report.

7          MR. CANIZARO:

8                Okay.  That's all I need to clear

9          up.  Thank you.

10         THE REPORTER:

11               Read and sign?

12         MS. MURRAY:

13               Yes.

14      (The deposition was concluded at 4:38 p.m.)

15

16

17

18

19

20

21

22

23

24

25



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1          CORRECTION SHEET

2

3     PAGE        LINE DESCRIPTION

4     _____       _____  _____

5     _____       _____  _____

6     _____       _____  _____

7     _____       _____  _____

8     _____       _____  _____

9     _____       _____  _____

10    _____       _____  _____

11    _____       _____  _____

12    _____       _____  _____

13    _____       _____  _____

14    _____       _____  _____

15    _____       _____  _____

16    _____       _____  _____

17    _____       _____  _____

18    _____       _____  _____

19

20    WITNESS:  LIEUTENANT PATRICK BRADLEY

21    TAKEN ON: MAY 31, 2019

22    BY:       CHERIE' E. WHITE, CCR (LA NO. 96002)

23              CSR (TX NO 10720)

24              CSR (MS NO. 1514)

25              RPR (NATIONAL NO. 839452)



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1                    WITNESS CERTIFICATE

 2

 3

 4        I, LIEUTENANT PATRICK BRADLEY, do hereby

 5   certify that the foregoing testimony was given by

 6   me, and the transcription of said testimony, with

 7   corrections and/or changes, if any, is true and

 8   correct as given by me on the aforementioned

 9   date.

10

11

12

13   _____   _____

14   DATE SIGNED           (Witness' Signature)

15

16

17

18        Signed with corrections as noted.

19

20        Signed with no corrections as noted.

21

22

23

24

25   DATE TAKEN: May 31, 2019
```



866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

REPORTER'S PAGE

I, CHERIE' E. WHITE, Certified Court
Reporter, in and for the State of Louisiana, the
officer, as defined in Rule 28 of the Federal
Rules of Civil Procedure and/or Article 1434(B)
of the Louisiana Code of Civil Procedure, before
whom this sworn testimony was taken, do hereby
state on the record;

That due to the interaction in the
spontaneous discourse of this proceeding, dashes
(--) have been used to indicate pauses, changes
in thought, and/or talkovers; that same is the
proper method for the court reporter's
transcription of a proceeding, and that dashes
(--) do not indicate that words or phrases have
been left out of this transcript; also, that any
words and/or names which could not be verified
through reference material have been denoted with
the phrase "(spelled phonetically)."


CHERIE' E. WHITE, CCR(LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1              REPORTER'S CERTIFICATE

 2

 3         This certification is valid only for a

 4    transcript accompanied by my original signature

 5    and original seal on this page.

 6         I, CHERIE' E. WHITE, Certified Court

 7    Reporter, in and for the State of Louisiana, do

 8    hereby certify that Lieutenant Patrick Bradley,

 9    to whom the oath was administered, after having

10    been duly sworn by me upon authority of R.S.

11    37:2554, did testify as hereinbefore set forth in

12    the foregoing 355 pages; that this testimony was

13    reported by me in the stenotype reporting method,

14    was prepared and transcribed by me or under my

15    personal direction and supervision, and is a true

16    and correct transcript to the best of my ability

17    and understanding; that I am not related to

18    counsel or the parties herein, nor am I otherwise

19    interested in the outcome of this matter.

20

21

22         CHERIE' E. WHITE, CCR (LA NO. 96002)

23         CSR (TX NO. 10720)

24         CSR (MS NO. 1514)

25         RPR (NATIONAL NO. 839452)
```



866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799